Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                           Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 16-cv-6848 (DLI)(VMS)

**DECLARATION OF MICHAEL E. BAUM IN SUPPORT OF THE RECEIVER'S APPLICATION FOR AN ORDER AUTHORIZING THE ARABELLA SETTLEMENT AGREEMENT**

I, Michael E. Baum, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am senior counsel at Schafer and Weiner, PLLC ("S&W").  I am over 18 years old and a member of the bar of the State of Michigan.  I make this declaration in support of the application of Bart M. Schwartz, the court-appointed Receiver in this case, for an order approving the Arabella Settlement Agreement.[1]

2.      The information set forth in this declaration is based on my personal knowledge, information provided to me by my colleagues at S&W, and information contained in depositions and documents produced in the various Arabella matters described in this declaration.

<u>INTRODUCTION</u>

3.      In August 2015, S&W was retained by Platinum Partners Credit Opportunities Master Fund, LP ("PPCO") in connection with disputes relating to a secured loan that PPCO

---

[1] Capitalized terms which are not defined herein are defined in the Declaration of Bart M. Schwartz dated April 25, 2017 (the "Schwartz Declaration").

made to a Cayman Islands company called Arabella Exploration, Inc. ("AEI").[2]  Through its

subsidiaries, AEI was involved in oil and gas investments in Texas.[3]  PPCO is now a

Receivership Entity.  After the Receiver's appointment, S&W and the other lawyers who were

representing PPCO in connection with Arabella matters continued to do legal work in those

matters on the understanding, common in receivership cases, that the Receiver would seek this

Court's permission to retain us *nunc pro tunc* to the date of his appointment.  I understand that

the Receiver is not seeking approval of the retention of S&W at this time, but will soon do so in

a separate application to this Court.

4.      As I discuss below, S&W has been representing PPCO in matters in six different

courts relating to the Arabella Loan.  I am the S&W lawyer principally responsible for the

representation of PPCO in those matters, and am fully familiar with the matters described in this

declaration.

5.      The principal purpose of my declaration is to explain a settlement agreement

reached in late March 2017, after a court-supervised mediation in Texas (the "Arabella

Settlement Agreement").  A copy of the Arabella Settlement Agreement is attached hereto as

Exhibit A.  The Arabella Settlement Agreement is subject to the approval of this Court and three

bankruptcy courts.  In my judgment, the Arabella Settlement Agreement will confer a significant

benefit on the Receivership Estate under circumstances where the Receivership Estate could

have lost all value in this secured position.  Accordingly, I recommend that the Court approve the

Arabella Settlement Agreement.

---

[2] I understand that PPCO was referred to me by one of my clients.  Neither I nor any person at S&W had any prior relationship with Platinum or any of its principals and do not now have any relationship with Platinum or its principals other than the attorney-client relationship described in this declaration.

[3] PPCO acted through its subsidiary Platinum Long Term Growth VIII, LLC ("PLTG8"), who acted as PPCO's agent in connection with the Arabella Loan (as defined below).  As used in this declaration, "PPCO" refers collectively to PPCO and PLTG8.

## THE ARABELLA LOAN[4]

6.      In September 2014, PPCO advanced $16,000,000 (including prepaid interest) to AEI, which was publicly traded over-the-counter in the Pink Sheets under the ticker symbol "AXPLF," as part of a $45,000,000 credit facility (the "Arabella Loan"). The Arabella Loan was secured by all of AEI's assets and guaranteed by AEI's Texas subsidiaries including, without limitation, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and together with AEX and AEI, the "Arabella Entities"). The AEX and AO guarantees were secured by all the assets owned by AEX and AO – primarily consisting of various oil and gas interests. The Arabella Loan was a complex, sophisticated secured transaction, and involved numerous agreements and documents, including a Securities Purchase Agreement, a Senior Secured Note Agreement, a Security and Pledge Agreement, and two documents (one to secure collateral in each of two counties) titled Deed of Trust, Security Agreement, Assignment of Production, Financing Statement and Fixture Filing.

7.      Except for two payments toward interest in April and May 2015, AEI did not repay any part of the Arabella Loan before it defaulted by failing to make its June 2015 payment. In July 2015, PPCO formally declared AEI in default. At the time, the unpaid obligations under the note were approximately $16,500,000. PPCO issued a second default notice in January 2016, at which point the unpaid obligations had grown to approximately $18,400,000.

8.      As I describe below, PPCO's interest in the property of AEI, AEX, and AO (the "Arabella Interests") was challenged because of the manner in which they obtained ownership of

---

[4] My description of these transfers and the various claims made regarding them is based on the court proceedings described in this declaration. My description of these matters is not an admission by the Receiver or any of the Receiver's professionals with respect to those matters, but rather a description of the allegations made by the various disputants.

the property that was used to secure the Arabella Loan.  As a consequence, PPCO has not been able to recover against any of its collateral.

## The Transfers from APC to AEX

9.      Prior to, and at the time of the Arabella Loan, Arabella Petroleum Company, LLC ("APC"), was managed by Jason Hoisager, who was also the sole member of APC.  Mr. Hoisager was a large shareholder of AEI and its president and CEO.  Mr. Hoisager was also the manager of AEX and AEX was the manager of AO at the time of the Arabella Loan.  *See* Exhibit B (Excerpts from 2004 Examination Jason Hoisager at pp. 185, 189-190, 250).

10.     In April 2013, prior to the Arabella Loan, APC transferred certain property rights and working interests to AEX and approximately thirty other individuals or interest partners (the "Arabella Working Interests").  *See* Exhibit B (Excerpts from 2004 Examination Jason Hoisager at pp. 23-37).

11.     Approximately 50% of the Arabella Working Interests were transferred by APC to AEX in exchange for AEX's assumption of a $6 million note.  *See* Exhibit C (Excerpts from SEC Form 20-F at pp. F-10 – F-11, F-30).  *See* also ¶ 17, *infra*.

## The APC Bankruptcy Filing and PPCO's Hiring of the Arabella Professionals

12.     On July 15, 2015, APC filed a voluntary petition for bankruptcy protection under title 11 of the United States Code, §§101 *et seq*. (the "Bankruptcy Code")  in the U.S. Bankruptcy Court for the Western District of Texas, Midland Division, Case No. 15-70098-RBK (the "APC Bankruptcy Case").  Upon information and belief, APC's filing was unrelated to PPCO or the Arabella Loan.[5]

---

[5] AEI's default, and the actions that PPCO took as a result, are described in ¶¶ 32-37 *infra*.

13.     On August 20, 2015, upon motion of the official committee of unsecured creditors of APC (the "APC Committee"), the APC Court appointed Morris D. Weiss as Chapter 11 Trustee of APC (the "Chapter 11 Trustee").

14.     After APC filed its bankruptcy case, PPCO retained S&W.  PPCO also retained Kessler Collins, P.C. ("Kessler") in Dallas, Texas, with whom S&W worked on a regular basis, as PPCO's local counsel, and it retained O'Connell Law PLLC ("O'Connell") to provide counsel with respect to oil and gas issues.  S&W, Kessler and O'Connell are referred to herein collectively as the "Arabella Professionals."

### THE APC ADVERSARY PROCEEDING

15.     On February 29, 2016, the Chapter 11 Trustee filed an adversary proceeding in the APC Bankruptcy Case (Adv. Proc. No. 16-07002-RB) against PPCO, AEI, AEX, AO, and Mr. Hoisager, among others (the "APC Adversary Proceeding") [APC Bankruptcy Case Docket No. 235].  In the APC Adversary Proceeding, the Chapter 11 Trustee alleged, among other things that:

    i.    the transfer of oil and gas interests and the operations from APC to AEX and AO was a fraudulent conveyance and should be avoided;

    ii.   the security interests that AEI, AEX and AO granted to PPCO should be avoided because PPCO knew, *or should have known*, of the fraudulent conveyance from APC to AEX;

    iii.  the APC bankruptcy estate was owed money for certain joint interest billings (i.e., oil and gas operations-related expenses) that had not been paid by AEX; and

    iv.   the forgoing unpaid expenses constituted a priority lien impressed upon PPCO's collateral.

16.     The claims asserted in the APC Adversary Proceeding posed a serious threat to the Arabella Interests.

A. **The Fraudulent Conveyance Claim**

17.     The Chapter 11 Trustee alleged that the transfer of a portion of the Arabella Working Interests from APC to AEX was fraudulent because APC did not receive reasonably equivalent value for the transfer.  The Chapter 11 Trustee alleged that the only consideration paid by AEX was an increase in the amounts booked as due to APC under an agreement between the entities, which was later recharacterized as $3 million of equity in AEX issued to Mr. Hoisager, and the assumption by AEX of an approximate $3 million note issued from APC to Mr. Hoisager.  Thus, according to the Chapter 11 Trustee, APC received no consideration for the transfer of a portion of the Arabella Working Interests to AEX, as the consideration flowed directly to Mr. Hoisager.

18.     As a subsequent transferee, PPCO could have prevailed on the fraudulent conveyance claim even if the underlying transfer was a fraudulent transfer.  To do so, PPCO would have had to prove either (1) that it entered into the Arabella Loan in good faith, for value, and without knowledge of the alleged underlying fraud, or (2) that its interest in the Arabella Loan should be maintained as a result of the expenditures PPCO made to satisfy liens and potential liens and thereby improve the value of AEX's property.  These are affirmative defenses on which PPCO bore the burden of proof.  To prevail on the first affirmative defense, PPCO needed to prove the good faith and lack of knowledge of Platinum personnel including Mark Nordlicht (who is currently under indictment and unlikely to testify in connection with the APC Adversary Proceeding).  To prevail on the second, PPCO needed to show that the money it advanced to AEI was used to improve the value of the property through the payment of debts secured by liens.  PPCO was likely to be able to show that some, of the loan proceeds were used in this fashion, but it was not likely to be able to show that all of the loan proceeds were so used.

19.     If the Chapter 11 Trustee was successful in the APC Adversary Proceeding against PPCO, PPCO would have lost substantially all interests in its collateral.

**B.   <u>The JIB Claim</u>**

20.     The Chapter 11 Trustee also brought a claim for unpaid expenses, which would have created a priority lien against the Arabella Interests.  Typically, in oil and gas operations, all of the working interest owners with respect to an oil and gas prospect area execute a joint operating agreement ("JOA") whereby one of the working interest owners or an affiliated company of a working interest owner, acts as an operator.  A JOA sets out the rights and obligations of the working interest owners and the operator.  There was a JOA between AEX and the other owners of the Arabella Working Interests (the "Arabella JOA").

21.     Originally, APC was both the owner of the Arabella Working Interests as well as the operator of the wells.  The transfer from APC to AEX and the other owners of the Arabella Working Interests contemplated a transfer of all of the operations to AO.

22.     The transfer of the Arabella Working Interests took place at or about the same time deeds of trust were executed by AEX in connection with the Arabella Loan (the "Deeds of Trust").  However, *operation* of the wells was not transferred to AO until the last quarter of 2015.  As a result, different entities owned the right to operate the wells, and the property rights in those wells.

23.     Between the time that Arabella Working Interests were transferred to AEX and other owners and the time that the operation of the wells was transferred to AO (the "APC Interim Operating Period"), APC claims to have incurred millions of dollars of expenses in operating the wells for which APC had not been reimbursed by the various Arabella Working Interest owners, including AEX and AEI.

24.     The JOA obligates the working interest owners to pay their share of day to day operating expenses. Once a month the operator generates invoices detailing these expenses and sends them to the working interest owners.  These statements are referred to as a joint interest billings ("JIBs").  The failure to make a JIB payment may give rise for a lien under the express terms of the parties' JOA.

25.     Based upon the schedules filed by APC, the Chapter 11 Trustee claimed in the APC Adversary Proceeding that AEX was indebted to APC in the amount of $3,194,968.18.[6]

26.     The Chapter 11 Trustee further claimed the collateral granted in connection with the Deeds of Trust was subject to a first priority lien by the Chapter 11 Trustee for the failure to make such JIB payments (the "JIB" or "Operator's Lien").  These allegations, if proved, would have created a secured interest with priority over the Arabella Interests.  Accordingly, even if AEX prevailed in defending against the fraudulent transfer action, a multi-million dollar lien would need to be cleared before the Arabella Interests could be monetized if the Chapter 11 Trustee succeeded on the JIB Claim.

### FOUNDERS' CLAIMS AGAINST AEX

27.     On June 1, 2016, during the APC Bankruptcy Case, the Arabella Working Interest owners elected Founders Oil and Gas Operating, LLC ("Founders") to operate various wells, including the oil and gas properties that were provided as collateral to PPCO in connection with Arabella Loan.

---

[6] The Statement of Financial Affairs ("SOFA") filed by APC in connection with its original Chapter 11 filing, APC listed at question B-16 approximately $5 million that was owed by all of the Arabella Working Interest owners (except AEX) and $3,194,968.18 that was owed by AEI.  *See* Exhibit D.  We believed this was a mistake in the SOFA because Arabella Exploration Inc. refers to a Cayman Islands company that never owned any of the Arabella Working Interests.

28.     Thereafter, Founders claimed that AEX received authority for expenditures

("AFEs") for work it did improving the property totaling $611,265.96.  Founders claimed that

these AFEs were sent between August 2016 and September 2016.  Founders claimed that:

> On November 8, 2016 Founders sent [AEX] a Non-Consent notice for the above
> referenced AFEs.  Pursuant to the JOAs, the non-consent charges associated with
> the AFEs are 500% of [AEX's] portion of the cost and expenses in the operations
> which is $3,056,329.80.  Additionally, Founders is owed $148,075.01 for
> [AEX]'s share of the lease operating expenses.

*See* Docket Number 35, filed in the AEX Bankruptcy Case (as defined below).

29.     In order to receive payment for the AFEs, on December 2, 2016, Founders

commenced litigation in the 143rd Judicial District Court of Reeves County, Texas (the

"Founders Litigation") seeking to foreclose on the Arabella Working Interests owned by AEX.

30.     In essence, Founders took a claim for approximately $600,000 (for services

rendered improving the property) and used that claim to allege that, under the Arabella JOAs,

AEX owed over $3,000,000 to Founders.  On that basis, Founders had placed liens against the

Arabella Working Interests.  Foreclosure on these liens would have destroyed PPCO's interest in

the Arabella Working Interests created through the Arabella Loan.

### THE MECHANICS' AND MATERIALMAN'S LIENS

31.     The Arabella Interests were also impacted by Mechanics' and Materialman's

Liens ("M&M Liens") in the face amount of $2.5 million.  The M& M Liens were placed on the

property by contractors and others who claimed to have performed work on the underlying

property.  Some portion of the M&M Liens likely reflected *bona fide* work performed by the

lienholders.  The M&M Liens had to be cleared (*i.e.*, paid or declared invalid) in order to effect a

sale of the Arabella Interests.  Under Texas law, M&M Liens are only valid where the work was

provided to the title owner of the property.  As discussed below, the Arabella Settlement

Agreement acknowledges that AEX has title to its portion of the Arabella Working Interests, thus allowing AEX to challenge the M&M Liens to the extent they reflect work performed at the request of APC and others.

<u>**THE AEI LIQUIDATION**</u>

32.     As discussed above, AEI failed to make payments to PPCO that were due under the Arabella Loan.  AEI's failure to make those payments constituted an Event of Default. PPCO notified AEI of the default in July 2015 and, after giving AEI time to remedy, declared that all unpaid obligations, plus fees and expenses, were immediately due and payable.

33.     As a result of AEI's default, PPCO was able to appoint Charles ("Chip") L. Hoebeke II of Rehmann Turnaround and Receivership Group as (a) the sole manager of AEX, and (b) the sole manager of AO.

34.     On May 19, 2016, PPCO placed AEI into a liquidation by filing its Winding Up petition in the Grand Court of the Cayman Islands ("AEI Court"), In the Matter of the Companies Law (2013 Revision) (As Amended) and In the Matter of Arabella Exploration, Inc., Cause No. FSD 72 of 2016, RMJ ("AEI Case").

35.     On June 16, 2016, the Cayman Court entered its Order appointing Christopher Kennedy and Matthew Wright, of RHSW Caribbean, 2nd Floor, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, Cayman Islands, as Joint Provisional Liquidators ("JPLs") of AEI.

36.     On July 7, 2016, the AEI Court entered a Winding Up Order appointing the JPLs as the Joint Official Liquidators (the "Cayman Liquidators") to wind up and liquidate AEI with, among others, the powers set forth in Part II of Schedule 3 of the Cayman Islands' Companies Law (2013 Revision).

37.     The Winding Up Order affirmed and ratified the appointment of Mr. Hoebeke as the person responsible to liquidate AEX and AO.  Mr. Hoebeke has also been appointed as the Chief Restructuring Officer (the "CRO") of AEX by the AEX Court in the AEX Bankruptcy Case.

## GUARANTY OF FEES

38.     After the motion to dismiss that we made on behalf of PPCO in the APC Adversary Proceeding on the ground that PPCO was not liable as a subsequent transferee of the alleged fraudulent transfer from APC to AEX was denied (which occurred on June 8, 2016), PPCO represented to me that it was having significant liquidity problems, and would be unable to pay S&W.

39.     On July 1, 2016, in order to reassure (and guaranty) that the Arabella Professionals and other professionals who were providing services to the Arabella Entities would be paid, PPCO entered into a Guaranty (the "Guaranty"), a copy of which is attached hereto as Exhibit E.

40.     On July 12, 2016, PPCO, AEX, and AO executed an amendment to the Guaranty (the "Amendment to Guaranty"), a copy of which is attached here to as Exhibit F.  The Amendment to Guaranty provided security for the Guaranty.  The Guaranty and the Amendment to Guaranty are referred to herein collectively as the "Guaranty of Fees."

## THE PARTICIPATION AGREEMENT

41.     On December 19, 2016, Bart M. Schwartz was appointed by this Court as the Receiver of PPCO and other entities.  Shortly after his appointment, on December 30, 2016, the Receiver, on behalf of PPCO, entered into a participation agreement (the "Participation

Agreement"), a copy of which is attached hereto as Exhibit G.  The Participation Agreement's effective date is December 28, 2016.

42.     Under the Participation Agreement, 30294, LLC, a Michigan limited liability company (the "Participating Purchaser") agreed to purchase 45% of PPCO's interest in the Arabella Loan in exchange for providing $500,000 to pay the Arabella Professionals, the fees of Mr. Hoebeke and Rehmann Turnaround and Receivership Group, and other professionals who had provided legal or other services to AEX and AEI. [7]  These funds were paid into a trust account controlled by S&W.

43.     As of the Participation Agreement, the Arabella Interests were under attack as a result of the APC Adversary Proceeding and the Founders Litigation.  The threat posed by the Founders Litigation was particularly acute, as Founders was on the verge of foreclosing its claimed liens.  In order to mount an effective defense against the Founders Litigation, action needed to be taken immediately.  In this regard, it is important to understand that the Founders Litigation was not a single case, but one of a number of state court proceedings in Texas.

44.     Although the Receiver Order contained a stay of litigation, I was concerned that arguing that the Founders Litigation was subject to that stay would not have protected PPCO because (1) I did not think it was clear that the AEX property at issue in the Founders Litigation was Receivership Property, (2) in any event, I believed Founders would claim that the AEX property at issue in the Founders Litigation was not Receivership Property, and (3) I believed that Founders would have been able to foreclose on some or all of the liens before PPCO would be able to establish that the Receiver Order stayed that litigation (assuming it did).  Given these uncertainties, I believed that the far safer course was for the Receiver to defend against the

---

[7] 30294, LLC is controlled by Craig Bush, a lawyer who is now a private equity investor.
https://www.linkedin.com/in/craig-bush-958a9651.

Founders Litigation, and so advised the Receiver's staff.  I also advised the Receiver's staff that if AEX filed for bankruptcy, AEX's property—including the collateral at risk because of the Founders Litigation—would be protected from foreclosure because of the automatic stay.

45.     I advised the Receiver's staff that defending against the Founders Litigation and putting AEX into bankruptcy required an immediate payment of $500,000 to pay a portion of the receivables owed to the Arabella Professionals and various professionals working for Arabella Entities, and/or to provide retainers for work going forward.  Over the long term, I expected that it would cost far more than $500,000 to effectively defend the Arabella Interests, and so advised the Receiver's staff.

46.     AEX did not have the cash needed to pay its professionals, including its counsel and Rehmann Turnaround and Receivership Group, to initiate a bankruptcy proceeding.  AEX and its professionals had incurred substantial fees and were unwilling to do additional work for AEX unless they were paid at least some of what they were owed, and a retainer for work going forward.

47.     The Arabella Professionals were in a similar position.  S&W, a bankruptcy boutique with eleven, could not continue to bear the strain of nonpayment for its work, nor was it in a position to advance PPCO's expenses.  When the Participation Agreement was being discussed, S&W had last received payment from PPCO in March 2016, and PPCO's outstanding balance due to S&W was over $400,000.  I advised the Receiver's staff that S&W, Kessler and O'Connell could not continue to work without being paid at least some of their past-due receivables.

48.     Because I understood that PPCO did not have sufficient cash to underwrite the actions I believed were urgently necessary to maintain the Arabella Interests for the benefit of

PPCO, Mr. Hoebeke and I approached multiple potential parties concerning investing in the Arabella Loan. We found only one party, the Participating Purchaser, willing to take that risk. At the time, given the Founders Litigation and other challenges, recovery on the Arabella Loan was far from certain, and it was seen as very possible that there would be no recovery for an investor. I therefore recommended that the Receiver enter into the Participation Agreement as the only viable approach to saving PPCO's Arabella Interests.

49.     As a result of the funding received through the Participation Agreement, Mr. Hoebeke, with the authority of the Cayman Liquidators, was able to file a voluntary petition for chapter 11 bankruptcy protection for AEX in the U.S. Bankruptcy Court for the Northern District of Texas, Fort Worth Division, Case No. 17-40120-RFN-11 ("AEX Bankruptcy Case") on January 8, 2017. This action protected AEX's assets in the face of total loss by foreclosure as a result of the Founders Litigation.[8]

50.     S&W received a $180,000 distribution from the $500,000 received under the Participation Agreement as partial payment of its past-due fees. The other Arabella Professionals received distributions of $20,000 each.[9] A significant portion of these payments were secured by virtue of the Guaranty of Fees.[10] The remaining $280,000 received under the Participation Agreement paid fees incurred by professionals working for AEX and AEI, made

---

[8] Additional work to protect the Arabella Interest has been undertaken subsequent to the AEX Bankruptcy Case. On April 4, 2017, AO filed a petition for bankruptcy protection under chapter 11 in the U.S. Bankruptcy Court for the Northern District of Texas, Ft. Worth Division, Case No. 17-41479-RFN (the "AO Bankruptcy Case"). AO also filed a Motion for Joint Administration with the AEX Bankruptcy Case (*See* AEX Bankruptcy Case Docket No. 138). In that Joint Administration Motion, AEX and AO request that Mr. Hoebeke be appointed to serve as the CRO of AO.

[9] Kessler and O'Connell had receivables of $30,000 and $70,000 respectively as of the Participation Agreement.

[10] I believe that all of these fees were secured. As the Schwartz Declaration notes, there is a difference of opinion concerning the Guaranty of Fees that the Receiver's counsel and I are currently discussing.

payment to AEX's counsel, and allowed for the payment of retainers in connection to the AEX Bankruptcy Case and the AEI Case, among other things.

### THE TAG-ALONG RIGHTS

51.     After PPCO entered the Participation Agreement, the Chapter 11 Trustee, as the person responsible in the APC Bankruptcy Case, and Mr. Hoebeke, as the CRO in the AEX Bankruptcy Case, were made aware of certain reversionary rights with respect to two tracts of property which allowed the owner of those reversionary interests the opportunity to tag-along with any sale by the majority working interest owners and to receive a pro-rata benefit of the sale price (the "Tag-Along Rights").  Neither I nor the other Arabella Professionals had previously been aware of the Tag-Along Rights.  The parties to the Arabella Settlement Agreement estimate that the Tag-Along Rights are worth between $6.8 and $9 million.

52.     The Chapter 11 Trustee argued that it was entitled to the Tag-Along Rights as it held record title of the assets in question, and filed motions in the APC Bankruptcy Case to obtain authority to execute the necessary documents to effectuate the Tag-Along Rights.  Mr. Hoebeke, believing that the Tag-Along Rights were arguably AEX's property, filed motions to effectuate ownership of the same property.  If the Tag-Along Rights were the property of APC, they would not be part of the Arabella Interests (*i.e.*, Receivership Property).   If the Tag-Along Rights were the property of AEX, then they would be part of the Arabella Interests (*i.e.*, part of the security for the Arabella Loan).

53.     AEX received its putative interests in the Tag-Along Rights as the result of a transfer from APC which had not been recorded.  APC claimed that this transfer was not

effective as to the Chapter 11 Trustee (who is a bona fide purchaser for value without notice[11]), and if it was effective was a fraudulent conveyance.  To establish a right to the Tag-Along Rights, AEX needed to demonstrate that the owners of the underlying properties were on notice of reservation of AEX's position by virtue of references to AEX's rights in documents recorded by others.  Whether that was so was disputed by the Chapter 11 Trustee.  Even if this were established, AEX still needed to defend against APC's allegation that it received the Tag-Along Rights as a result of a fraudulent transfer.

54.    The dispute over the Tag-Along Rights highlights the complexity and interrelatedness of the ongoing legal disputes between the various parties with respect to the Arabella Interests.

### THE MEDIATION

55.    With the approval and encouragement of the APC Bankruptcy Case court, APC, the Chapter 11 Trustee, AEX, AEI, AO, the APC Committee, Mr. Hoebeke, Mr. Hoisager, and the Receiver agreed to enter into a mediation in an effort resolve the various disputes between the interested parties, including but not limited to ownership of the Tag-Along Rights, the transfers made by APC to AEX and AO, and aspects of the Founders Litigation.

56.    All of the interested parties recognized the value of resolving disputes and moving quickly to monetize the Arabella assets because many, if not all, of the wells and tracts of land at issue are located in the Permian Basin, which is currently considered very valuable property.[12]

---

[11] *See* 11 U.S.C. § 544(a)(3).

[12] *See, e.g.*, https://www.bloomberg.com/news/articles/2016-11-15/permian-s-wolfcamp-holds-20-billion-barrels-of-oil-u-s-says (Oil explorers have been flocking to the Permian Basin in West Texas and New Mexico to tap extremely rich deposits that are generating profits despite recent slumps in crude oil prices. The U.S. Geological Survey reported that one portion of the Permian Basin known as the Wolfcamp formation was found to hold 20 billion barrels of oil trapped in four layers of shale beneath the desert in West Texas).
http://www.forbes.com/sites/rrapier/2016/11/21/the-permian-basin-keeps-on-giving/#5e759f88615a (U.S. Geological Survey announced the largest estimate of continuous oil that it has ever assessed is located in the

57.     The parties further agreed that a mediation would be most successful if the mediator was a sitting bankruptcy judge not involved in any of the various bankruptcy cases, but who nevertheless was familiar with both oil and gas law as well as the intricacies of bankruptcy and receivership law.  The bankruptcy judge presiding over the APC Bankruptcy Case agreed to ask his co-jurist, The Hon. H. Christopher Mott, U.S. Bankruptcy Judge for the Western District of Texas, Austin/El Paso Division, if he would be willing to serve as a mediator.  Judge Mott agreed.

58.     On March 27 and March 28, 2017 over 20 individuals (including me) appeared at the mediation, which lasted from morning until late into the evening each day (the "Mediation").

59.     As a result of the Mediation, the parties to the Arabella Settlement Agreement reached an agreement that resolved all issues among them, other than issues with respect to Mr. Hoisager, against whom the Mediation Parties retained their claims.  *See* Exhibit A.

60.     The Arabella Settlement Agreement is subject to the approval of this Court as well as the APC Court, the AEX Court, and the AO Court.[13]  *See* Exhibit A ¶ 10.

61.     For the reasons set forth below, I recommended to the Receiver that he enter into the Arabella Settlement Agreement.

#### THE TERMS OF THE ARABELLA SETTLEMENT AGREEMENT

62.     Among other things, the Arabella Settlement Agreement accomplishes the following:

---

Wolfcamp shale in the Midland Basin portion of Texas' Permian Basin; *See also* https://www.nytimes.com/2017/01/17/business/energy-environment/exxon-mobil-permian-basin-oil.html?_r=0

[13] Under the Arabella Settlement Agreement, this Court's approval needed to be requested within two weeks of the settlement.  Exhibit A ¶ 10.  We received an extension of time from the other parties to the Arabella Settlement Agreement to make this application.

a.      It resolves all disputes relating to the Tag-Along Rights, the proceeds of which the parties to the Arabella Settlement Agreement believe could be worth as much as $9 million (the "Tag-Along Proceeds").  The parties agreed that the Chapter 11 Trustee would be entitled to 77.5% of the Tag-Along Proceeds and AEX would be entitled to 22.5% of the Tag-Along Proceeds.  The parties determined these percentages through a negotiation supervised by Judge Mott that took into consideration, among other things, record title.

b.      It provides that APC will make available to AEX a Debtor-In-Possession loan of up to $1 million ("DIP Loan") that AEX can use to resolve any claims of Founders arising on or before February 28, 2017.

c.      It obligates AEX, as current holder of record title to the Arabella Working Interests transferred to it by APC, to resolve all issues with Founders – the current operator – in its bankruptcy case.

d.      After March 1, 2017, the cost for expenses owing to Founders will be shared 65% by AEX and 35% by APC.

e.      The parties agreed to work together to sell the assets in each debtor's respective bankruptcy case under 11 U.S.C. § 363.

f.      The net proceeds of the sale of oil and gas assets will be distributed 65% to AEX and 35% to APC.  As with the Tag-Along Proceeds, in negotiating these percentages, the parties took into account record title.

g.      APC will have the right to file objections to and resolve claims of Arabella Working Interest owners (but not AEX or AEI), who owe JIB receivables to APC in the APC Case, and AEX will pursue objections to and resolutions of the validity and priority of any M&M Liens against the oil and gas assets in the AEX case.

18

h.      The parties entered into mutual releases.

i.      All causes of action as to the former owners, board members, officers, etc. of APC, AEX, AO and AEI are reserved with respect to each estate.

j.      All potential claims against former owners, members, agents, and principals of PPCO in connection to the Arabella Loan are released.

k.      All potential claims against the Receivership Entities are being released (except with respect to the obligations set forth in the Arabella Settlement Agreement).

63.     I believe that it is difficult to place a value on the Arabella Interest either before or after the Arabella Settlement Agreement.  However, if one takes into account all the fees (legal, experts, etc.) that would have been incurred to litigate these matters to the end, and the significant risk factor involved in litigation (*i.e.*, the potential that the Arabella Interests could have been totally lost), it is clear that AEX's—and thus PPCO's—position is greatly improved as a result of the Arabella Settlement Agreement.  Certainly, the Arabella Settlement Agreement was a marked improvement over previous settlement offers made to PPCO by the Chapter 11 Trustee.

64.     Arabella Settlement Agreement resolves APC's claim that AEX and PPCO received the Arabella Working Interests through a fraudulent conveyance, a claim that could have totally destroyed the Arabella Interests.  The Arabella Settlement Agreement also resolves APC's multi-million dollar claim for unpaid JIB receivables, and allows the Receiver to lift APC's JIB Lien.  Litigating these issues would have been time consuming and costly, and there was significant litigation risk—if PPCO lost, the Arabella Interests would have been totally wiped out.

65.     The Arabella Settlement Agreement also provides a clearer path forward for clearing liens held by other entities.  As a result of the Arabella Settlement Agreement, AEX will be better situated to clear the M&M Liens.  Moreover, now that APC and AEX have agreed on a division of the proceeds of the sale of the Arabella Working Interests that AEX holds title to, APC and AEX's interests are aligned in defending against the Founders Litigation.

66.     Finally, the Arabella Settlement Agreement provides a clear path to monetizing the Arabella Interests.  It allows AEX to receive a portion of the proceeds from the sale of the Tag-Along Rights—assets to which APC had record title—and allows AEX to receive a majority of the proceeds from any future sale of the Arabella Working Interests it has record title to.

### CONCLUSION

67.     The Arabella matters described in this declaration are very complex, expensive to defend, and uncertain in terms of their recovery.  The factual and legal issues are complicated, and hotly disputed by the parties.  Given that backdrop, the Arabella Settlement Agreement is a favorable resolution that confers many benefits to the Receivership Estate.

68.     For the reasons set forth above, I strongly support the Receiver's application for an order approving the Arabella Settlement Agreement.

[Signature on Next Page]

Respectfully submitted,

**SCHAFER AND WEINER, PLLC**

MICHAEL E. BAUM (P29446)
Proposed Counsel for the Receiver
40950 Woodward Avenue, Suite 100
Bloomfield Hills, MI  48304
(248) 540-3340
mbaum@schaferandweiner.com

Dated: April __, 2017

21