# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                       Plaintiff,

         -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 16-cv-6848 (DLI)(VMS)

**FIRST APPLICATION OF COOLEY LLP FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FROM DECEMBER 19, 2016 THROUGH MARCH 31, 2017**

Cooley LLP ("Cooley"), as counsel to Bart M. Schwartz, the court-appointed receiver (the "Receiver") for defendant Platinum Credit Management, L.P. ("Platinum Credit") and certain related entities (collectively, the "Receivership Entities") hereby submits its First Application for Allowance of Compensation and Reimbursement of Expenses Incurred from December 19, 2016 through March 31, 2017 ("First Interim Application"). Cooley requests interim approval of $982,896.21 in fees and reimbursement of $7,495.57 in expenses for December 19, 2016 through March 31, 2017 (the "First Application Period").

This First Interim Application contains the following sections:

**Section I** provides the information required by Section C of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Receivership Billing Instructions").

**Section II** contains a narrative of the work that Cooley professionals performed under each task code in accordance with Section D of the SEC Receivership Billing Instructions.

**Section III** summarizes the expenses for which Cooley seeks reimbursement and the procedures and policies adopted by Cooley to comply with Section E of the SEC Receivership Billing Instructions.

**Section IV** describes the standards to be applied by the Court in determining fee awards in SEC equity receiverships.

I.    CASE BACKGROUND AND STATUS

    A.    **Information About the Applicant and the Application**

    1.    On December 19, 2016, the U.S. Attorney for the Eastern District of New York unsealed an eight-count indictment against Mark Nordlicht and six other individuals who were formally affiliated with Platinum Partners ("Platinum"), a purported $1.7 billion hedge fund family based in New York that includes the corporate defendants named in this action (No. 16-cr-0640 Docket No. 1, the "Indictment"). The Indictment alleges, among other things, that the defendants defrauded Platinum investors through, among other things, the overvaluation of assets, the concealment of severe cash flow problems, and the preferential payment of redemptions.

    2.    That same day, the SEC filed a complaint against the same seven individuals, Platinum Management (NY) LLC ("PMNY"), and Platinum Credit based on conduct similar to that alleged in the Indictment [Docket No. 1].  The SEC simultaneously moved by order to show cause for a temporary restraining order and the appointment of a receiver.  [Docket Nos. 2, 5].  Judge Matsumoto entered an order pursuant to which Bart M. Schwartz was appointed Receiver of the Receivership Entities on December 19, 2016, which Your Honor amended on January 30, 2017 (the "Receiver Order")  [Docket Nos. 6, 59-2].  On March 8, 2017, Your Honor entered a preliminary injunction, enjoining violation of the federal securities laws and ordering that Bart M. Schwartz continue to act as Receiver pursuant to the Receiver Order

[Docket Nos. 105, 106].

3. Under the terms of the Receiver Order, the Receiver was appointed to preserve the status quo, ascertain the extent of commingling of funds, ascertain the true financial condition of the Receivership Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Receivership Entities, preserve the books, records, and documents of the Receivership Entities, be available to respond to investor inquiries, protect investors' assets, conduct an orderly wind down, including a responsible liquidation of assets and orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings, among other things (Receiver Order at 2).

4. In support of these powers and duties, the Receiver is authorized and empowered, subject to leave of Court, "to resume or commence . . . litigation" and to "investigate, prosecute, defend, intervene in or otherwise participate in" actions in any state, federal or foreign court or proceeding of any kind "as may in the Receiver's discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve" property owned by the Receivership Entities (Receiver Order ¶ 33).  The Receiver is further authorized, empowered, and directed "to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted" and, with leave of this Court, "institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate" (Receiver Order ¶ 34).

5. The Receiver is empowered to "solicit persons and entities ("Retained Personnel") to assist the Receiver in carrying out the duties and responsibilities described in [the Receiver Order]" subject to obtaining an Order of the Court authorizing such engagement

(Receiver Order ¶ 44).

6.     Given the size and complexity of the Receivership Entities, the tasks presented by the Receiver Order are tremendous.  Unlike many SEC cases alleging a relatively simple Ponzi scheme with few concrete assets, the Platinum funds held and managed assets in a variety of industries worldwide.  As noted in the Complaint, in PMNY's March 30, 2016 Form ADV, Platinum Credit claimed to have approximately $590 million in assets under management in Platinum Partners Credit Opportunities Master Fund L.P. and its feeder funds (collectively, "PPCO").  PPCO holds a wide variety of assets in its portfolio, including operating entities involved in a variety of industries (*e.g.*, oil and gas, mining), investments in various ongoing litigations via litigation funding arrangements, and a portfolio of life insurance policies, to name but a few.  Thus, the Receiver was entrusted to administer the affairs of both the fund entities of which he is the Receiver, as well as the portfolio companies that are controlled by the Receivership Entities.

7.     In order to discharge his duties, the Receiver immediately enlisted the support of his firm Guidepost Solutions LLC ("Guidepost") and Cooley.  Given the enormity of the work confronting the Receiver, Cooley and Guidepost agreed to begin work immediately and seek the Court's approval *nunc pro tunc* to the date of the Receiver's appointment.

8.     The Receiver contemplated the need for legal assistance from Cooley on a wide range of matters.  In addition to pending and contemplated business transactions of the Receivership Entities and their portfolio companies, the Receiver faced ongoing litigations and bankruptcy proceedings relating to some of those entities.  The Receiver also anticipated the need for legal assistance in connection with investigating the transactions the Receivership Entities entered into, and, if appropriate, bringing lawsuits against insiders and other third parties

on behalf of the Receivership Entities and dealing with the Platinum funds in liquidation under the authority of the Grand Court of the Cayman Islands (the "PPVA Funds").

9.     Cooley is comprised of approximately 900 attorneys across 12 offices in the United States, China, and Europe.  Cooley's attorneys have deep experience in a variety of fields relevant to this action, including complex commercial litigation, white collar and regulatory defense, bankruptcy and corporate reorganizations, insurance coverage, investment funds, securities law, secured transactions and other commercial law matters.  The Cooley attorneys who have been advising the Receiver have considerable knowledge and experience in these fields.  The Cooley team is led by Alan Levine, a former federal prosecutor and a Fellow of the American College of Trial Lawyers.  Celia Goldwag Barenholtz, who is also a former federal prosecutor and a Fellow of the American College of Trial Lawyers, manages the engagement on a day to day basis.  Mr. Levine and Ms. Barenholtz have been practicing law for 43 and 37 years respectively.  Lawrence C. Gottlieb, the former chair of Cooley's Business Restructuring & Reorganization group, who has practiced in the field of creditors' rights, bankruptcy and workouts for more than 43 years, is the Cooley lawyer in charge of bankruptcy-related matters. Ann M. Mooney, the head of Cooley's Insurance Coverage practice group, has been advising the Receiver on insurance-related matters.  Thomas Salley, a member of Cooley's Fund Formation group, has been advising the Receiver on matters relating to the structure of the Platinum funds. Lynn D. Horwitz, a corporate attorney with a broad range of experience handling corporate and commercial matters, including mergers and acquisitions, corporate restructurings, public and private financings, private equity transactions, public offerings and securities law compliance, is advising the Receiver on corporate matters.  The Cooley team also includes a number of associates and partners who have been asked to assist on discrete matters (*e.g.*, tax,

employment).

10.     On January 31, 2017, the Receiver submitted an Application for an Order Approving the Retention of Cooley LLP *Nunc Pro Tunc* to the Appointment Date [Docket Nos. 65, 66], which was granted by the Court on February 17, 2017.

**B.     Case Status[1]**

11.     In accordance with Section C.2. of the SEC Receivership Billing Instructions, Cooley states as follows:

a.     **Cash on Hand and Unencumbered Funds.** Based on the Standardized Fund Accounting Report ("SFAR"), as of March 31, 2017, the Receivership Entities collectively had $11,645,885 in unencumbered funds, of which $11,100,577 was held in cash bank accounts and $545,308 was held in brokerage accounts.

b.     **Expenses.** The Receivership Entities incur expenses as part of their normal business operations.  These include payroll and benefits, rent, utilities, and other recurring expenses.  Some of the expenses incurred by the Receivership Entities, such as rent and utilities, are a result of long term contracts with fixed payment amounts.  Monthly recurring expenses of the Receivership Entities total approximately $366,000.

c.     **Summary of Receipts and Disbursements.** Cash disbursements during the First Application Period totaled approximately $11.4 million, primarily due to the payment of life insurance premiums in connection with PPCO's life settlements portfolio (approximately $3.1 million), litigation finance payments (approximately $1.8 million), upkeep and maintenance of investment assets (approximately ($1.6 million), legal settlement involving portfolio companies (approximately $1.4 million), tax payments (approximately $480,000),

_____

[1] All the information in this section was provided to Cooley by the Receiver and Guidepost.

interest on secured debt (approximately $370,000), and transfers to the Platinum Capital Management account (approximately $2.0 million), which went to payroll, rent, office expenses, moving expenses, employee reimbursement, taxes, and insurance.

        d.      **Closing of Case.** The Receiver cannot at this time state when he expects the case to be concluded. Given the early stage of the Receivership, there remains much to be accomplished: the assets of the Receivership Entities are continuing to be marshalled; the assets owned by the entities must be liquidated; and ongoing litigation, as well as possible affirmative litigation, must be resolved before the case can be concluded.

        e.      **Creditor Claims Proceedings.** Although the Receiver has prepared a listing of known creditors and unpaid redemptions, as noted in the Receiver's First Quarterly Status Report [Docket No. 130], a formal claims process has not yet been initiated, and accordingly the Receiver has not yet provided notice of the claims process to claimants, reviewed claims received, made recommendations to this Court for the payment or denial of those claims, or reached the final disposition of those claims.

        f.      **The Assets of the Receivership Estate.** The Receiver is still in the process of reviewing all aspects of the portfolio. Subject to the Court's approval, the Receiver has engaged Houlihan Lokey Financial Advisors, Inc. ("Houlihan Lokey"), a valuation firm, to assist it in valuing the Receivership's assets. The following investments represent the positions held by PPCO as of the most recent valuation date, September 30, 2016. ***Valuations were made by prior management, and the Receiver is not "vouching" for those valuations or representing them as accurate.*** All amounts are in U.S. Dollars:

| Investment Description | Investment Type | Estimated & Unaudited Value |
| --- | --- | --- |

| Investment Description | Investment Type | Estimated & Unaudited Value |
| --- | --- | --- |

| Investment Description | Investment Type | Estimated & Unaudited Value |
|---|---|---|
| | | |
| **Total** | | 596,920,439 |

The following investments represent the positions held by Platinum Partners Liquid Opportunities Master Fund LP ("PPLO") as of the most recent valuation date, June 30, 2016. *Valuations were made by prior management, and the Receiver is not "vouching" for those valuations or representing them as accurate.* All amounts are in U.S. Dollars.

| Investment Description | Investment Type | Est. & Unaudited Value |
|---|---|---|
| | | |

| Investment Description | Investment Type | Est. & Unaudited Value |
|---|---|---|
| | | |
| **Total** | | 22,958,514 |

### C.    Current and Previous Billings

12.    In connection with the First Application Period, Cooley requests interim compensation in the amount of $982,896.21, and reimbursement of expenses in the amount of $7,495.57.  This is Cooley's first fee application.  Cooley has not submitted a prior request for payment.

-10-

13.     These amounts generally reflect, and are determined primarily on the basis of, the hours worked by Cooley attorneys, legal assistants, and other support personnel and the hourly rates in effect at the time the services were rendered, as modified by a substantial public service discount, described below, which was approved by the SEC and the Court in the appointment of Cooley.  *See* Docket No. 65.

14.     Pursuant to the invoices attached hereto as Exhibit C, the hourly fee for all services rendered has been reduced by fifteen percent.  The reduced rates for these professionals range from $1,168.75 an hour, to $267.75 an hour.  Cooley agreed and understood at the time of its retention that, pursuant to the SEC Receivership Billing Instructions, interim fee applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses requested.

15.     Because of the public service discount, Cooley's fees have been discounted by $173,452.29.  Cooley also submitted its invoices to the SEC Staff to allow for a review of the Cooley's billing entries.  As a result of that review, the SEC requested an additional reduction amounting to $69,396.00.  In total, the fees for Cooley professionals have been reduced from $1,225,744.50 to $982,896.21, a reduction of $242,848.29.

**D.      Standardized Fund Accounting Report**

16.     The latest Standardized Fund Accounting Report ("SFAR") for the period from December 19, 2016 through March 31, 2017 is attached hereto as Exhibit A.

**E.      Exhibits**

17.     The following exhibits are attached:

a.      **Exhibit A:**  The latest Standardized Fund Accounting Report.

b.      **Exhibit B:**  A summary of the total fees billed and hours worked

-11-

by each Cooley professional.

         c.     **Exhibit C:**    All time records of Cooley professionals, chronologically by listing the activity category as well as a summary of all expenses incurred by Cooley professionals by expense category.[2]

         d.     **Exhibit D:**   The Certification of Alan Levine, as required by Section A.1 of the SEC Fee Guidelines.

## II.   SERVICES RENDERED BY COOLEY LLP DURING THE FIRST APPLICATION PERIOD

         18.     In accordance with Section D.3 of the SEC Billing Guidelines, Cooley segregated its time during the First Application Period into three different billing numbers and seventeen different time codes.  Narrative summaries of these activity categories follow.  Because the bulk of the work performed by Cooley during the First Application Period falls under "Case Administration (PP06)" that category is further broken down into subcategories describing the specific work performed.

### B.   Billing No. 330014-201 General Receivership Work

         19.     <u>Accounting/Auditing (PP01)</u>

No fees are being sought under this time code.

         20.     <u>Asset Analysis and Recovery (PP02)</u>

No fees are being sought under this time code.

         21.     <u>Asset Disposition (PP03)</u>

No fees are being sought under this time code.

         22.     <u>Business Analysis (PP04)</u>

---

[2] In some cases, these time records have been revised to supplement the description of work performed, to eliminate time charges that Cooley decided not to submit, or to move entries from one billing code to another.  References to Cooley's time records herein are to the revised final time records submitted by Cooley.

Near the beginning of the Receivership, work needed to be done to understand the corporate structure of the various Platinum entities, including an analysis of which entities potentially should be added to the Receivership.  Cooley partner Thomas R. Salley performed a review of organizational documents for the Receivership Entities, reviewed fund documents, and explored problems posed by differences between U.S. and Cayman law.

       23.     <u>Business Operations (PP05)</u>

No fees are being sought under this time code.

       24.     <u>Case Administration (PP06)</u>

The vast majority of Cooley's work since the inception of the Receivership has been performed under this task code.  That work includes:

**Black Elk –** Prior to the Receiver's appointment, Richard Schmidt, the Litigation Trustee for Black Elk Energy Offshore Operations, LLC ("Black Elk"), the debtor in a bankruptcy case filed in the Southern District of Texas captioned *In re Black Elk Energy Offshore Operations, LLC*, Case No. 15-34287 (the "Black Elk Bankruptcy Case"), commenced a fraudulent transfer adversary proceeding against four Platinum entities including PPCO, alleging, among other things, that PPCO and the other defendants had received fraudulent transfers from Black Elk (the "Fraudulent Transfer Action").  At the same time the Fraudulent Transfer Action was filed, the Litigation Trustee made an Emergency Application for Preliminary Injunctive Relief, Including an Emergency Motion for a Temporary Restraining Order.  The Application sought to prevent the dissipation of the defendants' assets pending the determination of the merits of the Fraudulent Transfer Action.  The bankruptcy court issued a Temporary Restraining Order (the "Black Elk TRO") that was in place when the Receiver was appointed.  The Black Elk TRO barred PPCO from transferring, spending or otherwise reducing in any manner its funds on

-13-

deposit at an institution or location in the world, if, after giving effect to such transfer, the total unencumbered funds held by PPCO was less than $24,600,584.31 (the damages claimed against PPCO in the Fraudulent Transfer Action). The Black Elk TRO contained a similar restraint on $5 million against an entity then thought to be PPLO. Because PPCO and PPLO did not have liquid assets that came close to $29 million, and because PPCO was the entity which held, directly or indirectly, most of the Receivership Property, the effect of the Black Elk TRO was to prevent the Receiver from spending any money at all. Prior to the Receiver's appointment, PPCO and PPLO had been submitting all expenditures to the Litigation Trustee for approval. However, after the Receiver was appointed, the Litigation Trustee's counsel took the position that the Litigation Trustee would no longer approve any expenditures (other than expenditures needed to preserve life insurance assets that the Litigation Trustee wanted as part of a security package) unless the Receiver agreed to provide security for Black Elk's claim. The Receivership Order contained provisions that indicated that the Litigation Trustee did not have the ability to constrain the Receiver in this fashion, but it also contained a provision—a handwritten addendum providing that there would be no litigation stay of bankruptcy matters—that supported the position of the Litigation Trustee.

Because of these events, the Receivership was in a state of crisis run the Receivership Entities and from the value of outset—the Receiver found himself in a position where he could not expend cash to preserve Receivership assets without taking the risk that he would be found to be in contempt of the Black Elk TRO. The Receiver turned to Cooley to advise him on his powers under the Receiver Order, to navigate a solution to the seeming conflict between the authority of this Court and the Texas bankruptcy court (and differences between Second Circuit law and Fifth Circuit law). Cooley had to investigate the relevant facts surrounding Platinum,

the Receivership and the Fraudulent Transfer Action, the relevant legal authorities, and what kinds of expenses the Receiver needed to make and why. Cooley also had to advise the Receiver on the meaning of the Receiver Order and developed a strategy for dealing with the Black Elk TRO. Cooley worked with the Receiver and PPCO's counsel in Texas to attempt to resolve the impasse consensually. When that did not succeed, Cooley met with the SEC Staff together with the Receiver and his Guidepost team. In advance of that meeting, Cooley prepared a 9 page agenda describing the Black Elk TRO, and the manner in which it was hampering the Receiver's ability to act, which it provided to the SEC together with supporting exhibits. Cooley took the laboring oar in preparing the Receiver and SEC's Joint Motion for the Modification of the Platinum TRO and Receiver Order and for Emergency Relief (the "Joint Motion") [Docket No. 20] which was submitted to the Court on January 9, 2017. Cooley drafted the Receiver's 19-page declaration and was actively involved in preparing the other supporting materials. Cooley was also involved in the Receiver and SEC's Joint Reply in Further Support of the Modification of the Platinum TRO and Receiver Order (the "Joint Reply") [Docket No. 44], which responded to the Litigation Trustee's January 19, 2017 Response to the Joint Motion [Docket No. 36]. In the Reply, Cooley and the SEC further explained why the Fraudulent Transfer Action should be enjoined, why the Litigation Trustee was subject to this Court's jurisdiction, why the litigation stay should not be lifted and other issues. Cooley also drafted the Receiver's reply declaration [Docket No. 46].

Because the Fraudulent Transfer Action was not stayed by the Receiver Order, and because the preliminary injunction hearing in Texas was scheduled before the hearing on the Joint Motion, Cooley took an active role preparing for the Texas preliminary injunction hearing, including preparing for and defending the Receiver at a deposition taken by the Litigation

Trustee, and researching and drafting the opposition brief filed by PPCO's counsel in Texas, Cooper & Scully, P.C., which opposed the Litigation Trustee's application for a preliminary injunction. Cooley also worked with the PPCO's Texas counsel and the SEC Staff to prepare for the hearing in Texas. In conjunction with the SEC Staff, Cooley also continued to communicate with the Litigation Trustee's counsel about a possible disposition of the matter. Two days before the preliminary injunction hearing, the Litigation Trustee agreed to withdraw his opposition to the Joint Motion pending before this Court, and to withdraw the motion for the preliminary injunction in Texas. Thereafter, Cooley engaged in protracted settlement discussions with counsel for the Litigation Trustee and the SEC Staff, including legal research and reviewing and revising numerous drafts of a settlement agreement.[3]

This work has provided value to the Receivership: it removed the Black Elk TRO and the requested preliminary injunction, thus allowing the Receiver to make expenditures needed to preserve and maximize the value of Receivership Property. It also resulted in the amendment of the Receiver Order, which clarified that its litigation stay included bankruptcy cases. And by engaging in constructive negotiations with the Litigation Trustee, Cooley helped to prevent prolonged, expensive litigation of the Fraudulent Transfer Action.

**PPVA Relationship** – Since the inception of the Receivership, Cooley has assisted the Receiver in managing the sometimes difficult relationship between the Receiver and the various liquidators appointed over the PPVA Funds in the Cayman Islands (the "Liquidators"). PPVA and PPCO hold common interests with respect to a number of investments. Ownership of some of these assets, and the distribution of proceeds obtained from the liquidation of those assets, has been disputed. Cooley devoted substantial attention during the period covered by this fee

---

[3] The settlement agreement has not yet been executed but is very close to being finalized.

application to the Receivership's interest in  To understand the relationship between these entities, a thorough analysis of joint investments was required, and ongoing negotiations regarding the ownership of assets, payment of shared fees, and other issues have been required. Following extensive negotiations, Cooley negotiated an amicable resolution of areas of disputed ownership.

Because the Liquidators have requested access to documents relating to PPVA investments, Cooley devoted substantial time to counselling the Receiver on a mechanism to share documents with the Liquidators without waiving the attorney client privilege or otherwise compromising the Receiver's rights. (Under the preliminary injunction in this case, the Receiver may not waive the privilege without giving the individual defendants notice and opportunity to be heard. The Receiver wants to afford appropriate access to PPVA documents to the Liquidators but does not want to waive the privilege by doing so.) This work required Cooley to understand the Receivership Entities' documents and document preservation practices, their ability to segregate PPVA and PPCO documents, and related issues. Cooley drafted a proposed information sharing agreement which has been the subject of extensive back and forth (and revision) between the Receiver and his counsel and the Liquidators and their counsel. This work will provide a benefit for the Receivership Estate by providing a consensual resolution to the thorny issue of how to share information with the Liquidators.

**Entities Application** – Cooley assisted the Receiver and Guidepost in conducting an analysis of the relationship of the Platinum related entities, the portfolio companies owned by those entities, the organizational structure of those entities, what role the various entities played, and more.  This review was taken to ensure that the Receiver had control over the entities necessary to manage the Receivership Entities and carry out the mandate of the Receiver Order.  In conducting this analysis, Cooley reviewed which entities were not under control of either the Receiver or the Joint Liquidators, which entities had investors, and which entities needed to be added to the Receivership to allow the Receiver to discharge his duties effectively.  Cooley assessed the corporate structure of the entities to determine whose consent was needed to effect changes in control of the entities.  Cooley discussed all of these issues with the Receiver, who ultimately determined to request a modification of the Receiver Order to bring nine unsupervised Platinum entities into the Receivership in order to better protect the interests of Platinum creditors and investors.  Cooley had extensive communications with the SEC Staff about these issues, and it negotiated with counsel for Mark Nordlicht to secure his consent where necessary.  Cooley drafted a letter application for an Order adding entities to the Receivership, proposed amended Receivership Order, and declaration in support of the application, which were filed on March 23, 2017 [Docket No.112], as well as responses to certain defendants' concerns about the application [Docket Nos. 123, 126].  That application is currently *sub judice*.

**Analysis of Ongoing Litigation** – Cooley, in conjunction with Guidepost and Platinum staff, conducted an extensive review of ongoing work performed by legal professionals who previously represented PPCO and its portfolio companies.  This included a review of what work had been done, the nature of the underlying disputes, and an analysis of what work was required on a going-forward basis.  This review also included a review of the retention agreements

-18-

entered into between PPCO and the various firms that had represented PPCO, cost-sharing arrangements between PPCO and non-Receivership Platinum entities, and other related issues.

Prior to this work, there was no unified system at Platinum tracking the use of legal professionals, and there was no systematic review of legal bills. Because the practice was that portfolio managers would engage legal professionals on their own with little to no review, no single individual was aware of all ongoing representations. As a result of this work, the Receiver has a much clearer grasp on where and how outside counsel is being used, what the nature of the representation is, and what the estimated cost of the representation is moving forward. As a result of the review of these services, Cooley and Guidepost were able to find areas where Platinum had been paying ongoing fees that were unnecessary. Based on this work, Cooley anticipates submitting applications to the Court to retain some of these professionals and to lift the litigation stays currently in place as to certain matters in the near future.

Cooley has also assisted in the enforcement and lifting of the litigation stay put in place by the Receiver Order. Cooley counseled the Receiver as the meaning and effect of the litigation stay, and prepared letters to litigants who pursued actions against Receivership Entities, informing them that they are bound by the litigation stay, thus preventing ongoing expenses from being accrued in connection with those actions. Cooley prepared an application seeking to lift the litigation stay with respect to affirmative litigation in Illinois that could provide for additional funds to flow into the Receivership Estate (The Receiver's Consented-To Motion for an Order Lifting the Litigation Stay [Docket No. 26]). That application was granted by the Court on February 16, 2017.

**Retention of Professionals** – Cooley has advised the Receiver on the retention of professionals to assist the Receiver carry out his tasks, and communicated with the SEC Staff

about those retentions or potential retentions.  In the case of Houlihan Lokey, Cooley reviewed and revised the terms of engagement letter to ensure that it complied with the terms of the Receiver Order.  Cooley has prepared three applications to retain professionals on behalf of the Receiver which were submitted to the Court during the time-period covered by this fee application (in addition to the application to retain Cooley).  Cooley prepared an application to retain Guidepost [Docket No. 63], which was granted on February 17, 2017; an application to retain Houlihan Lokey [Docket No. 111], which is *sub judice*; and an application to retain PricewaterhouseCoopers LLP to assist in the preparation of tax return extensions [Docket No. 110], which is also *sub judice*.

**Northstar** – PPCO made a nearly $60 million investment in Northstar Offshore Group, LLC ("Northstar") an oil and gas company in Texas (the "Northstar Investment").  On August 12, 2016, multiple creditors initiated an involuntary Chapter 11 bankruptcy proceeding in the Bankruptcy Court for the Southern District of Texas (the "Northstar Bankruptcy Case").  Northstar subsequently initiated a voluntary Chapter 11 proceeding and sought a post-petition financing arrangement (commonly known as a "DIP Loan") from Arena Limited SPV, LLC ("Arena").  In order to protect the Receivership's investment in Northstar, Cooley professionals evaluated the proposed DIP Loan from Arena, and an alternative DIP loan with New Mountain Finance Corporation ("New Mountain") that PPCO was asked to consider.  Doing so required a careful analysis of the structure of the Arena DIP Loan, the proposed alternative DIP arrangement, an understanding of PPCO's collateral, research relating to the scope of liens securing some of the Northstar Investment, evaluation of other options, review of the proceeding in the Northstar Bankruptcy Case, analysis and research of Northstar's corporate governance, analysis of the results of a Northstar default, analysis of a sale of the Northstar Investment,

review of agency agreements, credit agreements and other agreements entered into by or concerning Northstar, and coordination with counsel for other interested parties, among other things.

Cooley drafted the Receiver's February 17, 2017 Application for an Order Authorizing Him to Provide DIP Financing for Northstar Offshore Group, LLC (the "Northstar Application") [Docket No. 94] which was granted on March 8, 2017 [Docket No. 108].  Ultimately, the Receiver did not enter into the DIP financing arrangement because New Mountain change the terms of its participation and PPVA refused to participate, despite previous assurances.  Cooley has continued to assist the Receiver with respect to Northstar by assessing possible strategies and communicating with other stakeholders.

**Other Work –** Cooley has communicated frequently with the Receiver, Guidepost and Platinum staff regarding a large variety of matters including the legal issues relating to Receivership assets, the Receiver's rights in connection with transactions involving Receivership Property, diligence to assess the value of Receivership assets, potential claims against the Receivership Estate, the retention of professionals and Platinum staff, the Receiver's authority and obligations under the Receiver Order and various statutes, and the Court's docket and orders. Cooley has communicated regularly with the SEC Staff about the Receiver's applications and potential applications and the Receiver's business decisions.  Cooley has conducted legal research in anticipation of claims that the Receiver may wish to bring, as well as in connection with potential claims others may bring against the Receiver and how such claims would be handled under a liquidation plan, and had preliminary meetings with the Receiver and Guidepost about investigating affirmative litigation.

25.   <u>Claims Administration and Objections (PP07)</u>

No fees are being sought under this time code.  The Receiver has not yet established a claims administration process.

26.  Corporate Finance (PP08)

No fees are being sought under this time code.

27.  Data Analysis (PP09)

No fees are being sought under this time code.

28.  Employee Benefits/Pensions (PP10)

During the First Application Period, Cooley prepared a transition agreement for an employee whose services were no longer required by the Receivership Entities.  Doing so required a review of the contract at issue, correspondence and communication with the Receiver, and attention to other related issues.  Cooley employment and compensation and benefit lawyers also provided advice to the Receiver about a potential retention program for Platinum employees.

29.  Forensic Accounting (PP11)

No fees are being sought under this time code.

30.  Litigation Consulting (PP12)

No fees are being sought under this time code.

31.  Status Reports (PP13)

No fees are being sought under this time code.

32.  Tax Issues (PP14)

Cooley has provided the Receiver with guidance on tax compliance issues, including advice related to the creation of a Qualified Settlement Fund as required by the Receivership Order.

33.  Valuation (PP15)

No fees are being sought under this time code.

    34.    <u>Travel (PP16)</u>

No fees are being sought under this time code.

    35.    <u>Non-Billable Work (PP17)</u>

In addition to the discounts to its hourly rates as discussed above, through discussion with the SEC Staff, Cooley has agreed not to seek fees for a significant amount of time it spent on various matters, including agreeing to a reduction of its fees on issues related to a review of ongoing litigation and the engagement of various legal professionals by PPCO portfolio companies, legal research related to the Receiver's creation of a Liquidation Plan, associate-to-associate communications regarding filings, and other issues.  In total, Cooley has performed $91,447.00 in work that is considered Non-Billable under the SEC Receivership Billing Instructions, and reduced its fees by $69,390.00 through discussion with the SEC Staff, as discussed above.

Although the preparation of this fee application falls outside of the First Application Period, it is another example of the sort of work Cooley has performed under the Non-Billable Work task code.

    **C.**    **Billing No. 330014-202 ▓▓▓▓▓ Related Work**

    36.    Case Administration (PP06)[4]

Cooley conducted a review of outstanding debt due to entities related to ▓▓▓▓▓ as well as three transactions that were expected to generate funds to repay that debt.  This work included analysis of various credit agreements and transaction documents, coordinating investigative efforts with Guidepost, and other related issues.

---

[4] All work performed under this billing number was done under the Case Administration task code.

-23-

### D.      Billing No. 330014-203 D&O issues

### 37.      Case Administration (PP06)[5]

Cooley lawyers performed multiple tasks under this timecode related to the Receivership Entities' directors and officers liability insurance, and indemnity demands issues.  With respect to the D&O insurance, the work included analyzing the five insurers' policies, coverage obligations, and coverage positions; communicating with the insurers' five separate coverage counsel; analyzing and responding to the insurers' requests for documents and information, and coordinating, as appropriate and to the extent necessary, with the various individual insureds who have made claims under the policies.  With respect to the indemnification issues, the work included analyzing the Receivership's potential obligations to indemnify and advance legal expenses incurred by current and former Platinum employees and preparation of responses to three indemnification and advancement demands made by former Platinum employees.

## III.     EXPLANATION OF EXPENSES AND RELATED POLICIES

38.      Cooley seeks reimbursement of its out-of-pocket costs in the amount of $7,495.57.  Exhibit C includes an explanation of these expenses.  Cooley's expenses are limited to fees incurred in the reproduction of documents, fees incurred in generating certificates of good standing for notices of appearance, mailing fees, other document delivery fees, limited document retrieval costs, and costs connected to electronic research databases.  Cooley will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Receivership Billing Instructions.

39.      With respect to all expenses, Cooley seeks reimbursement only for its actual costs of filing and court reporting fees, postage and delivery fees.  Cooley has not included

---

[5] All work performed under this billing number was done under the Case Administration task code.

in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay.

40.     Cooley has not charged the Receivership for various reproduction costs and has taken efforts to defray costs to the greatest extent possible.

41.     Cooley has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

## IV.   FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving the fees and expenses for the Receiver's counsel.  This Court has discretion to determine the compensation to be awarded to the Receiver's counsel.  In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented."  *S.E.C. v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973).

While the results obtained are important, benefits to a receivership estate may take "more subtle forms than a bare increase in monetary value."  *S.E.C. v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992); *see also Gaskill v. Gordon,* 27 F.3d 248, 253 (7th Cir. 1994) (also noting "[e]ven though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").  That said, "'results are always relevant.'"  *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *S.E.C. v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975)).

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them" while understanding that an "equitable receivership is by its very nature, a legally complex process." *Moody*, 374 F. Supp. at 484-485.

In considering the appropriateness of a fee request, a court "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill*, 27 F.3d at 253. Although some authorities provide "convenient guidelines" for the compensation of receivership professionals, courts have noted that "the unique fact situation [presented by each receivership] renders direct reliance on precedent impossible." *Moody*, 374 F. Supp. at 480. Moreover, it is important to keep in mind that "the age of many cases distorts dollar valuations." *Id.*

"Time spent cannot be ignored." *Id.* at 483. This is particularly true when the dimensions and complexity of a receivership prevent counsel from taking on other full time assignments. *Id.* at 483-486 (describing the efforts of the receiver counsel's in the difficult task of determining ownership and disposability of a bank's assets and the high priority given to the matter by counsel demonstrated by working "nights, weekends, and holidays" on receivership matters). Another significant factor is "the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp 2d 176, 182 (E.D.N.Y. 2005) (noting that the receiver's legal fees were reasonable, "particularly in light of the extensive litigation and motion practice" that ensued in that case).

Under these standards Cooley has adequately demonstrated that the amount of fees requested is appropriate. Cooley acted quickly to protect Receivership Property, has helped the Receiver marshal complex and varied assets, and has done so under pressing conditions. In doing so, Cooley professionals prioritized the needs of the Receivership over other work that

could be performed.  The benefit to investors, though not quantifiable at this early stage at the Receivership, will become quantifiable as the case proceeds.

The issues being addressed by Cooley are highly complex, ranging from oil and gas issues, bankruptcy issues, analysis of many corporate entities, ongoing work to review, manage, and coordinate other litigation, tax issues, employment law issues, and more.  Because the Receivership controls funds, which in turn control many portfolio companies, this work has been particularly complex and unlike the majority of equity receiverships.  The problems facing the Receivership were exacerbated by the financial and legal problems the Receivership faced at the Appointment Date.  Addressing these initial problems and helping the Receiver stabilize and maintain the Receivership Entities and their portfolio companies has taken up a significant portion of multiple Cooley attorneys' time over the past several months.  Based on the foregoing, we respectfully submit that the compensation sought by Cooley is wholly warranted.

## V.      CONCLUSION

For the reasons set forth above, Cooley respectfully requests that the Court:

a.      grant interim approval of Cooley's compensation in the amount of $982,896.21; and

b.      grant interim approval of Cooley's request for reimbursement of its expenses in the amount of $7,495.57; and

c.      order the Receivership Entities to pay within ten (10) business days from available case the approved fees of Cooley in the amounts set forth herein and reimburse Cooley for its approved expenses; and

d.      grant such other relief as the Court deems appropriate.

Dated:  New York, NY
        May 24, 2017

_/s/ Alan Levine_____
Alan Levine
Celia Goldwag Barenholtz
Counsel to Bart M. Schwartz, Receiver
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 479-6000
alevine@cooley.com
cbarenholtz@cooley.com