# EXHIBIT 2

**CREDIT AGREEMENT**
**(Term Loan)**

By and Between

**PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, LP,**
**a Delaware limited partnership**

and

**HEARTLAND BANK**

Dated as of August 31, 2015

14571686v.6

# TABLE OF CONTENTS

**Page**

ARTICLE I  DEFINITIONS ................................................................................................1
ARTICLE II  THE CREDIT facility ...................................................................................7
    Section 2.1.  Term Loan Commitment...........................................................................7
ARTICLE III  INTEREST RATE PROVISIONS..............................................................8
    Section 3.1.  Interest Rate ..............................................................................................8
ARTICLE IV  PREPAYMENTS AND OTHER PAYMENTS ..........................................8
    Section 4.1.  Required Payments ...................................................................................8
    Section 4.2.  Prepayments..............................................................................................8
    Section 4.3.  Notice of Payments ..................................................................................9
    Section 4.4.  Place of Payment or Prepayment .............................................................9
    Section 4.5.  Prepayment Premium or Penalty .............................................................9
    Section 4.6.  [Intentionally Omitted] ............................................................................9
    Section 4.7.  Taxes ........................................................................................................9
    Section 4.8.  Payments on Business Day .....................................................................10
ARTICLE V  COMMITMENT FEE AND OTHER FEES AND EXPENSES .................10
    Section 5.1.  Commitment Fee.....................................................................................10
    Section 5.2.  Expenses .................................................................................................10
    Section 5.3.  Fees Fully Earned ...................................................................................10
    Section 5.4.  Fees Not Interest; Nonpayment .............................................................10
ARTICLE VI  REPRESENTATIONS AND WARRANTIES .........................................11
    Section 6.1.  Organization and Qualification; Subsidiaries ........................................11
    Section 6.2.  Accuracy of Information .........................................................................11
    Section 6.3.  Authorization ..........................................................................................11
    Section 6.4.  No Conflicts ............................................................................................11
    Section 6.5.  Enforceability..........................................................................................12
    Section 6.6.  Accuracy of Information; No Material Adverse Change.........................12
    Section 6.7.  Taxes ......................................................................................................12
    Section 6.8.  Litigation and Other Proceedings ..........................................................12
    Section 6.9.  No Defaults..............................................................................................12
    Section 6.10.  Solvency................................................................................................12
    Section 6.11.  Representations and Warranties............................................................13
    Section 6.12.  Margin Regulations...............................................................................13
    Section 6.13.  Investment Company Act ......................................................................13
    Section 6.14.  [Intentionally Omitted] .........................................................................13
    Section 6.15.  Licenses, Permits, Trademarks, etc......................................................13
    Section 6.16.  Compliance with Governmental Requirements ....................................13
    Section 6.17.  ERISA....................................................................................................13
    Section 6.18.  Title to Properties..................................................................................13
    Section 6.19.  Burdensome Contracts ..........................................................................14
    Section 6.20.  Authorization to File .............................................................................14
    Section 6.21.  Environmental and Safety Matters........................................................14
    Section 6.22.  Material Contracts .................................................................................14
    Section 6.23.  [Intentionally Omitted] .........................................................................14

i

# TABLE OF CONTENTS

**Page**

Section 6.24. Federal Securities Laws ..................................................14
Section 6.25. Commercial Tort Claims.................................................14
ARTICLE VII  CONDITIONS...............................................................14
Section 7.1. Conditions to Closing .....................................................14
ARTICLE VIII  AFFIRMATIVE COVENANTS........................................16
Section 8.1. Financial Statements and Information .............................16
Section 8.2. Maintenance of Existence/Good Standing and Permits......17
Section 8.3. Compliance With Governmental Requirements ..................17
Section 8.4. Payment of Obligations...................................................17
Section 8.5. Notification of Material Adverse Change ........................18
Section 8.6. Notification of Defaults ..................................................18
Section 8.7. [Intentionally Omitted] ...................................................18
Section 8.8. Notification of Lawsuits ...................................**Error! Bookmark not defined.**
Section 8.9. [Intentionally Omitted] ...................................................18
Section 8.10. Books and Records .......................................................18
Section 8.11. Insurance .....................................................................18
Section 8.12. [Intentionally Omitted] .................................................19
Section 8.13. Assignment of Contracts ...............................................19
Section 8.14. Inspection....................................................................19
Section 8.15. Notice to Lender ...........................................................20
Section 8.16. Other Information .........................................................20
Section 8.17. Reports and Testing ......................................................20
Section 8.18. Appraisal .....................................................................20
Section 8.19. Financial Covenant .......................................................20
Section 8.20. [Intentionally Omitted] .................................................20
Section 8.21. [Intentionally Omitted] .................................................20
Section 8.22. Hazardous Material Laws...............................................20
ARTICLE IX  NEGATIVE COVENANTS..................................................21
Section 9.1. Debt..............................................................................21
Section 9.2. Liens.............................................................................21
Section 9.3. Organizational Documents...............................................21
Section 9.4. No Subsidiaries .............................................................21
Section 9.5. Dividends ......................................................................22
Section 9.6. Acquisitions ..................................................................22
Section 9.7. Mergers, Conveyances, Consolidations, etc .....................22
Section 9.8. Change of Name or Location............................................22
Section 9.9. [Intentionally Omitted] ...................................................22
Section 9.10. Subordinated Debt ........................................................22
Section 9.11. Character of Business ....................................................22
Section 9.12. Management Change ......................................................22
Section 9.13. [Intentionally Omitted] .................................................22
Section 9.14. Membership/Partnership Interests...................................22
ARTICLE X  EVENTS OF DEFAULT; REMEDIES ...................................23
Section 10.1. Events of Default ..........................................................23

ii

# TABLE OF CONTENTS

**Page**

Section 10.2.  Remedies .................................................................................................... 24
Section 10.3.  Certain Other Remedial Matters ................................................................ 25
Section 10.4.  Disposition of Collateral ........................................................................... 25
ARTICLE XI  MISCELLANEOUS ............................................................................... 25
Section 11.1.  Waivers, Etc .............................................................................................. 25
Section 11.2.  Reimbursement of Expenses ..................................................................... 26
Section 11.3.  Venue ......................................................................................................... 26
Section 11.4.  Notices ....................................................................................................... 26
Section 11.5.  GOVERNING LAW ................................................................................. 27
Section 11.6.  Survival of Representations, Warranties and Covenants ........................... 27
Section 11.7.  Counterparts; Execution by Facsimile Transmission ............................... 27
Section 11.8.  Separability ................................................................................................ 27
Section 11.9.  Descriptive Headings ................................................................................. 28
Section 11.10.  Setoff ....................................................................................................... 28
Section 11.11.  Successors and Assigns; Participations ................................................... 28
Section 11.12.  Interest ..................................................................................................... 29
Section 11.13.  Indemnification ........................................................................................ 29
Section 11.14.  Payments Set Aside ................................................................................. 31
Section 11.15.  Amendments, Etc ..................................................................................... 31
Section 11.16.  Relationship of the Parties ...................................................................... 31
Section 11.17.  Certain Matters of Construction .............................................................. 31
Section 11.18.  JURY TRIAL WAIVER .......................................................................... 32
Section 11.19.  FINAL AGREEMENT ............................................................................ 32

14571686v.6

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** is entered into as of August 31, 2015, between **PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, LP**, a Delaware limited partnership ("Borrower") and **HEARTLAND BANK**, an Arkansas state bank ("Lender").

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained, the parties hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

As used herein, the following words and terms shall have the respective meanings indicated opposite each of them:

"Account Debtor" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

"Accounts Receivable" shall mean all of Borrower's accounts, instruments, contract rights, chattel paper, documents, and general intangibles arising from the sale of goods and/or the rendition of services by Borrower in the ordinary course of business, and the proceeds thereof and all security and guaranties therefor, whether now existing or hereafter created, and all returned, reclaimed or repossessed goods, and all books and records pertaining to the foregoing.

"Acquisition" shall mean any transaction or series of related transactions in which Borrower acquires stock or other equity interests in, or all or substantially all of the assets of, any Person or, in the case of a Person that is a corporation or other business entity, any division thereof.

"Affiliate" shall mean any Person controlled by, controlling or under common control with Borrower.

"Agreement" shall mean this Credit Agreement, as the same may be amended, modified or supplemented from time to time.

"Applicable Rate" shall mean five and 875/1000 percent (5.875%).

"Approved Uses" shall mean use of the Loan for (a) working capital needs of Borrower and its Subsidiaries, and (b) the payment of the all costs and expenses arising in connection with the negotiation and execution of this Agreement and the other Loan Documents.

"AUM" shall mean the market value of all assets Borrower manages for itself, its Subsidiaries or on behalf of investors minus all liabilities, but excluding assets of any Affiliate.

"Authorized Officer" shall mean, as to any Person, the Chairman, the President, Chief Executive Officer, Chief Financial Officer, Vice President or other officer duly authorized by the board of directors of such Person.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended, and any successor statute.

"Borrower" shall have the meaning set forth in the first paragraph of this Agreement.

"Business Day" shall mean any day other than Saturday, Sunday or any day on which commercial banks in Little Rock, Arkansas, are permitted or required to close.

"Capital Expenditures" means the expenditures of any Person which are capitalized on the balance sheet of such Person in accordance with GAAP (including that portion of Capitalized Lease Obligations which should be capitalized on a balance sheet of such Person in accordance with GAAP) and which are made in connection with the purchase, construction or improvement of items properly classified on such balance sheet as property, plant, equipment or other fixed assets or intangibles.

"Capitalized Lease" means, as to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property to such Person as lessee, with respect to which the obligations of such Person to pay rent or other amounts are required to be classified and accounted for as a capital lease on a balance sheet of such Person in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board), or with respect to which the amount of the asset and liability thereunder as if so capitalized is required to be disclosed in a note to such balance sheet.

"Capitalized Lease Obligations" means, as to any Person, the obligation of such Person to pay rent or other amounts under a Capitalized Lease and, for purposes of this Agreement, the amount of such obligation shall be the capitalized amount thereof, determined in accordance with GAAP.

"Closing Date" shall mean August 31, 2015.

"Code" shall mean the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of Arkansas; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of Arkansas, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"Collateral" shall mean the property and collateral described in the Security Documents, which grants a Lien in favor of Lender as security for the Obligations.

"Contingent Obligation" shall mean, with respect of any Person, any obligation of such Person guaranteeing or intended to guarantee any Debt or other obligation (the "primary

obligation") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, that notwithstanding the foregoing, the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Contingent Obligation of any Person shall be the amount of the primary obligation or such lesser amount to which the maximum exposure of such Person shall have been specifically limited.

"Debt" shall mean, with respect to any Person at any time, without duplication, (a) indebtedness for borrowed money or for the deferred purchase price of property or services purchased, excluding unsecured trade accounts payable within 120 days after the creation thereof, (b) all indebtedness of others for borrowed money or for the deferred purchase price of property or services secured by a Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) Capitalized Lease Obligations, (e) all obligations payable out of the proceeds of production from property of such Person, whether or not the obligation secured thereby shall have been assumed by such Person, and (f) Contingent Obligations of such Person.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" shall mean any of the events specified in Section 10.1, whether or not there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

"Distribution" by any Person, shall mean (a) with respect to any stock issued by such Person or any partnership or joint venture interest of such person, the retirement, redemption, repurchase, or other acquisition for value of such stock, partnership or joint venture interest, (b) the declaration or payment (without duplication) of any dividend or other distribution, whether monetary or in kind, on or with respect to any stock, partnership or joint venture of any Person, and (c) any other payment or distribution of assets of a similar nature or in respect of an equity investment.

"Dollars" and "$" shall mean lawful currency of the United States of America.

"Draw Request" shall have the meaning set forth in Section 2.1(f).

"ERISA" shall have the meaning set forth in Section 6.14.

"Event of Default" shall mean any of the events specified in Section 10.1, provided that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"Governmental Authority" shall mean any government, any state or other political subdivision thereof, or any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, rule, regulation, judgment, decree, injunction, writ, edict, franchise, permit, certificate, license, award, authorization or other direction, guideline, or requirement of any Governmental Authority, including, without limitation, any requirement under common law.

"Guaranty" shall mean individually, and "Guaranties" shall mean, collectively, the continuing guaranty of payment and performance of the Obligations, executed by any guarantor in favor of Lender, as it may from time to time be renewed, extended, amended or restated.

"Hazardous Material" shall mean any hazardous or toxic waste, substance or material defined or regulated as such in or for purposes of the Hazardous Material Laws.

"Hazardous Material Law(s)" shall mean all laws, codes, ordinances, rules, regulations and other governmental restrictions and requirements issued by any federal, state, local or other governmental or quasi-governmental authority or body (or any agency, instrumentality or political subdivision thereof) pertaining to any substance or material which is regulated for reasons of health, safety or the environment and which is present or alleged to be present on or about or used in any facilities owned, leased or operated by Borrower or any Subsidiary, or any portion thereof including, without limitation, those relating to soil, surface, subsurface ground water conditions and the condition of the indoor and outdoor ambient air; any so-called "superfund" or "superlien" law; and any other United States federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any Hazardous Material, as now or at any time during the term of the Agreement in effect.

"Highest Lawful Rate" shall mean, with respect to Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged, or received with respect to the Loan and Term Loan Note or on other amounts, if any,

due to Lender pursuant to this Agreement or any other Loan Document, under laws applicable to Lender which are presently in effect, or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.  To the extent required by applicable law in determining the Highest Lawful Rate with respect to Lender as of any date, there shall be taken into account the aggregate amount of all payments and charges theretofore charged, reserved or received by Lender hereunder or under the other Loan Documents which constitute or are deemed to constitute interest under applicable law.

"incur" (including the correlative terms "incurred," "incurring," "incurs" and "incurrence"), when used with respect to any Debt, shall mean create, incur, assume, guarantee or in any manner become liable in respect of such Debt.

"Indemnified Parties" shall have the meaning set forth in Section 11.13.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Interest Expense" shall mean for any period, without duplication, the aggregate of all interest expense, all prepayment charges and all amortization of debt discount and expense, including, without limitation, all net amounts payable (or receivable) under Interest Rate Agreements and all interest expense attributable to Capitalized Leases, in each instance determined in accordance with GAAP.

"Interest Rate Agreement" shall mean an interest rate swap agreement, interest rate cap agreement or similar arrangement.

"Investment" means, as applied to any Person, any direct or indirect purchase or other acquisition by such Person of stock or other securities of any other Person, or any direct or indirect loan, advance or capital contribution by such Person to any other Person, or any other item which would be classified as an "investment" on a balance sheet of such Person prepared in accordance with GAAP, including any direct or indirect contribution by such Person of property or assets to a joint venture, partnership or other business entity in which such Person retains an interest.

"Lender" shall have the meaning set forth in the first paragraph of this Agreement.

"Lien" shall mean (a) any interest in property (whether real, personal or mixed and whether tangible or intangible) which secures the payment of Debt or an obligation owed to, or a claim by, a Person other than the owner of such property, whether such interest is based on the common law, statute or contract, including, without limitation, any such interest arising from (and irrespective of whether created by such owner or another Person) a mortgage, charge, pledge, security agreement, conditional sale, Capitalized Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such property, including, without limitation, reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way and restrictive

covenants (other than minor exceptions to or irregularities in the title or ownership interest in such property which do not materially impair the use of such property for its intended purpose).

"Loan" shall mean the credit facility to be funded by Lender to Borrower pursuant to the term of this Agreement, as the same may be renewed or extended or increased from time to time.

"Loan Documents" shall mean this Agreement, the Term Loan Note, the Guaranties, the Security Agreement, and all instruments, certificates and agreements now or hereafter executed or delivered to Lender pursuant to any of the foregoing and the transactions connected therewith, and all amendments, modifications, renewals, extensions, increases and rearrangements of, and substitutions for, any of the foregoing.

"Material Adverse Effect" shall mean any material adverse effect on (a) the financial condition, business, properties, assets, prospects or operations of Borrower or any Subsidiary, (b) the ability of any Borrower to repay the Obligations owing by Borrower or the ability of any Borrower to perform on a timely basis any other obligations under this Agreement or any other Loan Document to which it is a party, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of Lender under any Loan Document.

"Maturity Date" shall mean the earlier of (i) August 31, 2017, or (ii) the date of the acceleration of the Obligations pursuant to the terms of the Loan Documents, on which all outstanding principal and accrued interest hereunder is due and payable (as such maturity date may be renewed or extended, or accelerated under the terms of the Term Loan Note or otherwise).

"Moody's" shall mean Moody's Investors Service, Inc. and any successor thereto.

"Obligations" shall mean the Loan and all of the other obligations of Borrower and the Subsidiaries now or hereafter existing under the Loan Documents, whether for principal, interest, fees, expenses, reimbursement, indemnification or otherwise and whether such obligations are absolute or contingent, joint or several, matured or unmatured, direct or indirect.

"Officer's Certificate" shall mean a certificate signed in the name of Borrower by an Authorized Officer thereof.

"Other Taxes" shall have the meaning set forth in Section 4.7(b).

"Payment Date" shall mean the first day of each fiscal quarter, beginning with October 1, 2015 and continuing thereafter (or if any such date is not a Business Day, then the next preceding Business Day).

"Person" shall mean an individual, partnership, joint venture, corporation, limited liability company, joint stock company, bank, trust, unincorporated organization and/or a government or any department or agency thereof.

"Prime Rate" shall mean the rate of interest per annum from time to time published in the money rates section of *The Wall Street Journal* or any successor publication thereto as the

"prime rate" then in effect; provided that if such rate of interest, as set forth from time to time in the money rates section of *The Wall Street Journal*, becomes unavailable for any reason as determined by Lender, the "Prime Rate" shall mean the rate of interest per annum announced by Lender as its prime rate in effect at its principal office in the State of Arkansas (such Lender announced Prime Rate not being intended to be the lowest rate of interest charged by Lender in connection with extensions of credit to debtors).

"S&P" shall mean Standard & Poor's Rating Group and any successor thereto.

"Security Agreement" shall mean that certain Security Agreement, dated as of the Closing Date executed by Borrower in favor of Lender.

"SEC" shall mean the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"Security Documents" means each and every security agreement, guaranty, pledge, mortgage, deed of trust or other collateral security agreement required by or delivered to Lender from time to time to secure the Obligations, or any portion thereof, including, without limitation, the Security Agreement, and the Guaranties.

"Subsidiary" shall mean any corporation, partnership, limited liability company, joint venture, association, bank or other business entity of which fifty percent (50%) or more of the indicia of equity rights is at the time directly or indirectly owned by Borrower or any Subsidiary.

"Taxes" shall have the meaning set forth in Section 4.7(a).

"Term Loan" shall mean a term loan in the principal amount of $7,000,000, as the same may be increased with the express written consent of Lender.

"Term Loan Note" shall mean the promissory note executed by Borrower in favor of Lender evidencing the obligation to repay the Term Loan, together with any renewals, extensions, modifications or amendments of the forgoing.

## ARTICLE II
## THE CREDIT FACILITY

### Section 2.1.    Term Loan Commitment.

(a)    **Term Loan.**   Upon the terms and conditions and relying upon the representations and warranties set forth herein and in the other Loan Documents, Lender agrees to make the Term Loan to Borrower in a single advance as of the Closing Date.  The Term Loan is not revolving, and any amount borrowed and repaid may not be reborrowed.

(b)    **Term Loan Note.**  Borrower shall execute and deliver to Lender the Term Loan Note, which shall be (i) dated the Closing Date; (ii) in the principal amount of the Term Loan, and (iii) payable as provided herein and in the Term Loan Note.  The Term Loan Note shall bear interest on the unpaid principal amount thereof from time to time outstanding at the rate per annum determined as specified in Section 3.1, payable on each Interest Payment Date

and on the Maturity Date, commencing with the first Interest Payment Date following the date of such Term Loan Note.

      (c)    **Use of Proceeds.** The Term Loan shall be used solely for Approved Uses.

# ARTICLE III
# INTEREST RATE PROVISIONS

**Section 3.1.**    **Interest Rate.** The Term Loan shall bear interest on the unpaid principal amount thereof from time to time outstanding, until maturity, at a rate per annum (calculated based on a year of 360 days in each case for the actual days elapsed) equal to the lesser of (a) the Applicable Rate, or (b) the Highest Lawful Rate. Notwithstanding anything set forth herein to the contrary (other than Section 11.12), if a Default has occurred and is continuing the Term Loan shall bear interest at a rate per annum which shall be equal to the lesser of (i) 5% above the Applicable Rate or (ii) the Highest Lawful Rate, which interest shall be due and payable on demand.

# ARTICLE IV
# PREPAYMENTS AND OTHER PAYMENTS

**Section 4.1.**    **Required Payments.**

      (a)    **Interest Payments.** Beginning on the first Payment Date and continuing on each subsequent Payment Date until the Maturity Date, Borrower shall make payments of interest owed under the Term Loan Note by no later than the close of business (Little Rock, Arkansas time) on each Payment Date, in immediately available funds in Little Rock, Arkansas, to Lender at its address referred to in Section 11.4.

      (b)    **Principal Payment Date.** All outstanding principal owed hereunder is due no later than the close of business (Little Rock, Arkansas time) on the Maturity Date in immediately available funds in Little Rock, Arkansas, to Lender at its addressed referred to in Section 11.4. Borrower acknowledges and understands that the Loan will not fully amortize prior to the Maturity Date, and on the Maturity Date a final balloon payment of all outstanding principal under the Term Loan Note and accrued interest thereon shall be due and payable in full.

**Section 4.2.**    **Prepayments.**

      (a)    **Optional Prepayments.** Borrower shall have the right at any time and from time to time to prepay, in whole or in part, without penalty, the Term Loan; provided, that (a) at the time of such prepayment, no Default or Event of Default exists, (b) Borrower shall pay at the time of such prepayment all accrued, but unpaid interest due and owing hereunder, and (c) Borrower shall have delivered a notice of payment, as required in Section 4.3.

      (b)    **Mandatory Prepayment.** Borrower shall use to prepay the outstanding principal of the Term Loan all net proceeds of (i) any disposition of all or any part of its assets permitted hereunder, (ii) any Debt permitted to be incurred hereunder, or (iii) any insurance

claim.  Prepayment made pursuant to this Section 4.2(b) shall be applied to the Term Loan in the inverse order of maturity.

**Section 4.3.    Notice of Payments.**    Borrower shall give Lender at least three (3) Business Days' prior written notice of each prepayment proposed to be made by Borrower pursuant to Section 4.2, specifying the principal amount thereof to be prepaid, the prepayment date and the account of Borrower to be charged if such prepayment is to be so effected.  Notice of such prepayment having been given, the principal amount of the Loan specified in such notice, together with interest thereon to the date of prepayment, shall become due and payable on such prepayment date.

**Section 4.4.    Place of Payment or Prepayment.**   All payments and prepayments made in accordance with the provisions of this Agreement or of principal or interest on the Term Loan Note shall be made to Lender no later than 10:00 a.m. (Little Rock, Arkansas time) in immediately available funds at the address referred to in Section 11.4.

**Section 4.5.    Prepayment Premium or Penalty.**    Each prepayment pursuant to Section 4.2 shall be without premium or penalty.

**Section 4.6.    [Intentionally Omitted].**

**Section 4.7.    Taxes.**

(a)    Subject to Section 11.12, any and all payments by Borrower hereunder or under the Term Loan Note shall be made free and clear of and without deduction for any and all present or future taxes, deductions, charges or withholdings, and all liabilities with respect thereto, including, without limitation, such taxes, deductions, charges, withholdings or liabilities whatsoever imposed, assessed, levied or collected by any jurisdiction (or any political subdivision thereof) of which Borrower or any Subsidiary is organized or doing business, excluding, taxes imposed on Lender's net income (including penalties and interest payable in respect thereof) and franchise taxes imposed on Lender, by the jurisdiction under the laws of which Lender is organized or any political subdivision thereof (all such non-excluded taxes, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").  Subject to Section 11.12 hereof, if Borrower shall be required by Governmental Requirement to deduct any Taxes from or in respect of any sum payable hereunder or under the Term Loan Note to Lender (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 4.7) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Governmental Requirement.  If requested by Lender, Borrower shall confirm that all applicable Taxes, if any, imposed on it by virtue of the transactions under this Agreement have been properly and legally paid by it to the appropriate taxing authorities by sending either (A) official tax receipts or notarized copies of such receipts to Lender within thirty (30) days after payment of any applicable tax or (B) a certificate executed by an Authorized Officer of Borrower confirming that such Taxes have been paid, together with evidence of such payment.

(b)     In addition, subject to <u>Section 11.12</u> hereof, Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or under the Term Loan Note or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or the Term Loan Note (hereinafter referred to as "<u>Other Taxes</u>").

(c)     Subject to <u>Section 11.12</u> hereof, Borrower will indemnify Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 4.7</u>) paid by Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.   This indemnification shall be made within thirty (30) days from the date Lender makes written demand therefor.

(d)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreement and obligations of Borrower contained in this <u>Section 4.7</u> shall survive the termination of this Agreement and the payment in full of the Term Loan Note and all other amounts payable hereunder.

**Section 4.8.      Payments on Business Day**.  Whenever any payment or prepayment hereunder or under the Term Loan Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

# ARTICLE V
# COMMITMENT FEE AND OTHER FEES AND EXPENSES

**Section 5.1.      Commitment Fee**.  Borrower agrees to pay to Lender, on the Closing Date, a fully earned, nonrefundable commitment fee in respect of the commitment of Lender hereunder to Borrower in the amount of $70,000.

**Section 5.2.      Expenses**.  Borrower agrees to pay to Lender when due (or, if no stated due date, upon demand by Lender) all expenses (including reasonable attorneys' fees and expenses for documentation and negotiation of this Agreement) incurred through and after the Closing Date.

**Section 5.3.      Fees Fully Earned**.  Unless otherwise provided in this Agreement or in a separate writing by Lender, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Lender pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Lender's obligation to make loans and advances hereunder.

**Section 5.4.      Fees Not Interest; Nonpayment**.  The fees described in this Agreement represent compensation for services rendered and to be rendered separate and apart from the lending of money or the provision of credit and do not constitute compensation for the use, detention, or forbearance of money, and, subject to <u>Section 11.12</u>, the obligation of Borrower to pay each fee described herein shall be in addition to, and not in lieu of, the

obligation of Borrower to pay interest, other fees described in this Agreement, and expenses otherwise described in this Agreement. Fees shall be payable when due in Dollars and in immediately available funds. Subject to Section 11.12 hereof, all fees, including, without limitation, the fees referred to in Section 5.1 and any other fees payable pursuant to this Agreement, shall be non-refundable, and shall, to the fullest extent permitted by Governmental Requirement, bear interest, if not paid when due, at a rate per annum equal to the lesser of (a) 5% above the Applicable Rate or (b) the Highest Lawful Rate.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants that:

**Section 6.1.**     **Organization and Qualification; Subsidiaries.**  Borrower and each Subsidiary is (i) duly organized, validly existing and in good standing under the laws of the state of its organization and has full legal right, power and authority to carry on its business as presently conducted and to execute, deliver and perform its obligations under this Agreement and all other Loan Documents executed by it, and (ii) is duly qualified to do business and in good standing in each jurisdiction in which the nature of the business it conducts makes such qualification necessary or desirable.  All of Borrower's Subsidiaries are identified in Schedule 6.1 hereto.  Borrower owns all of the issued and outstanding stock of such Subsidiaries and there are no outstanding warrants or requirements of any type for the issuance of additional shares in such Subsidiaries.

**Section 6.2.**     **Accuracy of Information.**  (a) Borrower's exact legal name is that indicated on Schedule 6.2 hereto; (b) Borrower and each Subsidiary is an organization of the type and is organized in the jurisdiction set forth on Schedule 6.2 hereto; (c) Schedule 6.2 hereto accurately sets forth Borrower's  and each Subsidiary's organizational identification number or accurately states that Borrower or such Subsidiary has none; (d) Schedule 6.2 hereto accurately sets forth Borrower's and each Subsidiary's chief executive office as well as Borrower's mailing address (if different than its chief executive office); and (e) except as disclosed on Schedule 6.2 hereto, none of Borrower or any Subsidiary (and each of its predecessors) has, in the past five (5) years, changed its jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction.

**Section 6.3.**     **Authorization**.   Borrower's and each Subsidiary's execution, delivery and performance of the Loan Documents executed by it (i) have been duly authorized by all necessary action under such Person's organizational documents and otherwise, (ii) do not and will not require any consent of any other person or entity, and (iii) do not and will not require any consent, license, permit authorization or other approval (including foreign exchange approvals) of any Governmental Authority, or any notice to, exemption by, any registration, declaration or filing with or the filing of any other action in respect of any Governmental Requirement.

**Section 6.4.**     **No Conflicts.**  Neither execution or delivery by Borrower or any Subsidiary of any Loan Document nor the fulfillment of or compliance with its terms and provisions will (i) violate any Governmental Requirement of any Governmental Authority or the

basic organizational documents of such Person or (ii) conflict with or result in a breach of the terms, conditions or provisions of, or cause a default under, any material agreement, instrument, franchise, license or concession to which such Person is a party or bound.

**Section 6.5.    Enforceability.**  Each Loan Document to which Borrower or any Subsidiary is a party has been duly and validly executed, issued and delivered by Borrower or such Subsidiary. They are in proper legal form for prompt enforcement and they are Borrower's or such Subsidiary's, as applicable, valid and legally binding obligations enforceable in accordance with their terms.

**Section 6.6.    Accuracy of Information; No Material Adverse Change.**  All information supplied to Lender and all statements made to Lender by or on behalf of Borrower or any Subsidiary in connection with this Agreement or any Loan Document are and will be true, correct, complete, valid and genuine in all material respects. Each of Borrower's and each Subsidiary's financial statements furnished to Lender fairly presents the financial condition and results of operations of Borrower and its Subsidiaries, on a consolidated basis, as of its date and for the period then ended. No material adverse change has occurred in the financial condition or results of operations reflected in any such statements since their dates, and all assets listed on such statements are subject to Borrower's or Subsidiary's management control and disposition and, except as shown therein, are available to satisfy any claim rightfully made pursuant to the Loan Documents executed by Borrower or any Subsidiary. There has been no material adverse change in the financial condition or results of operations of Borrower or any Subsidiary since July 31, 2015.

**Section 6.7.    Taxes.**  Borrower and each Subsidiary has filed all tax returns required to be filed and paid all taxes shown thereon to be due by the due date or extension thereof, including interest and penalties, except for taxes being diligently contested in good faith and for payment of which adequate reserves have been set aside.

**Section 6.8.    Litigation and Other Proceedings.**  There is no action, suit or proceeding pending at law or in equity, or before or by any Governmental Authority which would result in a Material Adverse Effect.

**Section 6.9.    No Defaults.**  None of Borrower or any Subsidiary is in default with respect to any Governmental Requirement, in the payment of any debt for borrowed money or under any agreement or other papers evidencing or securing any such debt, which has not been waived which would result in a Material Adverse Effect.

**Section 6.10.    Solvency.**  Borrower and each Subsidiary is solvent and no bankruptcy or insolvency proceedings are pending or contemplated by or, to Borrower's knowledge, against Borrower or any Subsidiary. Borrower's and each Subsidiary's liabilities and obligations under this Agreement and the other Loan Documents do not and will not render Borrower or any Subsidiary insolvent, cause Borrower's or any Subsidiary's liabilities to exceed Borrower's or such Subsidiary's assets or leave Borrower or any Subsidiary with too little capital to properly conduct all of its business as now conducted or contemplated to be conducted.

**Section 6.11.     Representations and Warranties.**  No representation or warranty contained in any Loan Document executed by Borrower or any Subsidiary and no statement contained in any certificates, schedule, list, financial statement or other papers furnished to Lender by or on behalf of Borrower or any Subsidiary contains or will contain any untrue statement of material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading, provided that, insofar as the foregoing representation and warranty addresses information provided to Borrower or any Subsidiary by customers, such representation and warranty is based solely upon investigation made by Borrower or any such Subsidiary in the normal course of business.

**Section 6.12.     Margin Regulations.**  No part of the proceeds of the Loan will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

**Section 6.13.     Investment Company Act**.  Borrower is not an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

**Section 6.14.     [Intentionally Omitted]**.

**Section 6.15.     Licenses, Permits, Trademarks, etc.**  Borrower and each Subsidiary possesses all material permits, licenses, patents, trademarks, trade names and copyrights required to conduct its business.

**Section 6.16.     Compliance with Governmental Requirements.**  Borrower, each Subsidiary and the property of Borrower and each Subsidiary covered by the Loan Documents are in compliance with all Governmental Requirements and Borrower and each Subsidiary manages and operates (and will continue to manage and operate) its business in accordance with good industry practices.

**Section 6.17.     ERISA.**  No event has occurred which could result in liability on Borrower or any Subsidiary to the Pension Benefit Guaranty Corporation.  Borrower and each Subsidiary, as applicable, have met all requirements with respect to funding of each plan (a "Plan") maintained for any of Borrower's or any Subsidiary's employees subject to Title IV of the Employee Retirement Benefit Act of 1974, as amended, and related regulations ("ERISA"), if any exists.  No event or condition has occurred that would permit any lien under ERISA to attach to any of the Collateral.

**Section 6.18.     Title to Properties.**  Borrower and each Subsidiary have good, sufficient and legal title to, or valid leasehold interest in, all of the assets listed on its balance sheet, and the Collateral is subject to no Liens in any jurisdiction.  The Collateral is not in the possession of any third party bailee (such as a warehouse).  In the event that Borrower, after the date hereof, intends to store or otherwise deliver the Collateral to such a bailee, then Borrower will receive the prior written consent of Lender and such bailee must acknowledge in writing that the bailee is holding such Collateral for the benefit of Lender.

**Section 6.19.     Burdensome Contracts.**  None of Borrower or any Subsidiary is a party to any contract or agreement or subject to any restriction which could reasonably be expected to have a Material Adverse Effect.

**Section 6.20.     Authorization to File.**  Borrower hereby authorizes Lender to file financing statements and financing statement amendments without notice to Borrower, with all appropriate jurisdictions, as Lender deems appropriate, in order to perfect or protect Lender's interest in the Collateral.

**Section 6.21.     Environmental and Safety Matters**.  Borrower shall conduct its business and operation, and shall cause all Subsidiaries to conduct business and operation, in compliance with all Hazardous Material Laws in all material respects.

**Section 6.22.     Material Contracts.**  <u>Schedule 6.20</u> sets forth an accurate list of all material leases, contracts, agreements and commitments to which Borrower or any Subsidiary is a party or by which it is bound, including, without limitation, any real or personal property leases to which Borrower or any Subsidiary is a party the terms of which the failure to comply with could reasonably be expected to result in a Material Adverse Effect (collectively, the "<u>Material Contracts</u>").  Each of the Material Contracts is in full force and effect and Borrower or such Subsidiary, as applicable, has satisfied in full or provided for all of its liabilities and obligations under such Material Contract requiring performance prior to the date hereof in all material respects, and is not in material default under any of them, nor does any condition exist that with notice or lapse of time or both would constitute such a default.

**Section 6.23.  [Intentionally Omitted].**

**Section 6.24.  Federal Securities Laws**.  None of Borrower or any Subsidiary of Borrower (i) is required to file periodic reports under the Exchange Act, (ii) has any securities registered under the Exchange Act or (iii) has filed a registration statement that has not yet become effective under the Securities Act.

**Section 6.25.  Commercial Tort Claims**.  Borrower does not have any commercial tort claims.

**ARTICLE VII**
**CONDITIONS**

**Section 7.1.   Conditions to Closing.**  Lender will not be obligated to make the Term Loan hereunder unless all of the following conditions shall be satisfied:

(a)     **Approvals.**  Prior to the Closing Date, Borrower and each Subsidiary shall have obtained all orders, approvals or consents of all Persons required for the execution, delivery and performance by Borrower and each Subsidiary of the Loan Documents to which each such Person is a party.

(b)     **Compliance with Law.**  The business and operations of Borrower and each Subsidiary as conducted at all times relevant to the transactions contemplated by this

Agreement to and including the close of business on the Closing Date shall have been and shall be in compliance (other than any failure to be in compliance that does not result in a Material Adverse Effect) with all applicable Governmental Requirements.   No Governmental Requirement shall prohibit the transactions contemplated by the Loan Documents, no order, judgment or decree of any Governmental Authority shall exist, and no litigation shall be pending or, to the best knowledge of Borrower, threatened, which in the judgment of Lender (A) would enjoin, prohibit or restrain the transactions contemplated by the Loan Documents or (B) could have a Material Adverse Effect.

(c)     **Financial Statements.**  On the Closing Date, Lender shall have received and reviewed: (i) internally prepared, consolidated financial statements of Borrower and its Subsidiaries as of _____, 20___; and (ii) a certificate dated the Closing Date of the chief financial officer of Borrower certifying that the financial position of Borrower and its Subsidiaries as of the Closing Date is not materially different from that presented in the _____, 20___ consolidated balance sheet of Borrower and its Subsidiaries attached to such certificate.

(d)     **Insurance.**  Lender shall have received evidence satisfactory to it of the existence of all insurance policies required by the Loan Documents, providing for the giving of at least thirty (30) days' notice to Lender of cancellation or material modification thereof, and otherwise complying with the provisions of <u>Section 8.11</u>. Lender shall have received such agreements, guaranties (including without limitation the guaranties of each corporate Affiliate of Borrower), subordinations (as to payment liens and security interests or both), releases and other agreements and assurances from other creditors of Borrower or any Subsidiary as Lender shall reasonably require.

(e)     **Payment of Fees and Expenses.**  Lender shall have received payment of (i) all fees described in <u>Section 5</u> hereof and (ii) without limiting the obligations of Borrower under <u>Section 11.2</u>, the reasonable expenses of, or incurred by, Lender and its counsel, to the extent billed as of the Closing Date, in connection with the negotiation and closing of the transactions contemplated herein.

(f)     **[Intentionally Omitted].**

(g)     **Required Documents and Certificates.**  On the Closing Date, Lender shall have received the following, in each case in form, scope and substance satisfactory to Lender:

(i)     the Term Loan Note;

(ii)     the Security Agreement;

(iii)     an Officer's Certificate from Borrower and each Subsidiary executing a Loan Document dated as of the Closing Date certifying, inter alia, (A) the Articles of Incorporation or Bylaws (or equivalent corporate documents), as amended and in effect, of Borrower and each Subsidiary; (B) resolutions duly adopted by the Board of Directors of Borrower and each Subsidiary authorizing the transactions contemplated by

the Loan Documents to which it is a party; and (C) the incumbency and specimen signatures of the officers of Borrower and each Subsidiary authorized to execute documents on its behalf;

(iv)     a certificate from the appropriate public official of the jurisdiction in which Borrower and each Subsidiary is organized as to the continued existence and good standing of Borrower and each Subsidiary;

(v)     a certificate from the appropriate public official of each jurisdiction in which Borrower and each Subsidiary is authorized and qualified to do business as to the due qualification and good standing of Borrower and each Subsidiary unless failure is not reasonably likely to have a Material Adverse Effect;

(vi)     certified copies of Requests for Information of Copies (Form UCC-11), or equivalent reports, listing all effective financing statements which name Borrower, any Gurantor or any Subsidiary (under its present name, any trade names and any previous names) as debtor and which are filed, together with copies of all such financing statements;

(vii)     all federal and state tax returns for the last three (3) years for Borrower and such other financial information as Lender shall require; and

(viii)     such other documents as Lender shall reasonably request.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until payment in full of the Obligations, Borrower will and will cause each Subsidiary to, as applicable:

**Section 8.1.   Financial Statements and Information.**  Furnish or cause to be furnished to Lender a copy of each of the following within the times indicated:

(a)     as soon as available and in any event no later than June 30 of each year, annual audited consolidated financial statements for Borrower and all notes thereto, including a balance sheet and statements of income, retained earnings and cash flows for such fiscal year prepared in conformity with GAAP on a consolidated basis and accompanied by a report and opinion of independent certified public accountants satisfactory to Lender stating that such accountants have conducted audits of such financial statements in accordance with generally accepted auditing standards and that, in their opinion, such financial statements present fairly, in all material respects, Borrower's financial position as of their date and the results of Borrower's operations and cash flows for the period they covered in conformity with GAAP;

(b)     as soon as available and in any event within forty-five (45) days after the end of each month, unaudited consolidated financial statements for Borrower, including a balance sheet as at the close of such month and an income statement for such month, all prepared

in accordance with GAAP on a consolidated basis and certified on behalf of Borrower by an appropriate officer or other responsible party acceptable to Lender;

(c)     as soon as available and in any event within ninety (90) days after the end of each fiscal quarter, all third-party valuations of Borrower and all AUM as prepared by or for Borrower or Borrower's equity holders;

(d)     as soon as available and in any event within five (5) days of filing, copies of all periodic and other reports, proxy statements and other materials filed by Borrower with any Governmental Authority, or distributed to its shareholders, as the case may be;

(e)     promptly following the discovery thereof, information in reasonable detail correcting any information provided to Lender which Borrower or any Subsidiary discovers to be inaccurate or misleading in any material respect;

(f)     as soon as available and in any event within five (5) days of filing, all tax returns and all extensions or modifications filed in connection therewith; and

(g)     contemporaneously with the delivery of the annual and quarterly financial statements referred to in clauses (a) and (b) above, such financial reports and information as Lender shall require evidencing compliance with the applicable financial covenants, which reports and information shall include, at a minimum, delivery to Lender of an officer's certificate substantially in the form set forth on Exhibit A attached hereto, signed by an authorized financial or accounting officer of Borrower (or any other authorized officer satisfactory to Lender) (a "Compliance Certificate"), and, if requested by Lender, back-up documentation (including invoices, receipts and other evidence of costs incurred during such quarter as Lender shall reasonably require) evidencing the propriety of the deductions from revenues in determining such compliance.

**Section 8.2.    Maintenance of Existence/Good Standing and Permits.**  Maintain (a) its existence and obtain and maintain all franchises and permits necessary for Borrower and each Subsidiary continuously to be in good standing in its state of its organization with full power and authority to conduct its regular business and to own and operate its property; (b) all licenses, permits, other authorization and agreements necessary to operate and maintain its various businesses; and (c) its property, including leasehold estates, in a good, operable condition.

**Section 8.3.    Compliance With Governmental Requirements.**  Conduct its business in substantial compliance with all Governmental Requirements, including, but not limited to, any environmental laws, and will comply with and punctually perform all of the covenants, agreements and obligations imposed upon it to the extent any failure to so comply could reasonably be expected to have a Material Adverse Effect or cause any representation or warranty in the Loan Documents to be false or misleading.

**Section 8.4.    Payment of Obligations.**  Pay punctually and discharge when due, (a) or renew or extend, any debt incurred by it and will discharge, perform and observe the covenants, provisions and conditions to be performed, discharged and observed on its part in connection therewith or in connection with any agreement or other instrument relating thereto or in

connection with any mortgage, pledge or lien existing at any time upon any of the property or assets of Borrower or any Subsidiary; provided, that nothing contained in this <u>Section 8.4</u> shall require Borrower or any Subsidiary to pay, discharge, renew or extend any such indebtedness or to discharge, perform or observe any such covenants, provisions and conditions so long as Borrower or such Subsidiary shall be diligently and in good faith contesting any claims which may be asserted against it with respect to any such indebtedness or any such covenants, provisions and conditions and shall set aside on its books reserves with respect thereto deemed adequate by Lender; and (b) all taxes, lease payments and any other obligations arising in connection with the ownership and operation of Borrower's or any Subsidiary's businesses.

**Section 8.5.   Notification of Material Adverse Change.**   Immediately upon acquiring knowledge of any change in its assets, liabilities, financial condition, business, operations, affairs or circumstances which could reasonably be expected to cause an Event of Default, notify Lender in writing thereof, setting forth the nature of such change in reasonable detail and will take or cause to be taken all such steps as are necessary or appropriate to remedy promptly any such change.

**Section 8.6.   Notification of Defaults.**   Immediately upon acquiring knowledge thereof, notify Lender by telephone (and confirm such notice in writing within five (5) days) of the existence of any Default or Event of Default hereunder or of any default or event of default (however denominated) under any of the Loan Documents, or under the loan papers evidencing and/or securing any other Debt, specifying the nature and duration thereof and what action Borrower has taken, is taking and proposes to take with respect thereto.  In no event shall silence by Lender be deemed a waiver by it of a Default or an Event of Default.  Borrower will take all such steps as are necessary or appropriate to remedy promptly any such Default or Event of Default

**Section 8.7.   [Intentionally Omitted].**

**Section 8.8.   [Intentionally Omitted].**

**Section 8.9.   [Intentionally Omitted].**

**Section 8.10.   Books and Records.**   At all times maintain proper books of record and account in accordance with GAAP or, if approved by Lender, other sound accounting practice in which true, full and correct entries will be made of all its dealings and business affairs, and will set aside on its books adequate reserves for depletion, depreciation, obsolescence and/or amortization of its property, and all other reserves which, in accordance with sound accounting practice, should be set aside, and will write down, to the estimated salvage value thereof, all property not useful in its business.  Lender shall be entitled to have such books examined and audited, at the expense of Borrower, at any time by representatives of Lender.

**Section 8.11.   Insurance.**   At all times maintain insurance with insurance companies acceptable to Lender or otherwise acceptable to Lender, in such amounts and against such risks as are satisfactory to Lender, including without limitation liability insurance as would be reasonably prudent for entities in the same or similar type and size of business and owning similar property in the same general area, and furnish to Lender, not less frequently than

annually a certificate of insurance as to the insurance carried.  If Borrower or any Subsidiary shall at any time or times hereafter fail to obtain or maintain any of the policies of insurance required herein, or fail to pay any premium in whole or in part relating to such policies, Lender may, but shall not be obligated to, obtain or cause to be maintained insurance coverage, including at Lender's option, the coverage provided by all or any of the policies of Borrower and its Subsidiaries and pay all or any part of the premium therefor, without waiving any default by Borrower, and any sums so disbursed by Lender shall be added to the principal of the Term Loan and payable on demand.

**Section 8.12.  [Intentionally Omitted].**

**Section 8.13.  Assignment of Contracts.**  As additional security for the Obligations, Borrower hereby transfers and assigns to Lender all of Borrower's right, title and interest, but not its liability, in, under, and to all contracts and agreements related to the Collateral and agrees that all of the same are covered by the security agreement provisions of the Security Agreement. Borrower agrees to deliver to Lender from time to time upon Lender's request such consents to the foregoing assignment from parties contracting with Borrower as Lender may require. Neither this assignment nor any action by Lender shall constitute an assumption by Lender of any obligation under any contract.  Borrower hereby agrees to perform all of its obligations under any contract, and Borrower shall continue to be liable for all obligations of Borrower with respect thereto.  Lender shall have the right at any time (but shall have no obligation) to take in its name or in the name of Borrower such action as Lender may determine to be necessary to cure any default under any contract or to protect the rights of Borrower or Lender with respect thereto.  Borrower irrevocably constitutes and appoints Lender as Borrower's attorney-in-fact, which power of attorney is coupled with an interest and irrevocable, to enforce in Borrower's name or in Lender's name all rights of Borrower under any contract.  Lender shall incur no liability if any action so taken by it or on its behalf shall prove to be inadequate or invalid. Borrower indemnifies and holds Lender harmless against and from any loss, cost, liability or expense (including, but not limited to, consultants' fees and expenses and attorneys' fees and expenses) incurred in connection with Borrower's failure to perform such contracts or any action taken by Lender.  WITHOUT LIMITATION, THE FOREGOING INDEMNITIES SHALL APPLY TO LENDER WITH RESPECT TO MATTERS WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF, OR ARE CLAIMED TO BE CAUSED BY OR ARISE OUT OF, THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE OR CONTRIBUTORY) OR STRICT LIABILITY OF LENDER.  HOWEVER, SUCH INDEMNITIES SHALL NOT APPLY TO LENDER TO THE EXTENT THAT THE SUBJECT OF THE INDEMNIFICATION IS CAUSED BY OR ARISES OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LENDER.  Borrower represents and warrants to Lender that the copy of any contract furnished or to be furnished to Lender is and shall be a true and complete copy thereof, that there have been no modifications thereof which are not fully set forth in the copies delivered, and that Borrower's interest therein is not subject to any claim, setoff, or encumbrance.

**Section 8.14.  Inspection.**  Lender and its agents may inspect the Collateral at any reasonable time, unless Lender deems such inspection is of an emergency nature, in which event Borrower shall provide Lender with immediate access to the Collateral or to the location of the

Collateral.   Borrower will furnish to Lender and its agents, for inspection and copying, all specifications, books and records, and other documents and information that Lender may request from time to time.

**Section 8.15.   Notice to Lender.**   Borrower shall promptly within five (5) days after the occurrence of any of the following events, notify Lender in writing thereof, specifying in each case the action Borrower has taken or will take with respect thereto:  (a) any violation of any law or Governmental Requirement; (b) any litigation, arbitration or governmental investigation or proceeding instituted or threatened against Borrower or any Subsidiary, and any material development therein that could result in a Material Adverse Effect; (c) any labor controversy pending or threatened against Borrower or any Subsidiary, or any contractor thereof, and any material development in any labor controversy; (d) any notice received by Borrower or any Subsidiary with respect to the cancellation, alteration or non-renewal of any insurance coverage maintained with respect to the Collateral; (e) any lien filed against the Collateral; or (f) any required permit, license, certificate or approval with respect to the Collateral lapses or ceases to be in full force and effect.

**Section 8.16.   Other Information.**   Borrower shall furnish to Lender from time to time upon Lender's request such other information relating to Borrower, any Subsidiary, the Collateral or any other indemnitor or other person or party connected with Borrower, any Subsidiary, the Loan, the Collateral or any security for the Loan.

**Section 8.17.   Reports and Testing.**   Borrower shall promptly deliver to Lender copies of all reports, studies, inspections and tests made on any property on which the Collateral is or has been located.

**Section 8.18.   Appraisal.**   Lender may obtain from time to time, an appraisal of all or any part of the Collateral prepared in accordance with written instructions from Lender by a third-party appraiser engaged directly by Lender.   Each such appraiser and appraisal shall be satisfactory to Lender (including satisfaction of applicable regulatory requirements).   The cost of any such appraisal shall be borne by Borrower.

**Section 8.19.   Financial Covenant.**

(a)      **Loan to AUM.**   Borrower shall maintain at all times, as determined by Lender, a ratio of (i) AUM, minus the amount of any AUM against which a Lien exists, other than the Lien securing the Loan, to (ii) the outstanding balance of the Loan of no less than 50.0 to 1.0.

**Section 8.20.   [Intentionally Omitted].**

**Section 8.21.   [Intentionally Omitted].**

**Section 8.22.      Hazardous Material Laws.**

(a)      Use and operate all of its facilities and properties in material compliance with all applicable Hazardous Material Laws, keep all material required permits, approvals,

certificates, licenses and other authorizations required under such Hazardous Material Laws in effect and remain in compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Hazardous Material Laws;

(b)    (i) Promptly notify Lender and provide copies upon receipt of all written claims, complaints, notices or inquiries received by Borrower or any Subsidiary of Borrower relating to its facilities and properties or compliance with Hazardous Material Laws which, if adversely determined, could reasonably be expected to have a Material Adverse Effect; and (ii) promptly cure and have dismissed with prejudice to the reasonable satisfaction of Lender any material actions and proceedings relating to compliance with Hazardous Material Laws to which any Credit Party is named a party, other than such actions or proceedings being contested in good faith and with the establishment of reasonable reserves;

(c)    To the extent necessary to comply in all material respects with Hazardous Material Laws, remediate or monitor contamination arising from a release or disposal of Hazardous Material, which solely, or together with other releases or disposals of Hazardous Materials could reasonably be expected to have a Material Adverse Effect;

(d)    Provide such information and certifications which the Lender may reasonably request from time to time to evidence compliance with this Section 8.22.

## ARTICLE IX
## NEGATIVE COVENANTS

Borrower covenants and agrees that, until payment in full of the Obligations, Borrower will not and will not permit any Subsidiary to, without obtaining the prior written consent of Lender:

**Section 9.1.    Debt.**    Create, incur, suffer or permit to exist, or assume or guarantee, directly or indirectly, or otherwise become or remain liable with respect to, any Debt, contingent or otherwise (including without limitation, any off balance sheet liabilities), including the Obligations, if the aggregate amount of such Debt causes Borrower to violate Section 8.19(a) hereof. Notwithstanding the foregoing, Borrower shall make no payments on Debt, including any Debt owing to an Affiliate, upon the occurrence of an Event of Default.

**Section 9.2.    Liens.**    Create or suffer to be created or to exist any Lien, if such Lien would cause Borrower to default under Section 8.19(a) hereof.

**Section 9.3.    Organizational Documents.**    Modify or amend its organization documents or suffer or permit a material modification or amendment to its organizational documents in any manner that reasonably could be expected to affect any rights of Lender under the Loan Documents or have a Material Adverse Effect.

**Section 9.4.    No Subsidiaries.**    Acquire or form any Subsidiary, if the acquisition or formation of such Subsidiary causes Borrower to violate Section 8.19(a) hereof, unless (a) such Subsidiary (i) is a wholly-owned Subsidiary, (ii) executes and delivers to Lender a Guaranty and such other Loan Documents as required by Lender, and (iii) delivers such certificates, evidences

of corporate action, financing statements, opinions of counsel and other documents as Lender may reasonably request, and (b) Borrower or the appropriate Subsidiary executes a Security Agreement pledging to Lender the stock of such new Subsidiary, and delivers to Lender the applicable stock certificates and stock powers executed in blank, all of the items referred to in (a) and (b) above to be in form and substance reasonably satisfactory to Lender, in each case not later than 10 days after the acquisition or formation of such Subsidiary.

**Section 9.5.    Dividends.**    Declare or pay any Distributions if such declaration or payment causes Borrower to violate section 8.19(a) hereof.

**Section 9.6.    Acquisitions.**    Make any Acquisition if such Acquisition causes Borrower to violate Section 8.19(a) hereof.

**Section 9.7.    Mergers, Conveyances, Consolidations, etc.**    (a) Merge or consolidate with or into any other Person, (b) convey, sell, lease, transfer, assign or otherwise dispose of all or substantially all of its assets to any Person, or (c) adopt or effect any plan of reorganization, recapitalization, liquidation or dissolution, except that a Subsidiary of Borrower may be a party to any merger or consolidation that constitutes an Acquisition permitted by Section 9.6, provided that such Subsidiary shall be the survivor of any such merger or consolidation.

**Section 9.8.    Change of Name or Location.**    Change its name, state of organization, or the location of its chief executive office without first notifying Lender in writing of such change at least thirty (30) days before its effective date.

**Section 9.9.    [Intentionally Omitted].**

**Section 9.10.    Subordinated Debt.**    Permit any amendment or modification to the documents evidencing or governing any subordinated debt permitted by Lender in writing, or directly or indirectly, voluntarily prepay, defease or in substance defease, purchase, redeem, retire, or otherwise acquire, any such subordinated debt if such payment would result in a violation of Section 8.19(a) hereof.

**Section 9.11.    Character of Business.**    Change the general character of its business as conducted on the Closing Date.

**Section 9.12.    Management Change.**    Permit the termination of, or change of, the President or Chief Investment Officer of Borrower.

**Section 9.13.    [Intentionally Omitted].**

**Section 9.14.    Membership/Partnership Interests**.    Designate or permit any of its Subsidiaries to (a) treat their limited liability company membership interests or partnership interests, as the case may be, as securities as contemplated by the definition of "security" in Section 8-102(15) and by Section 8-103 of Article 8 of the Uniform Commercial Code or (b) certificate their limited liability membership interests or partnership interests, as applicable.

# ARTICLE X
# EVENTS OF DEFAULT; REMEDIES

**Section 10.1.  Events of Default.**  The occurrence of any of the following events shall constitute an "Event of Default" (herein so called) under this Agreement:

(a)    Borrower shall fail to pay when due any principal of or interest on the Term Loan Note or any monetary amount due under this Agreement or any other Loan Document;

(b)    any covenant, agreement or condition contained in this Agreement or in any other Loan Document is not fully and timely performed, observed or kept in all material respects;

(c)    any representation, warranty, certification or statement made or deemed to have been made by Borrower or any Subsidiary in this Agreement or by Borrower or any Subsidiary or any other Person in any certificate, financial statement or other document delivered pursuant to this Agreement, including, without limitation, any other Loan Document, shall prove to have been incorrect in any material respect when made;

(d)    any event or condition shall occur and continue unremedied or unwaived for a period beyond any applicable cure period provided pursuant to the terms of any Debt of Borrower or any Subsidiary which entitles (or, with the giving of notice or lapse of time or both, would entitle) the holder of any such Debt to accelerate the maturity thereof;

(e)    Borrower or any Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

(f)    an involuntary case or other proceeding shall be commenced against Borrower or any Subsidiary seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of thirty (30) days; or an order for relief shall be entered against Borrower or any Subsidiary under the federal bankruptcy laws as now or hereafter in effect;

(g)    (i) the service of process seeking to attach, by trustee or similar process, any funds of Borrower or any Subsidiary, or (ii) a notice of lien or levy is filed against any of the assets of Borrower or any Subsidiary by any Governmental Authority, and the same under

subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise);

(h)   (i) any material portion of the assets of Borrower or any Subsidiary is attached, seized, levied on, or comes into possession of a trustee or receiver, or (ii) any court order enjoins, restrains, or prevents Borrower or any Subsidiary from conducting all or any material part of its business;

(i)   one or more final, non-appealable judgments or orders for the payment of money in an aggregate amount outstanding at any time shall be rendered against Borrower or any Subsidiary and such judgment or order (*i*) shall continue unsatisfied and unstayed (unless bonded with a supersedeas bond at least equal to such judgment or order) for a period of thirty (30) days or (*ii*) is not fully paid and satisfied at least ten  days prior to the date on which any of its assets may be lawfully sold to satisfy such judgment or order;

(j)   one  or more judgments or orders for the payment of money shall be rendered against Borrower or any Subsidiary, whether or not otherwise bonded or stayed, which has a Material Adverse Effect;

(k)   the sale, pledge, encumbrance, assignment or transfer, voluntarily or involuntarily, of any interest in Borrower or any Subsidiary, without the prior written consent of Lender which would cause a violation of Section 8.19(a) hereunder;

(l)   the occurrence of a default or an event of default under or the payment of any amount pursuant to any subordinated debt referred to in Section 9.1;

(m)   any Governmental Approval shall have been (i) revoked, rescinded, suspended, modified in an adverse manner or not renewed in the ordinary course for a full term or (ii) subject to any decision by a Governmental Authority that designates a hearing with respect to any applications for renewal of any of such Governmental Approval or that could result in the Governmental Authority taking any of the actions described in clause (i) above, and such decision or such revocation, rescission, suspension, modification or non-renewal adversely affects the legal qualifications of Borrower or any Subsidiary to hold such Governmental Approval in any applicable jurisdiction and such revocation, rescission, suspension, modification or non-renewal could reasonably be expected to affect the status of or legal qualifications of Borrower or any of its Subsidiaries to hold any Governmental Approval in any other jurisdiction; or

(n)   the occurrence of an event that has, or could cause, a Material Adverse Effect on Borrower.

**Section 10.2.  Remedies.**  If any of the Events of Default specified in Section 10.1 shall occur, then (a) Lender shall be entitled (i) by notice to Borrower, to declare the commitments and the obligation to make advances hereunder, if any, to be terminated, whereupon the same shall forthwith terminate, and (ii) to declare the Term Loan Note and all interest accrued and unpaid thereon, and all other amounts payable under the Term Loan Note, this Agreement, and the other Loan Documents, to be forthwith due and payable, whereupon the notes, all such interest and all

such other amounts, shall become and be forthwith due and payable without presentment, demand, protest, or further notice of any kind (including, without limitation, notice of default, notice of intent to accelerate and notice of acceleration), all of which are hereby expressly waived by Borrower, and (b) Lender may avail itself of any and all powers, rights and remedies available at law or provided in this Agreement, the Term Loan Note, the other Loan Documents or any other document executed pursuant hereto or in connection herewith; provided, however, that with respect to any Event of Default described in Section 10.1(e) or 10.1(f), the entire unpaid principal amount of the Term Loan Note, all interest accrued and unpaid thereon and all such other amounts payable under the Term Loan Note, this Agreement and the other Loan Documents, shall automatically become immediately due and payable, without presentment, demand, protest, or any notice of any kind (including, without limitation, notice of default, notice of intent to accelerate and notice of acceleration), all of which are hereby expressly waived by Borrower.

**Section 10.3.   Certain Other Remedial Matters.**  Upon the occurrence of any Event of Default, Lender shall also have the right immediately and without notice, to take possession of and exercise possessory rights with regard to any property securing payment of the Obligations. All powers, rights and remedies of Lender set forth in this Article X shall be cumulative and not exclusive of any other power, right or remedy available to Lender under any Governmental Requirement or under this Agreement, the Note, the other Loan Documents or any other document executed pursuant hereto or in connection herewith to enforce the performance or observance of the covenants and agreements contained in this Agreement and the other Loan Documents, and no delay or omission of Lender to exercise any power, right or remedy shall impair any such power, right or remedy, or shall be construed to be a waiver of the right to exercise any such power, right or remedy.  Every power, right or remedy of Lender set forth in this Agreement, the Note, the other Loan Documents or any other document executed pursuant hereto or in connection herewith, or afforded by Governmental Requirement may be exercised from time to time, and as often as may be deemed expedient by Lender.

**Section 10.4.   Disposition of Collateral.**  Upon the occurrence of any Event of Default, Lender may exercise all rights and remedies against the Collateral available under the Code. Borrower hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Borrower, addressed as set forth in Section 11.4, at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made.  The proceeds of the Collateral shall be applied by Lender to payment of the Obligations in such order as Lender shall determine in its sole discretion.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1.   Waivers, Etc.**  No failure or delay on the part of Lender in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  No course of dealing between Borrower and Lender shall operate as a waiver of any

right of Lender.  No modification or waiver of any provision of this Agreement,  the Note or any other Loan Document nor consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

**Section 11.2.  Reimbursement  of  Expenses.**    Whether  or  not  the  transactions contemplated by this Agreement shall be consummated, Borrower agrees to reimburse, within ten (10) days after written demand therefor, (a) Lender for its reasonable out-of-pocket expenses, including  the  reasonable  fees  and  expenses  of  counsel  to  Lender,  in  connection  with  such transactions, or any of them, or otherwise in connection with this Agreement or any other Loan Document, including, without limitation, the negotiation, preparation, execution, administration, modification and enforcement of this Agreement or any other Loan Document and all fees, including  the  fees  and  expenses  of  counsel  to  Lender,  costs  and  expenses  of  Lender  in connection with audits, due diligence, transportation, computer, duplication, consultants, search reports, all filing and recording fees, appraisals, insurance, environmental inspection fees, survey fees and escrow fees, and (b) Lender for its out-of-pocket expenses, including the reasonable fees and expenses of its counsel, in connection with the enforcement of this Agreement or any other Loan Document.

**Section 11.3.  Venue.  BORROWER AND LENDER AGREE THAT PULASKI COUNTY, ARKANSAS IS PROPER VENUE FOR ANY ACTION OR PROCEEDING BROUGHT BY BORROWER OR LENDER, WHETHER IN CONTRACT, TORT OR OTHERWISE. ANY ACTION OR PROCEEDING AGAINST BORROWER MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT IN SUCH COUNTY TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY IRREVOCABLY (A) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS, AND (B) WAIVES ANY OBJECTION BORROWER MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT OR THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. BORROWER AGREES THAT SERVICE OF PROCESS UPON BORROWER MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT BORROWER'S ADDRESSES SPECIFIED IN SECTION 11.4.  LENDER MAY SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW AND MAY BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR WITH RESPECT TO ANY OF BORROWER'S PROPERTIES IN COURTS IN OTHER PROPER JURISDICTIONS OR VENUES.**

**Section 11.4.  Notices.**  All notices and other communications provided for herein shall be in writing (including telex, facsimile, or cable communication) and shall be mailed, couriered, telecopied, telexed, cabled or delivered addressed as follows:

If to Borrower, to it at:

Platinum Partners Credit Opportunities Master Fund, LP

250 West 55th Street, 14th Floor
New York, NY 10019
Attention:  David Steinberg
Telephone: _____
Fax: _____

If to Lender, to it at:

Heartland Bank
One Information Way, Suite 300
Little Rock, Arkansas 72202
Attention:  Russ Laster
Telephone:  501-663-3872
Fax:  501-614-7832

or as to Borrower or Lender, to such other address as shall be designated by such party in a written notice to the other parties.  All such notices and communications shall, when mailed, delivered by courier, telecopied, telexed, transmitted, or cabled, become effective when three (3) Business Days have elapsed after being deposited in the mail (with first class postage prepaid and addressed as aforesaid), or when confirmed by telex answerback, transmitted to the correct telecopier, or delivered to the courier or the cable company, except that notices and communications from Borrower to Lender shall not be effective until actually received by Lender.

**Section 11.5.  GOVERNING LAW.   EACH LOAN DOCUMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ARKANSAS AND THE UNITED STATES OF AMERICA.**

**Section 11.6.  Survival of Representations, Warranties and Covenants.**   All representations, warranties and covenants contained herein or in the other Loan Documents or made in writing by Borrower or any Subsidiary in connection herewith or therewith shall survive the execution and delivery of this Agreement and the Note, and will bind and inure to the benefit of the respective successors and assigns of the parties hereto, whether so expressed or not.  No investigation at any time made by or on behalf of Lender shall diminish Lender's right to rely thereon.

**Section 11.7.  Counterparts; Execution by Facsimile Transmission.**  This Agreement may be executed in several counterparts, and by the parties hereto on separate counterparts, and each counterpart, when so executed and delivered, shall constitute an original instrument, and all such separate counterparts shall constitute but one and the same instrument.  The method of execution of each Loan Document may be by means of facsimile transmission, and delivery of such a facsimile transmission shall be deemed an original for purposes hereof, provided that each party so delivering a facsimile transmission shall promptly thereafter deliver the original version thereof.

**Section 11.8.  Separability.**  Should any clause, sentence, paragraph or section of this Agreement be judicially declared to be invalid, unenforceable or void, such decision shall not

have the effect of invalidating or voiding the remainder of this Agreement, and the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable or void will be deemed to have been stricken herefrom and the remainder will have the same force and effectiveness as if such part or parts had never been included herein. Each covenant contained in this Agreement shall be construed (absent an express contrary provision herein) as being independent of each other covenant contained herein, and compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with one or more other covenants.

**Section 11.9.  Descriptive Headings.**  The section headings in this Agreement have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and provisions of this Agreement.

**Section 11.10. Setoff.**  Borrower, for itself and its Subsidiaries hereby gives and confirms to Lender a right of setoff of all moneys, securities and other property of Borrower or any Subsidiary and the proceeds thereof, now or hereafter delivered to remain with or in transit in any manner to Lender, its correspondents or its agents from or for Borrower or any Subsidiary, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into possession of Lender in any way, and also, any balance of any deposit accounts and credits of Borrower or any Subsidiary with, and any and all claims of security for the payment of the Note and of all other liabilities and obligations now or hereafter owed by Borrower or any Subsidiary to Lender, contracted with or acquired by Lender, whether such liabilities and obligations be joint, several, absolute, contingent, secured, unsecured, matured or unmatured, and Borrower, for itself and its Subsidiaries, hereby authorizes Lender at any time or times, while there is then continuing an Event of Default without prior notice, to apply such money, securities, other property, proceeds, balances, credits of claims, or any part of the foregoing, to any or all of the Obligations now or hereafter existing, whether such Obligations be contingent, unmatured or otherwise, and whether any collateral security therefor is deemed adequate or not.  The rights described herein shall be in addition to any collateral security described in any separate agreement executed by Borrower.

**Section 11.11. Successors and Assigns; Participations.**

(a)     All covenants, promises and agreements by or on behalf of Borrower or any Subsidiary or Lender contained in this Agreement and the other Loan Documents shall bind and inure to the benefit of their respective successors and permitted assigns.  None of Borrower or any Subsidiary may assign or transfer any of its rights or obligations under the Loan Documents without the prior written consent of Lender.

(b)     Lender may sell participations to one or more banks or other financial institutions in all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of any of the Term Loan and the Obligations of Borrower owing to it and the Term Loan Note held by it).

(c)     Notwithstanding any other provision herein, Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.11, disclose to the assignee or participant or proposed assignee or participant, any

information relating to Borrower or any Subsidiary furnished to Lender by or on behalf of Borrower or any Subsidiary.

**Section 11.12. Interest.**   All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand being made on the Term Loan Note or otherwise, shall the amount contracted for, charged, reserved or received by Lender for the use, forbearance, or detention of the money to be loaned under this Agreement or otherwise or for the payment or performance of any covenant or obligation contained herein or in any other Loan Document exceed the Highest Lawful Rate.   If, as a result of any circumstances whatsoever, fulfillment by Borrower of any provision hereof or of any of such documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable usury law or result in Lender having or being deemed to have contracted for, charged, reserved or received interest (or amounts deemed to be interest) in excess of the maximum lawful rate or amount of interest allowed by applicable law to be so contracted for, charged, reserved or received by Lender, then, ipso facto, the obligation to be fulfilled by Borrower shall be reduced to the limit of such validity, and if, from any such circumstance, Lender shall ever receive interest or anything which might be deemed interest under applicable law which would exceed the Highest Lawful Rate, such amount which would be excessive interest shall be refunded to Borrower, or, to the extent (i) permitted by applicable law and (ii) such excessive interest does not exceed the unpaid principal balance of the Term Loan Note and the amounts owing on other Obligations of Borrower to Lender under any Loan Document, applied to the reduction of the principal amount owing on account of the Term Loan Note or the amounts owing on other Obligations of Borrower to Lender under any Loan Document and not to the payment of interest.   All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the indebtedness of Borrower to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term of such indebtedness until payment in full of the principal thereof (including the period of any renewal or extension thereof) so that the interest on account of such indebtedness shall not exceed the Highest Lawful Rate.   The terms and provisions of this <u>Section 11.12</u> shall control and supersede every other provision hereof and of all other agreements between Borrower and Lender.

**Section 11.13. Indemnification.**   Borrower agrees:

(a)   **TO INDEMNIFY LENDER AND ITS AFFILIATES AND EACH OF ITS OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS, REPRESENTATIVES, AGENTS, ATTORNEYS, ACCOUNTANTS AND EXPERTS ("INDEMNIFIED PARTIES") FROM, HOLD EACH OF THEM HARMLESS AGAINST AND PROMPTLY UPON DEMAND PAY OR REIMBURSE EACH OF THEM FOR, THE INDEMNITY MATTERS WHICH MAY BE INCURRED BY OR ASSERTED AGAINST OR INVOLVE ANY OF THEM (WHETHER OR NOT ANY OF THEM IS DESIGNATED A PARTY THERETO) AS A RESULT OF, ARISING OUT OF OR IN ANY WAY RELATED TO (I) ANY ACTUAL OR PROPOSED USE BY BORROWER OF THE PROCEEDS OF THE LOAN, (II) THE EXECUTION, DELIVERY AND PERFORMANCE OF THE LOAN DOCUMENTS, (III) THE OPERATION OF THE**

BUSINESS OF BORROWER OR THE SUBSIDIARIES, (IV) THE FAILURE OF BORROWER OR ANY OF THE SUBSIDIARIES TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT OR WITH ANY GOVERNMENTAL REQUIREMENT, (V) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OF BORROWER OR ANY OF THE SUBSIDIARIES SET FORTH IN ANY OF THE LOAN DOCUMENTS, (VI) ANY ASSERTION THAT LENDER WAS NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE LOAN DOCUMENTS OR (VII) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, THE REASONABLE FEES AND DISBURSEMENTS OF COUNSEL AND ALL OTHER EXPENSES INCURRED IN CONNECTION WITH INVESTIGATING, DEFENDING OR PREPARING TO DEFEND ANY SUCH ACTION, SUIT, PROCEEDING (INCLUDING ANY INVESTIGATIONS, LITIGATIONS OR INQUIRIES) OR CLAIM AND INCLUDING ALL INDEMNITY MATTERS ARISING BY REASON OF THE NEGLIGENCE OF ANY INDEMNIFIED PARTY (EXCEPT AS TO THE EXTENT ANY SUCH INDEMNITY MATTERS HAVE BEEN CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY, IT BEING THE INTENT OF THE PARTIES THAT EACH INDEMNIFIED PARTY SHALL BE INDEMNIFIED FROM INDEMNITY MATTERS CAUSED BY THE NEGLIGENCE, WHETHER SOLE, JOINT, CONCURRENT, CONTRIBUTORY, ACTIVE OR PASSIVE, OF SUCH INDEMNIFIED PARTY); AND

(b)     TO INDEMNIFY AND HOLD HARMLESS FROM TIME TO TIME THE INDEMNIFIED PARTY FROM AND AGAINST ANY AND ALL LOSSES, CLAIMS, COST RECOVERY ACTIONS, ADMINISTRATIVE ORDERS OR PROCEEDINGS, DAMAGES AND LIABILITIES TO WHICH ANY SUCH PERSON MAY BECOME SUBJECT (I) UNDER ANY ENVIRONMENTAL LAW APPLICABLE TO BORROWER, THE SUBSIDIARIES, OR ANY OF THEIR PROPERTIES, INCLUDING, WITHOUT LIMITATION, THE TREATMENT OR DISPOSAL OF HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES, (II) AS A RESULT OF THE BREACH OR NON-COMPLIANCE BY BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO BORROWER OR ANY SUBSIDIARY, (III) DUE TO PAST OWNERSHIP BY BORROWER OR ANY SUBSIDIARY OF ANY OF ITS PROPERTIES OR PAST ACTIVITY ON ANY OF ITS PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (IV) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT OR DISPOSAL OF HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY BORROWER OR ANY SUBSIDIARY OR (V) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE BUSINESS OF BORROWER OR ANY SUBSIDIARY.

(c)     Borrower's obligations under this Section 11.13 shall survive the termination of this Agreement and the payment in full of the Term Loan Note and all other amounts payable hereunder.

**Section 11.14. Payments Set Aside.**   To the extent any payments on the Obligations or proceeds of any Collateral or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other Person under any Debtor Relief Law, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all rights and remedies therefor, shall be revived and shall continue in full force and effect, and Lender's rights, powers and remedies under this Agreement and each other Loan Document shall continue in full force and effect, as if such payment had not been made or such enforcement or setoff had not occurred.   In such event, each Loan Document shall be automatically reinstated and Borrower and each Subsidiary shall take such action as may be reasonably requested by Lender to effect such reinstatement.

**Section 11.15. Amendments, Etc.**   No amendment or waiver of any provision of this Agreement, the Term Loan Note or any other Loan Document, nor consent to any departure by Borrower or any Subsidiary  herefrom or therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower and/or the applicable Subsidiary, as to amendments, and by Lender in all cases, and then, in any case, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 11.16. Relationship of the Parties.**   This Agreement provides for the making of a loan by Lender, in its capacity as a lender, to Borrower, in its capacity as a borrower, and for the payment of interest and repayment of principal by Borrower to Lender.   The relationship between Lender and Borrower is limited to that of creditor/secured party, on the one hand, and debtor, on the other hand.   The provisions herein for compliance with financial, 0al, and other covenants, delivery of financial, environmental and other reports, and financial, environmental and other inspections, investigations, audits, examinations or tests are intended solely for the benefit of Lender to protect its interests as a lender in assuring payments of interest and repayment of principal and nothing contained in this Agreement or any other Loan Document shall be construed as permitting or obligating Lender to act as financial or business advisors or consultants to Borrower or any Subsidiary, as permitting or obligating Lender to control Borrower or any Subsidiary or to conduct or operate Borrower's or any Subsidiary's operations, as creating any fiduciary obligation on the part of Lender to Borrower or any Subsidiary, or as creating any joint venture, agency, or other relationship between the parties other than as explicitly and specifically stated in this Agreement.   Borrower acknowledges that it has had the opportunity to obtain the advice of experienced counsel of its own choosing in connection with the negotiation and execution of this Agreement and the other Loan Documents and to obtain the advice of such counsel with respect to all matters contained herein.   Borrower further acknowledges that it is experienced with respect to financial and credit matters and has made its own independent decision to apply to Lender for the financial accommodations provided hereby and to execute and deliver this Agreement and the other Loan Documents.

**Section 11.17. Certain Matters of Construction.**   The masculine and neuter genders used in this Agreement each includes the masculine, feminine and neuter genders, and whenever the singular number is used, the same shall include the plural where appropriate, and vice versa. Wherever the term "including" or a similar term is used in this Agreement, it shall be read as if it

were written "including by way of example only and without in any way limiting the generality of the clause or concept referred to."

**Section 11.18. JURY TRIAL WAIVER.  EACH OF BORROWER AND LENDER, FOR ITSELF AND ANY OF ITS AFFILIATES, HEREBY WAIVES ANY RIGHT TO A JURY TRIAL WITH RESPECT TO ANY MATTER ARISING OR RELATING TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**Section 11.19. FINAL AGREEMENT.  THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

IN WITNESS WHEREOF, the parties hereto, by their respective officers thereunto duly authorized, have executed this Agreement effective as the Closing Date.

**BORROWER:**

**PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, LP,**
a Delaware limited partnership

By:    Platinum Credit Holdings LLC,
       a Delaware limited liability company
       its general partner

By: _____
Name: _____Mark Nordlicht_____
Title: _____CIO_____

**LENDER:**

**HEARTLAND BANK,**
an Arkansas state bank

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto, by their respective officers thereunto duly authorized, have executed this Agreement effective as the Closing Date.

**BORROWER:**

**PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, LP,** a Delaware limited partnership

By:     Platinum Credit Holdings LLC,
        a Delaware limited liability company
        its general partner

        By: _____
        Name: _____
        Title: _____

**LENDER:**

**HEARTLAND BANK,**
an Arkansas state bank

By: _____
Name: _____ _Ross Carnie_ _____
Title: _____ _SVP_ _____

### SCHEDULE 6.1

**List of Subsidiaries**

- Alpha Credit Resources, LLC
- ALS Capital Ventures LLC
- Beta Credit Services, LLC
- Burr Capital LLC
- Cedarbridge Healthcare Management LLC
- Centurion Structured Growth, LLC
- Credit Funding LLC
- LC Energy Operations LLC
- LC Energy Holdings LLC
- Credit International LLC
- Credit Mining LLC
- Credit Strategies LLC
- Diamed Holdings LLC
- Financial Ventures LLC
- Hamilton Capital II LLC
- Hamilton Capital III LLC
- Hamilton Capital IV LLC
- Hamilton Capital IX LLC
- Hamilton Capital LLC
- Hamilton Capital V LLC
- Hamilton Capital VI LLC
- Hamilton Capital VII LLC
- Hamilton Capital VIII LLC
- Hamilton Capital X LLC
- Hamilton Capital XI LLC
- Hamilton Capital XII LLC
- Hillcrest Trading Partners LLC
- JARM Capital LLC
- JH Funding LLC
- Lakewood Group LLC
- LC Energy Holdings LLC
- LC Energy Operations LLC
- M.A.G. Insurance Services Group, LLC
- Maximilian Investors LLC
- Maximilian Resources LLC
- Energy Capital Corp.
- NorthRock Financial LLC
- Partner Growth Capital LLC
- Pea & Eigh Company LLC
- Photon Management LLC

- Platinum Long Term Growth VIII, LLC
- Platinum Partners Credit International LLC
- Platinum Partners Credit International LP
- Pro Master Group LLC
- Pro Player Funding LLC
- RE Credit, LLC
- Regis Capital LLC
- RJ Funding LLC
- Secure Holdings LLC
- Titan Trade Finance LLC
- West Ventures LLC
- Voltage Energy Holdings Co LLC

## SCHEDULE 6.2

**Corporate Information**

(a) Borrower's and each Guarantor's exact legal name:

Platinum Partners Credit Opportunities Master Fund LP

(b) Borrower type of organization and jurisdiction:

Limited Partnership (Delaware)

(c) Borrower's organizational identification number:

26-2868917

(d) Borrower's chief executive office and mailing address (if different than its chief executive office):

250 West 55th Street, 14th Floor

New York, NY 10019

(e) Any change to jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction except in the past five (5) years for Borrower:

N/A

## SCHEDULE 6.20

## Material Contracts

## EXHIBIT A

## FORM OF COMPLIANCE CERTIFICATE

## FORM OF COMPLIANCE CERTIFICATE

For the Period

from _____, ____

to _____, _____

To:     Heartland Bank, as Agent, pursuant to Credit Agreement, dated August 31, 2015 (as amended, amended and restated, supplemented, joined, extended and/or otherwise modified from time to time, the "Credit Agreement"), by and between **HEARTLAND BANK**, an Arkansas state bank, as administrative agent (in such capacity, "Agent"), the financial institutions from time to time party thereto, including, but not limited to **HEARTLAND BANK**, an Arkansas state bank ("Lender") and **PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, LP**, a Delaware limited partnership ("Borrower").

Ladies and Gentlemen:

This Compliance Certificate (this "Certificate") is delivered to you pursuant to **Section 8.1(g)** of the Credit Agreement.  Unless otherwise stated in this Certificate, capitalized terms used in this Certificate are defined in the Credit Agreement.

The undersigned hereby certifies to you as follows:

1.  The undersigned is, and at all times mentioned herein has been, a duly elected, qualified and acting Authorized Officer of Borrower.

2.  The undersigned has reviewed the relevant provisions of the Credit Agreement and other Loan Documents, and a review of the records of the activities of Borrowers during the period from _____, _____ to _____, _____ (the "Subject Period") has been made under the supervision of the undersigned with a view towards determining whether, during the Subject Period, Borrowers have kept, observed, performed and fulfilled all their obligations under the Loan Documents.

3.  The financial statements of Borrower on a consolidated basis delivered to you concurrently herewith fairly and accurately in all material respects present the financial condition of the Borrower and results of operations of Borrower at the date and for the period indicated therein, and have been prepared in accordance with GAAP, subject, in the case of interim financial statements, to the absence of footnotes and to normally recurring year-end adjustments.

4.  No Default or Event of Default has occurred and is continuing, except for such Defaults or Events of Default, if any, described on Schedule A attached hereto.  (If any are described, state the nature, when it occurred, whether it is continuing and the steps being taken by the Borrowers with respect to such Default or Event of Default.)

5.  The representations and warranties contained in Article VI of the Credit Agreement are true and correct in all material respects on and as of the date hereof with the same force and effect as though made on or as of the date hereof except (i) for those representations and warranties that relate specifically to an earlier date, (ii) for changes previously disclosed in writing to Agent and (iii) as disclosed on the attached Schedule B.

6.  Attached hereto as Schedule C is a true and accurate calculation setting forth, among other information, information that demonstrates compliance (or noncompliance) with each of the covenants set forth in Section 8.19 of the Credit Agreement.


This Certificate is subject to and shall be construed in accordance with the terms of the Credit Agreement.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned has caused this Compliance Certificate to be duly executed as of this _____ day of _____, 20___.

**PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, LP**,
a Delaware limited partnership

By: Platinum Credit Holdings LLC,
   a Delaware limited liability company
   its general partner

   By: _____
   Name: _____
   Title: _____

Schedules:

A – Defaults
B – Representations and Warranties
C – Calculations
D – Environmental Reports

**Schedule A**
**to**
**Compliance Certificate**


**Defaults**

**Schedule B**
**to**
**Compliance Certificate**


**Representations and Warranties**

**Schedule C**
**to**
**Compliance Certificate**

**Financial Covenant Calculation**

**Loan to AUM Ratio (Section 8.19(a))**

**Required:**     Borrower shall maintain at all times, as determined by Lender, a ratio of (i) AUM, minus the amount of any AUM against which a Lien exists, other than the Lien securing the Loan, to (ii) the outstanding balance of the Loan of no less than 50.0 to 1.0:

**Calculation:**

| | | |
|---|---|---|
| A. | Market value of all assets Borrower manages for itself, it Subsidiaries or on behalf of investors | $_____ |
| B. | Market value of all assets of Affiliates otherwise included in Line A | $_____ |
| C. | Adjusted market value (Line A minus Line B) | $_____ |
| D. | Liabilities | $_____ |
| E. | Net market value (Line C minus Line D) | $_____ |
| F. | Market value of AUM against which a Lien exists, other than the Lien securing the Loan | $_____ |
| G. | Adjusted net market value (Line E minus Line F) | $_____ |
| H. | Outstanding balance of the Loan | $_____ |
| I. | Loan to AUM Ratio (Line G divided by Line H, expressed as a ratio) | _____:_____ |

Is Line I a ratio equal to or greater than 50.0:1.0?

_____ No, not in compliance          _____ Yes, in compliance