UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

          -v-

PLATINUM MANAGEMENT (NY) LLC;                    No. 16-CV-6848 (BMC)(VMS)
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**FIRST JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING
THE PERIOD JULY 6, 2017 THROUGH SEPTEMBER 30, 2017**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Management (NY)

LLC, Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund

LP, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit

Opportunities Fund LLC, Platinum Partners Credit Opportunity Fund (BL) LLC, Platinum

Liquid Opportunity Management (NY) LLC, and Platinum Partners Liquid Opportunity Fund

(USA) L.P. (collectively, the "Receivership Entities," the "Platinum Entities" or "Platinum") and

Otterbourg P.C., as counsel to the Receiver ("Otterbourg" and, together with the Receiver,

"Applicants"), hereby submit this First Joint Interim Application for Allowance of Compensation

and Reimbursement of Expenses Incurred During the Period from July 6, 2017 through

September 30, 2017 (the "First Interim Application").   There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg).   The Receiver requests interim approval of fees in the amount of $223,676.00 and reimbursement of expenses in the amount of $2,113.73 for the period from July 6, 2017 through September 30, 2017 (the "First Application Period").   Otterbourg requests interim approval of fees in the amount of $933,689.25 and reimbursement of expenses in the amount of $6,067.18 for the First Application Period, for a combined total of fees for Applicants in the amount of $1,157,365.25,[1] and expenses in the amount of $8,180.91.

This First Interim Application contains the following sections:

**Section I**  provides a preliminary statement of the Receiver's actions in this case to date.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this First Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the First Application Period, under each project

---

[1]  As agreed to by the Receiver, this total amount reflects a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges and a ten percent (10%) reduction in Otterbourg's attorneys' recorded time charges.  In addition, based upon the SEC's review, Otterbourg's attorneys' recorded time charges have been voluntarily reduced by $2,876.50. Therefore, the Receiver's recorded time charges before application of these accommodations were $279,595.00 and Otterbourg's recorded time charges were $1,040,309.00, for a combined gross legal fees total (before the application of any public service or the voluntary reductions) of $1,319,904.00.

category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.     PRELIMINARY STATEMENT

1.      The tasks immediately facing the Receiver were substantial and, in many cases, time-sensitive. The Receiver not only had to immediately take control of the assets from the prior receiver and implement controls and necessary protocols to safeguard the assets and the books and records, she had to quickly understand the portfolio of assets to be able to address the myriad of emergencies confronting her from day one of her appointment.  Although taking over from a prior receiver, the Receiver had to review Platinum's investment portfolio, often as if it were the first day of the receivership.  While the prior receiver, who had been involved with the Platinum Entities as its monitor since July 2016, had the benefit of some familiarity with the Platinum Entities (including their assets, investments and personnel) when he became receiver, for Ms. Cyganowski and her team, it was more like starting from scratch.  During the first days of the transition, there was little to no documentation with respect to each asset other than Platinum's "ordinary course" documents, which were of limited or questionable value.  There was a dearth of independent analysis regarding the nature of each of Platinum's investments (debt or equity) or the extent of urgent funding needed to maintain the asset.  Little was known regarding potential liabilities associated with each asset.

3

2.      As a result of this void of information and analysis, Applicants were forced to spend an extraordinary amount of time on an expedited basis learning about each asset, including (i) a review of the underlying transaction documents; (ii) meetings and telephone calls with the principals and Platinum portfolio managers to obtain requisite background information on any particular investment; (iii) analysis of funding requests; and (iv) a thorough review of each investment to enable the Receiver to make better informed decisions.

3.      Moreover, to the extent that potential values were attributed to any particular assets, the Receiver had to test the basis and assumptions underlying such assessment before she could agree or disagree.  Unfortunately, the Receiver has found that many of the values given to Platinum assets, whether by the prior receiver or management, were based upon assumptions that derived from prior (removed) management's plans, were unrealistic in light of the receivership's current liquidity challenges and/or can no longer be supported.  Accordingly, while yet at a preliminary stage of the Receivership, the Receiver believes that the majority of the valuations previously attributed to Platinum assets were substantially misstated.

**B.      Initial Tasks of Receiver**

4.      Following her appointment, the Receiver took immediate steps to assert control over the Receivership Entities' books, records and accounts, and to oversee their accounting, cash management and budgeting processes.   Among other things, the Receiver notified Platinum's banks and brokerage firms of her appointment, transferred signatory authority for the bank accounts to the Receiver and her designated alternate (a senior partner at Otterbourg), and subsequently closed several banking accounts to streamline Platinum's banking system.

5.      In addition, the Receiver took immediate steps to assert control over Platinum's books and records by obtaining access to the accounting systems of the Platinum Entities, which

include the QuickBooks systems of the pertinent master funds, management companies and affiliates.   At the direction of the Receiver, the Receiver's financial advisors undertook a reconciliation of the July 6, 2017 opening and closing balances of the Platinum Entities' bank accounts, brokerage accounts and investment portfolio.

6.     The Receiver directed that no documents could be destroyed and also confirmed that all document destruction policies at the Platinum Entities were suspended, that all documents were being preserved, and that Platinum maintained an offsite disaster recovery system for its electronically stored information should the need ever arise.  Applicants also met with Platinum's information technology director to ensure that only approved users had access to certain files and ensured that certain protocols were in place concerning the resetting of passwords and immediate suspension of access to online files following the termination of an employee.

7.     The Receiver also instituted a variety of cash disbursement, budgeting and control protocols, including a 13-week cash forecast ("13-Week Forecast"), to minimize the prospect of any sudden cash crisis and enable the Receiver and her professionals to better evaluate a given course of action with respect to any particular asset by having ready access to information concerning the recurring costs and expenditures required for each asset. The Receiver developed and implemented procedures regarding the review of, and written approval for, all disbursements.  On a weekly basis, cash disbursements for the following week are forecasted based on the existing 13-Week Forecast and updates are made based upon any new information. All requests for disbursements are made in writing, with details and the basis for the disbursement provided to the Receiver, following which, if the Receiver approves of the disbursement, and when the wire is ready, the Receiver herself is responsible for approving

initiation of the wire payment.  Similarly, the team employs a "look-back" to ensure that funds were only expended for the purposes approved and in accordance with the prior authorizations of the Receiver.

### C.   Analysis and Disposition of Receivership Assets

8.      The opening investment portfolio consisted of 90 investments in approximately 69 entities.  The investments of the Platinum Entities are diverse, but generally fall into three main asset categories: (i) life settlement investments (*e.g.*, investments in life insurance policies), (ii) litigation finance investments, and (iii) "other" assets, which are primarily concentrated in the metals, mining and energy sectors, in companies that are mostly in the developmental stages. The nature of the Receivership Entities' investments in the "other" assets varies.  In some cases the Receivership Entities own a debt position, in others an equity position, and in others it may be a combination of the two.  The debt holdings also vary from senior positions, subordinate positions or, in some cases, the Receivership Entity may have sold a 100% participation in its debt holding and may only have maintained a residual interest.  The types of companies in which these investments were made range from pharmaceutical startups, to foreign "shell" companies, to small grocery stores in rural China.

9.      During the First Application Period, the Receiver and her team undertook to evaluate Platinum's property and complete asset portfolio (the "Receivership Estate") and prioritize those assets that either required immediate attention or could be most readily liquidated in a manner designed to maximize value promptly without the appearance of a "fire sale."  With respect to each of these investments, the Receiver has attempted to ascertain through available documentation (i) the nature of the Receivership Entities' investment, including where it falls in the capital structure, and (ii) the purpose and necessity of the request, including whether it should

6

be funded by another entity higher in the capital structure. This process has been challenging and has required substantial time. Specifically, Applicants spent considerable time trying to assemble, organize and/or recreate the files for the investments and undertaking a more thorough financial and legal analysis of the Platinum Entities' position(s) in each, determining the rights of each Platinum Entity pursuant to the operative documents, assessing the maintenance costs of the asset, and determining the best disposition options available to the Receiver. As part of her review, the Receiver also immediately requested that each legacy portfolio manager provide written memos on each of the investments under their purview. Following the delivery of these memos, Otterbourg attorneys met (often more than once) with the relevant portfolio manager to discuss the pertinent investments, with a focus on maintenance costs, possible disposition options, and potential claims by the estate.

10.     Notwithstanding the tremendous hurdles initially confronting the Receiver, the Receiver has made significant progress in her review of the investment portfolio and the process to liquidate and/or monetize the assets. During the First Application Period, the Receiver, negotiated, documented, and sold investment portfolio positions that have brought more than $11 million into the Receivership Estate.[2] None of these assets has been liquidated in a "fire sale" fashion. Indeed, to the contrary, one of these investments was monetized at par value.

11.     There are several other investments on the verge of disposition and the Receiver has retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey"),[3] *nunc pro tunc* to September 11,

---

[2]   The approximately $11 million is comprised of the following: (i) Katrina Barge Litigation Joint Venture, LLC (litigation finance investment) - $5.6 million, (ii) Milberg LLP (litigation finance investment) - $2.25 million, (iii) Martin Kenney & Co. (litigation finance investment) - $1.8 million, (iv) Blumont (stock sale) - $1.2 million, (v) Grey K (environmental-related investment) - $136,000.00, and (vi) Bang Holdings Corp. (social media investment) - $50,000.00.

[3]   The Receiver also retained Houlihan Lokey Financial Advisors, Inc. ("HLFA"), pursuant to Court Order [Docket No. 245], to continue with its valuation of Platinum's assets, which valuation process was begun under the prior receiver.

2017,[4] to market and sell specific assets including the life settlements portfolio, the litigation finance portfolio, and certain other natural resource investments that require the skill, experience and expertise of Houlihan Lokey to maximize the potential recovery on these assets in a prudent and expeditious manner.  Houlihan Lokey was retained because of its extensive experience with several hedge fund wind-downs, experience with marketing illiquid assets across a broad spectrum of alternative investments, and breadth of knowledge of potential investors to create a competitive environment to maximize recovery, as well as its pre-existing familiarity with the portfolio itself.

12.     The Receiver and Otterbourg have been actively engaged with Houlihan Lokey regarding the disposition of assets it has been tasked to market.  Applicants have provided Houlihan Lokey with documentation regarding each asset, discussed funding challenges that may have an impact on the marketing and disposition timeline, and assisted with the process getting the particular assets ready for market.  The Receiver believes that the life settlements and certain of the litigation finance investments can be marketed in the near term, with the anticipation that they will be disposed of in the first quarter of 2018.

13.     Options regarding the disposition of other assets in the Platinum portfolio are being considered by the Receiver and her professionals.  The Receiver has retained Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie"), *nunc pro tunc* to October 12, 2017,[5] to provide guidance and marketing skills to help the Receiver expeditiously monetize other assets in Platinum's portfolio that Houlihan Lokey has not been tasked with monetizing.  There will be no duplication in the work of Houlihan Lokey and Conway MacKenzie.  The Receiver is

---

[4]   Houlihan Lokey's retention was approved by the Court on November 11, 2017 [without any assigned docket number].

[5]   Conway MacKenzie's retention was approved by the Court on November 11, 2017.  [Dkt. No. 280].

necessarily cautious and believes that the ultimate value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the prior receiver.  For instance, the Receiver has found that many of the prior receiver's valuations were based upon inaccurate assumptions.

14.     At this time, the Receiver is only making payments that are necessary to maintain or preserve the value of an asset, protect collateral, and/or stabilize operations (*e.g.*, lease payments, premium payments on a life insurance policy, etc.).  The Receiver has not, to date, determined that any assets warrant any capital investment beyond what is necessary to preserve the respective asset.  This is a particular challenge because many of the investments made by the Receivership Entities were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, may require significant additional capital investment to even have the possibility of realizing a return on investment.

15.     A description of the investments in which Applicants have dedicated significant time during the First Application Period and the work done during the First Application Period with respect to those investments is set forth in Section IV of this First Interim Application.

**D.     Reduction of Expenses and Liabilities**

16.     Parallel to analyzing the Platinum assets and how best to maximize value of the Receivership Estate, the Receiver and her professionals also have sought to reduce expenses and liabilities of the Platinum Entities.  To that end, in addition to authorizing only expenditures absolutely necessary to maintain the *status quo* of an asset or avoid a significant penalty, the Receiver and her team sought to reduce overhead and other expenses.

4985654.1

17. The Receiver and Otterbourg met with each employee, gained an understanding of the employee's role in the organization and knowledge concerning Platinum's portfolio of assets, and identified the core group of employees that continue to provide a benefit to Platinum. Since the Receiver's appointment, the number of employees has been reduced from thirteen to six. The remaining employees consist of three portfolio managers (one of whom is part-time), the chief financial officer, the general counsel and the director of information technology. In view of the reduced workforce, the Receiver and Otterbourg also sought to relocate the Platinum offices to smaller, significantly less expensive office space. The Receiver has negotiated a lease for temporary office space in the same building in which the Receiver's offices are located and across the street from Houlihan Lokey's offices. This new office space will significantly reduce the amount of rent currently being expended by Platinum and will further facilitate consultation between the Receiver, Otterbourg, Houlihan Lokey and Goldin on the one hand, and Platinum employees on the other hand. Applicants are coordinating the relocation efforts, including the seamless transfer of Platinum's files and information technology, ensuring the continued protection and availability of such data, while reducing costs and avoiding reliance on a single employee for maintenance of the information technology system. The relocation is expected to occur at the end of this year, when the current lease expires.

18. The Receiver also negotiated a payoff, satisfaction, and release of Platinum's senior secured debt at a considerable reduction (more than $1 million) from the amount that was owed. Pre-receivership, Platinum was party to a first priority secured loan made to it by Heartland Bank. Based on the Receiver's analysis, Heartland Bank had a valid, first-priority lien on effectively all of the assets of Platinum Partners Credit Opportunities Master Fund LP. The loan was to come due at the end of August 2017, at which time Platinum would have been

10

required to make a balloon payment in the amount of the outstanding principal balance and accrued interest or risk interest accruing on the outstanding amounts at the total default rate of 10.875%.  The Receiver therefore concluded that it was in the best interests of Platinum to enter into a settlement with Heartland Bank for the payoff of the loan at a reduced amount.  Pursuant to the settlement approved by the Court, on September 1, 2017, Platinum made a payment of $5,900,000, achieving savings of over $1,000,000 in principal and $200,000 in interest on behalf of the Receivership Estate.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

19.    On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

20.    The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC ("Platinum Management") and Platinum Credit Management, L.P. ("Platinum Credit"), the managers of hedge fund Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA")[6] and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by

---

[6]    PPVA is the subject of an insolvency proceeding pending in the Cayman Islands.

Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

21.     The SEC further alleged that Nordlicht and the Platinum Entities overstated the value of an oil company that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds. In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual Defendants have denied all material allegations.

*Appointment of Receiver and Receivership Order*

22.     To prevent further diversions of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

23.     On December 19, 2016, the District Court entered an Order Appointing Receiver (as amended, the "Receiver Order") [Dkt Nos. 6 and 16].  The Receiver Order appointed Bart Schwartz as receiver (the "Prior Receiver").   The Prior Receiver had at the time of his appointment been engaged as a monitor for the Platinum Entities.

24.     On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receiver Order [Dkt. No. 216] (the "Appointment Order").

4985654.1

25. The Receiver filed a proposed Second Amended Receiver Order on August 24, 2017 [dkt. no. 254], which was entered by the Court on October 16, 2017 (the "Second Amended Receiver Order").  [Dkt. No. 276].

26. Under the terms of the Receiver Order (and the recently entered Second Amended Receiver Order), the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

27. Under the Receiver Order (and the Second Amended Receiver Order), the Receiver was granted the following general powers and duties:

(a) To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property");

(b) To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive

and take into possession from third parties all Receivership Property and records relevant thereto;

(c)     To manage, control, operate and maintain the Receivership Entities and hold in the Receiver's possession, custody and control all Receivership Property, pending further Order of this Court;

(d)     To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging the Receiver's duties as Receiver;

(e)     To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of the Receivership Entities;

(f)     To engage and employ persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers, subject to Court approval;

(g)     To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

(h)     To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure and Court orders;

(i)     To investigate transactions by and among Receivership Entities, defendants, and any other persons and entities.

4985654.1

(j)     To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver;

(k)     To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and

(l)     To take such other action as may be approved by the Court.

28.     To assist her with her duties, the Receiver sought the retention of counsel and a financial advisor.  To that end, on July 21, 2017, the Court approved the retention of Otterbourg as legal counsel to the Receiver [dkt. no. 231] and Goldin Associates LLC as her financial advisor [dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

**B.     Case Status[7]**

29.     In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)     Based on the Standardized Fund Accounting Report ("SFAR")[8] prepared and filed in the receivership case, as of September 30, 2017, the Receivership Entities had $8.6 million in funds, of which $7.17 million was held in cash in bank accounts and $1.46 million was held in brokerage accounts.

(b)     It is estimated that, as of September 30, 2017, unpaid administrative expenses, accrued since the Receiver was appointed on July 6, 2017, amount to approximately

---

[7]  The Receiver and Otterbourg base the information in this section primarily on the receivership's first Standardized Fund Accounting Reports covering the period July 7, 2017 through September 30, 2017.

[8]   All references to cash-on-hand, disbursements, assets and liabilities in this section have been derived from the SFAR, which was submitted to the SEC on October 13, 2017.  It should be noted that the information contained in the SFAR in incomplete.  The Receiver, at the time of this Application, is still in the process of obtaining, verifying and analyzing financial information for many of the Platinum Entities, which is not currently reflected in the SFAR.

4985654.1

$3.6 million. These administrative expenses consist of accrued and unpaid professional fees and expenses owed as of September 30, 2017 to the Receiver, Otterbourg, Goldin, HLFA, Deloitte for tax work, and other limited scope ordinary course professionals that have or will be retained by the Receiver (including the Prior Receiver).   Through the date of this Application, the Receivership Estate has made no disbursements to its professionals other than Court-approved retainer payments to HLFA.   In addition to these unpaid administrative expenses, the Receivership Estate incurred and paid remaining in-house Platinum staff and other operating expenses during the First Application Period as described below.

Cash disbursements during the First Application Period totaled approximately $11.9 million.  This amount primarily consists of the following: (i) payment to Heartland Bank in connection with the August 24, 2017 loan settlement ($5.9 million) approved by this Court on August 31, 2017 [Dkt. No. 262]; (ii) disbursements to certain Platinum assets to preserve their value pending the commencement of a sales process ($4.5 million); (iii) payroll and related expenses paid to Platinum employees ($936,000); and (iv) payments to retained professionals ($546,000).

Cash receipts during the First Application Period totaled approximately $11.1 million. This amount primarily consists of proceeds derived from dispositions and collections associated with the following investment positions: Katrina Barge Litigation Joint Venture, LLC ($5.6 million), Milberg LLP ($2.2 million), Martin Kenney & Co. ($1.8 million), Blumont Ltd. ($1.2 million), Grey K Environmental Fund ($136,000) and Bang Holdings Corp. ($50,000).

The Receiver cannot at this time state when she expects the case to be concluded. The Receiver expects that it would be a minimum of several quarters before any distribution could be made to investors and creditors due to the complexity of Platinum's business operations

and the Receiver's strategy of avoiding a "fire sale" of approximately 90 investments in a multitude of investment categories.

(c)      The Receiver has not yet initiated a formal claims bar date.  Thus, no claims proceedings have yet been commenced.

(d)      As of September 30, 2017, the primary assets of the Receivership Estate consisted of the following:

(i)      Cash and cash equivalents of approximately \$8.6 million[9] and non-cash assets, such as stocks, bonds, and other securities held by various Platinum Entities;

(ii)     Real estate investments without any set book value, due to their inherently speculative nature;

(iii)    Investments in natural resources;

(iv)     Life settlement investments portfolio; and

(v)      Unliquidated litigation investments and recoveries.

At the time of this First Interim Application, the financial information possessed by the Receiver pertaining to the value of the Receivership Entities' investment portfolio is suspect.  The Receiver hopes to gain a better understanding of the value of these investments over time and will disclose it at the appropriate time.

(e)      The Receiver currently holds no liquidated claims (or unliquidated claims) in terms of any litigation recoveries to date.  The Receiver may, however, have causes of action against a number of parties and will be considering associated claims.  The Receiver at this time cannot state whether any actions will be commenced and, if commenced, the value of any claims and the likelihood of collecting on any judgment that may ultimately be obtained.

---

[9]  Of this amount \$7.17 million was held in cash bank accounts and \$1.46 million was held in brokerage accounts.

4985654.1

### III.    FEES AND EXPENSES REQUESTED

30.    In connection with the First Application Period, the Receiver requests interim compensation in the amount of $223,676.00 and reimbursement of expenses in the amount of $2,113.73.    Otterbourg requests interim compensation in the amount of $933,689.25 and reimbursement of expenses in the amount of $6,067.18.    Thus, the combined total of fees for Applicants of $1,157,365.25, plus expenses of $8,180.91, is the combined total of $1,165,546.16.

31.    There was a tremendous amount of work to be done in the beginning of the First Application Period simply to climb the learning curve and quickly learn about each of Platinum's investments.    This required the Receiver to assemble a team of Otterbourg professionals to address different items and learn about the investments (and legal rights and obligations thereunder) as quickly as possible.    Not surprisingly, much of the total time billed by the Receiver and Applicant during the First Application Period was incurred during the first two months of the Receivership, as can be seen by the below chart, which reflects the combined recorded time charges by both the Receiver and Otterbourg for each of July (3-weeks), August, and September:

| MONTH | AGGREGATE RECORDED FEES |
|---|---|
| July (from July 6) | $493,333.50 |
| August | $468,963.00 |
| September | $354,731.00 |

32.    The fees requested are determined on the basis of, the hours worked by Otterbourg attorneys, including the Receiver, and paraprofessionals, and the hourly rates in effect at the time the services were rendered, as modified by a substantial public service

18

accommodation, described below, which was approved by the SEC and the Court at the time of the appointment of the Receiver.   These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

33.     Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to Ms. Cyganowski's recorded time. Furthermore, fees for legal services performed by all other Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges.

34.     Pursuant to the public service accommodation described above, the recorded time charges for the Receiver have been reduced from $279,595.00 to $223,676.00, a reduction in the amount of $55,919.00.   Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,037,432.50 to $933,689.25, a reduction in the amount of $103,743.25.   Therefore, the total public service-related reduction for legal fees incurred to date in this case by the Receiver and Otterbourg professionals is $159,662.25.   While there was no travel time during this First Application Period, any such travel time going forward would only be billed at 50% of the actual travel time.

35.     In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of this First Interim Application to SEC counsel on October 13, 2017 to allow for a thirty-day review period.   The SEC review resulted in a voluntary reduction

of Otterbourg's attorneys' recorded time charges in the amount of $2,876.50.   No further reductions were requested by the SEC.

36.     This First Interim Application includes certain exhibits:

(a)     The SFAR, for the period of July 6, 2017 through September 30, 2017, as submitted to the SEC on October 13, 2017, is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the First Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the First Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the First Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

4985654.1

37.     The Receiver and Otterbourg have not filed any prior fee and expense applications in this case. Otterbourg received no retainer in this case and the Second Amended Receiver Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

38.     The Second Amended Receiver Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted this First Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

39.     The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

40.     Although twelve attorneys and three paraprofessionals billed time during the First Application Period, a core team of attorneys performed the lion's share of the services, including Adam C. Silverstein, Daniel F. Fiorillo, Philip C. Berg, Erik B. Weinick and Jennifer S. Feeney. However, in its initial stages, the receivership case required the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this case. Accordingly, in some instances relatively small amounts of time were spent by attorneys with expertise relevant to specific issues in the case.  These less significant involvements benefited the Receivership Estate because it gave the core group of attorney's additional insight into and knowledge of important legal issues directly impacting the Receiver's decisions in this case.  In addition, while several senior attorneys were utilized, each

brought different expertise to the engagement and were the primary responsible party on different tasks.

## IV.     SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING FIRST APPLICATION PERIOD

41.     In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the First Application Period into three (3) project categories.[10] Narrative summaries of these activity categories follow:

### A.     Asset Analysis and Recovery (P01) - Total Fees: $609,224.00
### Asset Disposition (P02)[11] - Total Fees:  $147,463.00

42.     During the First Application Period, the primary focus of the Receiver and her professionals was obtaining an understanding of each of the Platinum investments and the legal rights and obligations of Platinum thereunder.  Much of this work consisted of first identifying and analyzing all the diverse assets in the Platinum portfolio.  Applicants then had to review certain of the pertinent underlying documents that were critical to the issues at play with respect to each such asset.

43.     To understand the nature of the Platinum Entities' investment and position in the capital structure, Applicants had to undertake a review of the underlying loan documents, which entailed more than just a review of a single document, but rather, a sometimes forensic analysis of the transfers made, participations sold, and other amendments that altered Platinum's holdings over the years.  Platinum's current debt or investment position may be materially different from what it may have been when the investment was first made.  This analysis required the review by Otterbourg professionals with experience in understanding complex transactions, loan

---

[10]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed to reduction to the aggregate recorded time charges.  The fees for each activity category are stated herein *without* showing the reductions discussed in paragraph 33 above.

[11]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader a better understanding of the tasks performed.

agreements, and other transactional documents pertinent to understanding the entirety of the investment.

44.     In some instances, Applicants' analysis and review of a particular investment and the Receivership Estates' rights, interests, and obligations with respect thereto, involved understanding the terms and conditions of existing settlement agreements.  This required a review and analysis of the settlement agreements and, when available, discussions with parties that were involved in the settlement discussions.  A few of the investments are in entities that are in their own bankruptcy proceedings, which required Applicants to review and monitor the dockets in those proceedings for motions that may impact Platinum's interests and to discuss with bankruptcy counsel and advisors to the debtor companies the prospects for extracting value from the bankruptcy estate for the benefit of Platinum (as a secured creditor).

45.     Also, to fully understand the assets, Applicants had meetings and teleconferences with legacy Platinum portfolio managers that were still employed by the Receiver.  Applicants requested that the portfolio managers prepare memoranda regarding each of the investments in their respective portfolios and then an Otterbourg attorney (often accompanied by a member of the Goldin team) met with each manager (in some cases, on multiple occasions) to review the memorandum.

46.     Throughout the First Application Period, Applicants had multiple telephone calls and multiple in-person meetings to review the transactions.  These calls and meetings were with principals of the underlying investments, the Goldin team, other professionals engaged by the management of the underlying asset, Platinum personnel, and the joint liquidators and their professionals appointed to liquidate the PPVA funds in the Cayman Islands.  The substance of these meetings varied and was unique to each transaction, but included discussions regarding (i)

operational expenses, (ii) investment of new money by other parties to maintain the asset, (iii) budgeting future maintenance expenses, (iv) understanding potential liabilities, and (v) obtaining a preliminary understanding of the potential value of the asset, prospects for disposition, and timing of disposition.  The disposition discussions necessarily entailed an understanding of the interplay between future expenses (*i.e.*, cost to the estate to maintain the asset) and the time it will take to market and obtain a purchaser for the investment.  The Receiver's goal is to dispose of the investments in a manner that balances the interests of being judicious with Receivership funds for ongoing expenses, maximizing value, and expeditiously disposing of the asset to allow the Receiver to make distributions to investors and creditors and close the case.

47.     In addition to understanding the particulars of the investment, during the First Application Period, Applicants also met numerous times with Houlihan Lokey to discuss the disposition of certain assets.  Houlihan Lokey has been actively preparing the investment materials for market since it entered into an amended retention agreement with the Receiver on September 11, 2017 (prior to the Court's approval of it retention on November 11, 2017).  In addition to weekly update conference calls with Applicants and Houlihan Lokey, the Otterbourg attorneys tasked with overseeing transactions on behalf of the Receiver, have had periodic conferences and telephone calls with the Houlihan Lokey disposition team.

48.     Also included in the time billed during the First Application Period, are daily conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.  Applicants regularly visited Platinum's New York City office to meet with legacy Platinum personnel.

49.     Given the myriad of investments and different members of the Receivership Team working on each, to keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled weekly team meetings with her, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer (when appropriate).  In advance of these weekly meetings, Applicant reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.   These meetings were critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the sprawling Platinum portfolio.  Weekly calls also take place with the Houlihan Lokey disposition team.

50.     While the Receiver and Otterbourg have focused on a myriad of investments during the First Application Period, below is an overview of certain of the investments in which Applicants have dedicated significant time.  The below summaries include a brief description of the nature of the investment, work performed, and status during the First Application Period.

(a)     **Abdala** – refers to PPCO's interests in (through a subsidiary, West Ventures LLC) a tailings dam of the Abdala Mining gold mine located near Cuiaba, Brazil. PPCO's interests have been the subject of litigation and negotiation with multiple parties-in-interest, including the owner of the mine itself, as well as the landlord and primary tenant of the adjacent parcel on which a processing facility for the tailings is to be constructed.  The project is now entering the permitting stage.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal, financial, regulatory and business issues relating to this project, with a focus on confirming and approving only those expenditures (such as local legal, security and

25

4985654.1

consulting fees) as are necessary to preserve and position PPCO's interests for disposition by the Receivership Estate.   In this regard, Otterbourg professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.  Time billed to this matter included conference calls with local counsel in Brazil, in-person conferences with the portfolio manager responsible for the matter, and review of background documentation including, loan documents and consultants' reports and recommendations.  This investment is also within the portfolio of investments that Houlihan Lokey has been engaged to sell.

(b) **Acceleration Bay** – refers to a litigation funding loan made by Hamilton Capital XII LLC, a limited liability company of which PPCO is the managing member, to a company holding certain patents with application to, among other things, distributed gaming systems.  Acceleration Bay is in the process of prosecuting claims against multiple entities that Acceleration Bay claims are infringing on the applicable patents owned by it.   Trials on Acceleration Bay's claims are anticipated to commence in April of 2018.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal and business issues relating to this loan, with a focus on confirming and approving only those expenditures (primarily advances under the loan agreement legal fees to the law firm representing Acceleration Bay) as are necessary to preserve and position the Receivership's interests for disposition and/or fulfillment of the borrower's obligations under the loan.  In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters.   Time billed to this matter included conference calls and in-person conferences with principals for the borrower and its counsel, review of funding requests, and analysis of pleadings and other publicly available legal materials.

4985654.1

(c)     **AirDye** – refers to PPCO's interests in AirDye Solutions, LLC, a textile technology company based on a proprietary dyeing process.  PPCO directly owns a subordinated note from AirDye, as well as equity in AirDye's parent.   AirDye's management proposed to purchase and settle all of PPCO's and PPVA's interests in AirDye.

Since the Receiver's appointment, the Receivership Team conducted due diligence on AirDye and, together with Goldin, reviewed, evaluated and approved the pricing terms.  In this regard, the Otterbourg attorneys who have billed time to this matter primarily include attorneys with experience in finance and transactional matters.  Time billed to this matter included negotiation and drafting of the Settlement and Assignment Agreement and General Release and related settlement documents with not only AirDye's management, but with PPVA, which also had interests in AirDye.

(d)     **Arabella** – refers to three entities each containing Arabella in their names -- Arabella Exploration, Inc., Arabella Exploration, LLC, and Arabella Operating Company (collectively, the "Arabella Entities").  In 2014, PPCO lent money to one of the entities though a note secured by all of the Arabella Entities' assets.  PPCO is seeking to make a recovery on that note.  The Arabella Entities are involved in the ownership and operation of certain oil and gas properties in the Permian and Delaware Basins in Texas and are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas).  Pre-Receivership, a related Arabella entity in which Platinum does not have an interest – Arabella Petroleum Corporation ("APC") – commenced an action against the Arabella Entities asserting claims for the recovery of certain assets that are the subject of PPCO's liens.  APC is also a debtor in a bankruptcy proceeding pending in the

27

Western District of Texas.  The Prior Receiver entered into a settlement agreement with the Trustee of APC (the "Arabella Settlement Agreement"), settling the claims and agreeing to the interests of each estate in the combined assets that are to be sold in the respective bankruptcy cases.  The Arabella Settlement Agreement was approved by this Court.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal and business issues relating to this loan, with a particular emphasis of understanding how the bankruptcy cases and related adversary proceedings will impact any recovery by the Receivership Estate.  Applicants reviewed the Arabella Settlement Agreement to understand the terms in which the current Receiver is now bound, including the declarations and papers filed in support of the Arabella Settlement Agreement.  Applicants also reviewed and considered issues arising from an alleged "first out" participation claimed by certain professionals who represented Platinum in connection with Arabella, as well as a participation agreement entered into by the Prior Receiver, which purported to sell a portion of PPCO's interest in the loan.  This review and analysis is ongoing and will be addressed in future application periods.  In addition, Applicants prepared for a mediation with the operator of the wells that is claiming an interest in the revenues of certain operating wells that are subject to Platinum's lien.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.  Time billed to this matter included correspondence and conference calls with the Arabella Entities' counsel and chief restructuring officer, and PPCO's local counsel in Texas, as well as analysis of pleadings and preparation for participation in mediation.  Applicants also reviewed the financial analysis of this investment with Goldin to determine the best course of action and prospects for recovery on the loan.

(e)   **Bang** – refers to PPLO's former interests in Bang Holdings Corp. and its operating subsidiary, Bang Digital Media, a cannabis-focused digital media company.  PPLO was the direct holder of Bang common shares and a convertible note, and PPLO continues to be the direct holder of Bang common stock warrants.

Since the Receiver's appointment, Applicants, working with Goldin, negotiated the terms of the sale of PPLO's holdings of Bang common shares and the convertible note to an investor, in exchange for cash consideration, additional warrants and the investor's commitment to make a further investment in Bang. In this regard, Otterbourg attorneys who have billed time to this investment primarily include attorneys with experience in transactional matters. Time billed to this matter included drafting, negotiating and finalization of the Assignment of Convertible Notes, the Securities Purchase Agreement, the new Warrants and numerous ancillary agreements related thereto. The Bang transaction was closed by the Receiver in September.

(f)   **Black Elk**  - refers to the Black Elk Energy Offshore Operations LLC, in which PPCO and certain affiliates held interests at different levels of the Black Elk capital structure.  This is the investment that in large measure precipitated this SEC action in which the Platinum Entities and other individual defendants were accused of defrauding Black Elk and its investors.  Black Elk is a debtor in a bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Texas.  The Prior Receiver negotiated a settlement agreement with the Trustee of Black Elk (the "Black Elk Settlement Agreement"), pursuant to which, among other things, the Black Elk Trustee was given an allowed claim against PPCO.  The Black Elk Settlement Agreement also provides that if another entity that is currently not included in the Receivership Estate – Platinum Liquid Opportunity Master Fund, L.P., a Cayman Islands limited

partnership ("PPLO Master Fund"), then the Black Elk Trustee would have an additional claim against PPLO Master Fund in the Receivership Estate.

Since the Receiver's appointment, Applicants sought to understand the terms of the Black Elk Settlement Agreement and impact on the Receivership Estate.  Applicants also analyzed the impact on the Receivership Estate of seeking to add PPLO Master Fund as a Receivership Entity.  Time was spent by Applicants reviewing the Black Elk Settlement Agreement, having conference calls with counsel for the Black Elk Trustee regarding the PPLO Master Fund and related issues, and analyzing the assets and liabilities of the PPLO Master Fund to determine the risks and benefits of making the PPLO Master Fund a Receivership Entity.  In this regard, Otterbourg attorneys who have billed time to this investment primarily include attorneys with experience in bankruptcy and litigation matters.

(g)     **BLAB** - refers to a shuttered ethanol plant located in Minnesota in which PPCO holds a debt and equity interest.

Since the Receiver's appointment, the Receivership Team has spent significant time analyzing the legal, financial, regulatory and business issues relating to this investment, with a focus on confirming and approving only those expenditures as are necessary to preserve and position PPCO's interests for disposition by the Receivership Estate.  In this regard, the Receivership Team members who have billed time to this investment include attorneys with experience in litigation and transactional matters.  Time billed to this matter included conference calls with local counsel in Minnesota, in-person conferences with the portfolio manager responsible for the matter, and review of background documentation including, loan documents.

(h)     **Blumont** – refers to PPCO's former interests in Blumont Group Ltd., a Singapore company listed on the Singaporean Stock Exchange, currently a shell holding

company that previously invested in the common stock and debt of other companies.  PPCO was the direct holder of Blumont common shares.

Since the Receiver's appointment, Applicants conducted due diligence on Blumont and on the ownership of its shares and, working with Goldin, negotiated the final purchase price.  In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in finance and transactional matters.  Time billed to this matter included the drafting, negotiation and finalization of the Sale and Purchase Agreement, the Joint Notice, the Instrument of Transfer, the Statement of Satisfaction of Registered Charge, the Instruction Letter to Intertrust Singapore Corporate Services and other ancillary closing documents.  The Blumont transaction was closed by the Receiver in September and the Receivership Estate realized $1.2 million from the sale.

(i)     **Daybreak** - refers to a publicly held oil and gas company with assets in the San Joaquin Valley in California and in Montcalm County, Michigan.  PPCO is the managing member of Maximilian Resources LLC ("Maximilian"), which is owed approximately $8.8 million from Daybreak on account of a senior loan it extended to it, which is secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage.

Since the Receiver's appointment, Applicants have spent time analyzing the legal, financial, regulatory and business issues relating to this investment, with a focus on confirming PPCO's position within the debt and equity structure of the company, so that the assets may be preserved and positioned for disposition by the Receivership Estate.  In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in finance, transactional and litigation matters.  Time billed to this matter included conferences with the

31

portfolio manager responsible for the matter, review of background documentation, including loan documents, and correspondence with the borrower.

(j)  **Desert Hawk** – refers to Desert Hawk Gold Corp. ("Desert Hawk"), a publicly reporting gold mining company.  PPCO is owed approximately $22 million from Desert Hawk on account of a secured second priority debt in Desert Hawk and owns securities convertible into 20% of the common equity of the company.  Desert Hawk owns a pilot stage gold mine located in Gold Hill, Utah.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal, financial, regulatory and business issues relating to this investment, with a focus on confirming and approving only those expenditures as are necessary to preserve and position PPCO's interests for disposition by the Receiver.  In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation and transactional matters.  Time billed to this matter included in-person meetings with the borrower's principals, conference calls with the borrowers and their counsel, as well as other stakeholders, and review of background documentation including, loan documents.

(k)  **Heartland** – Although not an investment, Applicants also devoted time under this project category to preserving estate assets by eliminating a loan that was secured by a first priority lien on all of the assets of PPCO, was in default, and was on the precipice of coming due and accruing interest at the default rate.  To avoid this result, which could have been detrimental to the estate and could have had a severe negative impact on recoveries available to unsecured creditors, the Receiver negotiated and entered into a settlement agreement with Platinum's lender – Heartland Bank.  Applicants negotiated a discounted payoff of the loan from Heartland Bank, pursuant to which Platinum paid $5,900,000 for a complete payoff of the loan,

achieving savings of over $1,000,000 in principal and $200,000 in interest.  At the same time, the Receiver provided for an exception to the release of Heartland in the event the Receiver's investigation later uncovers fraud with respect to Heartland's loan.

Applicants spent significant time reviewing the loan and security documents, UCC filings, conferring with Platinum employees, and representatives of Heartland Bank for the purpose of understanding the validity of, and circumstances concerning, the loan.  In this regard, the Otterbourg attorneys who billed time to this matter include attorneys with experience in finance and litigation. Time billed to this matter included correspondence and conference calls with Heartland Bank and its counsel, as well as analysis of the loan and security documents, and the negotiation, drafting, and exchange of the payoff documents.

(l)      **Katrina Barge** – refers to certain loans and financial accommodations made by Hamilton Capital VII, LLC, an entity in which PPCO has an ownership interest, to, among others, Hurricane Katrina Barge Litigation Joint Venture, LLC, an entity that was formed to explore, evaluate and to jointly prosecute certain legal actions, including those arising in that certain litigation known as Parish of St. Bernard v. LaFarge North America, Inc. (La. Docket No. 2:11-cv-02350-ILRL-JCW) (the "Katrina Barge Litigation").   As a result of Applicants' efforts, the Receiver collected a payment of $5,628,059.98 on account of the repayment of the financing of the Katrina Barge Litigation.  The Receiver is currently involved in an interpleader litigation pending in the New York Supreme Court, Nassau County, entitled Hurricane Katrina Barge Litigation Joint Venture, LLC v. Law Office of Richard T. Seymour PLLC, et al., Index No. 607358/2017, regarding entitlement to additional funds from the Katrina Barge Litigation (the "Interpleader Litigation").

Applicants spent significant time reviewing the loan and security documents, UCC filings, conferring with Platinum employees, and representatives of the other parties to, and counsel involved with, the Katrina Barge Litigation to evaluate the validity of, and circumstances concerning, the loan and its repayment.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation. Time billed to this matter included correspondence and conference calls with Platinum portfolio managers, other counsel in the underlying litigation, and the review and drafting of pleadings in the Interpleader Litigation.

(m)     **LC Energy** – refers to LC Energy Holdings, LLC ("LC Energy"), the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.  PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of In re Lily Group, Inc., Case No. 13-81073 (Bankr. S.D. Ind.).  Following its acquisition of the mine, PPCO retained a third party mining contractor to assist it in putting the mine back into production.  Through a combination of mismanagement and a downturn in coal prices, the contract miner never achieved tangible success with the property and was terminated.

Since the Receiver's appointment, Applicants have spent time analyzing the legal, financial, regulatory and business issues relating to this investment, with a focus on confirming PPCO's position within the structure of the company, so that the assets may be preserved and positioned for disposition by the Receiver.  In this regard, the Otterbourg attorneys who have billed time to this investment include attorneys with experience in finance, bankruptcy and litigation matters.  Time billed to this matter included conferences with the portfolio manager responsible for the matter, review of background documentation, including loan documents,

review of bankruptcy and litigation pleadings, correspondence and teleconferences with local counsel.

(n)   **Martin Kenney** – refers to PPCO's former interests in a loan and credit facility in favor of Martin Kenney & Co. Ltd., through PPCO's subsidiary Hamilton Capital III LLC.  The Receiver sold this loan facility at par plus accrued interest, realizing $1.8 million for the Receivership Estate.

Since the Receiver's appointment, Applicants spent time negotiating and finalizing the Note Allonge, the Assignment Agreement, the Intercreditor Agreement, the Charge, the Receiver Letter the Opinions of Counsel, the Payoff Letter and other ancillary agreements.  In this regard, Otterbourg attorneys who have billed time to this investment primarily include attorneys with experience in finance and transactional matters.  The Receiver closed the Martin Kenney transaction in August.  The Receiver continues to examine the potential sale of the estate's remaining interests in certain litigation outcomes.

(o)   **Milberg** - refers to the loan originally extended by Hamilton Capital LLC to the law firm Milberg LLP.  The entirety of Hamilton's interest in the loan was sold as participations, with only a remaining "supplemental interest" retained by Hamilton.

When the Receiver was appointed, the Milberg loan was in default and Milberg, the participants and supposedly the prior Receiver had reach an agreement in principle for the discounted payoff of the loans with the proceeds of the payoff going solely to the participants.  The Receiver and her team immediately commenced extensive negotiations with the various parties-in-interest.  To that end, the Receiver and her team were led by a team of Otterbourg litigation and transactional lawyers who spent extensive time conducting in-person and telephonic meetings with counsel for Milberg, the participants and Milberg's new

lender.  Eventually the Receivership Team successfully structured a global settlement amongst the parties, resulting in a $2.25 million recovery on the "supplemental interest" for the Receivership Estate.  Time billed to this matter included conference calls and in-person conferences, review of the relevant loan documents, extensive negotiations regarding the terms of the payout, and, finally, documenting the settlement documents.

(p) **Northstar Offshore** – refers to PPCO's interest in an oil and gas company that is currently a debtor-in-possession in a Chapter 11 bankruptcy case in the Southern District of Texas, In re Northstar Offshore Group, LLC, Case No. 16-34028 (the "Northstar Bankruptcy Case").  Prior to the Receivership, PPCO made a large investment in Northstar totaling nearly $60 million, including: (a) approximately $700,000 invested through a letter of credit facility; (b) $28,000,000 of face value 12% Second Lien Notes; (c) a $2,470,000 face value unsecured 12% note; and (d) over $27,000,000 of face value Series A Preferred Equity Shares of Northstar Stock.

Prior to the appointment of the Receiver, the Prior Receiver determined not to invest further in Northstar or to submit a bid for its assets in the bankruptcy case.  Applicants have spent significant time analyzing the legal issues confronting the Receiver with regard to her exit of this position, which time includes analyses of equitable subordination, re-characterization and bankruptcy plan confirmation issues.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation and bankruptcy matters.  Time billed to this matter included analysis of pleadings, a plan and disclosure statement and conference calls with regards to threatened litigation in the bankruptcy case against PPCO.

(q)    **Pea and Eigh** – refers to Pea and Eigh Company LLC, a wholly owned subsidiary of PPCO, which leased equipment to a subsidiary of Black Elk Energy called Freedom Well Services ("Freedom") pursuant to an Equipment Lease Agreement dated May 28, 2013.  In the normal course of operations, Freedom engaged Extreme Energy to provide certain services to Freedom.  After Freedom failed to pay Extreme Energy for services it provided, Extreme Energy sued for and won a judgment in the United States District Court for the Southern District of Texas, which it then domesticated in Louisiana.  Extreme Energy then filed a sheriff's attachment on the equipment.  Pea & Eigh intervened in the action, asserting ownership of the equipment.  However, a state court found that Pea & Eigh could not establish ownership and refused to dissolve the attachment.  That ruling was on appeal when the Receiver was appointed.

Upon her appointment, the Receiver tasked her legal team with reviewing the most cost effective, yet value maximizing way in which to proceed.  To that end, Applicants spent significant time analyzing the legal, and business issues relating to this suit.   The Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation matters.  Time billed to this matter included conference calls with local counsel in Louisiana, conferences with the portfolio manager responsible for the matter, and the Fund's general counsel to determine and execute an exit strategy.

(r)    **Urigen** - refers to PPCO's interest in a specialty pharmaceutical company focused on the development and commercialization of innovative products for urology indications.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal and business issues relating to this investment, specifically including

4985654.1

addressing certain disputes as to PPCO's status in the debt and equity structure of the company.   In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters.   Time billed to this matter included conference calls and in-person conferences with principals for Urigen and PPVA, internal meetings to discuss the projected value of this investment and an exit strategy for same.

**B.**     **Case Administration (P04) - Total Fees:  $560,340.50**

51.     This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including tasks that were important for reducing the expenses of the estate.   The nature of the tasks performed under this category is varied, and includes the following:

(a)     **Control of Accounts and Books and Records.**     Applicants took immediate steps to assert control over all Platinum accounts, books, and records.   Applicants identified all of Platinum's bank and brokerage accounts and contacted those financial institutions to ensure compliance with the Initial Receivership Order and Appointment Order. Applicants effectuated the transfer of the accounts to the Receiver's control and took steps to ensure that the books and records of Platinum were maintained and procedures were in place to prevent access by unauthorized individuals or destruction of documents.   The Receiver also consolidated the number of accounts in Platinum's name.

(b)     **Employees.**   Applicants devoted significant time to conferring with, both in person, by telephone and via e-mail, all of the individuals who were employed by PPCO and/or other Receivership Entities at the time of the Receiver's appointment.   Time was spent gaining an understanding of the various investments, loans and other assets for which each employee was responsible.   In the case of employees other than portfolio managers, time was

spent understanding their areas of respective expertise, such as responsibility for accounting/financial systems, as well as information technology systems. The Receiver, with the assistance of the Receivership Team, also reviewed the continued need for each employee with an eye towards reducing expenses. Since the Receiver's appointment, the number of employees has been reduced from thirteen (13) to six (6). The remaining employees consist of three portfolio managers (one of whom is part-time), the chief financial officer, the general counsel and the director of information technologies.

(c)     **Relocation.**  In a continuing effort to reduce expenses of the Receivership Estate, the Receiver looked for new office space to relocate Platinum's offices to smaller, less costly space that is more convenient to the offices of the Receiver, Goldin, and Houlihan Lokey, thereby reducing travel time for meetings. In addition to cost savings on the office lease (a reduction from $15,750 per month to $9,972 per month for savings of $5,972 per month), the relocation project will result in cost savings on information technology due to a consolidation of services and equipment, all while safeguarding Platinum's electronically stored information through multiple redundant systems. The relocation is expected to begin in December and will be completed by the end of Platinum's current lease on December 31, 2017. Applicant spent time looking at office space, negotiating a reduced rent from that originally proposed, and coordinating with Platinum's director of information technologies to effectuate a seamless transition.

(d)     **PPVA**.  Applicants had several teleconferences and at least two in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund. These meetings also were attended by their counsel and financial advisors. Applicants also participate in bi-weekly calls with the PPVA Joint Liquidators. The purpose of these meetings

was primarily to discuss issues impacting both estates, including the disposition of shared assets and allocation of proceeds.  Applicant also spent time discussing and negotiating procedures to share with the liquidators non-privileged documents that are maintained on the Platinum servers controlled by the Receiver.  Applicants negotiated and eventually entered into an Electronically Stored Information Stipulation whereby the PPVA Joint Liquidators can begin to have access to non-privileged documents.

(e)   **SEC Meetings**.  The Receiver also regularly communicated via telephone and e-mails with the SEC staff to keep them apprised of ongoing matters and to alert them to potential retentions and filings by the Receivers.  The Receiver and her counsel have also met in-person with the SEC on at least two occasions.

(f)   **Website and Investor Communications.**   Applicants developed a Receivership website that is maintained by The Garden City Group LLC, which was engaged by the Receiver to host the website and send mass mailings to investors as needed.  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  Time was also devoted by Applicants to communications with investors and other interested parties, and an in-person meeting with the Defendants and their counsel.

(g)   **Taxes.**   Applicants have coordinated with Goldin and Platinum's tax accountants to monitor their efforts to prepare local, state and federal tax returns.  This work will ultimately enable the Receiver to issue pertinent tax information to investors, which has been of significant concern to investors.

(h)   **Review of Pending Applications.**  As requested by the Court on the first day of the Receiver's appointment, the Receiver and Otterbourg undertook a review of all

pending applications filed by the Prior Receiver.  This required a review of each pending application, an analysis of the need for the requested relief, and discussions with other parties regarding the impetus and need for the requested relief.  In her Initial Status Report, which was prepared at the request of the Court and filed on August 10, 2017 [Dkt. No. 237], the Receiver set forth her recommendation with respect to each of the pending applications.  This required an exhaustive review of the applications.  Certain applications required a more extensive review and, accordingly, the Receiver requested that the application be taken off the calendar or a decision deferred.

(i)  **Retention Applications.**  Applicants prepared, reviewed and filed the retention applications for Otterbourg, Goldin, and Houlihan Lokey, as well as an amendment to the retention application of HLFA.  Applicants also reviewed the Application by the Prior Receiver to engage limited scope professionals.  In connection with this review, Applicants analyzed the services provided by each firm, the continued need for such firm's services, and the reasonability of the fees and expenses billed to the estate post-Receivership.  Applicants prepared a Declaration for the Receiver, which sets forth those professionals that the Receiver seeks to retain on a go forward basis and contains a request to pay the fees incurred post-Receivership by the professionals asked to perform work on behalf of the Receivership Estate.

(j)  **Expansion of Receivership.**  Another application filed by the Prior Receiver was a request to expand the receivership by bringing additional Platinum entities under the control of the Receiver.  Applicants spent considerable time reviewing this request and discussing this request with the SEC to determine the basis for inclusion of each entity, which was not apparent from the application.  Applicants also undertook an analysis with the assistance of information prepared and collected by Goldin and Platinum's Chief Financial Officer to

41

understand the assets and liabilities of each before determining to recommend the inclusion of such entity in the Receivership Estate.   The Receiver will be filing with the Court her recommendation with respect to this application.

(k)     **Protocols Motion.**   At the request of the Court, Applicants considered what protocols, if any, should be put in place by which parties-in-interest may file a response to an application (whether in support or opposition) without the Court's docket becoming unduly cluttered and the administration of the case becoming burdensome.   The Receiver made a recommendation for protocols and submitted an application to the Court on August 24, 2017, recommending the implementation of certain protocols.  [Dkt. No. 255].

(l)     **Receivership Order.**   Applicants spent significant time reviewing and negotiating the terms of a proposed Second Amended Receiver Order.   The proposed Second Amended Receiver Order modifies the Initial Receiver Order based upon comments from the Court and actual experience by the Receiver and Otterbourg during the initial months of the case. The proposed Second Amended Receiver Order was filed on August 24, 2017 [Dkt. No. 254] and was entered by the Court on October 16, 2017. [Dkt. No. 276].

(m)     **Court Hearings.**   The Applicants prepared for and attended hearings before the Court on July 7, 2017 and August 28, 2017.

(n)     **Receiver Oversight**.   Time during the First Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.   The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance

4985654.1

from internal management and Goldin in analyzing budget, cash management and forensic accounting issues.

## V.    EXPLANATION OF EXPENSES AND RELATED POLICIES

52.    Applicants seek reimbursement of its out-of-pocket costs in the amount of $8,180.91.  **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

53.    Applicants observed the following policies in connection with its expenses during the First Application Period:

(a)    In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 24,964 internal photocopies during the First Application Period at the rate of 0.15 cents per page, totaling $3,744.60 for all in-house copies.

(b)    In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the First Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)    With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay

4985654.1

(except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses (including mileage, taxis, etc.) nor for meals.  Moreover, no travel time occurred during this First Application Period. With respect to any future long distance travel expenses, Applicants will always use the lowest available airfare (*e.g.*, coach) and train fare and will not seek reimbursement for luxury accommodations or deluxe meals.  In maintaining its expense documentation, Applicants will retain copies of receipts relating to long distance travel.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     As indicated above, the Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  In accordance with Section E.2.l (Communications with Investors), the estate promptly hired Garden City Group LLC ("GCG") to create the Receiver's website.  This service is only charged to the extent

of the invoiced cost from the vendor GCG, which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

54.     The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (some quite dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."  *Securities & Exchange Comm 'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

55.     In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented."  *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).  "[R]esults are always relevant."  *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480).  However, a good result may take a form other than

a bare increase in monetary value.  *Id.*  ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

56.     Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them."  *Moody*, 374 F. Supp. at 485.  Moreover, "[t]ime spent cannot be ignored."  *Id.* at 483.  Another "significant factor … is the amount of money involved."  *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

57.     Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate.  Applicants have acted quickly to take control of other assets of the Platinum Entities.  The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.  Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

58.     The issues being addressed by the Receiver and Otterbourg are highly complex and diverse, ranging from litigation finance to gold and coal mining.  Many of the people with factual knowledge are facing criminal charges.  Documentation, to the extent it exists, must be questioned and verified.  Comparisons with other receiverships do not adequately reflect the effect of the Prior Receiver's actions that, frankly speaking, make the Receiver's efforts only that much more difficult and time consuming.  Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII. HOLDBACKS

59.     The Receiver is cognizant of the fact that the disposition of assets is still in its early stages and that there are significant costs of maintaining certain of the portfolio assets until they can be sold in an orderly manner (*e.g.*, the monthly carrying costs of the litigation financing investments and the monthly premiums required to be paid on the life settlement policies). Accordingly, in an effort to preserve assets at this stage of the Receivership, the Receiver has agreed to, and has requested of Otterbourg and Goldin that they also agree to hold back forty (40%) percent payment of the allowed fees requested in their respective First Interim Applications (the "Holdback Amount(s)").  The Receiver, Otterbourg, and Goldin have each agreed to forego immediate payment of their respective Holdback Amounts, with the understanding that (i) upon disposition of additional assets, and subject to the consent of the SEC, the Receiver will authorize the payment of half of the parties' respective Holdback Amounts (*i.e.*, 20% of their allowed fees), and (ii) the remaining Holdback Amounts can be paid to the parties at the conclusion of the Receivership.  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     Grant interim approval of the Receiver's compensation in the amount of $223,676.00;

(b)     Grant interim approval of Otterbourg compensation in the amount of $933,689.25;

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $2,113.73;

47

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $6,067.18;

(e)     authorize the Receiver to immediately pay from the Receivership assets (i) the allowed fees of the Receiver and Otterbourg, less their respective Holdback Amounts, plus (ii) 100% of the allowed out-of-pocket expenses of the Receiver and Otterbourg;

(f)     authorize the Receiver upon the disposition of additional assets to pay from the Receivership assets, half of the Holdback Amounts of the Receiver and Otterbourg (*i.e.*, 20% of their allowed fees), subject to the consent of the SEC; and

(g)     Grant such other relief as the Court deems appropriate.

Dated:  November 15, 2017

Otterbourg P.C.

By:   /s/ *Adam C. Silverstein*
         Adam C. Silverstein

230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

4985654.1