UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                     :

SECURITIES AND EXCHANGE         :
COMMISSION,                          :
                                     :    **MEMORANDUM OPINION**

                     Plaintiff,     :
                                     :    16-CV-6848 (BMC)

         - against -       :
                                     :

PLATINUM MANAGEMENT (NY) LLC;  :
PLATINUM CREDIT MANAGEMENT,   :
L.P.; MARK NORDLICHT; DAVID LEVY;  :
DANIEL SMALL; URI LANDESMAN;    :
JOSEPH MANN; JOSEPH SANFILIPPO;  :
and JEFFREY SHULSE,             :
                                     :
                    Defendants.  :
                                     :
------------------------------------------------------------ X

**COGAN**, District Judge.

By Order dated November 11, 2017, I granted the Receiver's application to approve the

retention of Houlihan Lokey Capital, Inc. ("Houlihan"), *nunc pro tunc* to September 11, 2017

(the "Application"), overruling the opposition to the Application filed by "a large group of non-

insider Platinum Partners Credit Opportunities ("PPCO") investors" (the "Objecting Investors").

This Memorandum Opinion sets forth the basis for that Order.

BACKGROUND

*The Alleged Platinum Partners Conspiracies*

The Securities and Exchange Commission ("SEC") commenced this civil action on

December 19, 2016, alleging that defendants Platinum Management (NY) LLC ("PMNY") and

Platinum Credit Management, L.P. ("PCM"), as well as individual defendants Mark Nordlicht,

David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph San Filippo, and Jeffrey Shulse

(the "Individual Defendants") (collectively, the "Civil Defendants"), participated in multiple fraudulent schemes in violation of various securities laws.

Just prior to the filing of this civil action, on December 14, 2016, an indictment (the "Indictment") was filed in this district charging each of the Individual Defendants with various counts of conspiracy to commit securities fraud and wire fraud, securities fraud, and investment advisor fraud. The civil and criminal actions address essentially the same two allegedly fraudulent schemes.

First, the Indictment and civil complaint allege that between November 2012 and December 2016, the Civil Defendants concealed a growing liquidity crisis at Platinum Partners' flagship hedge fund, Platinum Partners Value Arbitrage Fund L.P. ("PPVA"), overvalued the performance of PPVA's assets, liquidity, and investments, and concealed the purpose of various transactions in violation of PPVA's governing documents. The Indictment and civil complaint also allege that select investors were paid requested redemptions of their investments in PPVA ahead of and/or in lieu of other investors, contrary to PPVA's governing documents.

Second, the Indictment and civil complaint allege that between November 2011 and December 2016, certain of the Individual Defendants defrauded third-party holders of Black Elk Energy Offshore Operations, LLC ("Black Elk") bonds and deprived those bondholders of the proceeds of a Black Elk asset sale through misrepresentations regarding PMNY's ownership and control over the bonds. After the SEC action was filed and the Indictment was unsealed, the Government moved on January 23, 2017 to intervene in the SEC's civil action and sought a stay of the civil proceedings pending the resolution of the parallel criminal action and ongoing grand jury investigation. On July 7, 2017, the Court granted the United States' motion to intervene and stay discovery pending the outcome of the associated criminal proceeding.

*The SEC Receiver*

All Platinum entities (the "Receivership Entities"), and all of their assets (the "Receivership Assets") are under the control of a Receiver. The Court first entered an order appointing a Receiver on December 19, 2016, the same day that the SEC commenced this action, and entered an Amended Receiver Order on January 30, 2017. On July 6, 2017, the Court accepted the resignation of the original Receiver, Bart Schwartz, and appointed Melanie L. Cyganowski as Receiver. On October 16, 2017, the Court approved a Second Amended Order Appointing Receiver (the "Receiver Order.").

The Receiver Order provides that the Receiver is, among other things, to preserve the status quo, ascertain the true financial condition of Receivership Entities and the disposition of investor funds, prevent further dissipation of the property and assets of the Receivership Entities, protect investors' assets, and conduct an orderly wind down including a responsible liquidation of assets and orderly and fair distribution of those assets to investors. The Receiver Order authorizes the Receiver to develop a plan (in conjunction with any other party), for the fair, reasonable, and efficient recovery and disposition of all Receivership Assets. This authorization expressly includes the right to develop a plan of liquidation. Additionally, the Receiver Order authorizes the Receiver, subject to Court order, to hire individuals or entities to assist in carrying out her duties.

*The Receiver's Proposed Retention of Houlihan and the Abdala Tailings Project*

On October 16, 2017, the same day she was appointed, the new Receiver filed the Application, seeking the Court's approval for her retention of Houlihan, *nunc pro tunc* to September 11, 2017 (the date in which she entered into an engagement letter with Houlihan). The Receiver sought Houlihan's assistance in providing financial advisory and investment

banking services in connection with the disposition of certain Receivership Assets. The original Receiver had retained an affiliate of Houlihan, Houlihan Lokey Financial Advisors, Inc. ("HLFA") to provide valuation services with respect to some investments in the Receivership Assets.

The Receivership Entities hold a diverse set of investments that generally fall into three categories: life settlement investments, litigation finance investments, and "other" assets, which primarily consist of investments in developing companies that work in the metals and mining sectors. The Receiver has been working to determine how to best dispose of the various Receivership Assets. The disposition of liquid Receivership Assets is relatively straightforward, but the Receiver argues that she would benefit from the skill of a professional institution, such as Houlihan, in the disposition of illiquid financial assets, including some of the "other" assets. One of the assets in this category that the Receiver seeks Houlihan's assistance in disposing of is an investment in the Abdala Tailings Project ("Abdala"), a Brazilian gold prospect. PPCO owns a 10-year mining right over the "tailings dam" of the prospect.[1]

In presenting Abdala to investors, Platinum's managers advised of the possibility of substantial returns – between $450 and $550 million. As part of its earlier work for the original Receiver, HLFA valued Abdala at a more modest range of between $55 and $114 million, assuming that PPCO invested an additional $5 million into it. The original Receiver noted, however, that if the investment were liquidated instead, PPCO would not recover its cost basis of approximately $10 million. The original Receiver ultimately cited disagreement with the SEC over the disposition of Abdala as one of the reasons for the breakdown in his relationship with the commission, which led to his resignation. The original Receiver claimed that his team

---

[1] A tailings dam is an earth-filled embankment used to store byproducts of mining operations.

conducted substantial due diligence and concluded that the risks of proceeding with the investment in Abdala are low, and carry the prospect of a significant return.

The Objecting Investors have no issue with the Receiver's retention of Houlihan with respect to any Receivership Assets except for Abdala. They argue that the Receiver has made the decision not to invest in Abdala without providing a detailed explanation of her reasoning, and that Houlihan does not possess sufficient expertise in minerology, natural resource extraction, or South America, to properly dispose of Abdala.

The Receiver and Houlihan negotiated a fee structure that provides a set base compensation, but is largely incentive-based, rewarding Houlihan if the Receivership Assets are disposed of above certain thresholds. Of the Receivership Assets with individualized incentive structures, sale of the Receivership Entities' interest in Abdala promises Houlihan the greatest percentage fee: 5% of the transaction value of any sale up to $40,000,000, and 8% of any transaction value greater than $40,000,000.

## DISCUSSION

The Court has considered the Application, the Objecting Investors' response to that application, and the Receiver's Reply. Tellingly, the Receiver did not receive any opposition from the SEC, the Civil Defendants, the former insiders of the Receivership Entities, any purported secured creditors, or the vast majority of investors in the Receivership Entities. Instead, a solitary group of investors opposes the retention only with respect to Abdala, which is best described as a speculative Brazilian gold prospect into which the Objecting Investors want the Receiver to invest millions of dollars. The Objecting Investors' arguments are meritless, and evince a fundamental misunderstanding of the purpose of the Receiver. The time to gamble is over; all that is left is to prudently secure what value remains in the Receivership Assets.

As an initial matter, the Receiver has convinced the Court of good reasons for retaining Houlihan. First, Houlihan offers an "Illiquid Financial Assets" ("IFA") team focused on the particularly challenging "other" assets with which the Receiver seeks help. The Receiver argues that Houlihan's IFA team is widely recognized and experienced in advising on the disposition of a range of complicated investments. Notably, the Objecting Investors do not, as a general manner, dispute Houlihan's expertise. Second, Houlihan's experience in disposing of such assets means that it has long-standing relationships with different kinds of potential investors, including secondary funds, financial institutions, sovereign wealth funds, hedge funds, family offices, pension funds, insurance companies, endowments, foundations, and public vehicles. Because of these relationships, Houlihan is well-positioned to provide the Receiver with value-maximizing liquidation options. Third, Houlihan has prior knowledge about the Receivership Assets because of HLFA's earlier role in assisting the original Receiver. Houlihan will therefore need less time than would another firm to get up to speed on the nature of the Receivership Assets. Fourth, the Receiver states that her decision to retain Houlihan was the outcome of months of study by her and her team of the Receivership Assets, and consideration of Houlihan's relevant capabilities.

No party has raised any objection to the Receiver's proposed compensation scheme for Houlihan. In light of the scale and complexity of the work it is being retained for, the Court finds that the proposed compensation is reasonable.

The Objecting Investors' concerns unduly rely upon the projections of the very managers now accused of a series of fraudulent conspiracies, and show a misunderstanding of the role of the Receiver. The Objecting Investors contend that investment in Abdala could generate a return of between $450 and $550 million. But, as described above, this range was provided by PPCO's

6

former managers, *who have been criminally charged with years long conspiracies to intentionally inflate asset values*.  There is no cause to put any faith in their projections.  Indeed, the Receiver noted in an August 10, 2017 status report that "[a]s a general matter, [] the Receiver has not found support for the values reflected on Platinum's books or for certain early indications of value in the Receivership."

The Objecting Investors also point to HLFA's preliminary, and considerably more modest assessment of Abdala's value ($55 to $114 million).  This range is not guaranteed, though; it is merely possible.  Tellingly, the PPCO managers who made the optimistic assessments that the Objecting Investors rely on do not object to the Receiver's decision to market Abdala.  If there were a real promise of a valuable return, presumably the managers would attest to it.

The Objecting Investors argue that the Receiver has not considered options other than liquidation.  This allegation is contradicted by the Receiver's credible statement that she thoroughly evaluated Abdala and made the reasonable and informed determination that marketing the asset was in the best interests of the Receivership.  It appears to the Court that the Objecting Investors are transparently complaining about a decision, trusted to the sound judgment of the Receiver, that does not align with their own narrow interests, and that their complaints about Houlihan's qualifications are largely another way of getting at that point.  Regardless, as independent investors in this case have previously stated, "it is for the receiver as fiduciary to the Fund's investors…to make the determination of what course of action best maximizes the recovery available to the investors."  That is precisely what she has done here.  In fact, the incentive structure described above means that more so than with any other

Receivership Asset, Houlihan is incentivized to seek the maximum possible sale price for Abdala.

Finally, the premise of the Objecting Investors' argument turns on a fundamental misunderstanding of the role of the Receiver. The Receiver is not tasked with making speculative investments. Instead, she is entrusted with the responsibility to prudently wind-down the Receiver Entities and dispose of the Receivership Assets in a manner that safely returns to stakeholders what value can be salvaged. She is not empowered to jeopardize that return by indulging in risky investment opportunities with the very money she has been charged to return to the victims of alleged years' long fraudulent conspiracies. It is clear to the Court that these investors are frustrated by their inability to realize the investment returns they were promised, but that frustration does not justify the Receiver using the limited remains of alleged conspiracies to look for South American gold.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
   November 20, 2017