UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**SECOND JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
OCTOBER 1, 2017 THROUGH AND INCLUDING DECEMBER 31, 2017**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunity Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Second Joint Interim Application (the "Second Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from October 1, 2017 through and including December 31, 2017 (the "Second Application Period").  There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg).  The Receiver requests interim approval of fees in the amount of $120,434.80 and reimbursement of expenses in the amount of $2,602.95 for the Second Application Period.  Otterbourg requests interim approval of fees in the amount of $903,961.80 and reimbursement of expenses in the amount of $9,184.99 for the Second Application Period, for a combined total of fees for Applicants in the amount of $1,024,396.60,[1] and expenses in the amount of $11,787.94.

This Second Interim Application contains the following sections:

**Section I**  provides a preliminary statement of the Receiver's activities during the Second Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines").  Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Second Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1]  As agreed to by the Receiver, this total amount reflects a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges and a ten percent (10%) reduction in Otterbourg's  recorded time charges.  In addition, in accordance with Otterbourg's customary practice, it reviews its hourly rates each year and adjusts the professionals' hourly billing rates as of October 1, 2017.  As previously agreed with the SEC, the Receiver's fees have been reduced (prior to application of the public service accommodation) to discount for any increase in her billable rate since October 1, 2017. Therefore, the Receiver's recorded time charges before application of these accommodations were $177,777.50 and Otterbourg's recorded time charges were $1,004,402.00, for a combined gross legal fees total (before the application of any public service accommodation or the discount for rate increases) of $1,182,179.50.

5125633.1

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Second Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines. All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

I.     **PRELIMINARY STATEMENT**

After assuming control of the Receivership Entities from the Prior Receiver (defined below), the Receiver and her team[2] spent the initial months of her appointment rapidly obtaining an understanding of the portfolio of assets and addressing the myriad of emergencies confronting several of the assets. During the Second Application Period, the Receiver turned her attention to monetizing the assets and analyzing, with the assistance of her retained professionals, options for monetizing each of the assets in the portfolio.

A.     **Analysis and Disposition of Receivership Assets**

The opening investment portfolio consisted of 90 investments. A single investment may have multiple assets, some of which may be separately marketed and monetized. Thus, a purportedly "single" investment may actually be the equivalent of multiple investments when it comes to liquidating the underlying assets. The investments of the Platinum Entities are diverse,

_____

[2]     To assist her with her duties, the Receiver sought the retention of counsel and a financial advisor. To that end, on July 21, 2017, the Court approved the retention of Otterbourg as legal counsel to the Receiver [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

5125633.1

but generally fall into three main asset categories: (i) life settlement investments (*e.g.*, investments in life insurance policies), (ii) litigation finance investments, and (iii) "other" assets, which vary greatly, although they have a significant concentration in the metals, mining and energy sectors.  Most of the companies are in the developmental stages and have not yet had proven success.  In addition, the investments are located around the country and around the world, including Brazil, China and Australia.

Important to understanding how best to monetize each asset was first gaining an understanding of exactly what was being sold and whether the cooperation of others in the capital structure was necessary to effectuate a sale and/or enhance the returns on any sale of the asset.  For example, in some cases the Receivership Entities own a debt position, in others an equity position, and in others it may be a combination of the two.  The debt holdings also vary from senior positions, subordinate positions or, in some cases, only a residual interest after the Receivership Entity sold a 100% participation in its debt holding.  Depending upon the nature of the Receivership Entity's holdings, it may be possible to sell the underlying business or a 100% equity interest in the business, while in other instances, it may only be possible to sell the Receivership Entity's debt position or its share of the equity (which in many cases is not publicly traded and, therefore, there is no readily available platform for a sale).  To the extent possible, the Receiver has worked with other investors in the asset to maximize recovery for both parties.

The Receivership Team spent considerable time evaluating the assets and prioritizing those investments that either required immediate attention or could be most readily monetized.  Unfortunately, many of the investments are problematic, have real or potential significant liabilities, and/or require additional cash investment for the underlying company (all of which were still in the developmental stages) to continue or resume operations.  During the application

4

period, and at this time, the Receiver was, and is, making expense payments that are necessary only to maintain or preserve the value of an asset, to protect collateral and/or to stabilize operations, such as lease payments, premium payments on life insurance policies, and/or satisfy litigation financing obligations.  The Receiver, at this time, does not believe that, under the circumstances of the receivership, any asset warrants capital investment beyond what is necessary to preserve that asset.  When possible, the Receiver has undertaken negotiations with other investors or stakeholders involved with an asset, including management, to infuse additional cash into the investment to preserve value until the asset can be sold, as well as to reduce ongoing expenditures.

Because the investments are diverse, the monetization options vary greatly from one investment to another.  For example, the types of companies in which these investments were made range from pharmaceutical startups, to foreign "shell" companies, to a chain of small grocery stores in rural China, and, while many of the assets are in the metals, mining and energy sectors, each of these companies are located in different regions domestically and globally and have unique characteristics.  The Receivership Team has sought to "triage" the various assets; first focusing on those assets that are relatively liquid, such as publicly traded stocks, life settlement investments and litigation finance investments; and then focusing on those assets that are less liquid, but nonetheless, with greater time and effort, can be marketed and hopefully liquidated.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway

---

[3]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

5125633.1

MacKenzie").[4]  Houlihan Lokey and Conway MacKenzie are each responsible for different assets and there is no overlap in the work performed by each.

Because of Houlihan Lokey's areas of expertise, it was retained to market and sell specific assets including the life settlements portfolio, the litigation finance portfolio and the following other investments: (i) Abdala Tailings Project, (ii) Urigen Pharmaceuticals, Inc. and (iii) LC Energy Operations LLP.  Houlihan was retained to market these assets because of their potential value to Platinum and Houlihan's experience in marketing assets of this type.  As the Court acknowledged in the Houlihan Opinion, Houlihan Lokey was retained because of, among other reasons, its extensive experience with several hedge fund wind-downs, experience with marketing illiquid assets across a broad spectrum of alternative investments, and breadth of knowledge of potential investors to create a competitive environment to maximize recovery. *Houlihan Opinion* at 6.

The Receiver also retained Conway MacKenzie to provide due diligence and recommendations for disposition on certain of the remaining assets that are not being marketed by Houlihan.  Conway MacKenzie was asked to focus its initial efforts on the following assets: (i) West Ventures LLC and its wholly owned subsidiary, Buffalo Lake Advanced Biofuels, LLC, also known as BLAB, (ii) Desert Hawk Gold Corp. and (iii) Daybreak Oil and Gas, Inc.  The Receiver has since identified additional investments for Conway MacKenzie to review and evaluate, including American Patriot Gold, Greentown Oil Company, Arabella Exploration, Nordaq Energy, Xcell Energy, and Decision Diagnostics Corp.

In addition to the due diligence performed by Houlihan Lokey and Conway MacKenzie on the assets that each has been asked to review, the Receiver and the Receivership Team have

---

[4]  Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

also fully debriefed Platinum's portfolio managers that were working at Platinum at the time of her appointment with respect to each of the investments, have had extensive interaction with the management teams of the underlying portfolio companies (when available and appropriate) and have received input from investors and Platinum's prior management regarding investments. The Receiver considers the information and input she has received in an effort to obtain as much information about the asset as possible to assist her with decisions regarding the disposition of the asset.

During the Second Application Period, the Platinum Receivership received approximately $11.5 million from the sale of some of its assets.  This is in addition to the approximately $11 million received by the Platinum Receivership from the liquidation of certain other assets during the preceding quarter.  None of these assets has been marketed or sold in a "fire sale" fashion.  Indeed, to the contrary, the assets were monetized at par value and, in one case described below (Acceleration Bay), at par, plus a residual "upside."  The investments liquidated during the Second Application Period and the amount received by the Receivership Estate was as follows:

- Acceleration Bay ($10.54 million, plus a 5% residual interest)

- AirDye ($1.265 million)

- Clifford Chance/Excalibur ($99,000)

Also during the Second Application Period, Houlihan Lokey, with the assistance of the Receivership Team, prepared other assets for market.  The Receivership Team has also been actively working with Conway MacKenzie on the assets that it has been asked to review.  The assets assigned to Conway MacKenzie for marketing tend to be assets that require substantial due diligence to enable the asset to be brought to market in a manner to achieve optimal value.

5125633.1

Conway MacKenzie has been tasked with gaining a further understanding of the particular assets in its portfolio, including making site visits and engaging with the management teams of each, to present the Receiver with options for monetizing each asset.

The Receiver cannot at this time ascribe values to each of the assets. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from prior (now removed) management's plans, which are now (and likely always were) unrealistic, in light of the receivership's current liquidity challenges, and/or can otherwise no longer be supported. The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations. The Receiver is focusing her efforts on ensuring a sound process for the marketing and disposition of assets to achieve the fair market value of the assets.

Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment. As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long term future. As the Court stated in the Houlihan Opinion, "[t]he Receiver is not tasked with making speculative investments. Instead, she is entrusted with the responsibility to prudently wind-down the Receiver Entities and dispose of the Receivership Assets in a manner that safely returns to stakeholders what value can be salvaged. She is not empowered to jeopardize that return by indulging in risky investment

5125633.1

opportunities with the very money she has been charged to return to the victims of alleged years' long fraudulent conspiracies."  Houlihan Opinion at 8.

In addition, there are certain assets that may ultimately have no realizable value. Decisions regarding the monetization of investments necessarily will entail an understanding of the interplay between future expenses (*i.e.*, cost to the estate to maintain the asset) and the time it will take to market and obtain a purchaser for the investment.  The Receiver's goal is to monetize and sell the investments in a manner that balances the interests of being judicious with the assets of the estate, maximizing value and expeditiously disposing of the assets to allow the Receiver to make distributions to investors and creditors and close the case.

In the performance of her duties, the Receiver has also sought input from investors and prior management regarding certain of the investments.  While the Receiver has made, and will continue to make, all decisions regarding the liquidation of the Receivership Entities' assets, and has made and will make informed decisions regarding each asset, the Receiver has elicited the input from others with knowledge of the asset and/or who have a stake in its disposition.  Of course, all decisions are ultimately those of the Receiver.

A description of the investments in which Applicants have dedicated significant time during the Second Application Period and the work done during the Second Application Period with respect to those investments is set forth in Section IV of this Second Interim Application.

**B.     Administrative Matters**

Since the last report, upon application of the Receiver, three additional Platinum entities have been added to the estate under the Receiver's control and the Court's oversight (the "Receivership Estate"): (i) Platinum Partners Liquid Opportunity Master Fund L.P.; (ii) Platinum Partners Credit Opportunities Fund International Ltd; and (iii) Platinum Partners Credit

Opportunities Fund International (A) Ltd.  The Receiver does not contemplate adding any additional entities at this time, although the Receiver reserved the right in her application to ask the Court to do so at any time if she believes that it is beneficial and appropriate.

Also on the administrative front, the Receiver filed a motion seeking to retain certain limited scope professionals in the ordinary course of the receivership's business.  Because of the wide range of jurisdictions in which the Platinum assets are located, the Receiver requires the assistance of several local law firms to assist with protecting the assets and to provide their relevant expertise.  Many of these law firms were providing services prior to the Receiver's retention.  To streamline the process for retaining additional limited scope professionals as needed going forward, the Receiver also sought and obtained approval for procedures to retain such limited scope professionals in the future should the need arise.

The Receivership Team also worked with the remaining employees of Platinum to effectuate the relocation of the Platinum offices to smaller, less expensive office space in the same building in which the Receiver's office is located.  In addition to cost savings on the office lease (a reduction from $15,750 per month to $9,972 per month for savings of $5,972 per month), the relocation will result in cost savings on information technology due to a consolidation of services and equipment, all while safeguarding Platinum's electronically stored information through multiple redundant systems.  The relocation was completed before the end of 2017 and allows the Receivership Team and the Platinum employees to meet in person without losing time to travel.

The Receiver and the Receivership Team also had several meetings with various interested parties and groups during the Second Application Period, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds,

5125633.1

"PPVA")[5], certain investors, counsel for the defendants, and the SEC.  The Receiver also held a "town hall" style meeting with investors and other interested parties via webinar and telephone to provide an update on the actions taken to date and to answer questions and has committed to holding similar forums going forward.  The Receiver updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The Receiver and the Receivership Team also have had meetings with investors and their representatives, the Defendants (defined below) and equity holders in specific investment vehicles in which Platinum is the majority holder.

Applicants also worked with Goldin and with Platinum's Chief Financial Officer, who have dedicated significant time to working with Deloitte Tax LLP, in connection with the preparation of Platinum's local, state and federal tax returns, as well as K-1 forms for investors. The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

Many of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the world.  During the Second Application Period, the Receivership Team dedicated substantial time to monitoring such proceedings, either directly or through local counsel, and, when necessary, preparing pleadings to file in such proceedings.

## II.      CASE BACKGROUND AND STATUS

### A.      Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht

---

[5]       PPVA is the subject of an insolvency proceeding pending in the Cayman Islands.

5125633.1

("Nordlicht"), David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC ("Platinum Management") and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds. In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual Defendants have denied all material allegations.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

5125633.1

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receiver Order.  [Dkt. No. 216].   On October 16, 2017, the Court entered the Second Amended Receiver Order (the "Receiver Order").  [Dkt. No. 276].

Under the terms of the Receiver Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

Under the Receiver Order, the Receiver was granted the following general powers and duties:

(a)     To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property");

13

(b)     To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

(c)     To manage, control, operate and maintain the Receivership Entities and hold in the Receiver's possession, custody and control all Receivership Property, pending further Order of this Court;

(d)     To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging the Receiver's duties as Receiver;

(e)     To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of the Receivership Entities;

(f)     To engage and employ persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers, subject to Court approval;

(g)     To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

(h)     To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure and Court orders;

(i)     To investigate transactions by and among Receivership Entities, defendants, and any other persons and entities.

14

(j)     To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver;

(k)     To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and

(l)     To take such other action as may be approved by the Court.

**B.     Case Status[6]**

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)     As of December 31, 2017, the Receivership Entities had $11.7 million in funds, of which $10.2 million was held in cash in bank accounts and $1.5 million was held in brokerage accounts.  These funds include proceeds from the liquidation of assets.  Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation purporting to grant them security interests in all or certain of the Receivership Estate's assets.  These claims will be addressed in due course.

It is estimated that, as of December 31, 2017, unpaid administrative expenses amount to approximately $2.58 million.  This amount includes the fees and expenses being requested by the Applicants and Goldin for the Second Application Period, holdbacks to Applicants and Goldin with respect to their respective first interim fee applications, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.

---

[6]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period October 1, 2017 through December 31, 2017.

5125633.1

(b)     Cash disbursements during the Second Application Period totaled approximately $8.6 million, consisting primarily of (i) $4.5 million in disbursements to retained professionals and the Receiver (many of which were incurred prior to the Receiver's appointment, but had not yet been paid); (ii) $535,100 in business asset expenses (payroll and related expenses paid to Platinum employees and rent); and (iii) $3.45 million in investment expenses, which include funds disbursed to preserve the value of the following assets, pending the sale of each: Acceleration Bay ($1.4 million), ALS Capital Ventures LLC ($1.7 million), LC Energy ($270,000) and Abdala ($111,600).

Cash receipts during the Second Application Period totaled approximately $11.5 million. This amount primarily consists of proceeds derived from dispositions associated with the following investments: Acceleration Bay ($10.01 million net to Platinum),[7] AirDye ($1.265 million) and a settlement with Clifford Chance ($99,000).

The Receiver cannot at this time state when she expects the case to be concluded. The Receiver expects that it will be a minimum of several quarters before any distribution will be made to investors and creditors due to the complexity of Platinum's business operations and the Receiver's strategy of avoiding a "fire sale" of Platinum's assets.

(c)     The Receiver has not yet initiated a formal claims bar date. Thus, no claims proceedings have yet been commenced. It is premature to determine how different types of claims or creditors will be treated, and the Receiver has not yet developed guidelines for how different investor or creditor claims will be treated or the method that will be used.

(d)     As of December 31, 2017, the primary assets of the Receivership Estate consisted of the following:

---

[7]   The net amount to Platinum is net of a $526,000 completion fee paid to Houlihan Lokey pursuant to its retention agreement. The gross sale amount was $10,540,000.

(i)         Cash and cash equivalents of approximately $11.7 million[8];

(ii)        Real estate investments without any set book value, due to their inherently speculative nature; and

(iii)       Investments in natural resources, litigation financing, life settlement investments, energy and other miscellaneous investments.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(e)     The Receiver has not as of yet commenced litigation against third and, accordingly, has not received any litigation recoveries.  The Receiver and her team, however, have begun to review and analyze potential causes of action against a number of parties and will be considering associated claims.  The Receivership Team has prepared an action plan for a historical review of Platinum's activities and flow of funds, which will assist the Receiver in analyzing both possible claims by the estate and claims that have or will be filed against the estate.

The Receiver at this time cannot state whether any actions will be commenced and, if commenced, the value of any claims and the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.  At the heart of the analysis will be a determination of the cost/benefit of asserting claims.  Investigation and litigation are costly endeavors and the Receiver does not intend to expend material estate assets unless the Receiver has the necessary facts and information to assert a meritorious claim and has concluded there is a likelihood of recovering funds if liability is eventually found.

## III.   FEES AND EXPENSES REQUESTED

In connection with the Second Application Period, the Receiver requests interim approval of her fees in the amount of $120,434.80 and reimbursement of expenses in the amount of

---

[8]  Of this amount $10.2 million was held in cash bank accounts and $1.5 million was held in brokerage accounts.

5125633.1

$2,602.95. Otterbourg requests interim approval of its fees in the amount of $903,961.80 and reimbursement of expenses in the amount of $9,184.99. Thus, the combined total of fees for Applicants of $1,024,396.60, plus expenses of $11,787.94, is the combined total of $1,036,184.54.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment. For example, a single investment, such as Arabella, which is in a bankruptcy proceeding in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, including cash collateral issues, as well as pure litigation issues to address the ongoing adversary proceeding with a third party that is impeding the ability to sell the Arabella assets in which Platinum has a security interest. The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below, which was approved by the SEC and the Court at the time of the appointment of the Receiver. The Receiver has also agreed to provide a discount equal to the amount of the increase in her hourly billable rate that went into effect on October 1, 2017.[9] These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal

---

[9]   As set forth in Otterbourg's retention application, the firm reviews its hourly billable rates annually. In accordance with such practice, the rates of Otterbourg's professionals were increased as of October 1, 2017 and such rate increases are reflected in its recorded time herein.

assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by all other Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since October 1, 2017 in accordance with Otterbourg's regular practice of reviewing and revising its hourly fee rates annually.

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $177,777.50 to $120,434.80, a reduction in the amount of $57,342.70.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,004,402.00 to $903,961.80, a reduction in the amount of $100,440.20.  Therefore, the total reduction for legal fees incurred during the Second Application Period by the Receiver and Otterbourg professionals is $157,782.90.  There was minimal travel time during this Second Application Period, which was billed at 50% of the actual travel time.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of this Second Interim Application to SEC counsel on January 16, 2018 to allow for a thirty-day review period.  In addition, based upon the SEC's review, Otterbourg and the Receiver voluntarily removed time entries with a value of $658.50.

This Second Interim Application includes certain exhibits:

5125633.1

(a)     The SFAR for the period of October 1, 2017 through December 31, 2017 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Second Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Second Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Second Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's second request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receiver Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

5125633.1

The Receiver Order permits the Receiver and her advisors to be paid on a quarterly basis. In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted this Second Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour. All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Although twelve (12) attorneys and one paraprofessional billed time during the Second Application Period (in addition to the Receiver), a core team of attorneys performed the lion's share of the services, including Adam C. Silverstein, Daniel F. Fiorillo, Philip C. Berg, Andrew Kramer, Erik B. Weinick, Chad Simon and Jennifer S. Feeney. However, because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. Accordingly, in some instances relatively small amounts of time were spent by attorneys with expertise relevant to specific issues in the case. These less significant involvements benefited the Receivership Estate because it gave the core group of attorney's additional insight into and knowledge of important legal issues directly impacting the Receiver's decisions in this case. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

5125633.1

## IV.  SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING SECOND APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Second Application Period into four (4) project categories.[10]  Narrative summaries of these activity categories follow:

### A.  Asset Analysis and Recovery (P01) - Total Fees: $614,589.00
### Asset Disposition (P02)[11] - Total Fees:  $139,872.00

During the Second Application Period, the Receiver and her professionals continued to review the various assets in the portfolio to gain an understanding of each and the legal rights and obligations of Platinum thereunder.  In certain instances, time was also spent with respect to an asset that may not ultimately have a positive return to the Receivership Estate, but work is still required to reduce potential liabilities and exposure to the Receivership Estate, as well as to ensure that an asset without value is not imprudently abandoned by the Receivership Estate.

During the Second Application Period, Applicants continued to analyze Platinum's asset portfolio, including a review of the underlying investment documents and in-person and telephonic meetings with Goldin, Houlihan Lokey and Conway MacKenzie (depending on the professional assigned to the particular investment), as well as, in some instances, management and other investors in the underlying asset.  This undertaking was done with an eye towards determining how best to position the asset for market and the options for maximizing value without incurring additional expenses beyond what are necessary to preserve the asset. The Receiver's continued goal is to monetize the investments in a manner that balances the interests of being judicious with Receivership funds for ongoing expenses, maximizing value, and

---

[10]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the reductions discussed on page 18 above.

[11]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

expeditiously disposing of the asset to allow the Receiver to make distributions to investors and creditors and close the case.

Also included in the time billed during the Second Application Period, are daily conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

Given the myriad of investments and different members of the Receivership Team working on each, to keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled weekly team meetings with her, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer.  In advance of these weekly meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency. These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the sprawling Platinum portfolio. Weekly calls also take place with the Houlihan Lokey disposition team and the Conway MacKenzie team.

While the Receiver and Otterbourg have focused on a myriad of investments during the Second Application Period, below is an overview of certain of the investments in which Applicants have dedicated significant time.  The below summaries include a brief description of the nature of the investment, work performed, and status during the Second Application Period.

(a)     **Abdala** – refers to PPCO's interests in (through a subsidiary, West Ventures LLC) a tailings dam of the Abdala Mining gold mine located near Cuiaba, Brazil.  PPCO's interests have been the subject of litigation and negotiation with multiple parties-in-interest, including the owner of the mine itself, as well as the landlord and primary tenant of the adjacent parcel on which a processing facility for the tailings is to be constructed.  The project is now in the permitting stage.  This investment is within the portfolio of investments that Houlihan Lokey has been engaged to market and sell.  Houlihan Lokey launched the marketing process for this asset on December 13, 2017, a data room for interested parties that have signed a Non-Disclosure Agreement ("NDA") was opened during the Second Application Period, Houlihan Lokey has been speaking with interested parties, and initial bidding has since begun.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal, financial, regulatory and business issues relating to this project, with a focus on confirming and approving only those expenditures (such as local legal, security and consulting fees) as are necessary to preserve and position PPCO's interests for disposition by the receivership.  In this regard, Otterbourg professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.  Time billed to this matter during the Second Application Period includes conference calls with local counsel in Brazil, in-person conferences with the portfolio manager responsible for the matter, review of background documentation including, loan documents and consultants' reports and recommendations, and investigation, negotiation and implementation of a revised retention agreement with local counsel.  Otterbourg attorneys also have spent time significant time working with Houlihan Lokey to prepare for the marketing of this asset.  Applicants have also had meetings and telephone calls with investors and their representatives to discuss the

24

Receiver's process for liquidating the assets and, with respect to certain assets, obtaining the views and input from the investors. The Receivership Team has made every effort to keep the lines of communication open with the investors.

(b)     **Acceleration Bay** – refers to a litigation funding loan made by Hamilton Capital XII LLC, ("Hamilton") a limited liability company of which PPCO is the managing member and majority owner, to a company holding certain patents with application to, among other things, distributed electronic gaming systems. Acceleration Bay is in the process of prosecuting claims against multiple entities that Acceleration Bay claims are infringing on the applicable patents owned by it. Trials on Acceleration Bay's claims are anticipated to commence in April of 2018.

This investment is within the portfolio of investments that Houlihan Lokey has been engaged to sell. The Receivership Team worked with Houlihan Lokey to position this asset for marketing. A data room was created, Houlihan Lokey reached out to its extensive network of potential investors regarding the sale and made the data room accessible to those potential investors that sought further review of the asset, after executing an NDA. Houlihan Lokey sought initial bids from interested parties by December 12, 2017. Houlihan Lokey received bids from ten (10) interested parties, some of whom submitted both all-cash at closing bids and hybrid based upon a cash payment and/or a structured payout (based upon the outcome of the infringement litigation). Houlihan Lokey reviewed each round of bids in detail with the Receiver, analyzing which bids warranted further engagement. The Receiver ultimately determined to engage with one investor that was willing to provide a pre-emptive premium. At the end of the fourth quarter of 2017, through these efforts, the Receiver successfully sold Hamilton's interest in the Acceleration Bay loan for (i) $10,540,000 cash at closing, representing a par recovery on Hamilton's investment, plus (ii) a retained 5% interest in all amounts received

5125633.1

by the purchaser from the litigation proceeds as provided for in the loan agreement governing Hamilton's loan to Acceleration Bay. The net cash amount received by Platinum at closing, after payment of $526,000 to Houlihan Lokey representing the transaction fee it was due under the terms of its engagement agreement, was approximately $10.01 million. This sale benefitted Platinum by not only receiving a return of the loan at par value and still retaining an interest in the potential recoveries on the litigation, but by also ending the significant outlay of cash ($700,000 per month) required to fund the litigation.

Time billed to this matter during the Second Application Period includes conference calls and in-person conferences with principals for the borrower and its counsel, review of funding requests, and analysis of pleadings and other publicly available legal materials, working with Houlihan Lokey to prepare for the disposition of the asset and prepare on an expedited basis all of the transaction documents, and the negotiation and closing of the asset sale. In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in transactional and litigation matters.

(c)   **Accutane** - refers to a litigation financing investment by a Platinum related entity in a products liability litigation currently on appeal before the Supreme Court for the State of New Jersey.

During the Second Application Period, the Receiver and her team worked closely with Houlihan Lokey to evaluate strategic alternatives with regards to this asset. Specifically, the Receiver and her team analyzed the legal and business issues relating to this investment. In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters. Time billed to this matter included conference calls

5125633.1

and in-person conferences with principals for the borrower and its counsel, and analysis of pleadings and other publicly available legal materials.

(d)     **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC.  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC ("Beechwood").

         During the Second Application Period, Applicants spent significant time analyzing the legal and business issues relating to this transaction, with a focus on understanding the remaining value in PGS' positions with Agera, and determining the specific nature of the various transactions between and among, PPCO, PPVA, Beechwood, PGS and Agera.  In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters.   Time billed to this matter included conference calls and in-person conferences with PPVA, the Receiver's financial advisors and others with information regarding the transactions, and an analysis of Beechwood's activities with respect to this investment.

(e)     **AirDye** – refers to PPCO's interests in AirDye Solutions, LLC, a textile technology company based on a proprietary dyeing process.   PPCO directly owned a subordinated note from AirDye, as well as equity in AirDye's parent.  PPVA also held interests in AirDye.  During the Second Application Period, the Receiver sold all of PPCO's interests in AirDye to AirDye's management, and settled all outstanding disputes among the parties, including the dismissal of four active arbitrations.

5125633.1

During the Second Application Period, the Receivership Team conducted due diligence on AirDye and, together with Goldin, reviewed, negotiated and approved the pricing and settlement terms initially proposed by AirDye's management to purchase all of PPCO's and PPVA's interests in AirDye and enter into settlement and release agreements with respect to the disputes and arbitrations.   The Receivership Estate realized $1.265 million from the sale and settlement.  Time billed to this matter included negotiation and drafting of the Settlement and Assignment Agreement and General Release and related settlement documents with not only AirDye's management, but with PPVA.  Otterbourg attorneys who have billed time to this matter primarily include attorneys with experience in finance and transactional matters.

(f)    **ALS** – refers to a portfolio of life settlement investments owned through an entity in which PPCO is the majority owner and managing member.

During the Second Application Period, Applicants continued to analyze the legal and business issues relating to this portfolio, with a focus on positioning the life settlements for disposition.  This investment is within the portfolio of investments that Houlihan Lokey has been engaged to sell.  Upon the Receiver's appointment and review of the portfolio of life insurance policies, she discovered that the files with respect to the policies were in disarray and information that was needed to market and sell the portfolio, such as updated medical reports on each of the insureds, was sorely lacking.  The Receivership Team has been working diligently with Houlihan Lokey and the third party administrator of the life settlement policies to reach out to each of the insureds to bring the files up to date, which will enhance the value of the portfolio. Otterbourg communicated with each of the insureds regarding their obligations under the purchase agreements by which ALS came to own the policies and had follow-up communications with the insureds or their representatives.  While the Receivership Team has not

5125633.1

yet achieved full compliance from all of the insureds, some of whom continue to be uncooperative or unresponsive notwithstanding the Receivership Team's efforts, significant progress was made to improve the portfolio and obtain the cooperation of the majority of the insureds in the portfolio.

Additionally, Applicants addressed issues raised by ALS' minority interest holders and negotiated a dismissal without prejudice of a lawsuit filed by those minority interests (<u>Pea & En, LLC et al. v. ALS Capital Ventures LLC</u>, Index No. 656939/2017, in the Supreme Court for the State of New York, New York County) and ascertaining and advocating the portfolio's rights in certain other policies.  The Receiver is also analyzing the extent, if any, that ALS proceeds should be distributed to ALS minority members upon disposition.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters.   Time billed to this matter included conference calls and in-person conferences with the insureds and their representatives, insurance companies, the company retained to service the policies on behalf of ALS, and with counsel for the minority interest holders.

(g)    **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("<u>AEI</u>") pursuant to a $45 million dollar facility, *i.e.,* the Loan. The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("<u>AEX</u>") and Arabella Operating, LLC ("<u>AO</u>" and, together with AEX and AEI, "<u>Arabella</u>"). Arabella is involved in the ownership and operation of certain oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the

Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.04.  Pre-Receivership, a related Arabella entity in which Platinum does not have an interest – Arabella Petroleum Corporation ("APC") – commenced an action against the Arabella Entities asserting claims for the recovery of certain assets that are the subject of PPCO's liens. APC is also a debtor in a bankruptcy proceeding pending in the Western District of Texas.  The Prior Receiver entered into a settlement agreement with the Trustee of APC, settling the claims and agreeing to the interests of each estate in the combined assets that are to be sold in the respective bankruptcy cases.  The Arabella Settlement Agreement was approved by this Court.

   During the Second Application Period, Applicants spent significant time analyzing the issues with respect to an adversary proceeding commenced by Founders Oil & Gas III, LLC and Founders Oil & Gas Operating, LLC (collectively "Founders"), which is attempting to seize revenues from six oil and gas wells through, what Arabella asserts is a misapplication of two joint operating agreements.  Applicants reviewed the Founders adversary proceeding, prepared for the mediation in Texas, and attended the mediation in Texas with Arabella, Founders and the Trustee of APC.  To prepare for the mediation, the Receivership Team had several internal strategy sessions and meetings with Arabella management and professionals representing Arabella, to review the mediation positions and impact on possible sale of the Arabella assets.  Otterbourg sent a representative to Texas to attend the all-day mediation in October.  The mediation did not result in a settlement, although the parties have continued to engage in periodic discussions. Applicants also monitored the summary judgment proceeding that occurred following the failure of the mediation.  Currently, a trial on the Founders adversary proceeding is expected to occur during the first half of this year.  The issues with Founders have

5125633.1

delayed the sale of the Arabella assets.  Applicants engaged in discussions with the Trustee for APC to resolve certain issues between the estates and work cooperatively to maximize value for both estates.  Applicants also spent significant time reviewing and negotiating a proposed use of cash collateral motion and order with Arabella, reviewing objections to the cash collateral motion, revising the relief requested, responding to an attempt to have Platinum's claims against Arabella transferred to a third party that is claiming a participation interest in the Arabella loan as a result of an agreement entered into with the Prior Receiver, and reviewing the financial analysis of this investment with Goldin and Arabella's retained professionals in Houston.  In connection with this analysis, Applicants spent time reviewing the purported participation agreement and responding to such participant's attempt to have Platinum's claims against Arabella transferred to it.  Applicants also reviewed the claims by certain former Arabella professionals that such professionals had a right to the cash collateral of Platinum by virtue of a purported guaranty provided to such professionals by prior Platinum management.   The Receiver disputes the rights of many, if not all, of the foregoing third parties who assert an interest in Arabella's assets.  Applicants have had regular communications with Arabella's retained professionals, including its Chief Restructuring Officer, bankruptcy counsel, litigation counsel and the broker retained to market and sell the Arabella assets.  Additionally, during the Second Application Period, Applicants requested assistance from Conway MacKenzie with the evaluation and execution of monetization alternatives related to PPCO's interests in Arabella.  Accordingly, Applicants spent time providing relevant background information and documentation to Conway MacKenzie and coordinating with the Conway team in the performance of its duties.  The Conway MacKenzie professional working on the matter is based in Texas and is experienced in the oil industry.  The ultimate recovery with respect to the

5125633.1

Arabella Loan can be impacted by many different factors, including the Founders litigation, an alleged "first out" participation claimed by certain professionals who represented Platinum in connection with Arabella, as well as the participation agreement entered into by the Prior Receiver.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

      (h)    **Black Elk**  - refers to the Black Elk Energy Offshore Operations LLC, in which PPCO and certain affiliates hold interests at different levels of the Black Elk capital structure. This is the investment that specifically contributed to the filing of this SEC action in which the Platinum Entities and other individual defendants were accused of defrauding Black Elk and its investors.  Black Elk is a debtor in a bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Texas.  The Prior Receiver negotiated a settlement agreement with the Trustee of Black Elk (the "Black Elk Settlement Agreement"), pursuant to which, among other things, the Black Elk Trustee was given an allowed claim against PPCO.  The Black Elk Settlement Agreement also provides that if another entity that is currently not included in the Receivership Estate – Platinum Liquid Opportunity Master Fund, L.P., a Cayman Islands limited partnership ("PPLO Master Fund"), then the Black Elk Trustee would have an additional claim against PPLO Master Fund in the Receivership Estate.

      During the Second Application Period, Applicants had multiple conversations with counsel for the Black Elk Trustee to discuss, among other things, whether the Receiver would be seeking to add the PPLO Master Fund to the Receivership estate and a request by the Black Elk Trustee for documents from Platinum.  On the first issue, Applicants analyzed the impact on the Receivership Estate of seeking to add PPLO Master Fund as a Receivership Entity and determined to add such entity, which inclusion was approved by the Court.  On the second

issue, the Black Elk Trustee followed-up his informal request for documents with a formal subpoena. Applicants reviewed the subpoena and prepared and served an objection to the subpoena, on the grounds that, among other things, it was overbroad and violated the Receiver Order. In this regard, Otterbourg attorneys who have billed time to this investment primarily include attorneys with experience in bankruptcy and litigation matters.

(i) **Buffalo Lake Advanced Biofuels (a/k/a BLAB)** - refers to a shuttered ethanol plant located in Minnesota in which PPCO holds a debt and equity interest. There are multiple legal, financial, regulatory and business issues relating to this investment that required attention so that the Receiver could seek to market the asset.

During the Second Application Period, the Receivership Team has worked with Conway MacKenzie to ascertain what funds are required by BLAB, to examine potential liabilities, and to evaluate relevant strategic alternatives that are available for the disposition of Platinum's interests. The Applicants negotiated and prepared Funding, Fee Sharing and Sale Proceeds Sharing Agreement (the "Funding and Sharing Agreement") with the CEO of BLAB, whereby the CEO will make an additional investment in BLAB and provide assistance to Conway MacKenzie with respect to a near term sale of BLAB's assets. In this regard, the Receivership Team members who have billed time to this investment include attorneys with experience in transactional matters. Time billed to this matter included conference calls with local counsel in Minnesota, in-person conferences with the portfolio manager responsible for the matter, and review of background documentation including, loan documents, as well as the aforementioned time working with Conway MacKenzie.

(j) **China Horizons/Yellow River** – refers to PPCO's equity and debt interests in two companies -- China Horizon and Yellow River—created to build a chain of convenience

stores in rural China.  China Horizon was originally a joint venture with another company, China Post.  China Post subsequently pulled out of the joint venture and China Horizon transferred its intellectual property to another company—Yellow River—in exchange for equity in Yellow River.  Subsequent to the transfer, China Horizon received approximately $15 million from China Post as proceeds of the settlement of a dispute between them.  PPCO and PPVA jointly own a share of the equity of Yellow River and a share of promissory notes from China Horizon, which are not yet due.

During the Second Application Period, the Receiver and the Receivership Team have explored options for obtaining an early repayment of the notes from China Horizon and liquidating PPCO's and PPVA's equity interests in Yellow River.  The Receiver received an expression of interest from a third party based in China to purchase Platinum's interests in the China Horizon notes and its Yellow River equity position.  Applicants spent time during the Second Application Period discussing the proposal with PPVA and analyzing the offer.  To that end, Otterbourg attorneys who have billed time to this matter primarily include transactional attorneys.

(k)      **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings").  PPCO and Platinum Long Term Growth VII LLC are owed approximately $15.6 million, which is secured by a first priority security interest in all of Cleveland Mining's and Iron Holdings assets.  PPCO also holds approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings.  Cleveland Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not

operating.   At this time, the Receiver understands that Cleveland Mining's subsidiary, Iron Holdings, has no assets of any value.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal, financial and business issues relating to this investment.  In addition, the management of Cleveland Mining has been litigious and has issued several demands addressed to the Receiver, including a challenge to PPCO's filed security interests in Australia, which have required responses.   The Receiver retained local counsel in Perth, Australia to assist in addressing the issues raised by Cleveland Mining.   The Receiver is also in the process of retaining a local financial advisor to assist in providing an independent review of Cleveland Mining's financial position.   In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation and workout matters.   Time billed included a review of the legal documentation, preparation of responses to the written demands received from Cleveland's management and coordinating with and instructing Australian counsel, including several conference calls with local Australian counsel.

(l)      **Clifford Chance/Excalibur** – refers to a litigation financing loan made by certain PPCO and PPVA entities to Excalibur Ventures LLC ("Excalibur") in connection with litigation in the United Kingdom prosecuted on its behalf by Clifford Chance.  Excalibur was unsuccessful and pursuant to British law, was required to pay the defendants' costs.   In 2014, the Platinum entities involved in this loan asserted claims against Clifford Chance and one of its members in connection with the litigation.   These claims were settled in 2015.   Thereafter, Clifford Chance identified additional sums that had been received from Platinum and were still being held in its client accounts.  After investigating potential causes of action associated with Clifford Chance's retention of these funds, the Receiver, along with the PPVA liquidator, determined to enter into a

5125633.1

settlement with Clifford Chance whereby they recovered the entirety of the sums which had been held by Clifford Chance, totaling $197,475, of which $99,000 represented PPCO' share of the settlement.

During the Second Application Period, the Applicants spent time reviewing underlying documentation associated with this loan, conferring with attorneys familiar with the applicable British laws, negotiating a settlement with Clifford Chance and agreeing with PPVA on a division of the settlement proceeds.  In this regard, the Receivership Team members who have billed time to this investment include attorneys with experience in litigation matters.

(m)   **Daybreak** - refers to a publicly held oil and gas company with assets in the San Joaquin Valley in California and in Montcalm County, Michigan.  PPCO owns 99% of the membership interests and is the managing member of Maximilian Resources LLC ("Maximilian"), which is owed approximately $9.2 million from Daybreak on account of a senior loan, secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage.  Conway MacKenzie has been asked to review this asset and provide the Receiver with disposition options.

During the Second Application Period, Applicants worked with Conway MacKenzie to position this asset for marketing and sale.  Conway MacKenzie and the Receivership Team are exploring all potential disposition options, and is open to a transaction with the insiders of the company, as well as strategic or investment buyers.  Conway MacKenzie and Otterbourg attorneys have had conversations with the management teams for both the California and Michigan sites.  In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in finance and transactions.  Time billed to this

matter includes review of background documentation, discussions with the management teams for the underlying companies, and conversations and updates from Conway MacKenzie.

(n)     **Desert Hawk** – refers to Desert Hawk Gold Corp. ("Desert Hawk"), a publicly reporting gold mining company.  PPCO holds secured second -priority debt in Desert Hawk and owns securities convertible into 20% of the common equity of the company.  Desert Hawk owns a pilot stage gold mine located in Gold Hill, Utah. This is a joint asset held with PPVA. Conway MacKenzie has been asked to review this asset and provide the Receiver with disposition options.

During the Second Application Period, Applicants worked with Conway MacKenzie to consider disposition options and have had discussions with the members of Desert Hawk management regarding their investment of additional capital.  Applicants spent time negotiating a possible term sheet with such management and PPVA.  Applicants have also discussed with Conway MacKenzie options for structuring the sale process and engaging with current management.  In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in transactional matters.

(o)     **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah.  Through Maximillian, PPCO holds a debt and equity interest in the company.

During the Second Application period, the Receivership Team began working with Conway MacKenzie to better understand the complex legal, financial, regulatory and business issues relating to this investment.  In this regard, the Receivership Team members who have billed time to this investment include attorneys with experience in litigation matters.   In connection therewith, the Receivership Team commenced an investigation into the receipt of

37

certain insurance proceeds by a Greentown related entity which the Receiver believes were assigned to Maximilian Resources, a PPCO owned entity, responded to a complaint filed by Pacific in the U.S. District Court for the District of Nevada (Pacific Energy & Mining Company v. Maximilian Resources LLC, Case No. 17-cv-00363 (HDM)(VPC)), and has begun to develop an overall resolution and disposition strategy.

(p)     **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of In re Lily Group, Inc., Case No. 13-81073 (Bankr. S.D. Ind.).   Following its acquisition of the mine, PPCO retained a third party mining contractor to assist it in putting the mine back into production.   Through a combination of mismanagement and a downturn in coal prices, the contract miner never achieved tangible success with the property and was terminated.

Since the Receiver's appointment, Applicants have spent time analyzing the legal, financial, regulatory and business issues relating to this investment and analyzing potential liabilities and options for disposition of the asset.  The asset, to date, is an unproven mining investment.  The Receiver is considering all options and, to that end, Applicants have had multiple conversations with the mining contractor regarding the mine and potential disposition. The Receiver Team also has had preliminary discussions with counsel for the Lily Group Official Committee of Unsecured Creditors, which has threatened claims against the Receiver Entities, including claims to claw back the asset into the Lily Group bankruptcy.  In this regard, the Otterbourg attorneys who have billed time to this investment primarily include attorneys with transaction and bankruptcy experience.

(q)   **Northstar Offshore** – refers to PPCO's interest in an oil and gas company that is currently a debtor-in-possession in a Chapter 11 bankruptcy case in the Southern District of Texas, In re Northstar Offshore Group, LLC, Case No. 16-34028 (the "Northstar Bankruptcy Case").  Prior to the Receivership, PPCO made a large investment in Northstar totaling nearly $60 million, including: (a) approximately $700,000 invested through a letter of credit facility; (b) $28,000,000 of face value 12% Second Lien Notes; (c) a $2,470,000 face value unsecured 12% note; and (d) over $27,000,000 of face value Series A Preferred Equity Shares of Northstar Stock.

Prior to the appointment of the Receiver, the Prior Receiver determined not to invest further in Northstar or to submit a bid for its assets in the bankruptcy case.  During the Second Application Period, Applicants spent significant time analyzing the legal issues confronting the Receiver with regard to her exit of this position. Time spent on this matter includes analyses of equitable subordination, re-characterization and bankruptcy plan confirmation issues, in addition to a review and analysis of Northstar's plan and disclosure statement, and conference calls with regards to threatened litigation in the bankruptcy case against PPCO.  Applicants also prepared an objection to Northstar's proposed disclosure statement and plan on the basis that Northstar was attempting to reserve claims against Platinum, which the Receiver argued was objectionable in view of the Receiver Order.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation and bankruptcy matters.

(r)   **Pro Player** – refers to a Platinum entity that made loans to professional athletes, often at the beginning of their careers.  A portfolio of these loans still has overdue outstanding balances owed to Pro Player by these athletes.

During the Second Application Period, the Receiver investigated the potential for pursuing collection of the outstanding loan balances.  In addition, one of the borrower athletes filed a lawsuit seeking to have a confession of judgment previously filed against him by Pro Player set aside.  That case is entitled <u>Nicholas Harris v. Pro Player Funding LLC</u>, Index No. 654965/2017, in the Supreme Court, State of New York, County of New York, and the deadlines in the case have been adjourned at the parties' request.    Time billed to this matter included analysis of pleadings, analysis of the loan documents, communications with counsel for the plaintiff, and investigation of the current financial and professional statuses of the various borrowers.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation and finance matters.

(s)     **TARS** - refers to an investment by a Platinum related entity in a *qui tam* action against a number of life insurance companies, which has been pending under seal since December 2010.

During the Second Application Period, the Receiver and her team worked closely with Houlihan Lokey to evaluate strategic alternatives with regards to this asset.  Time billed to this matter included conference calls and in-person conferences with principals for the borrower and its counsel, and analysis of pleadings and other publicly available legal materials.  In this regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation matters.

(t)     **Urigen** - refers to PPCO's equity and debt interests in Urigen Pharmaceuticals, Inc., a specialty pharmaceutical company focused on the development and commercialization of products for urology indications.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal and business issues relating to this investment, specifically including addressing certain disputes as to PPCO's status in the debt and equity structure of Urigen and negotiations with other entities in the capital structure for such entities to make further investments in the project.   The Receiver advised management that she is not prepared to make further investments in this asset given the uncertainty of the project and alternative sources in the capital structure for investment other than by the Receiver.   Time billed to this matter included conference calls and in-person conferences with principals of Urigen and PPVA, internal meetings to discuss the projected value of this investment and an exit strategy for same.   In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters.

### B.     Case Administration (P04) - Total Fees:  $423,368.50

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including preparing motions relating to the administration of the Receivership Estate.   The nature of the tasks performed under this category is varied, and includes the following:

(a)     **Employees.**   Since the Receiver's appointment, the number of employees has been reduced from thirteen (13) to four (4).   There are currently two remaining portfolio managers, the chief financial officer and the general counsel.   The director of information technology was transitioned to an independent consultancy at a lower cost to the Receivership Estate, while maintaining the same level of service.   Prior to the departure of each portfolio manager, the Receivership Team received a download regarding the assets in each's respective

41

portfolio.  During the Second Application Period, Applicants spent time coordinating the separation of employees from Platinum and negotiating revised work terms.

(b)    **Relocation.**  In a continuing effort to reduce expenses of the Receivership Estate, during the last application period, the Receiver obtained smaller, less costly space that is more convenient to the offices of the Receiver, Goldin, and Houlihan Lokey, thereby reducing travel time for meetings.  In addition to cost savings on the office lease (a reduction from $15,750 per month to $9,972 per month for savings of $5,972 per month), the relocation project will result in cost savings on information technology due to a consolidation of services and equipment, all while safeguarding Platinum's electronically stored information through multiple redundant systems.  During the Second Application Period, Applicants coordinated with Platinum's head of IT to ensure a seamless transition of the office space and information technology systems.  The move was completed prior to the end of the year.

(c)    **PPVA**.    Applicants had regular teleconferences and at least one in-person meeting with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund. Applicants also regularly have asset-specific teleconferences with the joint liquidators or their professionals to discuss the liquidation or analysis of assets that are jointly held by PPVA and Platinum.  Applicants also continued to discuss procedures to share with the liquidators non-privileged documents that are maintained on the Platinum servers controlled by the Receiver.

(d)    **Website and Investor Communications.**  In accordance with Section E.2.l (Communications with Investors), the estate hired Garden City Group LLC ("GCG") to create the Receiver's website (PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  Time was also devoted by Applicants to updating the

5125633.1

website to add or update the "Frequently Asked Questions" section of the website and to add "key documents." The Receiver prepared and updated letter to investors, which was posted on the website. The Receiver also established a mechanism on the website to allow interested parties to sign up to receiver daily notices when there are new filings on the docket. The Receiver and/or the Receivership Team have also held numerous meetings and/or teleconferences with various investors and Defendants at their request.

The Receiver also organized and held a "Town Hall" style webinar and telephone conference on December 20, 2017 to provide an update to investors and to answer questions submitted by investors. Forty people participated via the webinar and another 51 participated by telephone. The Receiver received positive feedback from this meeting and intends to hold them periodically going forward. Time was spent by Applicants providing notice to investors of the webinar, organizing the webinar, and preparing for the webinar.

(e) **SEC Meetings**. The Receiver also regularly communicated via telephone and e-mails with the SEC staff to keep them apprised of ongoing matters and to alert them to potential retentions and filings by the Receivers. The Receiver and her counsel have also met in-person with the SEC on at least one occasion during the Second Application Period.

(f) **Taxes.** Applicants spent time during this period coordinating with Goldin, Platinum's CFO and Deloitte Tax LLP to monitor their efforts to prepare local, state and federal tax returns. K-1s for the year ended December 31, 2016 for the PPCO Fund LLC and the PPCO Fund (TE) LLC were mailed to investors on December 13, 2017 and December 28, 2017, respectively. K-1s for investors in the PPLO (USA) Fund LP are near completion and we anticipate sending Final K-1s for the years ended December 31, 2015 and 2016 in the next 2

5125633.1

weeks. Completing and filing these tax returns has required more work, as there have not been any PPLO (USA) Fund LP tax returns completed since 2014.

(g)     **Retention of Professionals.**     Applicants also reviewed the Application by the Prior Receiver to engage limited scope professionals.  In connection with this review, Applicants analyzed the services provided by each firm, the continued need for such firm's services, and the reasonability of the fees and expenses billed to the estate post-Receivership.  Because of the wide range of jurisdictions in which the Platinum assets are located, the Receiver requires the assistance of several local law firms to assist with protecting the assets and provide their relevant expertise.   On November 15, 2017, the Receiver filed a Declaration, identifying those professionals that the Receiver sought to retain on a go forward basis.  [Dkt. No. 281].  The Court approved the Receiver's requests and entered an order authorizing the retention and payment of such limited scope professionals on December 26, 2017.  [Dkt. No. 294].  The Receiver also required the assistance of additional law firms to protect Platinum's interests as issues     arise in other jurisdictions (*e.g.*, the Receiver required the assistance of a local law firm in Australia to assist with the Cleveland Mining asset).  Accordingly, the Receiver filed a motion to approve procedures for the retention of professionals in the ordinary course of business.  [Dkt. No.  292]. The Court granted the relief on December 29, 2017.  [Dkt. No. 296].

(h)     **Expansion of Receivership**.  The Prior Receiver seeking to have several PPCO and PPLO entities, plus the umbrella management company, Platinum Management, added to the Platinum receivership estate.   Upon her appointment, the Receiver undertook a review of this expansion motion and withdrew the application, without prejudice to requesting the same or similar relief at a later date.  [Dkt. No. 240].  During the Second Application Period, the Receivership Team continued to review whether the Receivership Estate should be expanded to

5125633.1

include any additional entities.  Among other things, the Receiver considered the assets and liabilities of each entity and the relationship of each entity to the current Receivership Entities under the Receiver's control.  Following this review, the Receiver concluded that it would be in the best interests of the Receivership Estate to include the following as Receivership Entities:  (i) Platinum Partners Liquid Opportunity Master Fund L.P.; (ii) Platinum Partners Credit Opportunities Fund International Ltd; and (iii) Platinum Partners Credit Opportunities Fund International (A) Ltd.  On December 14, 2017, Applicants filed a motion to expand the Receivership Estate [Dkt. No. 291], which was approved by the Court on December 29, 2017. [Dkt. No. 298]. The foregoing entities are now under the control of the Receiver and the supervision of the Court in accordance with the provisions of the Receiver Order.

(i)  **Forensic/Investigatory Work**.  In addition to the liquidation of assets, potential sources of recovery include claims on behalf of the Platinum Entities against possible liable parties.  The Receivership Team has begun to identify potential claims, including against professional firms that provided services to Platinum.  For certain claims in which a statute of limitations deadline may be approaching, the Receivership Team has or will reach out to the potential adverse party to enter into a tolling agreement to allow the Receivership Team the appropriate time to investigate potential claims.  In that regard, time was spent by Otterbourg litigators reviewing potential causes of action and the applicable statutes of limitation applicable to such causes of action and applying such statutes to the known facts concerning the date such potential causes of action may have accrued.  Otterbourg will be coordinating forensic and investigatory work with the Goldin team.

(j)  **Court Hearings.**  The Applicants prepared for and attended the status conference in this case before the Court on December 1, 2017.  Applicants also prepared for and attended (i)

a hearing on October 12, 2017 to consider the petition of the joint liquidators of a PPVA related entity for recognition of the solvency proceeding; (ii) the October 17, 2017 status conference in the criminal proceeding; and (iii) a hearing on October 10, 2017 in state court to consider the Defendants' dispute with the excess insurers on the director and officer liability policies.

(k)     **Receiver Oversight**.   Time during the Second Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.   The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin in analyzing budget, cash management and forensic accounting issues.

## V.     EXPLANATION OF EXPENSES AND RELATED POLICIES

1.      Applicants seek reimbursement of its out-of-pocket costs in the amount of $11,787.94.  **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

2.      Applicants observed the following policies in connection with its expenses during the Second Application Period:

(a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 26,455

46

internal photocopies during the Second Application Period at the rate of 0.15 cents per page, totaling $3,968.20 for all in-house copies.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Second Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses (including mileage, taxis, etc.) nor for meals.  A limited amount of travel time occurred during this Second Application Period with respect to a single trip to Texas to attend a mediation session.  Applicants used the lowest available airfare (*e.g.*, coach) and are not seeking reimbursement for luxury accommodations or

47

deluxe meals.   In maintaining its expense documentation, Applicants will retain copies of receipts relating to long distance travel.

(f)      In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)      The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.   This service is only charged to the extent of the invoiced cost from the vendor GCG, which will be billed directly to the Receivership Estate.

(h)      In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.    FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.   This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."   *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).   Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."   *Securities & Exchange Comm 'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F. 2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds. Investors now have a forum in which they may present their views (including their

criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse, ranging from litigation finance to gold and coal mining. Many of the people with factual knowledge are facing criminal charges. Documentation, to the extent it exists, must be questioned and verified. Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.   HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of assets is ongoing and that there are significant costs of maintaining certain of the portfolio assets until they can be sold in an orderly manner (*e.g.*, the monthly premiums required to be paid on the life settlement policies). Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty-five percent (25%) of the allowed fees requested in this Second Interim Application (the "Holdback Amount"). Applicants have agreed to forego immediate payment of the Holdback Amount with the understanding that (i) upon disposition of additional assets, and subject to the consent of the SEC, the Receiver will authorize the reduction of the Holdback Amount to twenty percent (20%) and payment to Applicants of 5% of their allowed fees, and (ii) the remaining Holdback Amount can be paid to Goldin at the conclusion of the Receivership. All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     Grant interim approval of the Receiver's compensation in the amount of $120,434.80 (the "Allowed Receiver Fees");

5125633.1

(b)     Grant interim approval of Otterbourg's compensation in the amount of $903,961.80 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $2,602.95;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $9,184.99;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants;

(f)     authorize the Receiver, upon the disposition of additional assets, to reduce Applicants' Holdback Amount to twenty percent (20%) and pay to Applicants from the Receivership assets five percent (5% ) of Applicants' Allowed Fees, subject to the consent of the SEC, but without further notice or order of the Court; and

(g)     Grant such other relief as the Court deems appropriate.

Dated:  February 15, 2018

Otterbourg P.C.

By: */s/ Adam C. Silverstein*
    Adam C. Silverstein

230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

5125633.1