UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

   -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

               Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**THIRD JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
JANUARY 1, 2018 THROUGH AND INCLUDING MARCH 31, 2018**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Third Joint Interim Application (the "Third Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from January 1, 2018 through and including March 31, 2018 (the "Third Application Period").  There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg).  The Receiver requests interim approval of fees in the amount of $186,343.60 and reimbursement of expenses in the amount of $1,555.48 for the Third Application Period. Otterbourg requests interim approval of fees in the amount of $758,002.95 and reimbursement of expenses in the amount of $7,254.33 for the Third Application Period, for a combined total of fees for Applicants in the amount of $944,346.55,[1] and expenses in the amount of $8,809.81.

This Third Interim Application contains the following sections:

**Section I**  provides a preliminary statement of the Receiver's activities during the Third Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Third Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1]  As agreed to by the Receiver, this total amount reflects a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges and a ten percent (10%) reduction in Otterbourg's  recorded time charges.   In addition, based upon the SEC's review, Otterbourg's attorneys' recorded time charges have been voluntarily reduced by $5,591.00. Further, in accordance with Otterbourg's customary practice of reviewing its hourly rates annually, Otterbourg adjusted the professionals' hourly billing rates as of October 1, 2017.   As previously agreed with the SEC, the Receiver's aggregate fees have been reduced (prior to application of the public service accommodation) to discount for any increase in her billable rate since October 1, 2017. Therefore, the Receiver's recorded time charges before application of these accommodations were $275,067.50 and Otterbourg's recorded time charges were $842,225.50, for a combined gross legal fees total (before the application of any public service accommodation or the discount for rate increases) of $1,117,293.00.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Third Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines. All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.      PRELIMINARY STATEMENT

During the Third Application Period, the Receiver continued her efforts to monetize the assets in the portfolio. The Third Application Period was mostly focused on preparing for and assisting with the launch of marketing efforts with respect to the sale of certain assets that the Receiver believed would generate interest. The Receiver and her team[2] spent considerable time during the Third Application Period preparing the assets for market, performing due diligence on the assets to be sold, and evaluating the status of marketing efforts and offers received. Specifically, the Receiver began the marketing of the Abdala gold tailings mine in Brazil and the ALS life settlement portfolio. The sale of the ALS life settlement portfolio was presented to the Court during the Third Application Period and was subsequently approved by the Court. The marketing process with respect to the Abdala gold tailings mine is continuing and monetization of that asset is possible during the current calendar quarter. In addition, the Receivership Team

---

[2]     To assist her with her duties, the Receiver sought the retention of counsel and a financial advisor. To that end, on July 21, 2017, the Court approved the retention of Otterbourg as legal counsel to the Receiver [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

5292941.1

has continued to conduct due diligence with respect to the other investments in the portfolio, has monetized two such investments, and expects to complete the monetization of additional investments this calendar quarter, all as described in further detail herein.

A.     **Analysis and Disposition of Receivership Assets**

The investments of the Platinum Entities are diverse, but generally fall into three main asset categories: (i) life settlement investments (*e.g.*, investments in life insurance policies), (ii) litigation finance investments, and (iii) "other" assets, which vary greatly, although they have a significant concentration in the metals, mining and energy sectors.  Most of the "other assets" are investments in companies that are in the developmental stages and have not yet had proven success, or have failed to achieve stated expectations and, thus, may have little or no value.  In addition, the investments are located around the country and around the world, including Brazil, China and Australia.

The nature of Platinum's investment in each of the assets varies.  For example, in some cases the Receivership Entities own a debt position, in others an equity position, and in others it may be a combination of the two.  The debt holdings also vary from senior positions, subordinate positions or, in some cases, only a residual interest after the Receivership Entity sold a 100% participation in its debt holding.  Depending upon the nature of the Receivership Entity's holdings, it may be possible to sell the underlying business or a 100% equity interest in the business, while in other instances, it may only be possible to sell the Receivership Entity's debt position or its share of the equity (which in many cases is not publicly traded and, therefore, there is no readily available platform for a sale).  To the extent possible, the Receiver has worked with other investors in the asset to maximize recovery for both parties.

4

The Receivership Team continued to evaluate the assets and prioritize those investments that either required immediate attention or could be most readily monetized.  As previously reported, many of the investments are problematic, have real or potential significant liabilities, and/or require additional cash investment for the underlying company (which were still in the developmental stages) to continue or resume operations.  During the application period, and at this time, the Receiver was, and is, making expense payments that are necessary only to maintain or preserve the value of an asset, to protect collateral and/or to stabilize operations, such as lease payments and premium payments on life insurance policies (prior to the sale of the life insurance policies). As certain of these assets were sold, the liabilities have been substantially reduced. The Receiver continues to believe that, under the circumstances of the receivership, no asset warrants capital investment beyond what is necessary to preserve that asset.  When possible, the Receiver has undertaken negotiations with other investors or stakeholders involved with an asset, including management, to infuse additional cash into the investment to preserve value until the asset can be sold, as well as to reduce ongoing expenditures.

Because the investments are diverse, the monetization options vary greatly from one investment to another.  For example, the types of companies in which these investments were made range from pharmaceutical startups, to foreign "shell" companies, to a chain of small grocery stores in rural China, and, while many of the assets are in the metals, mining and energy sectors, each of these companies are located in different regions domestically and globally and have unique characteristics.  Some investments are in companies that are in bankruptcy and, consequently, have an additional layer of issues.  The Receivership Team has sought to "triage" the various assets; first focusing on those assets that are relatively liquid, such as publicly traded stocks, life settlement investments and litigation finance investments; and then focusing on those

5292941.1

assets that are less liquid, but nonetheless, with greater time and effort, can be marketed and hopefully liquidated.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie").[4]  Houlihan Lokey and Conway MacKenzie are each responsible for different assets and there is no overlap in the work performed by each.

Because of Houlihan Lokey's areas of expertise, it was retained to market and sell specific assets including (i) the life settlements portfolio, (ii) the litigation finance portfolio, (iii) Abdala Tailings Project, (iv) LC Energy Operations LLP and (v) Urigen Pharmaceuticals, Inc.[5] As the Court acknowledged in the Houlihan Opinion, Houlihan Lokey was retained because of, among other reasons, its extensive experience with several hedge fund wind-downs, its experience with marketing illiquid assets across a broad spectrum of alternative investments, and its breadth of knowledge of potential investors to create a competitive environment to maximize recovery. *Houlihan Opinion* at 6.

The Receiver also retained Conway MacKenzie to provide due diligence and assist with the disposition of certain of the remaining assets that are not being marketed by Houlihan. Conway MacKenzie was asked to focus its initial efforts on the following assets: (i) Buffalo Lake Advanced Biofuels, LLC, also known as "BLAB", (ii) Desert Hawk Gold Corp. (which was monetized during the Third Application Period) and (iii) Daybreak Oil and Gas, Inc.  The

---

[3]  The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[4]  Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

[5]  Platinum's investment in Urigen Pharmaceuticals is not currently ripe for marketing as management has obtained third party financing to enable it to continue the required testing on the product that is still in the developmental stage.  While the Receivership Team has periodic calls with management to discuss the status of the business and its finances, Houlihan is not currently marketing this investment.

5292941.1

Receiver has since identified additional investments for Conway MacKenzie to review and evaluate, including American Patriot Gold, Greentown Oil Company, Arabella Exploration, NordAq Energy, Xcell Energy and Decision Diagnostics Corp. The Receiver and Conway MacKenzie have been reviewing Platinum's portfolio of assets to identify additional assets that may be marketable and for which Conway MacKenzie can provide assistance.

In addition to the due diligence performed by Houlihan Lokey and Conway MacKenzie on the assets that each has been asked to review, the Receiver and the Receivership Team have also fully debriefed Platinum's portfolio managers that were working at Platinum at the time of her appointment with respect to each of the investments, have had extensive interaction with the management teams of the underlying portfolio companies (when available and appropriate) and have received input from investors and Platinum's prior management regarding investments.

During the Third Application Period, the Platinum Receivership received approximately $468,000 from the sale of some of its assets. In addition, the Receiver executed purchase and sale agreements with respect to the ALS life settlement portfolio for an aggregate gross purchase price of approximately $10.8 million. Certain parties have asserted a claim to all or part of the proceeds. In addition, subsequent to seeking approval of the sale of the ALS life settlement portfolio, and subsequent to the Third Application Period, the Receiver learned that an insured under one of the policies to be sold has passed away. As a result, ALS is now entitled to retain the death benefits payable under the matured policy ($4,780,000) and the purchase price under the purchase agreement was reduced by the amount of the purchase price attributable to such policy ($2,721,000.00), for a net increase of proceeds to ALS of $2,059,000.

The foregoing amounts are in addition to the approximately $22.5 million received by the Platinum Receivership from the liquidation of certain other assets during the preceding two

5292941.1

quarters since the Receiver was appointed.  None of these assets has been marketed or sold in a "fire sale" fashion.  The investments monetized during the Third Application Period and the proceeds received by the Receivership Estate were as follows:

- Desert Hawk:  $417,000

- Wintercrest: $51,000 (sale of stock)

During the Third Application Period, Houlihan Lokey, with the assistance of the Receivership Team, launched to market two of the portfolio's assets (Abdala and the ALS life settlement portfolio) and prepared an additional asset for market (LC Energy).  The Receivership Team has also been actively working with Conway MacKenzie on the assets that it has been asked to review and market.  The assets assigned to Conway MacKenzie for marketing tend to be assets that require unconventional disposition solutions and/or where information is limited or difficult to obtain.  For example, Desert Hawk was sold to a consortium of current management and an investor group that management organized.  Conway MacKenzie has been tasked with gaining a further understanding of the particular assets in its portfolio, including making site visits and engaging with the management teams of each, to present the Receiver with options for monetizing each asset.  Certain of these assets have been monetized (Desert Hawk) or are close to being monetized (Daybreak).

The Receiver cannot at this time ascribe values to each of the assets that have not yet been monetized.  Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver (defined below) or Platinum management, were based upon assumptions that derived from prior (now removed) management's plans, which are now (and likely always were) unrealistic and/or can otherwise no longer be supported.  The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior

management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations.  In addition, as with the ALS life settlement portfolio, there may be parties asserting an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets, which assertions the Receiver will address and are intertwined with the Receiver's forensics investigation.  While the focus of the Receiver continues to be on selling the investments and ensuring a sound process for the marketing and disposition of the assets to achieve the fair market value of such assets, the Receiver has also begun to investigate potential claims that the Receivership Estate may be able to assert.

Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment.  As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long term future.  As the Court stated in the Houlihan Opinion, "[t]he Receiver is not tasked with making speculative investments. Instead, she is entrusted with the responsibility to prudently wind-down the Receiver Entities and dispose of the Receivership Assets in a manner that safely returns to stakeholders what value can be salvaged. She is not empowered to jeopardize that return by indulging in risky investment opportunities with the very money she has been charged to return to the victims of alleged years' long fraudulent conspiracies."  Houlihan Opinion at 8.

In addition, there are certain assets that may ultimately have no realizable value. Decisions regarding the monetization of investments necessarily will entail an understanding of

5292941.1

the interplay between future expenses (*i.e.*, cost to the estate to maintain the asset) and the time it will take to market and obtain a purchaser for the investment. The Receiver's goal is to monetize and sell the investments in a manner that balances the interests of being judicious with the assets of the estate, maximizing value and expeditiously disposing of the assets to allow the Receiver to make distributions to investors and creditors and close the case.

In the performance of her duties, the Receiver has also sought input from investors and prior management regarding certain of the investments. While the Receiver has made, and will continue to make, all decisions regarding the liquidation of the Receivership Entities' assets, and has made and will make informed decisions regarding each asset, the Receiver has elicited the input from others with knowledge of the asset and/or who have a stake in its disposition. Of course, all decisions are ultimately those of the Receiver.

A description of the investments in which Applicants have dedicated significant time during the Third Application Period and the work done during the Third Application Period with respect to those investments is set forth in Section IV of this Third Interim Application.

### B. Administrative Matters

The Receiver and the Receivership Team continued to meet with various interested parties and groups during the Third Application Period, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA")[6], counsel for the Defendants (defined below), investors and their representatives, equity holders in specific investment vehicles in which Platinum is the majority holder, and the SEC. The Receiver also held a second "town hall" style meeting with investors and other interested parties via webinar and telephone to provide an update on the actions taken to date and to answer questions and has

---

[6] PPVA is the subject of an insolvency proceeding pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S .Bankruptcy Court for the Southern District of New York.

5292941.1

committed to holding similar forums going forward.  The Receiver updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The Receiver and the Receivership Team also meets in person or by telephone with investors and/or their representatives upon request.

Applicants also worked with Goldin and with Platinum's Chief Financial Officer, who have dedicated significant time to working with Deloitte Tax LLP, in connection with the preparation of Platinum's local, state and federal tax returns, including seeking extensions of time to file Platinum's 2017 returns and requesting (and receiving) tax abatements for late filing penalties.  The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

Many of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the world.  During the Third Application Period, the Receivership Team dedicated substantial time to monitoring such proceedings, either directly or through local counsel, and, when necessary, preparing pleadings in such proceedings.

## II.      CASE BACKGROUND AND STATUS

### A.      Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

11

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds. In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual Defendants have denied all material allegations.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all

5292941.1

authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

Under the Receivership Order, the Receiver was granted the following general powers and duties:

(a)      To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of

whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property");

(b)      To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

(c)      To manage, control, operate and maintain the Receivership Entities and hold in the Receiver's possession, custody and control all Receivership Property, pending further Order of this Court;

(d)      To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging the Receiver's duties as Receiver;

(e)      To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of the Receivership Entities;

(f)      To engage and employ persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers, subject to Court approval;

(g)      To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

(h)      To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure and Court orders;

14

(i)     To investigate transactions by and among Receivership Entities, defendants, and any other persons and entities.

(j)     To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver;

(k)     To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and

(l)     To take such other action as may be approved by the Court.

**B.     Case Status[7]**

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)     As of March 31, 2018, the Receivership Entities had $7.2 million in funds, of which $5.4 million was held in cash in bank accounts and $1.8 million was held in brokerage accounts. These funds include proceeds from the liquidation of assets. Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate). Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets. These claims will be addressed in due course.

It is estimated that, as of March 31, 2018, unpaid administrative expenses amount to approximately $3.0 million. This amount includes the fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the Third Application Period and are being requested pursuant to this Application and Goldin's interim application, holdbacks for prior

---

[7]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period January 1, 2018 through March 31, 2018.

5292941.1

applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.

(b)      Cash disbursements during the Third Application Period totaled approximately $5.1 million, consisting primarily of (i) $1.9 million in disbursements to retained professionals and the Receiver; (ii) $478,000 in business asset expenses (payroll and related expenses paid to Platinum employees and rent); and (iii) $2.75 million in investment-related expenses, which include funds disbursed to preserve the value of the following assets: ALS life settlement portfolio ($1.8 million), LC Energy ($665,000) and Abdala Gold ($305,000).

Cash receipts during the Reporting Period totaled approximately $468,000. This amount primarily consists of proceeds derived from dispositions associated with the following investment positions: Desert Hawk ($417,000) and Wintercrest ($51,000).

The Receiver cannot at this time state when she expects the case to be concluded.  The Receiver expects that distributions to investors and creditors will not occur until the end of this calendar year, at the earliest.  This is due to the complexity of Platinum's business operations, the desire to liquidate substantially all of Platinum's assets before making any distributions, and the Receiver's strategy of avoiding a "fire sale" of Platinum's assets.

(c)      The Receiver has not yet initiated a formal claims bar date.  Thus, no claims proceedings have yet been commenced.  The Receiver has not yet determined how different types of claims or creditors will be treated, and the Receiver has not yet developed guidelines for how different investor or creditor claims will be treated or the methods that will be used.

(d)      As of March 31, 2018, the primary assets of the Receivership Estate consisted of the following:

(i)          cash and cash equivalents of approximately $7.2 million[8];

(ii)         Real estate investments without any set book value, due to their inherently speculative nature;

(iii)        investments in natural resources, litigation financing, life settlement investments,[9] energy and other miscellaneous investments; and

(iv)         potential litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(e)     As of the end of the Third Application Period, the Receiver had not yet commenced litigation against third parties and, accordingly, has not received any litigation recoveries. The Receivership Team, however, continued to review and analyze potential causes of action against a number of parties. The Receivership Team has also commenced a historical review of Platinum's activities and flow of funds, which will assist the Receiver in analyzing both possible claims by the estate and claims that have or will be filed against the estate. The Receiver has begun to serve subpoenas on certain parties and has entered into tolling agreements as necessary to preserve a potential cause of action.

The Receiver at this time cannot state the extent of any litigations which will be commenced and, if commenced, the value of any claims and the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained. At the heart of the analysis will be a determination of the cost/benefit of asserting claims. Investigation and litigation are costly endeavors and the Receiver does not intend to expend material estate assets unless the Receiver has the necessary facts and information to assert a meritorious claim and has concluded that there is a likelihood of recovering funds if liability is eventually found.

---

[8]   Of this amount $5.4 million was held in cash bank accounts and $1.8 million was held in brokerage accounts.

[9]   All but one of the life settlement policies was monetized following the Third Application Period.

### III.    FEES AND EXPENSES REQUESTED

In connection with the Third Application Period, the Receiver requests interim approval of her fees in the amount of $186,343.60 and reimbursement of expenses in the amount of $1,555.48.   Otterbourg requests interim approval of its fees in the amount of $758,002.95 and reimbursement of expenses in the amount of $7,254.33.   Thus, the combined total of fees for Applicants of $944,346.55, plus expenses of $8,809.81, is $953,156.36.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment.  For example, a single investment, such as Arabella, which is in multiple bankruptcy proceedings in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, including cash collateral issues, as well as pure litigation issues to address the ongoing adversary proceeding with a third party that is impeding the ability to sell the Arabella assets in which Platinum has a security interest.   The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below, which was approved by the SEC and the Court at the time of the appointment of the Receiver. These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and

5292941.1

complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by all other Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since October 1, 2017 in accordance with Otterbourg's regular practice of reviewing and revising its hourly fee rates annually.

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $275,067.50 to $186,343.60, a reduction in the amount of $88,723.90.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $842,225.50 to $758,002.95, a reduction in the amount of $84,222.55.  Therefore, the total reduction for legal fees incurred during the Third Application Period by the Receiver and Otterbourg professionals is $172,946.45.

There was no travel time during this Third Application Period.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of this Third Interim Application to SEC counsel on April 16, 2018 to allow for a thirty-day review period.

This Third Interim Application includes certain exhibits:

(a)      The SFAR for the period of January 1, 2018 through March 31, 2018 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Third Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Third Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Third Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Third request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and

Otterbourg submitted this Third Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.   All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Although ten attorneys and two paraprofessionals billed time during the Third Application Period (in addition to the Receiver), a core team of attorneys performed the lion's share of the services, including Philip C. Berg, Erik B. Weinick and Jennifer S. Feeney. Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. Accordingly, in some instances relatively small amounts of time were spent by attorneys with expertise relevant to specific issues in the case.   These less significant involvements benefited the Receivership Estate because it gave the core group of attorney's additional insight into and knowledge of important legal issues directly impacting the Receiver's decisions in this case.   In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Third Application Period and their specific roles were as follows:

(a)    Daniel F. Fiorillo (Partner) (8.20 Hours to P01; 1.80 Hours to PO2; and 1.00 Hours to P04) – Mr. Fiorillo is the chairperson of Otterbourg's restructuring department and has provided general, as well as specific advice on asset dispositions, particularly those involving

liens and/or security interests.  Mr. Fiorillo has been a point person with the senior professionals at Conway MacKenzie regarding the status of due diligence and marketing efforts regarding the investments in the Conway MacKenzie portfolio.

(b)    Andrew M. Kramer (Partner) (10.70 Hours to P01 and .20 Hours to P04) – Mr. Kramer is a senior partner in the restructuring department.  During the Third Application Period, Mr. Kramer's involvement was solely with respect to the Cleveland Mining investment located in Australia.  Mr. Kramer oversaw due diligence with respect to this investment and coordinated with Australian counsel and the financial firm assessing the value of Cleveland Mining's assets.

(c)    Adam C. Silverstein (Partner) (4.30 in P01; 3.10 in P02; 7.70 in PO4; .70 in P10)– Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters relating to secured loans and professional claims, including Arabella, Beechwood, SHIP.  Mr. Silverstein will also be heavily involved in forensic issues, including potential claims against third-party professionals, and during the Third Application Period began to address issues regarding statutes of limitation, tolling agreements and subpoenas.

(d)    Philip C. Berg (Partner) (15.10 in P01; 227.50 in P02; 5.40 in P04) – Mr. Berg is a transactional attorney whose focus has been the documentation of Receivership transactions.  Mr. Berg is the point person for Houlihan Lokey regarding the review and disposition of assets within its portfolio.  During the Third Application Period, Mr. Berg dedicated a significant amount of time to preparing for market and documenting the sale of the ALS life settlement portfolio, as well as preparing draft documents and coordinating with Houlihan for the sale of the Abdala investment.

(e)    Keith N. Costa (Partner) (10.50 in P01; 32.70 in P04) – Mr. Costa is a member of Otterbourg's bankruptcy department and formerly served with the U.S. Trustee's office for the

Southern District of New York.  As such, Mr. Costa focuses his work for the Receiver on investor relations and communications.  Mr. Costa is primarily responsible for updating the Receiver's website and coordinating communications to investors.

(f)    Jennifer S. Feeney (Of Counsel) (81.80 in P01; 32.10 in P02; 90.80 in P04; 8.60 in P10) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Third Application Period, Ms. Feeney spent significant time with respect to the Arabella (particularly with respect to bankruptcy related issues) and amending the Black Elk settlement.  Ms. Feeney also attended to other case administration matters, including coordinating with Cayman counsel and the proposed Cayman directors for the addition of the Cayman entities to the Receivership and coordinating bringing such entities into compliance with Cayman regulations and preparing the Receiver's quarterly report and additional updates to the creditor body.  Additionally, Ms. Feeney, along with Erik B. Weinick prepares applications to the Court and works to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(g)    Erik B. Weinick (Of Counsel) (175.10 in P01; 173.10 in P02; 94.50 in P04; 25.10 in P10) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, such as employee management.

(h)     <u>Andrew S. Halpern (Associate) (1.10 in P01; 39.50 in P10)</u> – Mr. Halpern is an experienced litigator, particularly in the area of claims of professional malpractice and forensic analysis.  As such, during the Third Application Period, his work has focused on researching and analyzing the Receiver's potential claims against third-party professionals.

(i)     <u>Chad B. Simon (Associate) (16.90 in P01; 4.80 in P01)</u> – Mr. Simon is a member of Otterbourg's restructuring department and assists Mr. Fiorillo, at a lower billing rate, in certain dispositions, including Desert Hawk and LC Energy, and coordinating with the Conway MacKenzie team.

(j)     <u>Bennet A. Davis (Associate) (23.40 in P01; 32.40 in P02; 11.30 in P04)</u>  – Mr. Davis is a member of Otterbourg's corporate department, and assists Mr. Berg, at a lower billing rate, with the documentation of asset dispositions, along with the matters that lead to such dispositions, such as the drafting and execution of non-disclosure agreements.

(k)     <u>Joanne B. Arnold (Paralegal) (1.50 in P01; .40 in P02; .40 in P10)</u> – Ms. Arnold is a corporate paralegal who has assisted the Receivership team in analyzing liens and UCC financing statements relevant to causes of action and asset dispositions.

(l)     <u>Anthony Williams (Managing Clerk) (.40 in P01; 15.70 in P04; .50 in P10)</u>– Mr. Williams is Otterbourg's managing clerk and has assisted the Otterbourg attorneys with court filings and monitoring of dockets.

24

## IV.   SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING THIRD APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Third Application Period into four (4) project categories.[10]   Narrative summaries of these activity categories follow:

### A.   Asset Analysis and Recovery (P01) - Total Fees: $360,432.50
### Asset Disposition (P02)[11] - Total Fees:  $433,459.50

During the Third Application Period, the Receiver and her professionals continued to review the various assets in the portfolio to gain an understanding of each and the legal rights and obligations of Platinum thereunder.  In certain instances, time was also spent with respect to an asset that may not ultimately have a positive return to the Receivership Estate, but work is still required to reduce potential liabilities and exposure to the Receivership Estate, as well as to ensure that an asset without value is not imprudently abandoned by the Receivership Estate.

During the Third Application Period, Applicants continued to analyze Platinum's asset portfolio, including a review of the underlying investment documents and in-person and telephonic meetings with Goldin, Houlihan Lokey and Conway MacKenzie (depending on the professional assigned to the particular investment), as well as, in some instances, management and other investors in the underlying asset.  This undertaking was done with an eye towards determining how best to position the asset for market and the options for maximizing value without incurring additional expenses beyond what are necessary to preserve the asset.

Also included in the time billed during the Third Application Period, are daily conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver

---

[10]   As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[11]   Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

Given the myriad of investments and different members of the Receivership Team working on each, to keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled weekly team meetings with her, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer.  In advance of these weekly meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency. These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the sprawling Platinum portfolio. Weekly calls also take place with the Houlihan Lokey and the Conway MacKenzie teams.

While the Receiver and Otterbourg have focused on a myriad of investments during the Third Application Period, below is an overview of certain of the investments in which Applicants have dedicated significant time.  The below summaries include a brief description of the nature of the investment, work performed, and status during the Third Application Period.

(a)     **Abdala** – refers to PPCO's interests in (through a subsidiary, West Ventures LLC) a tailings dam of the Abdala Mining gold mine located near Cuiaba, Brazil.  PPCO's interests have been the subject of litigation and negotiation with multiple parties-in-interest, including the owner of the mine itself, as well as the landlord and primary tenant of a nearby parcel on which a processing facility for the tailings is to be constructed.  The project is now in the permitting stage.  This investment is within the portfolio of investments that Houlihan Lokey

has been engaged to market and sell.  Houlihan Lokey launched the marketing process for this

asset on December 13, 2017, a data room for interested parties that have signed a Non-

Disclosure Agreement ("NDA") was opened, initial bids were received and site visits were made

by certain prospective purchasers.  During the Third Application Period, Houlihan Lokey has

followed up with interested parties and Houlihan Lokey and the Receivership Team facilitated

additional due diligence to enable interested parties to finalize their initial bids.  The second

round of potential bidders requested a site visit in furtherance of their due diligence on the

project and prior to submission of a final bid.  Houlihan Lokey and the Platinum project manager

on Abdala were on-site in Brazil for a few days in March to facilitate individual site visits for

each of the interested parties. Depending on the resolution of certain issues, the Receiver is

hopeful that final bids and selection of the winning bidder can occur during the current calendar

quarter.

Since the Receiver's appointment, Applicants have spent significant time

analyzing the legal, financial, regulatory and business issues relating to this project.  During the

Third Application Period, the focus was on the continuing marketing and disposition process.  In

this regard, Otterbourg professionals who have billed time to this investment include attorneys

with experience in litigation and transactional matters.  During the Third Application Period,

Applicants worked with Houlihan Lokey to position the asset for sale and respond to due

diligence inquiries, prepared the form of Purchase, Sale and Royalty Agreement to be marked up

as part of the final bids, evaluated the initial bids and determined next steps.  In addition,

Applicants worked with the landlord of the project and had frequent communications with local

Brazilian counsel, management and Houlihan Lokey.   Applicants also have had meetings and

telephone calls with the second round of potential bidders and their representatives to discuss the

5292941.1

Receiver's process for liquidating this asset.  The Receivership Team has made every effort to keep the lines of communication open with the investors at each stage of the marketing and sale process.

(b)     **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC.  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC ("Beechwood").

During the Third Application Period, Applicants continued to analyze the legal and business issues relating to this transaction, with a focus on understanding the remaining value in PGS' positions with Agera, and determining the specific nature of the various transactions between and among, PPCO, PPVA, Beechwood, PGS and Agera.  In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters.   Time billed to this matter included conference calls and in-person conferences with PPVA and the forensics analysts at Goldin.  Applicants spent time reviewing the information known to date with respect to this transaction, including the relationship between and among the parties, the flow of cash, and an analysis of Beechwood's activities with respect to this investment.  This review is relevant to the Receiver's ongoing forensics investigation.

(c)     **ALS** – refers to a portfolio of life settlement investments owned through an entity in which PPCO is the majority owner and managing member.

On March 23, 2018, the Receiver filed a motion for entry of an order approving the sale of certain life insurance policies in which Platinum has a majority ownership interest [Dkt. No. 311] (the "ALS Sale Motion").  At the onset of the receivership, Platinum indirectly held a

28

portfolio of life insurance policies (the "Policies" or the "Portfolio"), some of which were sold by the Prior Receiver.  Upon the Receiver's appointment, she began taking steps to market and to sell the remaining Policies.  During the Third Application Period, the Receiver marketed for sale a Portfolio of twenty (20) separate Policies on fifteen (15) separate insureds.  Other than interests in one (1) policy that is the subject of a dispute with the insurer, the Policies that were the subject of the ALS Sale Motion were all of the remaining Policies in which Platinum had an indirect majority interest.  Houlihan Lokey conducted a robust marketing process during the Third Application Period.  Unfortunately, many of the Policies in the Portfolio were beset by characteristics which typically drive away bidders and/or lower prices, including unfavorable jurisdictional clauses, incomplete origination documentation and unfavorable life expectancy information.  The Receivership Team dedicated significant time to improving the marketability of the Portfolio, including considerable efforts to compel the non-compliant insureds to become compliant by providing updated medical information.

At the conclusion of the marketing process, the Receiver received seven (7) bids of varying amounts for various components of the Portfolio. After reviewing the bids, the Receiver determined that the optimum value for the Portfolio would be achieved through the implementation of the sale that was the subject of two separate purchases of "sub-portfolios," for an aggregate gross purchase price of $10,785,950.  The ALS Sale Motion was approved by the Court on April 23, 2018 [Dkt. No. 318] and the Receivership Team has since worked to effectuate the closing on all of the Policies subject to the approved purchase and sale agreements.

After filing the ALS Sale Motion, and after the conclusion of the Third Application Period, one of the Policies that was to be sold matured.  Pursuant to the purchase and sale agreement, ALS was entitled to receive the death benefits if a Policy matured prior to closing the

sale (which is what occurred), with aggregate purchase price reduced by the amount of the purchase price allocated to such policy. As a result of the policy maturing, ALS has received (subsequent to the Third Application Period) a net death benefit of $4,780,000 from the matured policy and the purchase price under the purchase and sale agreement was reduced by $2,721,000, for a net increase of gross proceeds to ALS of $2,059,000. Hence, as a result of the sale and the maturity, ALS realized the aggregate amount of $12,844,950, from which Houlihan Lokey was entitled to a transaction fee in the amount of $750,000. Certain parties have asserted a claim to all or part of the proceeds, as more fully described in the statements filed in response to the ALS Sale Motion.

During the Third Application Period, the Receivership Team prepared the form of Purchase and Sale Agreement, a markup of which was required to be submitted with final bids, and then negotiated the final Purchase and Sale Agreements with each winning bidder. Also during the Third Application Period, the Receivership Team worked diligently with Houlihan Lokey and the third party administrator of the life settlement policies to reach out to each of the insureds to bring the files up to date, to enhance the value of the Portfolio. Otterbourg communicated with each of the insureds regarding their obligations under the purchase agreements by which ALS came to own the policies and had follow-up communications with the insureds or their representatives. The Receivership Team had conference calls and in person meetings with the minority members of ALS and is also addressing responses raised by other parties purporting to have an interest in the Policies and/or the proceeds.

(d)     **American Patriot Gold** – refers to Platinum's ownership interest in an idled gold mining company in Southwest Colorado. During the Third Application Period, Applicants

worked to ascertain its ownership interest to enable Conway MacKenzie to market and monetize such interest in the near term.

(e)  **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million dollar facility, *i.e.,* the Loan. The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella"). Arabella is involved in the ownership and operation of certain oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.  Pre-Receivership, a related Arabella entity in which Platinum does not have an interest – Arabella Petroleum Corporation ("APC") – commenced an action against the Arabella Entities asserting claims for the recovery of certain assets that are the subject of PPCO's liens. APC is also a debtor in a bankruptcy proceeding pending in the Western District of Texas.  The Prior Receiver entered into a settlement agreement with the Trustee of APC, settling the claims and agreeing to the interests of each estate in the combined assets that are to be sold in the respective bankruptcy cases.  The Arabella Settlement Agreement was approved by this Court.

During the Third Application Period, Applicants spent significant time analyzing the issues with respect to an adversary proceeding commenced by Founders Oil & Gas III, LLC and Founders Oil & Gas Operating, LLC (collectively "Founders"), which is attempting to seize revenues from six oil and gas wells through, what Arabella asserts is a misapplication of two

joint operating agreements.  The issues with Founders have delayed the sale of the Arabella assets.  The parties mediated the issues during the fourth quarter of 2017, but mediation failed to bring about a resolution.  Following the failure of the mediation, Applicants discussed with AEX management and its counsel the next steps to prepare for litigation with Founders.  Founders had agreed to arbitrate the issue instead of going to trial.  After the Third Application Period, and in advance of the scheduled arbitration, the parties agreed to terms, still subject to final documentation of a settlement agreement, which will then be subject to court approval. Resolution of the issues with Founders will enable AEX to proceed to sell its assets.

During the Third Application Period, Applicants had an in person meeting with the Trustee for APC and his professionals, and the Chief Restructuring Officer of AEX and his professionals.  The purpose of this "summit" was to discuss certain issues of mutual interest between the estates and to work cooperatively to maximize value for both estates.   The Receivership Team has had regular status conferences with the APC and AEX estates and the Receiver frequently communicates with the Trustee for the APC estate.  Applicants also have regular communications with Arabella's retained professionals, including its Chief Restructuring Officer, bankruptcy counsel, litigation counsel and the broker retained to market and sell the Arabella assets.  Applicants also spent time during the Third Application Period working the Conway MacKenzie team members who have been asked to assist with the evaluation and execution of monetization alternatives related to PPCO's interests in Arabella and to be the Receiver's "point person" in Texas.  The ultimate recovery with respect to the Arabella Loan can be impacted by many different factors, including the Founders litigation, an alleged "first out" participation claimed by certain professionals who represented Platinum in connection with Arabella, as well as the participation agreement entered into by the Prior Receiver.   In this

32

regard, the Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

(f)     **Black Elk**   - refers to Black Elk Energy Offshore Operations LLC, in which PPCO and certain affiliates hold interests at different levels of the Black Elk capital structure. This is the investment that specifically contributed to the filing of this SEC action in which the Platinum Entities and other individual defendants were accused of defrauding Black Elk and its investors.  Black Elk is a debtor in a bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Texas.  The Prior Receiver negotiated a settlement agreement with the Trustee of Black Elk (the "Black Elk Settlement Agreement"), pursuant to which, among other things, the Black Elk Trustee was given an allowed claim against PPCO.

The Black Elk Settlement Agreement also provides that if another entity – Platinum Liquid Opportunity Master Fund, L.P., a Cayman Islands limited partnership ("PPLO Master Fund"), that at the time of the Black Elk Settlement Agreement was not a Receivership Entity -- subsequently becomes a Receivership Entity, then the Black Elk Trustee would have an additional claim in the Receivership Estate with respect to the PPLO Master Fund and the litigation by the Black Elk Trustee against the PPLO Master Fund will be dismissed.

During the Third Application Period, Applicants discussed with the Black Elk Trustee amending the Black Elk Settlement Agreement, now that the PPLO Master Fund was added to the Receivership, to extend certain timelines relevant to the addition of the PPLO Master Fund to the Receivership so that the Black Elk Settlement Agreement would be applicable to the PPLO Master Fund as contemplated by the parties.  The Amendment has since been executed.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with experience in bankruptcy and litigation matters.

(g)      **Buffalo Lake Advanced Biofuels (a/k/a BLAB)** - refers to a shuttered ethanol plant located in Buffalo Lake, Minnesota in which PPCO holds a debt and equity interest.  There are multiple legal, financial, regulatory and business issues relating to this investment that required attention so that the Receiver could seek to market the asset.

During the Third Application Period, Conway MacKenzie has actively marketed the BLAB assets for sale, including evaluating relevant strategic alternatives and determining, based upon the level of interest received in response to marketing efforts, the disposition option that will maximize recovery to Platinum (*e.g.*, sale of business or liquidation of assets).  If insufficient interest is generated for the sale of the business as a whole, the Receiver will seek to liquidate the machinery and equipment and sell the real property separately.  The Receivership Team members who have billed time to this investment include attorneys with experience in transactional matters.  Time billed to this matter included status updates with Conway MacKenzie and in-house counsel for Platinum who has been assisting with this matter and the analysis of the potential liabilities of BLAB.

(h)      **China Horizons/Yellow River** – refers to PPCO's equity and debt interests in two companies -- China Horizon and Yellow River—created to build a chain of convenience stores in rural China.  The promissory note held by PPCO has a face value of approximately $9.0 million and PPCO holds approximately 6.5 million share of stock in Yellow River.  China Horizon was originally a joint venture with another company, China Post.  China Post subsequently pulled out of the joint venture and China Horizon transferred its intellectual property to another company—Yellow River—in exchange for equity in Yellow River. Subsequent to the transfer, China Horizon received approximately $15 million from China Post

as proceeds of the settlement of a dispute between them.  PPVA also holds debt and equity in China Horizon and Yellow River.  The promissory notes from China Horizon are not yet due.

During the Third Application Period, the Receiver and the Receivership Team continued to explore options for obtaining an early repayment of the notes from China Horizon and liquidating PPCO's and PPVA's equity interests in Yellow River.  The Receiver and the PPVA received an expression of interest from an investor based in China to purchase their collective interests in the China Horizon notes and the Yellow River equity position.  The Receiver and PPVA are analyzing the offer and expect to make a counteroffer.  Applicants spent time during the Third Application Period discussing the proposal with PPVA and analyzing the offer.  To that end, Otterbourg attorneys who have billed time to this matter primarily include transactional attorneys.

(i)      **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings").  PPCO and Platinum Long Term Growth VII LLC are owed approximately $15.6 million, which is secured by a first priority security interest in all of Cleveland Mining's and Iron Holdings assets.  PPCO also holds approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings.  Cleveland Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not operating and is the subject of litigation in Brazil.

Since the Receiver's appointment, Applicants have spent significant time analyzing the legal, financial and business issues relating to this investment.  In addition, the management of Cleveland Mining has been litigious and has issued several demands addressed to the Receiver, including a challenge to PPCO's filed security interests in Australia, which have

5292941.1

required responses.   The Receiver retained local counsel in Perth, Australia to assist in addressing the issues raised by Cleveland Mining.   During the Third Application Period, the Receiver engaged a financial firm located in Australia to work directly with Cleveland to evaluate its current financial position and to determine the value (if any) of its assets.   Based on the findings and recommendations of the Australian professionals, who have met with the management of Cleveland, the assessment is that there is little to no value in the Cleveland Mining assets.   After the conclusion of the Third Application Period, Cleveland Mining was placed into a liquidation proceeding in Australia and Platinum has filed a proof of debt form to register its claim.   At this stage, Platinum is not prepared to invest any additional resources into this investment and the receivership estate is unlikely to realize any recovery on this asset.   In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation and workout matters.   Time billed included communications with Australian counsel and the retained financial advisor and analysis of the report evaluating Cleveland Mining's financial position and value of assets.

(j)       **Daybreak** - refers to a publicly held oil and gas company with assets in the San Joaquin Valley in California and in Montcalm County, Michigan.   PPCO owns 99% of the membership interests and is the managing member of Maximilian Resources LLC ("Maximilian"), which is owed approximately $9.2 million from Daybreak on account of a senior loan, secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage.   Conway MacKenzie has been asked to review this asset and provide the Receiver with disposition options.

During the Third Application Period, Applicants worked with Conway MacKenzie to market and sell the Daybreak assets.   Both the California and Michigan assets are

being actively marketed, a virtual data room has been created and interested parties have been provided access to conduct due diligence.  The Receiver expects to receive and review offers, and close a sale of some or all of the assets during the current quarter.  It is likely that a sale of the Michigan assets will occur prior to the sale of the California assets.  Otterbourg attorneys who have billed time to this investment include attorneys with experience in finance and transactions.   Time billed to this matter includes review of background documentation, discussions with the management teams for the underlying companies, conversations and updates from Conway MacKenzie, and analysis of expressions of interest received to date and evaluation of liquidation options.

(k)  **Desert Hawk** – refers to Desert Hawk Gold Corp. ("Desert Hawk"), a publicly reporting gold mining company.  PPCO held secured third -priority debt in Desert Hawk and owned securities convertible into 20% of the common equity of the company.  Desert Hawk owns a pilot stage gold mine located in Gold Hill, Utah.  This was a joint asset held with PPVA.

During the Third Application Period, Applicants drafted, negotiated and entered into an Assignment and Assumption Agreement for the sale of both PPCO's and PPVA's interests in Desert Hawk for $625,000.  PPCO's share of the purchase price was $416,667.  As a result of this sale, PPCO no longer has an interest in the Desert Hawk asset.  In connection with the sale of this asset, during the Third Application Period, Otterbourg negotiated the term sheet, prepared and negotiated the Assignment and Assumption Agreement, prepared a bill of sale, and finalized the closing documents and closed the sale.   Applicants also had frequent communications with Conway MacKenzie, which was tasked with selling this asset, as well as the management team.  Otterbourg attorneys who have billed time to this investment include attorneys with experience in M&A transactional matters.

37

(l)   **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah.  Through Maximillian, PPCO holds a debt and equity interest in the company.

During the Third Application period, the Receivership Team continued to work with Conway MacKenzie to better understand the complex legal, financial, regulatory and business issues relating to this investment.  The Receivership Team commenced an investigation into the receipt of certain insurance proceeds by a Greentown related entity which the Receiver believes were assigned to Maximilian Resources, a PPCO owned entity, responded to a complaint filed by Pacific in the U.S. District Court for the District of Nevada (Pacific Energy & Mining Company v. Maximilian Resources LLC, Case No. 17-cv-00363 (HDM)(VPC)) (the "Litigation").  The Receiver filed a motion to dismiss the Litigation on the grounds that, among other things, its filing violated the Receivership Order.  That motion is now fully briefed.  The Receivership Team and Conway MacKenzie continue to explore disposition options.  The Receiver is also exploring options available to Platinum pursuant to an indemnity agreement and guaranty agreement executed in connection with the original loan and security agreement and the subsequent loan modification agreement.  Applicants have dedicated time to the Litigation, namely preparing the motion to dismiss, as well as reviewing the transaction documents to determine legal rights and remedies that could be pursued.  In this regard, the Receivership Team members who have billed time to this investment include attorneys with experience in litigation and transactional matters.

(m)   **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of In re Lily Group, Inc.,

Case No. 13-81073 (Bankr. S.D. Ind.).   Following its acquisition of the mine, PPCO retained a third party mining contractor to assist it in putting the mine back into production.   Through a combination of mismanagement and a downturn in coal prices, the mine did reach cash flow breakeven, the contract miner was terminated, and the mine idled.   A new mine operator has subsequently been retained who now oversees environmental remediation and mine security.

Since the Receiver's appointment, Applicants have spent time analyzing the legal, financial, regulatory and business issues relating to this investment and analyzing potential liabilities and options for disposition of the asset.   The Receiver is considering all options and, to that end, Applicants have had multiple conversations with the mine operator regarding the mine and potential disposition. The Receivership Team has been working with Houlihan Lokey in preparation of launching the marketing of this asset during the current calendar quarter.   The Receivership Team has also worked with the Receiver's local counsel reviewing purported residual claims and liens on the assets to determine their validity and quantify the amount of such residual claims.   Applicants also spent time during the Third Application Period renegotiating the terms of the lease and obtained a bond for the mine.   Consequently, the Receiver has expended cash to maintain the value of the asset until it can be monetized.   During the Third Application Period, a total of $665,000 was expended to maintain this asset.   The Otterbourg attorneys who have billed time to this investment primarily include attorneys with M&A transaction and bankruptcy experience.

(n)   **PEDEVCO Corp., d/b/a Pacific Energy Development** – refers to a publicly-traded energy company engaged in the acquisition and development of strategic, high growth energy projects, including shale oil and gas assets, in the United States.   Platinum's interest in

5292941.1

PEDEVCO is through its 45% ownership in PGS, which owns a loan receivable from PEDEVCO.

PEDEVCO has been experiencing significant operational issues, which impact the ability to service its debt and place into question the value, if any, of the equity.  The Receiver and PPVA have received an offer to purchase their interests in this asset at a considerable discount. The Receiver and the PPVA are considering this offer.  The Otterbourg attorneys who have billed time to this investment primarily include attorneys with transaction experience.

(o)     **Pro Player** – refers to a Platinum entity that made loans to professional athletes, often at the beginning of their careers.  A portfolio of these loans still has overdue outstanding balances owed to Pro Player by these athletes.

During the Third Application Period, the Receiver continued to investigate the potential for pursuing collection of the outstanding loan balances.  Time billed to this matter included analysis of the loan documents and loan recipients, including current financial situation and wherewithal to repay the loans.  Applicants also prepared and delivered demand letters seeking to recover on the outstanding loans.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation and finance matters.

**B.     Case Administration (P04) - Total Fees:  $253,967.50**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including preparing motions relating to the administration of the Receivership Estate.   The nature of the tasks performed under this category is varied, and includes the following:

(a)     **Website and Investor Communications.**   In accordance with Section E.2.l (Communications with Investors), the estate hired Garden City Group LLC ("GCG") to create

the Receiver's website (PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  Time was also devoted by Applicants to revising updating the website to add or update the "Frequently Asked Questions" section of the website and to add "key documents."  The Receiver prepared and updated a letter to investors, which was posted on the website.  The Receiver also established a mechanism on the website to allow interested parties to sign up to receive daily notices whenever there are new filings on the docket. The Receiver and/or the Receivership Team have also held numerous meetings and/or teleconferences with various investors and Defendants at their request.

The Receiver also organized and held a second "Town Hall" style webinar and telephone conference on March 1, 2018 to provide an update to investors and to answer questions submitted by investors.  The Receiver received positive feedback from this webinar and intends to continue to hold them periodically going forward.  The videos of the Prior Town Halls are available through the website (www.platinumreceivership.com).  Time was spent by Applicants providing notice to investors of the webinar, organizing the webinar, and preparing for the webinar.  Applicants also spent time preparing the Receiver's quarterly status report for filing with the Court, as required under the Receivership Order.  Applicants also have had periodic conference calls with the representatives of certain of the larger group of investors to discuss the monetization efforts and claims process.

(b)     **SEC Meetings**.  The Receiver also regularly communicated via telephone and e-mails with the SEC staff to keep them apprised of ongoing matters and to alert them to potential retentions and filings by the Receivers.

41

(c)   **PPVA**.   Applicants had regular teleconferences and at least one in-person meeting at the Receiver's offices with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund.   Applicants also regularly have asset-specific teleconferences with the joint liquidators or their professionals to discuss the liquidation or analysis of assets that are jointly held by PPVA and Platinum.   Applicants also continued to discuss procedures to share with the liquidators non-privileged documents that are maintained on the Platinum servers controlled by the Receiver.

(d)   **Claims Process**.   The Receiver has not yet initiated a formal claims bar date or process.   The Prior Receiver had posted a claim form for creditors to assert a claim.   The Receivership Team has copies of all submitted claims.   It is premature to determine how different types of claims or creditors will be treated and we have not yet developed guidelines for how different investors' or creditors' claims will be treated or the method that will be used.   We also have not determined if there will be one pool of assets for all allowed claims of all of the Platinum entities in the receivership estate.   Although the Receiver has not yet formalized a claims process, Applicants spent time during the Third Application Period analyzing issues relating to the claims process, which will help inform the forms that may be used and how best to have creditors and investors assert claims.   The Receivership Team is currently evaluating the information that it has with respect to investor and creditor claims, which will also help with determinations regarding how different claims will be treated.   The Receiver currently anticipates that a formal process will be launched in the third quarter of this year, although that timeline could change.

(e)   **Taxes.**   Applicants spent time during the Third Application Period coordinating with Goldin, Platinum's Chief Financial Officer and Deloitte Tax LLP to monitor their efforts to

prepare local, state and federal tax returns.  Preparation of PPCO and PPLO's 2017 tax returns is currently in process. The commencement of the receivership, the subsequent change in receivers and the exigent circumstances at the inception of the receivership caused a delay in the filing of Platinum's 2016 tax returns. This resulted in the assessment of penalties for late filing by the various federal, state and local tax authorities. Through our own efforts and the efforts of Deloitte Tax LLP, we have successfully received abatement of penalties totaling approximately $220,000. We are continuing to work with the various tax authorities to ensure abatement of all penalties received due to late filing.

(f)     **Employees.**   Since the Receiver's appointment, the number of employees has been reduced from thirteen to four.  There are currently two remaining portfolio managers, the Chief Financial Officer and the General Counsel.  The director of information technology was transitioned to an independent consultancy at a lower cost to the Receivership Estate, while maintaining the same level of service.  During the Third Application Period, Applicants spent time addressing certain remaining issues regarding the separation agreements and employee benefits.  In addition, Applicants also addressed issues relating to requests for documents made to former employees in their capacities as employees of Platinum.  The Receiver has taken the position that such documents are the property of Platinum.

(g)     **Defendants.**   Applicants spent time during the Third Application Period meeting with counsel for the Defendants to discuss a variety of issues, including the status of certain asset sales and the Defendants' indemnification requests.   The Receivership Team monitored the criminal proceedings and the state court proceedings in which the Defendants were seeking access to the additional insurance coverage. At present, the lower tiers of insurers are required to advance legal costs to the Defendants once the senior tiers have been exhausted.

5292941.1

(h)   **Cayman Funds.**   At the end of 2017, three Platinum funds organized under the laws of the Cayman Islands were added to the Receivership Estate.  Applicants spent time during the Third Application Period speaking with local counsel and responding to issues regarding the status of the registration of the Cayman funds.  Applicants have prepared the necessary forms to appoint new directors and designate a registered office to be in compliance with Cayman corporate regulations.

(i)   **Receiver Oversight**.  Time during the Third Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate.  Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team.  Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin in analyzing budget, cash management and forensic accounting issues.

C.   **Forensic/Investigatory Work (P10) - Total Fees:  $70,060.50**

In addition to the monetization of assets, potential sources of recovery include claims on behalf of the Platinum Entities against possible liable parties.  During the Third Application Period, the Receivership Team continued to investigate certain pre-receivership activities to determine whether causes of action exist against, among others, valuation agents, fund administrators, auditors, legal advisors and other professional firms.  To take but one example, during the Third Application Period, the Receivership Team identified the largest PPCO investments and commenced a review of the pertinent valuations prepared for them by third party advisors.  This review, which is ongoing, involves identifying, gathering and analyzing information relied upon by the advisors, and assessing the reasonableness of the methodologies

44

used in connection with the valuations.  Inquiries like these seek to facilitate the Receiver's assessment of whether the Receivership Estate has actionable claims against any persons or parties who putatively provided professional services to Platinum.

During the Third Application Period, Applicants also reviewed with Goldin steps it is taking with respect to its historical review of Platinum's activities and flow of funds, which will assist the Receiver in analyzing both possible claims by the estate and claims that have or will be filed against the estate.  The Receivership Team has been working collaboratively with the joint liquidators of the PPVA entities on potential claims, as well as joint assets held by our two estates.  The Receiver at this time cannot state the extent of any litigations which will be commenced and, if commenced, the value of any claims and the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.

During the Third Application Period, the Receiver began to issue subpoenas to certain parties and it is anticipated that additional subpoenas will be issued this quarter.  For certain claims in which a statute of limitations may be approaching, the Receiver has, and will continue to, reach out to the potential target to enter into tolling agreements to allow the Receivership Team the appropriate time to investigate potential claims.

## V.     EXPLANATION OF EXPENSES AND RELATED POLICIES

1.      Applicants seek reimbursement of its out-of-pocket costs in the amount of $8,809.81.  **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

2.      Applicants observed the following policies in connection with its expenses during the Third Application Period:

5292941.1

(a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 15,701 internal photocopies during the Third Application Period at the rate of 0.15 cents per page, totaling $2,355.15 for all in-house copies.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Third Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to

court (including mileage, taxis, etc.) nor for meals. Applicants did have car expenses related to the ALS transaction when Applicants paid for Platinum's Chief Financial Officer to take a car to obtain needed signatures and provide a check to consummate a transaction related to the ALS life insurance portfolio.   Applicants did not have any travel expenses during this Third Application Period.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor GCG, which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange*

*Comm 'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F. 2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically

quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.  Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse, ranging from litigation finance to gold and coal mining.  Many of the people with factual knowledge are facing criminal charges.  Documentation, to the extent it exists, must be questioned and verified.  Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.   HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of assets is ongoing and that there are significant costs of maintaining certain of the portfolio assets until they can be sold in an orderly manner (*e.g.*, the monthly premiums required to be paid on the life settlement policies).  Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Third Interim Application (the "Holdback Amount").  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     Grant interim approval of the Receiver's compensation in the amount of $186,343.60 (the "Allowed Receiver Fees");

(b)     Grant interim approval of Otterbourg's compensation in the amount of $758,002.95 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

5292941.1

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $1,555.48;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $7,254.33;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     Grant such other relief as the Court deems appropriate.

Dated:  May 25, 2018

Otterbourg P.C.

By: */s/ Adam C. Silverstein*
        Adam C. Silverstein

230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver