UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

  -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

               Defendants.
------------------------------------X

No. 16-cv-6848 (DLI)(VMS)

**FINAL APPLICATION OF SCHAFER AND WEINER, PLLC FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FROM DECEMBER 19, 2016 THROUGH JUNE 13, 2017**

Schafer and Weiner, PLLC (the "Schafer Firm"), as former counsel to Bart M. Schwartz, the initial court-appointed receiver (the "Initial Receiver") for defendant Platinum Credit Management, L.P. ("Platinum Credit") and certain related entities (collectively, the "Receivership Entities") hereby submits its Final Application for Allowance of Compensation and Reimbursement of Expenses Incurred from December 19, 2016 Through June 13, 2017 (the "Final Application" and the "Application Period"). The Schafer Firm requests approval of $459,729.25 in fees and reimbursement of $29,197.86 in expenses for the Application Period.

The Final Application contains the following sections:

**Section I** provides the information required by Section C of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Instructions").

**Section II** contains a narrative of the work that the Schafer Firm's professionals performed under each task code in accordance with Section D of the SEC Billing Instructions.

**Section III** summarizes the expenses for which the Schafer Firm seeks reimbursement and the procedures and policies adopted by the Schafer Firm to comply with Section E of the SEC Billing Instructions.

**Section IV** describes the standards to be applied by the Court in determining fee awards in SEC equity receiverships.

### I. CASE BACKGROUND AND STATUS

#### A. Case Background

1.  On December 19, 2016, the U.S. Attorney for the Eastern District of New York unsealed an eight-count indictment against seven individuals who were formally affiliated with Platinum Partners, LP (together with Platinum Long Term Growth Fund VIII, LLC,[1] "Platinum"). That same day, the U.S. Securities and Exchange Commission (the "SEC") filed a complaint against the same seven individuals, Platinum Management (NY) LLC, and Platinum Credit based on alleged conduct similar to that alleged in the indictment. Docket No. 1.

2.  The SEC simultaneously moved for the appointment of a receiver. Docket Nos. 2, 5. Judge Kiyo A. Matsumoto entered an order pursuant to which Bart M. Schwartz was appointed Initial Receiver of the Receivership Entities (the "Receivership") on December 19, 2016, which was amended on January 30, 2017 (the "First Amended Receiver Order"). Docket Nos. 6, 59-2.[2]

---

[1] Platinum Long Term Growth Fund VIII, LLC served as the collateral and administrative agent for the Arabella Loan, defined and discussed below.
[2] In July 2017, the Initial Receiver resigned and this Court approved the appointment of Melanie Cyganowski as the new receiver (the "Current Receiver"). Docket No. 221.

{00697354.7}　　　　　　　　　　　　　　　　　　　　2

3.  Under the terms of the First Amended Receiver Order,[3] the Initial Receiver was appointed to, among other things, preserve the *status quo*, protect investors' assets, conduct an orderly wind down, including a responsible liquidation of assets and an orderly and fair distribution of those assets to investors, among other things. First Amended Receiver Order, p. 2.

4.  In support of these powers and duties, the Initial Receiver was authorized and empowered, subject to leave of Court, "to resume or commence . . . litigation" and to "investigate, prosecute, defend, intervene in or otherwise participate in" actions in any state, federal, or foreign court or proceeding of any kind "as may in the Receiver's discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve" property owned by the Receivership Entities. First Amended Receiver Order, ¶ 33.

5.  The Initial Receiver was empowered to "solicit persons and entities ("Retained Personnel") to assist the Receiver in carrying out the duties and responsibilities described in [the First Amended Receiver Order]" subject to obtaining an order of the Court authorizing the engagement. First Amended Receiver Order, ¶ 44.

B.  **Information about the Schafer Firm and the Representation**

6.  After his appointment, the Initial Receiver instructed the Schafer Firm to continue to represent the Receivership Entities on the understanding that approval of retention of the Schafer Firm would be sought *nunc pro tunc*.

7.  The Schafer Firm is a boutique bankruptcy and commercial litigation firm comprised of eleven attorneys in Bloomfield Hills, Michigan. The Schafer Firm's attorneys have extensive experience representing debtors and creditors alike in Chapter 11 proceedings across

---

[3] A Second Amended Order Appointing Receiver is currently pending before this Court. Docket No. 254. However, the paragraphs in the First Amended Receiver Order cited below remain substantively the same.

{00697354.7}  3

many sectors and industries, and have assisted clients in a wide variety of secured transactions. The Schafer Firm's team is led by Michael E. Baum, the firm's managing partner with nearly 40 years' experience in the field of creditors' rights, bankruptcy, and workouts. Joseph K. Grekin, an attorney practicing for 23 years, has provided substantial expertise and work throughout the Schafer Firm's representation of the Initial Receiver. Jason L. Weiner and Nicholas R. Marcus, a senior and junior associate, respectively, have assisted in all stages of the Schafer Firm's representation of the Initial Receiver. Other partners and associates from the Schafer Firm have also assisted throughout the representation in more limited roles.

8. The Schafer Firm represented Platinum from August 2015 through June 2017. Paragraphs 9-13 contain a brief synopsis of the services the Schafer Firm provided to the Initial Receiver and Platinum after the Initial Receiver was appointed. For a more in-depth discussion of the events summarized in paragraphs 9-13, please see the Declaration of Michael E. Baum, attached as **Exhibit F** (the "Baum Declaration").

9. The Schafer Firm was originally retained to represent Platinum in issues arising from a credit facility it extended to Arabella Exploration, Inc. ("AEI" and the "Arabella Loan"). The Arabella Loan, which has an outstanding balance of at least $20 million, is secured by the assets of AEI and guaranteed by AEI's Texas subsidiaries, including Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, the "Arabella Entities"). The AEX and AO guarantees are secured by all of the assets owned by AEX and AO, primarily consisting of various oil and gas interests (the "Arabella Assets").

10. Platinum retained the Schafer Firm to represent its interests in the Arabella Loan when AEI defaulted on the Arabella Loan, and Arabella Petroleum Company, LLC ("APC"), a company related to the Arabella Entities through common ownership, filed for Chapter 11

{00697354.7} 4

bankruptcy protection. APC's Chapter 11 Trustee asserted several claims against the Arabella Entities and Platinum during its bankruptcy proceedings.[4]

11. Following the Initial Receiver's appointment, the Schafer Firm assisted the Initial Receiver in raising and distributing the money necessary to protect the Arabella Assets. The Schafer Firm then implemented a legal strategy to preserve the Arabella Assets for the benefit of the Initial Receiver. The Schafer Firm coordinated the filing of the bankruptcies of each of the Arabella Entities and assisted in their implementation. These bankruptcies protected the Arabella Entities from an adversary proceeding filed by APC, which sought to recover the Arabella Assets based on fraudulent transfer allegations, and from a state court lawsuit filed by Founders Oil and Gas III, LLC ("Founders"), which sought to enforce mineral liens and foreclose on the Arabella Assets.

12. The Schafer Firm successfully resolved APC's claims in a two-day, seven party mediation. The Schafer Firm also worked with the Arabella Entities to defend against Founders' claims. The Schafer Firm represented the Initial Receiver's interests in the bankruptcies of the Arabella Entities and exerted heavy influence and leverage on behalf of the Initial Receiver to ensure that Platinum's first priority interest in the Arabella Assets was preserved and to remove all obstacles to a sale of the Arabella Assets. It is now anticipated that the sale of the Arabella Assets will yield several million dollars for the Receivership Entities.

13. The Initial Receiver terminated the Schafer Firm in June 2017 because the SEC alleged that the Schafer Firm was conflicted when it negotiated a participation agreement on the

---

[4] The Schafer Firm, with input from other professionals and Platinum, implemented an intricate strategy on Platinum's behalf in order to respond to these issues. Some elements of this strategy are addressed in more detail in the Baum Declaration.

{00697354.7} 5

Initial Receiver's behalf (the "Participation Agreement"). The Schafer Firm continuously maintained that it was never conflicted, and, in addition, that it did not negotiate the principle terms of the Participation Agreement.

14. In response to the SEC's allegations, the Schafer Firm retained Bankruptcy Judge Steven W. Rhodes (Retired) of the Eastern District of Michigan as an expert to make an independent determination of whether the Schafer Firm was conflicted in its representation. After reviewing the facts and circumstances, Judge Rhodes determined that the Schafer Firm was not conflicted and instead undertook its representation of the Initial Receiver diligently, appropriately, and in accordance with the Rules of Professional Conduct. *See* Judge Rhodes' Expert Report, attached as **Exhibit D**.

C. **Case Status**

15. In accordance with Section C.2 of the SEC Billing Instructions, the Schafer Firm states as follows:

    a. **Cash on Hand and Unencumbered Funds.** Based on the Standardized Fund Accounting Report ("SFAR"), as of March 31, 2017,[5] the Receivership Entities collectively had $11,645,885 in unencumbered funds, of which $11,100,577 was held in cash bank accounts and $545,308 was held in brokerage accounts.

    b. **Expenses.** The Receivership Entities incur expenses as part of their normal business operations. These include payroll and benefits, rent, utilities, and other recurring expenses. According to the SFARs, some of the expenses incurred by the Receivership Entities, such as rent and utilities, are a result of long term contracts with fixed payment amounts. These

---

[5] Because it is not employed by the Current Receiver, the Schafer Firm does not have access to the Current Receiver's accounting records. However, upon information and belief, the March 31, 2017 SFAR that the Schafer Firm relies upon is the most recent SFAR.

{00697354.7}      6

monthly recurring expenses of the Receivership Entities are reported to total approximately $366,000 as of March 31, 2017.

    c.    **Summary of Receipts and Disbursements.** According to the SFARs, cash disbursements through March 31, 2017 totaled approximately $11.4 million, primarily due to the payment of life insurance premiums in connection with PPCO's life settlements portfolio (approximately $3.1 million), litigation finance payments (approximately $1.8 million), upkeep and maintenance of investment assets (approximately ($1.6 million), legal settlement involving portfolio companies (approximately $1.4 million), tax payments (approximately $480,000), interest on secured debt (approximately $370,000), and transfers to the Platinum Capital Management account (approximately $2.0 million), which went to payroll, rent, office expenses, moving expenses, employee reimbursement, taxes, and insurance.

    d.    **Closing of Case.** The Schafer Firm is not privy to the Current Receiver's plans with regard to the method and timing of closing the case.

    e.    **Creditor Claims Proceedings.** To the knowledge of the Schafer Firm, the Current Receiver has not yet provided notice of a claims process to claimants, received claims, made any recommendations to this Court for the payment or denial of claims, or reached any decisions regarding the final disposition of claims.

    f.    **The assets of the Receivership Entities.** To the knowledge of the Schafer Firm, the Current Receiver is still in the process of reviewing all aspects of the portfolios. The Current Receiver has engaged Houlihan Lokey Financial Advisors, Inc., a valuation firm, to assist it in valuing the Receivership's assets. The Schafer Firm is not privy to its results of this valuation.

### D. Current and Previous Billings

16. The Schafer Firm requests compensation in the amount of $459,729.25 in fees and $29,197.86 for reimbursement of expenses incurred during the Application Period. This is the Schafer Firm's first and final fee application and the Schafer Firm has not submitted a prior request for payment.

17. Total pre-receivership fees and expenses incurred for all matters for the Schafer Firm relating to the Arabella Entities are $437,599.11. Total pre-receivership payments toward those matters are $215,000. The Schafer Firm received a $5,000 retainer from Platinum on August 17, 2015, which is still held in trust and has not been applied. The Schafer Firm also received pre-receivership payments of $25,000 on March 23, 2016, and of $10,000 on June 8, 2016. The Schafer Firm received $180,000 on January 6, 2017, from the Participation Agreement, for pre-receivership fees. The total unpaid balance of pre-receivership invoices issued prior to December 19, 2016 for all matters relating to the Arabella Entities is $222,599.11. Notwithstanding this outstanding balance for pre-receivership work, the Schafer Firm is only seeking compensation in the Final Application for work performed during the Application Period.[6]

18. With the exception of amounts requested for reimbursement of expenses, these amounts reflect and are determined on the basis of the hours worked by the Schafer Firm's attorneys and legal assistants, and the hourly rates in effect at the time the services were rendered.

### E. Exhibits

19. The following exhibits are attached:

   a. **Exhibit A:** The latest SFAR.

---

[6] As more fully explained in the Baum Declaration, the Schafer Firm believes that its fees, including its pre-receivership fees, are secured as a first-out participation in the Arabella Loan. See Exhibit F, ¶¶11-12.

      b.      **Exhibit B:** A summary of the total fees billed and hours worked by each Schafer Firm professional and a summary of all expenses incurred.

      c.      **Exhibit C:** All time records of Schafer Firm professionals and all expenses incurred by the Schafer Firm during the Application Period.

      d.      **Exhibit D**: Judge Rhodes' Expert Report.

      e.      **Exhibit E:** The Certification of Michael E. Baum, as required by Section A.1 of the SEC Billing Instructions.

      f.      **Exhibit F:** The Baum Declaration.

## II. SERVICES RENDERED BY THE SCHAFER FIRM DURING THE APPLICATION PERIOD

20. During the Application Period, the Schafer Firm worked diligently and efficiently to assist the Initial Receiver with a variety of legal issues. The Schafer Firm was uniquely positioned in its representation because it worked with the Receivership Entities prior to the Receivership, and was therefore intimately familiar with their complex and intertwining legal issues. Due to the Schafer Firm's assistance to the Initial Receiver, the Schafer Firm respectfully requests to be compensated on a final basis for its work performed and expenses incurred.

21. The Schafer Firm's professionals and paraprofessionals have billed 1,502.25 hours of services to the Initial Receiver during the Application Period. Based on the Schafer Firm's hourly rates, the Schafer Firm has provided a total of $459,729.25 in legal services for which it is charging. The Schafer Firm also performed 299.65 hours of work at the discounted rate of $275 per hour, and is not charging the Receivership Estate for 170.5 hours of work, saving the Initial Receiver a combined $95,205.00.

22. The hourly rates charged are the Schafer Firm's usual and customary charges for legal services, except for the services that were provided at a discounted, flat rate of $275 per hour – below the majority of the Schafer Firm's customary rates. The Schafer Firm's rates are less expensive than similar services provided in the marketplace.

23. The following is a summary of the services the Schafer Firm provided to the Initial Receiver, broken down by category as required under section D.5 of the SEC Billing Instructions. The Schafer Firm's complete time entries are detailed in **Exhibits B and C**.

A.  **Asset Analysis and Recovery**

24. This category includes various services the Schafer Firm performed to analyze, recover, and protect potential assets of the Receivership Estate. These include, but are not limited to, the following services:

25. The Schafer Firm successfully defended against attempts by APC and Founders to lift the automatic stay in the AEX bankruptcy and dispossess AEX of its assets. The Schafer Firm reviewed these motions, as well as AEX's objections to the motions, and filed its own objections. Neither motion was granted. Had APC succeeded in its attempt to lift the automatic stay, it would have been able to commence an adversary proceeding against AEX to determine ownership of the Tag-Along Rights ("TARs"),[7] worth several million dollars, which would have jeopardized significant collateral securing the Arabella Loan. Had Founders succeeded in its attempt to lift the automatic stay, it would have been able to continue its state court lawsuit against AEX to foreclose

---

[7] TARs provide owners of oil and gas interests with the opportunity to join, or "tag-along," with any sale by the majority owner, allowing them to receive a pro-rata share of the sale price.

{00697354.7}                                    10

on the Arabella Assets, which would have jeopardized AEX's ownership interest and thus the collateral securing the Arabella Loan.

26. The Schafer Firm prepared for and participated in a mediation to settle all claims between the Initial Receiver, AEX, and APC and to determine ownership of the TARs (the "Mediation"). In preparing for the Mediation, the Schafer Firm scoured thousands of documents to trace the ownership of the TARs, to support AEX's claim that it owned the TARs, and to provide leverage in the Mediation. The Schafer Firm also searched for, reviewed, and analyzed asset transfers to and from AEX and other entities[8] to support its arguments and affirmative defenses related to the merits of APC's adversary proceeding. The Schafer Firm drafted two Mediation statements, one confidentially circulated to the mediator and one circulated to all of the Mediation parties. The Schafer Firm then created a memorandum for the Initial Receiver to prepare him to take part in the Mediation. The Schafer Firm reviewed the Mediation statements drafted by the other Mediation parties, researched the claims made in APC's Mediation statement, and prepared responses to APC's arguments, all to ensure as beneficial a result as possible for the Initial Receiver.

27. Following this preparation, the Schafer Firm represented the Initial Receiver at the Mediation. The Schafer Firm and the Initial Receiver met with representatives of AEI, AEX, and AO before the Mediation to coordinate a Mediation strategy. Once the Mediation began, the Schafer Firm advised the Initial Receiver and participated in negotiations spanning two fourteen-hour days, culminating in a global settlement (the "Arabella Settlement Agreement").

---

[8] Although unrelated to the Mediation, the Schafer Firm also performed these tasks to determine whether assets were fraudulently transferred and could be recovered, thereby increasing the value of the Arabella Assets and the potential recovery for the Receivership in a sale of AEX.

{00697354.7}  11

28. Under the Arabella Settlement Agreement, AEX and APC will share proceeds realized from the sale of assets and the exercise of the TARs. This avoided years of costly litigation over the ownership of the Arabella Assets and TARs. The Arabella Settlement Agreement also eliminated the very real litigation risk that AEX would be adjudged to have an ownership interest in these assets which was inferior to that of APC. Had that risk been realized, the Receivership's collateral supporting the Arabella Loan would have had no value. Finally, the Arabella Settlement Agreement released APC's multi-million-dollar liens against AEX, allowing the Receivership Entities to retain their interest in AEX and AEI.

29. To obtain approval of the Arabella Settlement Agreement, the Schafer Firm reviewed and responded to AEX's motion for an expedited hearing of its motion for the AEX court to approve the settlement, reviewed AEX's motion to approve, and filed a concurrence and a limited objection. The Schafer Firm then reviewed and prepared responses and arguments to four separate objections to AEX's motion to approve the Arabella Settlement Agreement. The Schafer Firm prepared for, and argued at, the hearing on the motion. The AEX court approved the motion after a hearing lasting approximately two hours. This Court, as well as the AEI and APC courts, also approved the Arabella Settlement Agreement, bringing it into effect.

30. The Schafer Firm assisted the Initial Receiver with preparing a response to Founders' adversary proceeding.

31. Including the above-mentioned motions, the Schafer Firm reviewed one complaint, eight substantive motions, three expedited hearing motions, and eleven responses and objections. The Schafer Firm drafted and filed seven responses and objections and participated in four hearings in two different courts.

### B. Asset Disposition

32. The Schafer Firm drafted the Participation Agreement, which made it possible for AEX to file for chapter 11 relief and for AEI to file for chapter 15 recognition. These filings prevented Founders from pursuing its state court action to foreclose on the Arabella Assets, thereby preserving these assets and the collateral securing the Arabella Loan.

33. The Schafer Firm coordinated with AEX and AO and represented the Initial Receiver's interests in the form and substance of AEX's and AO's bankruptcy filings.[9] This ensured that the Initial Receiver had regular input in the AEX and AO bankruptcies, and that the bankruptcies were administered in a way most beneficial to the Receivership Entities. The Schafer Firm consulted with counsel for AEX and AO and represented the Initial Receiver's interests during these Chapter 11 cases.

34. The Schafer Firm also worked with AEX and their professionals to prepare for a sale of the Arabella Assets in order to realize their value. AEX filed a motion to sell its assets and approve bidding procedures, and Founders filed an objection to the motion. The Schafer Firm reviewed both pleadings, filed a response which supported the motion, prepared for the hearing on the motion, and participated in the hearing. The AEX court granted the motion. APC filed a parallel motion, allowing their assets to be sold in tandem, thereby maximizing the assets' value. This motion has also been granted.

---

[9] These cases are now jointly administered.

{00697354.7}　　　　　　　　　　　　　　　　13

### C. Case Administration

35. The Schafer Firm's activities in this category relate generally to pleadings, motions, hearings, correspondence, and meetings otherwise uncategorized or unrelated to existing categories.

36. For example, AEX filed a motion to retain Chip Hoebeke as its CRO. APC's Chapter 11 Trustee filed an objection. The Schafer Firm responded to this objection, and supported AEX's motion to retain, and responded to AEX's motion for an expedited hearing. The Schafer Firm then prepared for and participated in the hearing on the motion. The court granted AEX's motion. The Schafer Firm also prepared for and participated in hearings employing T2 Land Resources as AEX's land consultants and Mr. Hoebeke as AO's CRO.

37. In AEI's chapter 15 case, the Schafer Firm coordinated with AEI and represented the Initial Receiver's interests in the form and substance of AEI's Chapter 15 bankruptcy filing. The Schafer Firm also consulted with AEI's counsel and represented the Initial Receiver's interests during AEI's Chapter 15. In connection with AEI's case, the Schafer Firm also reviewed three substantive motions and three motions for expedited hearings, and prepared for and participated in all three hearings on behalf of the Initial Receiver. Preparation for these motions required review of not just the Bankruptcy Code, but also Cayman Islands law.

38. Including the above-mentioned motions, the Schafer Firm reviewed and prepared for seven substantive motions, six expedited hearing motions, and one objection. The Schafer Firm drafted and filed two responses of its own, and participated in six hearings.

### D. Claims Administration and Objections

39. The Schafer Firm's work in this category included reviewing and analyzing claims filed by other parties in the AEX and AO bankruptcy cases as well as analyzing, drafting, and filing a proof of claim on behalf of the Initial Receiver in the AEX and AO bankruptcy cases.

### III. EXPLANATION OF EXPENSES AND RELATED POLICIES

40. The Schafer Firm seeks reimbursement of its out-of-pocket costs in the amount of $29,219.21. **Exhibit C** includes a list of these expenses and receipts for certain expenses. The Schafer Firm's expenses are limited to fees incurred in the reproduction of documents, fees incurred in generating certificates of good standing for notices of appearance, mailing fees, other document delivery fees, limited document retrieval costs, costs connected to electronic research databases, parking and travel costs, and document hosting costs.[10] The Schafer Firm will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Instructions.

41. With respect to all expenses, the Schafer Firm seeks reimbursement only for its actual costs. The Schafer Firm has not included in any request for expense reimbursement the amortization of the cost of any investment, equipment, or capital outlay.

42. The Schafer Firm has not sought reimbursement for secretarial, word processing, proofreading, or document preparation expenses (other than by professionals and

---

[10] Although document hosting costs are not specifically referenced under Section E.2 of the SEC Billing Instructions, they are litigation expenses contemplated under Section E.1. These costs are reasonable because Computing Source, the document hosting company, provided the Schafer Firm substantial discounts, and the cost of these services was equal to or less than the market cost of similar services. The services were necessary because the Schafer Firm possessed over 120,000 pages of relevant documents that needed to be reviewed and analyzed as part of the representation and were vital to the Schafer Firm's defense against the APC and Founders claims, preparation for Mediation, and review of potential asset transfers. If these documents were not hosted, the Schafer Firm would have had to review them through much less efficient means, which would have cost the Receivership Estate many unnecessary hours of attorney time.

{00697354.7} 15

paraprofessionals), data processing and other staff services (exclusive of paraprofessional services), or clerical overtime.

### IV. FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

43. The case law on equity receiverships sets forth the standards for approving the fees and expenses of the Initial Receiver's counsel. A court appointed receiver and its professionals, who reasonably and diligently discharge their duties, are entitled to fair compensation for their services performed and expenses incurred. *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008) (citing 65 AM. JUR. 2D *Receivers* § 219 (2d ed. 2008)). "The amount of compensation to be awarded court-appointed receivers and the professionals that assist them is within the court's discretion." *FTC v. Consumer Health Benefits Ass'n*, 2011 U.S. Dist. LEXIS 130361, at *4 (E.D.N.Y. 2011) (quoting *Byers*, 590 F. Supp. 2d at 644).

44. In allowing fees, "the court may consider all of the factors involved in a particular receivership, including the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *Id.* (first quoting *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994); and then quoting *SEC v. Northshore Asset Mgmt.*, 2009 U.S. Dist. LEXIS 89947, at *3 (S.D.N.Y. 2009)) (internal quotations and citation omitted); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) ("In allowing fees the considerations are the time, labor and skill required, but not necessarily [the time, labor, and skill] actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.") (internal quotation omitted).

45. A "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them" while understanding that an "equitable receivership is by its very nature, a legally complex process." *SEC v. W.L. Moody & Co., Bankers*, 374 F. Supp. 465, 484-85 (S.D. Tex. 1974), *aff'd*, 519 F.2d 1087 (5th Cir. 1975). Not only is "[c]onsiderable analysis and drafting ability" necessary to adequately represent any receiver, but receiverships requiring peculiar skill or legal work add to the complexity. *Id.* at 484.

46. Results and benefits to the estate may take forms other than bare increases to monetary value. *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992); *see also Gaskill*, 27 F.3d at 253 (noting that "[e]ven though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."); *Byers*, 590 F. Supp. 2d at 644. Nonetheless, "results are always relevant." *Elliott*, 953 F.2d at 1577 (quoting *Moody*, 374 F. Supp. at 480).

47. "Time spent cannot be ignored." *Moody*, 374 F. Supp. at 483. This is particularly true when the dimensions and complexity of a receivership prevent counsel from taking on other full-time assignments. *Id.* at 483-484. Another significant factor is "the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (finding that legal fees were reasonable, "particularly in light of the extensive litigation and motion practice that has ensued.").

48. Therefore, courts must balance several factors to determine the proper amount of compensation for a receiver or its professionals. No single factor is determinative; a reasonable fee is based upon all circumstances and should avoid extravagantly compensating receivers or professionals. *Byers*, 590 F. Supp. 2d at 644; *Moody*, 374 F. Supp. at 480. In addition to the above

stated factors, "[o]pposition or acquiescence by the SEC to the fee application will be given great weight." *Byers*, 590 F. Supp. 2d at 644.

49. Under these standards, the Schafer Firm has clearly shown that its requested fees and expenses are appropriate. As discussed in greater detail above, the Schafer Firm represented the Initial Receiver in complex cases spanning at least six courts, two states, and two countries. Due to the volatile nature of oil and gas markets, timeliness and diligence are necessary to realize the maximum value of assets. When this Court appointed the Initial Receiver, the Receivership Entities, AEX, AEI, and AO were already involved in several of these cases. Due to their time sensitive nature, any hesitation or inaction threatened to destroy the value of the Arabella Assets. The Schafer Firm worked as the Initial Receiver's vanguard, assisting the Initial Receiver in understanding and managing the Arabella Assets.

50. During the Application Period, the Schafer Firm helped generate and protect millions of dollars of assets for the Receivership. Within days of the Initial Receiver's appointment, the Schafer Firm drafted and finalized the Participation Agreement, which provided the funds necessary for AEX to file for chapter 11 protection. If AEX had not received funds to file for bankruptcy protection, Founders would have foreclosed on the Arabella Assets, thereby eliminating 100% of their value to the Receivership.

51. The Schafer Firm created and implemented litigation and settlement strategies which leveraged the position of the Initial Receiver and allowed him to obtain a favorable settlement at the Mediation. The Schafer Firm assisted the Initial Receiver in negotiating the Arabella Settlement Agreement with AEX and APC during the Mediation. The Arabella Settlement Agreement settled APC's adversary proceeding, which threatened to avoid the Initial Receiver's lien on the Arabella Assets. The Arabella Settlement Agreement also settled the

{00697354.7} 18

distribution of the TAR proceeds, securing over $2 million in funds for AEX and, therefore, the Receivership Entities. The Arabella Settlement Agreement avoided costly, protracted litigation over the ownership of the Arabella Assets and TARs, and eliminated the very real litigation risk that the Initial Receiver would obtain nothing for the Arabella Assets. It also released APC's multi-million-dollar liens against AEX, allowing the Receivership Entities to retain their interest in AEX and AEI, and paving the way for an eventual sale of the Arabella Assets under §363 of the Bankruptcy Code.

52. Together with AEX, the Schafer Firm defended against APC's and Founders' motions to lift the AEX bankruptcy stay. Both parties sought to dispossess AEX of its assets, thereby attacking the assets of the Receivership. Neither motion was granted.

53. Through its efforts, the Schafer Firm generated great value for the Receivership Estate. Platinum had valued the Arabella Assets at $1.5 million, a value with which the Initial Receiver had agreed. Docket No. 128-1, ¶18. It now appears that, as the result of the legal services the Schafer Firm provided to the Initial Receiver, the Arabella Assets will generate somewhere between $5 million and $7 million for the Receivership Estate.

54. To document this work, the Schafer Firm has attached detailed billing records covering the Application Period as **Exhibits B and C**. These records show the reasonable and efficient use of the Schafer Firm's time in pursuing the various activities and tasks described above. With the exception of certain discounted rates, the Schafer Firm's hourly billing is based on its customary billing rates, which are not only fair, but also less expensive than similar services provided in the marketplace.

## V. CONCLUSION

Based on the work performed on behalf of the Initial Receiver, the substantial benefit realized from that work, and the reasonableness of the Schafer Firm's fees, the Schafer Firm respectfully requests this Court:

a. Approve the Schafer Firm's fees in the amount of $459,729.25;

b. Approve the Schafer Firm's expenses in the amount of $29,197.86;

c. Order the Receivership Entities to pay, within ten business days, the Schafer Firm's approved fees and expenses; and

d. Grant such other and further relief as this Court deems appropriate.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/ s / Michael E. Baum
MICHAEL E. BAUM (P29446)
JOSEPH K. GREKIN (P52165)
Former Counsel for the Initial Receiver
40950 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304
(248) 540-3340
mbaum@schaferandweiner.com

Dated: September 28, 2017