UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

     -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 16-CV-6848 (BMC)

## THE RECEIVER'S FIFTH STATUS REPORT TO THE COURT

Melanie L. Cyganowski, the duly appointed Receiver (the "Receiver") of Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP,[1] Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunity Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd and Platinum Partners Credit Opportunities Fund International (A) Ltd (collectively, the "Receivership Entities," the "Platinum Entities" or "Platinum"), by her undersigned counsel, hereby submits this Fifth Status Report, covering the period from July 1, 2018 through and including September 30, 2018 (the "Reporting Period").

---

[1]   Platinum Partners Credit Opportunities Master Fund LP, and its feeder funds are collectively referred to herein as "PPCO" and the Platinum Partners Liquid Opportunity Funds are collectively referred to as "PPLO".

This quarterly status report is being filed in accordance with the requirements of the Second Amended Order Appointing Receiver (the "Receiver Order"), entered on October 16, 2017 [Dkt. No. 276].

## I.   PRELIMINARY STATEMENT

During the Reporting Period, the Receiver continued her efforts to monetize the remaining assets in the portfolio and simultaneously dedicated resources to an analysis of the pre-receivership business and affairs of Platinum and an investigation into potential significant causes of action against third parties by the Platinum estate (the "Receivership Estate"). Notably, during the Reporting Period, the Receiver and her team[2] completed the marketing and bidding process with respect to the Abdala gold mine tailings impoundment in Brazil (the "Abdala Tailings Project"), widely acknowledged to be the Receivership Estate's most valuable asset, and then presented to, and obtained approval from, the Court to enter into the proposed sale.  Since the approval of the sale, the Receivership Team has been working diligently with the winning bidder to close the transaction.  It is a complicated transaction with several business, regulatory and tax components that has taken significant time and effort, but the Receiver expects to close the transaction this month.  The Receiver has also continued to work towards the monetization of remaining assets in the investment portfolio.   The remaining assets have presented more problems and have taken longer to dispose of for a variety of reasons (some long recognized, others unanticipated), including, in some cases, because they are being administered through bankruptcy proceedings or liquidations (*e.g.*, Arabella and Cleveland Mining).   The Receiver is hopeful that the remaining assets for which there is a path to monetization, can be

---

[2]     To assist her with her duties, the Receiver sought the retention of counsel and a financial advisor.  To that end, on July 21, 2017, the Court approved the retention of Otterbourg P.C. ("Otterbourg") as legal counsel to the Receiver [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

realized upon in whole or in substantial part by the end of the year.  In addition, the Receivership Team continues to assess which assets have no present or likely future market value and, thus, should be disposed of without the further expenditure of resources.

In addition to monetizing the portfolio investments, the Receivership Team is continuing to investigate pre-Receivership activities.  The Receivership Team is engaged in ongoing factual and legal analysis to determine if there exist any viable causes of action that may be of meaningful value to the Receivership Estate.   It has taken, and continues to take, steps to preserve potential causes of action that may be subject to time limitations.   It has issued subpoenas, and made informal document requests, to obtain additional information from entities involved with certain of the pre-receivership transactions under review.  The Receivership Team also continues to analyze the claims process and the factors that will impact which claims may be entitled to a distribution and the timing of distributions, including claims of security interests in Receivership assets and claims to funds in escrow.  It is the Receiver's goal to present a motion to the Court regarding a proposed claims process before the end of the year.

## II.    SUMMARY OF OPERATIONS OF THE RECEIVERSHIP

### A.    Appointment of Receiver and Duties

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver.  [Dkt. No. 216].

5462430.1

Under the terms of the Receiver Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

### B.      Analysis and Disposition of Receivership Assets

The Receivership Team continued to work to monetize the remaining assets in the portfolio or examine alternative disposition options for those assets that have no current market for which further investment of time is unwarranted.  To the extent possible, the Receiver has worked with other investors in the asset to maximize recovery.  If joint disposition is not feasible, the Receivership Team has worked and will continue to work to independently monetize its investment in the asset.

The investments in the Platinum portfolio are diverse.  While many of the assets are in the metals, mining and energy sectors, each of these companies are located in different regions domestically and globally and, as a result, have unique characteristics.  In addition, most of the investments were in companies that are in the developmental stages and have not yet had proven success or the prospects for success were greatly overstated by prior management.  As a result, many of the investments are problematic. For example, many of the investment have real or potential significant liabilities, are subject to potentially superior liens or debt, and/or require

4

additional cash investment for the underlying company to continue or resume operations. Even the real estate assets are problematic and have limited marketability and several of the stocks held by Platinum have restrictions on trading.

The Receiver continues to only make expense payments that are necessary to maintain or preserve the value of assets, to protect collateral and/or to stabilize operations. Because many assets have been sold since the Receiver's appointment, the liabilities have been substantially reduced. At this time, the only significant expense to maintain the remaining assets is the lease payments needed to preserve the LC Energy assets. As described below, disposition of this asset, which was purchased out of a bankruptcy estate, has been delayed because of unresolved purported liens on the assets. The Receiver, however, is focused on disposing of the LC Energy assets as quickly as possible. The Receiver continues to believe that, under the circumstances of the Receivership, no asset warrants capital investment beyond what is necessary to preserve that asset and maintain value until monetization is possible. To the extent that it is determined that an asset has no value (or value that is estimated to be less than maintenance costs), the Receiver will not invest further resources to maintain such asset. When possible, the Receiver has undertaken negotiations with other investors or stakeholders involved with assets, including management, to infuse additional cash into the investment to preserve value until the asset can be sold, as well as to reduce ongoing expenditures.

The Receivership Team has sought to "triage" the various assets: first focusing on those assets that are relatively liquid, such as publicly traded stocks, life settlement investments and litigation finance investments; and then focusing on those assets that are less liquid, but that nonetheless, with greater time and effort, can be marketed and hopefully monetized. For the most part, the assets that are relatively liquid or have a readily available market have been sold.

5462430.1

The Receiver continued to focus on the remaining assets during the Reporting Period, many of which have taken a longer time to monetize and have presented greater challenges.  Those assets for which the Receivership Team has determined, after thorough due diligence to have no viable exit alternative, may be disposed of through a bulk lot remnant sale.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie").[4]  Houlihan Lokey and Conway MacKenzie are each responsible for different assets and there is no overlap in the work performed by each.

Because of Houlihan Lokey's areas of expertise, it was retained to market and sell specific assets including (i) the ALS life settlements portfolio, (ii) the litigation finance portfolio, (iii) the Abdala Tailings Project, (iv) LC Energy Operations LLP, and (v) Urigen Pharmaceuticals, Inc.  The ALS life settlements portfolio was previously sold; the Abdala Tailings Project sale has been approved and the parties are working to close the sale; most of the litigation finance portfolio has been sold and the Receiver is continuing to explore options for the remaining litigation finance assets.  Finally, Urigen Pharmaceuticals, Inc. has questionable value due to (a) the suspension of its FDA Phase II trials as a result of inconsistent results and (b) Urigen's apparent inability to raise financing to re-start the trials. While the Receivership Team has periodic calls with Urigen management to discuss the status of the business and its finances, Houlihan is not currently marketing this investment.  Accordingly, Houlihan Lokey's current retention is limited to the marketing and sale of the LC Energy assets.  As the Court

---

[3]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[4]   Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

5462430.1

acknowledged in the Houlihan Opinion, Houlihan Lokey was retained because of, among other reasons, its extensive experience with several hedge fund wind-downs, its experience with marketing illiquid assets across a broad spectrum of alternative investments, and its breadth of knowledge of potential investors to create a competitive environment to maximize recovery. *Houlihan Opinion* at 6.

The Receiver also retained Conway MacKenzie to provide due diligence and assist with the disposition of certain remaining assets that are not being marketed by Houlihan.  Conway MacKenzie was asked to conduct due diligence and recommend a strategy to monetize the following assets: (i) Buffalo Lake Advanced Biofuels, LLC, (ii) Desert Hawk Gold Corp. (which was monetized during the prior application period); (iii) Daybreak Oil and Gas, Inc., (iv) American Patriot Gold, (v) Greentown Oil Company, (vi) Arabella Exploration, (vii) NordAq Energy, (viii) Xcell Energy, and (ix) Decision Diagnostics Corp.

In addition to the due diligence performed by Houlihan Lokey and Conway MacKenzie on the assets that each has been asked to review, the Receiver and the Receivership Team previously debriefed Platinum's portfolio managers that were working at Platinum at the time of her appointment with respect to each of the investments, had extensive interaction with the management teams of the underlying portfolio companies (when available and appropriate) and received input from investors and Platinum's prior management regarding certain of the investments.

During the Reporting Period, the Platinum Receivership received approximately $2.2 million from the sale of certain investments.  Certain parties have asserted a claim to all or part of the proceeds of certain of such liquidated investments.

The foregoing amount received during the Reporting Period is in addition to the approximately $35 million received by the Platinum Receivership from the liquidation of other assets since the Receiver was appointed.  None of these assets has been marketed or sold in a "fire sale" fashion.  As further discussed below, the investments monetized during the Reporting Period and the proceeds received by the Receivership Estate were as follows:

- ALS (final policy in approved sale closed): $1.9 million

- PEDEVCO: $215,700

- Katrina Barge: $75,000

**C.      Forensics Investigation**

In addition to the monetization of assets, potential sources of recovery include claims by the Receiver as innocent successor to the Platinum Entities against possible liable parties. Goldin and Otterbourg have assembled a forensics team to seek to review the complicated series of transactions entered into during the years prior to Platinum was placed into receivership and to analyze the flow of funds.

During the Reporting Period, the Receiver timely commenced a confidential arbitration action against a third party professional that had provided services to Platinum.  A tribunal was formed and an organizational meeting held, but the neutral that was selected  withdrew and the parties have been attempting to select a new neutral, but as of yet, have been unable to do so. Because the parties have not yet met, and raised the issue of confidentiality, with a reconstituted arbitration tribunal, the Receiver, in an excess of caution, has determined, at this point in time, not to disclose in her quarterly status reports the name of the third party professional and nature of the claims.  No other litigation seeking recovery against third parties has yet been initiated and no litigation recoveries have been received.

In addition to commencing the arbitration proceeding, the Receivership Team continued to investigate certain pre-receivership activities to assess the enforceability of claimed security interests in Platinum's assets, analyze the nature, intent and consideration given for transfers of Platinum's assets and determine whether additional causes of action exist against, among others, valuation agents, fund administrators, auditors, legal advisors and other professional firms. This analysis includes reviews of the pertinent valuations prepared for Platinum by third party advisors, and involves identifying, gathering and analyzing information relied upon by the advisors, and assessing the reasonableness of the methodologies used in connection with the valuations. The analysis also includes the solvency of Platinum, and the value of the assets it transferred and consideration given in return. Inquiries like these seek to facilitate the Receiver's assessment both of claims against the Receivership Estate, and of whether the Receivership Estate has actionable claims against any persons or parties who putatively provided professional services to Platinum.

In addition, during the Reporting Period, the Receiver issued additional subpoenas, as well as made informal requests for documents. The Receivership team also has been analyzing documents produced in response to such subpoenas and informal requests, and has had communications with representatives of the non-party custodians regarding their responses. For certain claims in which a statute of limitations may be approaching, the Receiver has reached out to potentials targets and has entered into tolling agreements to allow the Receivership Team the appropriate time to investigate potential claims. The Receivership Team also prepared for and took the deposition of a former Platinum portfolio manager that had information regarding specific assets, in particular the ALS life settlement portfolio.

The Receivership Team also has continued the historical review of Platinum's activities and flow of funds. The Receivership Team is in the process of considering whether these activities gave rise to potential causes of action for which Platinum may realize additional recoveries.

**D.    Administrative Matters**

The Receiver and the Receivership Team continued to speak and meet with various interested parties and groups during the Reporting Period, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA")[5], counsel for the defendants named in the SEC's criminal complaint (the "Defendants") regarding access to documents and requests for advances for defense costs, investors and their representatives, equity holders in specific investment vehicles in which Platinum is the majority holder, and the SEC. The Receiver also held another "town hall" style meeting with investors and other interested parties via webinar and telephone to provide an update on the actions taken to date and to answer questions. The Receiver will continue to hold these forums going forward. The Receiver regularly updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors. The Receiver and the Receivership Team also meet in person or by telephone with investors and/or their representatives upon request. The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

During the Reporting Period, the Receivership Team spent significant time objecting to a fee application filed by a law firm retained by Platinum prior to the Receivership and that continued to provide legal services, without Court-approved retention, to the Prior Receiver after

---

[5]    PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

the commencement of the Receivership.   The Receiver believed the law firm was not entitled to be paid any fees by the Receivership estate, and did not act in the best interests of Platinum.  The Receiver, therefore, objected to the payment of any fees to the law firm and the Court agreed with the Receiver and denied the request for fees during the Reporting Period.  The Receiver also has sought to clawback monies paid to the law firm in satisfaction of pre-Receivership obligations after the commencement of the Receivership.   The Receiver's clawback efforts remain the subject of ongoing Court proceedings.

The Receivership Team also responded to other applications made before this Court and in other state court proceedings involving Platinum.   Moreover, many of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world.  During the Reporting Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

(a)    **Website and Investor Communications.**   In accordance with Section E.2.l (Communications with Investors), the estate hired Garden City Group LLC ("GCG") to create the Receiver's website (PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receivers also revised and updated the website to add or update the "Frequently Asked Questions" section of the website and to add "key documents."  The Receiver has also used the website to publish a general notification of the data security incident discussed below.  The Receiver also established a mechanism on the website to allow interested parties to sign up to receive daily notices whenever there are new filings on the

11

docket.  The Receiver and/or the Receivership Team have also held numerous meetings and/or teleconferences with various investors and Defendants at their request.

The Receiver also organized and held a fourth "Town Hall" style webinar and telephone conference on August 15, 2018 to provide an update to investors and to answer questions submitted by investors.  The Receiver received positive feedback concerning this webinar and intends to continue to hold them periodically going forward, including one that we intend to schedule for December 4, 2018.  The videos of the Prior Town Halls are available through the website (www.platinumreceivership.com).  The Receiver and the Receivership Team also have had periodic conference calls with investors.

(b)     **Taxes.**  The preparation of PPCO's and PPLO's tax returns for the year ended December 31, 2017 has been completed and K-1s were sent to investors in August.  We advised investors that the K-1 statements may show decreases in the value of investors' interests in the funds as a result of the monetization of certain significant receivership assets for less than what was recorded on Platinum's books. The Receiver has not made any adjustments to the fair value of the investments. The significant decreases in values of investors' interests compared to the realized amounts are reflective of the fact that assets were significantly overvalued by prior management.  The amounts listed on the K-1s are not necessarily reflective of what distributions investors may ultimately receive in this case.   Additional pass-through tax benefits may be reflected in future K-1 statements.  The Receiver is addressing domestic and foreign tax issues arising from dispositions of assets, and is attempting to minimize the tax consequences of such dispositions. The Receiver cannot provide any tax advice.  Investors are encouraged to consult their own tax advisor on the impact of the K-1 statements on individual tax returns.

5462430.1

(c)      **Schafer & Weiner Fee Application**.  During the Reporting Period, Schafer &
Weiner ("S&W"), a Michigan law firm that was previously engaged by Platinum and that
continued to provide legal services to the Prior Receiver in connection with the Arabella
investment filed a fee application seeking to be paid nearly $500,000 in unpaid legal fees for
work purportedly performed for the Prior Receiver.  Subsequent to filing the objection and sur-
reply to S&W's fee request, the Receivership Team reviewed documents in response to the
subpoena issued to S&W, objected to subpoenas issued by S&W, and prepared for and took the
depositions of S&W's representative and S&W's expert witness.  On September 25, 2018, the
Court issued a Memorandum Decision and Order denying S&W's fee application, but reserving
judgment on the Receiver's cross-motion seeking disgorgement of the pre-Receivership fees paid
to S&W.  [Dkt. No. 383]

(d)      **SEC Meetings**.  The Receiver also regularly communicates with the SEC staff to
keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to
potential retentions and filings by the Receiver.  The Receiver and Otterbourg also has periodic
communications with SEC personnel about pending matters before the Court as to which SEC
input is appropriate, including, for example, the S&W fee dispute.

(e)      **PPVA**.  The Receiver and the Receivership Team had periodic teleconferences
and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA
Feeder Fund and/or their staff.  The Receiver and the Receivership Team also regularly have
asset-specific teleconferences with the Joint Liquidators or their professionals to discuss the
liquidation or analysis of assets that are jointly held by PPVA and Platinum.  Otterbourg also
continued to discuss procedures to share with the Joint Liquidators non-privileged documents
that are maintained on the Platinum servers controlled by the Receiver.  The Receiver and Joint

5462430.1

Liquidators continue to consider the resolution of inter-company claims amongst PPVA and Platinum.

(f)      **Employees.**   Since the Receiver's appointment, the number of employees has been significantly reduced.  There is currently one remaining portfolio manager (portfolio manager for the Abdala Tailings Project investment),[6] the Chief Financial Officer and the General Counsel.  The director of information technology was transitioned to an independent consultancy at a lower cost to the Receivership Estate, while maintaining the same level of service.  During the Reporting Period, the Receiver addressed certain inquiries from former employees whose benefits are expiring or have expired in accordance with their respective separation agreements.

(g)      **Defendants.**  During the Reporting Period, Otterbourg interfaced with counsel for the Defendants to discuss a variety of issues, including the production of certain documents on Platinum's servers.  The Receivership Team has sought to work with the Defendants to allow them access to documents on Platinum's servers to which they are entitled to have access (*e.g.* non-Receivership Platinum Management's documents that are on Platinum's servers). The Receiver also responded to demands from certain of the Defendants for indemnification and, in particular, their demands that their defense legal costs be advanced for payment by the Receivership as part of their claim for indemnification.  The Receivership Team researched the Defendants' alleged right to advances from Platinum and denied their requests.  The Receiver does not believe that she is legally obligated, or that it is a prudent use of Receivership resources, to make advances to the Defendants at the expense of the investors and creditors that have suffered significant losses.  The Court has ordered that any Defendants wishing to file motions to

---

[6]   This position will be eliminated following the closing of the Abdala Tailings Project sale.

compel the Receiver to advance their legal fees do so by October 19, 2018. Several such motions were filed and/or joined in by the other Defendants. The Receiver will respond to these motions and joinders by October 30, 2018, and after an opportunity for the Defendants to file reply briefs, the Court will consider the motions. The Receivership Team also continues to monitor the criminal proceedings.

(h) **Navidea Indemnification Claim.** Navidea Biopharmaceuticals, Inc. ("Navidea") sought leave from the Receivership Court to assert an indemnification claim against Platinum as a result of a claim asserted by PPVA against Navidea for repayment of a portion of a promissory note, the balance of which had been assigned to, and repaid to, Platinum during the Prior Receiver's tenure. Navidea claimed an entitlement to indemnification based on its payoff agreement with the Prior Receiver. The Receiver opposed Navidea's motion on the basis that Navidea had no colorable claim against Platinum and litigating the claim would constitute an unwarranted distraction and expense for the Receivership Estate. During the Reporting Period, the Court denied Navidea's motion. *See* Dkt. No. 353.

(i) **Cayman Funds.** At the end of 2017, three Platinum funds organized under the laws of the Cayman Islands were added to the Receivership Estate. The Receiver has worked with local counsel in the Cayman Islands to appoint new directors and designate a registered office to work with the Cayman regulators to satisfy compliance regulations and avoid being placed into liquidation in the Cayman Islands.

(j) **Receiver Oversight**. Time during the Reporting Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort. The Receiver maintained

5462430.1

direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and forensic accounting issues.

## III.   CASH, EXPENSES, AND UNENCUMBERED ASSETS

A schedule summarizing cash receipts and disbursements, as well as cash on hand for the Reporting Period, is set forth in the Schedule of Receipts and Disbursements attached hereto as **Exhibit A**.

As of September 30, 2018, the Receivership Entities had $16.6 million in unencumbered funds. These funds include proceeds from the liquidation of assets. Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate). Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets. These claims will be addressed in due course.

Cash disbursements during the Reporting Period totaled approximately $1.4 million. This amount consisted primarily of (i) $389,000 in disbursements to retained professionals, as well as limited scope professionals hired by the prior receiver; (ii) $389,000 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as rent); (iii) $608,000 in investment expenses, which include funds disbursed to preserve the value of the following assets: LC Energy ($330,000) and the Abdala Tailings Project ($278,000).

It is estimated that, as of September 30, 2018, accrued, unpaid administrative expenses amount to approximately $5.6 million. This amount includes the estimate of fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the Reporting Period and that will be requested in future applications, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its

16

interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Reporting Period.

Cash receipts during the Reporting Period totaled approximately $2.2 million.  This amount primarily consists of proceeds derived from dispositions (discussed below) associated with the following investment positions: a life insurance policy remaining from the sale of the ALS life settlements portfolio ($1.9 million), PEDEVCO ($215,700) and Katrina Barge ($75,000).

## IV.    RECEIVERSHIP PROPERTY

As of September 30, 2018, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

(i)    Cash and cash equivalents of approximately $16.6 million;

(ii)    Real estate investments without any set book value, due to their inherently speculative nature;

(iii)    Investments in natural resources, remaining litigation financing, energy and other miscellaneous investments; and

(iv)    Potential litigation claims.

A list of Receivership Property – namely each asset of the PPCO and PPLO entities – is attached hereto as **Exhibit B**.

The Receiver cannot ascribe values to each of the assets that have not yet been monetized.  Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from prior (now removed) management's plans, which are now (and likely always were) unrealistic and/or can otherwise no longer be supported.  The actual realized value of these investments may differ

materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations.  Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment.  As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  As the Court stated in the Houlihan Opinion,

> [t]he Receiver is not tasked with making speculative investments. Instead, she is entrusted with the responsibility to prudently wind-down the Receivership Entities and dispose of the Receivership Assets in a manner that safely returns to stakeholders what value can be salvaged. She is not empowered to jeopardize that return by indulging in risky investment opportunities with the very money she has been charged to return to the victims of alleged years' long fraudulent conspiracies.

*Houlihan Opinion* at 8.  Even with such assumptions made by prior management regarding additional investment, the prior valuations may not have been supportable in view of the issues that the Receiver has encountered with respect to many of the assets.

There are certain assets that may ultimately have no realizable value.  Decisions regarding the monetization of investments necessarily will entail an understanding of the interplay between future expenses (*i.e.*, cost to the estate to maintain the asset) and the time it will take to market and obtain a purchaser for the investment.  In the performance of her duties, the Receiver has also sought input from investors and prior management regarding certain of the investments where appropriate.  Of course, all decisions are ultimately those of the Receiver. The Receiver's goal is to monetize and sell the investments in a manner that balances the interests of being judicious with the assets of the estate, maximizing value and expeditiously

18

disposing of the assets to allow the Receiver to make distributions to investors and creditors and close the case. At this stage in the Receivership, disposition options for the remaining assets that are not in the process of being monetized are limited. Based upon the thorough due diligence performed by the Receivership Team, the Receiver's goal is to limit any further investment of professional resources in assets for which there has been a limited or non-existent market. The Receiver is seeking to finalize deals for which offers have been made and are still extant, or move such assets into a basket of assets to be marketed as a bulk lot remnant sale.

In addition, certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets. The Receivership Team has engaged with certain of these parties to discuss their asserted interests and has also been reviewing these purported interests in the context of the Receiver's forensics investigation. The Receiver has also been investigating potential claims that the Receivership Estate may be able to assert, which in some cases overlaps with parties asserting a secured interest in some or all of the Platinum assets.

The Receiver has focused on a myriad of investments during the Reporting Period. Below is an overview of certain of the investments in which the Receiver and the Receivership Team have dedicated significant time. The below summaries include a brief description of the nature of the investment, work performed, and status during the Reporting Period.

(a) **Abdala Tailings Project** – refers to PPCO's interests (through a subsidiary, West Ventures LLC) in a gold tailings pond located near Cuiababa, Brazil. PPCO has contract rights to extract gold for a period of ten years from the tailings pond. The tailings pond is an impoundment that is approximately 300 meters wide by 300 meters long and 20 meters deep containing dried slurry (*i.e.*, sand and gravel). This impoundment is adjacent to the Abdala gold

mining operation.  Because the Abdala mine is a less sophisticated operation as compared to other gold mines, there is a greater likelihood of gold not being captured in the mining operation and instead running off into the impoundment.

Platinum's investment in Abdala resulted from loans totaling, according to Platinum's books, $12.3 million that it extended to Resource Holdings, Inc. ("RHI").  RHI is a development-stage company that leased equipment and provided working capital to Brazilian gold mines.  With the funds advanced from Platinum, RHI, in turn, financed the owner of the Abdala gold mine, Reginaldo Luiz De Almeida Ferreira (a.k.a. "Rico"), whose loans from RHI subsequently were assigned to Platinum.  The loans to RHI and Rico went into default, and, following a settlement with RHI, Platinum began foreclosure proceedings against Rico.  In or about November 2015, following years of contentious litigation and negotiations, Platinum and Rico reached an agreement whereby Platinum received ten years of mining rights in and to the Abdala tailings pond in settlement of the loan obligations.  The settlement was recorded with the Brazilian court in January 2016.  Although the transfer of the rights was recorded, the fact that it was based upon a settlement of a loan was not reflected in the Brazilian records.  The project was in the permitting stages and the intended processing plant was never developed because of Platinum's liquidity issues.  Additional details regarding the background of this asset can be found in the motion papers submitted to the Court.

Houlihan Lokey launched the marketing process for this asset at the end of 2017, a data room for interested parties that had signed a Non-Disclosure Agreement ("NDA") was opened, initial bids were received and site visits were made by certain prospective purchasers.  Houlihan Lokey then followed up with interested parties and Houlihan Lokey and the Receivership Team facilitated additional due diligence to enable interested parties to finalize their initial bids,

including arranging for on-site visits with Houlihan Lokey and the Platinum project manager in March.  Issues arose relating to the lease in which the gold tailings are planned to be transported for processing.  The issues with the lease took longer than anticipated to resolve.  As a result, the Receiver and Houlihan Lokey delayed the deadline for further, post-due diligence, submission of bids until all such issues could be resolved.  Resolution of the lease issues was time consuming, but needed to be resolved before further bids could be made.

After eight months (not including pre-marketing preparation time), the efforts undertaken by Houlihan and by Brazilian counsel, Chediak, to resolve all local legal impediments, resulted in a robust competitive bidding process and in the Receivership achieving what the Receiver and her professionals believe is Abdala's fair value.  The winning bidder for the Abdala assets was an affiliate of Centerbridge Partners, L.P. ("Centerbridge").  Centerbridge is a multi-strategy private investment firm with approximately $28 billion in capital under management as of March 2018 and which has extensive experience both in Brazil and in mining ventures.  On August 6, 2018, the Receiver filed a motion seeking approval of the sale to Centerbridge and payment of related expenses.  There were a few objections to the proposed sale; notably, an objection by one of the losing bidders (subsequently withdrawn).  The Receiver filed additional papers in support of the sale and in response to the objections, and the sale motion was approved by the Court on September 11, 2018.  [Dkt. No. 380]

Since the approval of the sale, the Receivership Team, Houlihan and Chediak have been working with the buyer's professionals to close the sale.  All parties have been working diligently to close the sale, which has been complicated for a variety of reasons, including because of the manner in which Platinum's ownership and transfer to it was documented by prior management and because of issues involving Brazilian tax law.  As set forth in further detail in

5462430.1

the memorandum of law in support of the sale [Dkt. No. 364], the sale would yield the Receivership $27.5 million in cash at closing, plus additional and potentially highly valuable consideration based on resource validation results and future mining revenues.  The cash at closing, however, will be subject to the payment of Houlihan Lokey's fees, as well as Brazilian holding taxes, which will reduce the net amount received by Platinum, but give rise to a pass-through tax loss to investors.  The Receivership Team is in the process of working with the Brazilian authorities and local counsel on the amount of the withholding tax.  In addition to the cash up front, the Receivership is entitled to $3 million in cash royalty advances approximately six months after closing if gold content is validated to exceed a realistic threshold, as well a 7.5% royalty on cash revenues after the purchaser achieves a 3.0x multiple of invested capital.  The structure of the deal was designed to generate a substantial upfront cash payment to the Receivership Estate, while, at the same time, permitting the Receivership Estate to significantly enhance its return in the event that the tailings pond has significant recoverable gold.  The Receiver hopes to close the Abdala Tailings Project sale within the next few weeks and will provide an update to investors at the next Town Hall webinar.

(b)      **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC.  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC ("Beechwood").  The Agera transaction and, specifically, the nature of the various transactions between and among, PPCO, PPVA, Beechwood, PGS and Agera, has been a focus of the Receiver's forensics investigation.  This review is relevant to the Receiver's ongoing forensics

5462430.1

investigation, and has resulted in the Receiver issuing multiple subpoenas. These assets may be the subject of litigation and/or settlement, rather than disposition through a sale.

(c)     **ALS Life Settlements Portfolio** – refers to a portfolio of life settlement investments owned through an entity in which PPCO is the majority owner and managing member. The previously approved sale of the life settlement portfolio closed during the last reporting period (see Receiver's Fourth Quarterly Report) and all but one of the Policies that were sold were transferred to the Purchaser during the last reporting period. The one Policy that was not previously transferred required additional work to effectuate the transfer because of a residual ownership interest on the policy. Otterbourg worked with Houlihan Lokey and the residual interest owner to address the issue and eventually effectuate the transfer. As a result, approximately $1.88 million of the total purchase price was received by the Receivership Estate during the current Reporting Period. The Receiver also initiated a litigation involving a policy that was not sold, for which the insurance company is asserting that it terminated prior to the Receiver's appointment.

(d)     **American Patriot Gold** – refers to Platinum's ownership interest, through Maximilian Resources LLC ("Maximilian"), to approximately 370 acres of land fee simple, in addition to patented mining claims in Montezuma County, Colorado. American Patriot Gold ran the Red Arrow Mine on the property until its mining permit was revoked in March 2014 as a result of non-payment of restitution for environmental and operational violations. Conway MacKenzie was asked to review this asset and provide the Receiver with disposition options.

Based upon Conway MacKenzie's due diligence, obtaining permits and selling the asset as a working gold mine was determined not to be an economical option due to the significant cost and timeframes involved. Accordingly, during the Reporting Period, on August 22, 2018,

the Receiver filed a motion to retain a local broker, Wells Group of Durango, Inc., to market and show the property to potential purchasers.  [Dkt. No. 376]  At a status conference before the Court on October 1, 2018, the Court authorized the Receiver to retain the broker.  The Receiver is currently working with the broker on the listing details.  The sale of the property will likely be subject to a public sale.

(e)    **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million dollar facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella"). Arabella has working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.  Pre-Receivership, a related Arabella entity in which Platinum does not have an interest – Arabella Petroleum Corporation ("APC") – commenced an action against the Arabella Entities asserting claims for the recovery of certain assets that are the subject of PPCO's liens. APC is also a debtor in a bankruptcy proceeding pending in the Western District of Texas.  The Prior Receiver entered into a settlement agreement with the Trustee of APC, settling the claims and agreeing to the interests of each estate in the combined assets that are to be sold in the respective bankruptcy cases.  The Arabella Settlement Agreement was approved by this Court.

Pursuant to the settlement with APC, APC is entitled to 35% of the net proceeds, as defined, of the sale of Arabella's working interests in the leased oil and gas properties.

Earlier this year, Arabella entered into a settlement with Founders Oil & Gas III, LLC and Founders Oil & Gas Operating, LLC (collectively "Founders") to resolve all issues regarding revenues and expenses, as well as future operatorship with respect to the wells and inclusion of the operatorship in the sale process for Arabella's assets.  This settlement enabled AEX's sale process to move forward.  In connection with moving the sale process forward and obtaining maximum value for the AEX estate (of which PPCO is the largest secured creditor) AEX prepared and filed amended bidding procedures, negotiated terms for the exit of the current broker and retention of a new broker, which will add greater value to the sale. During the Reporting Period, Arabella conducted the sale process for its working interests, together with those of a majority of the other working interests and operatorship.  The sale process resulted in multiple bids for different combinations of the various working interests.  Arabella's CRO reviewed the bids in consultation with Platinum and the APC Trustee and two bids were selected (one for a single well and the other for the remaining assets), along with back-up bids should any of the parties be unable to close on the sale in accordance with an acceptable asset purchase agreement.  The sale of the assets with respect to one of the wells was approved by the Bankruptcy Court in Texas at a hearing held on October 16, 2018.  Arabella is in the process of negotiating the sale terms for the remaining assets and is in discussions with the highest bidders. In addition, Arabella has been addressing purported liens through adversary proceedings which are currently before its Texas Bankruptcy Court.  From the sale proceeds, payments will be made to the APC Trustee and Founders, in accordance with their respective settlements, the broker, the taxing authorities and Arabella's retained professionals upon approval of their fees.

Arabella and Platinum have also jointly propounded a proposed plan of reorganization. There are still several variables that need to be addressed to determine what recovery Platinum may receive from the sale proceeds after other required payments are made, but the Receiver is hopeful that the plan can be approved this calendar year. Any recovery to Platinum on its secured note will be significantly lower than the claimed amount.

In addition, the Receiver anticipates that the counterparty to a purported Participation Agreement entered into with the Prior Receiver may assert a claim to Platinum's recovery on account of the sale of the Arabella assets. Under the terms of the Participation Agreement, in exchange for $500,000, the participant was purportedly granted a 45% participation in the Arabella Loan after repayment of the $500,000 purchase price to the participant, plus interest, and after payment of professional fees. This Participation Agreement was never approved by this Court. The Receiver intends to contest the validity of the Participation Agreement and/or reach a consensual resolution with the purported participant.

During the Reporting Period, the Receiver and the Receivership Team had regular status conferences with the Trustee of APC and CRO of AEX (and their respective representatives) to discuss the sale process and the status of discussions with the non-operating interest holders regarding the addition of their acreage to the sale to increase the per acreage value continued during the Reporting Period. The Receiver and the Receivership Team also had frequent telephonic and e-mail communications with Arabella's retained professionals, including its CRO, bankruptcy counsel and litigation counsel. The Receivership Team has been working with Conway MacKenzie who has been asked to assist with the evaluation and execution of monetization alternatives related to PPCO's interests in Arabella and to be the Receiver's "point person" in Texas, including speaking with the broker and providing reports to the Receiver. The

5462430.1

Goldin team has also been actively involved in the process, speaking with Arabella's CRO on the status of bids and updating waterfall scenarios for potential recovery to Platinum.   The Receivership Team has also had discussions with the joint liquidators of the parent company in the Cayman Islands regarding payment under a purported guaranty of fees in favor of professionals that was given by prior management.

As the actions of various parties having claims with respect to Arabella assets, and rulings of courts with respect to such parties' rights, have developed, and there are still many variables at issue that will impact the Receivership Estate's assets, the Receivership Team has had to devote significant time and attention to the asset without knowing in advance what the expected recovery to the Receivership Estate will be.   It remains difficult to predict at this time what Platinum may ultimately recovery on account of this debt.   The Receiver does anticipate that she will have a clearer picture of the potential recovery by the end of this year.

(f)      **Azarga Uranium Corp.** – refers to a publicly traded uranium mining company headquartered in Denver.  Azarga merged with another similar company in July 2018, effectively doubling its size.  Prior to the merger, Azarga's stock was highly illiquid.  PPCO currently owns approximately 18 million shares of Azarga stock.    PPVA also owns Azarga shares.

Subsequent to the merger, as a result of both a recovery in the price of uranium and Azarga's increased size, there has been a renewed interest in Azarga's stock.  With the assistance of Azarga management, PPCO and PPVA has been contacted by a brokerage firm in Vancouver, BC that specializes in junior mining stocks about placing block trades in the combined positions. The terms of the engagement of the broker were negotiated during the Reporting Period and PPCO's positon in Azarga  was sold on October 17 for approximately $1.2 million.  Receipt of these funds will be reported in the next quarterly report.

(g)  **Bahamas Properties** – refers to three undeveloped lots in the Old Bahama Bay development on Grand Bahama Island.  PPCO owns a 15% interest in the net proceeds from the sale of these lots under an agreement with the owner of the lots.  PPCO also the right to recover certain advances it made to cover taxes and Home Owner Association fees. The Receivership Team is in discussions regarding options for selling the property or its interests in the property.

(h)  **Buffalo Lake Advanced Biofuels (a/k/a BLAB)** - refers to a idled, dry mill ethanol production facility located in Buffalo Lake, Minnesota in which PPCO, through West Ventures, holds a debt and equity interest.  Conway MacKenzie has been asked to review this asset and provide the Receiver with disposition options.  West Ventures was a senior secured lender to BLAB's predecessor, Purified Renewable Energy LLC, an entity that filed bankruptcy in 2013. West Ventures acquired all of BLAB's assets in the bankruptcy proceeding through a credit bid of its prepetition secured debt.  West Ventures' mortgage in the original principal amount of $18 million was preserved, in part, under the bankruptcy court's sale order.  Based upon the due diligence performed on this asset, the Receiver determined that this investment did not warrant additional funding.

Conway MacKenzie conducted significant due diligence, including compilation of a list of strategic purchasers, and contacted the strategic purchasers, as well as liquidators and auctioneers to determine the potential sale or liquidation value of BLAB.  The feedback from Conway MacKenzie's marketing and due diligence efforts -- the value of the real property assets in which West Ventures holds a lien either under a liquidation or sale scenario – has been evaluated by the Receiver in the context of existing liens that come ahead of West Venture's interests.  Simply put, this investment is likely "under water" given the value of the assets (either in a liquidation or sale) and the priority of other liens and interest holders that are entitled to

(g)  **Bahamas Properties** – refers to three undeveloped lots in the Old Bahama Bay development on Grand Bahama Island.  PPCO owns a 15% interest in the net proceeds from the sale of these lots under an agreement with the owner of the lots.  PPCO also the right to recover certain advances it made to cover taxes and Home Owner Association fees. The Receivership Team is in discussions regarding options for selling the property or its interests in the property.

(h)  **Buffalo Lake Advanced Biofuels (a/k/a BLAB)** - refers to a idled, dry mill ethanol production facility located in Buffalo Lake, Minnesota in which PPCO, through West Ventures, holds a debt and equity interest.  Conway MacKenzie has been asked to review this asset and provide the Receiver with disposition options.  West Ventures was a senior secured lender to BLAB's predecessor, Purified Renewable Energy LLC, an entity that filed bankruptcy in 2013. West Ventures acquired all of BLAB's assets in the bankruptcy proceeding through a credit bid of its prepetition secured debt.  West Ventures' mortgage in the original principal amount of $18 million was preserved, in part, under the bankruptcy court's sale order.  Based upon the due diligence performed on this asset, the Receiver determined that this investment did not warrant additional funding.

Conway MacKenzie conducted significant due diligence, including compilation of a list of strategic purchasers, and contacted the strategic purchasers, as well as liquidators and auctioneers to determine the potential sale or liquidation value of BLAB.  The feedback from Conway MacKenzie's marketing and due diligence efforts -- the value of the real property assets in which West Ventures holds a lien either under a liquidation or sale scenario – has been evaluated by the Receiver in the context of existing liens that come ahead of West Venture's interests.  Simply put, this investment is likely "under water" given the value of the assets (either in a liquidation or sale) and the priority of other liens and interest holders that are entitled to

5462430.1

proceeds before West Ventures will receive any funds.   The Receiver does not intend to invest any further resources towards this investment as there is unlikely to be a return, if any, that would warrant additional support.

(i)        **China Horizons/Yellow River** – refers to PPCO's 45% interest in PGS (which claims to be owned 55% owned by PPVA) equity and debt interests in two companies -- China Horizon and Yellow River—created to build a chain of franchised convenience stores in rural China.  The promissory note from China Horizon held by PGS has a face value of approximately $9.0 million and PGS holds approximately 6.5 million share of stock in Yellow River.  China Horizon was originally a joint venture with another company, China Post.   China Post subsequently pulled out of the joint venture and China Horizon transferred its intellectual property to Yellow River.  Yellow River, in turn, distributed its equity to the debt and equity holders of China Horizon.  Subsequent to the transfer, China Horizon received approximately $15 million from China Post as proceeds of the settlement of a dispute between them.  PPVA also directly holds debt and equity in China Horizon and Yellow River.  The promissory notes from China Horizon are not yet due.

Prior to the Reporting Period, the Receiver and the PPVA received an expression of interest from Yellow River's largest investor to purchase PGS's and PPVA's collective interests in the China Horizon notes and the Yellow River equity position.  Members of the Receivership Team and representatives of PPVA met in person with the investor and, as a result of this meeting, an agreement in principle was reached.  Negotiations to document that agreement in principle have revealed certain issues which are under discussion among the parties but may derail a transaction or result in a lower price.  During the Reporting Period, the Receivership Team spent time speaking with the potential purchaser and following up with PPVA's

representatives regarding its direct discussions with the potential purchaser, as well as beginning to draft documents if a sale can be closed.

(j)      **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings").  PPCO and Platinum Long Term Growth VII LLC are owed approximately $15.6 million, which is secured by a first priority security interest in all of Cleveland Mining's and Iron Holdings assets.  PPCO also holds approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings.  Cleveland Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not operating and is the subject of litigation in Brazil.

The Receiver previously retained local counsel in Perth, Australia to assist in addressing the issues raised by Cleveland Mining, including management's demands and challenges to PPCO's filed security interests in Australia.  The Receiver also previously retained a financial firm located in Australia to work directly with Cleveland to evaluate its current financial position and to determine the value (if any) of its assets.  The assessment was that there is little to no value in the Cleveland Mining assets and that Platinum will not invest additional resources into this asset.

Cleveland Mining has since been placed into a liquidation proceeding in Australia and Platinum has filed a proof of debt form to register its claim.  The Receivership Team has been in frequent communication with the Australian liquidator, including discussions regarding the sale of the publicly listed corporate shell and an allocation of the proceeds between the liquidator and PPCO.  These discussions are ongoing.

(k) **Cokal Limited** (ASX: "CKA") – is a coal mining company headquartered in Sydney, NSW.  CKA's active mining project is on the island of Borneo in the Bumi Barito Mineral ("BBM") of Indonesia.  Over the past year, the BBM mine has been developed and CKA has received commitments from several investors to support continued development of the mine.

PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, warrants, and a Note).  As a result of a Debt Restructuring Transaction agreed to by the prior management, the Note was restructured into new warrants and a royalty from revenues of the BBM upon CKA meeting certain conditions.  A number of those conditions have been met and one third of the Note has been converted into warrants.  The remaining two thirds will be converted into the royalty upon CKA meeting the remaining conditions.  During the Reporting Period, one of CKA's current shareholders approached PPCO and PPVA with an offer to purchase the common stock and warrants.  Negotiations continue with the prospective buyer.

(l) **Daybreak** - refers to a publicly held oil and gas company with assets in the Kern County, California and in Montcalm County, Michigan.  PPCO owns 99% of the membership interests and is the managing member of Maximilian, which is owed approximately $9.2 million,[7] plus accrued interest, from Daybreak on account of a senior loan, secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage.  Maximilian also holds a percentage of working interests in the Michigan operation.  Conway MacKenzie was asked to evaluate and market the Daybreak investment.  Conway MacKenzie created a virtual data room and compiled a comprehensive list of parties that may be interested in purchasing the California and/or Michigan assets.

---

[7]   In California, Platinum's position in Daybreak includes a promissory note in favor of Maximilian with a face value of approximately $9.1 million and in Michigan, Maximilian holds a promissory note with a face value of approximately $100,000.

During the prior reporting period, Conway MacKenzie conducted a sale process which resulted in several parties submitting bids which were qualified in various ways. Conway MacKenzie is working with these parties to remove or satisfy the qualifications and close the transaction.

(m)   **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah. Through Maximilian, PPCO holds a debt and equity interest in the company.

During the Reporting Period, the Receivership Team continued to work with Conway MacKenzie to better understand the complex legal, financial, regulatory and business issues relating to this investment. The Receivership Team commenced an investigation into the receipt of certain insurance proceeds by a Greentown related entity – Pacific Energy & Mining, Company ("Pacific") -- that the Receiver believes were assigned to Maximilian. Maximilian has asserted a right to the proceeds. In June 2017, while the Receivership case was pending, Pacific commenced a declaratory judgment action in the U.S. District Court for the District of Nevada (Pacific Energy & Mining Company v. Maximilian Resources LLC, Case No. 17-cv-00363 (HDM) (VPC)), seeking a declaration that Pacific does not owe any money to Maximilian. The Receiver has responded to the complaint. During the Reporting Period, the Receiver continued to engage in motion practice and negotiations to resolve the litigation are continuing. In parallel, the Receiver has evaluated various recovery alternatives with assistance from Conway MacKenzie and is prepared to proceed down an alternative path if it becomes unlikely that settlement negotiations will reach a successful conclusion

(n)   **Katrina Barge** – refers to certain loans and financial accommodations made by Hamilton Capital VII, LLC, an entity in which PPCO has an ownership interest, to, among

others, Hurricane Katrina Barge Litigation Joint Venture, LLC, an entity that was formed to explore, evaluate and to jointly prosecute certain legal actions, including those arising in that certain litigation known as Parish of St. Bernard v. LaFarge North America, Inc. (La. Docket No. 2:11-cv-02350-ILRL-JCW) (the "Katrina Barge Litigation").

During the first quarter after the Receiver's appointment, the Receiver collected a payment of $5,628,059.98 on account of the repayment of the financing of the Katrina Barge Litigation.  The Receiver, however, was still involved in an interpleader litigation pending in the New York Supreme Court, Nassau County, entitled Hurricane Katrina Barge Litigation Joint Venture, LLC v. Law Office of Richard T. Seymour PLLC, et al., Index No. 607358/2017, regarding entitlement to additional funds from the Katrina Barge Litigation (the "Interpleader Litigation").  During the Reporting Period, the Receiver settled her claim in the Interpleader Litigation for the payment to Platinum of $75,000.  The Receiver determined that the settlement was in the best interests of the Receivership Estate in light of the merits of, and cost to prosecute, the Receiver's claims to additional funds from the Katrina Barge Litigation, which claims to attorneys' fees had been assigned to Platinum by attorneys whose rights the Receiver would have ethical and evidentiary issues pursuing.

(o)   **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of In re Lily Group, Inc., Case No. 13-81073 (Bankr. S.D. Ind.).   Following its acquisition of the mine, PPCO retained a third party mining contractor to assist it in putting the mine back into production.   Through a combination of mismanagement and a downturn in coal prices, the mine did not reach cash flow

breakeven, the contract miner was terminated, and the mine idled.  A new mine operator has subsequently been retained who now oversees environmental remediation and mine security.

Since the Receiver's appointment, the Receiver has analyzed the legal, financial, regulatory and business issues relating to this investment and the potential liabilities and options for disposition of the asset.  The Receivership Team has had multiple conversations with the mine operator regarding the mine and potential disposition. The Receivership Team has been working with Houlihan Lokey in preparation for launching the marketing of this asset.  Before launching the asset to market, the Receivership team, working with local counsel, has endeavored to address unresolved issues regarding purported liens on the assets.  When the assets were acquired by PPCO through the bankruptcy process (via credit bidding its debt), the issue of what liens may still attach to the purchased assets and whether PPCO had an interest in all of the assets, was left unresolved.  During the Reporting Period, the Receivership Team and local counsel have discussed the best approach for quantifying and resolving the asserted claims and liens in the Lily Group bankruptcy proceeding and have engaged with certain of the purported lienholders and will seek to extinguish the purported liens of the remainder.  In the interim, the Receiver continues to make lease payments on the mine to maintain the value of the asset until it can be monetized.  During the Reporting Period, a total of $330,000 was expended to maintain this asset.  The Receivership Team is in active negotiations with the relevant parties so that Houlihan Lokey can begin the marketing process and cease making the lease payments.

(p)     **NJ Ethanol LLC** – refers to a company that built a small-scale plant in New Jersey to convert food waste into food- and pharmaceutical-grade ethanol.  The business failed and the plant was closed.  PPCO owns Class B preferred and common stock.  These shares have limited marketability outside of a sale back to the company.  Accordingly, the Receivership

Team discussed with the company's principal purchasing PPCO's stock.  During the Reporting Period, the Receiver accepted the principal's offer to purchase PPCO's stock for $75,000. The documentation is currently in process.

(q)     **NordAq Energy** – refers to a privately held oil and gas company that holds a 17.5% working interest in oil and gas development on 20,491 gross acres located offshore from Alaska in the Beaufort Sea in an area called Smith Bay.  NordAq is the Operator on two of the wells, both non-producing and non-revenue generating.   PPCO owns shares and potentially warrants in NordAq through RJ Funding LLC.   The shares held by PPCO represent approximately 2% of the total shares issued.  Monetization of this investment is challenging as it is illiquid private equity in a financially challenged pre-revenue company with significant debt. The company's largest asset is tax credits.  This asset created a further challenge because of the limited information in Platinum's files regarding NordAq's capital structure, rights, obligations and claims of other investors.   As a result, Conway MacKenzie had to rely upon limited information from the company's CFO.

During the prior reporting period, the Receiver received an offer for the purchase of PPCO's stock and warrants.  The Receivership Team engaged with the potential purchaser and began to prepare legal documentation to effectuate a sale, but the purchaser has since backed away from the offer.  Conway MacKenzie reached out to several other parties to explore interest in the purchase of the stocks and warrants, including whether management would be interested in purchasing PPCO's interests, but this outreach has thus far not generated any response.  These assets may be included in a bulk remnant asset sale if no further interest is generated.

(r)     **PEDEVCO Corp., d/b/a Pacific Energy Development** – refers to a publicly-traded energy company engaged in the acquisition and development of strategic, high growth

energy projects, including shale oil and gas assets, in the United States.  Platinum's interest in PEDEVCO is through its ownership in PGS (of which PPVA claims to own55%).  During the prior reporting period, PEDEVCO was restructured and PPCO received its share of the proceeds from PGS.  PGS also received warrants in the restructured PEDEVCO.  In the current Reporting Period, those warrants were sold and PPCO received its share of the proceeds, $215,700.  PGS's interest is PEDEVCO are now closed out.

## V.   LIQUIDATED   AND   UNLIQUIDATED   CLAIMS   HELD   BY   THE ESTATE/INVESTIGATION OF TRANSACTIONS

The Receiver has commenced a confidential arbitration proceeding against a pre-petition professional.  The Receivership Team is currently analyzing transactions involving Platinum and certain insurers and re-insurers, including Beechwood, Senior Health Insurance Company of Pennsylvania and CNO Financial Group, Inc.  These transactions, which are among the largest and most complex engaged in by Platinum, include the $170 million sale to a Beechwood-related entity of a convertible note issued by Agera Energy LLC.  In the period ahead, the Receivership Team will continue to assess the insurers' and reinsurers' involvement with Platinum, whether through investments or borrowings, in an effort to understand the full scope of their involvement with the Receivership Entities and their claims to having acquired security interests in all of the Receivership Estate's assets.

Simultaneously with this investigation, the Receivership Team continues to investigate certain pre-receivership activities to determine whether causes of action exist against, among others, valuation agents, fund administrators, auditors, legal advisors and other professional firms.  The Receiver has continued to issue subpoenas to and make informal document requests of certain parties during the Reporting Period.  For certain claims in which a statute of limitations may be approaching, the Receiver has, and will continue to reach out to the potential

target to enter into tolling agreements to allow the receivership team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those parties who have declined to toll the statute of limitations.  The Receiver negotiated and entered into tolling agreements during the Reporting Period.

The Receiver is considering the commencement of certain actions, although she cannot state at this time the ultimate targets and whether or when such actions will be commenced.  The timing of the commencement of certain actions may be dictated by statute of limitations.  For those actions in which a statute of limitations is not an issue, the Receivership Team will continue to investigate and develop a factual basis for potential causes of action and targets.  The Receiver cannot state the ultimate value of any claims or the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.  At the heart of the analysis will be a determination of the cost/benefit of asserting claims.  Investigation and litigation are costly endeavors and the Receiver does not intend to expend material estate assets unless the Receiver has the necessary facts and information to assert a meritorious claim and has concluded there is a likelihood of recovering funds if liability is eventually found.

## VI.   LIABILITIES OF THE RECEIVERSHIP ESTATE

Pursuant to Paragraph 47 of the Receiver Order, below, please find a description of the Receivership Estate's potential liabilities as of September 30, 2018.  Certain liabilities described herein, particularly those pertaining to creditor claims, are uncertain, and will remain as such until the Receivership Team concludes its claims analysis and forensic investigative processes.

(a)   **Creditors**.  The creditor-related information presented below is based on prior management's books and records, which are as of December 19, 2016, the date Platinum entered receivership.  The Receivership Team will test the veracity of these numbers as part of its

5462430.1

ongoing forensic investigative and upcoming claims analysis processes. The validity and amount of claims may differ materially from the values reported by prior management.

- PPCO Lenders: PPCO owed $65.9 million to three (3) lenders.

- PPCO Unpaid Redemptions: PPCO owed $28.2 million to 21 PPCO unpaid redeemers.

- PPLO Unpaid Redemptions: PPLO owed $6.5 million to three (3) PPLO unpaid redeemers.

- PPCO and PPLO Outstanding Payables: PPCO and PPLO had $2.7 million of outstanding payables attributable to 23 vendors.

(b)    **Accrued Administrative Expenses.**   As of June 30, 2018, accrued, unpaid administrative expenses amount to approximately $5.6 million.  These administrative expenses primarily consist of accrued and unpaid professional fees.   In addition to these unpaid administrative expenses, the Receivership Estate has budgeted approximately $150,000 per month to pay the remaining in-house Platinum staff and to cover other operating expenses.  The Receiver is continually looking to reduce these and other expenses.

(c)    **Disbursements to Preserve the Value of Certain Investments.**  The Receiver expects to incur expenses amounting to approximately $110,000 per month to preserve the value of the LC Energy investments, pending the conclusion of the associated sales processes.

(d)    **Investors.** The Receiver currently believes that there are 286 known investors. The aggregate net cash invested by investors in the Platinum Entities is approximately $310,000,000.  After conferring with the SEC, at this time, to protect the privacy of the investors, the Receiver is not filing with this Fourth Status Report a list of the names of each investor and the amount of such investor's net cash investment.   The actual amount and value of the

investors' claims is ultimately dependent upon the net recovery obtained on Receivership Property. The amount of "net cash invested" may be materially different than the amount ultimately received by the investor.

## VII.   CLAIMS ANALYSIS

The Receiver has not yet initiated a formal claims bar date or claims review process.  The Prior Receiver had posted a claim form for creditors to assert a claim.  The Receivership Team has copies of all claims submitted to the Prior Receiver.  The Receivership Team has been actively working on preparing a proof of claim form and designing a claims adjudication process.  The Receiver will likely be seeking court approval for the proof of claim form, notice and process for submitting claims, and establishment of a deadline for the submission of claims. Preparation of the form and establishing guidelines for what claims should be submitted cannot be done in isolation, but will in part be dependent upon decisions that are ultimately made regarding how to treat different types of claims and creditors.  In addition to determining how to treat different claims (*e.g.*, unsecured creditor claims, unpaid redemption claims, insider claims, investor claims), the Receiver will also need to determine if the various Platinum entities will be fully or partially consolidated for claim and distribution purposes or if each will be treated separately.  There may also be issues of Cayman law regarding the three Cayman funds that may be implicated.  In addition, there have been blanket secured liens asserted on the Platinum assets, which may need to be resolved before any distributions can be made to unsecured and investor claims.  The Receiver and the Receivership Team are analyzing all of these issues and have been examining them from both a factual and legal perspective.  The Receiver also intends to consult with the SEC regarding certain the claims process before presenting a motion to the Court for approval.   In light of the various issues that need to be considered, and the timetable for obtaining approval for any proposed claims reconciliation plan by the Court, it is unlikely that a

distribution will occur this year, but the Receiver is endeavoring to file a motion proposing a process by year end.

## VIII.   RECOMMENDATIONS FOR CONTINUATION OR DISCONTINUATION OF RECEIVERSHIP

The Receiver believes that continuation of the receivership is in the best interests of the creditors and investors of the Platinum Entities.  While the Platinum Entities could be liquidated in a bankruptcy proceeding, for the reasons stated in the Receiver's previous Status Reports, the Receiver continues to believe that continuing with the orderly liquidation of the Platinum Entities in this receivership case provides greater flexibility to achieve an equitable result for the investors who have been wronged here.  To start over at this late date – well over a year into the receivership case and following the appointment of a second receiver six months into the case -- would be extremely time consuming and expensive.  Importantly, it would disrupt the marketing and sales processes that are currently underway, ultimately reducing the recoveries to investors and other creditors as a result of added administrative expenses and prolonging the liquidation process.

## IX.   CONCLUSION

The Receiver cannot at this time state when she expects the case to be concluded.  The Receiver expects that the majority of the asset sales will be concluded this year, although there will still be some remnants that will carry over into next year, including stock sales, remnant bulk sales, joint assets with PPVA, and assets in which Platinum has a residual interest.  The Receiver and the Receivership Team will be focusing this quarter and next on the claims

reconciliation process, as well as the continuation of the forensics investigation for the possible assertion of additional claims.

Dated:  October 22, 2018

Otterbourg P.C.

By: ___/s/ *Adam C. Silverstein*_____
      Adam C. Silverstein
      Jennifer S. Feeney
      Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver

# EXHIBIT A

**PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND LP AND AFFILIATED ENTITIES**

Schedule of Receipts and Disbursements

| | Period from 7/1/2018 to 9/30/2018 | | | Cumulative Total from 7/7/2017 to 9/30/2018 | | |
|---|---|---|---|---|---|---|
| | PPCO | PPLO | Total | PPCO | PPLO | Total |
| Cash (Beginning of Period) | $ 13,969,817 | $ 1,773,831 | $ 15,743,648 | $ 7,788,872 | $ 1,617,492 | $ 9,406,363 |
| *Receipts* | | | | | | - |
| Business Income | - | - | - | - | - | - |
| Cash and Securities | - | - | - | - | - | - |
| Interest/Dividend Income | - | - | - | - | 2,321 | 2,321 |
| Business Asset Liquidation | 2,177,952 | 36,271 | 2,214,224 | 36,991,464 | 187,144 | 37,178,608 |
| Personal Asset Liquidation | - | - | - | - | - | - |
| Third-Party Litigation Income | - | - | - | - | - | - |
| Miscellaneous - Other | 17,199 | - | 17,199 | 509,747 | 3,146 | 512,892 |
| Total Receipts | $ 2,195,151 | $ 36,271 | $ 2,231,422 | $ 37,501,211 | $ 192,611 | $ 37,693,822 |
| *Disbursements* | | | | | | |
| Disbursements to Investors/Claimants | - | - | - | - | - | - |
| Disbursements for Receivership Operations | - | - | - | - | - | - |
| Disbursements to Receiver or Other Professionals | (388,885) | - | (388,885) | (9,317,145) | - | (9,317,145) |
| Business Asset Expenses | (388,198) | (396) | (388,594) | (2,877,668) | (396) | (2,878,064) |
| Personal Asset Expenses | - | - | - | - | - | - |
| Investment Expenses | (608,394) | - | (608,394) | (18,219,456) | - | (18,219,456) |
| Third-Party Litigation Expenses | - | - | - | - | - | - |
| Tax Administrator Fees and Bonds | - | (781) | (781) | (96,324) | (781) | (97,104) |
| Federal and State Tax Payments | - | - | - | - | - | - |
| Disbursements for Distribution Expenses Paid by the Fund | - | - | - | - | - | - |
| Disbursements to Court/Other | - | - | - | - | - | - |
| Total Disbursements | $ (1,385,477) | $ (1,177) | $ (1,386,654) | $ (30,510,592) | $ (1,177) | $ (30,511,769) |
| Cash (End of Period) | $ 14,779,490 | $ 1,808,926 | $ 16,588,416 | $ 14,779,490 | $ 1,808,926 | $ 16,588,416 |

# EXHIBIT B

262288.1

## Receivership Property List

### PPCO Assets

| Asset Name | Asset Type |
|---|---|
| 1) Abdala Tailings Project | 10-Year Right to Mine Tailings |
| 2) Acceleration Bay | Back-end proceeds from litigation |
| 3) Activision TV, Inc. | Patent Portfolio |
| 4) Agera Energy LLC | Preferred Stock |
| 5) ALS Capital Ventures, LLC | Life Settlements Portfolio |
| 6) American Patriot Gold, LLC | Fee Ownership of Real Estate |
| 7) Andrew McCarrell v. Hoffmann - La Roche Inc. and Roche Laboratories, Inc. (Accutane) | Litigation Finance Investment |
| 8) Arabella Exploration Inc. | Loan Receivable |
| 9) Azarga Uranium Corp. | Common Stock |
| 10) Bahamas Properties | Ownership Interest |
| 11) Buffalo Lake Advanced Biofuels LLC | 1) Loan Receivable<br>2) Common Stock |
| 12) Carbon Credits | Participations in PPVA deals |
| 13) Celsius Resources Ltd | Common Stock |
| 14) China Horizon Investment Group Ltd. | Loan Receivable |
| 15) Claus Shelling Family Trust | Life Settlements Portfolio |
| 16) Cleveland Mining Company Ltd. | 1) Loan Receivable<br>2) Common Stock |
| 17) Credit Card Receivables Portfolio | Loan Receivable |
| 18) Daybreak Oil and Gas, Inc. | 1) Term Loan<br>2) Warrants<br>3) 40% PPCO Ownership Interest in Belvidere Field in Michigan |
| 19) Decision Diagnostics Corp. | Preferred Stock |
| 20) Environmental Service Professionals, Inc. | Common Stock |

# Receivership Property List

## PPCO Assets

| | Company Name | Asset Description |
|---|---|---|
| 21) | Golden Gate Oil LLC | Notes Receivable |
| 22) | Greehey & Company | Loan Receivable |
| 23) | Greentown Oil Company, LLC | 1) Secured Note<br>2) Unsecured Note |
| 24) | Grey K Environmental Fund II, L.P. | Investment in Closed-End Fund |
| 25) | Khorrami Pollard & Abir, LLP | Loan Receivable |
| 26) | LC Energy Operations LLP | 1) Loan Receivable<br>2) Common Stock |
| 27) | Millennium Healthcare, Inc. | Common Stock |
| 28) | MMP Resources Limited (f/k/a Sino Construction) | Common Stock |
| 29) | Montsant Partners LLC | Loan Receivable |
| 30) | Nisayon International Inc. | Loan Receivable |
| 31) | NJ Ethanol LLC | 1) Class B Preferred Stock<br>2) Common Stock |
| 32) | Nordaq Energy Inc | 1) Common Stock<br>2) Warrants |
| 33) | Over Everything LLC | 1) Loan Receivable<br>2) Common Stock |
| 34) | Pro Player Athletes | Loan Receivable |
| 35) | Total Asset Recovery Services, LLC (TARS) | Litigation Finance Investment |
| 36) | Urigen Pharmaceuticals, Inc. | 1) Note Receivable<br>2) Preferred Stock |
| 37) | Xcell Energy Inc. | Loan Receivable |
| 38) | Yellow River | Common Stock |

# Receivership Property List

## PPLO Assets

| | Company Name | Asset Description |
|---|---|---|
| 1) | Alcyone Resources Limited | Common Stock<br>Note Receivable |
| 2) | Bang Holdings Corp. | Warrants |
| 3) | Black Elk Energy LLC | Note Receivable |
| 4) | Blink Car Charging (f/k/a Car Charging Group) | Common Stock |
| 5) | China Cablecom Holdings Ltd. | 1) Common Stock<br>2) Preferred Stock |
| 6) | Echo Therapeutics, Inc. | 1) Preferred Stock<br>2) Common Stock<br>3) Warrants |
| 7) | Misung Polytech | Loan Receivable |
| 8) | Navidea Biopharmaceuticals, Inc. | Common Stock |
| 9) | Ochre Group Holdings Limited | Common Stock |
| 10) | Range Resources Limited | Common Stock |
| 11) | Sun Resources NL | Options |
| 12) | Valley Forge | Common Stock |
| 13) | Wexford Petroleum Corporation | Common Stock |
| 14) | Woori Technology Inc. | Warrants |

# Receivership Property List

**Jointly Held PPCO / PPLO Assets**

| Company Name | Asset Description |
| --- | --- |
| 1) Cokal Limited | 1) Loan Receivable<br>2) Common Stock<br>3) Warrants |
| 2) Copper Rider / Parot Tovot | 1) Loan Receivable - Parot Tovot<br>2) Loan Receivable - Copper Rider |
| 3) Infinity Augmented Realty, Inc. | 1) Series A Preferred Stock<br>2) Series B Preferred Stock<br>3) Common Stock<br>4) Options |
| 4) Northstar Offshore Group | 1) Preferred Stock<br>2) Loan Receivable - Subordinated Debt<br>3) Loan Receivable - Line of Credit<br>4) Note |
| 5) Platinum Partners Value Arbitrage Fund | Loan Receivable |