UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

   -v-

PLATINUM MANAGEMENT (NY) LLC;                     No. 16-CV-6848 (BMC)
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## FOURTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD APRIL 1, 2018 THROUGH AND INCLUDING JUNE 30, 2018

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Fourth Joint Interim Application (the "Fourth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from April 1, 2018 through and including June 30, 2018 (the "Fourth Application Period").   There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg).   The Receiver requests interim approval of fees in the amount of $190,244.00 and reimbursement of expenses in the amount of $1,577.21 for the Fourth Application Period. Otterbourg requests interim approval of fees in the amount of $911,561.85 and reimbursement of expenses in the amount of $10,552.39 for the Fourth Application Period, for a combined total of fees for Applicants in the amount of $1,101,805.85,[1] and expenses in the amount of $12,129.60 for the Fourth Application Period.

This Fourth Interim Application contains the following sections:

**Section I**  provides a preliminary statement of the Receiver's activities during the Fourth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Fourth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1]  As agreed to by the Receiver, this total amount reflects a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges and a ten percent (10%) reduction in Otterbourg's recorded time charges.   Further, in accordance with Otterbourg's customary practice of reviewing its hourly rates annually, Otterbourg adjusted the professionals' hourly billing rates as of October 1, 2017.   As previously agreed with the SEC, the Receiver's aggregate fees have been reduced (prior to application of the public service accommodation) to discount for any increase in her billable rate since October 1, 2017. Therefore, the Receiver's recorded time charges before application of these accommodations were $280,825.00 and Otterbourg's recorded time charges were $1,012,846.50, for a combined gross legal fees total (before the application of any public service accommodation or the discount for rate increases) of $1,293,671.50.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Fourth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

I.      **PRELIMINARY STATEMENT**

During the Fourth Application Period, the Receiver continued her efforts to monetize the remaining assets in the portfolio and simultaneously dedicated resources to an analysis of the pre-receivership business and affairs of Platinum and an investigation into potential causes of action that could yield meaningful recoveries for the Platinum estate (the "Receivership Estate"). During the Fourth Application Period, the Receiver and her team[2] (i) completed the sale of certain assets, (ii) continued the marketing of other assets that had been launched to market during the previous quarter, most notably the Abdala gold mine tailings impoundment in Brazil (the "Abdala Tailings Project"), (iii) launched the marketing of certain additional assets, and (iv) continued to perform due diligence and evaluate options for monetizing the remaining assets in the portfolio, including assessing which assets are capable of being marketed now and which have no present or likely future market value.

---

[2]      To assist her with her duties, the Receiver sought the retention of counsel and a financial advisor.  To that end, on July 21, 2017, the Court approved the retention of Otterbourg P.C. ("Otterbourg") as legal counsel to the Receiver [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

5500334.2

During the Fourth Application Period, the Receiver consummated the sale of the ALS life settlements portfolio.  In addition, during this Fourth Application Period, the Receiver began the final stages of the Abdala Tailings Project auction process.  That process was complicated, and the winning bid was presented to, and approved by, the Court after this Fourth Application Period. The sale of the Abdala Tailings Project has recently closed.  In addition to monetizing the portfolio investments, the Receivership Team is continuing to investigate pre-Receivership activities, including determining the enforceability of purported secured claims against Platinum's assets and if there exist any viable causes of action that may be of meaningful value to the Receivership Estate.

**A.      Analysis and Disposition of Receivership Assets**

Applicants continued to evaluate the assets and prioritize those investments that either required immediate attention or could be most readily monetized.  To the extent possible, the Receiver has worked with other investors in the asset at issue to maximize recovery for both the Receivership Estate and that outside investor.  As previously reported, most of the Receivership assets are investments in companies that are in the developmental stages and have not yet had proven success, or have failed to achieve stated expectations and, thus, may have little or no value.  In addition, the investments are located around the country and around the world.  As a result, many of the investments are problematic, have real or potential significant liabilities, and/or require additional cash investment for the underlying company (still in the developmental stages) to continue or resume operations.  Even the real estate assets are problematic and have limited marketability.

The Receiver continues to only make expense payments that are necessary to maintain or preserve the value of assets, to protect collateral and/or to stabilize operations.  Because many

assets have been sold during the past four quarters since the Receiver's appointment, the liabilities have been substantially reduced. The Receiver continues to believe that, under the circumstances of the Receivership, no asset warrants capital investment beyond what is necessary to preserve that asset and maintain value until monetization is possible. To the extent that it is determined that an asset has no value (or value that is estimated to be less than maintenance costs), the Receiver will not invest further resources to maintain such asset. When possible, the Receiver has undertaken negotiations with other investors or stakeholders involved with assets, including management, to infuse additional cash into the investment to preserve value until the asset can be sold, as well as to reduce ongoing expenditures.

Because the investments are diverse, the monetization options vary greatly from one investment to another. For example, the types of companies in which these investments were made range from pharmaceutical startups, to foreign "shell" companies, to a chain of small grocery stores in rural China. While many of the assets are in the metals, mining and energy sectors, each of these companies are located in different regions domestically and globally and, as a result, have unique characteristics. Some investments are in companies that are in bankruptcy or similar proceedings and, consequently, have an additional layer of complication.

Applicants have sought to "triage" the various assets: first focusing on those assets that are relatively liquid, such as publicly traded stocks, life settlement investments and litigation finance investments; and then focusing on those assets that are less liquid, but that nonetheless, with greater time and effort, can be marketed and hopefully monetized. For the most part, the assets that are relatively liquid or have a readily available market have been sold. The Receiver continued to focus on the remaining assets during the Fourth Application Period. Certain sales of investments have been completed; certain others are nearing the completion of the sale

5

process; others have been launched to market; and a remaining bucket of assets that are currently unmarketable continue to be analyzed to determine disposition options.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie").[4]  Houlihan Lokey and Conway MacKenzie are each responsible for different assets and there is no overlap in the work performed by each.

Because of Houlihan Lokey's areas of expertise, it was retained to market and sell specific assets including (i) the ALS life settlements portfolio, (ii) the litigation finance portfolio, (iii) the Abdala Tailings Project, (iv) LC Energy Operations LLP, and (v) Urigen Pharmaceuticals, Inc.  The ALS life settlements portfolio has been sold; the Abdala Tailings Project sale has been approved by the Court and the parties recently closed on the sale; and most of the litigation finance portfolio has been sold and the Receiver is continuing to explore options for the remaining litigation finance assets.  Finally, Urigen Pharmaceuticals, Inc. has questionable value due to (a) the suspension of its FDA Phase II trials as a result of inconsistent results and (b) Urigen's apparent inability to raise financing to re-start the trials. While the Receivership Team has periodic calls with Urigen management to discuss the status of the business and its finances, Houlihan is not currently marketing this investment.  Accordingly, following the recent closing of the Abdala sale, Houlihan Lokey's current retention is limited to the marketing and sale of the LC Energy assets.

---

[3]  The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[4]  Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

5500334.2

The Receiver also retained Conway MacKenzie to provide due diligence and assist with the disposition of certain remaining assets that are not being marketed by Houlihan.  Conway MacKenzie was asked to conduct due diligence and recommend a strategy to monetize the following assets: (i) Buffalo Lake Advanced Biofuels, LLC ("BLAB"); (ii) Desert Hawk Gold Corp. (which was monetized during the prior application period); (iii) Daybreak Oil and Gas, Inc.; (iv) American Patriot Gold; (v) Greentown Oil Company; (vi) Arabella Exploration; (vii) NordAq Energy; (viii) Xcell Energy; and (ix) Decision Diagnostics Corp.

In addition to the due diligence performed by Houlihan Lokey and Conway MacKenzie on the assets that each has been asked to review, the Receiver and the Receivership Team have also fully debriefed Platinum's portfolio managers that were working at Platinum at the time of her appointment with respect to each of the investments, have had extensive interaction with the management teams of the underlying portfolio companies (when available and appropriate) and have received input from investors and Platinum's prior management regarding investments.

During the Fourth Application Period, the Platinum Receivership received approximately $11.8 million from the sale of investments.  Certain parties have asserted a claim to all or part of the proceeds of certain of such liquidated investments.

The foregoing amount received during the Fourth Application Period is in addition to the approximately $23 million received by the Platinum Receivership from the liquidation of other assets since the Receiver was appointed.  None of these assets has been marketed or sold in a "fire sale" fashion.  The investments monetized during the Fourth Application Period and the proceeds received by the Receivership Estate were as follows:

- ALS life settlement portfolio: $10.5 million[5]

---

[5]    An additional $1.88 million attributable to one of the policies that was sold was received by the Receivership Estate on July 11, 2018, following the close of the Fourth Application Period.

- Alcor Energy Solutions: $600,000

- Pedevco Corp.: $300,000

- Martin Kenney & Co. Ltd.: $300,000

- Rolling Acres of Stamford: $100,000

As previously reported, the Receiver cannot ascribe values to each of the assets that have not yet been monetized. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from prior (now removed) management's plans, which are now (and likely always were) unrealistic and/or can otherwise no longer be supported. The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations. Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment. As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future. As the Court stated in the Houlihan Opinion, "[t]he Receiver is not tasked with making speculative investments. Instead, she is entrusted with the responsibility to prudently wind-down the Receivership Entities and dispose of the Receivership Assets in a manner that safely returns to stakeholders what value can be salvaged. She is not empowered to jeopardize that return by indulging in risky investment opportunities with the very money she has been

8

charged to return to the victims of alleged years' long fraudulent conspiracies." *Houlihan Opinion* at 8.

There are certain assets that may ultimately have no realizable value. Decisions regarding the monetization of investments necessarily will entail an understanding of the interplay between future expenses (*i.e.*, cost to the estate to maintain the asset) and the time it will take to market and obtain a purchaser for the investment. In the performance of her duties, the Receiver has also sought input from investors and prior management regarding certain of the investments. While the Receiver has made, and will continue to make, all decisions regarding the liquidation of the Receivership Entities' assets, and has made and will make informed decisions regarding each asset, the Receiver has elicited the input from others with knowledge of the asset and/or who have a stake in its disposition. Of course, all decisions are ultimately those of the Receiver. The Receiver's goal is to monetize and sell the investments in a manner that balances the interests of being judicious with the assets of the estate, maximizing value and expeditiously disposing of the assets to allow the Receiver to make distributions to investors and creditors and close the case.

In addition, certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets. Applicants have started to engage with certain of these parties to discuss their asserted interests and has also been reviewing these purported interests in the context of the Receiver's forensics investigation. While the focus of the Receiver continues to be on selling the investments and ensuring a sound process for the marketing and disposition of the assets to achieve the fair market value of such assets, the Receiver has also begun to investigate potential claims that the Receivership Estate may be able to assert.

5500334.2

A description of the investments in which Applicants have dedicated significant time during the Fourth Application Period and the work done during the Fourth Application Period with respect to those investments is set forth in Section IV of this Fourth Interim Application.

**B.    Administrative Matters**

Applicants continued to speak and meet with various interested parties and groups during the Fourth Application Period, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA"),[6] counsel for the defendants named in the SEC's criminal complaint (the "Defendants"), investors and their representatives, equity holders in specific investment vehicles in which Platinum is the majority holder, and the SEC. The Receiver also held a third "town hall" style meeting with investors and other interested parties via webinar and telephone to provide an update on the actions taken to date and to answer questions.  The Receiver has committed to hold similar forums going forward.  The Receiver regularly updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  Applicants also meet in person or by telephone with investors and/or their representatives upon request.  Applicants have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

During the Fourth Application Period, Applicants spent time objecting to a fee application filed by a law firm retained by Platinum prior to the Receivership and that continued to provide legal services, without Court-approved retention, to the Prior Receiver after the commencement of the Receivership.  The Receiver believes the law firm is not entitled to be paid any fees by the Receivership estate, and did not act in the best interests of Platinum.

---

[6]    PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

Subsequent to the Fourth Application Period, the Court denied the law firm's request for approval of its fee application. [Dkt. No. 383]

Applicants also responded to other applications made before this Court and in other state court proceedings involving Platinum. Moreover, many of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world. During the Fourth Application Period, Applicants continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

In addition, during the Fourth Application Period, the Receiver was alerted to a data security incident involving a single email account on a cloud-based service used by Platinum. As described in further detail in Section IV.B.e below, Applicants took immediate action to identify the scope of the incident, implement further preventative measures, and notify the individuals who may have been impacted by the incident, informing them of the services that the Receiver is providing to them in an abundance of caution.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity

5500334.2

problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds. In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual Defendants have denied all material allegations.  The trial is currently scheduled to commence in January 2019.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No.

216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

## B.    Case Status[7]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)    As of June 30, 2018, the Receivership Entities had $15.7 million in unencumbered funds, of which $13.97 million was held in cash in bank accounts and $1.77 million was held in brokerage accounts.[8]  These funds include proceeds from the liquidation of

---

[7]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period January 1, 2018 through March 31, 2018.

[8]   As of the filing of this Application, following the closing of the sale of the Abdala Tailings Project, the Receivership Entities have approximately $38.5 million in unencumbered funds.

5500334.2

assets.  Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets.  These claims will be addressed in due course.

As of June 30, 2018, it is estimated that accrued, unpaid administrative expenses amount to approximately $3.6 million.  This amount includes the fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the Fourth Application Period and are being requested pursuant to this Application and Goldin's interim application, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley), and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Fourth Application Period.

(b)     Cash disbursements during the Fourth Application Period totaled approximately $3.5 million.  This amount consisted primarily of (i) $2.0 million in disbursements to the Receiver, her retained professionals, as well as limited scope professionals hired by the prior receiver; (ii) $475,000 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as rent); and (iii) $1.0 million in investment expenses, which include funds disbursed to preserve the value of the following assets: ALS life settlements portfolio ($398,000), LC Energy ($380,000) and the Abdala Tailings Project ($266,000).  The Receiver expects these latter expenses to decline now that several of the sales have closed.

Cash receipts during the Fourth Application Period totaled approximately $11.84 million. This amount primarily consists of proceeds derived from dispositions associated with the following investment positions: ALS life settlements portfolio ($10.5 million), Alcor Energy Solutions ($600,000), Pedevco Corp. ($300,000), Martin Kenney & Co., Ltd. ($300,000) and Rolling Acres of Stamford ($100,000).

The Receiver cannot at this time state when she expects the case to be concluded and when distributions may be made. The timing of distributions is dependent upon the time it will take to liquidate substantially all of Platinum's remaining assets, the funds available from such liquidation and decisions regarding the claims reconciliation process and determination of creditors entitled to a distribution.

(c)     The Receiver has not yet initiated a formal claims bar date. Thus, no claims proceedings have yet been commenced. The Receiver has not yet determined how different types of claims or creditors will be treated or the methods that will be used.

(d)     As of June 30, 2018, the primary assets of the Receivership Estate consisted of the following:

(i)     Cash and cash equivalents of approximately $15.7 million[9];

(ii)     Real estate investments without any set book value, due to their inherently speculative nature;

(iii)     Investments in natural resources, remaining litigation financing, energy and other miscellaneous investments; and

(iv)     Potential litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

---

[9]   Of this amount $13.97 million was held in cash bank accounts and $1.77 million was held in brokerage accounts.

5500334.2

(e)      The Receiver timely commenced a confidential arbitration action against a third party professional that had provided services to Platinum.   A tribunal was formed and an organizational meeting held, but the neutral that was selected withdrew following the Fourth Application Period and a new neutral was not selected until November 21, 2018.   Because the parties have not yet met, and raised the issue of confidentiality, with a reconstituted arbitration tribunal, the Receiver, in an excess of caution, has determined, at this point in time, not to disclose the name of the third party professional and nature of the claims.   The only other litigation commenced relates to one of the ALS life settlement policies against the life insurance company (Lincoln Financial) that is asserting that the life insurance policy terminated prior to the Receiver's appointment.   No litigation recoveries have been received.   The Receiver has, however, sought and obtained tolling agreements to preserve potential causes of action that may be subject to statutes of limitation.   The Receiver cannot at this time cannot state the extent of any further litigations that may be commenced and, if commenced, the value of any claims and the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.   At the heart of the analysis will be a determination of the cost/benefit of asserting claims.   Investigation and litigation are costly endeavors and the Receiver does not intend to expend material estate assets unless the Receiver has the necessary facts and information to assert a meritorious claim and has concluded that there is a likelihood of recovering funds if liability is eventually found.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Fourth Application Period, the Receiver requests interim approval of her fees in the amount of $190,244.00 and reimbursement of expenses in the amount of $1,577.21.   Otterbourg requests interim approval of its fees in the amount of $911,561.85 and

5500334.2

reimbursement of expenses in the amount of $10,552.39. Thus, the combined total of fees for Applicants of $1,101,805.85, plus expenses of $12,129.60, is $1,113,935.45.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment. For example, a single investment, such as Arabella, which is in multiple bankruptcy proceedings in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, including cash collateral issues, as well as pure litigation issues to address the adversary proceeding with a third party that was impeding the ability to sell the Arabella assets in which Platinum has a security interest. The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below, which was approved by the SEC and the Court at the time of the appointment of the Receiver. These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time. Furthermore, fees for legal services performed by all other Otterbourg professionals have been reduced by

17

5500334.2

10% from the aggregate recorded time charges.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since October 1, 2017 in accordance with Otterbourg's regular practice of reviewing and revising its hourly fee rates annually.

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $280,825.00 to $190,244.00, a reduction in the amount of $90,581.00.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,012,846.50 to $911,561.85, a reduction in the amount of $101,284.65.  Therefore, the total reduction for legal fees incurred during the Fourth Application Period by the Receiver and Otterbourg professionals is $191,865.65.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of this Fourth Interim Application to SEC counsel on October 10, 2018 to allow for a thirty-day review period.

This Fourth Interim Application includes certain exhibits:

(a)     The SFAR for the period of April 1, 2018 through June 30, 2018 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Fourth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

18

(c)      In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category is attached as **Exhibit C** hereto.

(d)      In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Fourth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)      In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)      In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Fourth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)      Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Fourth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted this Fourth Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Although ten attorneys and two paraprofessionals billed time during the Fourth Application Period (in addition to the Receiver), a core team of attorneys performed the lion's share of the services, including Adam Silverstein, Philip C. Berg, Erik B. Weinick, Jennifer S. Feeney and Andrew Halpern.[10]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. Accordingly, in some instances relatively small amounts of time were spent by attorneys with expertise relevant to specific issues in the case.  These less significant involvements benefited the Receivership Estate because it gave the core group of attorney's additional insight into and knowledge of important legal issues directly impacting the Receiver's decisions in this case.  In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Fourth Application Period and their specific roles were as follows:

(a)    Peter Feldman (Partner) (32.2 Hours to P10) – Mr. Feldman is a senior partner in the litigation department.  Mr. Feldman has extensive experience with forensics investigations and has joined the team to assist with the investigation of pre-receivership transactions and

---

[10]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Fourth Application Period and also voluntarily removed all of the time of one of the paraprofessionals that provided services during the Fourth Application Period.

analysis of potential causes of action against third parties, including former professionals of Platinum.

       (b)    <u>Andrew M. Kramer (Partner) (21.1 Hours to P01)</u> – Mr. Kramer is a senior partner in the restructuring department.  During the Fourth Application Period, Mr. Kramer's involvement was solely with respect to the Cleveland Mining investment located in Australia.  Mr. Kramer has been coordinating with local counsel in Australia regarding the liquidation proceeding commenced against the company in Australia.

       (c)    <u>Adam C. Silverstein (Partner) (12.4 Hours to P01; 7.4 Hours to P02; 51.2 Hours to P04; 35.4 Hours to P10)</u> – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters relating to secured loans and professional claims, including Arabella, Beechwood, SHIP.  Mr. Silverstein has also been heavily involved in forensic issues, including the arbitration proceeding commenced during the Fourth Application Period and the issuance of subpoenas.  Mr. Silverstein has also been one of the main point persons regarding communications with the SEC and during the Fourth Application Period assisted with the drafting of the Objection to the fee application of Schafer & Weiner and issues related thereto.

       (d)    <u>Philip C. Berg (Partner) (23.0 Hours to P01; 162.8 Hours to P02; 13.1 Hours to P03)</u> – Mr. Berg is a senior transactional partner and Chairman of Otterburg's corporate department, whose focus has been the negotiation, documentation and closing of Receivership transactions.  Mr. Berg is the point person for Houlihan Lokey regarding the analysis and monetization of assets within its portfolio.  During the Fourth Application Period, Mr. Berg dedicated a significant amount of time to assisting Houlihan Lokey with the due diligence and auction process issues relating to the Abdala Tailings Project to position it for final bids and eventual sale, as well as consummating the sale of the ALS life settlements portfolio.

(e)     Keith N. Costa (Partner) (11.8 Hours to P01; 14.5 Hours to P04;) – Mr. Costa is a member of Otterbourg's bankruptcy department and formerly served with the U.S. Trustee's office for the Southern District of New York.  As such, Mr. Costa focuses his work for the Receiver on coordinating communications and providing updates to investors.

(f)     Jennifer S. Feeney (Of Counsel) (86.3 Hours to P01; 31.1 Hours to P02; 104.9 Hours to P04; 2.9 Hours to P10) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Fourth Application Period, Ms. Feeney spent significant time with respect to the Arabella (particularly with respect to bankruptcy related issues).  Ms. Feeney also attended to other case administration matters, including coordinating with Cayman counsel and the proposed Cayman directors for the addition of the Cayman entities to the Receivership and coordinating bringing such entities into compliance with Cayman regulations and preparing the Receiver's quarterly report and additional updates to the creditor body.  Additionally, Ms. Feeney, along with Erik B. Weinick prepares applications to the Court and works to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(g)     Erik B. Weinick (Of Counsel) (131.3 Hours to P01; 83.6 Hours to P02; 228.8 Hours to P04; 48.4 Hours to P10; 8.7 Hours to P13) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, such as employee management and the data security issues that occurred during the Fourth Interim Application Period.  Mr. Weinick

5500334.2

is also part of the forensics team, analyzing potential causes of action, and coordinating with counsel for the PPVA on issues of mutual interest.

(h)     Andrew S. Halpern (Associate) (164.4 Hours to P10) – Mr. Halpern is an experienced litigator, particularly in the area of claims of professional malpractice and forensic analysis.  As such, during the Fourth Application Period, his work has focused on researching and analyzing the Receiver's potential claims against third-party professionals and was the primary drafter of the complaint initiating the arbitration proceeding against a third party professional, as well as the issuance of subpoenas.

(i)     Bennet A. Davis (Associate) (1.9 Hours to P01; 21.2 Hours to P02; 4.2 Hours to P04;) – Mr. Davis is a member of Otterbourg's corporate department, and assists Mr. Berg, at a lower billing rate, with the documentation of asset dispositions, along with the matters that lead to such dispositions, such as the drafting and execution of non-disclosure agreements.

(j)     Christine O'Brien (Paralegal) (.6 Hours in P01; 12.2 Hours in P04; 15.7 Hours in P10) – Ms. O'Brien is a litigation paralegal who assisted with the service of subpoenas and the arbitration complaint and has assisted with preparing the large volume of documents to be reviewed in connection with the Receiver's forensics investigation.

(k)     Jessica Hildebrandt (Paralegal) (30.5 Hours in P01; 1.4 Hours in P02; 18.8 Hours in P04; 7.9 Hours in P10)– Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a paralegal at a lower billable rate) and helped prepare the Otterbourg attorneys for various hearings and court filings.

5500334.2

IV.   **SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING FOURTH APPLICATION PERIOD**

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Fourth Application Period into five (5) project categories.[11]   Narrative summaries of these activity categories follow:

A.     **Asset Analysis and Recovery (P01) - Total Fees: $335,373.00**
       **Asset Disposition (P02)[12] - Total Fees:  $289,755.00**

During the Fourth Application Period, the Receiver and her professionals continued to review the various assets in the portfolio.  Certain assets were sold, certain others continued to be marketed, and others were prepared to be launched to market.  Other assets are still embroiled in litigation and/or bankruptcy proceedings and actions are being taken by the Receiver and the Receivership Team to position such assets so that it can eventually be monetized.  In certain instances, time was also spent with respect to an asset that may not ultimately have a positive return to the Receivership Estate, but work is still required to reduce potential liabilities and exposure to the Receivership Estate, as well as to ensure that any such asset without value is not imprudently abandoned by the Receivership Estate.

During the Fourth Application Period, Applicants continued to analyze Platinum's asset portfolio, including a review of the underlying investment documents and in-person and telephonic meetings with Goldin, Houlihan Lokey and Conway MacKenzie (depending on the professional assigned to the particular investment), as well as, in some instances, management and other investors in the underlying asset.  Also included in the time billed during the Fourth Application Period, are regular conferences with working groups of Otterbourg attorneys,

---

[11]   As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[12]   Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

Given the myriad of investments and different members of the Receivership Team working on each, to keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled weekly team meetings with her, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer.  In advance of these weekly meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency. These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the sprawling Platinum portfolio. The Receivership Team also had regular calls with the Houlihan Lokey and the Conway MacKenzie teams.

While the Receiver and Otterbourg have focused on a myriad of investments during the Fourth Application Period, below is an overview of certain of the investments in which Applicants have dedicated significant time.  The below summaries include a brief description of the nature of the investment, work performed, and status during the Fourth Application Period.

(a)     **Abdala Tailings Project** – refers to PPCO's interests (through a subsidiary, West Ventures LLC) in a gold tailings pond located near Cuiababa, Brazil.  PPCO has contract rights to extract gold for a period of ten years from the tailings impoundment.  The tailings impoundment is approximately 300 meters wide by 300 meters long and 20 meters deep

containing dried slurry (*i.e.*, sand and gravel) that was a byproduct of earlier gold mining operations.  This impoundment is adjacent to the former Abdala gold mining operation.

This investment was within the portfolio of investments that Houlihan Lokey has been engaged to market and sell.  Houlihan Lokey launched the marketing process for this asset at the end of 2017, a data room for interested parties that had signed a Non-Disclosure Agreement ("NDA") was opened, initial bids were received and site visits were made by certain prospective purchasers.  Houlihan Lokey then followed up with interested parties and Houlihan Lokey and Applicants facilitated additional due diligence to enable interested parties to finalize their initial bids, including arranging for on-site visits with Houlihan Lokey and the Platinum project manager in March.  Issues arose relating to the lease in which the gold tailings are planned to be transported for processing.  The issues with the lease took longer than anticipated to resolve.  As a result, the Receiver and Houlihan Lokey delayed the deadline for further, post-due diligence, submission of bids until all such issues could be resolved.  Resolution of the lease issues was time consuming, but needed to be resolved before further bids could be made.  Fortunately, Applicants resolved the lease issues during the second calendar quarter and final bids were received at the end of the second quarter and beginning of the third quarter.  The bidding process was completed in July 2018, the winning bid was then presented to, and approved by, the Court.  Following approval of the sale, the Receiver and her team worked with the winning bidder to close the sale.  The sale has since closed.  Further details regarding the sale are set forth in the sale motion and supporting documents [Dkt. Nos. 357-58, 367-68, 372], the Receiver's Fifth Status Report [Dkt. No. 507] and the subsequent fee application, which is being simultaneously filed with this application.

During the Fourth Application Period, the focus was on resolving the issues that were delaying the final bidding process. In particular, Applicants spent considerable time working with local counsel regarding the negotiation of the new lease and finalizing and documenting the lease. Applicant also drafted the proposed Asset Purchase Agreement that was provided to bidders to be submitted along with their respective bids. Applicants worked with the landlord of the project and had frequent communications with local Brazilian counsel, management and Houlihan Lokey. Otterbourg professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.

(b)     **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC. Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC ("Beechwood").

During the Fourth Application Period, Applicants continued to analyze the legal and business issues relating to this transaction, with a focus on understanding the remaining value in PGS' positions with Agera, and determining the specific nature of the various transactions between and among, PPCO, PPVA, Beechwood, PGS and Agera. In this regard, Otterbourg attorneys who have billed time to this matter include attorneys with experience in finance and litigation matters. Time billed to this matter included conference calls and in-person conferences with PPVA and the forensics analysts at Goldin. Applicants spent time reviewing the information known to date with respect to this transaction, including the relationship between and among the parties, the flow of cash, and an analysis of Beechwood's activities with respect

27

to this investment as well as undertaking efforts to obtain additional information.  This review is relevant to the Receiver's ongoing forensics investigation.

(c)    **Alcor Energy Solutions** -  refers to a note held by PPCO in a company based in Mesa, Arizona that sells and leases clean energy turbines.  In March 2017, the Prior Receiver entered into a Letter of Intent for the sale at a discount of PPCO's debt and equity positions to Maxus Capital, a Cleveland-based financier, for $4 million of cash, plus a potential earn out which may be earned under various conditions.  The Letter of Intent provided that $3 million of the consideration would be paid at closing and the remaining $1 million would be paid 18 months after closing.  The Promissory Note that the Prior Receiver and Maxus Capital executed in May 2017 in connection with the final $1 million owed to PPCO provided that if Maxus Capital repaid the remaining balance of the purchase price on or before May 23, 2018, it would receive a $400,000 discount.  Maxus Capital exercised its prepayment option and during the Fourth Application Period, the Receiver received $600,000 from Maxus Capital in full satisfaction of amounts owed to PPCO.

(d)    **ALS Life Settlements Portfolio** – refers to a portfolio of life settlement investments owned through an entity in which PPCO is the majority owner and managing member.

During the last application period, the Receiver filed a motion for entry of an order approving the sale of twenty (20) separate life insurance policies (the "Policies" or the "Portfolio") on fifteen (15) separate insureds in which Platinum has a majority ownership interest [Dkt. No. 311] (the "ALS Sale Motion"). Other than interests in one (1) policy that is the subject of a dispute with the insurer, the Policies that were the subject of the ALS Sale Motion were all of the remaining Policies in which Platinum had an indirect majority interest.  The ALS

Sale Motion was approved by the Court on April 23, 2018 [Dkt. No. 318] and Applicants have since worked to effectuate the closing on all of the Policies subject to the approved purchase and sale agreements.

After filing the ALS Sale Motion, and after the conclusion of the Fourth Application Period, one of the Policies scheduled for sale matured.  Pursuant to the purchase and sale agreement, ALS was entitled to receive the death benefits if a Policy matured prior to closing the sale (which is what occurred), with aggregate purchase price reduced by the amount of the purchase price allocated to such policy.  As a result of the sale and the maturity, ALS realized the aggregate amount of $13,093,300, from which Houlihan Lokey was entitled to a transaction fee in the amount of $750,000, resulting in a net realization of $12,343,300.  Certain parties have asserted a claim to all or part of the proceeds, as more fully described in the statements filed in response to the ALS Sale Motion.

During the Fourth Application Period, once the ALS Sale Motion was approved, Applicants worked to effectuate the closing of the transaction, including obtaining all documents necessary to effectuate the transfers of the Policies.  All but one of the Policies that were sold were transferred to the Purchaser during the Fourth Application Period.  The one Policy that was not transferred during the Fourth Application Period (but has since been transferred) required additional work to effectuate the transfer because of a residual ownership interest on the Policy. Otterbourg worked with Houlihan Lokey and the residual interest owner to address the issue and eventually effectuate the transfer.  As a result, approximately $1.88 million of the total purchase price was received by the Receivership Estate shortly after the close of the Fourth Application Period and will be reflected in the next report.  The remaining purchase price and the death benefit were all received during the Fourth Application Period.

During the Fourth Application Period, Applicants also met with the minority shareholders of ALS that are asserting an interest in the proceeds of the Portfolio sale to discuss the respective rights of the parties under the ALS operative organizational documents.  Such discussions are ongoing.  The Receivership Team also spent time preparing for anticipated litigation involving a policy that was not sold, for which the insurance company is asserting that it terminated prior to the Receiver's appointment.   This litigation has since been commenced.   Otterbourg professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.

(e)   **American Patriot Gold** – refers to Platinum's ownership interest, through Maximilian Resources LLC ("Maximilian"), to approximately 370 acres of land fee simple, in addition to patented mining claims in Montezuma County, Colorado.  American Patriot Gold ran the Red Arrow Mine on the property until its mining permit was revoked in March 2014 as a result of non-payment of restitution for environmental and operational violations.   Conway MacKenzie was asked to review this asset and provide the Receiver with disposition options.

During the Fourth Application Period, Conway MacKenzie continued to perform due diligence on this asset and make recommendations to the Receiver on disposition options.  Applicants also worked with Conway MacKenzie to assist with the due diligence on this asset, including ascertaining the precise ownership interests so that the land can be properly marketed and sold.  Obtaining permitting and selling the asset as a working gold mine was assessed and has been determined not to be an economical option due to the significant cost and timeframes involved. The Receiver authorized Conway MacKenzie to retain a broker and authorized minimal expenses to fix the road to the property, which will both improve the value of the property and allow it to be accessed by the broker and potential purchasers.  Applicants worked

with Conway MacKenzie during the Fourth Application Period to assist with the due diligence on this asset, including ascertaining the precise ownership interests so that the land can be properly marketed and sold.

(f)     **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million dollar facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella"). Arabella has working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.  Pre-Receivership, a related Arabella entity in which Platinum does not have an interest – Arabella Petroleum Corporation ("APC") – commenced an action against the Arabella Entities asserting claims for the recovery of certain assets that are the subject of PPCO's liens. APC is also a debtor in a bankruptcy proceeding pending in the Western District of Texas.  The Prior Receiver entered into a settlement agreement with the Trustee of APC, settling the claims and agreeing to the interests of each estate in the combined assets that are to be sold in the respective bankruptcy cases.  The Arabella Settlement Agreement was approved by this Court.

Earlier this year, Arabella entered into a settlement with Founders Oil & Gas III, LLC and Founders Oil & Gas Operating, LLC (collectively "Founders") to resolve all issues regarding revenues and expenses, as well as future operatorship with respect to the wells and

inclusion of the operatorship in the sale process for Arabella's assets. This settlement enabled AEX's sale process to move forward. In connection with moving the sale process forward and obtaining maximum value for the AEX estate (of which PPCO is the largest secured creditor) AEX prepared and filed amended bidding procedures, negotiated terms for the exit of the current broker and retention of a new broker. Subsequent to the Fourth Application Period, Arabella conducted the sale process for its working interests, together with those of a majority of the other working interests and operatorship. The sale of the assets was approved by the Texas Bankruptcy Court following the Fifth Application Period. Arabella and Platinum also jointly propounded a proposed plan of reorganization and requested that it be heard on an expedited basis. The plan was confirmed by the Texas Bankruptcy Court at a hearing held on November 20th.

During the Fourth Application Period, Applicants had regular status conferences with the Trustees of the APC and AEX estates (and their respective representatives). Applicants also had frequent telephonic and e-mail communications with Arabella's retained professionals, including its Chief Restructuring Officer, bankruptcy counsel and litigation counsel to discuss issues concerning the settlement with Founders, the sale and bidding process, use of cash collateral, discussions with potential purchasers and/or strategic partners in connection with a sale, and discussions with the other non-operating well owners. Applicants have been working with Conway MacKenzie who has been asked to assist with the evaluation and execution of monetization alternatives related to PPCO's interests in Arabella and to be the Receiver's "point person" in Texas. Applicants reviewed, commented on and revised documentation to be filed in the AEX and/or APC bankruptcy cases, including the settlement papers with Founders, the cash

collateral motion filed in the AEX case, proposed settlement term sheets with the non-operating owners, proposed bidding procedures and a motion to approved amended bidding procedures.

In addition, during the Fourth Application Period, Applicants appeared in the Bankruptcy Court in Texas to contest a Notice of Transfer of Claim filed by the counterparty to a purported Participation Agreement entered into with the Prior Receiver.  Under the terms of the Participation Agreement, in exchange for $500,000, the participant was purportedly granted a 45% participation in the Arabella Loan after repayment of the $500,000 purchase price to the participant, plus interest, and after payment of professional fees.  This Participation Agreement was never approved by this Court.  The "Participant" claimed that it was not a participation, but actually an assignment of claim to it and sought to have it recognized as the actual claimholder in the Arabella bankruptcy case.  The Receiver objected to the Notice of Transfer of Claim and, during the Fourth Application Period, when the Bankruptcy Court in Texas set the issue for hearing, Applicants prepared a further objection, objected to subpoenas issued by the purported participant, prepared document and witness lists, and appeared in court in Texas for the full day evidentiary hearing.  Subsequent to the hearing, the Court issued an oral decision denying the transfer of claim.  Applicants reviewed the transcript of the Court's decision, discussed it with the SEC, and reviewed the proposed order that was filed in the Texas Bankruptcy Court.  The Receiver intends to contest the validity of the Participation Agreement.

In addition to fluctuations in the oil market that will impact the per acre sale amount, the ultimate recovery on the Arabella Loan can be impacted by many other factors, including asserted materialman's (oil) liens, professional administrative expenses of the Arabella estates, an alleged "first out" participation claimed by certain professionals who represented Platinum in connection with Arabella, as well as the purported Participation Agreement entered

into by the Prior Receiver.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

(g)      **Buffalo Lake Advanced Biofuels (a/k/a BLAB)** - refers to a idled, dry mill ethanol production facility located in Buffalo Lake, Minnesota in which PPCO, through West Ventures, holds a debt and equity interest.  Conway MacKenzie has been asked to review this asset and provide the Receiver with disposition options.  There are multiple legal, financial, regulatory and business issues relating to this investment that required attention so that the Receiver could seek to market the asset.  West Ventures was a senior secured lender to BLAB's predecessor, Purified Renewable Energy LLC ("PRE"), an entity that filed bankruptcy in 2013. West Ventures acquired all of BLAB's assets in the bankruptcy proceeding through a credit bid of its prepetition secured debt.  West Ventures' mortgage in the original principal amount of $18 million was preserved, in part, under the bankruptcy court's sale order.  West Ventures, however, did not acquire a continuing lien on BLAB's personal property.  The Receiver determined that this investment did not warrant additional funding and caused West Ventures to enter into a Funding, Fee Sharing and Sale Proceeds Sharing Agreement (the "Funding and Sharing Agreement") with BLAB's CEO, Leo Fischer, which, among other things, provides a mechanism for continued funding to BLAB by Fischer and established the relative priority of claims as between West Ventures and Fischer.

Since the Receiver's appointment, Applicants have worked in conjunction with Fischer and certain other receivership professionals and representatives to conduct focused due diligence with respect to the BLAB investment, including review and analysis of the underlying business, recent historical operating performance and cash flows for BLAB and an evaluation of its financial projections and strategic plans under various operating and non-operating scenarios.

Conway MacKenzie also conducted an evaluation of strategic monetization alternatives for BLAB, including (i) an orderly liquidation; (ii) a near term sale of the company; (iii) an investment of additional resources to restart the business and then a sale; or (iv) abandonment of the asset if there is no value to the Receivership and to stop incurring professional fees on the asset.

Conway MacKenzie did significant due diligence, including compilation of a list of strategic purchasers, and contacted the strategic purchasers, as well as liquidators and auctioneers to determine the potential sale or liquidation value of BLAB.  Applicants also worked with Conway MacKenzie and Platinum's in-house counsel to evaluate BLAB's obligations, including tax obligations, liens and other expenses that would come ahead of any distributions of sale proceeds to the Receivership.  The feedback from Conway MacKenzie's marketing and due diligence efforts -- the value of the real property assets in which West Ventures holds a lien either under a liquidation or sale scenario – has been evaluated by the Receiver in the context of existing liens that come ahead of West Venture's interests and the waterfall provisions under the Funding and Sharing Agreement.  Simply put, this investment is likely "under water" given the value of the assets (either in a liquidation or sale) and the priority of other liens and interest holders that are entitled to proceeds before West Ventures will receive any funds.   The Receiver does not intend to invest any further resources towards this investment as there is unlikely to be a return, if any, that would warrant additional support.

During the Fourth Application Period, Applicants had regular calls with Conway MacKenzie on the status of its marketing efforts, including its evaluation of strategic alternatives and potential value.  Applicants also worked with Conway MacKenzie and Platinum's in-house counsel to evaluate the BLAB's obligations, including tax obligations, liens and other expenses

that would come ahead of any distributions of sale proceeds to the Receivership.  Otterbourg attorneys who have billed time to this investment include attorneys with experience in transactional matters.

      (h)      **China Horizons/Yellow River** – refers to PPCO's equity and debt interests in two companies -- China Horizon and Yellow River—created to build a chain of convenience stores in rural China.  The promissory note from China Horizon held by PPCO has a face value of approximately $9.0 million and PPCO holds approximately 6.5 million share of stock in Yellow River.  China Horizon was originally a joint venture with another company, China Post.  China Post subsequently pulled out of the joint venture and China Horizon transferred its intellectual property to Yellow River.  Yellow River, in turn, distributed its equity to the debt and equity holders of China Horizon.  Subsequent to the transfer, China Horizon received approximately $15 million from China Post as proceeds of the settlement of a dispute between them.  PPVA also holds debt and equity in China Horizon and Yellow River.  The promissory notes from China Horizon are not yet due.

      The Receiver and the PPVA received an expression of interest from Yellow River's largest investor to purchase PPCO's and PPVA's collective interests in the China Horizon notes and the Yellow River equity position.  Members of the Receivership Team and representatives of PPVA met in person with the investor.  Although an agreement in principle was initially reached and documentation began, negotiations to document that agreement in principle have revealed certain issues which are currently under discussion among the parties but may derail a transaction.

      During the Fourth Application Period, to prepare for the meeting with the interested purchaser and to formulate a counteroffer, Applicants spent time reviewing and

5500334.2

analyzing the formation and underlying transaction documents, including historical correspondence regarding the validity of the note documents, and consulting with the Receiver on the appropriate counteroffer and range of acceptable values. Applicant also began the preparation of the sale documentation. Otterbourg attorneys who have billed time to this matter primarily include transactional attorneys.

(i)     **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings"). PPCO and Platinum Long Term Growth VII LLC are owed approximately $15.6 million, which is secured by a first priority security interest in all of Cleveland Mining's and Iron Holdings assets. PPCO also holds approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings. Cleveland Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not operating and is the subject of litigation in Brazil.

The Receiver previously retained local counsel in Perth, Australia to assist in addressing the issues raised by Cleveland Mining, including management's demands and challenges to PPCO's filed security interests in Australia. The Receiver also previously retained a financial firm located in Australia to work directly with Cleveland to evaluate its current financial position and to determine the value (if any) of its assets. The assessment was that there is little to no value in the Cleveland Mining assets and that Platinum will not invest additional resources into this asset.

Cleveland Mining has since been placed into a liquidation proceeding in Australia and Platinum has filed a proof of debt form to register its claim. Applicants have been in frequent communication with the Australian liquidator, including discussions regarding

5500334.2

potentially selling the publicly listed corporate shell and an allocation of the proceeds between the liquidator and PPCO. These discussions are ongoing. In this regard, Otterbourg attorneys who have billed time to this investment include attorneys with experience in workout matters.

(j)     **Daybreak** - refers to a publicly held oil and gas company with assets in the Kern County, California and in Montcalm County, Michigan. PPCO owns 99% of the membership interests and is the managing member of Maximilian, which is owed approximately $9.2 million,[13] plus accrued interest, from Daybreak on account of a senior loan, secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage. Maximilian also holds a percentage of working interests in the Michigan operation. Conway MacKenzie was asked to evaluate and market the Daybreak investment. Conway MacKenzie created a virtual data room and compiled a comprehensive list of parties that may be interested in purchasing the California and/or Michigan assets. During the Fourth Application Period, Conway MacKenzie engaged in discussions with those expressing an interest in bidding on the assets, 11 NDAs were executed, and initial bids were solicited. Subsequently, Conway MacKenzie further engaged with interested parties and further revised bids were submitted. The Receiver evaluated the last round of bids received, which were subject to due diligence. Conway continues to engage with the interested bidders and is working with the Receivership Team to discuss the mechanics of realizing on this asset.

During the Fourth Application Period, Applicants worked with Conway MacKenzie on its efforts to market and sell the Daybreak assets. Otterbourg attorneys who have billed time to this investment include attorneys with experience in finance and transactions. Time billed to this matter includes further review of background documentation, conversations

---

[13]   In California, Platinum's position in Daybreak includes a promissory note in favor of Maximilian with a face value of approximately $9.1 million and in Michigan, Maximilian holds a promissory note with a face value of approximately $100,000.

and updates from Conway MacKenzie, and analysis of expressions of interest received to date and evaluation of liquidation options.

      (k)    **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah.  Through Maximilian, PPCO holds a debt and equity interest in the company.

      During the Fourth Application Period, Applicants continued to work with Conway MacKenzie to better understand the complex legal, financial, regulatory and business issues relating to this investment.  Applicants commenced an investigation into the receipt of certain insurance proceeds by a Greentown related entity – Pacific Energy & Mining, Company ("Pacific") -- that the Receiver believes were assigned to Maximilian.  Maximilian has asserted a right to the proceeds.  In June 2017, while the Receivership case was pending, Pacific commenced a declaratory judgment action in the U.S. District Court for the District of Nevada (Pacific Energy & Mining Company v. Maximilian Resources LLC, Case No. 17-cv-00363 (HDM) (VPC)) (the "Litigation"), seeking a declaration that Pacific does not owe any money to Maximilian.  The Receiver has responded to the complaint. During the Fourth Application Period, Applicants continued to engage in motion practice and has had periodic discussions regarding resolution of the Litigation.

      The Receivership Team and Conway MacKenzie continue to explore disposition options.  The Receiver is also exploring options available to Platinum pursuant to an indemnity agreement and guaranty agreement executed in connection with the original loan and security agreement and the subsequent loan modification agreement.  Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation.

(l)      **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of <u>In re Lily Group, Inc</u>., Case No. 13-81073 (Bankr. S.D. Ind.).   Following its acquisition of the mine, PPCO retained a third party mining contractor to assist it in putting the mine back into production.   Through a combination of mismanagement and a downturn in coal prices, the mine did not reach cash flow breakeven, the contract miner was terminated, and the mine idled.   A new mine operator has subsequently been retained who now oversees environmental remediation and mine security.

The Receivership Team has been working with Houlihan Lokey in preparation for launching the marketing of this asset.   Before launching the asset to market, the Receivership team, working with local counsel, has endeavored to address issues regarding purported liens on the assets.   During the Fifth Application Period, the Receivership Team and local counsel have discussed the best approach for quantifying and resolving the asserted claims and liens in the Lily Group bankruptcy proceeding and have engaged with certain of the purported lienholders and will seek to extinguish the purported liens of the remainder.   In the interim, the Receiver continues to make lease payments on the mine to maintain the value of the asset until it can be monetized.   Otterbourg attorneys who have billed time to this investment primarily include attorneys with M&A transactions and bankruptcy experience.

(m)      **Martin Kenney & Co. Ltd.** - refers to PPCO's former interests in a loan and credit facility in favor of Martin Kenney & Co. Ltd., through PPCO's subsidiary Hamilton Capital III LLC.  This was a litigation financing facility.

The Receiver previously sold this loan facility at par plus accrued interest, realizing $1.8 million for the Receivership Estate.   The Receivership Estate, however, retained

5500334.2

interests in certain litigation outcomes.  During the Fourth Application Period, Martin Kenney Solicitors sold its interests in such litigations, including Platinum's back-end interest.  As a result, the Receivership Estate received $300,000.  Time billed to this matter included the reviewing and drafting of the necessary documentation to sell and transfer Platinum's interests. Otterbourg attorneys who have billed time to this investment primarily include attorneys with M&A transaction experience.

(n)      **NordAq Energy** – refers to a privately held oil and gas company that holds a 17.5% working interest in oil and gas development on 20,491 gross acres located offshore from Alaska in the Beaufort Sea in an area called Smith Bay.  NordAq is the Operator on two of the wells, both non-producing and non-revenue generating.  PPCO owns shares and potentially warrants in NordAq through RJ Funding LLC.  The shares held by PPCO represent approximately 2% of the total shares issued.  Monetization of this investment is challenging as it is illiquid private equity in a financially challenged pre-revenue company with significant debt. The company's largest asset is tax credits.  This asset created a further challenge because of the limited information in Platinum's files regarding NordAq's capital structure, rights, obligations and claims of other investors.  As a result, Conway MacKenzie had to rely upon limited information from the company's CFO.

During the Fourth Application Period, the Receiver evaluated an offer that was received for the purchase of PPCO's stock and warrants.  The Receiver discussed with Conway MacKenzie other options, including whether management would be interested in purchasing PPCO's interests.  The Receiver directed Conway MacKenzie to further engage with the interested party to determine if a sale can be closed in the near term.  During the Fourth Application Period, Applicant began to prepare legal documentation so that a sale could be

41

quickly closed if a firm offer is made and accepted.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with transactional experience.

(o)     **PEDEVCO Corp., d/b/a Pacific Energy Development** – refers to a publicly-traded energy company engaged in the acquisition and development of strategic, high growth energy projects, including shale oil and gas assets, in the United States.  Platinum's interest in PEDEVCO is through its 45% ownership in PGS, which owns a loan receivable from PEDEVCO that had a principal balance of approximately $13.6 million.   PPVA also holds an interest in PGS and, thus, has an interest in PEDEVCO.

PEDEVCO has been experiencing significant operational issues, which impact the ability to service its debt and place into question the value, if any, of PGS's loan receivable from PEDEVCO.  The Receiver and PPVA received an offer to purchase their interests in this asset at a considerable discount as a part of a global financial restructuring of PEDEVCO in which the shareholders are being heavily diluted. After due consideration, the Receiver and PPVA accepted the offer, which both viewed as favorable given the likelihood of any repayment of the loan was highly unlikely.  During the Fourth Application Period, the sale was documented and finalized and PPCO received its share -- $300,000 – of the sale proceeds.  Applicants assisted with the preparation of the sale documents and closing of the transaction.  The Otterbourg attorneys who have billed time to this investment primarily include attorneys with M&A transaction experience.

(p)     **Pro Player** – refers to a Platinum entity that made loans to professional athletes, often at the beginning of their careers.  A portfolio of these loans still has overdue outstanding balances owed to Pro Player by these athletes.

5500334.2

During the Fourth Application Period, Applicants worked with Platinum's in-house counsel to gather a due diligence package on the loans to present to third party liquidators to determine interest in purchasing the portfolio or acting as Platinum's agent, thus mitigating the expense and uncertainty of pursuing collection directly.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation.

(q)     **Rolling Acres of Stamford** – refers to an undeveloped tract of land in Stamford, Connecticut.   RE Credit LLC, a wholly owned subsidiary of PPCO owned a $200,000 participation interest in a $3.2 million mortgage note, accruing interest at 14%, which was due in November 2006.  The Receiver received an offer to purchase PPCO's participation interest for $100,000.  Given the dormancy of the development project and the likelihood of collecting on the loan, the Receiver accepted the offer to purchase that she received from Magdalina Shtern. During the Fourth Application Period, Applicants worked with the purchaser's counsel and Platinum's in-house lawyer reviewing and finalizing the documents that transferred ownership to the purchaser.  The Otterbourg attorneys who have billed time to this investment primarily include attorneys with transaction experience.

## B.     Case Administration (P04) - Total Fees:  $399,096.50

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The nature of the tasks performed under this category is varied, and includes the following:

(a) **Website and Investor Communications.**   In accordance with Section E.2.l (Communications with Investors), the estate hired Garden City Group LLC ("<u>GCG</u>") to create the Receiver's website (PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receivers also revised and updated the website to add or update the "Frequently Asked Questions" section of the website and to add "key documents."  The Receiver has also used the website to publish a general notification of the data security incident discussed below.  The Receiver also established a mechanism on the website to allow interested parties to sign up to receive daily notices whenever there are new filings on the docket.  The Receiver and/or the Receivership Team have also held numerous meetings and/or teleconferences with various investors and Defendants at their request.

The Receiver also organized and held a third "Town Hall" style webinar and telephone conference on June 6, 2018 to provide an update to investors and to answer questions submitted by investors.  The Receiver received positive feedback concerning this webinar and intends to continue to hold them periodically going forward, including one held on August 15, 2018.  The videos of the Prior Town Halls are available through the website (www.platinumreceivership.com).  The Receiver and the Receivership Team also have had periodic conference calls with the representatives of certain of the larger groups of investors to discuss the monetization efforts and claims process and had one in-person meeting with a group of investors regarding a comparison of the list of assets on the Receiver's status reports compared to the list of assets provided by prior management.  The information provided to this group of investors was subsequently posted to the website so that it would be available to all interested parties.

5500334.2

(b)      **Schafer & Weiner Fee Application**.   During the Fourth Application Period, Schafer & Weiner ("S&W"), a Michigan law firm that was previously engaged by Platinum and that continued to provide legal services to the Prior Receiver in connection with the Arabella investment filed a fee application seeking to be paid nearly $500,000 in unpaid legal fees for work purportedly performed for the Prior Receiver.   In addition to preparing the objection and sur-reply to S&W's fee request, the Receiver also issued a subpoena to S&W, objected to subpoenas issued by S&W and reviewed documents.   Applicants spent significant time preparing the objection and sur-reply, drafting a subpoena, objecting to subpoenas issued by S&W and reviewing documents.   On September 25, 2018, the Court issued a Memorandum Decision and Order denying S&W's fee application.   [Dkt. No. 383]   S&W has since filed a Notice of Appeal.

(c)      **SEC Meetings**.   The Receiver also regularly communicates with the SEC staff to keep them apprised of ongoing matters and to alert them to potential retentions and filings by the Receiver.   The Receiver and Otterbourg also has periodic communications with SEC personnel about pending matters before the Court, including, for example, the S&W fee dispute.

(d)      **PPVA**.   The Receiver and the Receivership Team had regular teleconferences and in-person meetings at the Receiver's offices with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff.   The Receiver and the Receivership Team also regularly have asset-specific teleconferences with the Joint Liquidators or their professionals to discuss the liquidation or analysis of assets that are jointly held by PPVA and Platinum. Otterbourg also continued to discuss procedures to share with the Joint Liquidators non-privileged documents that are maintained on the Platinum servers controlled by the Receiver.

(e)      **Data Security.**   During the Fourth Application Period, the Receiver was alerted to a data security incident involving a single email account on a cloud-based service used by

5500334.2

Platinum.  As a result, the Receiver immediately engaged LMG Security, a leading independent cybersecurity firm.  LMG has been working to further secure Platinum's systems, as well as to conduct a comprehensive forensic review to determine the scope of the incident, including the specific data that may have been impacted. The investigation revealed limited unauthorized access to a single email account on a cloud-based service used by Platinum from March 19, 2018 to May 19, 2018.

Applicants have investigated and are not aware of any impact on Platinum's bank accounts or other assets as a result of this incident, nor is Platinum aware of any attempt to misuse any individual personal information that may have been exposed as a result of this incident.  While there is no evidence to suggest that there has been any attempt to misuse any of the personal information which may have been contained in the impacted data, those individuals who may have been directly affected by this incident were sent individual letters apprising them of the incident, and informing them of the services that the Receiver is offering to provide to them in an abundance of caution.  The Receiver, working with the cyber response team at GCG, established a call center to respond to inquiries by those individuals who receive letters from the Receiver, and offered complimentary identify theft protection services through ID Experts®. This service includes 12 months of credit monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services.  With this protection, MyIDCare will help affected individuals resolve issues if their identity is compromised by reason of this cyber incident.

In addition to its forensic analysis, LMG Security and Platinum took steps to minimize and prevent any future unauthorized access to Platinum's electronic systems or data.  In addition, the Receiver reported the incident to appropriate law enforcement and regulators nationally as

46

well as in states whose residents may have been impacted by this incident.  The Receiver kept the SEC apprised of the situation while it conducted its investigation of the matter.

In connection with this incident, Applicants worked closely with LMG, having regular conference calls to update the Receiver on identifying the incident and determining what information may have been exposed.  Applicants also spent time speaking with the companies that maintain Platinum's cloud-based server and advising law enforcement of the incident.

(f)    **Claims Process**.  The Receiver has not yet initiated a formal claims bar date or claims review process.  The Prior Receiver had posted a claim form for creditors to assert a claim.  The Receivership Team has copies of all claims submitted to the Prior Receiver.  The Receivership Team has been actively working on preparing a proof of claim form and designing a claims adjudication process.  The Receiver will likely be seeking court approval for the proof of claim form, notice and process for submitting claims, and establishment of a deadline for the submission of claims.  Preparation of the form and establishing guidelines for what claims should be submitted cannot be done in isolation, but will in part be dependent upon decisions that are ultimately made regarding how to treat different types of claims and creditors.  In addition to determining how to treat different claims (e.g., unsecured creditor claims, unpaid redemption claims, insider claims, investor claims), the Receiver will also need to determine if the various Platinum entities will be fully or partially consolidated for claim and distribution purposes or if each will be treated separately.  There may also be issues of Cayman law regarding the three Cayman funds that may be implicated.  In addition, there have been blanket secured liens asserted on the Platinum assets, which may need to be resolved before any distributions can be made to unsecured and investor claims.  During the Fourth Application Period, the Receivership Team and Platinum's Chief Financial Officer began to compile

5500334.2

information on potential creditors and investors that will ultimately be useful in determining how best to have creditors and investors assert claims and determining how different claims will be treated.

(g) **Employees.** Since the Receiver's appointment, the number of employees has been reduced from thirteen to three. There is currently one remaining portfolio manager (portfolio manager for the Abdala Tailings Project investment, who will be separating from Platinum on November 30, 2018 now that the sale has closed), in addition to the Chief Financial Officer and the General Counsel. The director of information technology was transitioned to an independent consultancy at a lower cost to the Receivership Estate, while maintaining the same level of service. During the Fourth Application Period, the Receiver finalized the separation agreement and employee benefits with one of the portfolio managers and coordinated an orderly exit.

(h) **Defendants.** During the Fourth Application Period, Applicants interfaced with counsel for the Defendants to discuss a variety of issues, including the production of certain documents on Platinum's servers. Otterbourg and Platinum's CFO had an in-person meeting and several follow-up calls to focus the requests and, ultimately to respond to the subpoenas issued by the Defendants. Applicants also monitored the criminal proceedings and the state court proceedings in which the Defendants were seeking access to the additional insurance coverage. During the Fourth Application Period, the Defendants (by their counsel) also inquired if the Receiver was willing to recognize their demands for indemnification and, in particular, their demands that their defense legal costs be advanced for payment by the Receivership as part of their claim for indemnification. The Receiver declined their demands. The Defendants

subsequently filed motions or joined in motions to compel the Receiver to advance legal fees. The Court has since denied such requests.

(i)     **Navidea Indemnification Claim.**     During the Fourth Application Period, Navidea Biopharmaceuticals, Inc. ("Navidea") sought leave from the Receivership Court to assert an indemnification claim against Platinum as a result of a claim asserted by PPVA against Navidea for repayment of a portion of a promissory note, the balance of which had been assigned to, and repaid to, Platinum during the Prior Receiver's tenure.  Navidea claimed an entitlement to indemnification based on its payoff agreement with the Prior Receiver.  The Receiver opposed Navidea's motion on the basis that Navidea had no colorable claim against Platinum and litigating the claim would constitute an unwarranted distraction and expense for the Receivership Estate.  The Court has since denied Navidea's motion.  *See* Dkt. No. 353.

(j)     **Cayman Funds.**  At the end of 2017, three Platinum funds organized under the laws of the Cayman Islands were added to the Receivership Estate.  Applicants have prepared, and presented to the Cayman regulators, the necessary forms to appoint new directors and designate a registered office to be in compliance with Cayman corporate regulations.

(k)     **Receiver Oversight**.  Time during the Fourth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a regular basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and forensic accounting issues.

5500334.2

C.    **Forensic/Investigatory Work** (P10) - Total Fees:  **$263,139.50**

In addition to the monetization of assets, potential sources of recovery include claims by the Receiver as innocent successor to the Platinum Entities against possible liable parties. Goldin and Otterbourg have assembled a forensics team to seek to review the complicated series of transactions entered into during the years prior to Platinum was placed into receivership and to analyze the flow of funds.

During the Fourth Application Period, in addition to commencing an arbitration proceeding against a third-party professional, Applicants continued to investigate certain pre-receivership activities to determine whether additional causes of action exist against, among others, valuation agents, fund administrators, auditors, legal advisors and other professional firms.  This analysis includes reviews of the pertinent valuations prepared for Platinum by third party advisors, and involves identifying, gathering and analyzing information relied upon by the advisors, and assessing the reasonableness of the methodologies used in connection with the valuations.  Inquiries like these seek to facilitate the Receiver's assessment of whether the Receivership Estate has actionable claims against any persons or parties who putatively provided professional services to Platinum.

During the Fourth Application Period, Applicants, in conjunction with Goldin continued its historical review of Platinum's activities and flow of funds.  The Receivership Team is in the process of considering whether or not these activities and flow of funds were proper. and if not, whether they give rise to potential causes of action for which Platinum may realize additional recoveries.  Applicants have been discussing collaboratively with the joint liquidators of the PPVA entities on potential claims, as well as joint assets held by our two estates.  The Receiver at this time cannot state the extent of any litigations which will be commenced and, if

commenced, the value of any claims and the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.

During the Fourth Application Period, the Receiver issued additional subpoenas to certain parties and it is anticipated that additional subpoenas or informal document requests will be issued this quarter.  Applicants have been analyzing documents produced in response to such subpoenas and has had communications with representatives of the subpoena targets regarding their responses.  For certain claims in which a statute of limitations may be approaching, the Receiver has, and will continue to, reach out to the potential target to enter into tolling agreements to allow Applicants the appropriate time to investigate potential claims.

## V.      EXPLANATION OF EXPENSES AND RELATED POLICIES

1.      Applicants seek reimbursement of its out-of-pocket costs in the amount of $12,129.60.  **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

2.      Applicants observed the following policies in connection with its expenses during the Fourth Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 19,231 internal photocopies during the Fourth Application Period at the rate of 0.15 cents per page, totaling $2,884.65 for all in-house copies.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However,

51

Otterbourg did not make any outgoing facsimile transmissions during the Fourth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did have one transportation expense ($34.20) in connection with attendance at a meeting with the SEC.  Applicants had travel expenses during this Fourth Application Period in connection with Erik Weinick's attendance at a hearing in Texas in connection with the Arabella bankruptcy case.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses

(other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)    The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor GCG, which will be billed directly to the Receivership Estate.

(h)    In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period.  Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.    FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."  *Securities & Exchange Comm 'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F. 2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented."  *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill

5500334.2

required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds. Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse. Many of the people with factual knowledge are facing criminal charges. Documentation, to the extent it exists, must be questioned and verified. Based on the foregoing,

we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.    HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of assets is ongoing and that the claims reconciliation process has not yet formally begun.  Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Fourth Interim Application (the "Holdback Amount").  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)    Grant interim approval of the Receiver's compensation in the amount of $190,244.00 (the "Allowed Receiver Fees");

(b)    Grant interim approval of Otterbourg's compensation in the amount of $911,561.85 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)    grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $1,577.21;

(d)    grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $10,552.39;

(e)    authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)      Grant such other relief as the Court deems appropriate.

Dated:  November 29, 2018

Otterbourg P.C.

By: */s/ Adam C. Silverstein*
        Adam C. Silverstein

230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver,
and Otterbourg P.C., as Counsel to the Receiver

56