UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

SECURITIES AND EXCHANGE COMMISSION,

                   Plaintiff,

  -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                 Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

## FIFTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD JULY 1, 2018 THROUGH AND INCLUDING SEPTEMBER 30, 2018

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Fifth Joint Interim Application (the "Fifth Interim Application") for Allowance of Compensation

and Reimbursement of Expenses Incurred During the Period from July 1, 2018 through and including September 30, 2018 (the "Fifth Application Period"). There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $138,344.80 and reimbursement of expenses in the amount of $1,031.70 for the Fifth Application Period. Otterbourg requests interim approval of fees in the amount of $980,039.70 and reimbursement of expenses in the amount of $10,938.91 for the Fifth Application Period, for a combined total of fees for Applicants in the amount of $1,118,384.50,[1] and expenses in the amount of $11,970.61 for the Fifth Application Period.

This Fifth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Fifth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Fifth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1] As agreed to by the Receiver, this total amount reflects a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges and a ten percent (10%) reduction in Otterbourg's recorded time charges. Further, in accordance with Otterbourg's customary practice of reviewing its hourly rates annually, Otterbourg adjusted the professionals' hourly billing rates as of October 1, 2017. As previously agreed with the SEC, the Receiver's aggregate fees have been reduced (prior to application of the public service accommodation) to discount for any increase in her billable rate since October 1, 2017. Therefore, the Receiver's recorded time charges before application of these accommodations were $204,215.00 and Otterbourg's recorded time charges were $1,088,933.00, for a combined gross legal fees total (before the application of any public service accommodation or the discount for rate increases) of $174,763.50.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Fifth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.    PRELIMINARY STATEMENT

During the Fifth Application Period, the Receiver continued her efforts to monetize the remaining assets in the portfolio and simultaneously dedicated resources to an analysis of the pre-receivership business and affairs of Platinum, including the enforceability of purported security interests in Platinum's assets, and an investigation into potential significant causes of action against third parties by the Platinum estate (the "Receivership Estate").  Notably, during the Fifth Application Period, the Receiver and her team[2] completed the marketing and bidding process with respect to the Abdala gold mine tailings impoundment in Brazil (the "Abdala Tailings Project"), widely acknowledged to be the Receivership Estate's most valuable asset, and then presented to, and obtained approval from, the Court to enter into the proposed sale.  Since the approval of the sale, the Receivership Team worked diligently with the winning bidder and multiple professionals on the closing of the transaction, which involved several business,

---

[2]    To assist her with her duties, the Receiver sought the retention of counsel and a financial advisor.  To that end, on July 21, 2017, the Court approved the retention of Otterbourg P.C. ("Otterbourg") as legal counsel to the Receiver [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

regulatory and tax components. The sale has recently closed. The Receiver also continued to work towards the monetization of remaining assets in the investment portfolio. The remaining assets have presented more problems and have taken longer to dispose of for a variety of reasons (some long recognized, others unanticipated), including, in some cases, because they are being administered through bankruptcy proceedings or liquidations (*e.g.*, Arabella and Cleveland Mining). The Receiver is hopeful that the remaining assets for which there is a path to monetization can be realized upon in whole or in substantial part in the coming months. In addition, the Receivership Team continued to assess which assets have no present or likely future market value and, thus, should be disposed of without the further expenditure of resources.

In addition to monetizing the portfolio investments during the Fifth Application Period, the Receivership Team continued to investigate pre-Receivership activities. The Receivership Team is engaged in ongoing factual and legal analysis to determine the enforceability of purported security interests claimed in certain or all of Platinum's assets and if there exist any viable causes of action that may be of meaningful value to the Receivership Estate. The Receiver has taken, and continues to take, steps to preserve potential causes of action that may be subject to time limitations. The Receiver has issued subpoenas, and made informal document requests, to obtain additional information from entities involved with certain of the pre-receivership transactions under review. The Receivership Team also dedicated time to the claims process and the factors that will impact which claims may be entitled to a distribution and the timing of distributions, including claims of security interests in Receivership assets and claims to funds in escrow. It is the Receiver's goal to present a motion to the Court regarding a proposed claims process before the end of the year.

4

## A.    Analysis and Disposition of Receivership Assets

The Receivership Team continued to work to monetize the remaining assets in the portfolio or examine alternative disposition options for those assets that have no current market for which further investment of time is unwarranted.  To the extent possible, the Receiver has worked with other investors in the asset to maximize recovery.  If joint disposition is not feasible, the Receivership Team has worked and will continue to work to independently monetize its investment in the asset.

The investments in the Platinum portfolio are diverse.  While many of the assets are in the metals, mining and energy sectors, each of these companies are located in different regions domestically and globally and, as a result, have unique characteristics.  In addition, most of the investments were in companies that are in the developmental stages and have not yet had proven success or the prospects for success were greatly overstated by prior management.  As a result, many of the investments are problematic. For example, many of the investment have real or potential significant liabilities, are subject to potentially superior liens or debt, and/or require additional cash investment for the underlying company to continue or resume operations.  Even the real estate assets are problematic and have limited marketability and several of the stocks held by Platinum have restrictions on trading.

The Receiver continues to only make expense payments that are necessary to maintain or preserve the value of assets, to protect collateral and/or to stabilize operations.  Because many assets have been sold since the Receiver's appointment, the liabilities have been substantially reduced.  At this time, the only significant expense to maintain the remaining assets is the lease payments needed to preserve the LC Energy assets.  As described below, disposition of this asset, which was purchased out of a bankruptcy estate, has been delayed because of unresolved

5500339.3

purported liens on the assets.  The Receiver, however, is examining all options for disposing of this asset and reducing the carrying costs required to maintain the assets. The Receiver continues to believe that, under the circumstances of the Receivership, no asset warrants capital investment beyond what is necessary to preserve that asset and maintain value until monetization is possible. To the extent that it is determined that an asset has no value (or value that is estimated to be less than maintenance costs), the Receiver will not invest further resources to maintain such asset. When possible, the Receiver has undertaken negotiations with other investors or stakeholders involved with assets, including management, to infuse additional cash into the investment to preserve value until the asset can be sold, as well as to reduce ongoing expenditures.

The Receivership Team has sought to "triage" the various assets: first focusing on those assets that are relatively liquid, such as publicly traded stocks, life settlement investments and litigation finance investments; and then focusing on those assets that are less liquid, but that nonetheless, with greater time and effort, can be marketed and hopefully monetized.  For the most part, the assets that are relatively liquid or have a readily available market have been sold. The Receiver continued to focus on the remaining assets during the Fifth Application Period, many of which have taken a longer time to monetize and have presented greater challenges. Those assets for which the Receivership Team has determined, after thorough due diligence to have no viable exit alternative, may be disposed of through a bulk lot remnant sale.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway

---

[3]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

5500339.3

MacKenzie").[4]   Houlihan Lokey and Conway MacKenzie are each responsible for different assets and there is no overlap in the work performed by each.

Because of Houlihan Lokey's areas of expertise, it was retained to market and sell specific assets including (i) the ALS life settlements portfolio, (ii) the litigation finance portfolio, (iii) the Abdala Tailings Project, (iv) LC Energy Operations LLP, and (v) Urigen Pharmaceuticals, Inc.   The ALS life settlements portfolio has been sold; the Abdala Tailings Project sale has been approved by the Court and the parties recently closed the sale; most of the litigation finance portfolio has been sold and the Receiver is continuing to explore options for the remaining litigation finance assets.   Finally, Urigen Pharmaceuticals, Inc. has questionable value due to (a) the suspension of its FDA Phase II trials as a result of inconsistent results and (b) Urigen's apparent inability to raise financing to re-start the trials. While the Receivership Team has periodic calls with Urigen management to discuss the status of the business and its finances, Houlihan is not currently marketing this investment.   Accordingly, following the recent closing of the Abdala sale, Houlihan Lokey's current retention is limited to the marketing and sale of the LC Energy assets.

The Receiver also retained Conway MacKenzie to provide due diligence and assist with the disposition of certain remaining assets that are not being marketed by Houlihan.   Conway MacKenzie was asked to conduct due diligence and recommend a strategy to monetize the following assets: (i) Buffalo Lake Advanced Biofuels, LLC; (ii) Desert Hawk Gold Corp. (which was monetized during the prior application period); (iii) Daybreak Oil and Gas, Inc.; (iv) American Patriot Gold; (v) Greentown Oil Company; (vi) Arabella Exploration; (vii) NordAq Energy; (viii) Xcell Energy; and (ix) Decision Diagnostics Corp.

---

[4]   Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

During the Fifth Application Period, the Platinum Receivership received approximately $2.2 million from the sale of investments. (The closing of the sale of the Abdala Tailings Project closed subsequent to the Fifth Application Period.) Certain parties have asserted a claim to all or part of the proceeds of certain of such liquidated investments.

The foregoing amount received during the Fifth Application Period is in addition to the approximately $35 million received by the Platinum Receivership from the liquidation of other assets since the Receiver was appointed. None of these assets has been marketed or sold in a "fire sale" fashion. As further discussed below, the investments monetized during the Fifth Application Period and the proceeds received by the Receivership Estate were as follows:

- ALS (final policy in approved sale closed): $1.9 million

- PEDEVCO: $215,700

- Katrina Barge: $75,000

As previously reported, the Receiver cannot ascribe values to each of the assets that have not yet been monetized. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from prior (now removed) management's plans, which are now (and likely always were) unrealistic and/or can otherwise no longer be supported. The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations. Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment. As such, the prior valuations were often based on assumptions that Platinum would invest significant

8

additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  As the Court stated in the Houlihan Opinion,

> [t]he Receiver is not tasked with making speculative investments. Instead, she is entrusted with the responsibility to prudently wind-down the Receivership Entities and dispose of the Receivership Assets in a manner that safely returns to stakeholders what value can be salvaged. She is not empowered to jeopardize that return by indulging in risky investment opportunities with the very money she has been charged to return to the victims of alleged years' long fraudulent conspiracies.

*Houlihan Opinion* at 8.  Even with such assumptions made by prior management regarding additional investment, the prior valuations may not have been supportable in view of the issues that the Receiver has encountered with respect to many of the assets.

There are certain assets that may ultimately have no realizable value.  Decisions regarding the monetization of investments necessarily will entail an understanding of the interplay between future expenses (*i.e.*, cost to the estate to maintain the asset), the amount of professional fees required to continue to monitor the asset and examine disposition options, and the time it will take to market and obtain a purchaser for the investment.  The Receiver's goal is to monetize and sell the investments in a manner that balances the interests of being judicious with the assets of the estate, maximizing value and expeditiously disposing of the assets to allow the Receiver to make distributions to investors and creditors and close the case.  At this stage in the Receivership, disposition options for the remaining assets that are not in the process of being monetized are limited.  Based upon the thorough due diligence performed by the Receivership Team, the Receiver's goal is to limit any further investment of professional resources in assets

9

for which there has been a limited or non-existent market.  The Receiver is seeking to finalize

deals for which offers have been made and are still extant, or move such assets into a basket of

assets to be marketed as a bulk lot remnant sale.

In addition, certain parties have asserted an interest, including an alleged secured interest,

in some or all of the proceeds of the sale of assets.  The Receivership Team has engaged with

certain of these parties to discuss their asserted interests and has also been reviewing these

purported interests in the context of the Receiver's forensics investigation.  The Receiver has

also been investigating potential claims that the Receivership Estate may be able to assert, which

in some cases overlaps with parties asserting a secured interest in some or all of the Platinum

assets.

A description of the investments in which Applicants have dedicated significant time

during the Fifth Application Period and the work done during the Fifth Application Period with

respect to those investments is set forth in Section IV of this Fifth Interim Application.

### B.   Administrative Matters

The Receiver and the Receivership Team continued to speak and meet with various

interested parties and groups during the Fifth Application Period, including the joint liquidators

for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA"),[5]

counsel for the defendants named in the SEC's criminal complaint (the "Defendants") regarding

access to documents and requests for advances for defense costs, investors and their

representatives, equity holders in specific investment vehicles in which Platinum is the majority

holder, and the SEC.  The Receiver also held another "town hall" style meeting with investors

and other interested parties via webinar and telephone to provide an update on the actions taken

---

[5]      PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15
bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

5500339.3

to date and to answer questions.  The Receiver will continue to hold these forums going forward. The Receiver regularly updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The Receiver and the Receivership Team also meet in person or by telephone with investors and/or their representatives upon request.   The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

During the Fifth Application Period, the Receivership Team spent significant time objecting to a fee application filed by a law firm retained by Platinum prior to the Receivership and that continued to provide legal services, without Court-approved retention, to the Prior Receiver after the commencement of the Receivership.   The Receiver believed the law firm was not entitled to be paid any fees by the Receivership estate, and did not act in the best interests of Platinum.  The Receiver, therefore, objected to the payment of any fees to the law firm and the Court agreed with the Receiver and denied the request for fees during the Fifth Application Period.  The law firm has since filed a notice of appeal of the Court's decision.  The Receiver also has sought to clawback monies paid to the law firm in satisfaction of pre-Receivership obligations after the commencement of the Receivership.   The Receiver's clawback efforts remain the subject of ongoing Court proceedings.

The Receivership Team also responded to other applications made before this Court and in other state court proceedings involving Platinum.   Moreover, many of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world.   During the Fifth Application Period, the

11

Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds. In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual

Defendants have denied all material allegations.  The trial is currently scheduled to commence in January 2019.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to

13

investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

**B.    Case Status[6]**

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)    As of September 30, 2018, the Receivership Entities had $16.6 million in unencumbered funds.[7]  These funds include proceeds from the liquidation of assets.  Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets.  These claims are under investigation and will be addressed in due course.

It is estimated that, as of September 30, 2018, accrued, unpaid administrative expenses amount to approximately $5.6 million.  This amount includes the estimate of fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the Fifth Application Period and that will be requested in future applications, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the

---

[6]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period July 1, 2018 through September 30, 2018.

[7]   As of the filing of this Application, following the closing of the sale of the Abdala Tailings Project, the Receivership Entities have approximately $38.5 million in unencumbered funds.

Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Fifth Application Period.

(b)     Cash disbursements during the Fifth Application Period totaled approximately $1.4 million.  This amount consisted primarily of (i) $389,000 in disbursements to retained professionals, as well as limited scope professionals hired by the prior receiver; (ii) $389,000 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as rent); (iii) $608,000 in maintenance expenses, which include funds disbursed to preserve the value of the following assets: LC Energy ($330,000) and the Abdala Tailings Project ($278,000).  The Receiver expects expenses to decline now that the Abdala Tailings Project sale has closed.

Cash receipts during the Fifth Application Period totaled approximately $2.2 million. This amount primarily consists of proceeds derived from dispositions (discussed below) associated with the following investment positions: a life insurance policy remaining from the sale of the ALS life settlements portfolio ($1.9 million), PEDEVCO ($215,700) and Katrina Barge ($75,000).

The Receiver cannot at this time state when she expects the case to be concluded.  The Receiver expects that the majority of the asset sales will be concluded this year, although there will still be some asset sales that will carry over into next year.  The Receiver and the Receivership Team will be focusing this quarter and next on the claims reconciliation process, as well as the continuation of the forensics investigation for the possible assertion of additional claims.

(c)     The Receiver has not yet initiated a formal claims bar date.  Thus, no claims proceedings have yet been commenced.  The Receiver has not yet determined how different types of claims or creditors will be treated or the methods that will be used.

As of September 30, 2018, the primary assets of the Receivership Estate consisted of the following:

(i)     Cash and cash equivalents of approximately $16.6 million;

(ii)     Real estate investments without any set book value, due to their inherently speculative nature;

(iii)     Investments in natural resources, remaining litigation financing, energy and other miscellaneous investments; and

(iv)     Potential litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(d)     The Receiver timely commenced a confidential arbitration action against a third party professional that had provided services to Platinum.  A tribunal was formed and an organizational meeting held, but the neutral that was selected withdrew during the Fifth Application Period and a new neutral was not selected until November 21, 2018.  Because the parties have not yet met, and raised the issue of confidentiality, with a reconstituted arbitration tribunal, the Receiver, in an excess of caution, has determined, at this point in time, not to disclose the name of the third party professional and nature of the claims.  The only other litigation commenced relates to one of the ALS life settlement policies against the life insurance company (Lincoln Financial) that is asserting that the life insurance policy terminated prior to the Receiver's appointment.   No litigation recoveries have been received.   The Receiver has, however, sought and obtained tolling agreements to preserve potential causes of action that may be subject to statutes of limitation.  The Receiver cannot at this time cannot state the extent of

16

any further litigations that may be commenced and, if commenced, the value of any claims and the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.  At the heart of the analysis will be a determination of the cost/benefit of asserting claims.  Investigation and litigation are costly endeavors and the Receiver does not intend to expend material estate assets unless the Receiver has the necessary facts and information to assert a meritorious claim and has concluded that there is a likelihood of recovering funds if liability is eventually found.

## III.     FEES AND EXPENSES REQUESTED

In connection with the Fifth Application Period, the Receiver requests interim approval of her fees in the amount of $138,344.50 and reimbursement of expenses in the amount of $1,031.70.  Otterbourg requests interim approval of its fees in the amount of $980,039.70 and reimbursement of expenses in the amount of $10,938.91.  Thus, the combined total of fees for Applicants of $1,118,384.50, plus expenses of $11,970.61, is $1,130,355.11.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment.  For example, a single investment, such as Arabella, which is in multiple bankruptcy proceedings in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, including cash collateral issues, as well as pure litigation issues to address the adversary proceeding with a third party that was impeding the ability to sell the Arabella assets in which Platinum has a security interest.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below,

which was approved by the SEC and the Court at the time of the appointment of the Receiver. These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time. Furthermore, fees for legal services performed by all other Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges. In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since October 1, 2017 in accordance with Otterbourg's regular practice of reviewing and revising its hourly fee rates annually.

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $204,215.00 to $138,344.80, a reduction in the amount of $65,870.20. Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,088,933.00 to $980,039.70, a reduction in the amount of $108,893.30. Therefore, the total reduction for legal fees incurred during the Fifth Application Period by the Receiver and Otterbourg professionals is $174,763.50.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of this Fifth Interim Application to SEC counsel on November 9, 2018 to allow for a thirty-day review period.

This Fifth Interim Application includes certain exhibits:

(a)     The SFAR for the period of July 1, 2018 through September 30, 2018 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Fifth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Fifth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Fifth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)       Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Fifth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted this Fifth Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Although nine attorneys and two paraprofessionals billed time during the Fifth Application Period (in addition to the Receiver), a core team of attorneys performed the lion's share of the services, including Adam Silverstein, Philip C. Berg, Erik B. Weinick, Jennifer S. Feeney and Andrew Halpern.[8]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. Accordingly, in some instances relatively small amounts of time were spent by attorneys with expertise relevant to specific issues in the case.  These less significant involvements benefited the Receivership Estate because it gave the core group of attorney's additional insight into and knowledge of

---

[8]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Fifth Application Period.

important legal issues directly impacting the Receiver's decisions in this case.  In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Fifth Application Period and their specific roles were as follows:

(a)     Andrew M. Kramer (Partner) (45.9 Hours to P01) – Mr. Kramer is a senior partner in the restructuring department.  During the Fifth Application Period, Mr. Kramer's involvement was solely with respect to the Cleveland Mining investment located in Australia. Mr. Kramer has been coordinating with local counsel in Australia regarding the liquidation proceeding commenced against the company in Australia.

(b)     Adam C. Silverstein (Partner) (4.0 Hours to P01; 41.6 Hours to P02; 59.2 Hours to P04; 63.0 Hours to P10) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation.  Mr. Silverstein was active in ancillary issues concerning the Arabella matter, including the objection to the fee dispute with former (un-retained) counsel with respect to the Arabella asset –Schafer & Weiner ("S&W") – and analysis of the purported participant and guaranty claims of certain third parties.  Mr. Silverstein also assisted with applications to the Court, including the application seeking approval of the Abdala Tailings Project sale and the response to the objections filed with respect to such motion.  Finally, Mr. Silverstein has also been heavily involved in forensic issues, including the arbitration proceeding, selection of a neutral in such proceeding, issuance of subpoenas to third parties, negotiation of tolling agreements and communications with parties that are the subject of the Receiver's investigation.

21

Mr. Silverstein has also been one of the main point persons regarding communications with the SEC and during the Fifth Application Period.

(c)     <u>William Moran (Partner) (30.5 Hours to P10)</u> – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's forensics investigation.  In particular, Mr. Moran has focused on issues related to Beechwood and SHIP, including the recently initiated litigation between the two parties and the impact on the Receivership Estate.  Mr. Moran spent significant time reviewing the underlying documents and complaint and formulation of claims that can be asserted by the Receiver.

(d)     <u>Philip C. Berg (Partner) (2.8 Hours to P01; 319.3 Hours to P02; 3.7 Hours to P04)</u> – Mr. Berg is a senior transactional partner and Chairman of Otterbourg's corporate department, whose focus has been the negotiation, documentation and closing of Receivership transactions. Mr. Berg is the point person for Houlihan Lokey regarding the review and monetization of assets within its portfolio.  During the Fifth Application Period, Mr. Berg dedicated a significant amount of time to the Abdala Tailings Project, including working with Houlihan Lokey to position the asset for final bids, review and analysis of the final bids, negotiations with final bidders, assistance with preparing for the motion papers seeking approval of the sale, and preparation for the closing of the sale.  Mr. Berg has also drafted, reviewed and/or negotiated transactional documents and strategies for the sale of other assets, including Arabella, PEDEVCO, Daybreak and Cokal, among others.

(e)     <u>Jennifer S. Feeney (Of Counsel) (79.1 Hours to P01; 41.7 Hours to P02; 81.3 Hours to P04; 7.9 P05; 5.5 Hours to P10)</u> – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Fifth Application Period, Ms. Feeney spent significant time with respect to the Arabella

bankruptcy case and sales process.  Ms. Feeney also attended to other case administration matters, including coordinating with Cayman counsel and the Cayman directors for the de-registration of the Cayman funds, preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Additionally, Ms. Feeney, along with Erik B. Weinick prepares applications to the Court and works to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(f)     Erik B. Weinick (Of Counsel) (35.4 Hours to P01; 120.4 Hours to P02; 200.9 Hours to P04; 4.4 Hours to P05; 55.4 Hours to P10) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including the objection to the S&W fee application and taking the deposition of the S&W witness, the deposition of a former Platinum employee with information relevant to the ALS asset in particular, response to the Defendants' request for advancement of legal fees, and coordinating with Platinum's remaining employees.  Mr. Weinick is also part of the forensics team, analyzing potential causes of action.

(g)     Andrew S. Halpern (Associate) (132.3 Hours to P10) – Mr. Halpern is an experienced litigator, particularly in the area of claims of professional malpractice and forensic analysis.  As such, during the Fifth Application Period, Mr. Halpern continued his work with respect to the confidential arbitration proceeding, prepared subpoenas issued to third parties, and negotiated tolling agreements.

(h)   <u>Afruz Sayah (Associate) (24.4 Hours to P02)</u>  – Ms. Sayah is a member of Otterbourg's corporate department, and assists Mr. Berg, at a lower billing rate, with the documentation of asset dispositions. Among other transactions, Ms. Sayah assisted with the review of the Daybreak and PEDEVCO documents.

(i)   <u>Gabriela S. Leon (Awaiting Admission) (9.6 Hours to P04, 62.1 Hours to P10)</u> – Ms. Leon is a new member of the litigation department.  Ms. Leon was utilized to research issues relating to the forensics investigation, the objection to the S&W fee application, and the Defendants' request for advances to pay legal costs, at a considerably lower billing rate.

(j)   <u>Jessica Hildebrandt (Paralegal) (2.8 Hours in P01; .4 Hours in P02; 49.5 Hours in P04; 27.1 Hours in P10)</u> – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a paralegal at a lower billable rate), helped prepare the Otterbourg attorneys for various hearings, depositions and court filings, and monitored the criminal docket for the Receivership Team.

## IV.   SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING FIFTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Fifth Application Period into five (5) project categories.[9]   Narrative summaries of these activity categories follow:

### A.   <u>Asset Analysis and Recovery (P01) - Total Fees: $249,547.00</u><br><u>Asset Disposition (P02)</u>[10] <u> - Total Fees:  $430,633.50</u>

During the Fifth Application Period, the Receiver and her professionals continued to review the various assets in the portfolio.  Certain assets were sold, certain others continued to be

---

[9]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[10]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

marketed, and others were prepared to be launched to market.  Other assets are still embroiled in litigation and/or bankruptcy proceedings and actions are being taken by the Receiver and the Receivership Team to position such assets so that it can eventually be monetized.  In certain instances, time was also spent with respect to an asset that may not ultimately have a positive return to the Receivership Estate, but work is still required to reduce potential liabilities and exposure to the Receivership Estate, as well as to ensure that any such asset without value is not imprudently abandoned by the Receivership Estate.

During the Fifth Application Period, Applicants continued to analyze Platinum's asset portfolio, including a review of the underlying investment documents and in-person and telephonic meetings with Goldin, Houlihan Lokey and Conway MacKenzie (depending on the professional assigned to the particular investment), as well as, in some instances, management and other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Fifth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

Given the myriad of investments and different members of the Receivership Team working on each, to keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular (approximately every two weeks) team meetings with her, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer.  In advance of these weekly meetings, Applicants reviewed with members of the Receivership Team

which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency. These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the sprawling Platinum portfolio. Regular calls also take place with the Conway MacKenzie team to coincide with the Otterbourg and Goldin team meetings. Calls were held as often as necessary with Houlihan Lokey with respect to the Abdala Tailings Project.

While the Receiver and Otterbourg have focused on a myriad of investments during the Fifth Application Period, below is an overview of certain of the investments in which Applicants have dedicated significant time. The below summaries include a brief description of the nature of the investment, work performed, and status during the Fifth Application Period.

(a)     **Abdala Tailings Project** – refers to PPCO's interests (through a subsidiary, West Ventures LLC) in a gold tailings pond located near Cuiababa, Brazil. PPCO has contract rights to extract gold for a period of ten years from the tailings impoundment. The tailings impoundment is approximately 300 meters wide by 300 meters long and 20 meters deep containing dried slurry (*i.e.*, sand and gravel) that was a byproduct of earlier gold mining operations. This impoundment is adjacent to the former Abdala gold mining operation.

Platinum's investment in Abdala resulted from loans totaling, according to Platinum's books, $12.3 million that it extended to Resource Holdings, Inc. ("RHI"). RHI is a development-stage company that leased equipment and provided working capital to Brazilian gold mines. With the funds advanced from Platinum, RHI, in turn, financed the owner of the Abdala gold mine, Reginaldo Luiz De Almeida Ferreira (a.k.a. "Rico"), whose loans from RHI subsequently were assigned to Platinum. The loans to RHI and Rico went into default, and, following a settlement with RHI, Platinum began foreclosure proceedings against Rico. In or about

November 2015, following years of contentious litigation and negotiations, Platinum and Rico reached an agreement whereby Platinum received ten years of mining rights in and to the Abdala tailings pond in settlement of the loan obligations. The project was in the permitting stages and the intended processing plant was never developed because of Platinum's liquidity issues. Additional details regarding the background of this asset can be found in the motion papers submitted to the Court seeking the approval of the sale.

Houlihan Lokey launched the marketing process for this asset at the end of 2017. After eight months (not including pre-marketing preparation time), the efforts undertaken by Houlihan and by Brazilian counsel, Chediak, to resolve local legal impediments, resulted in a robust competitive bidding process and in the Receivership achieving what the Receiver and her professionals believe is Abdala's fair value. The winning bidder for the Abdala assets was an affiliate of Centerbridge Partners, L.P. ("Centerbridge"). On August 6, 2018, the Receiver filed a motion seeking approval of the sale to Centerbridge and payment of related expenses. There were a few objections to the proposed sale; notably, an objection by one of the losing bidders (subsequently withdrawn). The Receiver filed additional papers in support of the sale and in response to the objections, and the sale motion was approved by the Court on September 11, 2018. [Dkt. No. 380]

Following the approval of the sale, Applicants worked diligently with Goldin, Houlihan Lokey, Chediak, and the buyer's team of professionals to close the sale. The closing involved the drafting and review of multiple documents and was complicated as a result of the manner in which Platinum's ownership and transfer to it was documented by prior management and because of issues involving Brazilian tax law. As set forth in further detail in the memorandum of law in support of the sale [Dkt. No. 364], the sale was for $27.5 million in cash at closing,

plus additional and potentially highly valuable consideration based on resource validation results and future mining revenues. The cash at closing, however, was subject to the payment of Houlihan Lokey's fees, as well as Brazilian capital gains holding taxes. In addition to the cash up front, the Receivership is entitled to $3 million in cash royalty advances approximately six months after closing if gold content is validated to exceed a 9 grams per ton, as well a 7.5% royalty on cash revenues after the purchaser achieves a 3.0x multiple of invested capital.

During the Fifth Application Period, after resolving issues that delayed the final bidding process, Applicants worked closely with Houlihan Lokey on the solicitation of final bids, reviewed the bids with Houlihan Lokey, had several meetings with Houlihan Lokey, the Receiver and Golding to evaluate the competing bids and provide direction to Houlihan Lokey to seek to improve upon the offers and select the winning bidder. Applicants also spent time drafting the sale documents and making changes to the proposed Asset Purchase Agreement. Applicants also prepared the motion and supporting declaration seeking the approval of the sale, reviewed the objections filed with respect thereto, and prepared responses to the objections. Following the approval of the sale, Applicants worked with local co-counsel and Centerbridge's counsel to prepare all ancillary documents and resolve impediments to closing. Otterbourg professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.

(b) **ALS Life Settlements Portfolio** – refers to a portfolio of life settlement investments owned through an entity in which PPCO is the majority owner and managing member. The previously approved sale of the life settlement portfolio closed during the prior Application Period and all but one of the Policies that were sold were transferred to the Purchaser during the prior period. The one Policy that was not previously transferred required

28

additional work to effectuate the transfer because of a residual ownership interest on the policy. Otterbourg worked with Houlihan Lokey and the residual interest owner to address the issue and eventually effectuate the transfer.  As a result, approximately $1.88 million of the total purchase price was received by the Receivership Estate during the Fifth Application Period. The Receiver also initiated a litigation involving a policy (Rosenberg) that was not sold, for which the insurance company (Lincoln) is asserting that it terminated prior to the Receiver's appointment.

During the Fifth Application Period, Applicants worked to effectuate the closing of the final policy that was sold.  Applicants also oversaw and worked with contingency counsel retained in connection with the litigation against Lincoln with respect to payment on the Rosenberg policy.  Additionally, Applicants prepared for and took the deposition of Jayson Winer, a former Platinum employee that was responsible for the ALS asset portfolio, regarding information he has concerning ALS.  Otterbourg professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.

(c)     **American Patriot Gold** – refers to Platinum's ownership interest, through Maximilian Resources LLC ("Maximilian"), to approximately 370 acres of land fee simple, in addition to patented mining claims in Montezuma County, Colorado.  American Patriot Gold ran the Red Arrow Mine on the property until its mining permit was revoked in March 2014 as a result of non-payment of restitution for environmental and operational violations.  Conway MacKenzie was asked to review this asset and provide the Receiver with disposition options.

Based upon Conway MacKenzie's due diligence, obtaining permits and selling the asset as a working gold mine was determined not to be an economical option due to the significant cost and timeframes involved.  Accordingly, during the Fifth Application Period, on August 22, 2018, the Receiver filed a motion to retain a local broker, Wells Group of Durango, Inc., to

market and show the property to potential purchasers.  [Dkt. No. 376]  At a status conference before the Court on October 1, 2018, the Court authorized the Receiver to retain the broker.  The Receiver is currently working with the broker on the listing details.  The sale of the property will likely be subject to a public sale.

During the Fifth Application Period, Applicants worked with Conway MacKenzie during the Fifth Application Period to analyze the options for disposition of the asset and also prepared the motion papers seeking to retain the broker.

(d)     **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million dollar facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella"). Arabella has working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.  Pre-Receivership, a related Arabella entity in which Platinum does not have an interest – Arabella Petroleum Corporation ("APC") – commenced an action against the Arabella Entities asserting claims for the recovery of certain assets that are the subject of PPCO's liens. APC is also a debtor in a bankruptcy proceeding pending in the Western District of Texas.  The Prior Receiver entered into a settlement agreement with the Trustee of APC, settling the claims and agreeing to the interests of each estate in the combined assets that are to be sold in the

respective bankruptcy cases.  The Arabella Settlement Agreement was approved by this Court. Pursuant to the settlement with APC, APC is entitled to 35% of the net proceeds, as defined, of the sale of Arabella's working interests in the leased oil and gas properties.

Earlier this year, Arabella entered into a settlement with Founders Oil & Gas III, LLC and Founders Oil & Gas Operating, LLC (collectively "Founders") to resolve all issues regarding revenues and expenses, as well as future operatorship with respect to the wells and inclusion of the operatorship in the sale process for Arabella's assets.  This settlement enabled AEX's sale process to move forward.  In connection with moving the sale process forward and obtaining maximum value for the AEX estate (of which PPCO is the largest secured creditor) AEX prepared and filed amended bidding procedures, negotiated terms for the exit of the current broker and retention of a new broker.

During the Fifth Application Period, Arabella conducted the sale process for its working interests, together with those of a majority of the other working interests and operatorship.  The sale process resulted in multiple bids for different combinations of the various working interests. Arabella's CRO reviewed the bids in consultation with Platinum and the APC Trustee and two bids were selected (one for a single well and the other for the remaining assets).  The initial winning bidder for the sale of the bulk of the assets reneged on the terms of its initial bid and AEX ultimately completed a sale with the next highest bidder.  The sale of the assets was approved by the Texas Bankruptcy Court following the Fifth Application Period.  Arabella and Platinum also jointly propounded a proposed plan of reorganization and requested that it be heard on an expedited basis.  The plan was confirmed by the Texas Bankruptcy Court at a hearing held on November 20th.  In addition, Arabella has been addressing purported liens through adversary proceedings which are currently before its Texas Bankruptcy Court.  From the

sale proceeds, payments will be made to the APC Trustee and Founders, in accordance with their respective settlements, the broker, the taxing authorities, priority and administrative claimants and Arabella's retained professionals upon approval of their fees.  In addition, the counterparty to a purported Participation Agreement entered into with the Prior Receiver may assert a claim to Platinum's recovery on account of the sale of the Arabella assets, in addition to parties to a purported guaranty entered into with certain professionals and prior management.

As the actions of various parties having claims with respect to Arabella assets, and rulings of courts with respect to such parties' rights, have developed, and there are still many variables at issue that will impact the Receivership Estate's assets, the Receivership Team has had to devote significant time and attention to the asset without knowing in advance what the expected recovery to the Receivership Estate will ultimately be.

During the Fifth Application Period, Applicants had regular status conferences with the Trustee of APC and CRO of AEX (and their respective representatives) to discuss the sale process and the status of discussions with the non-operating interest holders regarding the addition of their acreage to the sale to increase the per acreage value continued during the Fifth Application Period.  The Receiver and the Receivership Team also had frequent telephonic and e-mail communications with Arabella's retained professionals, including its CRO, bankruptcy counsel and litigation counsel.  Applicants also worked with Goldin to analyze various liquidation scenarios and claims and liens that may come ahead of those of Platinum to ascertain the potential best case and worst case recovery scenarios.  Applicants also had discussions with the joint liquidators of the parent company in the Cayman Islands regarding payment under a purported guaranty of fees in favor of professionals that was given by prior management.  In addition, Applicants spent time reviewing and commenting upon (i) the sale motion and bidding

32

procedure papers prepared by AEX, including the proposed sale order and asset purchase agreement; (ii) the motion to combine the disclosure statement and confirmation hearing; (iii) the proposed plan of reorganization and disclosure statement that is being jointly propounded by AEX and Platinum; (iv) and the complaint filed seeking to disallow asserted materialman's (oil) liens. Applicants also analyzed the list of priority and administrative expenses that are required to be paid under the proposed plan of reorganization. Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

(a)   **Azarga Uranium Corp.** – refers to a publicly traded uranium mining company headquartered in Denver. Azarga merged with another similar company in July 2018, effectively doubling its size. Prior to the merger, Azarga's stock was highly illiquid. PPCO currently owns approximately 18 million shares of Azarga stock.   PPVA also owns Azarga shares.

Subsequent to the merger, as a result of both a recovery in the price of uranium and Azarga's increased size, there has been a renewed interest in Azarga's stock. With the assistance of Azarga management, PPCO and PPVA has been contacted by a brokerage firm in Vancouver, BC that specializes in junior mining stocks about placing block trades in the combined positions. The terms of the engagement of the broker were negotiated during the Fifth Application Period and PPCO's positon in Azarga was sold on October 17 for approximately $1.2 million.   Applicants reviewed the transaction summary and the Securities Engagement Agreement.   Otterbourg attorneys who have billed time to this matter are attorneys with transactional experience.

(b)   **Buffalo Lake Advanced Biofuels (a/k/a BLAB)** - refers to a idled, dry mill ethanol production facility located in Buffalo Lake, Minnesota in which PPCO, through West Ventures, holds a debt and equity interest. Conway MacKenzie has been asked to review this

asset and provide the Receiver with disposition options.  West Ventures was a senior secured lender to BLAB's predecessor, Purified Renewable Energy LLC, an entity that filed bankruptcy in 2013. West Ventures acquired all of BLAB's assets in the bankruptcy proceeding through a credit bid of its prepetition secured debt.  West Ventures' mortgage in the original principal amount of $18 million was preserved, in part, under the bankruptcy court's sale order.  Based upon the due diligence performed on this asset, the Receiver determined that this investment did not warrant additional funding.

Conway MacKenzie conducted significant due diligence, including compilation of a list of strategic purchasers, and contacted the strategic purchasers, as well as liquidators and auctioneers to determine the potential sale or liquidation value of BLAB.  The feedback from Conway MacKenzie's marketing and due diligence efforts -- the value of the real property assets in which West Ventures holds a lien either under a liquidation or sale scenario – has been evaluated by the Receiver in the context of existing liens that come ahead of West Venture's interests.  Based upon this assessment, the Receiver determined not to invest any further resources towards this investment as there is unlikely to be a return, if any, that would warrant additional support.

During the Fifth Application Period, Applicants reviewed Conway MacKenzie's memorandum and conclusions regarding Platinum's position and discussed such conclusions with the Receiver.   Otterbourg attorneys who have billed time to this investment include attorneys with experience in transactional matters.

(c)     **China Horizons/Yellow River** – refers to PPCO's 45% interest in PGS (which claims to be owned 55% owned by PPVA) equity and debt interests in two companies -- China Horizon and Yellow River—created to build a chain of franchised convenience stores in rural

5500339.3

China.  The promissory note from China Horizon held by PGS has a face value of approximately $9.0 million and PGS holds approximately 6.5 million share of stock in Yellow River.  China Horizon was originally a joint venture with another company, China Post.  China Post subsequently pulled out of the joint venture and China Horizon transferred its intellectual property to Yellow River.  Yellow River, in turn, distributed its equity to the debt and equity holders of China Horizon.  Subsequent to the transfer, China Horizon received approximately $15 million from China Post as proceeds of the settlement of a dispute between them.  PPVA also directly holds debt and equity in China Horizon and Yellow River.  The promissory notes from China Horizon are not yet due.

Prior to the Fifth Application Period, the Receiver and the PPVA received an expression of interest from Yellow River's largest investor to purchase PGS's and PPVA's collective interests in the China Horizon notes and the Yellow River equity position.  Members of the Receivership Team and representatives of PPVA met in person with the investor.  Although an agreement in principle was initially reached, negotiations to document that agreement in principle have revealed certain issues which are currently under discussion among the parties but may derail a transaction.

During the Fifth Application Period, Applicants and Goldin spent time speaking with the potential purchaser and following up with PPVA's representatives regarding its direct discussions with the potential purchaser and seeking to resolve issues that are an impediment to closing a sale.  Applicants also drafted a Settlement, Assignment and Release Agreement to effectuate the sale, anticipating that the remaining issues involving PPVA could be resolved and the Receiver wanted to be in a position to quickly close on the transaction.  Otterbourg attorneys who have billed time to this matter primarily include transactional attorneys.

(d)  **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings").  PPCO and Platinum Long Term Growth VII LLC are owed approximately $15.6 million, which is secured by a first priority security interest in all of Cleveland Mining's and Iron Holdings assets.  PPCO also holds approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings.  Cleveland Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not operating and is the subject of litigation in Brazil.

Cleveland Mining has been in a liquidation proceeding in Australia.  Platinum previously filed a proof of debt form to register its claim.  Applicants have been in frequent communication with the Australian liquidators, including discussions regarding the status of the liquidation and potentially selling the publicly listed corporate shell and an allocation of the proceeds between the liquidator and PPCO.  Applicants also reviewed and discussed with the liquidators bids received for the shell.  Discussions are ongoing.  Applicants prepared the Proof of Debt Form and have also been working with local counsel and spent time working on a draft Non-Disclosure Agreement for potential bidders and a Deed of Forbearance in connection with a potential sale of the shell company.  One Otterbourg attorney with experience in workout matters has had primary responsibility for this investment.

(e)  **Cokal Limited** (ASX: "CKA") – is a coal mining company headquartered in Sydney, NSW.  CKA's active mining project is on the island of Borneo in the Bumi Barito Mineral ("BBM") of Indonesia.  Over the past year, the BBM mine has been developed and CKA has received commitments from several investors to support continued development of the mine.

PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, warrants, and a Note).  As a result of a Debt Restructuring Transaction agreed to by the prior management, the Note was restructured into new warrants and a royalty from revenues of the BBM upon CKA meeting certain conditions.  A number of those conditions have been met and one third of the Note has been converted into warrants.  The remaining two thirds will be converted into the royalty upon CKA meeting the remaining conditions.

During the Fifth Application Period, Applicants reviewed an offer to purchase the common stock and warrants and Goldin's recommendations and analysis with respect to the disposition of this asset, including a review of equity documents and valuation analysis.  Negotiations continue with the prospective buyer.  A review of the relevant documents and documents needed to effectuate a sale are in process.  Otterbourg attorneys who have billed time to this investment include attorneys with transactional experience.

(f)    **Daybreak** - refers to a publicly held oil and gas company with assets in the Kern County, California and in Montcalm County, Michigan.  PPCO owns 99% of the membership interests and is the managing member of Maximilian, which is owed approximately $9.2 million,[11] plus accrued interest, from Daybreak on account of a senior loan, secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage.  Maximilian also holds a percentage of working interests in the Michigan operation.  Conway MacKenzie was asked to evaluate and market the Daybreak investment.  Conway MacKenzie created a virtual data room and compiled a comprehensive list of parties that may be interested in purchasing the California and/or Michigan assets.

---

[11]    In California, Platinum's position in Daybreak includes a promissory note in favor of Maximilian with a face value of approximately $9.1 million and in Michigan, Maximilian holds a promissory note with a face value of approximately $100,000.

During the prior period, Conway MacKenzie conducted a sale process which resulted in several parties submitting bids that were qualified in various ways. Conway MacKenzie continues to work with these parties to remove or satisfy the qualifications so that a sale can occur. During the Fifth Application Period, Applicants reviewed the documents in the virtual data room and drafted form purchase documents in anticipation of a sale. Otterbourg attorneys who have billed time to this investment include attorneys with transactional experience.

(g)     **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah. Through Maximilian, PPCO holds a debt and equity interest in the company.

The Receivership Team previously investigated the receipt of certain insurance proceeds by a Greentown related entity – Pacific Energy & Mining, Company ("Pacific") -- that the Receiver believes were assigned to Maximilian. Maximilian has asserted a right to the proceeds. In June 2017, while the Receivership case was pending, Pacific commenced a declaratory judgment action in the U.S. District Court for the District of Nevada (Pacific Energy & Mining Company v. Maximilian Resources LLC, Case No. 17-cv-00363 (HDM) (VPC)), seeking a declaration that Pacific does not owe any money to Maximilian. During the Fifth Application Period, the Receiver continued to engage in motion practice and negotiations to resolve the litigation are continuing. In parallel, the Receiver has evaluated various recovery alternatives with assistance from Conway MacKenzie and is prepared to proceed down an alternative path if it becomes unlikely that settlement negotiations will reach a successful conclusion.

During the Fifth Application Period, Applicants spent time reviewing Pacific's Motion for Summary Judgment and analyzing and discussing the terms of a potential settlement. Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation.

(h)     **Katrina Barge** – refers to certain loans and financial accommodations made by Hamilton Capital VII, LLC, an entity in which PPCO has an ownership interest, to, among others, Hurricane Katrina Barge Litigation Joint Venture, LLC, an entity that was formed to explore, evaluate and to jointly prosecute certain legal actions, including those arising in that certain litigation known as Parish of St. Bernard v. LaFarge North America, Inc. (La. Docket No. 2:11-cv-02350-ILRL-JCW) (the "Katrina Barge Litigation").

During the first quarter after the Receiver's appointment, the Receiver collected a payment of $5,628,059.98 on account of the repayment of the financing of the Katrina Barge Litigation.  The Receiver, however, was still involved in an interpleader litigation pending in the New York Supreme Court, Nassau County, entitled Hurricane Katrina Barge Litigation Joint Venture, LLC v. Law Office of Richard T. Seymour PLLC, et al., Index No. 607358/2017, regarding entitlement to additional funds from the Katrina Barge Litigation (the "Interpleader Litigation").  During the Fifth Application Period, the Receiver settled her claim in the Interpleader Litigation for the payment to Platinum of $75,000.  The Receiver determined that the settlement was in the best interests of the Receivership Estate in light of the merits of, and cost to prosecute, the Receiver's claims to additional funds from the Katrina Barge Litigation, which claims to attorneys' fees had been assigned to Platinum by attorneys whose rights the Receiver would have ethical and evidentiary issues pursuing.  Applicants spent time preparing a stipulation adjourning the pending summary judgment motion while the parties were discussing

settlement, and then reviewing the settlement offer and settlement papers.  Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation.

(i)      **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of In re Lily Group, Inc., Case No. 13-81073 (Bankr. S.D. Ind.).   Following its acquisition of the mine, PPCO retained a third party mining contractor to assist it in putting the mine back into production.   Through a combination of mismanagement and a downturn in coal prices, the mine did not reach cash flow breakeven, the contract miner was terminated, and the mine idled.  A new mine operator has subsequently been retained who now oversees environmental remediation and mine security.

The Receivership Team has been working with Houlihan Lokey in preparation for launching the marketing of this asset.  Before launching the asset to market, the Receivership team, working with local counsel, has endeavored to address issues regarding purported liens on the assets.  During the Fifth Application Period, the Receivership Team and local counsel have discussed the best approach for quantifying and resolving the asserted claims and liens in the Lily Group bankruptcy proceeding and have engaged with certain of the purported lienholders and will seek to extinguish the purported liens of the remainder.  In the interim, the Receiver continues to make lease payments on the mine to maintain the value of the asset until it can be monetized.

During the Fifth Application Period, Applicants engaged with local counsel to obtain updates and provide direction regarding the negotiations with purported lien holders and the estate.  Applicants continued to review options for addressing liens, concluding negotiations, and moving to dispose of the asset.  Applicants also negotiated a settlement with one of the

40

landlords for reduced rent payments and the landlord's agreement to work with PPCO on any potential sale to a third party.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with litigation, M&A transactions and bankruptcy experience.

(j)  **NordAq Energy** – refers to a privately held oil and gas company that holds a 17.5% working interest in oil and gas development on 20,491 gross acres located offshore from Alaska in the Beaufort Sea in an area called Smith Bay.  NordAq is the Operator on two of the wells, both non-producing and non-revenue generating.  PPCO owns shares and potentially warrants in NordAq through RJ Funding LLC.  The shares held by PPCO represent approximately 2% of the total shares issued.  Monetization of this investment is challenging as it is illiquid private equity in a financially challenged pre-revenue company with significant debt. The company's largest asset is tax credits.  This asset created a further challenge because of the limited information in Platinum's files regarding NordAq's capital structure, rights, obligations and claims of other investors.  As a result, Conway MacKenzie had to rely upon limited information from the company's CFO.

During the prior quarter, the Receiver received an offer for the purchase of PPCO's stock and warrants.  During the Fifth Application Period, Applicants engaged with the potential purchaser and began to prepare legal documentation to effectuate a sale, but the purchaser has since backed away from the offer.  These assets may be included in a bulk remnant asset sale if no further interest is generated.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with transactional experience.

(k)  **PEDEVCO Corp., d/b/a Pacific Energy Development** – refers to a publicly-traded energy company engaged in the acquisition and development of strategic, high growth energy projects, including shale oil and gas assets, in the United States.  Platinum's interest in

5500339.3

PEDEVCO is through its ownership in PGS (of which PPVA claims to own 55%). During the prior Fifth Application Period, PEDEVCO was restructured and PPCO received its share of the proceeds from PGS. PGS also received warrants in the restructured PEDEVCO.

During the Fifth Application Period, the warrants were sold and PPCO received its share of the proceeds, $215,700. PGS's interest is PEDEVCO are now closed out. Applicants billed time to reviewing the disposition recommendation memorandum prepared by Goldin, reviewing PPCO's exact ownership interests, conducting due diligence, and drafting and revising the Warrant Purchase Agreement. Otterbourg attorneys who have billed time to this investment primarily include attorneys with transactional experience.

**B.** **Case Administration (P04) - Total Fees: $330,560.50**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio. The nature of the tasks performed under this category is varied, and includes the following:

(a) **Website and Investor Communications.** In accordance with Section E.2.l (Communications with Investors), the estate hired Garden City Group LLC ("GCG") to create the Receiver's website (PlatinumReceivership.com). This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions. The Receiver also revised and updated the website to add or update the "Frequently Asked Questions" section of the website and to add "key

documents." The Receiver also established a mechanism on the website to allow interested parties to sign up to receive daily notices whenever there are new filings on the docket.

During the Fifth Application Period, the Receiver organized and held a fourth "Town Hall" style webinar and telephone conference, which was held on August 15, 2018, to provide an update to investors and to answer questions submitted by investors. The next webinar is scheduled for December 4, 2018. Applicants spent time during the Fifth Application Period preparing for the webinar, communicating with investors, and updating the Receiver's website. Applicants also spent time preparing the quarterly Status Report to the Court, which provides an update for the Court and investors on the status of asset disposition and other efforts of the Receiver.

(b)     **Schafer & Weiner Fee Application**. During the Fifth Application Period, S&W, a Michigan law firm that was previously engaged by Platinum and that continued to provide legal services to the Prior Receiver in connection with the Arabella investment filed a fee application seeking to be paid nearly $500,000 in unpaid legal fees for work purportedly performed for the Prior Receiver. Subsequent to filing the objection and sur-reply to S&W's fee request, Applicants reviewed documents in response to the subpoena issued to S&W, objected to subpoenas issued by S&W, and prepared for and took the depositions of S&W's representative and S&W's expert witness. On September 25, 2018, the Court issued a Memorandum Decision and Order denying S&W's fee application, but reserving judgment on the Receiver's cross-motion seeking disgorgement of the pre-Receivership fees paid to S&W. [Dkt. No. 383] S&W has since filed a Notice of Appeal.

(c)     **SEC Meetings**. The Receiver also regularly communicates with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to

potential retentions and filings by the Receiver.  The Receiver and Otterbourg also has periodic communications with SEC personnel about pending matters before the Court as to which SEC input is appropriate, including, for example, the S&W fee dispute.

(d)     **PPVA**.   The Receiver and the Receivership Team had periodic teleconferences with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff regarding the status of each's respective estates, as well as asset-specific teleconferences to discuss the liquidation or analysis of assets that are jointly held by PPVA and Platinum. Otterbourg also continued to discuss procedures to share with the Joint Liquidators non-privileged documents that are maintained on the Platinum servers controlled by the Receiver. The Receiver and Joint Liquidators continue to consider the resolution of inter-company claims amongst PPVA and Platinum.

(e)     **Defendants.**   During the Fifth Application Period, Otterbourg interfaced with counsel for the Defendants to discuss a variety of issues, including the production of certain documents on Platinum's servers.  Applicants also sought to work with the Defendants to allow them access to documents on Platinum's servers to which they are entitled to have access (*e.g.* non-Receivership Platinum Management's documents that are on Platinum's servers). The Receiver also responded to demands from certain of the Defendants for indemnification and, in particular, their demands that their defense legal costs be advanced for payment by the Receivership as part of their claim for indemnification.  The Receivership Team researched the Defendants' alleged right to advances from Platinum and denied their requests.  The Receiver does not believe that she is legally obligated, or that it is a prudent use of Receivership resources, to make advances to the Defendants at the expense of the investors and creditors that have suffered significant losses.  Several motions to compel the Receiver to advance their legal fees

were filed and/or joined in by the other Defendants.  The Receiver responded to these motions and joinders on October 30, 2018.  The Defendants' motions have since been denied by the Court.  Applicants also continue to monitor the criminal proceedings.

(f)      **Navidea Indemnification Claim.**  Navidea Biopharmaceuticals, Inc. ("Navidea") sought leave from the Receivership Court to assert an indemnification claim against Platinum as a result of a claim asserted by PPVA against Navidea for repayment of a portion of a promissory note, the balance of which had been assigned to, and repaid to, Platinum during the Prior Receiver's tenure.  Navidea claimed an entitlement to indemnification based on its payoff agreement with the Prior Receiver.  The Receiver opposed Navidea's motion on the basis that Navidea had no colorable claim against Platinum and litigating the claim would constitute an unwarranted distraction and expense for the Receivership Estate.  During the Fifth Application Period, Applicants reviewed Navidea's Reply in Further Support to Lift the Stay.  During the Fifth Application Period, the Court denied Navidea's motion.  *See* Dkt. No. 353.

(g)      **Cayman Funds.**  At the end of 2017, three Platinum funds organized under the laws of the Cayman Islands were added to the Receivership Estate.  The Receiver has worked with local counsel in the Cayman Islands to appoint new directors and designate a registered office to work with the Cayman regulators to satisfy compliance regulations and avoid being placed into liquidation in the Cayman Islands, including working with Cayman counsel and the directors to follow the de-registration procedures.

(h)      **Receiver Oversight**.  Time during the Fifth Application Period, time was also devoted to the general oversight of the Platinum Entities and the Receivership Estate.  Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The

Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and forensic accounting issues.

### C. Claims Administration Work (P05) – Total Fees: $23,451.00

The Receiver has not yet initiated a formal claims bar date or claims review process. The Prior Receiver had posted a claim form for creditors to assert a claim. The Receivership Team has copies of all claims submitted to the Prior Receiver. The Receivership Team has been actively working on preparing a proof of claim form and designing a claims adjudication process. The Receiver will likely be seeking court approval for the proof of claim form, notice and process for submitting claims, and establishment of a deadline for the submission of claims. Preparation of the form and establishing guidelines for what claims should be submitted cannot be done in isolation, but will in part be dependent upon decisions that are ultimately made regarding how to treat different types of claims and creditors. In addition to determining how to treat different claims (*e.g.*, unsecured creditor claims, unpaid redemption claims, insider claims, investor claims), the Receiver will also need to determine if the various Platinum entities will be fully or partially consolidated for claim and distribution purposes or if each will be treated separately. There may also be issues of Cayman law regarding the three Cayman funds that may be implicated. In addition, there have been blanket secured liens asserted on the Platinum assets, which may need to be resolved before any distributions can be made to unsecured and investor claims. The Receiver and the Receivership Team spent time during the Fifth Application Period continuing to analyze all of these issues from both a factual and legal perspective. The Receiver also intends to consult with the SEC regarding certain the claims process before presenting a

motion to the Court for approval.  In light of the various issues that need to be considered, and the timetable for obtaining approval for any proposed claims reconciliation plan by the Court, it is unlikely that a distribution will occur this year, but the Receiver is endeavoring to file a motion proposing a process by year end.

      **D.**      **Forensic/Investigatory Work (P10) - Total Fees:  $258,956.00**

In addition to the monetization of assets, potential sources of recovery include claims by the Receiver as innocent successor to the Platinum Entities against possible liable parties. Goldin and Otterbourg have assembled a forensics team to seek to review the complicated series of transactions entered into during the years prior to Platinum was placed into receivership and to analyze the flow of funds.

The Receiver has commenced a confidential arbitration proceeding against a pre-petition professional.  The Receivership Team is currently analyzing transactions involving Platinum and certain insurers and re-insurers, including Beechwood, Senior Health Insurance Company of Pennsylvania and CNO Financial Group, Inc.  These transactions, which are among the largest and most complex engaged in by Platinum, include the $170 million sale to a Beechwood-related entity of a convertible note issued by Agera Energy LLC.  In the period ahead, the Receivership Team will continue to assess the insurers' and reinsurers' involvement with Platinum, whether through investments or borrowings, in an effort to understand the full scope of their involvement with the Receivership Entities and their claims to having acquired security interests in all of the Receivership Estate's assets.

Simultaneously with this investigation, the Receivership Team continues to investigate certain pre-receivership activities to determine whether causes of action exist against, among others, valuation agents, fund administrators, auditors, legal advisors and other professional

firms.  The Receiver has continued to issue subpoenas to and make informal document requests of certain parties during the Fifth Application Period.  For certain claims in which a statute of limitations may be approaching, the Receiver has, and will continue to reach out to the potential target to enter into tolling agreements to allow the receivership team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those parties who have declined to toll the statute of limitations.  The Receiver negotiated and entered into tolling agreements during the Fifth Application Period.

The Receiver is considering the commencement of certain actions, although she cannot state at this time the ultimate targets and whether or when such actions will be commenced.  The timing of the commencement of certain actions may be dictated by statute of limitations.  For those actions in which a statute of limitations is not an issue, the Receivership Team will continue to investigate and develop a factual basis for potential causes of action and targets.  The Receiver cannot state the ultimate value of any claims or the likelihood and timing of collecting on any judgment or settlement that may ultimately be obtained.  At the heart of the analysis will be a determination of the cost/benefit of asserting claims.  Investigation and litigation are costly endeavors and the Receiver does not intend to expend material estate assets unless the Receiver has the necessary facts and information to assert a meritorious claim and has concluded there is a likelihood of recovering funds if liability is eventually found.

## V.      EXPLANATION OF EXPENSES AND RELATED POLICIES

1.      Applicants seek reimbursement of its out-of-pocket costs in the amount of $11,970.61.  **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

2.      Applicants observed the following policies in connection with its expenses during the Fifth Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 36,935 internal photocopies during the Fifth Application Period at the rate of 0.15 cents per page, totaling $5,540.25 for all in-house copies.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Fifth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)      With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)      In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

49

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did not have any travel expenses during this Fifth Application Period.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor GCG, which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period.  Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."  *Securities & Exchange*

*Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F. 2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d. 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically

quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.  Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse.  Many of the people with factual knowledge are facing criminal charges. Documentation, to the extent it exists, must be questioned and verified.  Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.    HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of assets is ongoing and that the claims reconciliation process has not yet formally begun.  Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Fifth Interim Application (the "Holdback Amount").  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)    Grant interim approval of the Receiver's compensation in the amount of $138,344.80 (the "Allowed Receiver Fees");

(b)    Grant interim approval of Otterbourg's compensation in the amount of $980,039.70 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)    grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $1,031.70;

5500339.3

(d)      grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $10,938.91;

(e)      authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)      Grant such other relief as the Court deems appropriate.

Dated:  November 29, 2018

Otterbourg P.C.

By: */s/ Adam C. Silverstein*
      Adam C. Silverstein

230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver