```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,  :
                                     :
                    Plaintiff,       :
                                     :           No. 16-cv-6848 (BMC)
                                     :
     -v-                             :
                                     :
PLATINUM MANAGEMENT (NV) LLC;        :
PLATINUM CREDIT MANAGEMENT, L.P.;    :
MARK NORDLICHT;                      :
DAVID LEVY;                          :
DANIEL SMALL;                        :
URI LANDESMAN;                       :
JOSEPH MANN;                         :
JOSEPH SANFILIPPO; and               :
JEFFREY SHULSE,                      :
                                     :
                    Defendants.      :
---------------------------------------------------------------X
```

**FIRST INTERIM APPLICATION OF
CONWAY MACKENZIE CAPITAL ADVISORS, LLC FOR THE ALLOWANCE OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING
THE PERIOD OCTOBER 12, 2017 THROUGH DECEMBER 31, 2017**

Conway MacKenzie Capital Advisors, LLC ("CM"), as consultant and investment banker to Melanie L. Cyganowski, the Court-appointed receiver (the "Receiver") for Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP ("PPCOMF"), Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunity Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd. and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the "Receivership Entities" or "Platinum"), hereby submits its First Interim

1

Application for Allowance of Compensation and Reimbursement of Expenses incurred During the Period October 12, 2017 through December 31, 2017 ("First Interim Application"). CM respectfully requests interim approval for payment of $251,530.00 in professional fees and reimbursement of $2,940.07 in expenses incurred for October 12, 2017 through December 31, 2017 (the "First Application Period").

CM's First Interim Application contains the following sections:

(a) **Section I** contains a preliminary statement on CM's activities in this case during the First Application Period.

(b) **Section II** contains information about CM and the case's status, as required by Section C of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Receivership Billing Instructions"). Section II also includes a description of each exhibit to this First Interim Application, as well as the reduction in fees agreed to by CM in connection with appointment as consultant and investment banker to the Receiver.

(c) **Section III** contains a narrative of the work that CM professionals performed by professional and under each activity category, as required by Section D of the SEC Receivership Billing Instructions.

(d) **Section IV** summarizes the expenses for which CM seeks reimbursement, as required by section E of the SEC Receivership Billing Instructions.

(e) **Section V** describes the standards to be applied by the Court in determining fee awards in SEC equity receiverships.

2

(f)     **Section VI** describes the interim payment and holdback arrangement to which CM has agreed.

I.     **PRELIMINARY STATEMENT**

1.     During the First Application Period, CM's central focus was assisting the Receiver to monetize assets of the Platinum receivership estate (the "Receivership Estate").

2.     CM's activities during the First Application Period were comprised generally of the performance of due diligence and the identification and evaluation of strategic monetization alternatives related to the following Platinum assets: (i) West Ventures LLC and its wholly owned subsidiary, Buffalo Lake Advanced Biofuels, LLC ("BLAB"); (ii) Desert Hawk Gold Corp. ("Desert Hawk"); (iii) Daybreak Oil and Gas, Inc. ("Daybreak"), (iv) Arabella Exploration ("Arabella"); (v) Greentown Oil Company ("Greentown"); American Patriot Gold ("APG"); (vi) Xcel Energy ("Xcel"); and (vii) Nordaq Energy ("Nordaq") (collectively, the "Portfolio Companies").

3.     Specifically, with regard to the Portfolio Companies, CM performed the following services:

a.     Validation of any debt, equity or other interests held by the Receivership Entities and gaining and documenting an understanding of the rights, remedies and obligations held by the Receivership Entities and other capital structure participants, in each instance working in conjunction with legal counsel to the Receiver, as appropriate;

b.     Performance of a focused review and analysis of the underlying business, recent historical operating performance and cash flows and evaluation of financial projections, strategic plans and other information necessary to evaluate each Portfolio Company's business plan with identification of risks and opportunities to the achievement of that plan;

3

    c. Evaluation of near term cash flows and identification of potential financing requirements for each Portfolio Company;

    d. Evaluation of strategic alternatives available to maximize value for the Receivership Entities related to Portfolio Companies, including the comparison of potential near term liquidity events with orderly exits over a longer timeframe; and

    e. Performance of routine monitoring and analysis of investment positions, including engaging in regular communications with management teams and other relevant stakeholders and undertaking site visits, for Portfolio Companies and the preparation and delivery of periodic updates regarding the same to the Receiver; and

    f. The formulation and communication of advice and recommendations for monetizing the Receivership Entities' interests in the Portfolio Companies, and the provision of other structured and informal communications and updates to the Receiver and her professionals regarding the status of CM's efforts.

## II. APPLICATION REQUIREMENTS

### A. Information About the Applicant and the Application

4. **Application Period**. This First Interim Application covers the First Application Period.

5. **Appointment of Receiver**. On December 19, 2016, the U.S. Attorney for the Eastern District of New York unsealed an eight-count indictment (the "Indictment") against seven individuals who were formerly affiliated with Platinum, a purported $1.7 billion hedge-fund family based in New York. The Indictment alleges that the defendants defrauded Platinum investors through, among other things, the overvaluation of assets, the concealment of severe cash flow problems and the preferential payment of redemptions. The Indictment also charges four of the defendants with defrauding the independent bondholders of Black Elk Energy Offshore Operations, LLC, a portfolio company owned by Platinum, through a fraudulent offering document and diverting more than $95 million in proceeds to Platinum by falsely representing in the offering

document that Platinum controlled approximately $18 million of the bonds when, in fact, Platinum controlled more than $98 million of the bonds.

On December 19, 2016, the SEC filed this action, asserting violations of the anti-fraud provisions of federal securities laws and seeking, among other relief, temporary and permanent injunctive relief, disgorgement of ill-gotten gains, imposition of civil penalties, and appointment of a receiver [Docket No. 1].

On December 19, 2016, the Court entered an Order to Show Cause and Temporary Restraining Order against the defendants, granting certain specified relief to the SEC, including the appointment of a receiver, and granting the receiver control over the assets of the Receivership Entities [Docket No. 5].

On January 31, 2017, the initial receiver sought to retain Cooley LLP as his counsel and Guidepost Solutions LLC to advise, assist and support him with his duties as receiver. [Docket Nos. 63 and 65]. Such retention applications were approved by the Court on February 17, 2017.

On June 3, 2017, Mr. Schwartz requested that the Court approve his resignation as receiver, effective upon the Court's appointment of a successor receiver [Docket No. 170]. On July 6, 2017, the Court accepted the resignation of Mr. Schwartz and appointed the Receiver as his successor [Docket No. 216]. On October 16, 2017, in connection with the Motion of the SEC to Appoint a Substitute Receiver, the Court entered the Second Amended Order Appointing Receiver (the "Amended Receiver Order") [Docket No. 276].

6. **Appointment of the Applicant**. The Amended Receiver Order authorized the Receiver to engage professionals to assist in fulfilling her duties. On November 11, 2017 (as

modified on November 30, 2017), this Court approved CM's retention as consultant and investment banker to the Receiver *nunc pro tunc* to October 12, 2017 [Docket Nos. 280 and 287].

7.      **Fee Schedule**.  The names and hourly rates of all CM professionals who billed during the First Application Period is attached as Exhibit B (the "Fee Schedule").  The fees requested in this First Interim Application were determined on the basis of the hours worked by CM professionals and CM's usual and customary hourly rates, as modified by a 10% public service discount.  Pursuant to the authority of this Court, CM has received interim payments not to exceed $100,000.00 per month.

8.      **Prior Applications**.  None.

**B.  Case Status**

9.       **Cash on Hand and Unencumbered Funds**.  As of December 31, 2017, the Receivership Entities had $11.7 million in unencumbered funds, of which $10.2 million was held in cash in bank accounts and $1.5 million was held in brokerage accounts.

10.     **Accrued Administrative Expenses**.  As of December 31, 2017, it is estimated that accrued, unpaid administrative expenses amount to approximately $2.6 million.  These administrative expenses primarily consist of accrued and unpaid professional fees.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the First Application Period.

11.     **Summary of Receipts and Disbursements**.  Cash disbursements during the last quarter of 2017 (the "Quarter") totaled approximately $8.6 million.  This amount primarily consists of the following: (i) payments to the Receiver and retained professionals ($4.5 million); (ii)

6

disbursements to certain Platinum assets to preserve their value pending their sale ($3.45 million);[1] (iii) $535,100 in rent, payroll and related expenses paid to Platinum employees.  Cash receipts during the Quarter totaled approximately $11.5 million.  This amount primarily consists of proceeds derived from dispositions associated with the following investment positions: Acceleration Bay ($10 million net to Platinum)[2] and Airdye ($1.265 million), as well as certain miscellaneous stock sales.

12. **Closing of Case**.  CM cannot at this time state when the Receiver will deem it appropriate to seek the conclusion of this case.

13. **Summary of Creditor Claims Proceedings**.  The Receiver and her professionals have not yet initiated a formal claims process.

14. **Summary of Assets**.  The primary assets of the Receivership Estate consist of the following:

   **(a)** Cash and cash equivalents of approximately $11.7 million.

   **(b)** Non-cash assets that had been valued by prior management at approximately $446.6 million as of December 19, 2016.[3]

---

[1] This amount includes funds disbursed to preserve the value of the following assets pending their sale: Acceleration Bay ($1.4 million); ALS Capital Ventures LLC ($1.7 million); LC Energy ($270,000); and Abdala ($111,600).

[2] This amount is net of a $526,000 completion fee paid to Houlihan pursuant to its retention agreement. The gross sale amount was $10,540,000.00.

[3] Prior management placed its investments into the following categories and assigned the values noted: Mining ($222.3 million); Energy ($96.1 million); Litigation Finance ($34.6 million); Life Settlements ($30.9 million); Pharmaceuticals/Healthcare ($29.7 million); Industrials ($11.0 million) and Other Investments ($22.0 million).  Prior management's values should not be deemed as admissions,

15. **Liquidated and Unliquidated Claims**. The Receiver currently holds no liquidated litigation recoveries. The Receiver may, however, have causes of action against a number of parties and is currently considering associated claims.

C. **SEC Review**

16. CM submitted this First Interim Application to the SEC in sufficient time to allow for a thirty-day review period, as required by the SEC Receivership Billing Instructions.

D. **Exhibits**

17. The First Interim Application contains the following exhibits:

   a. **Exhibit A**: The Standardized Fund Accounting Report ("SFAR") for the period October 1, 2017 through December 31, 2017.

   b. **Exhibit B**: A Fee Schedule showing the total fees billed, hours worked and hourly rates of each CM professional involved.

   c. **Exhibit C**: A summary of the total fees billed and hours worked by activity category.

   d. **Exhibit D**: All time records of CM professionals listed chronologically by activity category, as required by Section E.1a of the SEC Receivership Billing Instructions.

---

representations, or waivers with respect to the actual value of the assets. The actual realizable values and/or fair market value for the assets may differ significantly from prior management's estimates.

    e. **Exhibit E**: A summary of all expenses incurred by CM, organized by expense category, as required by Section E.1a of the SEC Receivership Billing Instructions.

    f. **Exhibit F**: The certification contemplated by Section A.1 of the SEC Receivership Billing Instructions.

**III.  SERVICES RENDERED BY CM DURING THE FIRST APPLICATION PERIOD**

18. CM professionals recorded services performed in time increments of one tenth (0.1) of an hour. CM made use of a lean team; the senior professionals involved each brought distinct, but essential, expertise to the engagement and were the primary responsible parties on the different tasks.

19. Although nine CM professionals performed services to the Receivership during the First Application Period, CM is seeking approval for the fees expenses associated with six professionals[4]; they are Kenneth Garnett, Patrick Kelleher, Kenneth Latz, Tom McNamara, Brian Smith and George Vassilellis.

20. The particular roles of each of the CM professionals who billed time during the First Application Period were as follows:

---

[4] Conway MacKenzie has elected to not bill the time of any professional that billed less than fifteen (15) hours during the time period covered.

a. Kenneth Garnett (Managing Director) (4.2 hours to P04; 79.1 hours to P08; 43.4 hours to P10; 14.6 hours to P15) – Mr. Garnett is co-leader of CM's Private Fund Services practice, which provides advisory and fiduciary services to the stakeholders of private capital funds. He has particular industry expertise in the mining and energy industries. During the First Application Period, Mr. Garnett: (i) managed and participated in the CM team that performed focused operational and financial due diligence on Desert Hawk, (ii) drove CM's strategic alternatives analysis with respect to the company and (iii) assisted the receiver in negotiating a monetization transaction through which the Receivership sold its investment positions related to the company during the first quarter of 2018. Similarly, Mr. Garnett also managed and participated in the CM teams that performed focused operational and financial due diligence and prepared strategic alternatives/monetization analyses for BLAB and Daybreak. Other matters Mr. Garnett participated in during the period include CM's due diligence with respect to Greentown and APG.

b. Patrick Kelleher (Director) (22.5 hours to P08; 17.8 hours to P10) – Mr. Kelleher is a member of CM's restructuring and turnaround practice and specializes in the chemical and energy industries, among others. During the First Application Period, Mr. Kelleher focused on the Receivership's investments related to BLAB, performing focused operational and financial due diligence as well as preparing strategic alternatives and monetization analyses on the company.

c. Kenneth Latz (Senior Managing Director) (9.0 hours to P04; 25.8 hours to P08; 14.9 hours to P10) – Mr. Latz is co-leader of CM's Private Fund Services practice, which provides advisory and fiduciary services to the stakeholders of private capital funds. During the First Application Period, Mr. Latz directed the teams performing due diligence, preparing strategic alternative and monetization analyses for the Portfolio Companies, with particular focus on Desert Hawk, BLAB and Daybreak.

d. Tom McNamara (Managing Director) (38.0 hours to P08; 3.3 hours to P10) – A Professional Engineer and degreed mine engineer with decades of mining experience, Mr. McNamara provides technical, financial and economic analysis as part of CM's mining practice. During the First Application Period, Mr. McNamara performed focused operational and financial due diligence on Desert Hawk, (ii) assisted in the preparation of CM's strategic alternatives analysis with respect to the company and (iii) evaluated monetization alternatives for the Receivership's positions related to Desert Hawk. Mr. McNamara also began due diligence on APG's Red Arrow Mine.

e. Brian Smith (Director) (3.5 hours to P04; 107.5 hours to P08; 40.4 hours to P10; 4.0 hours to P15) – Mr. Smith is member of CM's energy practice, with a particular expertise in the oil & gas industry. During the First Application Period, Mr. Smith performed operational and financial due diligence on Daybreak and prepared CM's strategic alternatives and monetization analyses with respect to the company. Mr. Smith also performed focused operational and financial due diligence with respect to Arabella and Greentown.

11

    f.  George Vassilellis (Managing Director) ( 11.9 hours to P08; 12.6 hours to P10; 1.0 hour to P15) – A Professional Engineer, degreed geologist and petroleum engineer, Mr. Vassilellis has over 30 years of reservoir engineering and oil & gas operations experience. Mr. Vassilellis provides technical, financial and economic analysis as part of CM's energy practice.  During the First Application Period, Mr. Vassilellis performed focused operational and financial due diligence on Daybreak, (ii) assisted in the preparation of CM's strategic alternatives analysis with respect to the company and (iii) evaluated monetization alternatives for the Receivership's positions related to Daybreak.

21.    Per Section D.3 of the SEC Receivership Billing Instructions, CM accounted for its time charges during the First Application Period by activity categories.  Narrative summaries of these activity categories follow.

22.    *Case Administration*.  During the First Interim Application Period, CM incurred 16.7 hours and $10,370.50 of fees related to the activity category *Case Administration*.  Key tasks comprising this activity category included initial communications and briefing with the Receiver and her other professionals regarding Platinum; internal CM correspondence re engagement status and strategy; preparation for and participation in regular and as needed communications and updates with the Receiver and her other professionals; preparation of summary materials and document production activities.  The CM professionals and staff that incurred time in connection with this activity category during the First Interim Application Period included Kenneth Latz, Kenneth Garnett and Brian Smith.

23. *Business Analysis*. During the First Interim Application Period, CM incurred 284.8 hours and $149,354.00 of fees related to the activity category *Business Analysis*. Key tasks comprising this activity category included the performance of reviews and analyses of Portfolio Company business and operations, recent historical operating performance and cash flows; evaluation of financial projections, strategic plans and other information necessary to evaluate Portfolio Company business plans; preparation for and participation in site visits to Portfolio Companies and meetings and correspondence with Portfolio Company management teams; and participation in Portfolio Company-specific coordination meetings and communications with the internal CM team as well as with the Receiver and her other professionals. The CM professionals and staff that incurred time in connection with this activity category during the First Interim Application Period included Kenneth Latz, Kenneth Garnett, Tom McNamara, George Vassilellis, Brian Smith, and Patrick Kelleher.

24. *Data Analysis*. During the First Interim Application Period, CM incurred 132.4 hours and $70,341.00 of fees related to the activity category *Data Analysis*. Key tasks comprising this activity category included the identification and evaluation of strategic monetization alternatives for Portfolio Companies; analysis of the waterfall of disposition proceeds for Portfolio Companies; performance of Portfolio Company liquidation analyses; preparation of deliverables for the Receiver and her other professionals; and meetings and communications with the Receiver and her other professionals to present feedback from CM's activities, including monetization recommendations with respect to certain Portfolio Companies. The CM professionals and staff that incurred time in connection with this activity category during the First Interim Application Period included Kenneth Latz, Kenneth Garnett, Tom McNamara, George Vassilellis, Brian Smith, and Patrick Kelleher.

25. *Valuation*. During the First Interim Application Period, CM incurred 19.6 hours and $10,789.00 of fees related to the activity category *Valuation*. Key tasks comprising this activity category included review of the valuation analyses that were developed by Houlihan Lokey with respect to the Portfolio Companies; evaluation of reserve and subsurface analysis with respect Portfolio Companies that are engaged in the exploration and production of natural resources; and performance of valuation analysis with respect to the Receivership Entities' interests in the Portfolio Companies in connection with relevant strategic monetization alternatives. The CM professionals and staff that incurred time in connection with this activity category during the First Interim Application Period included Kenneth Garnett, George Vassilellis, and Brian Smith.

26. *Travel Time*. During the First Interim Application Period, CM incurred 41.4 hours and $10,675.50 of fees (billed at 50% of agreed upon hourly rates) in connection with CM's travel to conduct Portfolio Company site visits and management meetings. The CM professionals and staff that incurred time in connection with this activity category during the First Interim Application Period included Kenneth Garnett, Tom McNamara, George Vassilellis and Brian Smith.

IV. **EXPLANATION OF EXPENSES AND RELATED POLICIES**

27. CM seeks reimbursement for its out-of-pocket costs in the amount of $2,940.07. Exhibit E sets forth various categories of expenses for which CM seeks reimbursement. CM will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Receivership Billing Instructions and will provide the SEC with copies of such materials

upon request. CM's request for expense reimbursement complies with the SEC Receivership Billing Instructions.

### V. FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

28. The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's retained professionals. This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and her retained professionals and "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994). Many authorities (some quite dated) provide "convenient guidelines," but in the final analysis, "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465 (S.D. Tex. 1974), aff'd, 519 F.2d 1087 (5th Cir. 1975).

29. In allowing professional fees in receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir 1966) (court should consider the time, labor and skill, the degree of activity, the dispatch with which the work is conducted, and the result obtained). "'[R]esults are always relevant.'" *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992), quoting Moody, 374 F. Supp. At 480, as are the extent to which "a receiver reasonably and diligently discharges his duties." Id.

30.     Under these standards CM has demonstrated that the amount of fees requested is appropriate.  CM, in concert with the Receiver and her professionals, has acted with appropriate dispatch to develop and execute monetization strategies for the Portfolio Companies.  CM's efforts during the First Interim Application period were crucial for gaining an understanding of the specific nature and value of the interests held by the Receivership Entities in connection with the Portfolio Companies and positioning those assets down the path toward monetization.

## VI.    HOLDBACK

31.     CM and the Receiver are cognizant of the fact that the disposition of assets is still in the early stages and that there are significant costs of maintaining certain of the portfolio assets until they can be sold in an orderly manner (e.g. the monthly premiums required to be paid in the life settlement policies.)   Accordingly, in an effort to preserve assets at this stage of the Receivership, the Receiver has requested, and CM has agreed to limit interim monthly payments to no more than $100,000.00 per month.  To date, CM has received aggregate interim monthly payments from the Receiver of $630,341.81, including $230,341.81 of interim payments related to the First Application Period.

32.     Furthermore, CM understands that the SEC has requested that certain Receivership contractors and professionals, including CM, be subject to a holdback (the "Holdback") equal to 20% of its fees and expenses incurred in connection with each application filed with the Court.  Total amounts held back will be available for payment at the conclusion of the Receivership at the discretion of the Court pursuant to a final fee application.  Based on CM's total fees and expenses incurred during the First Application Period of $254,470.07, CM is subject to a Holdback of $50,894.01 in connection with the First Application Period.

33. The Receiver has agreed to pay the balance of any allowed fees (net of Holdback amounts and any interim monthly payments previously received by CM) pursuant to this First Interim Application within 10 days of allowance by the Court.

WHEREFORE, CM respectfully requests that this Court:

    a. Grant interim approval of CM's request for $251,530.00 in professional fees and $2,940.07 expenses incurred;

    b. Grant interim approval of payment of the amount of $49,575.49, representing CM's aggregate professional fees incurred during the First Application Period of $251,530.00 less the Holdback of $50,894.01, of which CM has received interim payments from the Receiver of $151,060.50;

    c. Grant interim approval of CM's request for reimbursement of its out-of-pocket expenses in the amount of $2,940.07, of which CM has not received any interim payments;

    d. Authorize the Receiver to immediately pay from the Receivership assets (i) any unpaid allowed fees of CM, plus (ii) 100% of the allowed out-of-pocket expenses of CM; and

    e. Grant such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Kenneth T. Latz_____
Senior Managing Director
Conway MacKenzie Capital Advisors, LLC
600 Fifth Avenue, 25th Floor

                                                        New York, NY 10020  
                                                        Telephone: (212) 586-2200  
                                                        klatz@conwaymackenzie.com

Date: December 28, 2018