UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                   Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;          No. 16-CV-6848 (BMC)
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SIXTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD OCTOBER 1, 2018 THROUGH AND INCLUDING DECEMBER 31, 2018

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the "Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this Sixth Joint Interim Application (the "Sixth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from October 1, 2018 through and including December 31, 2018 (the "Sixth Application Period").[1]   There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg).   The Receiver requests interim approval of fees in the amount of $122,628.40 and reimbursement of expenses in the amount of $801.58 for the Sixth Application Period.   Otterbourg requests interim approval of fees in the amount of $1,043,307.90 and reimbursement of expenses in the amount of $11,365.44 for the Sixth Application Period, for a combined total of fees for Applicants in the amount of $1,165,936.30,[2] and expenses in the amount of $12,167.02 for the Sixth Application Period.

This Sixth Interim Application contains the following sections:

**Section I**  provides a preliminary statement of the Receiver's activities during the Sixth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description

---

[1]   This Sixth Interim Fee Application is being filed simultaneously with Applicants' Seventh Interim Fee Application covering the first quarter of 2019.  The SEC requested additional time to review this Sixth Interim Fee Application and to review it alongside the Seventh Interim Application.

[2]  As agreed to by the Receiver, this total amount reflects a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges and a ten percent (10%) reduction in Otterbourg's recorded time charges.  Further, in accordance with Otterbourg's customary practice of reviewing its hourly rates annually, Otterbourg adjusted the professionals' hourly billing rates as of October 1, 2017 and October 1, 2018.  As previously agreed with the SEC, the Receiver's aggregate fees have been reduced (prior to application of the public service accommodation) to discount for any increase in her billable rate since October 1, 2017. In addition, based upon the SEC's review, Otterbourg's attorneys' recorded time charges have been voluntarily reduced by $28,789.00. Therefore, during the Sixth Application Period, the Receiver's recorded time charges before application of these accommodations were $192,875.00 and Otterbourg's recorded time charges were $1,188,020.00, for a combined gross legal fees total (before the application of any discounts or voluntary reductions) of $1,380,895.00.

2

of each exhibit to this Sixth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

      **Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Sixth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines. All such categories correspond with the SEC's SFAR in this case.

      **Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

      **Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.      PRELIMINARY STATEMENT

      During the Sixth Application Period, several significant activities occurred in the Platinum estate (the "<u>Receivership Estate</u>"), including that the Receiver (i) closed the sale of the Abdala gold mine tailings impoundment in Brazil (the "<u>Abdala Tailings Project</u>"), widely acknowledged to be the Receivership Estate's most valuable asset; (ii) filed suit in the United States District Court for the Southern District of New York against a group of defendants seeking damages for claims arising from a fraudulent scheme perpetrated to the detriment of Platinum, as well as the avoidance of certain purported liens which may otherwise adversely impact potential distributions to investors and creditors (the "<u>Beechwood Action</u>"); (iii) advanced the confidential arbitration proceeding; (iv) filed a motion with the Receivership Court seeking approval of a process for pre-receivership claimants to file their claims against Platinum; (v) filed a motion to sell the LC Energy asset; and (vi) continued to seek to monetize the remaining assets, both in and out of ongoing court proceedings.

The Receiver and her team[3] also continued to work towards the monetization of remaining assets in the investment portfolio. In addition to the Abdala Tailings Project, three other assets were liquidated during the Sixth Application Period: Azarga Uranium Corp ($1,300,000), Daybreak Oil and Gas, Inc. ($700,000) and Pro Player Athletes ($20,000). The remaining assets have presented more challenges and have taken longer to dispose of for a variety of reasons (some long recognized, others unanticipated), including, in some cases, because they are being administered through or relate to bankruptcy proceedings or liquidations (*e.g.*, Arabella, LC Energy and Cleveland Mining). The Receiver will continue to seek to realize upon those assets that are impacted by bankruptcy/litigation processes or other litigation, and will take continue to take steps to expedite those processes when able. In addition, the Receivership Team continued to sell stock holdings, including seeking relief from trading restrictions, and assessed which remaining assets have no present or likely future market value and, thus, should be disposed of without the further expenditure of resources.

In addition to monetizing portfolio investments, the Receiver continued to dedicate resources to an ongoing analysis of the pre-receivership business and affairs of Platinum, including the enforceability of purported security interests in Platinum's assets, and ongoing investigation into potential significant causes of action against third parties by the Platinum estate. This investigation led to the commencement of the Beechwood Action with the filing a complaint against a group of defendants, including certain so-called Beechwood entities, Senior Health Insurance Company of Pennsylvania, Fuzion Analytics, Inc., Bankers Conseco Life Insurance Company, Washington National Insurance Company and CNO Financial Group, Inc. (collectively, the "Insurance Defendants"), asserting thirteen causes of action, including aiding

---

[3]      To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

4

and abetting of common law fraud, aiding and abetting of breach of fiduciary duty, fraudulent conveyances, federal securities fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act.  In addition to monetary damages, the Receiver is seeking to avoid the purported first-priority liens asserted against Platinum's assets by certain of the defendants which may otherwise adversely impact potential distributions to investors and creditors of funds.  The Beechwood Action and the pending arbitration case are discussed in further detail below.  The Receiver is continuing to evaluate other potential causes of action to be asserted on behalf of the Receivership Entities.

The Receivership Team also continued to analyze the factors that will impact which claims may be entitled to a distribution and the timing of distributions, including claims of security interests in Receivership assets and claims to funds in escrow.  During the Sixth Application Period, the Receiver presented a motion to the Court regarding a proposed claims process, which was approved by the Receivership Court.

### A.    Analysis and Disposition of Receivership Assets

During the Sixth Application Period, the Receivership Team continued to monetize the remaining assets in the portfolio, stayed actively involved with bankruptcy and liquidation proceedings in which Platinum has a claim or interest, and designated certain assets for which no interest has developed for a bulk remnant sale.  To the extent possible, the Receiver has worked with other investors in the asset to maximize recovery.  If joint disposition is not feasible, the Receivership Team has sought to independently monetize its investment in the asset.

As previously reported, most investments in the Platinum portfolio were in companies that have been in the developmental stages and have not yet had proven success or for which the prospects for success were greatly overstated by prior management.  As a result, disposition of

many investments is highly challenging. For example, many of the investments have actual or potential significant liabilities, are subject to potentially superior liens or debt, and/or require additional cash investment for the underlying company to continue or resume operations.  If there are any assets that have no current value, but have the potential to have value in the future and have no cost to the estate to maintain, the Receiver will continue to hold such assets until Receivership assets are otherwise ready to be distributed.  Throughout the Receivership case, the Receiver has not invested in any asset beyond what is necessary to preserve that asset and maintain value until monetization is possible or there is a determination that there is no realizable value for the asset.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[4] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie").[5]  Houlihan Lokey and Conway MacKenzie were each responsible for different assets and there was no overlap in the work performed by each.  Conway MacKenzie began to wind down its services during the Sixth Application Period and its work is now complete. Similarly, Houlihan Lokey's services are almost complete.

During the Sixth Application Period, the Platinum Receivership received approximately $23.3 million from the sale of certain investments.  Certain parties have asserted a claim to all or part of the proceeds of certain of such liquidated investments.

The foregoing amount received during the Sixth Application Period is in addition to the approximately $37.2 million received by the Platinum Receivership from the liquidation of other

---

[4]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[5]   Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

6

assets since the Receiver was appointed.  None of these assets has been marketed or sold in a "fire sale" fashion.  As further discussed below, the investments monetized during the Sixth Application Period and the proceeds received by the Receivership Estate (net of any transaction fees and tax withholdings) were as follows:

- Abdala Tailings Project: $21.3 million

- Azarga Uranium Corp: $1.3 million

- Daybreak Oil and Gas, Inc.: $700,000

- Pro Player Athletes: $20,000

The Receiver cannot ascribe values to the assets that have not yet been monetized. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from the plans and projections of prior (now removed) management which plans and projections are now (and likely always were) unrealistic and/or can otherwise no longer be supported.  The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations.  Many of the investments made by Platinum were investments in enterprises that were still in the developmental stage, had no established market value (with any future value being highly speculative) and, in some instances, required significant additional capital investment to even have the possibility of realizing a return on such investment.  As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  As the Court stated in the Houlihan Opinion, "[t]he Receiver is not tasked with making speculative investments." *Houlihan Opinion*

at 8.  Even with such assumptions made by prior management regarding additional investment, the prior valuations may not have been supportable in view of the issues that the Receiver has encountered with respect to many of the assets.

There are certain assets that may ultimately have no realizable value.  At this stage in the Receivership, all assets have been reviewed and disposition options for the remaining assets that are not in the process of being monetized are limited.  Based upon the thorough due diligence performed by the Receivership Team, the Receiver's goal is to limit any further investment of professional resources in assets for which there has been a limited or non-existent market.  If the Receiver believes that there is the possibility that a market will develop (*e.g.*, a stock that is not currently trading, but for which the underlying company may develop into a profitable business), the Receiver may hold the asset for a period of time until a final decision must be made.  Certain assets may ultimately be abandoned or become part of a bulk lot remnant sale.  The Receivership Team also continues to work with other parties to realize upon assets that are subject to bankruptcy or liquidation proceedings.

Certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets.  In the Beechwood Action, the Receiver is seeking to void the blanket liens asserted on the Platinum assets.

A description of the investments in which Applicants have dedicated significant time during the Sixth Application Period and the work done during the Sixth Application Period with respect to those investments is set forth in Section IV of this Sixth Interim Application.

### B.    Administrative Matters

The Receiver and the Receivership Team continued to speak and meet with various interested parties and groups during the Sixth Application Period, including the joint liquidators

for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA"),[6] the SEC and investors. The Receiver also held another "town hall" style meeting with investors and other interested parties via webinar and telephone to provide an update on the actions taken to date and to answer questions.  The Receiver will continue to hold these forums going forward. The Receiver regularly updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The website now includes links to the Beechwood Action docket.  The Receiver and the Receivership Team also meet in person or by telephone with investors and/or their representatives upon request.   The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

The Receivership Team also prepared and responded to applications made before this Court and in other state court proceedings involving Platinum.   Many of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world.   During the Sixth Application Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

## II.     CASE BACKGROUND AND STATUS

### A.     Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht

---

[6]        PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

5758432.1

("Nordlicht"), David Levy, Daniel Small, Uri Landesman,[7] Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.  In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual Defendants have denied all material allegations.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

---

[7]   Uri Landesman passed away in September 2018.

5758432.1

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver"). At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order. [Dkt. No. 216]. On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order"). [Dkt. No. 276]. The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd. [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

B.      **Case Status**[8]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)      As of December 31, 2018, the Receivership Entities had $35.3 million in funds. These funds include proceeds from the liquidation of assets.  Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets.  These claims will be addressed in due course.

It is estimated that, as of December 31, 2018, accrued, unpaid administrative expenses amount to approximately $4.5 million.  This amount includes the estimate of fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the Sixth Application Period, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Sixth Application Period.

(b)      Cash disbursements during the Sixth Application Period totaled approximately $4.6 million.  This amount consisted primarily of (i) $3.7 million in disbursements to retained professionals, as well as limited scope professionals hired by the prior receiver; (ii) $472,125 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as

---

[8]   The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period October 1, 2018 through December 31, 2018.

rent); (iii) $441,224 in investment expenses, which include funds disbursed to preserve the value of the following assets: LC Energy ($386,000) and the Abdala Tailings Project ($55,000).

Cash receipts during the Sixth Application Period totaled approximately $23.3 million. This amount primarily consists of net proceeds derived from dispositions (discussed below) associated with the following investment positions: Abdala Tailings Project ($21.3 million), Azarga Uranium Corp ($1.3 million), Daybreak Oil and Gas, Inc. ($700,000) and Pro Player Athletes ($20,000).

The Receiver cannot at this time state when she expects the case to be concluded. The focus is shifting from the liquidation of assets to the prosecution and/or resolution of claims, litigation and/or resolution of purported blanket secured liens, and the claims review and reconciliation process.

(c)     The Receiver has not yet determined how different types of claims or creditors will be treated or the methods that will be used. The Receiver did, however, file a Motion for Entry of an Order (I) Establishing Claims Bar dates and (II) Approving (A) a Proof of Claim Form, (B) the Form and Manner of Notice to the Claims Bar Dates and (C) Procedures For Submitting Proofs of Claim by Receiver (the "Bar Date Motion"). [Dkt. No. 424]  The Bar Date Motion was granted by the Receivership Court and, following the Sixth Application Period, the applicable claims bar dates passed.

As of December 31, 2018, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

(i)     Cash and cash equivalents of approximately $35.3 million;

(ii)     Real estate investments without any set book value, due to their inherently speculative nature;

(iii)     Investments in natural resources, remaining litigation financing, energy and other miscellaneous investments; and

5758432.1

(iv)     Potential litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(d)     Other than the two actions relating to specific assets -- Greentown Oil Company and Lincoln National Insurance (described above) -- the Receiver's investigation of pre-petition activities has so far resulted in the commencement of two litigations: (i) a confidential arbitration proceeding commenced on April 27, 2018 and (ii) the Beechwood Action against the Insurance Defendants commenced on December 19, 2018.  During the Sixth Application Period, both of these actions were in their early stages.  The Receiver cannot predict the outcome of these litigations or the timing of collecting on any judgment or settlement that may ultimately be obtained.

The Receivership Team continues to analyze other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and the professional services provided by, among others, valuation agents, fund administrators, auditors, and legal advisors, to determine if any additional causes of action exist that warrant the commencement of litigation.  The Receiver continues to issue subpoenas to and engage in informal exchange of documents.  For any claims in which a statute of limitations may be approaching, the Receiver has, and will continue to reach out to the potential target to enter into tolling agreements to allow the receivership team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those parties who have declined to toll the statute of limitations.

## III.   FEES AND EXPENSES REQUESTED

In connection with the Sixth Application Period, the Receiver requests interim approval of her fees in the amount of $122,628.40 and reimbursement of expenses in the amount of $801.58.  Otterbourg requests interim approval of its fees in the amount of $1,043,307.90 and

reimbursement of expenses in the amount of $11,365.44.  Thus, the combined total of fees for Applicants of $1,165,936.30, plus expenses of $12,167.02, is $1,178,103.32.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment.  For example, a single investment, such as Arabella, which is in multiple bankruptcy proceedings in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, including cash collateral issues, as well as pure litigation issues to address the adversary proceeding with a third party that was impeding the ability to sell the Arabella assets in which Platinum has a security interest. The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below, which was approved by the SEC and the Court at the time of the appointment of the Receiver. These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by all other Otterbourg professionals have been reduced by

10% from the aggregate recorded time charges.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since October 1, 2017 in accordance with Otterbourg's regular practice of reviewing and revising its hourly fee rates annually.

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $192,875.00 to $122,628.40, a reduction in the amount of $70,246.60.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,188,020 to $1,043,307.90, a reduction in the amount of $144,712.10, inclusive of an additional voluntary reduction requested by the SEC of $28,789.00 based upon its review of Otterbourg's time records.  Therefore, the total reduction for legal fees incurred during the Sixth Application Period by the Receiver and Otterbourg professionals is $214,958.70.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of this Sixth Interim Application to SEC counsel on April 12, 2019 to allow for a thirty-day review period.  The SEC review resulted in a voluntary reduction of Otterbourg's attorneys' recorded time charges in the amount of $28,789.00.  No further reductions were requested by the SEC.

This Sixth Interim Application includes certain exhibits:

(a)     The SFAR for the period of October 1, 2018 through December 31, 2018 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Sixth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Sixth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Sixth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Sixth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and

Otterbourg submitted this Sixth Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Although nine attorneys and two paraprofessionals billed time during the Sixth Application Period (in addition to the Receiver), a core team of attorneys performed the lion's share of the services, including Adam Silverstein, Philip C. Berg, William Moran, Erik B. Weinick, Jennifer S. Feeney and Andrew Halpern.[9]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. Accordingly, in some instances relatively small amounts of time were spent by attorneys with expertise relevant to specific issues in the case.  These less significant involvements benefited the Receivership Estate because it gave the core group of attorney's additional insight into and knowledge of important legal issues directly impacting the Receiver's decisions in this case.  In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Sixth Application Period and their specific roles were as follows:

(a)      Adam C. Silverstein (Partner) (9.7 Hours to P01; 5.6 Hours to P02; 52.9 Hours to P04; .6 Hours to P05;  98.8 Hours to P10) – Mr. Silverstein is a senior litigator who has focused

---

[9]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Sixth Application Period.

his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation.  Mr. Silverstein dedicated most of his time during the Sixth Application Period to matters relating to the arbitration and to the preparation of the complaint in the Beechwood Action.  Mr. Silverstein also assisted with applications to the Court.  Mr. Silverstein has also been one of the main point persons regarding communications with the SEC during the Sixth Application Period.

(b)      William Moran (Partner) (175.3 Hours to P10) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's forensics investigation.  In particular, Mr. Moran spent significant time analyzing claims that can be asserted against the Insurance Defendants and assisting with the drafting of the complaint in the Beechwood Action.

(c)      Philip C. Berg (Partner) (12.4 Hours to P01; 155.3 Hours to P02) – Mr. Berg is a senior transactional partner and Chairman of Otterbourg's corporate department, whose focus has been the negotiation, documentation and closing of Receivership transactions.  Mr. Berg is the point person for Houlihan Lokey regarding the review and monetization of assets within its portfolio.  During the Sixth Application Period, Mr. Berg dedicated a significant amount of time to the Abdala Tailings Project, including working with Houlihan Lokey to close the sale and preparing all closing documents.  Mr. Berg also drafted, reviewed and/or negotiated transactional documents and developed strategies for the sale of other assets, including Daybreak, Pro Player and Cokal, among others.

(d)      Jennifer S. Feeney (Of Counsel) (62.9 Hours to P01; 25.0 Hours to P02; 68.3 Hours to P04; 11.6 Hours to P05; .5 Hours to P10) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the

5758432.1

Receiver.  During the Sixth Application Period, Ms. Feeney spent significant time with respect to the Arabella bankruptcy case and sale process.  Ms. Feeney also attended to other case administration matters, including coordinating with Cayman counsel regarding issues concerning the Cayman entities, preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Additionally, Ms. Feeney, along with Erik B. Weinick prepared applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)     Erik B. Weinick (Of Counsel) (69.3 Hours to P01; 124.1 Hours to P02; 135 Hours to P04; 28.6 Hours to P05; 28.4 Hours to P10; 8.0 to P13) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick also travelled to Texas during the Sixth Application Period to appear at the Arabella plan confirmation hearing on behalf of Platinum.

(f)     Andrew S. Halpern (Associate) (353.1 Hours to P10) – Mr. Halpern is an experienced litigator, particularly in the area of claims of professional malpractice and forensic analysis.  As such, during the Sixth Application Period, Mr. Halpern continued his work with respect to the arbitration proceeding, prepared subpoenas issued to third parties, and negotiated tolling agreements. Mr. Halpern also dedicated significant time to the preparation of the complaint in the Beechwood Action.

(g)     Gabriela S. Leon (Associate) (40.4 Hours to P01; 7.3 Hours to P02; 50.9 Hours to P04; 34.1 Hours to P10) – Ms. Leon is a new member of the litigation department.  Ms. Leon was utilized to research issues relating to the forensics investigation and the claims asserted in the Beechwood Action, the Defendants' request for advances to pay legal costs, and other motions made to the Court, all at a considerably lower billing rate.

(h)     Jessica Hildebrandt (Paralegal) (3.1 Hours to P01; 15.7 Hours to P02; 11.9 Hours to P04; 6.5 Hours to P10; 2.5 to P13) – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a paralegal at a lower billable rate), helped prepare the Otterbourg attorneys for various hearings and court filings, and monitored the criminal docket for the Receivership Team.

(i)     Anthony Williams (Managing Clerk) (2.3 Hours to P01; 20.6 Hours to P04; 1.4 Hours to P05) – Mr. Williams is Otterbourg's managing clerk and has assisted the Otterbourg attorneys with court filings, monitoring of dockets, obtaining court papers, and calendaring relevant dates.

## IV.   SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING SIXTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Sixth Application Period into five (5) project categories.[10]  Narrative summaries of these activity categories follow:

---

[10]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

**A.** **Asset Analysis and Recovery (P01) - Total Fees: $173,591.50**
**Asset Disposition (P02)[11] - Total Fees:  $300,017.50**

During the Sixth Application Period, the Receiver and her professionals continued to review the various assets in the portfolio.  Certain assets were sold, certain others continued to be marketed, and others were prepared to be launched to market.  Other assets are still embroiled in litigation and/or bankruptcy proceedings and actions have been taken by the Receiver and the Receivership Team to position such assets so that they can eventually be monetized.  In certain instances, time was also spent with respect to an asset that may not ultimately have a positive return to the Receivership Estate, but work is still required to reduce potential liabilities and exposure to the Receivership Estate, as well as to ensure that any such asset without value is not imprudently abandoned by the Receivership Estate.

During the Sixth Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with Goldin, Houlihan Lokey and Conway MacKenzie (depending on the professional assigned to the particular investment), as well as, in some instances, management and other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Sixth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

Given the myriad of investments and different members of the Receivership Team working on each, to keep the Receiver and the Receivership Team apprised of all activities with

---

[11]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular (approximately every two weeks) team meetings with her team of professionals and staff, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer.  In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.  These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the sprawling Platinum portfolio.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Sixth Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.      **Abdala Tailings Project** – refers to PPCO's interests (through a subsidiary, West Ventures LLC) in a gold tailings impoundment located near Cuiababa, Brazil.  PPCO owned contract rights to extract gold for a period of ten years from the tailings impoundment.  The tailings impoundment is approximately 300 meters wide by 300 meters long and 20 meters deep containing dried slurry (*i.e.*, sand and gravel) that was a byproduct of earlier gold mining operations.  This impoundment is adjacent to the former Abdala gold mining operation.

Platinum's investment in Abdala resulted from loans totaling, according to Platinum's books, $12.3 million that it extended to Resource Holdings, Inc. ("RHI").  RHI is a development-stage company that leased equipment and provided working capital to Brazilian gold mines.  With the funds advanced from Platinum, RHI, in turn, financed the owner of the Abdala gold mine, Reginaldo Luiz De Almeida Ferreira (a.k.a. "Rico"), whose loans from RHI subsequently were assigned to Platinum.  The loans to RHI and Rico went into default, and, following a

settlement with RHI, Platinum began foreclosure proceedings against Rico.  In or about November 2015, following years of contentious litigation and negotiations, Platinum and Rico reached an agreement whereby Platinum received ten years of mining rights in and to the Abdala tailings pond in settlement of the loan obligations.  The project was in the permitting stages and the intended processing plant was never developed because of Platinum's liquidity issues. Additional details regarding the background of this asset can be found in the motion papers submitted to the Court seeking the approval of the sale.  [Dkt. Nos. 357-58, 367-68, 372]

Houlihan Lokey launched the marketing process for this asset at the end of 2017.  After eight months (not including pre-marketing preparation time), the efforts undertaken by Houlihan and by Brazilian counsel, Chediak, to resolve local legal impediments, resulted in a robust competitive bidding process and in the Receivership achieving what the Receiver and her professionals believe is Abdala's fair value.  The winning bidder for the Abdala assets was an affiliate of Centerbridge Partners, L.P. ("Centerbridge").  The sale motion was approved by the Court on September 11, 2018.  [Dkt. No. 380]

Following the approval of the sale, Applicants worked diligently with Goldin, Houlihan Lokey, Chediak, and the buyer's team of professionals to close the sale.  The logistics of closing (particularly dealing with issues in Brazil, including tax issues and a decision issued by the Court in Brazil in November 2018) proved to be extremely complicated and took longer than anticipated.  The closing of the sale was completed during the Sixth Application Period, on November 29, 2018.

During the Sixth Application Period, Applicants worked closely with Houlihan Lokey and Centerbridge to close the sale.  Applicants worked with local co-counsel and Centerbridge's counsel to prepare all ancillary documents and resolve impediments to closing.  Otterbourg

24

professionals who have billed time to this investment include attorneys with experience in litigation and transactional matters.

2.      **ALS Life Settlements (Lincoln/Rosenberg Litigation)** – refers to a portfolio of life settlement investments owned through an entity in which PPCO is the majority owner and managing member.  The previously approved sale of the life settlement portfolio closed during prior application periods.  However, there was one policy that was not sold because the insurance company – Lincoln Life – improperly lapsed the policy prior to the current Receiver's appointment.  The insurance policy has a total death benefit of $8.5 million (with ALS entitled to $7.2 million of that total).  The insured under the policy (Rosenberg) subsequently passed away, leaving the potential death benefit in dispute.  The Receiver commenced an action in the Eastern District of New York and retained contingency counsel.  A back-end beneficiary under the policy who the Receiver named as a nominal defendant because it was a necessary party to the litigation, has since filed counterclaims against the Receiver, seeking a ruling that it is entitled to 100% of the death benefit should the Court determine that the alleged lapse was improper.

During the Sixth Application Period, Applicants worked with contingency counsel to dispute the counterclaims asserted by the back-end beneficiary, which the Receiver believes are without merit and are legally insufficient, as well as continuing to pursue the primary claims against the insurer.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and their primary role was to monitor and interface with contingency counsel.

3.      **American Patriot Gold** – refers to Platinum's ownership interest, through Maximilian Resources LLC ("Maximilian"), to approximately 370 acres of land fee simple, in addition to patented mining claims in Montezuma County, Colorado.  American Patriot Gold ran

5758432.1

the Red Arrow Mine on the property until its mining permit was revoked in March 2014 as a result of non-payment of restitution for environmental and operational violations.  Conway MacKenzie was asked to review this asset and provide the Receiver with disposition options.

Based upon Conway MacKenzie's due diligence, obtaining permits and selling the asset as a working gold mine was determined not to be an economical option due to the significant cost and timeframes involved.  Accordingly, on August 22, 2018, the Receiver filed a motion to retain a local broker, Wells Group of Durango, Inc., to market and show the property to potential purchasers.  [Dkt. No. 376]  At a status conference before the Court on October 1, 2018, the Court authorized the Receiver to retain the broker.  The broker actively marketed the property. Two bids were received an auction was held on March 11, 2019 in which a bid for the gross amount of $300,000.00 was deemed the highest and best bid.  The Receiver filed a motion to approve the sale to the winning bidder and the Court entered an order approving the sale on March 22, 2019 [Dkt. No. 457].   The sale closed on April 3, 2019.

During the Sixth Application Period, Applicants appeared at the status conference to retain the broker, worked with the broker regarding the property listing and to obtain status reports on the interest received in the property.  Applicants also reviewed the form of contract for a potential sale.

4.     **Arabella** – refers to three entities each containing Arabella in their names.    In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million dollar facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella"). Arabella has working interests in certain leased oil and gas properties in the Permian and

26

Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Northern District of Texas). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.

During the Sixth Application Period, Arabella and Platinum jointly propounded a proposed plan of reorganization, which was confirmed by the Texas Bankruptcy Court at a hearing held on November 20, 2018. In addition, Arabella has been addressing purported liens through adversary proceedings which are currently before its Texas Bankruptcy Court and a claim by one of the non-working interest holders that Arabella contends was released as part of the settlement with Founders. From the proceeds of the sale of Arabella's assets, payments will be made to the Trustee of Arabella Petroleum Corporation ("APC") and the prior operator with which AEX previously settled its disputes -- Founders Oil & Gas III, LLC and Founders Oil & Gas Operating, LLC (collectively "Founders"), in accordance with their respective settlements, the broker, the taxing authorities, lienholders, priority and administrative claimants and Arabella's retained professionals upon approval of their fees.

During the Sixth Application Period, Applicants had frequent telephonic and e-mail communications with Arabella's retained professionals, including its CRO, bankruptcy counsel and litigation counsel regarding the sale of assets, the plan of reorganization, claims by purported mineral lienholders, as well as claims by non-operating owners. Applicants worked with Arabella's professionals to complete the sale of Arabella's assets and participated telephonically in the sale hearing. Applicants reviewed and revised the proposed plan of reorganization and appeared in Texas at the hearing to confirm the plan. Applicants also worked with Goldin to

5758432.1

analyze various liquidation scenarios and claims and liens that may come ahead of those of Platinum to ascertain the potential best case and worst case recovery scenarios.  Applicants had discussions with the joint liquidators of the parent company in the Cayman Islands regarding payment under a purported guaranty of fees in favor of professionals that was given by prior management.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

5.     **Azarga Uranium Corp.** – refers to a publicly traded uranium mining company headquartered in Denver.  Azarga merged with another similar company in July 2018, effectively doubling its size.  Prior to the merger, Azarga's stock was highly illiquid.  PPCO owned approximately 18 million shares of Azarga stock.    PPVA also owned Azarga shares.

Subsequent to the merger, as a result of both a recovery in the price of uranium and Azarga's increased size, there was renewed interest in Azarga's stock.  During the third quarter of 2018, PPCO and PPVA engaged a brokerage firm in Vancouver, BC that specializes in junior mining stocks and during the Sixth Application Period, on October 17, 2018, PPCO's Azarga shares were sold for approximately $1.3 million.  Applicant reviewed and provided comments to the engagement letter with the brokerage firm retained to sell the stock.  Otterbourg attorneys who have billed time to this matter are attorneys with transactional experience.

6.     **China Horizons/Yellow River** – refers to PPCO's 45% interest in PGS[12], which owns equity and debt interests in two companies -- China Horizon and Yellow River—created to build a chain of franchised convenience stores in rural China.  The promissory note from China Horizon held by PGS has a face value of approximately $9.0 million and PGS holds approximately 6.5 million shares of stock in Yellow River.  China Horizon was originally a joint

---

[12] PPVA claims a 55% ownership interest in PGS.

venture with another company, China Post.  China Post subsequently pulled out of the joint venture and China Horizon transferred its intellectual property to Yellow River.  Yellow River, in turn, distributed its equity to the debt and equity holders of China Horizon.  Subsequent to the transfer, China Horizon received approximately $15 million from China Post as proceeds of the settlement of a dispute between them.  PPVA also directly holds debt and equity in China Horizon and Yellow River.  The promissory notes from China Horizon are not yet due.

During mid-2018, the Receiver and PPVA received an expression of interest from Yellow River's largest investor to purchase PGS's and PPVA's collective interests in the China Horizon notes and the Yellow River equity position.  An agreement in principle was reached; however, negotiations to document that agreement revealed certain issues that derailed the transaction.  The Receiver has learned that the new majority owner is starting a process to raise capital and may be interested in having PPCO participate in the process so that it can sell its shares.  The Receivership Team is keeping in contact with new management regarding the progress of its common stock sales.

During the Sixth Application Period, Applicants and Goldin spent time monitoring the ongoing discussions between PPVA and the potential purchaser.  Otterbourg attorneys who have billed time to this matter primarily include transactional attorneys.

7.    **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings").  PPCO and Platinum Long Term Growth VII LLC are owed approximately $15.6 million, which is secured by a first priority security interest in all of Cleveland Mining's and Iron Holdings assets.  PPCO also holds approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings.  Cleveland

29

Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not operating and is the subject of litigation in Brazil.

Cleveland Mining was placed into a liquidation proceeding in Australia and Platinum has filed a proof of debt form to register its claim and has been working with the Australian liquidator and the Receiver's local counsel regarding a sale of the publicly listed corporate shell and an allocation of the proceeds between the liquidator and PPCO. The liquidators previously had a purchaser for the shell company, but the buyer was unable to close the transaction. One Otterbourg attorney with experience in workout matters has had primary responsibility for this investment and has been in regular communications with Australian counsel regarding the status of any sale.

8.   **Cokal Limited** (ASX: "CKA") – is a coal mining company headquartered in Sydney, NSW.  CKA's active mining project is on the island of Borneo in the Bumi Barito Mineral ("BBM") of Indonesia.  Over the past year, the BBM mine has been developed and CKA has received commitments from several investors to support continued development of the mine.

PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, warrants, and a Note).  As a result of a Debt Restructuring Transaction agreed to by the prior management, the Note was restructured into new warrants and a royalty from revenues of the BBM.

During the Sixth Application Period, PPCO and PPVA negotiated with one of CKA's current shareholders to sell the combined common stock and options.  Subsequent to the Sixth Application Period, the Receiver completed the sale (in multiple tranches) of PPCO's entire stock and warrants position for total revenues of $2,213,490.45.  The Receiver is currently

discussing with the same buyer entering into a sale for the remaining royalty once the common stock and option transaction is completed.

During the Sixth Application Period, Applicant reviewed Platinum's holdings in Cokal, negotiated the sale price and reviewed and revised the execution documents. Otterbourg attorneys who have billed time to this investment include attorneys with transactional experience.

9. **Daybreak** - refers to a publicly held oil and gas company with assets in the Kern County, California and in Montcalm County, Michigan. PPCO owned 99% of the membership interests and is the managing member of Maximilian, which is owed approximately $9.2 million, plus accrued interest, from Daybreak on account of a senior loan, secured by Daybreak's interest in two joint ventures via a senior secured real property mortgage. Maximilian also holds a percentage of working interests in the Michigan operation. This asset was sold during the Sixth Application Period.

Conway MacKenzie conducted a sale process which resulted in several parties submitting bids that were qualified in various ways and were not workable or "real" offers. The Receivership, through Conway MacKenzie, maintained a dialogue with the CEO of the company, who came forward with an offer from an investor group that, after negotiation, was deemed the best alternative for sale of the asset. During the Sixth Application Period, the Receivership Team completed the negotiations with the CEO and closed the sale of Platinum's position to the CEO for $700,000.

During the Sixth Application Period, Applicants reviewed the purchaser's mark-up of the Securities Purchase Agreement and Letter of Intent and oversaw the closing of the sale.

Otterbourg attorneys who have billed time to this investment include attorneys with transactional experience.

10.     **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah.  Through Maximilian, PPCO holds a debt and equity interest in the company.

As previously reported, Maximilian asserted a right to certain insurance proceeds received by a Greentown related entity – Pacific Energy & Mining, Company ("<u>Pacific</u>") – that Maximilian believes were assigned to it.  In June 2017, while the Receivership case was pending, Pacific commenced a declaratory judgment action in the U.S. District Court for the District of Nevada (<u>Pacific Energy & Mining Company v. Maximilian Resources LLC</u>, Case No. 17-cv-00363 (HDM) (VPC)), seeking a declaration that Pacific does not owe any money to Maximilian.   During the Sixth Application Period, the Receiver continued to engage in negotiations to resolve the litigation and other claims.  Specifically, during the Sixth Application Period, Applicants spent time discussing the terms of a potential settlement. Following the Sixth Application Period, the settlement was completed and the Receiver received a payment of $800,000.  Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation.

11.     **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of <u>In re Lily Group, Inc</u>., Case No. 13-81073 (Bankr. S.D. Ind.).   The mine is currently idled.

Unlike the usual circumstance in which assets are sold from a bankruptcy estate free and clear of all liens, here, the bankruptcy court order did not provide for the sale of the

assets to LC Energy free and clear of liens.  As a result, there are potentially multiple liens and a claim by the committee of unsecured creditors in the Lily Group bankruptcy case against the LC Energy assets.  These unresolved claims make a sale of the mine very difficult and would depress the price received.  The Receivership Team, with the assistance of local counsel, tried for many months to both locate and negotiate with many of the parties who claim to be lienholders in LC Energy.  The Receiver was unsuccessful in locating all interested parties.  As such, the Receiver filed a motion on December 6, 2018 [Dkt. No. 422] in the Receivership Court that sought entry of an order (i) authorizing the Receiver to sell the Receivership's rights in and to LC Energy free and clear of all liens, and (ii) approving certain bidding and claims procedures in connection with the proposed sale (the "Bid Procedures Motion").  On January 16, 2019, the Court entered an order approving the procedures (as modified after discussions with three objecting parties).  [Dkt. No. 444].

During the Sixth Application Period, Applicants spent time working with and having conference call with Indiana bankruptcy counsel concerning efforts to negotiate with parties claiming to have an interest in LC Energy Assets.  Applicants also worked with Platinum in-house counsel in drafting the Bid Procedures Motion and subsequently sought to address objections to the Bid Procedures Motion, which were memorialized in a revised proposed order that was entered by the Court.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with litigation and bankruptcy experience.

12.  **Pro Player Athletes** –refers to a PPCO-related entity that typically extended loans to professional athletes.  Because a portfolio of these loans had not been repaid in full, Pro Player wrote them off as losses prior to the commencement of the receivership.  Nevertheless, the Receiver was able to monetize the loan portfolio by selling certain loans to Hilco IP Services,

LLC d/b/a Hilco Streambank for $20,000.00 plus 25% of any net proceeds recovered by Hilco over $100,000.00.  Given that the collectability on these loans was highly uncertain, thus leading prior management to conclude to write-off these loans, the sale is in the best interests of the estate because it provides some return to Platinum and mitigates the expense and uncertainty of pursuing collection directly.  It also provides some measure of upside should the purchaser's collection efforts prove successful.

During the Sixth Application Period, Applicants drafted and reviewed the Loan Purchase, and Assignment Agreement.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with transactional experience.

**B.** **Case Administration (P04) - Total Fees:  $302,868.00**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The nature of the tasks performed under this category is varied, and includes the following:

13.    **Website and Investor Communications.**  During the Sixth Application Period, the Receiver continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver also added a link for interested parties to access the docket for the Fraud Litigation.  The Receiver and the Receivership Team also meet in person or by telephone with investors and/or their representatives upon request.  The Receiver and the Receivership Team have attempted to

respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

The Receiver also organized and held a fifth "Town Hall" style webinar and telephone conference on December 4, 2018 to provide an update to investors and to answer questions submitted by investors.  The Town Hall also was an opportunity for the Receiver to review for investors the fifth quarterly status report that was prepared and filed by Applicants during the Sixth Application Period.

14.  **Defendants**.  Earlier in the case, the Receiver received several requests from the defendants named in the SEC's criminal complaint (the "<u>Defendants</u>") for the advancement of their legal fees as they anticipated that they would be exhausting the D&O insurance.  The Receiver denied the Defendants' requests and opposed their efforts in Court, before Judge Cogan, to compel the Receivership to advance their legal fees.  On November 25, 2018, the Court denied the Defendants' Motion to compel the advancement of legal fees.  [Dkt. No. 417]  Time was spent by Applicants during the Sixth Application Period responding to the Debtors' requests for advancement of fees.  Applicants also monitored the criminal proceedings and analyzed any impact those proceedings may have on the receivership.

15.  **SEC Meetings**.  The Receiver had regular communications with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to potential retentions and filings by the Receiver.  The Receiver and the Receivership Team also had periodic communications with SEC personnel about pending matters before the Court as to which SEC input is appropriate.

16.  **PPVA**.  The Receiver and the Receivership Team had periodic teleconferences and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA

Feeder Fund and/or their staff to discuss the liquidation or analysis of assets that are jointly held by PPVA and Platinum and their respective investigations and assertion of claims. PPVA has also commenced an action in the Southern District of New York that named several of the same defendants that the Receiver named in the Beechwood Action based upon some of the same facts and allegations. Otterbourg also continued to discuss procedures to share with the Joint Liquidators non-privileged documents that are maintained on the Platinum servers controlled by the Receiver.

17. **Cayman Funds.** Applicants continued to discuss with local counsel in the Cayman Islands issues specific to Cayman law, including the recent liquidation proceedings commenced by a Beechwood Re affiliate in the Cayman Islands.

18. **Receiver Oversight**. Time during the Sixth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort. The Receivership Team meets with the Receiver bi-monthly to discuss ongoing asset disposition, litigation, claims and other administrative matters. The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and forensic accounting issues.

C.   **Claims Administration Work** (P05) – Total Fees: **$39,524.00**

During the Sixth Application Period, the Receiver filed file a Motion for Entry of an Order (I) Establishing Claims Bar dates and (II) Approving (A) a Proof of Claim Form, (B) the Form and Manner of Notice to the Claims Bar Dates and (C) Procedures For Submitting Proofs

of Claim by Receiver (the "Bar Date Motion"). [Dkt. No. 424]   The Bar Date Motion was granted by the Receivership Court and, following the Sixth Application Period, the applicable claims bar dates passed.  The Receiver has preliminarily reviewed the filed proofs of claim.

As part of the claims review analysis, the Receiver will determine how to treat different claims (*e.g.*, unsecured creditor claims, unpaid redemption claims, insider claims, investor claims), in addition to determining if the various Platinum entities will be fully or partially consolidated for claim and distribution purposes or if each will be treated separately.  There may also be issues of Cayman law regarding the three Cayman funds that may be implicated.  In addition, there have been blanket secured liens asserted on the Platinum assets, which may need to be resolved before any distributions can be made to unsecured and investor claims.  The Receiver and the Receivership Team spent time during the Sixth Application Period continuing to analyze all of these issues from both a factual and legal perspective.  The Receiver also intends to consult with the SEC regarding certain the claims process before presenting a motion to the Court for approval.

### D.     Forensic/Investigatory Work (P10) - Total Fees:  $558,037.00

In addition to the monetization of assets, potential sources of recovery include claims by the Receiver as innocent successor to the Platinum Entities against possible liable parties. Goldin and Otterbourg have assembled a forensics team to seek to review the complicated series of transactions entered into during the years prior to Platinum was placed into receivership and to analyze the flow of funds.

### 19.     The Arbitration

The Receiver previously has reported on a confidential arbitration proceeding against a pre-petition professional that she commenced (*see* The Receiver's Fourth Status Report to the

Court, at pp. 7, 34; and The Receiver's Fifth Status Report to the Court, at pp. 8, 36), but had not identified the professional or the nature and status of the proceeding so as to permit presentation of the question of confidentiality of such information to the arbitration panel.  The panel has now ruled that the Receiver can disclose the following information:

On April 27, 2018, the Receiver timely commenced a confidential arbitration against an accounting firm and its affiliate (collectively, the "Accounting Firms") that provided audit services to certain of the Receivership Entities, claiming that the Accounting Firms committed negligence in conducting audits of the financial statements of certain of the Receivership Entities (the "Audited Platinum Entities") for the fiscal year ended December 31, 2014, and that the Accounting Firms breached their contractual obligations to the Audited Platinum Entities in connection with those audits.  The Receiver seeks monetary damages in an amount to be determined by the arbitration panel.  The arbitration is before a tribunal of three neutral arbitrators, and is currently in the pre-hearing discovery phase.  Under the current schedule, fact discovery will close on June 14, 2019, and any dispositive motions will be fully briefed in accordance with a schedule to be agreed on by the parties following notice of a party's intention to file such a motion.

20.     **The Beechwood Action**

In addition to the arbitration proceeding, on December 19, 2018, the Receiver commenced the Beechwood Action in the Southern District of New York against the Insurance Defendants. The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood RE Ltd., et al.*" and is now pending as Case 1:18-cv-12018 in the United States District Court for the Southern District of

New York.  A copy of the complaint filed in the Beechwood Action may also be accessed on the Receiver's website (www.PlatinumReceivership.com).[13]

The Receiver's complaint (subsequently amended) sought redress for the massive scheme perpetrated to the detriment of Platinum and its innocent investors by certain of the now indicted and/or convicted managers of Platinum.  Specifically, in the complaint, the Receiver alleges, among other things, that through the creation of what was a thinly disguised independent reinsurance entity, Beechwood, the Platinum insiders, fueled with money knowingly or recklessly contributed by the Insurance Defendants, were able to prolong and expand a massive fraud that personally enriched the insiders through the generation of tens of millions of dollars in management fees, incentive fees, false profits and other remuneration over the years.

Certain of the Insurance Defendants named in the Receiver's complaint are alleged to be willing participants in the scheme, turning a blind eye to multiple red flags of fraud that left Platinum gravely damaged in the form of limited liquidity, loss of their most valued assets for less than reasonably equivalent value and liens against substantially all of their assets for which less than adequate consideration was provided.   The summary here is not intended to alter or recast any of the substantial allegations in the complaint.

The Receiver asserted causes of action for, among others, aiding and abetting of common law fraud, aiding and abetting of breach of fiduciary duty, fraudulent conveyances, federal securities fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act, which collectively seek to remedy the harm inflicted on the Platinum Credit Funds in receivership for the ultimate benefit of their innocent investors and creditors.  The Receiver in the complaint sought judgment against each of the Defendants in the amount of actual damages

---

[13]   The Receiver filed an Amended Complaint on March 29, 2019.

5758432.1

proven at trial, including all direct or consequential damages, treble damages pursuant to 18 U.S.C. § 1964 (RICO), punitive damages under state law, damages for diminution of value, and restitution, plus all applicable interest, attorneys' fees, costs of suit.  In addition, the Receiver sought to avoid the purported first-priority liens asserted against Platinum Credit Funds' assets by certain defendants that may otherwise adversely impact potential distributions to investors and creditors of funds.

21.    **Additional Review of Potential Claims**

The Receivership Team also has continued the historical review of Platinum's activities and flow of funds.  The Receivership Team is in the process of determining whether there are additional causes of action against other parties that may be asserted.  The analysis also includes transfers from Platinum and the value of the assets it transferred and consideration given in return.  Inquiries like these seek to facilitate the Receiver's assessment both of claims against the Receivership Estate, and of whether the Receivership Estate has actionable claims against any persons or parties who putatively provided professional services to Platinum.

In addition, during the Sixth Application Period, the Receivership Team analyzed documents produced in response to subpoenas and informal requests, and has had communications with representatives of the non-party custodians regarding their responses.  For certain claims in which a statute of limitations may be approaching, the Receiver has reached out to potential targets and has entered into tolling agreements to allow the Receivership Team the appropriate time to investigate potential claims.

## V.    EXPLANATION OF EXPENSES AND RELATED POLICIES

22.    Applicants seek reimbursement of its out-of-pocket costs in the amount of $12,167.02.  **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period

of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

23.     Applicants observed the following policies in connection with its expenses during the Sixth Application Period:

(a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 26,993 internal photocopies during the Sixth Application Period at the rate of 0.15 cents per page, totaling $4,048.95 for all in-house copies.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Sixth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants incurred travel expenses during this Sixth Application Period in connection with a trip to Texas with respect to the Arabella asset.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.    FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining

an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).  "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F. Supp. at 480).  However, a good result may take a form other than a bare increase in monetary value.  *Id.*  ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485.  Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.  Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate.  Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities.  The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.  Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse.  Many of the people with factual knowledge are facing criminal charges.  Documentation, to the extent it exists, must be questioned and verified.  Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.   HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted purported blanket liens on Platinum's assets are ongoing.  Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Sixth Interim Application (the "Holdback Amount").  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)    Grant interim approval of the Receiver's compensation in the amount of $122,628.40 (the "Allowed Receiver Fees");

5758432.1

(b)     Grant interim approval of Otterbourg's compensation in the amount of $1,043,307.90 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $801.58;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $11,365.44;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     Grant such other relief as the Court deems appropriate.

Dated:  June 26, 2019

Otterbourg P.C.

By: /s/ Adam C. Silverstein
          Adam C. Silverstein
          Jennifer S. Feeney
          Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

5758432.1