UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;              No. 16-CV-6848 (BMC)
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### SEVENTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD JANUARY 1, 2019 THROUGH AND INCLUDING MARCH 31, 2019

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Seventh Joint Interim Application (the "Seventh Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from January 1, 2019 through and including March 31, 2019 (the "Seventh Application Period").[1]  There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg).  The Receiver requests interim approval of fees in the amount of $65,749.60 and reimbursement of expenses in the amount of $4,060.68 for the Seventh Application Period. Otterbourg requests interim approval of fees in the amount of $1,088,551.72 and reimbursement of expenses in the amount of $17,126.40 for the Seventh Application Period, for a combined total of fees for Applicants in the amount of $1,154,301.32,[2] and expenses in the amount of $21,187.08 for the Seventh Application Period.

This Seventh Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Seventh Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and

---

[1]   This Seventh Interim Fee Application is being filed simultaneously with Applicants' Sixth Interim Fee Application covering the fourth quarter of 2018.  The SEC requested additional time to review the Fee Applications and to discuss with Applicants the additional fee accommodations relating to the ongoing litigations that are described herein.

[2]   As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Litigation and the Arbitration (defined below), for which we have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges beginning this Seventh Application Period, subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since October 1, 2017. Therefore, during the Seventh Application Period, the Receiver's recorded time charges before application of these accommodations were $103,250.00 and Otterbourg's recorded time charges were $1,369,002.00, for a combined gross legal fees total (before the application of any public service accommodation or the discount for rate increases) of $1,472,252.00.

provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Seventh Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

Section III contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Seventh Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines. All such categories correspond with the SEC's SFAR in this case.

Section IV contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

Section V briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.    PRELIMINARY STATEMENT

During the Seventh Interim Period, the significant areas of focus for the Receiver and her team[3] were (i) the litigation commenced by the Receiver at the end of 2018 in the United States District Court for the Southern District of New York against a group of defendants seeking damages for claims arising from a fraudulent scheme perpetrated to the detriment of Platinum, as well as the avoidance of certain purported liens which may otherwise adversely impact potential distributions to investors and creditors (the "Beechwood Action"); (ii) the confidential arbitration proceeding (the "Arbitration"); (iii) monitoring the claims received prior to the bar date established to file a pre-Receivership claim; and (iv) continuing to seek to monetize the remaining assets, both in and out of ongoing court proceedings.

---

[3]    To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

During the Seventh Interim Period, the Receiver (i) closed the sales of Platinum's stock and option holdings in Cokal Limited ("Cokal") for an aggregate recovery of approximately $2.2 million for the Platinum estate (the "Receivership Estate"); and (ii) completed the settlement with respect to the Greentown Oil Company litigation and received $800,000 in settlement proceeds.  The Receiver continues to monitor and seek disposition options for the remaining, more challenging, assets.  While the completion of the liquidation of the asset portfolio continues, the focus of the receivership has shifted to the pursuit of claims in the Arbitration and the Beechwood Action. The Beechwood Action also seeks to avoid purported blanket liens on Platinum's assets asserted by certain of the defendants in the Beechwood Action.

The Receiver has begun the process of analyzing claims by setting a bar date with respect to pre-Receivership claims and is in the preliminary stages of reviewing such claims.  The avoidance of all purported blanket liens, however, is a necessary predicate to making distributions to investors and general unsecured creditors.  Accordingly, the results of the Fraud Action have significance greater than just obtaining recoveries on behalf of the Receivership Estate.

A.      **Analysis and Disposition of Receivership Assets**

During the Seventh Application Period, the Receivership Team completed the sale of one portfolio asset (Cokal) and consummated the settlement related to another portfolio asset that was the subject of an ongoing litigation (Greentown Oil).  Marketing efforts continued with respect to the sale of the assets of LC Energy Operations LLP ("LC Energy").  The sale of American Patriot Gold was completed and closed in early April.  And the Receivership Team continues to work with the restructuring professionals in Texas to bring the Arabella bankruptcy proceeding to a conclusion.  In addition, the Receivership Team continues to seek to sell any

remaining stock and other miscellaneous holdings that have value (certain stock and other holdings have zero value). If there are any assets that have no current value, but have the potential to have value in the future and have no cost to the estate to maintain, the Receiver will continue to hold such assets until Receivership assets are otherwise ready to be distributed. Throughout the Receivership case, the Receiver has not invested in any asset beyond what is necessary to preserve that asset and maintain value until monetization is possible or there is a determination that there is no realizable value for the asset.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[4] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie").[5] The services of Conway MacKenzie concluded during the Seventh Application Period and Houlihan Lokey concluded the marketing of LC Energy during the current quarter.

During the Seventh Application Period, the Platinum Receivership received approximately $3 million from the sale of certain investments. This amount is in addition to the approximately $61 million received by the Platinum Receivership from the liquidation of other assets from the date of appointment of the Receiver. Certain parties have asserted a claim to all or part of the proceeds of some of such liquidated investments. None of these assets has been marketed or sold in a "fire sale" fashion. As discussed in more detail below, the investments monetized during the Seventh Application Period and the net proceeds received by the Receivership Estate were as follows:

- Cokal Limited: $2.2 million

---

[4]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[5]   Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017. [Dkt. No. 280].

5759556.1

- Greentown Oil Company: $800,000

The Receiver cannot ascribe values to the assets that have not yet been monetized. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from the plans and projections of prior (now removed) management which plans and projections are now (and likely always were) unrealistic and/or can otherwise no longer be supported. The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations. Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment. As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future. As the Court previously stated, the Receiver is not tasked with making speculative investments or indulging in risky investment opportunities. *Houlihan Opinion* at 8. Even with such assumptions made by prior management regarding additional investment, the prior valuations may not have been supportable in view of the issues that the Receiver has encountered with respect to many of the assets.

There are certain assets that may ultimately have no realizable value. At this stage in the Receivership, all assets have been reviewed and disposition options for the remaining assets that are not in the process of being monetized are limited. Based upon the thorough due diligence performed by the Receivership Team, the Receiver's goal is to limit any further investment of

6

professional resources in assets for which there has been a limited or non-existent market.  If the Receiver believes that there is the possibility that a market will develop (*e.g.*, a stock that is not currently trading, but for which the underlying company may develop into a profitable business), the Receiver may hold the asset for a period of time until a final decision must be made.  Certain assets may ultimately be abandoned or become part of a bulk lot remnant sale.  The Receivership Team also continues to work with other parties to realize upon assets that are subject to bankruptcy or liquidation proceedings.

Certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets.  In the Beechwood Action, the Receiver is seeking to void the purported blanket liens asserted on the Platinum assets.

A description of the investments in which Applicants have dedicated significant time during the Seventh Application Period and the work done during the Seventh Application Period with respect to those investments is set forth in Section IV of this Seventh Interim Application.

## B.    Administrative Matters

During the Seventh Application Period, the Receiver and the Receivership Team continued to speak and meet with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[6] the SEC and Platinum investors. The Receiver also held another "town hall" style meeting with investors and other interested parties via webinar and telephone to provide an update on the actions taken to date and to answer questions.  The Receiver will continue to hold these forums going forward.  The Receiver regularly updates the Receiver's

---

[6]    PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

5759556.1

website with key documents, answers to frequently asked questions, and status reports to investors.  The website now includes links to the Fraud Action docket.

The Receivership Team also responded to other applications made before this Court and in other court proceedings involving Platinum.  Some of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world.  During the Reporting Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy, Daniel Small, Uri Landesman,[7] Joseph Mann, Joseph San Filippo, Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving

---

[7]   Uri Landesman passed away in September 2018.

5759556.1

multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.  In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  For their part, the individual Defendants have denied all material allegations.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund

9

International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

B.      Case Status[8]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)      As of March 31, 2019, the Receivership Entities had approximately $37 million in funds.  These funds include proceeds from the monetization of Platinum assets.  Certain parties claiming an interest in particular assets sold have asserted claims to a portion of the sale proceeds of the particular assets sold (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets.  These claims are being addressed.

It is estimated that, as of March 31, 2019, accrued, unpaid administrative expenses amount to approximately $6.2 million.  This amount includes the estimate of fees and expenses

---

[8]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period October 1, 2018 through December 31, 2018.

that have been incurred by the Receiver, Otterbourg and Goldin during the Seventh Application Period and will be requested in future applications, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Seventh Application Period.

(b)     Cash disbursements during the Seventh Application Period totaled approximately $1.28 million.  This amount consisted primarily of (i) $403,948 in disbursements to professionals; (ii) $418,195 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as rent); and (iii) $445,000 in investment expenses, which relates to expenses associated with the preservation of the LC Energy asset.

Cash receipts during the Seventh Application Period totaled approximately $3 million. This amount primarily consists of net proceeds derived from dispositions (discussed below) associated with the following investment positions: Cokal ($2.2 million) and Greentown Oil ($800,000).

The Receiver cannot at this time state when she expects the case to be concluded.  The focus is shifting from the liquidation of assets to the prosecution and/or resolution of claims, litigation and/or resolution of purported blanket secured liens, and the claims review and reconciliation process.

(c)     Pursuant to the previously approved bar date procedures motion, the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  Parties holding

investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  In addition, the Receiver has claims that may have been filed with the Prior Receiver.  In total, 327 claims were filed prior to the bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  The Receivership Team has preliminarily reviewed the filed claims, but has not yet done an in depth analysis of each claim, including which claims may be the subject to an objection and disallowance.

As of March 31, 2019, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

      (i)      Cash and cash equivalents of approximately $37 million;

      (ii)      Real estate investments without any set book value, due to their inherently speculative nature;

      (iii)      Remaining investments in natural resources, litigation financing, energy and other miscellaneous investments; and

      (iv)      Potential litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(d)      Other than the two actions relating to specific assets -- Greentown Oil Company and Lincoln National Insurance (described below) -- the Receiver's investigation of pre-petition activities has so far resulted in the commencement of two litigations: (i) the Arbitration commenced on April 27, 2018 and (ii) the Beechwood Action commenced on December 19, 2018.  The Receiver cannot predict the outcome of these litigations or the timing of collecting on any judgment or settlement that may ultimately be obtained.

The Receivership Team continues to analyze other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal

advisors, to determine if any additional causes of action exist that warrant the commencement of litigation. For any claims in which a statute of limitations may be approaching, the Receiver has reached, and will continue to reach, out to the potential target to enter into tolling agreements to allow the receivership team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those parties who have declined to toll the statute of limitations.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Seventh Application Period, the Receiver requests interim approval of her fees in the amount of $65,749.60 and reimbursement of expenses in the amount of $4,060.68. Otterbourg requests interim approval of its fees in the amount of $1,088,551.72 and reimbursement of expenses in the amount of $17,126.40. Thus, the combined total of fees for Applicants of $1,154,301.32, plus expenses of $21,187.08, is $1,175,488.40.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment. For example, a single investment, such as Arabella, which is in multiple bankruptcy proceedings in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, as well as pure litigation issues. The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and

ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time. Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Fraud Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case. In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment. (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $103,250.00 to $65,749.60, a reduction in the amount of $37,500.40. Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,369,002.00 to $1,088,551.72, a reduction in the amount of $280,450.28. Therefore, the total reduction for legal fees incurred during the Seventh Application Period by the Receiver and Otterbourg professionals is $317,950.68.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted their time records for the Seventh Interim Application to SEC counsel on June 5, 2019 to allow for a thirty-day review period.

This Seventh Interim Application includes certain exhibits:

(a)     The SFAR for the period of January 1, 2019 through March 31, 2019 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Seventh Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Seventh Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Seventh Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

15

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Seventh request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted this Seventh Interim Application and all Exhibits to SEC counsel prior to filing the Application with the Court, and SEC counsel has already reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Seven attorneys and three paraprofessionals billed time during the Seventh Application Period (in addition to the Receiver). A core team of attorneys performed the lion's share of the services, including Adam Silverstein, Philip C. Berg, William Moran, Erik B. Weinick, Jennifer S. Feeney, Andrew Halpern and Gabriela Leon.[9]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.  Because of the shift in the Receivership from the sale of assets to the pursuit of recoveries through

---

[9]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Seventh Application Period.

5759556.1

litigation, the bulk of the hours billed were performed by litigation attorneys who are actively involved in the Fraud Action and/or the Arbitration.

The particular Otterbourg professionals who billed time during the Seventh Application Period and their specific roles were as follows:

(a)     Adam C. Silverstein (Partner) (5.3 Hours to P01; 2.8 Hours to P02; 15.1 Hours to P04; .6 Hours to P05; 43.7 Hours to P14; 64.3 Hours to P15) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation.  Mr. Silverstein dedicated most of his time during the Seventh Application Period to matters relating to the Arbitration.  Mr. Silverstein also assisted with applications to the Court.  Mr. Silverstein has also been one of the point persons regarding communications with the SEC during the Seventh Application Period.

(b)     William Moran (Partner) (102.1 Hours to P14) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.  In particular, Mr. Moran has primarily assisted with the Beechwood Action, including the preparation of the Amended Complaint (discussed below) during the Seventh Application Period.

(c)     Philip C. Berg (Partner) (16.5 Hours to P01; 42.3 Hours to P02; 1.1 to P04 ) – Mr. Berg is a senior transactional partner and Chairman of Otterbourg's corporate department, whose focus has been the negotiation, documentation and closing of Receivership transactions.  Mr. Berg is the point person for Houlihan Lokey regarding the review and monetization of assets within its portfolio.  During the Seventh Application Period, Mr. Berg reviewed and negotiated all documents relating to the sale of assets and reviewed other corporate documents that were necessary in connection with the sale or proposed sale of Platinum assets.  Mr. Berg was also

involved in post-closing matters relating to certain of the sold assets, including the Abdala Tailings Project.

(d)      Jennifer S. Feeney (Of Counsel) (45.0 Hours to P01; 30.2 Hours to P02;  66.6 Hours to P04; 1.5 Hours to P05) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.   During the Seventh Application Period, Ms. Feeney spent significant time with respect to the Arabella bankruptcy case, including attention to the remaining items necessary to close-out this asset.  Ms. Feeney also attended to other case administration matters, including coordinating with Cayman counsel regarding issues concerning the Cayman entities, preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Additionally, Ms. Feeney, along with Erik B. Weinick, prepared applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)      Erik B. Weinick (Of Counsel) (132.3 Hours to P01; 49.7 Hours to P02; 72.0 Hours to P04; 8.0 Hours to P05; 1.9 Hours to P10; 283.2 to P14; 1.4 Hours to P15) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick is also the attorney primarily responsible for the Beechwood Action and spent significant time during the Seventh

Application Period preparing the Amended Complaint and attending to other matters relating to the Beechwood Action.

(f)     Andrew S. Halpern (Associate) (0.5 Hours to P04; .5 Hours to P10; 368.4 Hours to P14; 190.0 Hours to P15) – Mr. Halpern is an experienced litigator, particularly in the area of claims of professional malpractice and forensic analysis.  As such, Mr. Halpern continued his work in both the Beechwood Action and the Arbitration, as well as preparing tolling agreements for other third parties.  Mr. Halpern was critical to the preparation of the Amended Complaint in the Beechwood Action, and the revised Notice of Arbitration and document production in the Arbitration.

(g)     Gabriela S. Leon (Awaiting Admission) (40.4 Hours to P01;7.3 Hours to P02; 50.9 Hours to P04; 34.1 Hours to P10) – Ms. Leon is a junior associate in the litigation department.  Ms. Leon was utilized to research issues relating to both the Beechwood Action and the Arbitration, in addition to assisting with the preparation and review of pleadings.  Ms. Leon also assisted with research related to other motions made to the Court, all at a considerably lower billing rate.

(h)     Christine O'Brien (Paralegal) (1.9 Hours to P01; 2.6 Hours to P04; 6.7 Hours to P14; 26.8 Hours to P15) – Ms. O'Brien is an experienced litigation paralegal. Ms. O'Brien primarily assisted with the production of documents and the receipt of documents produced to the Receiver in connection with ongoing litigation.

(i)     Jessica Hildebrandt (Paralegal) (5.8 Hours to P01; 9.4 Hours to P02; 17.1 Hours to P04; 2.0 Hours to P10; 108.4 Hours to P14; 5.3 Hours to P15) – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a

paralegal at a lower billable rate), helped prepare the Otterbourg attorneys for various hearings and court filings, and monitored the criminal docket for the Receivership Team.

(j)    Anthony Williams (Managing Clerk) (0.3 Hours to P01; 18.8 Hours to P04; 6.2 Hours to P14) – Mr. Williams is Otterbourg's managing clerk and has assisted the Otterbourg attorneys with court filings, monitoring of dockets, obtaining court papers, and calendaring relevant dates.

## IV.    SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING SEVENTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Seventh Application Period into five (5) project categories.[10]  Narrative summaries of these activity categories follow:

### A.    Asset Analysis and Recovery (P01) - Total Fees: $201,293.00 Asset Disposition (P02)[11] - Total Fees: $121,433.50

During the Seventh Application Period, the Receiver and her professionals continued to review the remaining assets in the portfolio.  Certain assets are still embroiled in litigation and/or bankruptcy proceedings and actions have been taken by the Receiver and the Receivership Team to position such assets so that they can eventually be monetized.  In certain instances, time was also spent with respect to an asset that may not ultimately have a positive return to the Receivership Estate, but work is still required to reduce potential liabilities and exposure to the Receivership Estate, as well as to ensure that any such asset without value is not imprudently abandoned by the Receivership Estate.

---

[10]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[11]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

5759556.1

During the Seventh Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with her team of professionals and staff, as well as, in some instances, management and other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Seventh Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular (approximately every two weeks) team meetings with her team of professionals and staff, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer. In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.  These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the remaining Platinum portfolio.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Seventh Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.     **Abdala Tailings Project** – refers to PPCO's formerly held interests (through a subsidiary, West Ventures LLC) in a gold tailings impoundment located near Cuiababa, Brazil.

5759556.1

PPCO owned contract rights to extract gold for a period of ten years from the tailings impoundment, which was adjacent to the former Abdala gold mining operation.  The Abdala Tailings Project was previously sold to an affiliate of Centerbridge Partners, L.P.  The sale was approved by the Court in September 2018 and the sale closed on November 29, 2018.  The sale was for $27.5 million in cash at closing (less payment of fees and taxes), plus potential additional consideration based on resource validation results and future mining revenues.

During the Seventh Application Period, Applicants attended to certain post-closing matters.  Otterbourg professionals who have billed time to this investment include attorneys with experience in transactional matters.

2.      **ALS Life Settlements (Lincoln/Rosenberg Litigation)** – refers to a portfolio of life settlement investments that were owned through an entity in which PPCO is the majority owner and managing member.  All but one policy in the portfolio was previously sold by the Receiver.  The one insurance policy that was not sold has a total death benefit of $8.5 million (with ALS entitled to $7.2 million of that total).  The Receiver believes that the insurance company – Lincoln Life – improperly lapsed this policy prior to the Receiver's appointment.  The insured under the policy (Rosenberg) subsequently passed away, leaving the potential death benefit in dispute.  The Receiver commenced an action in the Eastern District of New York and retained contingency counsel.  A back-end beneficiary under the policy (who the Receiver named as a nominal defendant because it was a necessary party to the litigation) filed counterclaims against the Receiver, seeking a ruling that it is entitled to 100% of the death benefit in the event that the Court determines that the Receivership somehow caused the alleged lapse.

During the Seventh Application Period, Applicants worked with contingency counsel to dispute the counterclaims asserted by the back-end beneficiary, which the Receiver believes are without merit and are legally deficient, as well as continuing to pursue the primary claims against the insurer.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and their role was primarily to monitor and interface with contingency counsel.

3.      **American Patriot Gold** – refers to Platinum's formerly held ownership interest, through Maximilian Resources LLC ("Maximilian"), to approximately 370 acres of land fee simple, in addition to patented mining claims in Montezuma County, Colorado.  American Patriot Gold ran the Red Arrow Mine on the property until its mining permit was revoked in March 2014 as a result of non-payment of restitution for environmental and operational violations.

Based upon Conway MacKenzie's due diligence, obtaining permits and selling the asset as a working gold mine was determined not to be an economical option due to the significant cost and timeframes involved.  Accordingly, the Receiver retained a local broker, with the authority of the Court, and the broker actively marketed the property.  Two bids were received and an auction was held on March 11, 2019.  At the auction, the winning bid was $300,000 minus a $20,000 credit for certain environmental remediation, which represented an $80,000 increase above the initial bid.  The Receiver filed a motion to approve the sale to the winning bidder and the Court entered an order approving the sale on March 22, 2019 [Dkt. No. 457].  The sale closed on April 3, 2019.  After taking into account the environmental remediation credit and payment to the broker of its 8.5% fee ($25,500), the Receivership Estate received net cash of $254,500, which will be reflected in cash receipts for the second calendar quarter.

During the Seventh Application Period, Applicants worked with the broker regarding the property listing, the status of interest in the property and the auction.   Applicants also reviewed the sale contract, prepared the motion to approve the sale and related order and addressed tax and title issues related to the sale.   Otterbourg attorneys who have billed time to this matter include attorneys with transactional experience and attorneys that the Receiver has called upon to prepare applications to the Court.

      4.     **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, Platinum (PPCO) made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million dollar facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella"). Arabella had working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas (the "Texas Bankruptcy Court") and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Texas Bankruptcy Court). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.

Arabella's plan of reorganization was confirmed by the Texas Bankruptcy Court and the sale of assets closed at the end of 2018.  From the sale proceeds, payments will be made by Arabella to certain third parties pursuant to settlement agreements entered into by Arabella with parties that had claimed an interest in Arabella's assets.  In addition, payments were made to the broker and the taxing authorities, and payments will also be made to certain lienholders with interests senior to those of Platinum, priority and administrative claimants and Arabella's

retained professionals, all entitled to be paid before Platinum will receive its share of the proceeds.

As of the beginning of the Seventh Application Period, there were three issues that remained to be resolved before Arabella could conclude its bankruptcy case: (i) claims made by a handful of parties claiming to have materialman's (oil) liens superior to those of Platinum (the "M&M Liens"); (ii) a non-operating former owner, which claims to be owed money from Arabella (Arabella asserts that these claims were released in a prior settlement) (the "Non-Op Claim"); and (iii) a motion made by the liquidating trustee of AEI (the Cayman parent to the operating subsidiaries) seeking payment of his and his professionals' fees on the grounds of substantial contribution to the Arabella bankruptcy case (the "Substantial Contribution Claim"). The foregoing claims, if allowed, are entitled to priority before Platinum receives a distribution under the confirmed plan of reorganization.

Arabella, with Applicants' assistance, sought to resolve the M&M Liens and the Non-Op Claim during the Seventh Application Period.  While not resolved during the Seventh Application Period, both of these issues were recently resolved, subject to documentation and approval by the Texas Bankruptcy Court.  First, Arabella and Platinum sought to have the M&M Lien dispute referred to mediation, which it was by the Texas Bankruptcy Court.  Following an all-day mediation session in Texas (the Receiver was represented by local counsel and a Goldin professional), all of the M&M Liens were resolved and the payment to be made to each lienholder was agreed upon.  Second, Arabella brought the gating issue of whether the Non-Op Claim was released in a prior settlement to an arbitrator that the parties have previously used in the case.  The arbitrator decided that the Non-Op Claim was not released and that the non-operating owner could assert a claim, subject to proving validity and amount of any claim.

Instead of litigating the validity and amount of the claim asserted by the non-operating former owner, the parties agreed to an acceptable claim amount to avoid the expense and uncertainty of litigation.

Accordingly, the only issue that remained (and continues to remain) is the Substantial Contribution Claim by the AEI liquidator and his professionals.   These professionals were retained by Prior Management to assist with the workout of the Arabella loan and are also parties to a Guaranty Agreement with Prior Management.   The Receiver disputes these professionals' Substantial Contribution Claim and prepared a response to the Substantial Contribution Motion during the Seventh Application Period.

Following resolution of the final issue of the Substantial Contribution Motion, Arabella expects to be able to make final distributions and close the case.   Any proceeds received by Platinum, the amount of which is still uncertain, are subject to a claim by the counterparty to a Participation Agreement entered into with the Prior Receiver.

During the Seventh Application Period, Applicants had frequent telephonic and e-mail communications with Arabella's retained professionals, including its CRO, bankruptcy counsel and litigation counsel regarding the M&M Liens, the Non-Op Claim and the Substantial Contribution Motion.   Applicants reviewed the papers submitted to the Texas Bankruptcy Court and to the arbitrator, also reviewed the M&M Liens analysis and assisted with preparing for the mediation of the M&M Liens.   Applicants also worked with Goldin to analyze various liquidation scenarios and claims and liens that may come ahead of those of Platinum to ascertain the potential best case and worst case recovery scenarios.   Applicants had discussions with the joint liquidators of the parent company in the Cayman Islands regarding the Substantial Contribution Motion and payment under a purported guaranty of fees in favor of professionals

that was given by prior management.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

5.      **Cokal Limited** (ASX: "CKA") – refers to a coal mining company headquartered in Sydney, NSW.  CKA's active mining project is on the island of Borneo in the Bumi Barito Mineral ("BBM") of Indonesia.  Over the past year, the BBM mine was developed and CKA received commitments from several investors to support continued development of the mine. PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, options, and a Note).  As a result of a Debt Restructuring Transaction agreed to by prior management, the Note was restructured into new options and a royalty from revenues of the BBM.

PPCO and PPVA negotiated with one of CKA's current shareholders to sell the combined common stock and options.  During the Seventh Application Period, the Receiver completed the sale (in multiple tranches) of PPCO's entire stock and options position for total revenues of $2,213,490.

During the Seventh Application Period, Applicants prepared the Escrow Deed and transfer documents necessary to complete the sale. Otterbourg attorneys who have billed time to this investment include attorneys with transactional experience.

6.      **Greentown Oil Company** – refers to an investment in a company holding certain oil and gas assets located in the Paradox Basin in the state of Utah.  Through Maximilian, PPCO holds a secured debt and equity interest in the company.

In connection with certain amounts owed under a loan, Maximilian asserted a right to certain insurance proceeds received by a Greentown related entity – Pacific Energy & Mining, Company ("Pacific") – that Maximilian believed were assigned to it.  In June 2017, while the

5759556.1

Receivership case was pending, Pacific commenced a declaratory judgment action in the U.S. District Court for the District of Nevada (Pacific Energy & Mining Company v. Maximilian Resources LLC, Case No. 17-cv-00363 (HDM) (VPC)), seeking a declaration that Pacific did not owe any money to Maximilian.  During the Seventh Application Period, the Receiver completed the negotiation and drafting of a Global Settlement Agreement whereby in consideration for $800,000, the Receiver, on behalf of Maximilian, released all claims against Greentown and released all liens against its property.

During the Seventh Application Period, Applicants reviewed the term sheet for the proposed settlement and reviewed the settlement documents, including the Global Settlement Agreement and the Debt Conversion Agreement. Otterbourg attorneys who have billed time to this investment include attorneys with experience in litigation and transactional matters.

7.     **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.   PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of In re Lily Group, Inc., Case No. 13-81073 (Bankr. S.D. Ind.).   The mine is currently idled.

Unlike the usual circumstance in which assets are sold from a bankruptcy estate free and clear of all liens, here, the bankruptcy court order did not provide for the sale of the assets to LC Energy free and clear of liens.  As a result, there are potentially multiple liens and a claim by the committee of unsecured creditors in the Lily Group bankruptcy case against the LC Energy assets.  The Receivership Team, with the assistance of local counsel, tried for many months to both locate and negotiate with many of the parties who claimed to be lienholders in LC Energy. The Receiver was unsuccessful in locating all interested parties.  As such, the Receiver filed a motion on December 6, 2018 [Dkt. No. 422] in the Receivership Court that sought entry of an

order (i) authorizing the Receiver to sell the Receivership's rights in and to LC Energy free and clear of all liens, and (ii) approving certain bidding and claims procedures in connection with the proposed sale (the "<u>Bid Procedures Motion</u>").   The Receivership Court approved the Bid Procedures Motion on January 16, 2019 [Dkt. No. 444] and Houlihan Lokey immediately began to market the LC Energy assets.

During the Seventh Application Period, Applicants resolved the objections to the Bid Procedures Motion so that a final order could be presented to and entered by the Court and also addressed a lease issue regarding one of the parcels of property on which the mining operations are located.   Applicants also worked with Houlihan Lokey to market the assets, including reviewing the offering memorandum and having regular discussions with the Houlihan Lokey team regarding outreach, parties contacted, parties that performed due diligence and the status of interest in the assets.   Otterbourg attorneys who have billed time to this investment primarily include attorneys with litigation and bankruptcy experience.

8.    **<u>NJ Ethanol LLC</u>** – refers to a company that built a small-scale plant in New Jersey to convert food waste into food- and pharmaceutical-grade ethanol.  The business failed and the plant was closed.  PPCO owns Class B preferred and common stock.  These shares have limited marketability outside of a sale back to the company.  Applicants spent time during the Seventh Application Period coordinating with Goldin, who took the lead on discussions to potentially sell Platinum's interests in NJ Ethanol on an "as is" basis to the company's principal for $75,000.   In connection with this potential sale, Applicants prepared a form Securities Purchase Agreement.

5759556.1

9.      **Securities Dispositions** – Applicants coordinated with Goldin on the sale of a handful of securities with limited marketability, including seeking the assistance of foreign brokers to help with the sale of securities registered in foreign jurisdictions.

B.      **Case Administration (P04) - Total Fees:  $172,130.00**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The nature of the tasks performed under this category is varied, and includes the following:

1.      **Investor Communications.**  During the Seventh Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  Applicants also added a link for interested parties to access the docket for the Fraud Litigation.  Applicants also meet in person or by telephone with investors and/or their representatives upon request, as well as the minority shareholders of ALS.  The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to such inquiries and requests for information.

The Receiver also organized and held a fifth "Town Hall" style webinar and telephone conference on March 12, 2019 to provide an update to investors and to answer questions submitted by investors.  The Town Hall also was an opportunity for the Receiver to review for

investors the sixth quarterly status report that was prepared and filed by Applicants.  Applicants also prepared the Seventh Status Report of the Receiver during the Seventh Application Period.

       2.      **Defendants**.  Earlier in the case, the Receiver received several requests from the defendants named in the SEC's criminal complaint (the "<u>Defendants</u>") for the advancement of their legal fees as they anticipated that they would be exhausting the D&O insurance.  The Court previously denied Defendants' Motion to compel the advancement of legal fees.  [Dkt. No. 417]  During the Seventh Application Period, one of the Defendants renewed his request and asked the Receiver to reconsider advancing his legal fees.  The Receiver denied this request.  Time was spent by Applicants during the Seventh Application Period responding to this particular request.  Applicants monitored the criminal proceedings and analyzed any impact those proceedings may have on the receivership.  Applicants also analyzed the impact on the Receivership Estate of the conviction and sentence obtained against Murray Huberfeld and potential right to any restitution proceeds and/or claims that can be asserted against Mr. Huberfeld.

       3.      **Schafer & Weiner**.  On September 25, 2018, the Court issued its Memorandum Decision and Order denying Schafer & Weiner's ("<u>S&W</u>") fee application and reserving judgment on the Receiver's cross-motion seeking disgorgement of the pre-Receivership fees paid to S&W.  [Dkt. No. 383]  S&W then appealed that decision to the U.S. Court of Appeals for the Second Circuit.  During the Seventh Application Period, Applicants participated in the Second Circuit's mandatory mediation conference (CAMP) and engaged in conversations with S&W and the SEC regarding a possible resolution of the appeal and the Receiver's cross-motion.

       4.      **SEC Communications/Meetings**.  The Receiver had regular communications with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to potential retentions and filings by the Receiver.  The Receiver

5759556.1

and the Receivership Team also had periodic communications with SEC personnel about pending matters before the Court as to which SEC input is appropriate.

5.      **PPVA**.    The Receiver and the Receivership Team had periodic teleconferences and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest, including jointly held assets, the Fraud Action and additional claims that may be jointly held.  Otterbourg also continued to discuss procedures regarding access to documents held on the Platinum mainframe and the production of documents in connection with the ongoing litigations.

6.      **Subpoenas**.    Applicants also spent time during the Seventh Application Period responding to subpoenas on a variety of matters.

7.      **Receiver Oversight**.    Time during the Seventh Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.   The Receivership Team meets with the Receiver bi-monthly to discuss ongoing asset disposition, litigation, claims and other administrative matters, and prepared agendas and reviewed assets for discussion in advance of the meetings.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues, and establishing new bank accounts for Platinum.

C.      **Claims Administration Work** (P05) – **Total Fees: $7,846.50**

Pursuant to the previously approved bar date procedures motion, the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar

date for governmental units to file a proof of claim was April 12, 2019.  Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  In addition, the Receiver has claims that may have been filed with the Prior Receiver.  In total, 327 claims were filed prior to the bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  The Receivership Team has preliminarily reviewed the filed claims, but has not yet done an in depth analysis of each claim, including which claims may be the subject to an objection and disallowance.  The Receiver cannot at this time state what distributions will ultimately be or even the pot that will ultimately be available for distribution.  Addressing the asserted secured blanket liens on the assets is also fundamental to formulating a distribution plan.

Applicants spent time during the Seventh Application Period working with in-house counsel and the Receiver's claims agent to ensure that all potential creditors were sent notice of the bar date, preliminarily reviewed the claims submissions, including attention to particular claims that are relevant to other analyses being undertaken by the Receiver, and responded to inquiries from creditors regarding the status of their claims.

### D.    Forensic/Investigatory Work (P10) - Total Fees:  $2,423.50

In addition to the monetization of assets, potential sources of recovery include claims by the Receiver as innocent successor to the Platinum Entities against possible liable parties.  The bulk of the investigatory work to date has resulted in the commencement of the Arbitration and the Fraud Action (both discussed below).  In addition, the Receiver continues to review additional causes of action that could be asserted.  The analysis also includes transfers from Platinum and the value of the assets it transferred and consideration given in return.  In addition, during the Seventh Application Period, Applicants entered into additional tolling agreements or

5759556.1

reviewed and renewed tolling agreements that were set to expire.  The tolling agreements will allow the Receiver and the Receivership Team the appropriate time to investigate potential claims.

### E.      Beechwood Action (P14) – Total Fees: $746,725.00

On December 19, 2018, the Receiver commenced the Beechwood Action in the Southern District of New York against (i) certain so-called Beechwood entities, (ii) Senior Health Insurance Company of Pennsylvania, (iii) Fuzion Analytics, Inc., (iv) CNO Financial Group, Inc., (v) Bankers Conseco Life Insurance Company, (vi) Washington National Insurance Company and (vii) 40|86 Advisors, Inc.  The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood RE Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the United States District Court for the Southern District of New York.  The Receiver exercised her right under the applicable rules and orders of the Court to amend the original filed complaint and on March 29, 2019, the Receiver filed an amended complaint.   A copy of the redacted amended complaint filed in the Beechwood Action may also be accessed on the Receiver's website (www.PlatinumReceivership.com).  The summary here is not intended to alter or recast any of the substantial allegations in the complaint.

The Receiver's complaint (subsequently amended) sought redress for the massive scheme perpetrated to the detriment of Platinum and its innocent investors by certain of the now indicted and/or convicted managers of Platinum.  Specifically, in the complaint, the Receiver alleges, among other things, that through the creation of what was a thinly disguised independent reinsurance entity, Beechwood, the Platinum insiders, fueled with money knowingly or recklessly contributed by the defendants, were able to prolong and expand a massive fraud that

personally enriched the insiders through the generation of tens of millions of dollars in management fees, incentive fees, false profits and other remuneration over the years.

Certain of the defendants named in the Receiver's amended complaint are alleged to have substantially assisted, and participated with, Beechwood and the Platinum insiders to commit fraud and breach their fiduciary duties to the PPCO Funds.  Specifically, these defendants – acting through Beechwood – structured and implemented a series of transactions that ultimately saddled the PPCO Funds with approximately $69.1 million of debt owing to Beechwood, as agent for the insurers, secured by purported liens on substantially all of the PPCO Funds' assets, including those of nearly all of their portfolio companies, in consideration for assets that were worth a fraction of that amount.

For these reasons, the Receiver asserted causes of action for, among other things, (i) violations of the Racketeer Influenced and Corrupt Organizations Act and/ or federal securities fraud; (ii) aiding and abetting common law fraud; (iii) aiding and abetting breach of fiduciary duty; (iv) actual and constructive fraudulent conveyances; and (v) unjust enrichment.  In addition to monetary damages, the Receiver sought to avoid the first-priority liens asserted against PPCO Funds' assets by certain defendants that may otherwise adversely impact potential distributions to investors and creditors.

Prior to filing the Amended Complaint, one of the defendants filed a motion to dismiss, which the Receiver responded to and also addressed certain of the points raised in the motion to dismiss in the Amended Complaint.  One of the defendants has filed an answer, cross-claims and third-party claims.   Additional motions to dismiss, and/or add cross-claims and third-party actions were filed following the Application Period.

5759556.1

During the Seventh Application Period, Applicants spent significant time preparing the Amended Complaint, including researching additional legal issues and gathering additional facts to buttress the claims asserted in the Amended Complaint, and working with the Goldin Team on the Amended Complaint and case strategy. In addition, Applicants spent time preparing for the production of documents and other aspects of discovery.

**F.      Arbitration (P15) – Total Fees $220,400.50**

On April 27, 2018, the Receiver timely commenced a confidential arbitration against an accounting firm and its affiliate (collectively, the "Accounting Firms") that provided audit services to certain of the Receivership Entities, claiming that the Accounting Firms committed negligence in conducting audits of the financial statements of certain of the Receivership Entities (the "Audited Platinum Entities") for the fiscal year ended December 31, 2014, and that the Accounting Firms breached their contractual obligations to the Audited Platinum Entities in connection with those audits.  The Receiver seeks monetary damages in an amount to be determined by the arbitration panel.  The arbitration is before a tribunal of three neutral arbitrators, and is currently in the pre-hearing discovery phase.  Under the current schedule, fact discovery will close on June 14, 2019, and any dispositive motions will be fully briefed in accordance with a schedule to be agreed on by the parties following notice of a party's intention to file such a motion.

**V.      EXPLANATION OF EXPENSES AND RELATED POLICIES**

Applicants seek reimbursement of its out-of-pocket costs in the amount of $21,187.08. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Seventh Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 30,358 internal laser copies and photocopies during the Seventh Application Period at the rate of 0.15 cents per page, totaling $4,553.70 for all in-house copies.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Seventh Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)      With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)      In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for Computerized Research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

37

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

5759556.1

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds. Investors now have a forum in which they may present their views (including their

criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse.   Many of the people with factual knowledge are facing criminal charges. Documentation, to the extent it exists, must be questioned and verified.  Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.    HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Seventh Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Litigation and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Seventh Interim Fee Application if the requested fees are approved is $123,197.71 ($13,149.92 for the Receiver and $110,047.79 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     Grant interim approval of the Receiver's compensation in the amount of $65,749.60 (the "Allowed Receiver Fees");

(b)    Grant interim approval of Otterbourg's compensation in the amount of $1,088,551.72 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)    grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $4,060.68;

(d)    grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $17,126.40;

(e)    authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)    Grant such other relief as the Court deems appropriate.

Dated:  June 26, 2019

Otterbourg P.C.

By: /s/ Adam C. Silverstein
      Adam C. Silverstein
      Jennifer S. Feeney
      Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

41

5759556.1