UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

   -v-

PLATINUM MANAGEMENT (NY) LLC;             No. 16-CV-6848 (BMC)
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## EIGHTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD APRIL 1, 2019 THROUGH AND INCLUDING JUNE 30, 2019

      Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Eighth Joint Interim Application (the "Eighth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from April 1, 2019 through and including June 30, 2019 (the "Eighth Application Period"). There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $67,660.00 and reimbursement of expenses in the amount of $873.00 for the Eighth Application Period. Otterbourg requests interim approval of fees in the amount of $966,801.82 and reimbursement of expenses in the amount of $16,269.87 for the Eighth Application Period, for a combined total of fees for Applicants in the amount of $1,034,461.82,[1] and expenses in the amount of $17,142.87 for the Eighth Application Period.

This Eighth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Eighth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description

---

[1] As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Action and the Arbitration (defined below), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Eighth Application Period, the Receiver's recorded time charges before application of these accommodations were $106,250.00 and Otterbourg's recorded time charges were $1,218,824.50, for a combined gross legal fees total (before the application of any accommodations) of $1,325,074.50.

of each exhibit to this Eighth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Eighth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.      PRELIMINARY STATEMENT

During the Eighth Application Period, the significant areas of focus for the Receiver and her team[2] continued to be (i) the litigation commenced by the Receiver at the end of 2018 in the United States District Court for the Southern District of New York against a group of defendants seeking the avoidance of certain liens which may otherwise adversely impact potential distributions to investors and creditors as well as damages for claims arising from a fraudulent scheme perpetrated to the detriment of Platinum (the "Beechwood Action"); and (ii) the confidential arbitration proceeding commenced against the auditor of PPCO's 2014 financial statements (the "Arbitration").   The Receiver also continued to review the remaining non-litigation assets in the portfolio and seek to monetize those assets that still have prospects for monetization, both in and out of ongoing court proceedings, and for certain assets for which

---

[2]      To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

monetization is not currently a possibility, to seek to limit any liability while the asset is held for potential future monetization or abandonment.

During the Eighth Application Period, the Receiver closed the sale of American Patriot Gold for net cash of $251,679 to the Platinum estate (the "Receivership Estate"). The Receiver continues to monitor and seek disposition options for the remaining, illiquid and/or more problematic assets, but the focus of the Receivership has shifted to the pursuit of claims in the Arbitration and the Beechwood Action. The Beechwood Action also seeks to avoid blanket liens on Platinum's assets asserted by certain of the defendants in the Beechwood Action. Accordingly, the results of the Beechwood Action have significance greater than just obtaining recoveries on behalf of the Receivership Estate.

A.     Analysis and Disposition of Receivership Assets

The Receivership Team completed the sale of one portfolio asset (American Patriot Gold). The Receivership Team continued during the Eighth Application Period to work with restructuring professionals in Texas to bring the Arabella bankruptcy proceeding to a conclusion and focused on the disposition of the assets of LC Energy Operations LLP and the limitation of any potential liabilities with respect to the assets. The Receiver continued to explore options for some of the smaller assets, including small stock holdings. If there are any assets that have no current value, but have the potential to have value in the future and have no cost to the estate to maintain, the Receiver will continue to hold such assets while the litigations are ongoing.

5923533.2

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie").[4] The services of both Houlihan Lokey and Conway MacKenzie have concluded.

During the Eighth Application Period, the Platinum Receivership received approximately $250,000 from the sale of American Patriot Gold. This amount is in addition to the approximately $64 million received by the Platinum Receivership from the liquidation of other assets from the date of appointment of the Receiver. Certain parties have asserted a claim to all or part of the proceeds of some of such liquidated investments. None of these assets has been marketed or sold in a "fire sale" fashion.

The Receiver cannot ascribe values to the assets that have not yet been monetized. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from the plans and projections of prior (now removed) management. The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations. Many of the investments made by Platinum were investments in enterprises that are still in the developmental stage, have no established market value (with any future value being highly speculative) and, in some instances, require significant additional capital investment to even have the possibility of realizing a return on such investment. As such, the prior valuations were often based on assumptions that Platinum would invest significant

---

[3]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[4]   Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017. [Dkt. No. 280].

additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  As the Court previously stated, the Receiver is not tasked with making speculative investments or indulging in risky investment opportunities.  *Houlihan Opinion* at 8. Even with such assumptions made by prior management regarding additional investment, the prior valuations generally were not supportable.

There are certain assets that may ultimately have no realizable value.  All assets have been reviewed and disposition options for the remaining assets that are not in the process of being monetized are limited.  Based upon the thorough due diligence performed by the Receivership Team, the Receiver's goal is to limit any further investment of professional resources in assets for which there is a limited or non-existent market.  If the Receiver believes that there is the possibility that a market will develop (*e.g.*, a stock that is not currently trading, but for which the underlying company may develop into a profitable business), the Receiver may hold the asset for a period of time until a final decision must be made.  Certain assets may ultimately be abandoned or become part of a bulk lot remnant sale.  The Receivership Team also continues to work with other parties to realize upon assets that are subject to bankruptcy or liquidation proceedings.

Certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of Receivership Estate assets.  In the Beechwood Action, the Receiver is seeking to void the purported blanket liens asserted on the Platinum assets.

A description of the investments in which Applicants dedicated significant time during the Eighth Application Period and the work done during the Eighth Application Period with respect to those investments is set forth in Section IV of this Eighth Interim Application.

5923533.2

### B.  Administrative Matters

During the Eighth Application Period, the Receiver and the Receivership Team continued to speak and meet with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[5] the SEC and Platinum investors. The Receiver regularly updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.

The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum.  Some of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world.  During the Eighth Application Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.  The Receivership Team also responded to third party subpoenas during the Eighth Application Period.

## II.  CASE BACKGROUND AND STATUS

### A.  Case Background

_SEC Complaint_

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy ("Levy"), Daniel Small, Uri Landesman,[6] Joseph Mann, Joseph San

---

[5]       PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

[6]  Uri Landesman passed away in September 2018.

Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  The criminal trial against Nordlicht, Levy and San Filippo proceeded during the Eighth Application Period. Following the trial, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting the pair on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Mr. Levy and ordered a new trial with respect to Mr. Nordlicht.  The Department of Justice is in the process of appealing those decisions, and in the interim, two additional criminal trials have been delayed.  The Receiver and

5923533.2

the Receivership Team were not involved in either the prosecution of the criminal case by the Department of Justice (which almost entirely focused on PPVA rather than PPCO) or the advancement of the civil litigation by the SEC.  However, the Receiver and her team did monitor the trial and verdict to analyze any impact of the outcome and the trial evidence on the Receivership.

<u>*Appointment of Receiver and Receivership Order*</u>

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "<u>Prior Receiver</u>").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "<u>Receivership Order</u>").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true

9

financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

B.    Case Status[7]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)    As of June 30, 2019, the Receivership Entities had approximately $37 million in funds. These funds include proceeds from the monetization of Platinum assets. Certain parties claiming an interest in particular sold assets have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Estate). Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets. These claims are being challenged in the Beechwood Action.

It is estimated that, as of June 30, 2019, accrued and unpaid administrative expenses were approximately $7.3 million. Subsequent to the Eighth Application Period, the Court entered orders authorizing the payment of professional fees requested by the Receiver and the Receivership Team for the fourth quarter of 2018 and first quarter of 2019. Accordingly, current accrued and unpaid administrative expenses are approximately $5.5 million, inclusive of this request and unbilled fees and expenses through September 30th. This amount also includes

---

[7]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period October 1, 2018 through December 31, 2018.

holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Eighth Application Period.

(b)     Cash disbursements during the Eighth Application Period totaled approximately $674,000.  This amount consisted primarily of (i) $93,079 in disbursements to professionals; (ii) $420,976 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent); and (iii) $160,025 in investment expenses, which relates to expenses associated with the preservation of the LC Energy asset.

Cash receipts during the Eighth Application Period totaled approximately $491,000.  This amount primarily consists of net proceeds derived from the disposition of the American Patriot Gold asset ($251,679) and a refund ($239,340) of the unused portion of a retainer that was deposited pre-Receivership with JDS Energy, a consultant retained in connection with the Abdala Gold Tailings asset.

The Receiver cannot at this time state when she expects the case to be concluded.  The focus is shifting from the liquidation of assets to the prosecution and/or resolution of claims, litigation and/or resolution of purported blanket secured liens.

(c)     Pursuant to the previously approved bar date procedures motion, the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  In addition, the Receiver has claims that may have been filed with the Prior

11

Receiver.  In total, 327 claims were filed prior to the bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  The Receivership Team has preliminarily reviewed the filed claims, but has not yet done an in-depth analysis of each claim, including which claims may be the subject to an objection and disallowance.

As of June 30, 2019, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

(i)       Cash and cash equivalents of approximately $37 million;

(ii)      Real estate investments without any set book value, due to their inherently speculative nature;

(iii)     Remaining investments in natural resources, litigation financing, energy and other miscellaneous investments; and

(iv)      Potential litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(d)     Other than the one pending action relating to a specific asset -- Lincoln National Insurance – and PPCO's interest in the lawsuit relating to Agera Energy, the Receiver's investigation of pre-petition activities has so far resulted in the commencement of two litigations: (i) the Arbitration commenced on April 27, 2018 and (ii) the Beechwood Action commenced on December 19, 2018.[8]  Both of these actions are in the discovery and dispositive pleading stage and the Receiver cannot predict the outcome of these litigations or the timing of collecting on any judgment or settlement that may ultimately be obtained.

The Receivership Team continues to analyze other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional

---

[8]   Subsequent to the Eighth Application Period, on August 1, 2019, the Receiver commenced a lawsuit against Greehey & Company, Ltd. Dynamic Resources LLC to recover on a loan obligation.

services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that warrant the commencement of litigation.  For any claims in which a statute of limitations may be approaching, the Receiver has reached out, and will continue to reach out, to the potential targets to enter into tolling agreements to allow the Receivership Team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those targets that have declined to toll the statute of limitations.  The Receiver cannot at this time state whether any additional actions will be commenced and, if so, when they would be commenced.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Eighth Application Period, the Receiver requests interim approval of her fees in the amount of $67,660.00 and reimbursement of expenses in the amount of $873.00.  Otterbourg requests interim approval of its fees in the amount of $966,801.82 and reimbursement of expenses in the amount of $16,269.87.  Thus, the combined total of fees for Applicants of $1,034,461.82, plus expenses of $17,142.87, is $1,051,604.69.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment.  For example, a single investment, such as Arabella, which is in multiple bankruptcy proceedings in Texas, may require the assistance of professionals knowledgeable about bankruptcy issues, as well as pure litigation issues.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below.

5923533.2

The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment.  (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $106,250.00 to $67,660.00, a reduction in the amount of $38,590.00.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,218,824.50 to $966,801.82, a reduction in the amount of $252,022.68.  Therefore, the total reduction for legal fees incurred during the Eighth Application Period by the Receiver and Otterbourg professionals is $290,612.68.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the Eighth Interim Application to SEC counsel on October 18, 2019 to allow for a thirty-day review period and previously provided the SEC with its monthly time records.

This Eighth Interim Application includes certain exhibits:

(a)     The SFAR for the period of April 1, 2019 through June 30, 2019 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Eighth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Eighth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

5923533.2

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Eighth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's eighth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Eighth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Seven attorneys and three paraprofessionals billed time during the Eighth Application Period (in addition to the Receiver). A core team of attorneys performed the lion's share of the services, including Adam Silverstein, Philip C. Berg, William Moran, Erik B. Weinick, Jennifer S. Feeney, Andrew Halpern and Gabriela Leon.[9]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of additional attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this

---

[9]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Eighth Application Period.

receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.  Because of the shift in the Receivership from the sale of assets to the pursuit of recoveries through litigation, the bulk of the hours billed were performed by litigation attorneys who are actively involved in the Beechwood Action and/or the Arbitration.

The particular Otterbourg professionals who billed time during the Eighth Application Period and their specific roles were as follows:

(a)    Adam C. Silverstein (Partner) (5.4 Hours to P01; 18.0 Hours to P04; 1.5 Hours to P10; 5.3 Hours to P14; 94.8 Hours to P15) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation.  Mr. Silverstein dedicated most of his time during the Eighth Application Period to matters relating to the Arbitration.  Mr. Silverstein also assisted with applications to the Court.  Mr. Silverstein has also been one of the point persons regarding communications with the SEC during the Eighth Application Period.

(b)    William Moran (Partner) (1.6 Hours to P01; 5.5 Hours to P10; 144.1 Hours to P14; 1.2 Hours to P15) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.  In particular, Mr. Moran has primarily assisted with the Beechwood Action during the Eighth Application Period.

(c)    Philip C. Berg (Partner) (36.7 Hours to P01; 30.4 Hours to P02; 4.0 Hours to P04) – Mr. Berg is a senior transactional partner and Chairman of Otterbourg's Corporate Department, whose focus has been the negotiation, documentation and closing of Receivership transactions. During the Eighth Application Period, Mr. Berg reviewed and negotiated all documents relating

17

5923533.2

to the sale of assets and reviewed other corporate documents that were necessary in connection with the review and possible sale of Platinum assets.

(d)     <u>Jennifer S. Feeney (Of Counsel) (39.2 Hours to P01; 32.2 Hours to P02; 82.4 Hours to P04; 1.1 Hours to P05; .4 to P14)</u> – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Eighth Application Period, Ms. Feeney spent time with respect to the Arabella bankruptcy case, including attention to the remaining items necessary to close-out this asset.  Ms. Feeney also attended to other case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Additionally, Ms. Feeney, along with Erik B. Weinick, prepared applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)     <u>Erik B. Weinick (Of Counsel) (80.0 Hours to P01; 26.7 Hours to P02; 51.6 Hours to P04; .9 Hours to P05; 3.8 Hours to P10; 214.9 Hours to P14)</u> – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick is also the attorney primarily responsible for the Beechwood Action and spent significant time during the Eighth Application

Period preparing the Receiver's response to the motions to dismiss, coordinating discovery and attending to other matters relating to the Beechwood Action.

(f)     <u>Andrew S. Halpern (Associate) (2.6 Hours to P10; 241.1 Hours to P14; 252.7 Hours to P15)</u> – Mr. Halpern is an experienced litigator, particularly in the areas of claims of professional malpractice and fraudulent conveyance and forensic analysis.  As such, Mr. Halpern continued his work in both the Beechwood Action and the Arbitration, as well as preparing tolling agreements for other third parties.  Mr. Halpern spent significant time responding to the motions to dismiss in the Beechwood Action and the completion of document production in the Arbitration.

(g)     <u>Gabriela S. Leon (Associate) (.8 Hours to P04; .6 Hours to P10; 221.7 Hours to P14; 49.1 Hours to P15)</u> – Ms. Leon is a junior associate in the litigation department.  Ms. Leon was utilized to research issues relating to both the Beechwood Action and the Arbitration, in addition to assisting with the preparation and review of pleadings.  Ms. Leon also assisted with research related to other motions made to the Court, all at a considerably lower billing rate.

(h)     <u>Christine O'Brien (Paralegal) (.7 Hours to P04; 21.9 Hours to P14; 3.6 Hours to P15)</u> – Ms. O'Brien is an experienced litigation paralegal. Ms. O'Brien primarily assisted with the production of documents and the receipt of documents produced to the Receiver in connection with ongoing litigation.

(i)     <u>Jessica Hildebrandt (Paralegal) (.7 Hours to P01; .1 Hours to P02; 25.3 Hours to P04; 2.9 Hours to P10; 113.6 Hours to P14; 4.9 Hours to P15)</u> – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a paralegal at a lower billable rate), helped prepare the Otterbourg attorneys for various hearings and court filings, and monitored the criminal docket for the Receivership Team.

(j)      Anthony Williams (Managing Clerk) (12.8 Hours to P04; 10.6  Hours to P14) –
Mr. Williams is Otterbourg's managing clerk and has assisted the Otterbourg attorneys with
court filings, monitoring of dockets, obtaining court papers, and calendaring relevant dates.

## IV. SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING EIGHTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated
their time during the Eighth Application Period into seven (7) project categories.[10]   Narrative
summaries of these activity categories follow:

### A.      Asset Analysis and Recovery (P01) - Total Fees: $166,358.50 Asset Disposition (P02)[11] - Total Fees:  $75,787.00

During the Eighth Application Period, the Receiver and her professionals continued to
review the remaining assets in the portfolio.  Certain assets are still embroiled in litigation and/or
bankruptcy proceedings and actions have been taken by the Receiver and the Receivership Team
to position such assets so that they can eventually be monetized.  In certain instances, time was
also spent with respect to an asset that may not ultimately have a positive return to the
Receivership Estate, but work is still required to reduce potential liabilities and exposure to the
Receivership Estate, as well as to ensure that any such asset without value is not imprudently
abandoned by the Receivership Estate.

During the Eighth Application Period, Applicants continued to analyze the remaining
assets in Platinum's portfolio, including in-person and telephonic meetings with her team of
professionals and staff, as well as, in some instances, management and other investors in the
underlying asset, including counsel to PPVA.  Also included in the time billed during the Eighth

---

[10]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total
hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges.
The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[11]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with
respect to each in a combined narrative to allow the reader to better understand the tasks performed.

Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular (approximately every two weeks) team meetings with her team of professionals and staff, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer. In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.   These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the remaining Platinum portfolio.  Goldin also prepared regular updates on the status of the remaining assets in the Platinum portfolio and current disposition options, which Applicants reviewed.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Eighth Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.     **Accutane** - refers to a litigation financing investment by a Platinum related entity in a products liability litigation currently on appeal before the Supreme Court for the State of New Jersey.  PPCO has been engaged in a dispute with two insurance companies insuring up to a $4.5 million return on the litigation finance investment.  The PPCO subsidiary made a claim under the insurance policy for the $4.5 million which was initially denied by the insurers.  The

parties then commenced informal discovery after which they entered into arms' length negotiations to resolve their dispute without court intervention. Following the Eighth Application Period, the Receiver settled with the insurance companies for $1.8 million to resolve the dispute without litigation. During the Eighth Application Period, Applicants and in-house spent reviewing documents produced by the insurer and had multiple calls with the insurance carrier's counsel. Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience.

2.      **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera"). Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC.

Pursuant to their respective interests in PGS, both PPVA and PPCO agreed to pursue certain claims and causes of action relating to PGS's ownership of a certain promissory note convertible into 95% of the common equity of energy reseller Agera Energy (the "Agera Claims"). In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, Senior Health Insurance Company of Pennsylvania and CNO Financial Group, Inc. The case was subsequently removed to the United States District Court for the District of Delaware, where a motion to remand is currently pending. The Case No. is 19-cv-01319-CFC.

During the Eighth Application Period, Applicants reviewed and commented on draft term sheets to fund the litigation, reviewed the litigation funding agreement, coordinated with PPVA on case strategy and reviewed and commented upon the draft complaint. Otterbourg attorneys

who have billed time to this matter include attorneys with litigation experience and transactional experience.

3.     **<u>ALS Life Settlements (Lincoln/Rosenberg Litigation)</u>** – refers to a portfolio of life settlement investments that were owned through an entity in which PPCO is the majority owner and managing member.  All but one policy in the portfolio was previously sold by the Receiver.  The one insurance policy that was not sold has a total death benefit of $8.5 million (with ALS entitled to $7.2 million of that total).  The Receiver believes that the insurance company – Lincoln Life – improperly lapsed this policy prior to the Receiver's appointment. The insured under the policy (Rosenberg) subsequently passed away, leaving the potential death benefit in dispute.  The Receiver commenced an action in the United States District Court for the Eastern District of New York and retained contingency counsel.  A back-end beneficiary under the policy (who the Receiver named as a nominal defendant because it was a necessary party to the litigation) filed counterclaims against the Receiver, seeking a ruling that it is entitled to 100% of the death benefit in the event that the Court determines that the Receivership somehow caused the alleged lapse.

During the Eighth Application Period, Applicants worked with contingency counsel to Receiver's Reply in Support of the Motion to Dismiss the counterclaims asserted by the back-end beneficiary, which the Receiver believes are without merit and are legally deficient. Applicants also spent time responding to discovery requests.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and their role was primarily to monitor and interface with contingency counsel and to assist with responses to discovery.

4.     **<u>American Patriot Gold</u>** – refers to Platinum's formerly held ownership interest, through Maximilian Resources LLC ("<u>Maximilian</u>"), in approximately 370 acres of land fee

simple, in addition to mining claims in Montezuma County, Colorado.  American Patriot Gold ran the Red Arrow Mine on the property until its mining permit was revoked in March 2014 as a result of non-payment of restitution for environmental and operational violations.

Based upon Conway MacKenzie's due diligence, obtaining permits and selling the asset as a working gold mine was determined not to be an economical option due to the significant cost and timeframes involved.  Accordingly, the Receiver retained a local broker, with the authority of the Court, and the broker actively marketed the property.  Two bids were received and an auction was held on March 11, 2019.  At the auction, the winning bid was $300,000 minus a $20,000 credit for certain environmental remediation, which represented an $80,000 increase above the initial bid.  The Receiver filed a motion to approve the sale to the winning bidder and the Court entered an order approving the sale on March 22, 2019 [Dkt. No. 457].  The sale closed on April 3, 2019.  After taking into account the environmental remediation credit and payment to the broker of its 8.5% fee, the Receivership Estate received net cash of $251,679.

The majority of the work done with respect to this asset occurred during the prior Eighth Application Period.  During the Eighth Application Period, Applicants attended to the closing of the sale and certain post-closing matters.

5.     **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, PPCO made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella").  Arabella had working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the

24

Northern District of Texas (the "Texas Bankruptcy Court") and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Texas Bankruptcy Court). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.

Arabella's plan of reorganization was confirmed by the Texas Bankruptcy Court and the sale of assets closed at the end of 2018.  From the sale proceeds, payments will be made by Arabella to certain third parties pursuant to settlement agreements entered into by Arabella with parties that had claimed an interest in Arabella's assets.  In addition, payments were made to the broker and the taxing authorities, and payments will also be made to certain lienholders with interests senior to those of Platinum, priority and administrative claimants and Arabella's retained professionals, all entitled to be paid before Platinum will receive its share of the proceeds.  As of the beginning of the Eighth Application Period, there were several issues that remained open before Arabella could conclude its bankruptcy case

During the Eighth Application Period, Applicants worked with Arabella to resolve the remaining open issues.  Applicants had frequent telephonic and e-mail communications with Arabella's retained professionals, including its CRO, bankruptcy counsel and litigation counsel regarding (i) claims made by a handful of parties claiming to have materialman's (oil) liens superior to those of Platinum (the "M&M Liens"); (ii) a non-operating former owner, which claims to be owed money from Arabella (Arabella asserts that these claims were released in a prior settlement); and (iii) a motion made by the liquidating trustee of AEI (the Cayman parent to the operating subsidiaries) seeking payment of his and his professionals' fees on the grounds of substantial contribution to the Arabella bankruptcy case (the "Substantial Contribution Claim"). Applicants reviewed the M&M Liens analysis, the mediations statements and assisted with

preparing for the mediation of the M&M Liens.  Applicants also worked with Goldin to analyze various liquidation scenarios and claims and liens that may come ahead of those of Platinum to ascertain the potential best case and worst case recovery scenarios.  Applicants continued to have discussions with the joint liquidators of the parent company in the Cayman Islands regarding the Substantial Contribution Motion, preparation of discovery requests and discussions to mediate the issue.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

6.      **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.  PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of <u>In re Lily Group, Inc</u>., Case No. 13-81073 (Bankr. S.D. Ind.).   The Mine is currently idled.

During the Eighth Application Period, Houlihan Lokey thoroughly and diligently marketed the Mine.  To that end, Houlihan contacted nine local strategic buyers, all of whom but one declined to bid.  The one offer received for LC Energy was predicated on the Receivership Estate paying the buyer for potential environmental liabilities, which the bidder believed may well exceed any short-term future production from the mine.  The Receiver has since met and conferred with Houlihan Lokey, her financial advisors, her local Indiana bankruptcy and environmental counsel, and certain other interested parties, to determine how best to dispose of the Mine without the prospect of a ready, willing and able buyer for the mine.  This analysis included a review of the potential remediation liabilities of LC Energy and the responsibilities of the operator with respect to such liabilities.

Subsequent to the Eighth Application Period, to avoid potential liabilities with respect to the Mine (even if abandoned), including purported liabilities to ERC Mining Indiana Corp.

("ERC"), in its capacity as manager of the Mine, the Receiver and ERC entered into an Asset Purchase Agreement dated August 16, 2019 (the "APA").  Pursuant to the APA, LC Energy sold the Mine to ERC and ERC agreed to assume any and all current and future clean-up and other remediation costs at the Mine in consideration for a payment by LC Energy to Purchaser of $380,000 and an assignment to Purchaser of the $250,000 in cash collateral that had secured a bond in favor of the State of Indiana.  The APA was approved by the Receivership Court and the sale of the Mine closed during the third quarter of this year.

During the Eighth Application Period, Applicants discussed with Houlihan Lokey the results of its marketing efforts, had several conference calls with local Indiana bankruptcy and environmental counsel to review options available and to minimize further expense, reviewed the analysis prepared by environmental counsel regarding applicable Indiana statutory regulations and other legal issues applicable to the asset, spoke to the one bidder who is seeking payment from LC Energy for potential environmental liabilities and spoke with the permittee of the Mine. Otterbourg attorneys regularly updated the Receiver on the status of these efforts.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with litigation, transactional and bankruptcy experience.

7.    **NJ Ethanol LLC** – refers to a company that built a small-scale plant in New Jersey to convert food waste into food- and pharmaceutical-grade ethanol.  The business failed and the plant was closed.  PPCO owns Class B preferred and common stock.  These shares have limited marketability outside of a sale back to the company.  During the Eighth Application Period, the Receivership Team continued discussions to sell Platinum's interests in NJ Ethanol on an "as is" basis to the company's principal for $75,000.  During the Eight Application Period, Applicants prepared a draft Securities Purchase Agreement.   The sale has not yet closed.

Otterbourg attorneys regularly updated the Receiver on the status of these efforts.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with transactional experience.

8.      **Securities Dispositions** – Applicants coordinated with Goldin on the status of the sale of a handful of securities with limited marketability, including seeking the assistance of foreign brokers to help with the sale of securities registered in foreign jurisdictions.  Applicants also reviewed a confidentiality deed in connection with the possible sale of the Receiver's interest in a royalty in Cokal.

B.      **Case Administration (P04) - Total Fees:  $192,168.00**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The nature of the tasks performed under this category is varied, and includes the following:

1.      **Investor Communications.**  During the Eighth Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to inquiries and requests for information.  Applicants also prepared the Seventh Status Report of the Receiver during the Eighth Application Period.

2.      **Defendants**.  During the Eighth Application period, the Receiver continued to monitor the criminal trial of Mark Nordlicht, David Levy and Joseph SanFilippo to analyze any impact those proceedings may have on the Receivership.

3.      **Employees**.  During the Eighth Application Period, the Receiver responded to the Motion of a former Platinum employee, Samuel Salfati, seeking Allowance and Payment of Administrative Expense Claim. [Dkt. Nos. 465, 472]  Mr. Salfati was seeking the immediate and full payment of a pre-receivership claim based upon a Retention Agreement entered into with Prior Management that was rejected by the Receiver when Mr. Salfati was terminated.  The Receiver filed papers in opposition to Mr. Salfati's motion on the basis of, among other things, that Mr. Salfati is not entitled to payment at this time of a pre-Receivership claim.  On July 17, 2019, the Court entered an order denying Mr. Salfati's motion.  [Dkt. No. 480]

4.      **Schafer & Weiner**.  On September 25, 2018, the Court issued its Memorandum Decision and Order denying Schafer & Weiner's ("S&W") fee application and reserving judgment on the Receiver's cross-motion seeking disgorgement of the pre-Receivership fees paid to S&W.  [Dkt. No. 383]  S&W then appealed that decision to the U.S. Court of Appeals for the Second Circuit.  During the Eighth Application Period, Applicants continued to participate in the Second Circuit's mandatory mediation conference (CAMP) and engaged in conversations with S&W and the SEC regarding a possible resolution of the appeal and the Receiver's cross-motion. The CAMP process did not lead to a resolution of issues with S&W, and has come to a conclusion.  The parties continue to discuss a resolution.

5.      **SEC Meetings**.  Applicants communicated as warranted with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.  The Receiver and the Receivership Team also met in person with

the SEC during the Eighth Application Period.  Applicants also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

      6.    **PPVA**.  The Receiver and the Receivership Team had periodic teleconferences and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest, including jointly held assets, the Beechwood Action, a related Chapter 15 bankruptcy proceeding and additional claims that may be jointly held, such as the Agera Claims.  Otterbourg also continued to discuss procedures regarding access to documents held on the Platinum mainframe and the production of documents in connection with the ongoing litigations.

      7.    **Subpoenas**.  Applicants also spent time during the Eighth Application Period responding to subpoenas on a variety of matters.

      8.    **Retention of Professionals**.  During the Eighth Application Period, Applicants prepared an application to retain experts in connection with the Arbitration and, if necessary, the Beechwood Action.  The Application was approved by the Court during the Eighth Application Period.  Applicants also monitored the work of the ordinary course professionals and the status of payments to such professionals to stay within the previously entered order approving the retention of ordinary course professionals.

      9.    **Receiver Oversight**.  Time during the Eighth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The Receivership Team meets with the Receiver bi-monthly to discuss ongoing asset disposition,

litigation, claims and other administrative matters, and prepared agendas and reviewed assets for discussion in advance of the meetings.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues.

C.     **Claims Administration Work** (P05) – **Total Fees: $1,574.00**

Pursuant to the previously approved bar date procedures motion, the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  In addition, the Receiver has claims that may have been filed with the Prior Receiver. In total, 327 claims were filed prior to the bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  The Receivership Team has preliminarily reviewed the filed claims, but has not yet done an in depth analysis of each claim, including which claims may be the subject to an objection and disallowance.  Applicants did not devote significant time to the claims review process during the Eighth Application Period other than to review the bar date order and to respond to inquiries regarding the status of claims.  At this time, Platinum's in-house team is conducting the initial review and analysis of claims as Applicants focus on the Receiver's efforts to void the purported blanket liens on assets.

D.     **Forensic/Investigatory Work** (P10) - **Total Fees:  $11,585.50**

In addition to the monetization of assets, potential sources of recovery include claims by the Receiver as innocent successor to the Platinum Entities against possible liable parties.  The bulk of the investigatory work to date has resulted in the commencement of the Arbitration and

the Beechwood Action (both discussed below).  In addition, the Receiver continues to review additional causes of action that could be asserted.  The analysis also includes transfers from Platinum and the value of the assets it transferred and consideration given in return.  In addition, during the Eighth Application Period, Applicants entered into additional tolling agreements or reviewed and renewed tolling agreements that were set to expire.  The tolling agreements will allow the Receiver and the Receivership Team the appropriate time to investigate potential claims.  The Receiver also issued certain subpoenas for the production of documents, which were prepared by Applicants during the Eighth Application Period.

     **E.**       **Beechwood Action** (P14) – **Total Fees: $585,851.50**

On December 19, 2018, the Receiver commenced the Beechwood Action in the Southern District of New York against (i) certain so-called Beechwood entities, (ii) Senior Health Insurance Company of Pennsylvania, (iii) Fuzion Analytics, Inc., (iv) CNO Financial Group, Inc., (v) Bankers Conseco Life Insurance Company, (vi) Washington National Insurance Company and (vii) 40|86 Advisors, Inc.  The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood RE Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the United States District Court for the Southern District of New York.  The Receiver exercised her right under the applicable rules and orders of the Court to amend the original filed complaint, and on March 29, 2019, the Receiver filed an amended complaint.   A copy of the redacted amended complaint filed in the Beechwood Action may be accessed on the Receiver's website (www.PlatinumReceivership.com).  The summary here is not intended to alter or recast any of the substantial allegations in the complaint.

The Receiver's complaint (subsequently amended) seeks redress for an alleged scheme perpetrated to the detriment of Platinum and its innocent investors by certain criminally charged managers of Platinum. Specifically, in the complaint, the Receiver alleges, among other things, that through the creation of what was a thinly disguised independent reinsurance entity, Beechwood, the Platinum insiders, fueled with money knowingly or recklessly contributed by the defendants, were able to prolong and expand a scheme that personally enriched the insiders through the generation of tens of millions of dollars in management fees, incentive fees, false profits and other remuneration over the years.

Certain of the defendants named in the Receiver's amended complaint were alleged to have substantially assisted, and participated with, Beechwood and the Platinum insiders to commit fraud and breach their fiduciary duties to the PPCO Funds. Specifically, these defendants – acting through Beechwood – structured and implemented a series of transactions that ultimately saddled the PPCO Funds with approximately $69.1 million of debt owing to Beechwood, as agent for the insurers, secured by purported liens on substantially all of the PPCO Funds' assets, including those of nearly all of their portfolio companies, in consideration for assets that were worth a fraction of that amount.

For these reasons, the Receiver asserted causes of action for, among other things, (i) violations of the Racketeer Influenced and Corrupt Organizations Act and/ or federal securities fraud; (ii) aiding and abetting common law fraud; (iii) aiding and abetting breach of fiduciary duty; (iv) actual and constructive fraudulent conveyances; and (v) unjust enrichment. In addition to seeking to avoid the purported first-priority liens asserted against PPCO Funds' assets by certain defendants that may otherwise adversely impact potential distributions to investors and creditors, the Receiver seeks monetary damages.

Each of the defendants in the Beechwood Action filed motions to dismiss the Amended Complaint.  The hearing on the motions to dismiss took place on August 15, 2019.  Shortly thereafter, Judge Rakoff issued a "bottom line" decision, which, while dismissing certain of the Receiver's causes of action, sustained certain of her causes of action including, among others, claims to set aside the liens currently preventing a distribution of estate assets and for unjust enrichment.  On October 7, 2019, Judge Rakoff issued a 177-page opinion setting forth the reasons for his decision.  The parties are now fully immersed in discovery, including the exchange of documents and fact and expert depositions.  Discovery is to conclude on December 31, 2019, followed by summary judgment motions and a trial sometime in late spring 2020.

During the Eighth Application Period, Applicants spent time issuing the necessary summonses, negotiating the 502(d) Stipulation, producing documents and reviewing documents that had been produced, participating in multiple discovery calls with the defendants, negotiating a briefing schedule and attending to certain privilege issues in connection with the production of documents.  Applicants also reviewed the motions to discuss and analyzed the legal and factual issues raised by each.  Applicants responded to the motions to dismiss, including researching additional legal issues and gathering additional facts to buttress the claims asserted in the Amended Complaint.

### F.    Arbitration (P15) – Total Fees $294,125.00

On April 27, 2018, the Receiver timely commenced a confidential arbitration against an accounting firm and its affiliate (collectively, the "Accounting Firms") that provided audit services to certain of the Receivership Entities, claiming that the Accounting Firms committed negligence in conducting audits of the financial statements of certain of the Receivership Entities (the "Audited Platinum Entities") for the fiscal year ended December 31, 2014, and that the

Accounting Firms breached their contractual obligations to the Audited Platinum Entities in connection with those audits.  The Receiver seeks monetary damages in an amount to be determined by the arbitration panel.  The arbitration is before a tribunal of three neutral arbitrators, and, subject to the resolution of disputes, recently completed the discovery phase.  On June 25, 2019, the Accounting Firms submitted a dispositive motion for summary judgment seeking the dismissal of all of the Receiver's claims.  The Receiver submitted her response on July 25, 2019.  The Accounting Firms submitted their reply papers on August 9, 2019.  Depositions were taken and completed between September 6th and 20th.  The argument date on the motion had been scheduled for September 24, 2019, but, unfortunately, the Chairperson of the arbitration panel passed away on September 10, 2019.  On October 17, 2019, a new Chairperson was appointed, and argument on the motion is scheduled to take place on November 21, 2019.  A hearing is currently scheduled for April 13, 2020.   Because of confidentiality restrictions, no further information regarding the arbitration can be provided at this time, including the identity of the Accounting Firms.

During the Eighth Application Period, Applicants spent time reviewing the documents to be produced to the Accounting Firms, worked with the Receiver's retained experts, prepared subpoenas and document requests and participated in conferences regarding discovery disputes. Applicants also continued to research factual and legal issues in connection with the Accounting Firms' motion for summary judgment and began to prepare the Receiver's response to the motion.  Applicants also corresponded with the arbitration panel and strategized on the response to the motion for summary judgment and the Arbitration in general.

## V.      EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $17,142.87.

**Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks

35

reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Eighth Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 23,611 internal laser copies and photocopies during the Eighth Application Period at the rate of 0.15 cents per page, totaling $3,541.65 for all in-house copies.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Eighth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)      With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)      In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)      In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals.

(f)      In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)      The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)      In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.      FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact

situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the

assets of the Platinum Entities. The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds. Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse. Many of the people with factual knowledge are facing criminal charges. Documentation, to the extent it exists, must be questioned and verified. Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.   HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Eighth Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount"). Accordingly, the total Holdback Amount for this Eighth Interim Fee Application if the requested fees are approved is $109,287.20 ($13,532.00 for the Receiver and $95,755.20 for Otterbourg). All payments will be made from the Receivership assets.

5923533.2

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     Grant interim approval of the Receiver's compensation in the amount of $67,660.00 (the "Allowed Receiver Fees");

(b)     Grant interim approval of Otterbourg's compensation in the amount of $966,801.82 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $873.00;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $16,269.87;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     Grant such other relief as the Court deems appropriate.

Dated:  November 26, 2019

<div style="margin-left:40%">

Otterbourg P.C.

By: */s/ Adam C. Silverstein*
      Adam C. Silverstein
      Jennifer S. Feeney
      Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

</div>

40

5923533.2