UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                        Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## NINTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD JULY 1, 2019 THROUGH AND INCLUDING SEPTEMBER 30, 2019

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the "Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this Ninth Joint Interim Application (the "Ninth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from July 1, 2019 through and including September 30, 2019 (the "Ninth Application Period"). There are two components to this Application: (i) the Receiver's services; and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $44,337.20 and reimbursement of expenses in the amount of $938.27 for the Ninth Application Period. Otterbourg requests interim approval of fees in the amount of $1,038,220.95 and reimbursement of expenses in the amount of $18,339.44 for the Ninth Application Period, for a combined total of fees for Applicants in the amount of $1,082,558.15,[1] and expenses in the amount of $19,277.71 for the Ninth Application Period.

This Ninth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Ninth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Ninth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1] As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Action and the Arbitration (defined below), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Ninth Application Period, the Receiver's recorded time charges before application of these accommodations were $69,625.00 and Otterbourg's recorded time charges were $1,328,139.00, for a combined gross legal fees total (before the application of any accommodations) of $1,397,764.00.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Ninth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Otterbourg seeks reimbursement and the procedures and policies adopted by Otterbourg to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

I.     **PRELIMINARY STATEMENT**

During the Ninth Application Period, the primary focus of the Receiver and her team[2] continued to be (i) the litigation commenced by the Receiver at the end of 2018 in the United States District Court for the Southern District of New York against a group of defendants seeking the avoidance of certain liens which may otherwise adversely impact potential distributions to investors and creditors as well as damages for claims arising from a fraudulent scheme perpetrated to the detriment of Platinum (the "Beechwood Action"); and (ii) the confidential arbitration proceeding commenced against the auditor of PPCO's 2014 financial statements (the "Arbitration").   The Receiver also finalized the disposition of one of the Receivership's most problematic assets – LC Energy – and made significant progress towards bringing another one of its problematic assets – Arabella Exploration – to a conclusion.

---

[2]      To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

A.      **Analysis and Disposition of Receivership Assets**

During the Ninth Application Period, the Receiver (i) completed the sale of one portfolio asset (LC Energy LLP) that resulted in the limitation of potential liabilities with respect to the asset and (ii) settled a dispute over a litigation finance asset that resulted in the payment to Platinum of certain insurance proceeds (described below).   The Receivership Team also participated in a successful mediation in Texas that resolved one of the last remaining issues so that the Arabella bankruptcy case can be closed and distributions made to creditors, including Platinum as its secured creditor.   Both Arabella and LC Energy have been two of the more challenging assets in the Platinum portfolio.   The Receiver continues to explore options for some of the smaller assets in the Platinum portfolio, but the Receiver is not anticipating any significant recoveries on account of the remaining non-litigation assets.

To assist the Receiver with the monetization of the assets, she retained Houlihan Lokey Capital, Inc. ("Houlihan Lokey")[3] and Conway MacKenzie Capital Advisors, LLC ("Conway MacKenzie") shortly after her appointment.[4]   The services of both Houlihan Lokey and Conway MacKenzie have since concluded.

During the Ninth Application Period, the Platinum Receivership received approximately $1.8 million from the settlement of a dispute with two insurance companies relating to the Accutane litigation finance investment.   This amount is in addition to the approximately $64.2 million received by the Platinum Receivership from the liquidation of other assets from the date of appointment of the Receiver.   Certain parties have asserted a claim to all or part of the

---

[3]   The Court approved Houlihan Lokey's retention on November 11, 2017, *nunc pro tunc* to September 11, 2017, and issued a Memorandum Opinion regarding Houlihan Lokey's retention on November 21, 2017 [Dkt. No. 285] (the "Houlihan Opinion").

[4]   Conway MacKenzie's retention was approved by the Court on November 11, 2017, *nunc pro tunc* to October 12, 2017.  [Dkt. No. 280].

proceeds of some of such liquidated investments.  None of these assets has been marketed or sold in a "fire sale" fashion.

The Receiver cannot ascribe values to the assets that have not yet been monetized. Unfortunately, many of the values ascribed to Platinum assets, whether by the Prior Receiver or Platinum management, were based upon assumptions that derived from the plans and projections of prior (now removed) management.  The actual realized value of these investments may differ materially from the valuations determined by Platinum's prior management and/or the Prior Receiver, and the underlying assets may suffer from significant liabilities that were not accounted for in prior valuations.  Many of the investments made by Platinum were investments in enterprises that were still in the developmental stage, had no established market value (with any future value being highly speculative) and, in some instances, required significant additional capital investment to even have the possibility of realizing a return on such investment.  As such, the prior valuations were often based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  As the Court previously stated, the Receiver is not tasked with making speculative investments or indulging in risky investment opportunities. *Houlihan Opinion* at 8. Even with such assumptions made by prior management regarding additional investment, the prior valuations generally were not supportable.

The Receiver at this time does not anticipate significant recoveries from the remaining non-litigation assets.  While there may be a few assets in which recoveries on a smaller scale are possible, most of the remaining non-litigation assets in the portfolio may ultimately have no realizable value.  All assets have been reviewed and disposition options for the remaining assets that are not in the process of being monetized are limited.  Based upon the thorough due

diligence performed by the Receivership Team, the Receiver's goal is to limit any further investment of professional resources in assets for which there is a limited or non-existent market. If the Receiver believes that there is the possibility that a market will develop (*e.g.*, a stock that is not currently trading, but for which the underlying company may develop into a profitable business), the Receiver may hold the asset for a period of time until a final decision must be made. Certain assets may ultimately be abandoned or become part of a bulk lot remnant sale. The Receivership Team also continues to work with other parties to realize upon assets that are subject to bankruptcy or liquidation proceedings.

Certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets of the estate (the "Receivership Estate'). In the Beechwood Action, the Receiver is seeking to void the purported blanket liens asserted on the Platinum assets.

A description of the investments in which Applicants dedicated significant time during the Ninth Application Period and the work done during the Ninth Application Period with respect to those investments is set forth in Section IV of this Ninth Interim Application.

**B.   Administrative Matters**

During the Ninth Application Period, the Receiver and the Receivership Team continued to speak and meet with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[5] the SEC and Platinum investors. The Receiver regularly updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors. The website also includes links to the Beechwood Action docket.

---

[5]   PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

5967726.1

The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum.  Some of the Platinum investments are subject to their own bankruptcy proceedings or are involved in other court proceedings around the country and the world.  During the Ninth Application Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

## II.      CASE BACKGROUND AND STATUS

### A.      Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy ("Levy"), Daniel Small, Uri Landesman,[6] Joseph Mann, Joseph San Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.

---

[6]  Uri Landesman passed away in September 2018.

The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  The criminal trial against Nordlicht, Levy and San Filippo proceeded during the Ninth Application Period. Following the trial, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting the pair on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Mr. Levy and ordered a new trial with respect to Mr. Nordlicht.   The Department of Justice is in the process of appealing those decisions, and in the interim, two additional criminal trials have been delayed.  The Receiver and the Receivership Team were not involved in either the prosecution of the criminal case by the Department of Justice (which almost entirely focused on PPVA rather than PPCO) or the advancement of the civil litigation by the SEC.  However, the Receiver and her team did monitor the trial and verdict to analyze any impact of the outcome and the trial evidence on the Receivership.

_Appointment of Receiver and Receivership Order_

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, _inter alia,_ the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets to investors, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

## B.     Case Status[7]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)     As of September 30, 2019, the Receivership Entities had approximately $37.7 million in funds.  Certain parties claiming an interest in particular sold assets have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets.  These claims are being challenged in the Beechwood Action.

It is estimated that, as of September 30, 2019, accrued and unpaid administrative expenses amount to approximately $5.5 million.  This amount includes the estimate of fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the second and third quarters of this year and that will be requested in future applications, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Ninth Application Period.

(b)     Cash disbursements during the Ninth Application Period totaled approximately $4.9 million.   This amount consisted primarily of (i) $4,037,597 in disbursements to professionals; (ii) $517,613 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent); and (iii) $427,053 in investment expenses (of this

---

[7]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period October 1, 2018 through December 31, 2018.

amount, $380,000 represents funds paid to the purchaser of LC Energy to avoid certain potential environmental liabilities and the balance represents funds used to preserve the pre-sale value of LC Energy).

Cash receipts during the Reporting Period totaled $1,863,885.  This amount primarily consists of net proceeds derived from the settlement of a dispute with two insurance companies relating to the litigation finance investment referred to as "Accutane," which is discussed below.

The Receiver cannot at this time state when she expects the case to be concluded.  The focus is shifting from the liquidation of assets to the prosecution and/or resolution of claims, litigation and/or resolution of purported blanket secured liens.

(c)     Pursuant to the previously approved bar date procedures motion, the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  In addition, the Receiver has claims that may have been filed with the Prior Receiver.  In total, 327 claims were filed prior to the bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  The Receivership Team has preliminarily reviewed the filed claims, but has not yet done an in-depth analysis of each claim, including which claims may be the subject to an objection and disallowance.

As of June 30, 2019, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

(i)     Cash and cash equivalents of approximately $37.7 million;

(ii)     Real estate investments without any set book value, due to their inherently speculative nature;

(iii)     Remaining investments in natural resources, litigation financing, energy and other miscellaneous investments; and

(iv)     Litigation claims.

As stated above, the Receiver cannot at this time ascribe values to each of the assets in the Platinum portfolio.

(d)     In addition to the asset specific lawsuits – namely, Lincoln National Insurance and Greehey (described below) – and PPCO's interest in the lawsuit relating to Agera Energy, the Receiver's investigation of pre-petition activities has to date resulted in the commencement of two litigations: (i) the Arbitration commenced on April 27, 2018, and (ii) the Beechwood Action commenced on December 19, 2018.  The Receiver cannot predict the outcome of these litigations or the timing of collecting on any judgment or settlement that may ultimately be obtained.  The primary focus of the Beechwood Action remains voiding of purported blanket liens on Platinum's assets.

The Receivership Team continues to analyze other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that warrant the commencement of litigation.  For any claims in which a statute of limitations may be approaching, the Receiver has entered into tolling agreements and amended tolling agreements with potential targets to allow the Receivership Team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those targets that have declined to toll the statute of limitations.  The Receiver cannot at this time state whether any additional actions will be commenced and, if so, when they would be commenced.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Ninth Application Period, the Receiver requests interim approval of her fees in the amount of $44,337.20 and reimbursement of expenses in the amount of

$938.27.  Otterbourg requests interim approval of its fees in the amount of $1,038,220.95 and reimbursement of expenses in the amount of $18,339.44.  Thus, the combined total of fees for Applicants of $1,082,558.15, plus expenses of $19,277.71, is $1,101,835.86.

The Receiver has assembled a team of Otterbourg professionals to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case.  In addition, the Receiver has agreed to provide a further

13

discount in an amount that represents the increase in her fees since her appointment.   (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $69,625.00 to $44,337.20, a reduction in the amount of $25,287.80.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,328,139.00 to $1,038,220.95, a reduction in the amount of $289,918.05.   Therefore, the total reduction for legal fees incurred during the Ninth Application Period by the Receiver and Otterbourg professionals is $315,205.85.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the Ninth Interim Application to SEC counsel on November 22, 2019 to allow for a thirty-day review period and previously provided the SEC with its monthly time records.

This Ninth Interim Application includes certain exhibits:

(a)      The SFAR for the period of July 1, 2019 through September 30, 2019 is attached as **Exhibit A** hereto.

(b)      A Fee Schedule showing the total fees billed and hours worked during the Ninth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)      In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional

organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Ninth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Ninth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's ninth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Ninth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed the Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other

paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Eight attorneys and two paraprofessionals billed time during the Ninth Application Period (in addition to the Receiver).[8]   Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.   Because of the shift in the Receivership from the sale of assets to the pursuit of recoveries through litigation, the bulk of the hours billed were performed by litigation attorneys who are actively involved in the Beechwood Action and/or the Arbitration.

The particular Otterbourg professionals who billed time during the Ninth Application Period and their specific roles were as follows:

(a)    Adam C. Silverstein (Partner) (.9 Hours to P01; 7.5 Hours to P04; .3 Hours to P10; 2.8 Hours to P14; 247.0 Hours to P15) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation.  Mr. Silverstein is the lead attorney responsible for the Arbitration and, therefore, most of his time during the Ninth Application Period was dedicated to matters relating to the Arbitration.  Mr. Silverstein also assisted with applications to the Court and negotiations involving the S&W dispute (described below).  Mr. Silverstein has also been one of the point persons regarding communications with the SEC during the Ninth Application Period.

---

[8]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Ninth Application Period.

(b)      William Moran (Partner) (.7 Hours to P01; 29.8 Hours to P02; 215.1 Hours to P14; 8.1 Hours to P15) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.  In particular, Mr. Moran has primarily assisted with the Beechwood Action during the Ninth Application Period, as well as post-sale issues in connection with Abdala.

(c)      Philip C. Berg (Partner) (6.4 Hours to P01; 50.8 Hours to P02; 3.7 Hours to P04) – Mr. Berg is a senior transactional partner and Chairman of Otterbourg's Corporate Department, whose focus has been the negotiation, documentation and closing of Receivership transactions. During the Ninth Application Period, Mr. Berg reviewed and negotiated all documents relating to the sale of assets and reviewed other corporate documents that were necessary in connection with the review and possible sale of Platinum assets.  In Particular, during the Ninth Application Period, Mr. Berg assisted with the closing of the LC Energy Asset and with post-closing issues related to the prior sale of assets known as Abdala.

(d)      Jennifer S. Feeney (Of Counsel) (26.9 Hours to P01; 31.5 Hours to P02; 44.0 Hours to P04; 5.2 Hours to P13; .5 Hours to P14) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Ninth Application Period, Ms. Feeney spent time with respect to the Arabella bankruptcy case, including attendance at the mediation in Texas to resolve one of the last remaining issues necessary to close the Arabella bankruptcy case.  Ms. Feeney also attended to other case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Additionally, Ms. Feeney, along with Erik B. Weinick, prepared applications to the Court and worked to keep the Receiver

apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)     Erik B. Weinick (Of Counsel) (39.2 Hours to P01; 46.3 Hours to P02; 20.4 Hours to P04; 2.6 Hours to P10; 257.3 Hours to P14; 11.4 Hours to P15) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating, along with Jennifer S. Feeney, the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick is also the attorney primarily responsible for the Beechwood Action and spent significant time during the Ninth Application Period in connection with argument in opposition to various motions to dismiss, preparing for depositions and other discovery matters including attention to preparation of the Receiver's expert report in the Beechwood Action.

(f)     Andrew S. Halpern (Associate) (17.5 Hours to P10; 83.1 Hours to P14; 315.4 Hours to P15) – Mr. Halpern is an experienced litigator, particularly in the areas of claims of professional malpractice and fraudulent conveyance and forensic analysis.  As such, Mr. Halpern continued his work in both the Beechwood Action and the Arbitration, as well as preparing tolling agreements for other third parties.  Mr. Halpern spent significant time in connection with argument in opposition to various motions to dismiss, preparing for depositions and other discovery matters including attention to preparation of the Receiver's expert report in the Beechwood Action and the completion of document production in the Arbitration.

(g)      Gabriela S. Leon (Associate) (4.1 Hours to P01; .6 Hours to P04; 186.1 Hours to P14; 169.6 Hours to P15) – Ms. Leon is a junior associate in the litigation department.  Ms. Leon was utilized to research issues relating to both the Beechwood Action and the Arbitration, in addition to assisting with the preparation and review of pleadings.  Ms. Leon also assisted with research related to other motions made to the Court, all at a considerably lower billing rate.

(h)      Breahna S. Wright (Associate) (7.0 Hours to P01; 11.9 Hours to P04) – Ms. Wright is a junior associate in the litigation department.  Ms. Wright assisted with the response to motions for indemnification made by certain former employees.

(i)      Christine O'Brien (Paralegal) (1.9 Hours to P04; .5 Hours to P14; 14.3 Hours to P15) – Ms. O'Brien is an experienced litigation paralegal. Ms. O'Brien primarily assisted with the production of documents and the receipt of documents produced to the Receiver in connection with ongoing litigation.

(j)      Jessica Hildebrandt (Paralegal) (4.8 Hours to P01; 11.4 Hours to P04; 4.1 Hours to P10; 107.9 Hours to P14; 13.2 Hours to P15) – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a paralegal at a lower billable rate), helped prepare the Otterbourg attorneys for various hearings and court filings, and monitored the criminal docket for the Receivership Team.

## IV.    SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING NINTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Ninth Application Period into seven (7) project categories.[9]  Narrative summaries of these activity categories follow:

---

[9]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges.  The fees for each activity category are stated herein *without* showing the agreed upon reductions.

5967726.1

**A.** **Asset Analysis and Recovery (P01)** - Total Fees: **$ 73,819.00**
**Asset Disposition (P02)[10]** - Total Fees: **$137,140.00**

During the Ninth Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with her team of professionals and staff, as well as, in some instances, management and other investors in the underlying asset, including counsel to PPVA. Also included in the time billed during the Ninth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular (approximately every two weeks) team meetings with her team of professionals and staff, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer. In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency. These meetings were and are critical to maintaining a comprehensive and organized approach to understanding and developing a strategic plan for liquidating the remaining Platinum portfolio. Goldin also prepared regular updates on the status of the remaining assets in the Platinum portfolio and current disposition options, which Applicants reviewed.

---

[10] Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Ninth Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.     **Abdala** – refers to PPCO's formerly held interests (through a subsidiary, West Ventures LLC) in a gold tailings impoundment located near Cuiababa, Brazil.  PPCO owned contract rights to extract gold for a period of ten years from the tailings impoundment, which was adjacent to the former Abdala gold mining operation.  The sale of the Abdala Tailings Project was previously approved and closed in September 2018.  The sale was for $27.5 million in cash at closing (less payment of fees and taxes).  The sale agreement also provided that if the gold content of the tailings impoundment was validated to exceed 9 grams per ton, the Receivership Estate will be entitled to receive $3 million in cash royalty advances approximately six months after closing.  Multiple rounds of testing have now been performed on the tailings impoundment to determine the gold content.  The results of these tests as reported to the Receiver are that the gold content is well below the 9 grams per ton threshold and Platinum will not be receiving any additional consideration from this asset.

During the Ninth Application Period, Applicants attended to certain post-closing issues.  Applicants reviewed the results of the gold content testing and participated in conference calls with counsel to discuss their concerns regarding the low gold content.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and transactional experience.

2.     **Accutane** - refers to a litigation financing investment by Platinum in a products liability litigation concerning the drug Accutane.  In October 2018, the Supreme Court for the State of New Jersey entered a decision ending the lawsuits.  This investment was insured by

insurance from two insurance companies that had insured up to a $4.5 million return on the litigation finance investment.  The PPCO subsidiary made a claim under the insurance policy for the $4.5 million which was initially denied by the insurers.  The parties then commenced informal discovery after which they entered into arms' length negotiations to resolve their dispute without court intervention.  During the Ninth Application Period, Applicants and Platinum's General Counsel spent time reviewing documents produced by the insurers and had multiple calls with the insurance carrier's counsel, and negotiated and consummated a settlement with the insurance companies that recovered $1.8 million in settlement proceeds.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience.

3.    **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera").  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC.

Pursuant to their respective interests in PGS, both PPVA and PPCO agreed to pursue certain claims and causes of action relating to PGS's ownership of a certain promissory note convertible into 95% of the common equity of energy reseller Agera Energy (the "Agera Claims").  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, Senior Health Insurance Company of Pennsylvania and CNO Financial Group, Inc. (the "Agera Action").  The Case is No. 2019-0431.  Thereafter, the case was removed to the United States District Court for the District of Delaware (Case No. 19-cv-01319), where a motion for remand is currently pending.

In addition, on October 4, 2019, Agera Energy LLC and certain of its affiliates, none of which are parties to the Agera Action, filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-23803.

During the Ninth Application Period, Applicants reviewed filings in both the Delaware matter and the bankruptcy case, as well as spent time communicating with counsel for PGS and PPVA regarding these matters.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience.

4. **ALS Life Settlements (Lincoln/Rosenberg Litigation)** – refers to a portfolio of life settlement investments that were owned through an entity in which PPCO is the majority owner and managing member.  All but one policy in the portfolio was previously sold by the Receiver.  The one insurance policy that was not sold has a total death benefit of $8.5 million (with ALS entitled to $7.2 million of that total).  The Receiver believes that the insurance company – Lincoln Life – improperly lapsed this policy prior to the Receiver's appointment.  The insured under the policy (Rosenberg) subsequently passed away, leaving the potential death benefit in dispute.  The Receiver commenced an action in the United States District Court for the Eastern District of New York and retained contingency counsel.  A back-end beneficiary under the policy (who the Receiver named as a nominal defendant because it was a necessary party to the litigation) filed counterclaims against the Receiver, seeking a ruling that it is entitled to 100% of the death benefit in the event that the Court determines that the Receivership somehow caused the alleged lapse.  During the Reporting Period, the Receivership Team and contingency counsel continued to litigate the counterclaims asserted by the back-end beneficiary, which claims the Receiver believes are without merit and are legally deficient, and continued to pursue the primary claims against the insurer.  Discovery has concluded.

During the Ninth Application Period, Applicants worked with contingency counsel regarding discovery matters, including the taking and defense of depositions and the retention of an expert. Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and their role was primarily to monitor and interface with contingency counsel and to assist with responses to discovery.

5.     **Arabella** – refers to three entities each containing Arabella in their names.   In 2014, PPCO made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella").  Arabella had working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas. AEX and AO are debtors in bankruptcy proceedings in the U.S. Bankruptcy Court for the Northern District of Texas (the "Texas Bankruptcy Court") and a liquidation proceeding in the Cayman Islands (which has been recognized in a Chapter 15 case pending in the Texas Bankruptcy Court). Platinum filed claims in Arabella's bankruptcy proceedings in an amount of $20,061,589.

Arabella's plan of reorganization was confirmed by the Texas Bankruptcy Court and the sale of assets closed at the end of 2018.  From the sale proceeds, payments will be made by Arabella to certain third parties pursuant to settlement agreements entered into by Arabella with parties that had claimed an interest in Arabella's assets.  In addition, payments were made to the broker and the taxing authorities, and payments will also be made to certain lienholders with interests senior to those of Platinum, priority and administrative claimants and Arabella's

retained professionals, all entitled to be paid before Platinum will receive its share of the proceeds.

As of the beginning of the Ninth Application Period, the only remaining issue to be resolved to enable Arabella to make distributions and close the bankruptcy case, was the claim by the AEI liquidator and his professionals for approximately $530,000 (the "Substantial Contribution Claim").  These professionals were retained by Prior Management to assist with the workout of the Arabella loan and are also parties to a Guaranty Agreement with Prior Management.  The Receiver objected to the Substantial Contribution Claim.

During the Ninth Application Period, the parties, while preparing for discovery, agreed to mediate the issue in a one-day session in Texas.  Applicants agreed to the selection of a mediator, prepared a mediation statement and participated in an all-day mediation session in Texas on August 14, 2019.  As a result of the all-day mediation, a resolution was reached by which the substantial contribution claim was allowed against the Arabella estate in the amount of $100,000 and the AEI liquidator and his professionals will be entitled to an unsecured claim against the Platinum estate for the balance.  This resolution avoided the additional cost and expense of litigation the Substantial Contribution Claim in the Arabella bankruptcy.  Arabella's professionals are currently in the process of settling the amounts owed to all parties.  Arabella intends to make final distributions before the end of the year.  Any proceeds received by Platinum are subject to a claim by the counterparty to a Participation Agreement entered into with the Prior Receiver.  The Receiver is in the process of resolving the claim with the participant.

During the Ninth Application Period, in addition to preparing for and attending the mediation session, Applicants also documented the terms of the settlement with the claimants,

and had frequent telephonic and e-mail communications with Arabella's retained professionals, including its CRO, bankruptcy counsel and litigation counsel.  Applicants also worked with Goldin to analyze various liquidation scenarios and claims and liens that may come ahead of those of Platinum to ascertain the potential best case and worst case recovery scenarios. Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

6.      **Greehey** – refers to a $3.23 million secured loan (the "Loan") made by a wholly owned subsidiary of PPCO, Bakken Development Opportunities, I, LLC ("Bakken"), to Greehey & Company, Ltd. ("Greehey") and Dynamic Resources LLC ("Dynamic," and together with Greehey, "Defendants").  The Loan was secured by certain real property located in Telluride, Colorado and certain oil and gas leases located in North Dakota.  The Loan matured on August 31, 2017.  Despite repeated requests by the Receiver, the Defendants failed to pay the amounts outstanding under the Loan and on August 1, 2019, the Receiver commenced a lawsuit against Greehey and Dynamic seeking entry of a judgment holding Defendants in default on an immediate payment obligation to Bakken of $3.23 million, in addition to associated interest, costs and expenses, including reasonable attorneys' fees and costs.  The Defendants have since answered the complaint and filed counterclaims against PPCO and Bakken, and discovery has commenced.

During the Ninth Application Period, Applicants prepared for and attended the case management conference and assisted with the preparation of an answer to the counterclaims. Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation.

26

7.      **LC Energy** – refers to LC Energy Holdings, LLC, the owner of the Goldstar Coal Mine in Green County, Indiana, which is wholly owned by PPCO.  PPCO acquired its ownership interest in the mine in March 2014 in the bankruptcy case of <u>In re Lily Group, Inc</u>., Case No. 13-81073 (Bankr. S.D. Ind.).   The Mine is currently idled.

Unlike the usual circumstance in which assets are sold from a bankruptcy estate free and clear of all liens, here, the bankruptcy court order did not provide for the sale of the assets to LC Energy free and clear of liens.  As a result, there were multiple liens and a claim by the committee of unsecured creditors in the Lily Group bankruptcy case asserted against the LC Energy assets.  The Receivership Court previously approved a Bid Procedures Motion on January 16, 2019 [Dkt. No. 444] and Houlihan Lokey immediately began to market the LC Energy assets.

The one offer received for the Mine was predicated on the Receivership Estate *paying* the buyer for potential environmental liabilities, which the bidder believed may well exceed any short-term future production from the Mine.  When it became apparent that no additional bids were forthcoming, the Receiver met and conferred with Houlihan Lokey, her financial advisors, her local Indiana bankruptcy and environmental counsel, and certain other experts and interested parties, to determine how best to dispose of the Mine without the prospects of a ready, willing and able buyer for it.  The Receiver considered abandoning the Mine.  However, while the Receiver believed that upon abandonment, ERC Mining Indiana Corp. (the "<u>Purchaser</u>"), in its capacity as manager of the Mine, would be responsible to remediate the Mine, the Purchaser disagreed.  Rather, the Purchaser asserted that LC Energy would remain liable for any such costs and expenses, expenses that the Purchaser asserted could well exceed $1.5 million.  To avoid a lengthy and costly dispute over the ramifications of abandonment, the parties soon commenced

negotiations about the future of the Mine and which party would have responsibility for satisfying associated liabilities.  The Receiver ultimately agreed with the Purchaser in an Asset Purchase Agreement dated August 16, 2019 (the "APA"), that LC Energy would sell the Mine to the Purchaser while the Purchaser would assume any and all current and future clean-up and other remediation costs at the Mine in consideration for a payment by LC Energy to the Purchaser of $380,000 and an assignment to the Purchaser of the $250,000 in cash collateral currently securing a bond in favor of the State of Indiana.  The APA was approved by the Receivership Court and closing of the sale occurred during the Ninth Application Period.

During the Ninth Application Period, Applicants continued to review its options with respect to this asset and the potential environmental liability that could arise or be asserted. Applicants had several conference calls with local Indiana bankruptcy and environmental counsel and considered the abandonment of the asset, including the preparation of a motion to abandon. Simultaneously, Applicants spoke with the permittee of the Mine and entered into negotiations for the permittee to become the Purchaser.  Otterbourg attorneys provided the Purchaser with necessary due diligence, drafted the sale documents, including a bill of sale and quitclaim deed and effectuated the closing of the sale on September 20, 2019.  Otterbourg attorneys regularly updated the Receiver on the status of these efforts.  Otterbourg attorneys who have billed time to this investment primarily include attorneys with litigation, transactional and bankruptcy experience.

**B.**    **Case Administration (P04) - Total Fees:  $ 93,125.00**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the

28

Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The nature of the tasks performed under this category is varied, and includes the following:

1. **Investor Communications.**  During the Ninth Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver and the Receivership Team have responded to investor inquiries and continue to regularly respond and react to inquiries and requests for information.  The Receiver held a Town Hall on August 14, 2019.  Applicants spent time preparing for the Town Hall and addressing questions that were provided in advance of the webinar.  Applicants also prepared the Eighth Status Report of the Receiver during the Ninth Application Period.

2. **Defendants**.  During the Ninth Application period, the Receiver continued to monitor the criminal trial of Mark Nordlicht, David Levy and Joseph SanFilippo to analyze any impact those proceedings may have on the Receivership.

3. **Employees**.  During the Ninth Application Period, the Receiver responded to the Motion of a former Platinum employee, Samuel Salfati, seeking Allowance and Payment of Administrative Expense Claim. [Dkt. Nos. 465, 472]  Mr. Salfati was seeking the immediate and full payment of a pre-receivership claim based upon a Retention Agreement entered into with Prior Management that was rejected by the Receiver when Mr. Salfati was terminated.  The Receiver filed papers in opposition to Mr. Salfati's motion on the basis of, among other things, that Mr. Salfati is not entitled to payment at this time of a pre-Receivership claim.  On July 17, 2019, the Court entered an order denying Mr. Salfati's motion.  [Dkt. No. 480]

4.     **Schafer & Weiner**.  On September 25, 2018, the Court issued its Memorandum Decision and Order denying Schafer & Weiner's ("S&W") fee application for post-Receivership work and reserving judgment on the Receiver's cross-motion seeking disgorgement of fees paid to S&W for pre-Receivership work after the commencement of the Receivership.  [Dkt. No. 383] S&W then appealed that decision to the U.S. Court of Appeals for the Second Circuit.  During the Ninth Application Period, Applicants participated in the Second Circuit's mandatory mediation conference (CAMP) and engaged in conversations with S&W and the SEC regarding a possible resolution of the appeal and the Receiver's cross-motion.  The CAMP process did not lead to a resolution of issues with S&W, and S&W filed its appeal brief.  Since then the Receiver has reached an agreement in principle with S&W that Applicants are in the process of documenting.  The settlement requires Court approval and its terms will be publicly filed.

5.     **SEC Meetings**.  Applicants communicated as warranted with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.  The Receiver and the Receivership Team also met in person with the SEC during the Ninth Application Period.  Applicants also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

6.     **PPVA**.  Applicants had regular teleconferences and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest, including jointly held assets, the Beechwood Action, a related Chapter 15 bankruptcy proceeding and additional claims that may be jointly held, such as the Agera action discussed above.  Applicants also continued to discuss procedures regarding access

5967726.1

to documents held on the Platinum mainframe and the production of documents in connection with the ongoing litigations.

7.     **Receiver Oversight**.  Time during the Ninth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate.  Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The Receivership Team meets with the Receiver regularly to discuss ongoing asset disposition, litigation, claims and other administrative matters, and prepared agendas and reviewed assets for discussion in advance of the meetings.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues.

   **C.     Forensic/Investigatory Work (P10) - Total Fees:  $16,758.00**

The Receivership Team continues to analyze other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that warrant the commencement of litigation.  For any claims in which a statute of limitations may be approaching, the Receiver has entered into  tolling agreements with potential targets and has amended such agreements to extend the time period when necessary and appropriate.  Applicants also negotiated a protective order with one of Platinum's former professionals regarding the delivery of documents to the Receiver.  Applicants also reviewed and responded to subpoenas.

### D.    Beechwood Action (P14) – Total Fees: $ 543,197.00

On December 19, 2018, the Receiver commenced the Beechwood Action in the Southern District of New York against (i) certain so-called Beechwood entities, (ii) Senior Health Insurance Company of Pennsylvania, (iii) Fuzion Analytics, Inc., (iv) CNO Financial Group, Inc., (v) Bankers Conseco Life Insurance Company, (vi) Washington National Insurance Company and (vii) 40|86 Advisors, Inc.   The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood RE Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the United States District Court for the Southern District of New York.   The Receiver exercised her right under the applicable rules and orders of the Court to amend the original filed complaint, and on March 29, 2019, the Receiver filed an amended complaint.    A copy of the redacted amended complaint filed in the Beechwood Action may be accessed on the Receiver's website (www.PlatinumReceivership.com).   The summary here is not intended to alter or recast any of the substantial allegations in the complaint.

The Receiver's complaint (subsequently amended) seeks redress for an alleged scheme perpetrated to the detriment of Platinum and its innocent investors by certain now criminally charged managers of Platinum.   Specifically, in the complaint, the Receiver alleges, among other things, that through the creation of what was a thinly disguised independent reinsurance entity, Beechwood, the Platinum insiders, fueled with money knowingly or recklessly contributed by the defendants, were able to prolong and expand a scheme that personally enriched the insiders through the generation of tens of millions of dollars in management fees, incentive fees, false profits and other remuneration over the years.

Certain of the defendants named in the Receiver's amended complaint were alleged to have substantially assisted, and participated with, Beechwood and the Platinum insiders to commit fraud and breach their fiduciary duties to the PPCO Funds.  Specifically, these defendants – acting through Beechwood – structured and implemented a series of transactions that ultimately saddled the PPCO Funds with approximately $69.1 million of debt owing to Beechwood, as agent for the insurers, secured by purported liens on substantially all of the PPCO Funds' assets, including those of nearly all of their portfolio companies, in consideration for assets that were worth a fraction of that amount.

For these reasons, the Receiver asserted causes of action for, among other things, (i) violations of the Racketeer Influenced and Corrupt Organizations Act and/ or federal securities fraud; (ii) aiding and abetting common law fraud; (iii) aiding and abetting breach of fiduciary duty; (iv) actual and constructive fraudulent conveyances; and (v) unjust enrichment.  In addition to seeking to avoid the purported first-priority liens asserted against PPCO Funds' assets by certain defendants that may otherwise adversely impact potential distributions to investors and creditors, the Receiver seeks monetary damages.

Each of the defendants in the Beechwood Action filed motions to dismiss the Amended Complaint.  The hearing on the motions to dismiss took place on August 15, 2019.  Shortly thereafter, Judge Rakoff issued a "bottom line" decision, which, while dismissing certain of the Receiver's causes of action, sustained certain of her causes of action including, among others, claims to set aside the liens currently preventing a distribution of estate assets and for unjust enrichment.  On October 7, 2019, Judge Rakoff issued a 177-page opinion setting forth the reasons for his decision.  The parties are now fully immersed in discovery, including the

exchange of documents and fact and expert depositions.  Discovery is to conclude on December 31, 2019, followed by summary judgment motions and a trial sometime in late spring 2020.

During the Ninth Application Period, Applicants spent time issuing the necessary summonses, negotiating the 502(d) Stipulation, producing documents and reviewing documents that had been produced, participating in multiple discovery calls with the defendants, negotiating a briefing schedule and attending to certain privilege issues in connection with the production of documents.  Applicants also reviewed the motions to dismiss and analyzed the legal and factual issues raised by each.  Applicants responded to the motions to dismiss, including researching additional legal issues and gathering additional facts to buttress the claims asserted in the Amended Complaint in preparation for oral argument which was heard during the Application Period.  The Applicants participated in discovery, including depositions, which commenced during the Application Period.  Finally, the Applicants participated in numerous discussions and meetings with various defendants regarding potential settlements of the claims.

### E.    <u>Arbitration</u> (P15) – Total Fees <u>$529,539.00</u>

On April 27, 2018, the Receiver timely commenced a confidential arbitration against an accounting firm and its affiliate (collectively, the "<u>Accounting Firms</u>") that provided audit services to certain of the Receivership Entities, claiming that the Accounting Firms committed negligence in conducting audits of the financial statements of certain of the Receivership Entities (the "<u>Audited Platinum Entities</u>") for the fiscal year ended December 31, 2014, and that the Accounting Firms breached their contractual obligations to the Audited Platinum Entities in connection with those audits. The Receiver seeks monetary damages in an amount to be determined by the arbitration panel. The arbitration is before a tribunal of three neutral arbitrators, and, subject to the resolution of disputes, recently completed the discovery phase. On

June 25, 2019, the Accounting Firms submitted a dispositive motion for summary judgment seeking the dismissal of all of the Receiver's claims.  The Receiver submitted her response on July 25, 2019. The Accounting Firms submitted their reply papers on August 9, 2019.  Depositions were taken and completed between September 6th and 20th.  The argument date on the motion had been scheduled for September 24, 2019, but, unfortunately, the Chairperson of the arbitration panel passed away on September 10, 2019.  On October 17, 2019, a new Chairperson was appointed, and argument on the motion took place on November 21, 2019.  A hearing is currently scheduled for April 13, 2020.   Because of confidentiality restrictions, no further information regarding the arbitration can be provided at this time, including the identity of the Accounting Firms.

During the Ninth Application Period, Applicants reviewed the Accounting Firms' motion for summary judgment and researched and prepared a memorandum of law in response to the motion.  In connection with the response to the motion for summary judgment, Applicants researched relevant issues, reviewed documents and spoke with the Receiver's retained experts. Applicants also prepared the Receiver's witness for deposition, prepared for the deposition of the Accounting Firms' witness and attended the depositions.  Applicants also spent time during the Ninth Application Period engaged in extensive correspondence with opposing counsel and the representatives of the arbitration panel regarding the selection of a replacement neutral arbitrator and researched numerous potential replacements.

## V.      EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $19,277.71. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period

of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Ninth Application Period:

(a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 39,026 internal laser copies and photocopies during the Ninth Application Period at the rate of 0.15 cents per page, totaling $5,853.90 for all in-house copies.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Ninth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period.  Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact

situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate. Applicants have acted quickly to take control of and monetize the

assets of the Platinum Entities.   The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.   Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

The issues being addressed by the Receiver and Otterbourg are highly complex and diverse.   Many of the people with factual knowledge are facing criminal charges. Documentation, to the extent it exists, must be questioned and verified.  Based on the foregoing, we respectfully submit that the compensation sought by the Receiver and Otterbourg is wholly warranted.

## VII.   HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Ninth Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Ninth Interim Fee Application if the requested fees are approved is $98,683.52 ($8,867.44 for the Receiver and $89,816.08 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     Grant interim approval of the Receiver's compensation in the amount of $44,337.20 (the "Allowed Receiver Fees");

(b)     Grant interim approval of Otterbourg's compensation in the amount of $1,038,220.95 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $938.27;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $18,339.44;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     Grant such other relief as the Court deems appropriate.

Dated:  December 24, 2019

Otterbourg P.C.

By: /s/ Adam C. Silverstein
      Adam C. Silverstein
      Jennifer S. Feeney
      Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver