UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

   -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 16-CV-6848 (BMC)

## TENTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD OCTOBER 1, 2019 THROUGH AND INCLUDING DECEMBER 31, 2019

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the "Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this Tenth Joint Interim Application (the "Tenth Interim Application") for Allowance of

6031360.1

Compensation and Reimbursement of Expenses Incurred During the Period from October 1, 2019 through and including December 31, 2019 (the "Tenth Application Period").  There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg).  The Receiver requests interim approval of fees in the amount of $53,730.00 and reimbursement of expenses in the amount of $319.20 for the Tenth Application Period. Otterbourg requests interim approval of fees in the amount of $1,214,267.40 and reimbursement of expenses in the amount of $27,315.49 for the Tenth Application Period, for a combined total of fees for Applicants in the amount of $1,267,997.40,[1] and expenses in the amount of $27,634.69 for the Tenth Application Period.

This Tenth Interim Application contains the following sections:

**Section I**  provides a preliminary statement of the Receiver's activities during the Tenth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Tenth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1]  As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Action and the Arbitration (defined below), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Tenth Application Period, the Receiver's recorded time charges before application of these accommodations were $88,762.50 and Otterbourg's recorded time charges were $1,579,628.50, for a combined gross legal fees total (before the application of any accommodations) of $1,668,391.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Tenth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

# I.      PRELIMINARY STATEMENT

During the Tenth Application Period, the primary focus of the Receiver and her team[2] was (i) the litigation commenced by the Receiver in the United States District Court for the Southern District of New York against a group of defendants seeking the avoidance of certain liens that may otherwise adversely impact potential distributions to investors and creditors as well as damages for claims arising from a fraudulent scheme perpetrated to the detriment of Platinum (the "Beechwood Action"); and (ii) the confidential arbitration proceeding commenced against the auditor of PPCO's 2014 financial statements (the "Arbitration").  With the exception of a royalty asset for which inquiries have recently been made, the Receiver at this time does not anticipate significant recoveries from the remaining non-litigation assets and will seek to liquidate the small volume of remaining assets, measured by value, during the first half of this year.

---

[2]      To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

6031360.1

### A.       Analysis and Disposition of Receivership Assets

During the Tenth Application Period, the Platinum Receivership received approximately $261,000 on account of Platinum's investment in Arabella ($200,000), a dividend received on account of a bond payment from Black Elk (approximately $40,000) and other miscellaneous income (approximately $21,000).  This amount is in addition to the approximately $66 million received by the Platinum Receivership from the liquidation of other assets from the date of appointment of the Receiver.  Certain parties have asserted a claim to all or part of the proceeds of some of such liquidated investments.  None of these assets has been marketed or sold in a "fire sale" fashion.

The Receiver's goal is to monetize during the first half of this year all assets that have not yet been liquidated.  Negotiations are in progress to dispose of certain other assets that also remain in the PPCO portfolio, such as debt and equity in Cleveland Mining Ltd. and Cleveland Mining Holdings, Australian entities owning gold mining and pig iron exploration ventures in Brazil.  The Receivership Team has fielded inquiries regarding its royalty interest in Cokal and is seeking to monetize this asset if possible.  If discussions progress towards a sale, the Receiver will report on it in subsequent reports. Further, diligence is underway for a remnant sale of the remaining assets in the PPCO portfolio determined to have relatively insignificant value. Progress also is being made on the disposition of the illiquid PPLO securities that remain to be liquidated.

Certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of assets of the estate (the "Receivership Estate").   In the Beechwood Action, the Receiver is seeking to void the purported blanket liens asserted on the Platinum assets and underlying debt.

4

A description of the investments in which Applicants dedicated significant time during the Tenth Application Period and the work done during the Tenth Application Period with respect to those investments is set forth in Section IV of this Tenth Interim Application.

### B.    Administrative Matters

During the Tenth Application Period, the Receiver and the Receivership Team continued to speak and meet with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[3] the SEC and Platinum investors. The Receiver updates the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The website also includes links to the Beechwood Action docket.

The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum.  During the Tenth Application Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy ("Levy"), Daniel Small, Uri Landesman,[4] Joseph Mann, Joseph San

---

[3]     PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

[4]   Uri Landesman passed away in September 2018.

Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.  The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  Following the criminal trial of Mark Nordlicht, David Levy and Joseph SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting the pair on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht.  The Department of Justice is in the process of appealing those decisions, and in the interim, two additional criminal trials have been adjourned.  The Receiver and the Receivership Team were not involved

in either the prosecution of the criminal case by the Department of Justice (which almost entirely focused on PPVA rather than PPCO) or the advancement of the civil litigation by the SEC.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to

investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

B.     Case Status[5]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)     As of December 31, 2019, the Receivership Entities had approximately $30.5 million in funds. Certain parties claiming an interest in particular sold assets have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Estate). Other parties have presented documentation purporting to grant them security interests in all or certain of Platinum's assets. These claims are being challenged in the Beechwood Action.

It is estimated that, as of December 31, 2019, accrued and unpaid administrative expenses amount to approximately $4.52 million. This amount includes the fees being requested by the Receiver, Otterbourg and Goldin for the Tenth Application Period, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver. In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Tenth Application Period.

(b)     Cash disbursements during the Tenth Application Period totaled approximately $3.5 million. This amount consisted primarily of (i) $3,132,312 in disbursements to

---

[5] The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period October 1, 2018 through December 31, 2018.

6031360.1

professionals; and (ii) $379,048 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent).

Cash receipts during the Reporting Period totaled $243,596.  This amount primarily consists of net proceeds derived from the distribution received from the Arabella bankruptcy case on account of Platinum's secured loan and a small distribution on Black Elk bonds.

The Receiver cannot at this time state when she expects the case to be concluded.  The focus is shifting from the liquidation of assets to the prosecution and/or resolution of claims, litigation and/or resolution of purported blanket secured liens.

(c)      Pursuant to the previously approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019. Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  In addition, the Receiver has claims that may have been filed with the Prior Receiver.  In total, 327 claims were filed prior to the applicable bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  The Receivership Team has preliminarily reviewed the filed claims, but has not yet done an in-depth analysis of each claim, including which claims may be the subject to disallowance based on an objection.  The Receiver cannot at this time state what distributions will ultimately be, or even the total amount that will ultimately be available for distribution. Addressing the asserted secured blanket liens on the assets is fundamental to formulating a distribution plan.

As of December 31, 2019, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

6031360.1

(i)      cash and cash equivalents of approximately $30.5 million;

(ii)     remaining stock and royalty interests, litigation financing, loan receivables and other miscellaneous investments; and

(iii)    litigation claims.

(d)      In addition to the asset specific lawsuits – namely, Lincoln National Insurance and Greehey (described below) – and PPCO's interest in the lawsuit relating to Agera Energy, the Receiver's investigation of pre-petition activities has to date resulted in the commencement of two litigations: (i) the Arbitration commenced on April 27, 2018, which has recently been resolved (subject to documentation), and (ii) the Beechwood Action commenced on December 19, 2018.  The primary focus of the Beechwood Action remains voiding of purported blanket liens on Platinum's assets.

The Receivership Team continues to analyze other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis, warrant the commencement of litigation.  For any claims in which a statute of limitations may be approaching, the Receiver has reached out, and will continue to reach out, to the potential targets to enter into tolling agreements to allow the Receivership Team the appropriate time to investigate potential claims and, if necessary, commence action(s) against those targets that have declined to toll the statute of limitations.  The Receiver cannot at this time state whether any additional actions will be commenced and, if so, when they would be commenced.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Tenth Application Period, the Receiver requests interim approval of her fees in the amount of $53,730.00 and reimbursement of expenses in the amount of

6031360.1

$319.20.   Otterbourg requests interim approval of fees in the amount of $1,214,267.40 and reimbursement of expenses in the amount of $27,315.49.  Thus, the combined total of fees for Applicants of $1,267,997.40, plus expenses of $27,634.69, is $1,295,632.09.

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment

6031360.1

of the discount later in the case.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment.  (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

 Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $88,762.50 to $53,730.00, a reduction in the amount of $35,032.50.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,579,628.50 to $1,214,267.40, a reduction in the amount of $365,361.10.  Therefore, the total reduction for legal fees incurred during the Tenth Application Period by the Receiver and Otterbourg professionals is $400,393.60.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the detail for the Tenth Interim Application to SEC counsel on February 11, 2020 to allow for a thirty-day review period.

This Tenth Interim Application includes certain exhibits:

(a)     The SFAR for the period of October 1, 2019 through December 31, 2019 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Tenth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional

12

organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Tenth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Tenth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Tenth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Tenth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour. All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Seven attorneys and one paraprofessional billed time during the Tenth Application Period (in addition to the Receiver).[6] Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks. Because of the shift in the Receivership from the sale of assets to the pursuit of recoveries through litigation, the bulk of the hours billed were performed by litigation attorneys who are actively involved in the Beechwood Action and/or the Arbitration.

The particular Otterbourg professionals who billed time during the Tenth Application Period and their specific roles were as follows:

(a) <u>Adam C. Silverstein (Partner) (2.5 Hours to P01; .6 Hours to P02; 34.6 Hours to P04; 1.7 Hours to P10; 30.8 Hours to P14; 181.1 Hours to P15)</u> – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation. Mr. Silverstein is the lead attorney responsible for the Arbitration and, therefore, most of his time during the Tenth Application Period was dedicated to matters relating to the Arbitration, including preparing for argument in connection with the respondents' motion for summary judgment in the Arbitration. Mr.

---

[6] The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Tenth Application Period.

Silverstein also assisted with applications to the Court and negotiations involving the S&W dispute (described below), including the preparation of the settlement papers relating to the dispute.   During the Tenth Application Period, Mr. Silverstein was the primary attorney responsible for responding to the Court's Minute Order in response to certain Defendants' request for advancement of fees and whether the Platinum Estate should be  in bankruptcy (discussed below).   Mr. Silverstein has also been one of the point persons regarding communications with the SEC.

(b)    <u>William Moran (Partner) (.3 Hours to P01; 7.7 Hours to P02; 342.1 Hours to P14;)</u> – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.   In particular, Mr. Moran has primarily assisted with the Beechwood Action during the Tenth Application Period including preparing for and taking depositions and attending other relevant depositions (there were twenty eight (28) depositions in total during the Tenth Application Period), as well as post-sale issues in connection with Abdala.

(c)    <u>Jennifer S. Feeney (Of Counsel) (12.3 Hours to P01; 5.4 Hours to P02; 38.1 Hours to P04; 2.3 Hours to P14)</u> – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.   During the Tenth Application Period, Ms. Feeney monitored the remaining items for the closing of the Arabella matter.   Ms. Feeney also attended to other case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions. Additionally, Ms. Feeney, along with Erik B. Weinick, prepared and/or applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(d)      Erik B. Weinick (Of Counsel) (27.8 Hours to P01; 18.9 Hours to P02; 29.9 Hours to P04; 2.2 Hours to P10; 1.8 Hours to P13; 387.3 Hours to P14; 11.4 Hours to P15) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick is also the attorney primarily responsible for the Beechwood Action and spent significant time during the Tenth Application Period in connection with preparing for and taking and/or defending the majority of the twenty-eight (28) depositions that took place during the Tenth Application Period, preparing the Receiver's witnesses for deposition, attending court hearings and attending to all other matters in the Beechwood Action.

(e)      Andrew S. Halpern (Associate) (20.8 Hours to P04; 7.9 Hours to P10; 304.9 Hours to P14; 134.7 Hours to P15) – Mr. Halpern is an experienced litigator, particularly in the areas of claims of professional malpractice and fraudulent conveyance and forensic analysis.  As such, Mr. Halpern continued his work in both the Beechwood Action and the Arbitration, as well as preparing or extending tolling agreements for other third parties.   Mr. Halpern spent significant time in connection with depositions and other discovery matters in the Beechwood Action and preparing for argument in the Arbitration.    He also had extensive communications with experts and consultants in that both the Beechwood Action and the Arbitration.

16

(f)      <u>Gabriela S. Leon (Associate) (8.0 Hours to P01; 4.6 Hours to P02; 4.5 Hours to P13; 320.7 Hours to P14; 58.5 Hours to P15)</u> – Ms. Leon is a junior associate in the litigation department.  Ms. Leon was utilized to research issues relating to both the Beechwood Action and the Arbitration, in addition to assisting with the preparation and review of pleadings.  Ms. Leon also prepared for and attended several of the depositions in the Beechwood Litigation.  Ms. Leon also assisted with research related to other motions made to the Court, all at a considerably lower billing rate.

(g)      <u>Breahna S. Wright (Associate) (3.4 Hours to P01; 32.4 Hours to P04; 25.0 Hours to P15)</u> – Ms. Wright is a junior associate in the litigation department.  Ms. Wright assisted with the response to motions for indemnification made by certain former employees and with certain research issues in connection with the Arbitration, at a considerably lower billing rate.

(h)      <u>Jessica Hildebrandt (Paralegal) (.5 Hours to P01; 6.5 Hours to P04; 1.4 Hours to P10; 269.5 Hours to P14; 2.1 Hours to P15)</u> – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain research issues (which are suitable for a paralegal at a lower billable rate), helped prepare the Otterbourg attorneys for various hearings and court filings, and assisted with the review and preparation of document productions in connection with discovery in the Beechwood Litigation, including preparation for the taking and defense of depositions.

## IV.   SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING TENTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Tenth Application Period into seven (7) project categories.[7]  Narrative summaries of these activity categories follow:

---

[7] As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

6031360.1

A.    **Asset Analysis and Recovery (P01)** - Total Fees: $57,732.50_
      **Asset Disposition (P02)[8]** - Total Fees:  $64,271.50_

During the Tenth Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with her team of professionals and staff, as well as, in some instances, other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Tenth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular (approximately every two weeks) team meetings with her team of professionals and staff, Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer. In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.  Goldin also prepared regular updates on the status of the remaining assets in the Platinum portfolio and current disposition options, which Applicants reviewed.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Tenth Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

---

[8]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

1.  **Abdala** – refers to PPCO's formerly held interests (through a subsidiary, West Ventures LLC) in a gold tailings impoundment located near Cuiababa, Brazil.  Although the sale of the Abdala Tailings Project was previously approved and closed in September 2018, Applicants were required to address certain post-closing issues with the buyer.  The sale was for $27.5 million in cash at closing (less payment of fees and taxes).  The sale agreement also provided that if the gold content of the tailings impoundment was validated to exceed 9 grams per ton, the Receivership Estate would be entitled to receive $3 million in cash royalty advances approximately six months after closing.  Multiple rounds of testing were performed after closing on the tailings impoundment to determine the gold content.  The results of these tests as reported to the Receiver are that the gold content is well below the 9 grams per ton threshold and Platinum will not be receiving any additional consideration from this asset.

During the Tenth Application Period, Applicants communicated with the buyer and the SEC regarding the buyer's concerns regarding the lack of gold content at the tailings impoundment, including preparation of a written response to a letter sent by the buyer to the SEC to refute several of the statements made by the buyer in its letter.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and transactional experience.

2.  **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera").  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is jointly owned by PPVA and PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC.

6031360.1

Pursuant to their respective interests in PGS, both PPVA and PPCO agreed to pursue certain claims and causes of action relating to PGS's ownership of a certain promissory note convertible into 95% of the common equity of energy reseller Agera Energy (the "Agera Claims").  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, Senior Health Insurance Company of Pennsylvania and CNO Financial Group, Inc. (the "Agera Action").  The Case is No. 2019-0431.  Thereafter, the case was removed to the United States District Court for the District of Delaware (Case No. 19-cv-01319), where a motion for remand remains pending.

In addition, on October 4, 2019, Agera Energy LLC and certain of its affiliates, none of which are parties to the Agera Action, filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-23803.

During the Tenth Application Period, Applicants communicated with counsel for PGS and PPVA regarding these matters and reviewed pleadings when appropriate.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience.

**ALS Life Settlements (Lincoln/Rosenberg Litigation)** – refers to a portfolio of life settlement investments that were owned through an entity in which PPCO is the majority owner and managing member.  All but one policy in the portfolio was previously sold by the Receiver or her predecessor.  The one insurance policy that was not sold has a total death benefit of $8.5 million (with ALS entitled to $7.2 million of that total).  The Receiver believes that the insurance company – Lincoln Life – improperly lapsed this policy prior to the Receiver's appointment.  The insured under the policy (Rosenberg) subsequently passed away, leaving the potential death benefit in dispute.  The Receiver commenced an action in the United States

District Court for the Eastern District of New York (the "Rosenberg Litigation") and retained contingency counsel.  A back-end beneficiary under the policy (who the Receiver named as a nominal defendant because it was a necessary party to the litigation) filed counterclaims against the Receiver, seeking a ruling that it is entitled to 100% of the death benefit in the event that the Court determines that the Receivership somehow caused the alleged lapse.  During the Tenth Application Period, the Receivership Team and contingency counsel continued to litigate the counterclaims asserted by the back-end beneficiary and continued to pursue the primary claims against the insurer.  On November 8, 2019, the Court dismissed the back-end beneficiary's counterclaims, but granted the back-end beneficiary leave to replead its counterclaims.  The back-end beneficiary then filed amended counterclaims.  On a parallel track, the parties continued to discuss a possible resolution of the case.  Following the Tenth Application Period, a settlement in principle of this matter was reached, which remains subject to documentation and will be reported upon in subsequent reports to the Court.

During the Tenth Application Period, Applicants worked with contingency counsel in charge of the matter.  Applicants reviewed and revised the expert report that the Receiver submitted in support of its claims and reviewed and analyzed the amended counterclaims asserted by the back-end beneficiary.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and their role was primarily to monitor and interface with contingency counsel.

3.    **Arabella** – refers to three entities each containing Arabella in their names.    In 2014, PPCO made a $16 million loan to Arabella Exploration, Inc. ("AEI") pursuant to a $45 million facility (the "Loan"). The Loan was secured by all of AEI's assets, and was guaranteed and secured by the assets of AEI's subsidiaries, Arabella Exploration, LLC ("AEX") and

Arabella Operating, LLC ("AO" and, together with AEX and AEI, "Arabella").  Arabella had working interests in certain leased oil and gas properties in the Permian and Delaware Basins in Texas.

As of the start of the Tenth Application Period, all remaining issues that were impeding Arabella's ability to make final distributions and exit from bankruptcy were resolved.  All that remained was for Arabella's Chief Restructuring Officer to make a final reconciliation of amounts owed between the Arabella estate and the estate of a related Arabella entity that was in its own bankruptcy proceeding, and then make final payments to professionals and Platinum on account of its secured claim.

Simultaneously, during the Tenth Application Period, the Receiver turned her efforts to discussions with the counterparty to a Participation Agreement entered into with the Prior Receiver.  Pursuant to the Participation Agreement, the participant asserted a claim on any distribution received by Platinum from Arabella in an amount equal to the original $500,000 payment to Platinum, plus interest accrued, plus a split of the proceeds, plus additional fees and expenses.  The Receiver and the participant settled on an amount to be paid from the Arabella distribution that is significantly less than the full amount claimed by the participant.  As a result of this agreement, and following Arabella's distribution, Platinum received $200,000 from the Arabella estate and all matters related to Arabella are now concluded.

During the Tenth Application Period, Applicants revised and finalized certain agreements to memorialize the results of the mediation that took place in August, monitored the status of final distributions and reviewed the waterfall scenarios regarding final distributions.  Applicants also negotiated with counsel for the Participant to resolve its claims.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in bankruptcy and litigation.

4.    **Greehey** – refers to a $3.23 million secured loan (the "Loan") made by a wholly owned subsidiary of PPCO, Bakken Development Opportunities, I, LLC ("Bakken"), to Greehey & Company, Ltd. ("Greehey") and Dynamic Resources LLC ("Dynamic").  The Loan was secured by certain real property located in Telluride, Colorado and certain oil and gas leases located in North Dakota.  The Loan matured on August 31, 2017.  Despite repeated requests by the Receiver, the Defendants failed to pay the amounts outstanding under the Loan and on August 1, 2019, the Receiver commenced a lawsuit against Greehey and Dynamic (the "Greehey Litigation") seeking entry of a judgment holding the defendants in default on an immediate payment obligation to Bakken of $3.23 million, in addition to associated interest, costs and expenses, including reasonable attorneys' fees and costs.  The Receiver has amended her complaint and responded to the defendants revised counter-claims.  During the Tenth Application Period, the parties began written discovery with the exchange of document requests and written responses.

During the Tenth Application Period, Applicants assisted with the preparation of an answer to the counterclaims as well as discovery.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation.

**B.    Case Administration (P04) - Total Fees:  $154,214.50**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The nature of the tasks performed under this category is varied, and includes the following:

6031360.1

1.     **Investor Communications.**   During the Tenth Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.   The Receiver and the Receivership Team have responded to investor inquiries and continue to regularly respond and react to inquiries and requests for information.   The Receiver held a Town Hall on December 11, 2019.   Applicants spent time preparing for the Town Hall and addressing questions that were provided in advance of the webinar.   Applicants also prepared the Ninth Status Report of the Receiver during the Tenth Application Period.

2.     **Response to Requests for Advancement of Fees**.   Following the conclusion of the criminal trial, certain of the Defendants renewed their requests for the advancement and/or indemnification of attorneys' fees.   Toward the conclusion of the Tenth Application Period, by minute order entered December 12, 2019, the Court requested additional briefing and argument on the "sole issue [of] whether it would be appropriate for this Court to dismiss the case without prejudice to the right of the Receiver or creditors to file a bankruptcy petition against the company in light of the fact that this Court has been called upon to apply Bankruptcy Code concepts to substantial claims and procedures in this matter."   In response to the minute order, on January 17, 2020, the Receiver filed a Declaration and Memorandum of Law in Response to the Minute Order Entered December 12, 2019 (collectively, the "Receiver's Response to Minute Order") [Dkt. No. 516].   On January 22, 2020, the Court issued an Order on the docket, pursuant to which the Court found that (i) compelling the Receiver to file a bankruptcy petition at this point would not be in the best interest of all parties and (ii) that while both SanFilippo and Levy are entitled to indemnification, there claims are just two unsecured claims among many and they

24

must wait for any payment alongside the other unsecured creditors.   During the Tenth Application Period, Applicants dedicated significant time to preparing the Receiver's Response to Minute Order, which was pivotal to the future of the receivership case.

        3.     **Schafer & Weiner**.   On September 25, 2018, the Court issued its Memorandum Decision and Order denying the fee application of Schafer & Weiner ("S&W") and reserving judgment on the Receiver's cross-motion seeking disgorgement of the pre-Receivership fees paid to S&W.   [Dkt. No. 383]   S&W then appealed that decision to the U.S. Court of Appeals for the Second Circuit.   During the Tenth Application Period, Applicants participated in the Second Circuit's mandatory mediation conference (CAMP) and engaged in conversations with S&W and the SEC regarding a possible resolution of the appeal and the Receiver's cross-motion.   The CAMP process did not directly lead to a resolution of issues with S&W, and has come to a conclusion.   At the end of the Tenth Application Period, the parties reached a settlement in principle and documented that agreement.   A motion to approve the Settlement Agreement was filed with the Court on February 6, 2020.   [Dkt. No. 520] Time was spent by Applicants during the Tenth Application Period in connection with the negotiation of the settlement and then preparation of the settlement agreement and motion to the Court.

        4.     **SEC Meetings**.   Applicants communicated as warranted with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.   Applicants also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

        5.     **PPVA**.   Applicants had regular teleconferences and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest, including jointly held assets, the Beechwood Action, a related

6031360.1

Chapter 15 bankruptcy proceeding and additional claims that may be jointly held, such as the Agera action discussed above.

6. **Receiver Oversight**.  Time during the Tenth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate.  Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The Receivership Team meets with the Receiver regularly to discuss ongoing asset disposition, litigation, claims and other administrative matters, and prepared agendas and reviewed assets for discussion in advance of the meetings.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues.

C. **Forensic/Investigatory Work (P10) - Total Fees:  $11,577.00**

The Receivership Team continues to analyze other pre-Receivership activities, including the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that warrant the commencement of litigation.  Applicant conducted research, where appropriate, as part of this analysis.  For any claims in which a statute of limitations may be approaching, the Receiver has entered into  tolling agreements with potential targets and has amended such agreements to extend the time period when necessary and appropriate.

D. **Beechwood Action (P14) – Total Fees: $1,099,375.50**

On December 19, 2018, the Receiver commenced the Beechwood Action in the Southern District of New York against (i) certain so-called Beechwood entities, (ii) Senior Health

6031360.1

Insurance Company of Pennsylvania, (iii) Fuzion Analytics, Inc., (iv) CNO Financial Group, Inc., (v) Bankers Conseco Life Insurance Company, (vi) Washington National Insurance Company and (vii) 40|86 Advisors, Inc.   The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood RE Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the United States District Court for the Southern District of New York.   The Receiver exercised her right under the applicable rules and orders of the Court to amend the original filed complaint, and on March 29, 2019, the Receiver filed an amended complaint.   A copy of the redacted amended complaint filed in the Beechwood Action may be accessed on the Receiver's website ([www.PlatinumReceivership.com](www.PlatinumReceivership.com)).   The summary here is not intended to alter or recast any of the substantial allegations in the complaint.

The Receiver's complaint (subsequently amended) seeks redress for an alleged scheme perpetrated to the detriment of Platinum and its innocent investors by the managers of Platinum. Specifically, in the complaint, the Receiver alleges, among other things, that through the creation of a purported independent reinsurance entity, Beechwood, the Platinum insiders, fueled with money knowingly or recklessly contributed by the defendants, were able to prolong and expand a scheme that personally enriched the insiders through the generation of tens of millions of dollars in management fees, incentive fees, false profits and other remuneration over the years.

Certain of the defendants named in the Receiver's amended complaint were alleged to have substantially assisted, and participated with, Beechwood and the Platinum insiders to commit fraud and breach their fiduciary duties to the PPCO Funds.   Specifically, these defendants – acting through Beechwood – structured and implemented a series of transactions that ultimately saddled the PPCO Funds with approximately $69.1 million of debt owing to

Beechwood, as agent for the insurers, secured by purported liens on substantially all of the PPCO Funds' assets in consideration for assets that were worth a fraction of that amount.

For these reasons, the Receiver asserted causes of action for, among other things, (i) violations of the Racketeer Influenced and Corrupt Organizations Act and/ or federal securities fraud; (ii) aiding and abetting common law fraud; (iii) aiding and abetting breach of fiduciary duty; (iv) actual and constructive fraudulent conveyances; and (v) unjust enrichment.  In addition to seeking to avoid the purported first-priority liens asserted against the PPCO Funds' assets by certain defendants that may otherwise adversely impact potential distributions to investors and creditors, the Receiver seeks monetary damages.

Each of the defendants in the Beechwood Action filed motions to dismiss the Amended Complaint.  The hearing on the motions to dismiss took place on August 15, 2019.  On October 7, 2019, Judge Rakoff issued an Opinion and Order, which, while dismissing certain of the Receiver's causes of action, sustained her causes of action to set aside the liens currently preventing a distribution of estate assets, as well as the Receiver's causes of action for aiding and abetting breach of fiduciary duty, and unjust enrichment against certain of the defendants. During the Tenth Application Period, the parties completed discovery, including the exchange of documents, and fact and expert depositions.  The deadline for summary judgment motions was February 14, 2020. Argument on summary judgment and a final pre-trial conference are scheduled for April 2, 2020.

Parallel to the litigation track, the Receiver and the Receiver's counsel have also been engaged in ongoing settlement discussions with certain of the defendants.  A settlement in principle resolving disputed liens with one of the three groups of defendants has been reached and is in the process of being finalized.

During the Tenth Application Period, Applicants spent time producing documents and reviewing documents that had been produced, participating in multiple discovery calls with the defendants and the Court, negotiating a briefing schedule and attending to certain privilege issues in connection with the production of documents.  Applicants participated in discovery, including depositions, which commenced and were completed during the Tenth Application Period. Specifically, the Applicants participated in not less than twenty eight (28) depositions, some of which lasted multiple days.  Certain of the depositions were of the Receiver's witnesses, which required Applicants to spend significant time preparing the witness.  The majority of the depositions were depositions in which Applicants had an opportunity to ask questions, which required significant preparation of varying degrees depending upon whether Applicants were the primary examiner.  Other depositions only required Applicants to participate by listening in and monitoring for relevant information.  Finally, the Applicants participated in numerous discussions and meetings with various defendants regarding potential settlements of the claims and reached an agreement with one of the three groups of defendants.

### E.      Arbitration (P15) – Total Fees $313,524.50

On April 27, 2018, the Receiver timely commenced a confidential arbitration against an accounting firm and its affiliate (collectively, the "Accounting Firms") that provided audit services to certain of the Receivership Entities.  In the arbitration, the Receiver claims that the Accounting Firms committed negligence in conducting audits of the financial statements of certain of the Receivership Entities (the "Audited Platinum Entities") for the fiscal year ended December 31, 2014, and that the Accounting Firms breached their contractual obligations to the Audited Platinum Entities in connection with those audits.  The Receiver seeks monetary damages in an amount to be determined by the arbitration panel.  The arbitration is before a

tribunal of three neutral arbitrators.  On June 25, 2019, the Accounting Firms submitted a motion for summary judgment dismissing all of the Receiver's claims.  The motion was fully briefed and oral argument was scheduled for late September 2019.  A few weeks before the argument, however, the arbitration panel chairperson died.  The parties were required to undertake another selection process to replace the chairperson.  Eventually a new chairperson was selected, and argument on the motion was held on the motion on November 21, 2019.  The submission of opening expert reports, which originally had been scheduled to be submitted during the Tenth Application Period, was adjourned to a later date.   While the motion remained under consideration, the parties agreed to participate in a mediation and to stay further consideration of the motion pending the outcome of the mediation.   The mediation, which occurred subsequent to the Tenth Application Period, resulted in a resolution.  The parties are currently in the process of documenting the mediated settlement.   Because of confidentiality restrictions, no further information regarding the arbitration or the settlement can be provided at this time, including the identity of the Accounting Firms.

During the Tenth Application Period, Applicants researched possible chairperson replacement candidates and engaged in communications with counsel for respondents and the arbitration association regarding the selection of a replacement chairperson.   Following the selection of a replacement chairperson, Applicants engaged in communications with the arbitration panel regarding future proceedings and scheduling, and had communications with counsel for respondents regarding discovery issues.   Applicants argued and prepared a supplemental filing on respondents' motion for summary judgment.   In connection with the preparation for the oral argument on that motion, Applicants conducted legal and factual research regarding numerous legal and factual issues relating to the motion, and analyzed the transcripts

of the depositions taken in the arbitration.  Applicants also had numerous communications and meetings with their experts and analyzed and commented on drafts reports prepared by those experts.  In addition, Applicants engaged in communications with opposing counsel regarding possible mediation and began preparing a mediation statement for that mediation.  In connection with the preparation of that mediation statement, Applicants conducted further legal and factual research, analyzed theories of damages and liability, and had communications with their experts regarding those matters.

## V.  EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $27,634.69. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Tenth Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 100,421 internal laser copies and photocopies during the Tenth Application Period at the rate of 0.15 cents per page, totaling $15,063.15 for all in-house copies.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Tenth Application

Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)      With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)      In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)      In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants incurred travel and transportation expenses during the Tenth Application Period in connection with travel to Rhode Island to participate in depositions.

(f)      In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period.  Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."  *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented."  *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).  "[R]esults are

always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds. Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

## VII. HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Tenth Interim

34

Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Tenth Interim Fee Application if the requested fees are approved is $98,040.79 ($10,746.00 for the Receiver and $87,294.79 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)    Grant interim approval of the Receiver's compensation in the amount of $53,730.00 (the "Allowed Receiver Fees");

(b)    Grant interim approval of Otterbourg's compensation in the amount of $1,214,267.40 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)    grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $319.20;

(d)    grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $27,315.49;

(e)    authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

      (f)      Grant such other relief as the Court deems appropriate.

Dated:  February 21, 2020

                    Otterbourg P.C.

                    By: */s/ Adam C. Silverstein*
                        Adam C. Silverstein
                        Jennifer S. Feeney
                        Erik B. Weinick
                    230 Park Avenue
                    New York, New York 10169
                    Tel.:  (212) 661-9100
                    Fax:  (212) 682-6104
                    asilverstein@otterbourg.com

                    On Behalf of Melanie L. Cyganowski, as Receiver,
                    and Otterbourg P.C., as Counsel to the Receiver