UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

  -v-

PLATINUM MANAGEMENT (NY) LLC;      No. 16-CV-6848 (BMC)
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

### ELEVENTH JOINT INTERIM APPLICATION OF THE RECEIVER AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD JANUARY 1, 2020 THROUGH AND INCLUDING MARCH 31, 2020

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Eleventh Joint Interim Application (the "Eleventh Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from January 1, 2020 through and including March 31, 2020 (the "Eleventh Application Period"). There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $102,206.40 and reimbursement of expenses in the amount of $1,366.19 for the Eleventh Application Period. Otterbourg requests interim approval of fees in the amount of $1,213,020.30 and reimbursement of expenses in the amount of $22,744.39 for the Eleventh Application Period, for a combined total of fees for Applicants in the amount of $1,315,226.70,[1] and expenses in the amount of $24,110.58 for the Eleventh Application Period.

This Eleventh Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Eleventh Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description

---

[1] As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Action and the Arbitration (defined below), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Eleventh Application Period, the Receiver's recorded time charges before application of these accommodations were $168,846.00 and Otterbourg's recorded time charges were $1,573,188.00, for a combined gross legal fees total (before the application of any accommodations) of $1,742,034.00.

6125703.1

of each exhibit to this Eleventh Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Eleventh Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.    PRELIMINARY STATEMENT

During the Eleventh Application Period, the primary focus of the Receiver and her team[2] was (i) the litigation commenced by the Receiver in the United States District Court for the Southern District of New York against various defendants seeking to avoid certain liens purportedly held by those defendants that would adversely impact potential distributions to investors and creditors as well as to recover damages for claims arising from a fraudulent scheme perpetrated to the detriment of Platinum (the "Beechwood Action"); and (ii) the confidential arbitration proceeding commenced against certain Accounting Firms (the "Arbitration").  In addition, during the Eleventh Application Period or in the intervening time prior to the submission of this Fee Application, settlements in were reached with respect to significant lien avoidance claims within the Beechwood Action (which is subject to final documentation) and the

---

[2]     To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

entire Arbitration.  In addition, a settlement was reached resolving the litigation that the Receiver commenced to recover death benefits from a life insurance policy that was part of the ALS Life Settlement Portfolio.

Certain of the settlements that the Receiver reached, and is in the process of negotiating or expects to negotiate, are confidential.  To preserve the confidentiality of these settlements, in this Eleventh Interim Application (as was done in the recently filed Status Report and in future Status Reports and fee applications), the Receiver will not disclose details of *any* settlements, including the identity of the settling parties, the amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts or over what period of time, and/or the source of any litigation-related funds received in any interim application period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

A.      **Analysis and Disposition of Receivership Assets**

During the Eleventh Application Period, the Platinum Receivership received approximately $5.4 million.  This amount is in addition to the approximately $66.2 million received by the Platinum Receivership from the liquidation of various assets from the date of appointment of the Receiver.  Certain parties have asserted a claim to all or part of the proceeds of such liquidated investments.  None of these assets has been marketed or sold in a "fire sale" fashion.

The Receiver's goal is to complete the monetization of the non-litigation assets by the third quarter of this year.  There are certain assets in the portfolio that may ultimately have no realizable value.  Many of the investments made by Platinum were investments in enterprises that were in the developmental stage, had no established market value (with any future value

4

being highly speculative) and, in some instances, required significant additional capital investment to even have the possibility of realizing a return on such investment.  As such, the prior valuations were often seemingly based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  Even with such assumptions made by prior management regarding additional investment, the prior valuations generally were not supportable.

The Receiver's attorneys continue to prosecute the Greehey Action (discussed below).  During the Eleventh Application Period, the Receiver settled the Lincoln/Rosenberg litigation with the life settlement insurance company over its refusal to pay the death benefit on the last remaining policy in the ALS portfolio of life insurance policies.  Negotiations are in progress to resolve certain other litigations the Receiver commenced and/or has an interest in, and to dispose of certain other assets that also remain in the Platinum portfolio.  The Receiver continues to evaluate the remaining assets in the portfolio to determine if any can be liquidated.

Certain parties have asserted an interest, including an alleged secured interest, in some or all of the proceeds of the sale of Receivership Estate assets.  In the Beechwood Action, the Receiver has sought to void the purported blanket liens asserted on the Platinum assets and the underlying debt secured by the purported liens.  The Receiver expects that those lien claims will be completely or significantly resolved by the aforementioned settlements reached with certain defendants in the Beechwood Action.

A description of the investments in which Applicants dedicated significant time during the Eleventh Application Period and the work done during the Eleventh Application Period with respect to those investments is set forth in Section IV of this Eleventh Interim Application.

### B.    Administrative Matters

During the Eleventh Application Period, the Receiver and the Receivership Team continued to speak and meet with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[3] the SEC and Platinum investors. The Receiver regularly updated the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The website also includes links to the Beechwood Action docket.

The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum.  During the Eleventh Application Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"), David Levy ("Levy"), Daniel Small, Uri Landesman,[4] Joseph Mann, Joseph San Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

---

[3]      PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

[4]      Uri Landesman passed away in September 2018.

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.   This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.   The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.   Following the criminal trial of Mark Nordlicht, David Levy and Joseph SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges.   SanFilippo was acquitted on all counts with which he was charged.   The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht.   The Department of Justice has appealed those decisions, and in the interim, two additional criminal trials have been delayed.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

6125703.1

**B.    Case Status[5]**

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)    As of March 31, 2020, the Receivership Entities had approximately $30 million in funds.  Certain parties have claimed an interest in certain sold assets and have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation which, on their face, purport to grant them security interests in all or certain of Platinum's assets.  These secured claims have been challenged and are subject to settlements, the exact scope of which is now being documented

It is estimated that, as of March 31, 2020, accrued and unpaid administrative expenses amount to approximately $4.8 million.  This amount includes the fees and expenses that the Receiver and Otterbourg are requesting in this Eleventh Interim Application and that Goldin is requesting in a separate application for the Eleventh Application Period, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Eleventh Application Period.

(b)    Cash disbursements during the Interim Application Period totaled approximately $5.9 million.  This amount consisted primarily of (i) $3,084,812 in disbursements to

---

[5]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period January 1, 2020 through March 31, 2020.

6125703.1

professionals; (ii) $661,741 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent); and (iii) $2,166,667 in additional litigation expenses.

Cash receipts during the Interim Application Period totaled $5,395,000.  This amount primarily consists of proceeds from prior and/or current settlements.

The Receiver believes that the Receivership is currently entering the final stages in which the remaining assets that can be monetized will be, the significant litigations have concluded or will be concluding, and the issues regarding the purported blanket liens resolved.  The next stage for the receivership will be continued and heightened focus on formulating a plan of distribution of assets to creditors and investors, making final determinations regarding the commencement of any additional litigations and resolving any claim issues.

Pursuant to the previously-approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  In total, 327 claims were filed prior to the applicable bar date.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.  The Receiver cannot at this time state what distributions will ultimately be to creditors and investors.  Also, in addition to determining how to treat different claims (*e.g.*, unsecured creditor claims, unpaid redemption claims, insider claims, non-insider investor claims), the Receiver will need to determine if the various Platinum Entities will be fully or partially consolidated for claim and distribution purposes or if each will be treated separately. There may also be issues of Cayman law regarding the three Cayman funds that also may be implicated.

6125703.1

As of March 31, 2020, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

> (i)    cash and cash equivalents of approximately $30.5 million;

> (ii)   remaining stock and royalty interests, litigation financing, loan receivables and other miscellaneous investments; and

> (iii)  litigation claims.

(c)    In addition to the asset specific lawsuits – including, the Lincoln/Rosenberg (now settled) and Greehey Litigations – PPCO's interest in the lawsuit relating to Agera Energy and PPCO's and PPLO's interest in certain other litigation commenced pre-petition that continue to be pending, the Receiver's investigation of pre-petition activities has to date resulted in the commencement of two targeted litigations: (i) the Arbitration and (ii) the Beechwood Action. Other than the Beechwood Action and the Arbitration, which the Receiver has now settled, the Receiver cannot predict the outcome of any litigations she commenced or in which the Receivership has an interest or the timing of collecting on any judgment or settlement that may ultimately be obtained.  As set forth above, to preserve the confidentiality of certain settlements that the Receiver has reached, and is in the process of negotiating or expects to negotiate, the Receiver will not disclose details of any settlements, including the identity of the settling parties, amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and the source of any litigation-related funds received in any interim application period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

The Receivership Team is concluding its review and analysis of other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors

6125703.1

and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis, warrant the commencement of litigation.  For any claims in which a statute of limitations may be approaching, the Receiver has reached out, and will continue to reach out, to the potential targets to enter into tolling agreements to allow the Receivership Team the appropriate time to investigate potential claims, reach agreements prior to commencing any litigation, and, if necessary, commence action(s) against those targets that have declined to toll the statute of limitations.  The Receiver will be making final determinations in the coming months whether any additional actions will be commenced.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Eleventh Application Period, the Receiver requests interim approval of her fees in the amount of $102,206.40 and reimbursement of expenses in the amount of $1,366.19.  Otterbourg requests interim approval of fees in the amount of $1,213,020.30 and reimbursement of expenses in the amount of $22,744.39.  Thus, the combined total of fees for Applicants of $1,315,226.70, plus expenses of $24,110.58, is $1,339,337.28.

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys,

12

6125703.1

including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment.  (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $168,846.00 to $102,206.40, a reduction in the amount of $66,639.60.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,573,188.00 to $1,213,020.30, a reduction in the amount of $360,167.70.  Therefore, the total reduction for legal fees incurred during the Eleventh Application Period by the Receiver and Otterbourg professionals is $426,807.30.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the detail for the Eleventh Interim Application to SEC counsel on May 6, 2020 to allow for a thirty-day review period.

This Eleventh Interim Application includes certain exhibits:

(a)     The SFAR for the period of January 1, 2020 through March 31, 2020 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Eleventh Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Eleventh Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Eleventh Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

6125703.1

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's eleventh request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Eleventh Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Eight attorneys and one paraprofessional billed time during the Eleventh Application Period (in addition to the Receiver).[6]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.  Because of the shift in the Receivership from the sale of assets to the pursuit of recoveries through litigation, the bulk of the

---

[6]  The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Eleventh Application Period.

6125703.1

hours billed were performed by litigation attorneys who are actively involved in the Beechwood Action and/or the Arbitration.

The particular Otterbourg professionals who billed time during the Eleventh Application Period and their specific roles were as follows:

(a)    Adam C. Silverstein (Partner) (8.4 Hours to P01; 5.4 Hours to P02; 56.2 Hours to P04; 42.3 Hours to P14; 45.7 Hours to P15) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services, and the forensics investigation.  Mr. Silverstein is the lead attorney responsible for the Arbitration and, therefore, most of his time during the Eleventh Application Period was dedicated to matters relating to the Arbitration, including matters relating to the settlement.  Mr. Silverstein also assisted with certain issues relating to the Beechwood Action and proposed settlements.  During the Eleventh Application Period, Mr. Silverstein also spent time responding to the Court's Minute Order in response to certain Defendants' request for advancement of fees and whether the Platinum Estate should be in bankruptcy (discussed below).  Mr. Silverstein has also been one of the point persons regarding communications with the SEC.

(b)    William Moran (Partner) (.5 Hours to P02; 6.1 Hours to P04; 1.4 Hours to P10; 386.3 Hours to P14; .5 Hours to P15) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.  In particular, Mr. Moran has primarily assisted with the Beechwood Action during the Eleventh Application Period including responding to requests for admissions, responding to motions for summary judgment and assisting the Receiver in analyzing settlements proposals and preparing documents in connection with the settlement with at least one of the defendants.

16

(c)      <u>Philip Berg (Partner) (5.5 Hours to P01; 20.7 Hours to P02)</u> – Mr. Berg is a partner in the firm's corporate department and specializes in negotiation and documentation of asset sales and other transactions.   During the Eleventh Application Period, Mr. Berg was primarily involved with the sale of the Cokal royalty, including preparing a non-disclosure agreement, reviewing the necessary documents and preparing and negotiating the asset purchase agreement and corresponding acknowledgment agreement.

(d)      <u>Jennifer S. Feeney (Of Counsel) (5.4 Hours to P01; 7.7 Hours to P02; 21.8 Hours to P04; .4 Hours to P14)</u> – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.   During the Eleventh Application Period, Ms. Feeney attended to case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.   Additionally, Ms. Feeney, along with Erik B. Weinick, reviewed applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)      <u>Erik B. Weinick (Of Counsel) (20.6 Hours to P01; 2.9 Hours to P02; 22.5 Hours to P04; 4.7 Hours to P10; 452.6 Hours to P14)</u> – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.   He has served as the Receiver's "hub and spoke," coordinating the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest. Mr. Weinick is also the attorney primarily responsible for the Beechwood Action and spent

6125703.1

significant time during the Eleventh Application Period in connection with responding to motions for summary judgment, preparing for oral argument, conducting remaining depositions and attending to all other matters in the Beechwood Action, including issues relating to settlements.

(f)     Andrew S. Halpern (Associate) (49.6  Hours to P04; 2.6 Hours to P10; 417.9 Hours to P14; 27.6 Hours to P15) – Mr. Halpern is an experienced litigator, particularly in the areas of claims of professional malpractice and fraudulent conveyance and forensic analysis.  As such, Mr. Halpern continued his work in both the Beechwood Action and the Arbitration, as well as analyzing potential additional actions, the relevant statutes of limitation and extending tolling agreements when necessary.  Mr. Halpern spent significant time in connection with responding to motions for summary judgment in the Beechwood Action and analyzing for the Receiver issues relevant to settlement discussions.    He also had extensive communications with experts and consultants in the Beechwood Action.

(g)     Gabriela S. Leon (Associate) (1.7 Hours to P02; 4.8 Hours to P10; 354.5 Hours to P14; 9.6 Hours to P15) – Ms. Leon is a junior associate in the litigation department.  Ms. Leon assisted with both the Arbitration and the Beechwood Action. During the Eleventh Application Period, in the Beechwood Action, Ms. Leon assisted with responding to requests for admissions, responding to supplemental documents requests, reviewing transcripts and researching issues for the response to motions for summary judgment.  Ms. Leon also assisted with research related to statutes of limitation, all at a considerably lower billing rate.

(h)     Alessandra Dagirmanjian (Associate) (15.3 Hours to P01; 2.6 Hours to P14) – Ms. Dagirmanijian is a first-year associate in the litigation department.  Ms. Dagirmanjian

assisted with certain research issues in connection with the Greehey action and the Beechwood Action, at a considerably lower billing rate.

(i)     Jessica Hildebrandt (Paralegal) (17.0 Hours to P01; 11.8 Hours to P04; .8 Hours to P10; 276.0 Hours to P14; .3 Hours to P15) – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain document review, including review of transcripts (which are suitable for a paralegal at a lower billable rate), and helped prepare the Otterbourg attorneys for various hearings, depositions and court filings.

## IV.     SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING ELEVENTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Eleventh Application Period into seven (7) project categories.[7]   Narrative summaries of these activity categories follow:

### A.     Asset Analysis and Recovery (P01) - Total Fees: $55,218.00 Asset Disposition (P02)[8] - Total Fees:  $37,426.00

During the Eleventh Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with her team of professionals and staff, as well as, in some instances, other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Eleventh Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

---

[7]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[8]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular team meetings with Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer. In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.  Goldin also prepared regular updates on the status of the remaining assets in the Platinum portfolio and current disposition options, which Applicants reviewed.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Eleventh Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.     **Agera** – refers to Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera").  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is jointly owned by PPVA and PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC.

Pursuant to their respective interests in PGS, both PPVA and PPCO agreed to pursue certain claims and causes of action relating to PGS's ownership of a certain promissory note convertible into 95% of the common equity of energy reseller Agera Energy (the "Agera Claims").[9]  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, Senior Health Insurance Company of Pennsylvania and CNO Financial Group, Inc. (the

---

[9]   On October 4, 2019, Agera Energy LLC and certain of its affiliates, none of which are parties to the Agera Action, filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-23803.

"Agera Action").  The Case is No. 2019-0431.  Thereafter, the case was removed to the United States District Court for the District of Delaware (the "Delaware District Court") (Case No. 19-cv-01319) and the plaintiffs filed a motion for remand.  In early April, the Delaware District Court granted Plaintiffs' motion to remand the action to the Delaware Chancery Court.

In addition, in connection with the Agera litigation, a settlement was reached by and among PPVA, the Joint Official Liquidators of PPVA, PGS, Michael Nordlicht, Kevin Cassidy and two "Starfish" entities.  While PPCO is not a party to the agreement, it acknowledged and agreed to its terms because of PPCO's membership interest in PGS.  The agreement provides for a settlement payment to PPVA/ PGS. While PPCO will not receive cash from the settlement with Cassidy and Starfish, its share of the funding amount that must be repaid from any settlement proceeds before PGS can share in any recovery was reduced.

During the Eleventh Application Period, Applicants communicated with counsel for PGS and PPVA regarding these matters and reviewed pleadings and agreements when appropriate. Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience.

2.  **ALS Life Settlements (Lincoln/Rosenberg Litigation)** – refers to a portfolio of life settlement investments that were owned through an entity in which PPCO is the majority owner and managing member.  All but one policy in the portfolio was previously sold by the Receiver or her predecessor.  The Receiver asserted that the insurance company – Lincoln Life – improperly lapsed this policy prior to the Receiver's appointment.  The insured under the policy (Rosenberg) subsequently passed away, leaving the potential death benefit in dispute.  The Receiver commenced an action in the United States District Court for the Eastern District of New York (the "Rosenberg Litigation").  A back-end beneficiary under the policy (who the

Receiver named as a nominal defendant because it was a necessary party to the litigation) filed counterclaims against the Receiver, seeking a ruling that it is entitled to 100% of the death benefit in the event that the Court determines that the Receivership somehow caused the alleged lapse.  During the Eleventh Application Period, the Receiver and the other parties to the Rosenberg Litigation engaged in settlement discussions, which resulted in the execution of a Settlement Agreement.  The terms of the settlement will not be disclosed.

During the Eleventh Application Period, Applicants worked with counsel of record in charge of the matter.   Applicants reviewed and revised the settlement agreement and communicates with the minority shareholders of ALS.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation experience and their role was primarily to monitor and interface with contingency counsel.

3.     **Cokal Limited** (ASX: "CKA") – refers to a coal mining company headquartered in Sydney, NSW.  CKA's active mining project is on the island of Borneo in the Bumi Barito Mineral ("BBM") of Indonesia.  PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, options, and a Note).  As a result of a debt restructuring transaction agreed to by prior management, the Note was restructured into new options and a royalty from revenues of BBM.   During the first quarter of 2019, PPCO sold its entire stock and options position in CKA to one of CKA's current shareholders.  At the time, the shareholder expressed interested in potentially purchasing PPCO's royalty interest, but such discussions went dormant until the end of last year.  The Receivership team re-engaged with the shareholder and during the Eleventh Application Period, entered into an agreement for the sale of PPCO's royalty interest.  Pursuant to the sale agreement, a good faith deposit on the sale was wired to Otterbourg's escrow account on March 27, 2020, and the closing on the sale is to be completed

6125703.1

within ninety (90) days from receipt of such deposit, at which point the escrowed funds will be released from escrow to PPCO and the purchaser will pay the remaining portion of the purchase price to PPCO.

During the Eleventh Application Period, Applicants prepared a non-disclosure agreement with the purchaser, reviewed the underlying documents and prepared the asset purchase agreement and acknowledgment for the sale of the royalty. This matter was handled by an Otterbourg attorney with transactional experience.

4.     **Greehey** – refers to a $3.23 million secured loan (the "Loan") made by a wholly owned subsidiary of PPCO, Bakken Development Opportunities, I, LLC ("Bakken"), to Greehey & Company, Ltd. ("Greehey") and Dynamic Resources LLC ("Dynamic," and together with Greehey, "Defendants"). The Loan was secured by certain real property located in Telluride, Colorado and certain oil and gas leases located in North Dakota. The Loan matured on August 31, 2017. Despite repeated requests by the Receiver, the Defendants failed to pay the amounts outstanding under the Loan and on August 1, 2019, the Receiver commenced a lawsuit against Greehey and Dynamic (the "Greehey Litigation") seeking entry of a judgment holding Defendants in default on an immediate payment obligation to Bakken, in addition to associated interest, costs and expenses, including reasonable attorneys' fees and costs. The Receiver has amended her complaint and responded to the Defendants revised counter-claims. Discovery continued during the Eleventh Application Period.

During the Eleventh Application Period, Applicants discussed strategy with Platinum's General Counsel, who is primarily responsible for the Greehey Litigation, and assisted with research and document production issues. Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation.

23

**B.**      **Case Administration (P04) - Total Fees:  $156,540.50**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The tasks recorded under this category include the following:

1.      **Investor Communications.**  During the Eleventh Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver and the Receivership Team have responded to investor inquiries and continue to regularly respond and react to inquiries and requests for information.  Applicants also prepared the Tenth Status Report of the Receiver during the Eleventh Application Period.

2.      **Response to Requests for Advancement of Fees**.  Following the conclusion of the criminal trial, certain Defendants renewed their requests for the advancement and/or indemnification of attorneys' fees.  Toward the conclusion of the fourth quarter of 2019, by minute order entered December 12, 2019 (the "Minute Order"), the Court requested additional briefing and argument on the "sole issue [of] whether it would be appropriate for this Court to dismiss the case without prejudice to the right of the Receiver or creditors to file a bankruptcy petition against the company in light of the fact that this Court has been called upon to apply Bankruptcy Code concepts to substantial claims and procedures in this matter."  In response to the Minute Order, Applicants prepared and filed on January 17, 2020 a Declaration and

24

Memorandum of Law in Response to the Minute Order Entered December 12, 2019 (collectively, the "Receiver's Response to Minute Order") [Dkt. No. 516].   On January 22, 2020, the Court issued an Order on the docket, pursuant to which the Court found, *inter alia*, that (i) compelling the Receiver to file a bankruptcy petition at this point would not be in the best interest of all parties and (ii) that while both SanFilippo and Levy are entitled to indemnification, their claims are non-priority claims among many that must wait for any payment *pari passu* with other non-priority claimants.

       3.     **Schafer & Weiner**.  On September 25, 2018, the Court issued its Memorandum Decision and Order denying the fee application of Schafer & Weiner ("S&W") and reserving judgment on the Receiver's cross-motion seeking disgorgement of the pre-Receivership fees paid to S&W.  [Dkt. No. 383]  S&W then appealed that decision to the U.S. Court of Appeals for the Second Circuit.  While the appeal was pending, S&W and the Receiver participated in the Second Circuit's mandatory mediation conference (CAMP) and simultaneously engaged in conversations with S&W and the SEC regarding a possible resolution of the appeal and the Receiver's cross-motion to disgorge fees.  The CAMP process did not directly lead to a resolution of issues with S&W.  The parties, however, continued to engage in discussions and during the Eleventh Application Period, the parties agreed to and executed a written Settlement Agreement on January 16, 2020 (the "S&W Settlement") that was presented to the Court on February 6, 2020 [Dkt. No. 520] and approved on February 24, 2020 [Dkt. No. 525].  The Receivership received the first payment and agreed to a delay in the second payment in view of circumstances caused by COVID-19.

       Time was spent by Applicants during the Eleventh Application Period in connection with the negotiation of the preparation of the settlement agreement and motion to the Court.

4.      **SEC Meetings**.  Applicants communicated as warranted with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.  Applicants also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

5.      **PPVA**.  The Receiver and the Receivership Team had periodic teleconferences and in-person meetings with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest, including jointly held assets, the Beechwood Action, a related Chapter 15 bankruptcy proceeding, the Agera Action (discussed below) and additional claims that may be jointly held.

6.      **Receiver Oversight**.  Time during the Eleventh Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate. Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.  The Receivership Team meets with the Receiver regularly to discuss ongoing asset disposition, litigation, claims and other administrative matters, and prepared agendas and reviewed assets for discussion in advance of the meetings.  The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues.

C.      **Forensic/Investigatory Work (P10) - Total Fees:  $9,549.50**

The Receiver is nearing the conclusion of her review on whether additional causes of action against other parties should be asserted.  The analysis includes transfers from Platinum, the value of the assets transferred, and the consideration given in return for the transferred assets.

The Receiver has entered into tolling agreements with certain third parties.  Final decisions will be made in the near term as to whether to commence, or to settle out of court, any additional claims.

During the Eleventh Application Period, the Receiver engaged in discussions with the Executor of the estate of Uri Landesman (the "Landesman Estate"), a former Platinum officer, who, prior to his passing, had been a defendant in the criminal and civil action commenced by the SEC.  The discussions included the SEC and the joint liquidators for the PPVA Funds.  In cooperation with the SEC and the Joint Liquidators, the Receiver agreed to settle all claims against the Landesman Estate.  PPVA and the SEC agreed to settle its claims against the Landesman Estate as well.  During the Eleventh Application Period, Applicants spent time reviewing and addressing issues relevant to the settlement with the Landesman Estate.

### D.     <u>Beechwood Action</u> (P14) – Total Fees: <u>$1,384,636.50</u>

On December 19, 2018, the Receiver commenced the Beechwood Action in the Southern District of New York against (i) certain so-called Beechwood entities, (ii) Senior Health Insurance Company of Pennsylvania, (iii) Fuzion Analytics, Inc., (iv) CNO Financial Group, Inc., (v) Bankers Conseco Life Insurance Company, (vi) Washington National Insurance Company and (vii) 40|86 Advisors, Inc.  The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood RE Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the United States District Court for the Southern District of New York.  The Receiver exercised her right under the applicable rules and orders of the Court to amend the original filed complaint, and on March 29, 2019, the Receiver filed an amended complaint.   A copy of the redacted amended complaint filed in the Beechwood Action may be accessed on the Receiver's website

(www.PlatinumReceivership.com), and summaries of developments in the Beechwood Action may be found in the Receiver's prior Status Reports.

Each of the defendants in the Beechwood Action filed motions to dismiss the Amended Complaint.  The hearing on the motions to dismiss took place on August 15, 2019.  On October 7, 2019, Judge Rakoff issued an Opinion and Order, which, while dismissing many of the Receiver's causes of action for monetary damages, sustained her causes of action to set aside the liens currently preventing a distribution of estate assets, as well as the Receiver's causes of action for aiding and abetting breach of fiduciary duty, and unjust enrichment against certain of the defendants.  During the Interim Application Period, the Receiver filed a motion for partial summary judgment against one of the defendants, and responded to motions for summary judgment filed by the defendants in the Beechwood Action.  The Receiver's professionals also prepared to present oral argument on these motions on April 7, 2020, although, due to the settlements in principle discussed above and below, which were reached on the eve of argument, argument was only heard by the Court on the one motion not covered by those settlements.

Parallel to the litigation track, the Receiver and the Receiver's counsel also engaged in ongoing settlement discussions with certain defendants asserting liens, as principal and/or agent, on all of the Receiver's assets.  Together, there were three groups of defendants and the Receiver has now reached settlements with each group of defendants asserting such liens, although the exact scope of such settlements, which are in the process of being documented, will depend, in part, on the ability of defendants holding liens as agent to compromise such liens.  As a result of the settlements, at the request of the parties, the District Court held the majority of the summary judgment motions in abeyance, and only heard argument on the summary judgment motion filed by a defendant that had not asserted liens against the estate.  By Memorandum and Opinion

dated April 15, 2020, the Court granted that defendant's motion for summary judgment and the Receiver is now considering her options relating thereto, including appeal.

The Receiver expects to completely document and execute settlement agreements resolving all or a significant portion of the Beechwood Action during the current quarter, and will report on such settlements, to the extent allowed, in the next status report.  The Receiver also will continue to update her website, www.PlatinumReceivership.com/index, with any developments in the case.

During the Eleventh Application Period, Applicants spent time responding to requests for admissions propounded by one of the defendants and completing discovery, including final depositions.  Applicants also prepared responses to multiple motions for summary judgment, prepared for and attended oral argument on the motions for summary judgment.  Applicants also participated in numerous discussions and meetings with various defendants regarding potential settlements of the claims, which included a thorough analysis of settlement options and an analysis of the liens asserted by the defendants.  Applicants also spent time drafting and revising the settlement agreement with one of the defendants.

E.   **Arbitration (P15) – Total Fees $92,088.50**

On April 27, 2018, the Receiver timely commenced a confidential arbitration against an accounting firm and its affiliate (collectively, the "Accounting Firms") that provided audit services to certain of the Receivership Entities.  In the Arbitration, the Receiver claimed that the Accounting Firms committed negligence in conducting audits of the financial statements of certain of the Receivership Entities (the "Audited Platinum Entities") for the fiscal year ended December 31, 2014, and that the Accounting Firms breached their contractual obligations to the Audited Platinum Entities in connection with those audits.  The Receiver sought monetary

damages in an amount to be determined by the arbitration panel.  The Arbitration was before a tribunal of three neutral arbitrators.  On June 25, 2019, the Accounting Firms submitted a motion for summary judgment dismissing all of the Receiver's claims.  The motion was fully briefed and oral argument was held on the motion on November 21, 2019.

During the Eleventh Application Period, the Receiver and the Accounting Firms reached a settlement resolving the Arbitration in its entirety.  Consistent with the rules of the arbitral forum in which the Arbitration was contractually required to be brought, the terms of the parties' settlement are, and must remain, confidential.  By letter to the Court, dated February 28, 2020, filed on the docket that day [Dkt. No. 526], the Receiver notified the Court and all interested parties of the Receiver's intention to consummate the settlement with the Accounting Firms confidentially and without further order of the Court, in accordance with the powers vested in her by the Receiver Order, unless the Court were to express disagreement with the Receiver's approach within ten days after the filing of such letter.   The Receiver received no objection to the approach described in her letter from the Court or any interested party.  Accordingly, the Receiver consummated the settlement during the Eleventh Application Period. Because of the aforementioned confidentiality restrictions, no further information regarding the Arbitration can be provided.

During the Eleventh Application Period, time was spent by the attorney working on the case to issues relevant to the negotiations and settlement of the Arbitration.

## V.      EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $24,110.58. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period

6125703.1

of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Eleventh Application Period:

(a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 29,856 internal laser copies and photocopies during the Eleventh Application Period at the rate of 0.15 cents per page, totaling $4,478.40 for all in-house copies.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Eleventh Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)      In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)      In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants incurred travel and transportation expenses during the Eleventh Application Period in connection with the Receiver's travel to Texas to discuss settlement with the representatives for one of the defendants.

(f)      In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)      The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)      In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.      FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining

6125703.1

an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994). Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted.  Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities.  The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.  Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

**VII.    HOLDBACKS**

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Eleventh Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Tenth Interim Fee Application if the requested fees are approved is $110,908.70 ($20,441.28 for the Receiver and $90,467.42 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)    Grant interim approval of the Receiver's compensation in the amount of $102,206.40 (the "Allowed Receiver Fees");

6125703.1

(b)     Grant interim approval of Otterbourg's compensation in the amount of $1,213,020.30 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $1,366.19;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $22,744.39;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     Grant such other relief as the Court deems appropriate.

Dated: May 8, 2020

Otterbourg P.C.

By: /s/ Adam C. Silverstein
        Adam C. Silverstein
        Jennifer S. Feeney
        Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

6125703.1