UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

   -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TWELFTH JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
APRIL 1, 2020 THROUGH AND INCLUDING JUNE 30, 2020**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Twelfth Joint Interim Application (the "Twelfth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from April 1, 2020 through and including June 30, 2020 (the "Twelfth Application Period"). There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $93,928.00 and reimbursement of expenses in the amount of $200.10 for the Twelfth Application Period. Otterbourg requests interim approval of fees in the amount of $852,788.69 and reimbursement of expenses in the amount of $18,060.02 for the Twelfth Application Period, for a combined total of fees for Applicants in the amount of $946,716.69,[1] and expenses in the amount of $18,260.12 for the Twelfth Application Period.

This Twelfth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Twelfth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Twelfth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1] As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Action and the Arbitration (defined below), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting   partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Twelfth Application Period, the Receiver's recorded time charges before application of these accommodations were $155,170.00 and Otterbourg's recorded time charges were $1,019,356.50, for a combined gross legal fees total (before the application of any accommodations) of $257,106.50.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Twelfth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines. All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I. PRELIMINARY STATEMENT

During the Twelfth Application Period, the Receiver and her team[2] focused on (i) documenting the settlement reached with respect to the litigation commenced by the Receiver in the United States District Court for the Southern District of New York (the "District Court") against various defendants seeking to avoid certain liens that would adversely impact potential distributions to investors and creditors (the "Beechwood Action"); (ii) discussions with the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds") regarding pre-receivership transactions between the estates; (iii) monetizing the few remaining assets that can be liquidated; and (iv) analyzing issues regarding the formulation of a plan of distribution.

As previously reported, certain of the settlements that the Receiver reached during the course of the Receivership are confidential. To preserve the confidentiality of these settlements, in this Twelfth Interim Application (as was done with respect to the last interim fee application

---

[2]  To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

and Status Reports and in future Status Reports and fee applications), the Receiver would not and will not disclose details of *any* settlements, including the identity of the settling parties, the amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts or over what period of time, and/or the source of any litigation-related funds received in any reporting period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

### A.     Analysis and Disposition of Receivership Assets

During the Twelfth Application Period, the Platinum Receivership received approximately $8.1 million.  This amount is in addition to the approximately $71.6 million received by the Platinum Receivership from the liquidation of various assets from the date of appointment of the Receiver.  Certain parties have asserted a claim to all or part of the proceeds of such liquidated investments, which have been addressed, in larger part, through the resolution of the Beechwood Action.

The Receiver's goal is to complete the monetization of the non-litigation assets during the current calendar quarter.  There are certain assets in the portfolio that may ultimately have no realizable value.  Many of the investments made by Platinum were investments in enterprises that were in the developmental stage, had no established market value (with any future value being highly speculative) and, in some instances, required significant additional capital investment to even have the possibility of realizing a return on such investment.  As such, the prior valuations were often seemingly based on assumptions that Platinum would invest significant additional capital in the assets with the hope that such investments would pay dividends in the long-term future.  Even with such assumptions made by prior management regarding additional investment, the prior valuations generally were not supportable.

A description of the investments in which Applicants dedicated significant time during the Twelfth Application Period and the work done during the Twelfth Application Period with respect to those investments is set forth in Section IV of this Twelfth Interim Application.

**B.      Administrative Matters**

During the Twelfth Application Period, the Receiver and the Receivership Team continued to speak with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[3] the SEC and Platinum investors. The Receiver has updated the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The website also includes links to the Beechwood Action docket.

The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum.  During the Twelfth Application Period, the Receivership Team continued to monitor such proceedings, either directly or through local counsel, and, when necessary, prepared pleadings and/or made appearances in such proceedings.

**II.      CASE BACKGROUND AND STATUS**

**A.      Case Background**

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht

---

[3]      PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

("Nordlicht"),[4] David Levy ("Levy"), Daniel Small, Uri Landesman,[5] Joseph Mann, Joseph San Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.  The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  Following the criminal trial of Mark Nordlicht, David Levy and Joseph SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht.  The Department

---

[4]    Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York.  Case No. 20-22782-rdd.  The Receiver is currently monitoring the bankruptcy case.

[5]    Uri Landesman passed away in September 2018.

of Justice has appealed those decisions, and in the interim, two additional criminal trials have been delayed.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to

investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

**B.    Case Status[6]**

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)    As of June 30, 2020, the Receivership Entities had approximately $36.4 million in funds.  Certain parties have claimed an interest in certain sold assets and have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Estate).  Other parties purported to have security interests in all or certain of Platinum's assets. These secured claims were challenged by the Receiver and have now been substantially resolved through settlements.

It is estimated that, as of June 30, 2020, accrued and unpaid administrative expenses amounted to approximately $4.56 million.  This amount includes the fees and expenses that the Receiver and Otterbourg are requesting in this Twelfth Interim Application and that Goldin is requesting in a separate application for the Twelfth Application Period, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application, and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.   In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Twelfth Application Period.

---

[6]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period April 1, 2020 through June 30,, 2020.

(b)      Cash disbursements during the Interim Application Period totaled approximately $1.77 million.   This amount consisted primarily of (i) $1,434,647 in disbursements to professionals and (ii) $337,651in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent).

Cash receipts during the Interim Application Period totaled approximately $8.1 million. This amount primarily consists of proceeds from asset sales and prior and/or current settlements.

The Receiver believes that the Receivership is currently entering the final stages in which the remaining assets that can be monetized will be and the significant litigations have concluded. The Receiver is now focused on preparing a plan of distribution of assets to creditors and investors, making final determinations regarding the commencement of any additional litigations and resolving any claim issues.

Pursuant to the previously-approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.   In total, 327 claims were filed prior to the applicable bar date.   Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.   Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.   The Receiver cannot at this time state what distributions will ultimately be to creditors and investors.   Also, in addition to determining how to treat different claims (*e.g.*, unsecured creditor claims, unpaid redemption claims, insider claims, non-insider investor claims), as part of the formulation of the plan of distribution, the Receiver will determine if the various Platinum Entities will be fully or partially consolidated for claim and distribution purposes or if each will be treated separately.

As of June 30, 2020, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

(i)      cash and cash equivalents of approximately $36.4 million;

(ii)     remaining stock and royalty interests, litigation financing, loan receivables and other miscellaneous investments; and

(iii)    potential litigation claims.

(c)      In addition to the asset specific lawsuits (*e.g.*, the Lincoln/Rosenberg and Greehey Litigations), that have now been resolved, and PPCO's and PPLO's interest in certain other litigation commenced pre-petition that continue to be pending, the Receiver's investigation of pre-petition activities has to date resulted in the commencement of two targeted litigations: (i) the confidential arbitration against an accounting firm and its affiliate that provided audit services to certain of the Receivership Entities (the "Arbitration") and (ii) the Beechwood Action, both of which have now been settled.  As set forth above, to preserve the confidentiality of certain settlements that the Receiver has reached, the Receiver will not disclose details of any settlements, including the identity of the settling parties, amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and the source of any litigation-related funds received in any interim application period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Twelfth Application Period, the Receiver requests interim approval of her fees in the amount of $93,928.00 and reimbursement of expenses in the amount of $200.10.  Otterbourg requests interim approval of fees in the amount of $852,788.69 and

reimbursement of expenses in the amount of $18,060.02.  Thus, the combined total of fees for Applicants of $946,716.69, plus expenses of $18,260.12, is $964,976.89

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case.  In addition, the Receiver has agreed to provide a further

discount in an amount that represents the increase in her fees since her appointment.  (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $155,170.00 to $93,928.00, a reduction in the amount of $61,242.00.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $1,019,356.50 to $852,788.69, a reduction in the amount of $166,567.81.  Therefore, the total reduction for legal fees incurred during the Twelfth Application Period by the Receiver and Otterbourg professionals is $227,809.81.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.   There was no travel time during the Twelfth Application Period.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted a draft of the Twelfth Interim Application to SEC counsel on September 9, 2020 to allow for a thirty-day review period.

This Twelfth Interim Application includes certain exhibits:

(a)    The SFAR for the period of April 1, 2020 through June 30, 2020 is attached as **Exhibit A** hereto.

(b)    A Fee Schedule showing the total fees billed and hours worked during the Twelfth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)    In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional

organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)    In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Twelfth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)    In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)    In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Twelfth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)    Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Twelfth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Twelfth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Ten attorneys and one paraprofessional billed time during the Twelfth Application Period (in addition to the Receiver).[7]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.  Because of the shift in the Receivership from the sale of assets to the pursuit of recoveries through litigation, the bulk of the hours billed were performed by litigation attorneys.

The particular Otterbourg professionals who billed time during the Twelfth Application Period and their specific roles were as follows:

(a)      Adam C. Silverstein (Partner) (10.5 Hours to P01;  9.9 Hours to P02;  20.5 Hours to P04; .5 Hours to P10; 62.3 Hours to P14; 3.8 Hours to P15) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services and the forensics investigation.  During the Twelfth Application Period, Mr. Silverstein spent considerable time with respect to the settlement of the Beechwood Action, assisting with the drafting and oversight of the settlement agreement and acting as the point person in discussions with counsel for the defendants.  Mr. Silverstein also spent time analyzing issues relating to potential litigation options, as well as issues relating to settlement discussions

---

[7]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Twelfth Application Period.

with PPVA.  Mr. Silverstein has also been one of the point persons regarding communications with the SEC.

(b)    William Moran (Partner) (36.8 Hours to P01;  50.8 Hours to P04; 7.9 Hours to P05; 27.3 Hours to P10;  83.6 Hours to P14) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.  During the Twelfth Application Period, Mr. Moran assisted with numerous litigation matters, including the settlement with Beechwood, formulating a litigation strategy with respect to the Receivership's ownership of certain securities, and guidance with respect to the Greehey litigation.  Mr. Moran also assisted with the review and analysis of potential additional claims that can be asserted by the Receiver against third parties.  Mr. Moran also assisted with the review of insider claims.

(c)    Philip Berg (Partner) (4.4 Hours to P01; 9.3 Hours to P02; 1.2 Hours to P04; 3.4 Hours to P14) – Mr. Berg is a partner in the firm's corporate department and specializes in negotiation and documentation of asset sales and other transactions.  During the Twelfth Application Period, Mr. Berg finalized the sale of the Cokal royalty, including drafting an acknowledgement of receipt of deposit and a bill of sale. Mr. Berg also assisted from a corporate law perspective with the review of certain of PPCO's stock holdings.

(d)    Jennifer S. Feeney (Of Counsel) (16.2 Hours to P01; 7.2 Hours to P02;  50.4 Hours to P04;  4.0 Hours to P05; .7 Hours to P10) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Twelfth Application Period, Ms. Feeney attended to case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Additionally, Ms. Feeney, along with Erik B. Weinick, reviewed

applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)    Erik B. Weinick (Of Counsel) (90.8 Hours to P01; 4.8 Hours to P02;  87.4 Hours to P04; 3.3 Hours to P05;  5.2 Hours to P10;  130.4 Hours to P14; .3 Hours to P15) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating the work of the Receiver's professionals and Platinum's in-house employees on almost every matter confronting the Receivership from asset dispositions, to affirmative and defensive claims (including appearing in court on behalf of the Receiver), and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick is also the attorney primarily responsible for litigation of the Beechwood Action.

(f)    Andrew S. Halpern (Associate) (72.4 Hours to P01; 29.8 Hours to P04; 21.5 Hours to P05; 21.1 Hours to P10;  212.1 Hours to P14; 1.8 Hours to P15) – Mr. Halpern is an experienced litigator, particularly in the areas of claims of professional malpractice and fraudulent conveyance and forensic analysis.  Mr. Halpern was involved in numerous matters for the Receivership during the Twelfth Application Period, taking the laboring oar on drafting several of the agreements that were reached by the Receiver.  Notably, Mr. Halpern continued his work in the Beechwood Action, including preparing the initial drafts of the settlement agreement and memorandum of law, which also required a detailed analysis of the various liens being released in connection with the settlement.  Mr. Halpern also lent his litigation expertise to the Greehey litigation by assisting with the preparation of the mediation statement and helping to formulate litigation strategy with respect to the Receivership's ownership of certain securities.

(g)      Gabriela S. Leon (Associate) (55.2 Hours to P01; 1.8 Hours to P04; 7.1 Hours to P10; 54.6 Hours to P14) – Ms. Leon is a junior associate in the litigation department.  Ms. Leon primarily assisted with the Beechwood Action and the Decision Diagnostics matter during the Twelfth Application Period.  In the Beechwood Action, Ms. Leon assisted with the preparation for oral argument on summary judgment and also assisted with the preparation of the memorandum of law in support of the settlement agreements that were reached with the defendants.  In the Decision Diagnostics matter, Ms. Leon was the primary associate responsible for document review and research in connection with the Receiver's assertion of ownership interests in certain securities at a considerably lower billing rate.

(h)      Afruz Sayah (Associate) (19.2 Hours to P01; 2.1 Hours to P02) – Ms. Sayah is a junior associate in the corporate department.  During the Twelfth Application Period, Ms. Sayah assisted with the review of certain loan documents relating to PPCO's ownership and other interests in certain securities.  Ms. Sayah also assisted Mr. Berg in connection with the completion of the Cokal transaction, at a considerably lower billing rate.

(i)      Michael Pantzer (Associate) (10.1 Hours to P01; 47.0 Hours to P04) – Mr. Pantzer is a junior associate in the bankruptcy department.  Mr. Pantzer, at a lower billing rate, assisted with a variety of research issues related to the Greehey litigation and the formulation of a plan of distribution,

(j)      Alessandra Dagirmanjian (Associate) (46.5 Hours to P01) – Ms. Dagirmanijian is a first-year associate in the litigation department.  Ms. Dagirmanjian assisted with certain research issues in connection with the Greehey action and the Beechwood Action, at a considerably lower billing rate.

(k)    Jessica Hildebrandt (Paralegal) (28.6 Hours to P01; 53.5 Hours to P04; .3 Hours to P10; 7.4 Hours to P14) – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain document review, including review of transcripts (which are suitable for a paralegal at a lower billable rate), and helped prepare the Otterbourg attorneys for various hearings, depositions and court filings.

## IV.   SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING TWELFTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Twelfth Application Period into seven (7) project categories.[8]   Narrative summaries of these activity categories follow:

### A.    Asset Analysis and Recovery (P01) - Total Fees: $274,976.50
Asset Disposition (P02)[9] - Total Fees:  $29,368.00

During the Twelfth Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with her team of professionals and staff, as well as, in some instances, other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Twelfth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working,

---

[8]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[9]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

the Receiver scheduled regular team meetings with Otterbourg, Goldin, and Platinum's General Counsel and Chief Financial Officer. In advance of these meetings, Applicants reviewed with members of the Receivership Team which matters were active and needed to be discussed with the Receiver, and prepared an Agenda for maximum efficiency.  Goldin also prepared regular updates on the status of the remaining assets in the Platinum portfolio and current disposition options, which Applicants reviewed.

During the Twelfth Application Period, Applicants also reviewed the remaining assets in the portfolio and worked with Goldin to determine the assets that should be included in a remnant asset sale or abandoned.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Twelfth Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.      **Cleveland Mining** – refers to Cleveland Mining Company Limited ("Cleveland Mining"), a publicly listed company located in Australia, and its subsidiary Cleveland Iron Holdings Pty Ltd ("Iron Holdings").  PPCO and Platinum Long Term Growth VII LLC were owed approximately $15.6 million, which was secured by a first priority security interest in all assets of Cleveland Mining and Iron Holdings.  PPCO also held approximately 29.3 million shares of Cleveland Mining and approximately 50% of the equity of Iron Holdings.  Cleveland Mining has a 50% joint venture interest in a gold mine located in Brazil, which is currently not operating and is the subject of litigation in Brazil.

Cleveland Mining was placed into a liquidation proceeding in Australia and PPCO filed a proof of debt form to register its claim and has been working with the Australian liquidators and the Receiver's local counsel regarding a sale of the publicly listed corporate shell and an

allocation of the proceeds between the liquidators and PPCO.  The liquidators previously had a purchaser for the shell company, but the buyer was unable to close the transaction and lost its deposit.  Since the default by the purchaser, the liquidators have negotiated an amended plan, pursuant to which the purchaser, together with certain other individuals, have agreed to purchase the shell company and PPCO will receive a portion of the purchase price in consideration for releasing its liens.  The amended plan was approved by the creditors and the transaction closed following the Twelfth Application Period and will be reported on in the next status report.

During the Twelfth Application Period, Applicants were in frequent communication with local counsel in Australia regarding the status and logistics of the closing.  This matter was handled by an Otterbourg attorney with transactional experience.  The overall time billed by this attorney was less than fifteen (15) hours in the aggregate and, therefore, the time of this attorney was written off by Applicants in accordance with Applicants' customary practice in this case.

2.      **Cokal Limited** (ASX: "CKA") – refers to a coal mining company headquartered in Sydney, NSW.  CKA's active mining project is on the island of Borneo in the Bumi Barito Mineral ("BBM") of Indonesia.  PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, options, and a Note).  As a result of a Debt Restructuring Transaction agreed to by prior management, the Note was restructured into new options and a royalty from revenues of BBM.   During the first quarter of 2020, the Receiver entered into an agreement for the sale of PPCO's royalty interest.   During the Twelfth Application Period, the sale closed and PPCO received the sale proceeds.

During the Twelfth Application Period, Applicants finalized the relevant sale documents and worked to close of the sale.  This matter was handled by Otterbourg attorneys with transactional experience.

3.      **Decision Diagnostics** – refers to Decision Diagnostics Corp. ("Decision Diagnostics"), a company that describes itself on its website as "a leading manufacturer of low cost home testing devices and test strips for use with legacy meters."  Earlier this year, Decision Diagnostics announced that it would be developing a COVID-19 test.

Alpha Credit Resources LLC ("Alpha Credit"), a wholly-owned subsidiary of PPCO, holds certain common and preferred shares in Decision Diagnostics.  According to certain of Decision Diagnostics' financial statements, Decision Diagnostics has purported to cancel some or all of Alpha Credit's shares in Decision Diagnostics.  Decision Diagnostics has also refused to remove a restrictive legend from Alpha Credit's shares in Decision Diagnostics and to convert Alpha Credit's preferred shares in Decision Diagnostics into common shares.  The Receiver believes that Decision Diagnostics' actions in purporting to cancel, refusing to remove the restrictive legend from, and refusing to convert Alpha Credit's shares are unjustified.  .

During the Twelfth Application Period, Applicants spent considerable time reviewing the underlying stock documents, making demand upon Decision Diagnostics to convert PPCO's preferred stock, reinstate the cancelled shares and to remove any and all restrictions to trading the shares.  Applicants also analyzed, researched and formulated a litigation strategy if an amicable resolution cannot be reached.  Otterbourg attorneys who have billed time to this matter include attorneys with litigation and transactional experience.

4.      **Greehey** – refers to a $3.23 million secured loan (the "Loan") made by a wholly owned subsidiary of PPCO, Bakken Development Opportunities, I, LLC ("Bakken"), to Greehey & Company, Ltd. ("Greehey") and Dynamic Resources LLC ("Dynamic," and together with Greehey, "Defendants").  The Loan was secured by certain real property located in Telluride, Colorado and certain oil and gas leases located in North Dakota.  The Loan matured on August

31, 2017.  Despite repeated requests by the Receiver, the Defendants failed to pay the amounts outstanding under the Loan and on August 1, 2019, the Receiver commenced a lawsuit against Greehey and Dynamic (the "<u>Greehey Litigation</u>") seeking entry of a judgment holding Defendants in default on an immediate payment obligation to Bakken, in addition to associated interest, costs and expenses, including reasonable attorneys' fees and costs.  The Defendants asserted substantial counterclaims against Bakken for breach of the Loan, including failure to provide additional funding.  The Receiver responded to the counterclaims and discovery was ongoing during the Interim Application Period.  Towards the end of the discovery process, the parties agreed to seek to resolve the Greehey Litigation through mediation.  A one-day mediation session occurred on June 11, 2020 and as a result of such mediation a consensual resolution was reached, releases were exchanged and the Greehey Action was dismissed.

During the Twelfth Application Period, Applicants continued with discovery in the action prior to the agreement to mediate the issues.  Applicants reviewed the documents in the Platinum database for relevance and privilege in connection with a supplemental production.  Applicants also researched issues relevant to the Receiver's affirmative claims and defenses to the asserted counterclaims.  In connection with the mediation, Applicants prepared a mediation statement, researched additional issued relevant to the issues being mediated and prepared for and attended the mediation session.  Otterbourg attorneys who have billed time to this matter include attorneys with experience in litigation.

### B.    <u>Case Administration (P04)</u> - Total Fees:  <u>$296,275.50</u>

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the

Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.  The tasks recorded under this category include the following:

1.       **Investor Communications.**  During the Twelfth Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver and the Receivership Team have responded to investor inquiries and continue to regularly respond and react to inquiries and requests for information.  Applicants also prepared the Eleventh Status Report of the Receiver during the Twelfth Application Period.

2.       **SEC Meetings**.  Applicants communicated as warranted with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.  Applicants also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

3.       **PPVA**.  Since the Receiver's appointment, she and the Receivership Team have kept in frequent communication with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest, including jointly held assets, the Beechwood Action, a related Chapter 15 bankruptcy proceeding and additional claims that may be jointly held.  One of the assets in which both PPVA and PPCO have an interest is Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera").  Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC.

23

Pursuant to their respective interests in PGS, both PPVA and PPCO agreed to pursue certain claims and causes of action relating to PGS's ownership of a certain promissory note convertible into 95% of the common equity of energy reseller Agera Energy (the "Agera Claims").[10]   In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, SHIP and CNO (the "Agera Action").

PPVA and PPCO have each asserted claims against the estate of the other stemming from pre-Receivership transactions.  The Receiver and the joint liquidators previously agreed to hold the resolution of such purported claims in abeyance during the cases.  During the Twelfth Application Period, in connection with efforts to wind-down the case, the Receiver engaged in discussions with the joint liquidators of PPVA regarding a resolution of such purported claims and any remaining mutual interests, such as the Agera Action.  Such discussions continued throughout the Twelfth Application Period.

4.   **Distribution Plan**.  During the Twelfth Application Period, Applicants turned their attention to formulating a proposed plan of distribution.  In connection with such efforts, Applicants researched issues related to the treatment of various claims, methodologies for distribution and potential consolidation of entities.  Applicants analyzed these issues in the context of the claims asserted against the Receivership Estate.  Applicants prepared memoranda for the Receiver and the Receivership Team to outline the issues for consideration.  Applicants also spoke with Cayman counsel to discuss issues relevant to Cayman law.

5.   **Receiver Oversight**.  Time during the Twelfth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate.

---

[10]   On October 4, 2019, Agera Energy LLC and certain of its affiliates, none of which are parties to the Agera Action, filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-23803.

Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.   The Receivership Team meets with the Receiver regularly to discuss ongoing asset disposition, litigation, claims and other administrative matters, and prepared agendas and reviewed assets for discussion in advance of the meetings.   The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues.

### C.      Claim Review (P05) – Total Fees:  $36,364.50

In connection with the formulation of a plan of distribution, Applicants began to review the filed claims to perform analyses that will be relevant to the ultimate distribution methodology to be employed.  Applicants also reviewed the claims, including an analysis of insider claims, for potential objection or subordination. Also included in this time is the discussions with the PPVA regarding the resolution of claims and interests between the two estates.

### D.      Forensic/Investigatory Work (P10) - Total Fees:  $51,957.00

During the Twelfth Application Period, Applicants continued to analyze whether any additional causes of action against other parties should be asserted and/or if actions should be taken in connection with asserted claims against the Receivership Estate.   Included in this analysis was an analysis of any pending statutes of limitation and the status of tolling agreements.

### E.      Beechwood Action (P14) – Total Fees: $476,940.00

On December 19, 2018, the Receiver commenced the Beechwood Action in the District Court against (i) certain so-called Beechwood entities, (ii) Senior Health Insurance Company of

Pennsylvania ("SHIP"), (iii) Fuzion Analytics, Inc. ("Fuzion"), (iv) CNO Financial Group, Inc. ("CNO"), (v) Bankers Conseco Life Insurance Company ("BCLIC"), (vi) Washington National Insurance Company ("WNIC") and (vii) 40|86 Advisors, Inc ("40/86").  The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood Re Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the District Court.  On March 29, 2019, the Receiver filed an amended complaint.

Each of the defendants in the Beechwood Action filed motions to dismiss the Amended Complaint.  The hearing on the motions to dismiss took place on August 15, 2019.  On October 7, 2019, Judge Rakoff issued an Opinion and Order, which, while dismissing many of the Receiver's causes of action for monetary damages, sustained her causes of action to set aside the liens, as well as the Receiver's causes of action for aiding and abetting breach of fiduciary duty, and unjust enrichment against certain of the defendants.  The Receiver filed a motion for partial summary judgment against one of the defendants, and responded to motions for summary judgment filed by the other defendants in the Beechwood Action.  The Receiver's professionals prepared to present oral argument on these motions on April 7, 2020; however, settlements in principle were reached on the eve of argument, and, accordingly, argument was only heard by the Court on the one motion not covered by those settlements.  By Memorandum and Opinion dated April 15, 2020, the Court granted that defendant's motion for summary judgment.

During the Interim Application Period, the Receiver completed the negotiation of the settlements and on July 1, 2020 entered into two settlement agreements:

1.  A settlement agreement with (i) CNO, BCLIC, WNIC, 40|86 Advisors (collectively with CNO, BCLIC and WNIC, the "CNO Defendants") and (ii) BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BRe BCLIC Primary and BRe BCLIC

Sub, as represented by Wilmington Trust, N.A., in its capacity as their former custodian (collectively with the CNO Defendants, the "CNO Parties"); and

2. A settlement agreement with SHIP and Fuzion (together with SHIP, the "SHIP Parties").

Also on July 1, 2020, the Receiver filed a motion with the Court requesting approval of the settlement agreements (the "Beechwood Settlement Motion"). No objections to the Settlement Motion were received and an Order approving the Beechwood Settlement Motion was entered by the Court today, July 20, 2020 [Dkt. No. 538].

As set forth in more detail in the Beechwood Settlement Motion, one of the primary obstacles to the successful completion of the receivership and formulation of a plan of liquidation and distribution was more than $79 million (principal amount) of debt (the "Secured Debt") allegedly owed by PPCO, guaranteed by certain of its subsidiaries and secured by all of PPCO's and its subsidiaries' assets, to a group of secured noteholders (the "Noteholders") for which BAM Administrative Services, LLC ("BAM Admin") is agent.

As a result of the settlements, PPCO and more than sixty subsidiaries of PPCO received, among other consideration, satisfaction of more than $44 million of the Secured Debt (principal amount) owned by SHIP, BCLIC, WNIC and Beechwood Bermuda International Ltd. ("BBIL"), and extinguishment of a total of 38 proofs of claim filed by BCLIC, WNIC, SHIP and Fuzion in the receivership in exchange for, among other consideration, a total payment of $14 million ($4.5 million of which was paid into escrow and will be used, if needed, to indemnify PPCO for claims based on alleged Secured Debt of three other Noteholders, which Noteholders failed to file their own proofs of claim), and dismissal of the Receiver's claims against the settling defendants and certain other parties.

27

The Receivership Entities have also exchanged general releases with the CNO Parties and the SHIP Parties, BBIL, its parent Beechwood Bermuda Ltd., their affiliate, Beechwood Re Limited and certain other Beechwood Parties, other than BAM Admin in its capacity as "Agent" for the Noteholders (subject to certain exceptions described in the Motion).

SHIP, BCLIC, WNIC, BBIL and BAM Admin will also permit the release of more than $6.3 million currently being held in an escrow account containing the proceeds of the sale of certain life insurance policies previously owned by indirect PPCO subsidiaries ALS Capital Ventures LLC and ALS Life Holdings LLC enabling the Receiver to use and/or distribute those funds as described in the Beechwood Settlement Motion.

As set forth in the Beechwood Settlement Motion, one of the driving forces behind the settlement was the Receiver's recognition that if she were unsuccessful in avoiding the secured claims of the Noteholders in the Beechwood Action, then all of the assets of the Receivership Estate, which are worth less than the $44 million of outstanding principal amount of the Secured Debt owned by those creditors, would be the collateral of the Secured Debt holders, leaving nothing for unsecured creditors and investors.

Further information regarding the Beechwood Action and Beechwood Settlement Motion can be found on the Receiver's website, www.PlatinumReceivership.com.

During the Twelfth Application Period, Applicants initially spent time preparing for oral argument prior to reaching a settlement.  Simultaneously with preparing for continued litigation, Applicants had several calls with counsel for the various defendants regarding the terms of the settlement. Applicants drafted the settlement papers, which took extensive time because of the number of parties and liens at issue.  This also required an extensive analysis of the liens and the

lienholders to determine what was being released by each of the settling defendants.   The agreements were then shared with the defendants and further negotiated and redrafted.

       **F.**     **<u>Arbitration</u> (P15) – Total Fees <u>$8,645.00</u>**

During the Twelfth Application Period, time was spent by the attorney working on the case to issues relevant to the dismissal of the Arbitration.

## V.     EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $24,110.58. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Twelfth Application Period:

       (a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants normally seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  However, no photocopy or laser printing expenses were incurred by Applicants during the Twelfth Application Period.

       (b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Twelfth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)      With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)      In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)      In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did not incur any travel or transportation expenses during the Twelfth Application Period.

(f)      In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)      The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.    FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).  "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480).  However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or

prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485.  Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.  Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted.  Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities.  The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds.  Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

## VII.   HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Twelfth Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time

with respect to those two project codes (collectively, the "<u>Holdback Amount</u>").  Accordingly, the total Holdback Amount for this Tenth Interim Fee Application if the requested fees are approved is $135,902.25 ($13,818.62 for the Receiver and $122,083.63 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     grant interim approval of the Receiver's compensation in the amount of $93,928.00 (the "<u>Allowed Receiver Fees</u>");

(b)     grant interim approval of Otterbourg's compensation in the amount of $852,788.69 (the "<u>Allowed Otterbourg Fees</u>" and, together with the Allowed Receiver Fees, the "<u>Allowed Fees</u>");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $200.10;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $18,060.02;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     grant such other relief as the Court deems appropriate.

Dated: October 8, 2020

Otterbourg P.C.

By: *Adam C. Silverstein*
        Adam C. Silverstein
        Jennifer S. Feeney
        Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver,
and Otterbourg P.C., as Counsel to the Receiver