UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

   -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

              Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**THIRTEENTH JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
JULY 1, 2020 THROUGH AND INCLUDING SEPTEMBER 30, 2020**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Thirteenth Joint Interim Application (the "Thirteenth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from July 1, 2020 through and including September 30, 2020 (the "Thirteenth Application Period"). There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $45,292.40 and reimbursement of expenses in the amount of $71.25 for the Thirteenth Application Period. Otterbourg requests interim approval of fees in the amount of $625,515.75 and reimbursement of expenses in the amount of $18,280.00 for the Thirteenth Application Period, for a combined total of fees for Applicants in the amount of $670,808.15,[1] and expenses in the amount of $18,351.25 for the Thirteenth Application Period.

This Thirteenth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Thirteenth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Thirteenth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1] As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to the Beechwood Action and the Arbitration (defined below), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Thirteenth Application Period, the Receiver's recorded time charges before application of these accommodations were $75,218.00 and Otterbourg's recorded time charges were $715,874.50, for a combined gross legal fees total (before the application of any accommodations) of $791,092.50.

6383156.1

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Thirteenth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.        PRELIMINARY STATEMENT

During the Thirteenth Application Period, the Receiver and her team[2] focused on (i) finalizing and effectuating the terms of the settlement reached with respect to the litigation commenced by the Receiver in the United States District Court for the Southern District of New York (the "District Court") against various defendants seeking to avoid certain liens that would adversely impact potential distributions to investors and creditors (the "Beechwood Action") and attending to other remaining matters related to the Beechwood Action, including preparation of a notice of appeal and other papers relating to an appeal from the dismissal of certain claims in the Beechwood Action that were not settled; (ii) analyzing claims against the estate and those the estate may have against others, while preparing an application for the approval of procedures to reconcile and verify claims and interests; (iii) analyzing issues relevant to the formulation of a plan of distribution and beginning to prepare such plan of distribution; (iv) drafting an agreement to resolve inter-estate claims between the Receivership Entities and the joint liquidators for

---

[2]        To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin Associates LLC as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"); and (v) finalizing the review of the remaining assets in the portfolio and beginning the marketing of the few remaining assets that may be sold in a remnant sale or by other means.

As previously reported, certain of the settlements that the Receiver reached during the course of the Receivership are confidential.  To preserve the confidentiality of these settlements, the Receiver previously advised that she would not and will not be disclosing details of *any* settlements, including the identity of the settling parties, the amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and/or the source of any litigation-related funds received in any reporting period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

A.      **Analysis and Disposition of Receivership Assets**

During the Thirteenth Application Period, the Platinum Receivership received approximately $6.6 million.  This amount is in addition to the approximately $79.7 million received by the Platinum Receivership from the liquidation of various assets from the date of appointment of the Receiver.  Certain parties have asserted a claim to all or part of the proceeds of such liquidated investments.

The review of the non-litigation assets in the Receivership's asset portfolio is substantially complete.  The assets that the Receiver believes could be liquidated have been and a bucket of remnant assets for which there may be some limited value have been marketed and are subject to final sales agreements.  There is currently one asset, Decision Diagnostics, which the Receiver believes has potential value.  As such, during the Thirteenth Application Period, the Receiver's team explored options for this asset.  There are a few shared assets with PPVA that

may potentially realize value and the Receiver continues to monitor such assets and communicate with the PPVA joint liquidators.

A description of the investments in which Applicants dedicated significant time during the Thirteenth Application Period and the work done with respect to those investments is set forth in Section IV of this Thirteenth Interim Application.

### B.    Administrative Matters

During the Thirteenth Application Period, the Receiver and the Receivership Team continued to speak with various interested parties and groups, including the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"),[3] the SEC and Platinum investors. The Receiver has updated the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.  The website also includes links to the Beechwood Action docket.  The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum, such as the personal bankruptcy of Mark Nordlicht.

## II.    CASE BACKGROUND AND STATUS

### A.    Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Mark Nordlicht ("Nordlicht"),[4] David Levy ("Levy"), Daniel Small, Uri Landesman,[5] Joseph Mann, Joseph San

---

[3]     PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

[4]     Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York.  Case No. 20-22782-rdd.  The Receiver is currently monitoring the bankruptcy case.

[5]     Uri Landesman passed away in September 2018.

Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems. This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO. The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants. Following the criminal trial of Mark Nordlicht, David Levy and Joseph SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges. SanFilippo was acquitted on all counts with which he was charged. The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht. The Department of Justice has appealed those decisions, and in the interim, two additional criminal trials have been delayed.

6383156.1

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a

responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

### B.    Case Status[6]

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)    As of September 30, 2020, the Receivership Entities had approximately $24.8 million in funds.  Certain parties have claimed an interest in certain sold assets and have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Estate).  Other parties have presented documentation which purportedly grant them security interests in all or certain of Platinum's assets.  These secured claims were challenged and have been substantially resolved pursuant to settlements in the Beechwood Action.

It is estimated that, as of September 30, 2020, accrued and unpaid administrative expenses amount to approximately $5.3 million.  This amount includes the estimate of fees and expenses that have been incurred by the Receiver, Otterbourg and Goldin during the Thirteenth Application Period, holdbacks for prior applications of the Receiver, Otterbourg and Goldin, holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application and fees and expenses of other professionals retained by the Receiver or the Prior Receiver.  In addition to these unpaid administrative expenses, the Receivership Estate paid remaining in-house Platinum staff and other operating expenses during the Thirteenth Application Period.

(b)    Cash disbursements during the Thirteenth Application Period totaled approximately $18.2 million.  This amount consisted primarily of (i) $14,00,000 to settle the Beechwood Action and obtain a release of liens, (ii) $3,874,754 paid to the minority

---

[6]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period April 1, 2020 through June 30,, 2020.

shareholders of ALS, (iii) $75,271 in professional expenses, and (iv) $293,146 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent).

Cash receipts during the Thirteenth Application Period totaled approximately $6.6 million. This amount primarily consists of the release of funds from the ALS Escrow pursuant to the Beechwood settlements.

Pursuant to the previously-approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019. In total, 327 claims were filed prior to the applicable bar date. Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities. Parties holding investor claims, claims for unpaid redemptions and administrative claims were not required to file proofs of claim.

During the Thirteenth Application Period, Platinum's CFO and the Receivership Team began an extensive review of each of the asserted claims. The Receiver will likely be objecting to certain of the filed and/or deemed filed claims in whole or in part. To facilitate the objection process, the Receiver filed a motion seeking to implement procedures for the reconciliation of claims and the verification of the investment and withdrawal amounts with respect to the interests held by investors (the "Claims Procedures Motion"). The Court entered an Order approving the Claims Procedures Motion on December 1, 2020 [Dkt. No. 554]. Subject to her soon-to-be completed review of filed claims, the Receiver will be filing a notice of her determinations with respect to each of the claims and claimants will have an opportunity to respond, if necessary in accordance with the procedures provided for by the Claims Procedures Order.

6383156.1

By the Claims Procedures Motion the Receiver only sought the Court's approval of the Receiver's proposed procedures for finalizing the reconciliation and verification of claims and interests and did not seek approval of the validity, amount, classification, or distribution methodology on account of any claims against, or interests in, any of the Receivership Entities. Rather, the Receiver will be filing a separate motion with the Court to approve a plan for making distributions to claimants and investors, including, but not limited to, the classification of claims and interests, and the distribution methodology she will seek to employ.

The Receiver cannot at this time state what distributions will ultimately be to creditors and investors. The Receiver and the Receivership Team have been working diligently to analyze the claims that have been asserted and consider the structure of a plan of distribution, classification of claims and interests, and distribution methodology. The formulation of the plan is ongoing.

As of September 30, 2020, the primary assets of the Receivership Estate ("Receivership Property") consisted of the following:

     (i)     Cash and cash equivalents of approximately $24.8 million;

     (ii)     Remaining stock and royalty interests, litigation financing, loan receivables and other miscellaneous investments; and

     (iii)     Potential litigation claims.

(c)     As set forth above, to preserve the confidentiality of certain settlements that the Receiver has reached, the Receiver will not disclose details of any settlements, including the identity of the settling parties, amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and the source of any litigation-related funds received in any interim application period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise. The

6383156.1

Receiver and the Receivership Team have analyzed other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis, warrant the commencement of litigation.  The Receiver has concluded that no such additional litigation is warranted.  Where mutual releases are warranted, the Receiver has sought and will seek such releases.  The Receiver, however, continues to evaluate the claims of insiders of the Platinum Entities and has begun preliminary conversations with certain of the insiders regarding their claims.  In addition, the Receiver is considering an additional litigation related to her efforts to recover on a specific asset (Decision Diagnostics).

### III.    FEES AND EXPENSES REQUESTED

In connection with the Thirteenth Application Period, the Receiver requests interim approval of her fees in the amount of $45,292.40 and reimbursement of expenses in the amount of $71.25.  Otterbourg requests interim approval of fees in the amount of $625,515.75 and reimbursement of expenses in the amount of $18,280.00.  Thus, the combined total of fees for Applicants of $670,808.15, plus expenses of $18,351.25, is $689,159.40.

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below.

6383156.1

The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action and the Arbitration, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment.  (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $75,218.00 to $45,292.40, a reduction in the amount of $29,925.60.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $715,874.50 to $625,515.75, a reduction in the amount of $90,358.75.  Therefore, the total reduction for legal fees incurred during the Thirteenth Application Period by the Receiver and Otterbourg professionals is $120,284.35.

6383156.1

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.    There was no travel time during the Thirteenth Application Period.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the professionals' time detail to the SEC for its review.

This Thirteenth Interim Application includes certain exhibits:

(a)     The SFAR for the period of July 1, 2020 through September 30, 2020 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Thirteenth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Thirteenth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

6383156.1

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Thirteenth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Thirteenth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Thirteenth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Nine attorneys and one paraprofessional billed time during the Thirteenth Application Period (in addition to the Receiver).[7]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition,

---

[7]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Thirteenth Application Period.

6383156.1

while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Thirteenth Application Period and their specific roles were as follows:

(a)    Adam C. Silverstein (Partner) (17.1 Hours to P01; 8.3 Hours to P02; 17.7 Hours to P04; 1.4 Hours to P05; 24.6 Hours to P14) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services and the forensics investigation.  During the Thirteenth Application Period, Mr. Silverstein dedicated time to implementation of the Beechwood settlements and remaining open issues regarding the Beechwood Action.  Mr. Silverstein also spent time analyzing issues relating to potential litigation options on certain remaining assets, as well as issues relating to settlement discussions with PPVA.  Mr. Silverstein has also been one of the point persons regarding communications with the SEC.

(b)    William Moran (Partner) (57.3 Hours to P01; 7.9 Hours to P04; 11.6 Hours to P10;   3.5 Hours to P14) – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.   During the Thirteenth Application Period, Mr. Moran assisted with numerous litigation matters, including the post-settlement issues stemming from the Beechwood Action and formulating a litigation strategy with respect to the Receivership's ownership of certain securities.  Mr. Moran also assisted with the review and analysis of potential additional claims that can be asserted by the Receiver against third parties and insiders.

(c)    Philip Berg (Partner) (4.6 Hours to P01; 17.6 Hours to P02; .3 Hours to P04) – Mr. Berg is a partner in the firm's corporate department and specializes in negotiation and

documentation of asset sales and other transactions.  During the Thirteenth Application Period, Mr. Berg attended to certain post-closing issues regarding the sale of the Cokal royalty and assisted with the preparation of the securities purchase agreement for the sale of the Receivership's interests in NJ Ethanol.  Mr. Berg also assisted Goldin with the preparation of the materials relevant to the remnant sale offering, including a review of the underlying documents of certain of the assets, the descriptions of the assets and the preparation of a non-disclosure agreement.

(d)     <u>Jennifer S. Feeney (Of Counsel) (7.5 Hours to P01; 11.9 Hours to P02; 96.5 Hours to P04; 40.3 Hours to P05; 1.3 Hours to P10)</u> – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Thirteenth Application Period, Ms. Feeney attended to case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Ms. Feeney also dedicated significant time to the Claims Procedures Motion, review of claims and issues relevant to the formulation of a plan of distribution.  Additionally, Ms. Feeney, along with Erik B. Weinick, reviewed applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(e)     <u>Erik B. Weinick (Of Counsel) (15.5 Hours to P01; 7.8 Hours to P02; 111.0 Hours to P04; 36.1 Hours to P05; 2.2 Hours to P10;  25.7 Hours to P14)</u> – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating the work of the Receiver's professionals and Platinum's remaining in-house employees on almost every matter confronting the Receivership from asset dispositions, to litigation matters, and administrative matters, including responding to

16

investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest.  Mr. Weinick was also the attorney primarily responsible for litigation of the Beechwood Action and is now working on the claims review process and the formulation of a plan of distribution.

(f)     Andrew S. Halpern (Associate) (91.8 Hours to P01; 23.7 Hours to P04; .8 Hours to P05; 6.0 Hours to P10; 91.7 Hours to P14) – Mr. Halpern is an experienced litigator, particularly in the areas of claims of professional malpractice and fraudulent conveyance and forensic analysis.  During the Thirteenth Application Period, Mr. Halpern helped prepare the notice of appeal and other papers relating to the appeal from the dismissal of certain claims in the Beechwood Action that were not settled.  Mr. Halpern also lent his litigation expertise to the Decision Diagnostics matter.  Mr. Halpern also assisted with the drafting of as settlement agreement to resolve open issues with the PPVA joint liquidators.

(g)     Gabriela S. Leon (Associate) (25.5 Hours to P01; 5.4 Hours to P10; 9.4 Hours to P14) – Ms. Leon is a junior associate in the litigation department.  Ms. Leon primarily assisted with the post-settlement issues related to the Beechwood Action, including the preparation of the notice of appeal and related documents.  In the Decision Diagnostics matter, Ms. Leon was the primary associate responsible for document review and research at a considerably lower billing rate.

(h)     Robert Yan (Associate) (24.1 Hours to P04;) – Mr. Yan is an associate in the bankruptcy department.  Mr. Yan has significant experience with formulations of plans and, accordingly, during the Thirteenth Application Period, assisted with the preparation of a plan of distribution and motion for approval of such plan.

(i)    Michael Pantzer (Associate) (2.1 Hours to P02; 34.9 Hours to P04; 100.3 Hours to P05) – Mr. Pantzer is a junior associate in the bankruptcy department.  Mr. Pantzer, at a lower billing rate, assisted with a variety of research issues related to the plan of distribution and claims reconciliation process.  Mr. Pantzer was also primarily responsible for the preparation of the Claims Procedures Motion.

(j)    Jessica Hildebrandt (Paralegal) (12.7 Hours to P01; 27.3 Hours to P04; 14.7 Hours to P14) – Ms. Hildebrandt is a paralegal and has assisted the Otterbourg attorneys with certain document review and helped prepare the Otterbourg attorneys for various hearings, depositions and court filings.

## IV.    SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING THIRTEENTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Thirteenth Application Period into six (6) project categories.[8]  Narrative summaries of these activity categories follow:

### A.    Asset Analysis and Recovery (P01) - Total Fees: $177,122.50
### Asset Disposition (P02)[9] - Total Fees:  $49,094.50

During the Thirteenth Application Period, Applicants continued to analyze the remaining assets in Platinum's portfolio, including in-person and telephonic meetings with her team of professionals and staff, as well as, in some instances, other investors in the underlying asset, including counsel to PPVA.  Also included in the time billed during the Thirteenth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the asset and make a decision, and regular

---

[8]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[9]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

meetings with the Receiver and the Receivership Team to update the Receiver on activities with respect to each investment and other current tasks of the Receivership.

To keep the Receiver and the Receivership Team apprised of all activities with respect to each investment, cash activity, and other matters on which the Receivership Team was working, the Receiver scheduled regular team meetings with the Receivership Team. During the Thirteenth Application Period, Applicants also reviewed the remaining assets in the portfolio and worked with Goldin to determine the assets that should be included in a remnant asset sale or abandoned.

Below is an overview of certain of the investments in which Applicants have dedicated time during the Thirteenth Application Period.  The below summaries include a brief description of the nature of the investment, work performed, and status.

1.    **Cokal Limited** (ASX: "CKA") – refers to a coal mining company headquartered in Sydney, NSW.  CKA's active mining project, the Bumi Barito Mineral ("BBM"), is on the island of Borneo in Indonesia.  PPCO originally held common stock, warrants, and a Note in CKA (PPVA also owned common stock, options and a Note).  As a result of a Debt Restructuring Transaction agreed to by prior management, the Note was restructured into new options and a royalty from revenues of BBM.  During the last quarter, the Receiver sold PPCO's royalty interest.  During the Thirteenth Application Period, the Receivership Team attended to certain post-closing items.  This matter was handled by Otterbourg attorneys with transactional experience.

2.    **Decision Diagnostics** – refers to Decision Diagnostics Corp. ("Decision Diagnostics"), a company that describes itself on its website as "a leading manufacturer of low cost home testing devices and test strips for use with legacy meters."  Despite that description,

Decision Diagnostics announced in March that it had developed a COVID-19 test, causing its publicly-traded stock to jump in price and the Securities and Exchange Commission to institute a suspension in trading.

Alpha Credit Resources LLC ("Alpha Credit"), a wholly-owned subsidiary of PPCO, holds certain common and preferred shares, convertible into common shares, in Decision Diagnostics.  According to certain of Decision Diagnostics' financial statements, Decision Diagnostics purported to cancel certain of Alpha Credit's shares in Decision Diagnostics. Decision Diagnostics has also taken active steps to prevent the Receiver from liquidating Alpha Credit's shares, by, among other things, refusing to remove a restrictive legend from Alpha Credit's shares in Decision Diagnostics and to convert Alpha Credit's preferred shares in Decision Diagnostics into common shares.  The Receiver believes that Decision Diagnostics' actions in purporting to cancel, refusing to remove the restrictive legend from, and refusing to convert Alpha Credit's shares are unjustified, constitute a contempt of the Receiver Order and violate applicable law.

During the Third Application Period, the Receiver reiterated her demand on Decision Diagnostics to restore, recognize and convert, as applicable, Alpha Credit's shares.  Decision Diagnostics continued to refuse the demand and the Receiver directed the Receivership Team to take appropriate steps to enforce the Receivership's rights.  Consequently, during the Third Application Period, the Receivership Team analyzed the Receiver's options to enforce her rights in this asset.  Otterbourg attorneys who have billed time to this matter primarily included attorneys with litigation experience.

3. **NJ Ethanol LLC** – refers to a company that built a small-scale plant in New Jersey to convert food waste into food- and pharmaceutical-grade ethanol.  The business failed

20

and the plant was closed.  PPCO owned common and Class B preferred stock.  These shares had limited marketability outside of a sale back to the company.  Prior discussion to sell the shares never materialized into a firm offer and the Receiver continued to hold the shares with the intent to include them in the remnant sale if no offers were received.  During the Third Application Period, however, the Receiver sold Platinum's interests in NJ Ethanol on an "as is" basis to the company's principal for $10,000.

During the Third Application Period, Otterbourg attorneys prepared the Securities Purchase Agreement to document the sale.  Otterbourg attorneys who have billed time to this matter include attorneys with transactional experience.

4. **Remnant Sale**.  In August, after having reviewed the remaining assets in the portfolio, the Receiver sent out marketing materials for the sale of nine (9) remaining assets for which no market developed during the course of the Receivership.  The assets include:  (i) warrants in Bang Holdings Corporation; (ii) stock in Echo Therapeutics, Inc.; (iii) limited partner interests in Grey K Environmental Fund II LP; (iv) stock in MMP Resources Limited; (v) participation interest in a loan to Nico Steel Holdings Limited that is collateralized by stock in the company; (vi) stock in Nordaq Energy; (vii) an assignment of proceeds of a loan in the Pro Players loan portfolio; (vii) stock in Star Phoenix Group Ltd.; and (viii) rights to a litigation funding loan made to Total Asset Recovery Services, LLC that is dependent upon the outcome of the litigation.

The marketing materials were provided to nine (9) companies that are known to purchase "remnant" assets and a data room was established.  Further details regarding the outcome of the sale will be in the Receiver's next report.

6383156.1

During the Third Application Period, Applicants assisted with analyzing the assets that should be included in the remnant sale and helping to prepare the marketing materials for the sale of the assets.  In connection with this process, Applicants reviewed the underlying documents for the assets being sold, reviewed the "teaser" that was sent to interested parties and prepared a form non-disclosure agreement for any party interested in reviewing the documents in the data room.   Otterbourg attorneys who have billed time to this matter include attorneys with transactional experience.

        **B.**      <u>**Case Administration (P04)**</u> **- Total Fees:**  <u>**$290,467.50**</u>

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including communications with investors, preparing motions relating to the administration of the Receivership Estate, addressing internal business and administrative issues at Platinum and litigation relating to current or prior assets in the Receivership portfolio.   The tasks recorded under this category include the following:

        1.      **PPVA**.    Since the Receiver's appointment, she and the Receivership Team have kept in frequent communication with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest.   One of the assets in which both PPVA and PPCO have an interest is Agera Energy LLC and Agera Holdings, LLC (collectively, "<u>Agera</u>").   Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("<u>PGS</u>"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC. Pursuant to their respective interests in PGS, both PPVA and PPCO agreed that PGS would pursue certain claims and causes of action relating to its

ownership of a certain promissory note convertible into 95% of the common equity of Agera's subsidiary, energy reseller Agera Energy.[10]  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, SHIP and CNO (the "Agera Action").

PPVA and PPCO have each analyzed and discussed potential claims against the estate of the other stemming from pre-Receivership transactions.  The Receiver and the joint liquidators previously agreed to hold the resolution of any such purported claims in abeyance during the cases.  During the Thirteenth Application Period, in connection with efforts to wind-down the case, the Receiver engaged in discussions with the joint liquidators of PPVA regarding a resolution of such purported claims and any remaining mutual interests, such as the Agera Action.  During the Thirteenth Application Period, Applicants spent time drafting a proposed settlement agreement to resolve all issues between the PPVA and Receivership estates, including claims with respect to PGS, the settlement of which the Receiver believes is in the best interest of the Receivership Estate as it will avoid additional litigation.

2.  **Plan of Distribution**.  During the Thirteenth Application Period, Applicants continued to work on formulating a proposed plan of distribution.  In connection with such efforts, Applicants continued to review and analyze issues related to the treatment of various claims, methodologies for distribution and potential consolidation of entities.  This involved reviewing the claims and reviewing the implementation of different methodologies, the review of plans in other receivership cases and consideration of issues relevant to Cayman law. Applicants prepared memoranda for the Receiver and the Receivership Team to outline the issues for consideration and continued to refine such analyses.

---

[10]     On October 4, 2019, Agera Energy LLC and certain of its affiliates, none of which are parties to the Agera Action, filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-23803.

3.      **Nordlicht Bankruptcy Case**.  Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York. Case No. 20-22782-rdd.  The Receiver has been monitoring the bankruptcy case and has been in communication with counsel for the Chapter 7 Trustee and counsel for Nordlicht.    During the Thirteenth Application Period, Applicants monitored the proceedings, including preparing for and attending the 341 meeting of creditors and reviewing relevant court documents.  Applicants also spoke with the Chapter 7 Trustee regarding a resolution of claims asserted by Nordlicht in the Receivership Estate and potential claims against the Nordlicht bankruptcy estate.  Subsequent to the Thirteenth Application Period, Applicants filed a proof of claim in the Nordlicht bankruptcy proceeding.

4.      **Website and Investor Communications.**  During the Thirteenth Application Period, Applicants continued to revise and update the Receiver's website (PlatinumReceivership.com), which provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver and the Receivership Team have responded to investor inquiries and continue to regularly respond and react to inquiries and requests for information.  Applicants also prepared the Twelfth Status Report of the Receiver during the Thirteenth Application Period.

5.      **SEC Meetings**.  Applicants communicated as warranted with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.   Applicants also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

6.      **Receiver Oversight**.  Time during the Thirteenth Application Period was also devoted to the general oversight of the Platinum Entities and the Receivership Estate.

6383156.1

Conferences with the Receiver and members of the Receivership Team occurred on a daily basis to facilitate the exchange of relevant information and to avoid duplication of effort.   The Receivership Team meets with the Receiver regularly to discuss ongoing asset disposition, litigation, claims and other administrative matters, and prepared agendas and reviewed items for discussion in advance of the meetings.   The Receiver maintained direct oversight over all the legal and financially-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from internal management and Goldin, in analyzing budget, cash management and tax issues.

### C.    Claim Review (P05) – Total Fees:  $123,148.50

During the Third Application Period, Applicants prepared the Claims Procedures Motion, which is an important step in advancing the claims resolution process and eventual distribution once an approved plan of distribution is in place.   In connection with the Claims Procedures Motion and formulation of a plan of distribution, Applicants spend significant time during the Third Application Period reviewing the filed claims and the underlying documents and bases for claims asserted, including a comparison to the Platinum Entities books and records.   This analysis ties into both plan considerations and the filing of the Receiver's determinations regarding the allowance, disallowance or partial disallowance of claims in accordance with the procedures outlined in the Claims Procedures Motion.

### D.    Forensic/Investigatory Work (P10) - Total Fees:  $19,731.50

During the Thirteenth Application Period, Applicants continued to analyze whether any additional causes of action against other parties should be asserted and/or if actions should be taken in connection with asserted claims against the Receivership Estate.   The review of certain potential claims is coming to a conclusion, including whether any claims should be asserted in

6383156.1

the personal bankruptcy case of Nordlicht.  In the interim, the Receiver has entered into at least one release agreement with a third party professional during the Thirteenth Application Period and is continuing to explore whether other releases are appropriate with respect to entities that the Receiver has analyzed and determined not to assert affirmative claims.

### E.     Beechwood Action (P14) – Total Fees: $130,928.00

On December 19, 2018, the Receiver commenced the Beechwood Action in the District Court against (i) certain so-called Beechwood entities, (ii) Senior Health Insurance Company of Pennsylvania ("SHIP"), (iii) Fuzion Analytics, Inc. ("Fuzion"), (iv) CNO Financial Group, Inc. ("CNO"), (v) Bankers Conseco Life Insurance Company ("BCLIC"), (vi) Washington National Insurance Company ("WNIC") and (vii) 40|86 Advisors, Inc ("40/86").  The case is captioned "*Melanie L. Cyganowski, as Equity Receiver for Platinum Partners Credit Opportunities Master Fund LP, et al. v. Beechwood Re Ltd., et al.*" and is pending as Case 1:18-cv-12018 in the District Court.  On March 29, 2019, the Receiver filed an amended complaint.

On July 1, 2020, the Receiver entered into two settlement agreements:

1. A settlement agreement with (i) CNO, BCLIC, WNIC, 40|86 Advisors (collectively with CNO, BCLIC and WNIC, the "CNO Defendants") and (ii) BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BRe BCLIC Primary and BRe BCLIC Sub, as represented by Wilmington Trust, N.A., in its capacity as their former custodian (collectively with the CNO Defendants, the "CNO Parties"); and

2. A settlement agreement with SHIP and Fuzion (together with SHIP, the "SHIP Parties").

Also on July 1, 2020, the Receiver filed a motion with the Court requesting approval of the settlement agreements (the "Beechwood Settlement Motion").  No objections to the

Beechwood Settlement Motion were received and an Order approving the Beechwood Settlement Motion was entered by the Court on July 20, 2020 [Dkt. No. 538].

As set forth in more detail in the Beechwood Settlement Motion, one of the primary obstacles to the successful completion of the receivership and formulation of a plan of liquidation and distribution is more than $79 million (including interest) of debt (the "Secured Debt") allegedly owed by PPCO, guaranteed by certain of its subsidiaries and secured by all of PPCO's and its subsidiaries' assets, to a group of secured noteholders (the "Noteholders") for which BAM Administrative Services, LLC ("BAM Admin") is agent.

As a result of the settlements, PPCO and more than sixty subsidiaries of PPCO received, among other consideration, satisfaction of more than $44 million of the Secured Debt (principal amount) owned by SHIP, BCLIC, WNIC and Beechwood Bermuda International Ltd. ("BBIL"), and extinguishment of a total of 38 proofs of claim filed by BCLIC, WNIC, SHIP and Fuzion in the receivership in exchange for, among other consideration, a total payment of $14 million ($4.5 million of which will be paid into escrow and used, if needed, to indemnify PPCO for claims based on alleged Secured Debt of three non-settling Noteholders, which Noteholders failed to file their own proofs of claim), and dismissal of the Receiver's claims against the settling defendants and certain other parties.

The Receivership Entities also exchanged general releases with the CNO Parties and the SHIP Parties, BBIL, its parent Beechwood Bermuda Ltd., their affiliate, Beechwood Re Limited and certain other Beechwood Parties, other than BAM Admin in its capacity as "Agent" for the Noteholders (subject to certain exceptions described in the Motion).

SHIP, BCLIC, WNIC, BBIL and BAM Admin also permitted the release of more than $6.5 million currently being held in an escrow account containing the proceeds of the sale of

certain life insurance policies previously owned by indirect PPCO subsidiaries ALS Capital Ventures LLC and ALS Life Holdings LLC (the "ALS Escrow") enabling the Receiver to use and/or distribute those funds as described in the Beechwood Settlement Motion.

During the Thirteenth Application Period, the Receiver and the Receivership Team took all steps necessary to effectuate the terms of the settlement agreements.

In addition, although the Receiver settled substantially all claims in the Beechwood Action, the appeal of Judge Rakoff's decision granting summary judgment in favor of defendant PBIHL continues.  During the Thirteenth Application Period, Applicants spent time preparing the necessary documents to initiate the appeal of Judge Rakoff's summary judgment decision. That appeal is required to be perfected by December 22, 2020.  Applicants also responded during the Thirteenth Application Period to various pre-trial requests by parties in actions consolidated for pre-trial purposes with the Beechwood Action for certain documents and/or testimony from the Receivership Estate to be used in those consolidated actions, and continued to monitor the docket of the consolidated actions for matters relevant to the Receivership Estate.

## V.    EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $18,351.25. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Thirteenth Application Period:

(a)    In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants normally seek reimbursement for photocopying and laser printing expenses performed in-house

(listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  However, no photocopy or laser printing expenses were incurred by Applicants during the Thirteenth Application Period.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Thirteenth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did not incur any travel or transportation expenses during the Thirteenth Application Period.

6383156.1

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period.  Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.    FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."  *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented."  *Securities & Exchange Comm 'n v. Fifth Ave.*

*Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted. Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities. The ultimate benefit to investors, though not specifically quantifiable at this stage of the Receivership, will become more quantifiable as the case proceeds. Investors now have a forum in which they may present their views (including their criticisms) and monitor the Receiver's efforts to marshal the valuable assets of Platinum Entities to expeditiously dispose of these assets and generate a return for investors.

6383156.1

## VII.    HOLDBACKS

The Receiver and Otterbourg are cognizant of the fact that the disposition of the all assets is not yet complete, that the claims reconciliation process is in process and that the litigations to address, among other things, the asserted blanket liens on Platinum's assets are ongoing. Accordingly, in an effort to preserve assets at this stage of the Receivership, Applicants have agreed to hold back twenty percent (20%) of the allowed fees requested in this Thirteenth Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action and the Arbitration, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount"). Accordingly, the total Holdback Amount for this Tenth Interim Fee Application if the requested fees are approved is $120,082.81 ($9,058.48 for the Receiver and $111,024.33 for Otterbourg). All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)    grant interim approval of the Receiver's compensation in the amount of $45,292.40 (the "Allowed Receiver Fees");

(b)    grant interim approval of Otterbourg's compensation in the amount of $625,515.75 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)    grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $71.25;

(d)    grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $18,280.00;

32

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership

assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-

pocket expenses of Applicants; and

(f)     grant such other relief as the Court deems appropriate.

Dated: December 4, 2020

Otterbourg P.C.

By: *Adam C. Silverstein*
       Adam C. Silverstein
       Jennifer S. Feeney
       Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver,
and Otterbourg P.C., as Counsel to the Receiver

33