UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

SECURITIES AND EXCHANGE COMMISSION,  :
                                      :
                    Plaintiff,        :
                                      :
        -v-                           :
                                      :
PLATINUM MANAGEMENT (NY) LLC;         :        No. 16-CV-6848 (BMC)
PLATINUM CREDIT MANAGEMENT, L.P.;     :
MARK NORDLICHT;                       :
DAVID LEVY;                           :
DANIEL SMALL;                         :
URI LANDESMAN;                        :
JOSEPH MANN;                          :
JOSEPH SANFILIPPO; and                :
JEFFREY SHULSE,                       :
                                      :
                    Defendants.       :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**FOURTEENTH JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
<u>OCTOBER 1, 2020 THROUGH AND INCLUDING DECEMBER 31, 2020</u>**

Melanie L. Cyganowski, the receiver (the "<u>Receiver</u>") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"<u>Receivership Entities</u>," the "<u>Platinum Entities</u>" or "<u>Platinum</u>"), and Otterbourg P.C., as counsel

to the Receiver ("<u>Otterbourg</u>" and, together with the Receiver, "<u>Applicants</u>"), hereby submit this

Fourteenth Joint Interim Application (the "<u>Fourteenth Interim Application</u>") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from October 1, 2020 through and including December 31, 2020 (the "Fourteenth Application Period"). There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $46,964.00 and reimbursement of expenses in the amount of $62.87 for the Fourteenth Application Period. Otterbourg requests interim approval of fees in the amount of $764,381.70 and reimbursement of expenses in the amount of $12,756.56 for the Fourteenth Application Period, for a combined total of fees for Applicants in the amount of $811,345.70,[1] and expenses in the amount of $12,819.43 for the Fourteenth Application Period.

This Fourteenth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Fourteenth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description

---

[1] As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to certain litigation matters (the Beechwood Action and a previously resolved arbitration proceeding), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Fourteenth Application Period, the Receiver's recorded time charges before application of these accommodations were $82,600.00 and Otterbourg's recorded time charges were $859,860.50, for a combined gross legal fees total (before the application of any accommodations) of $942,460.50.

2

of each exhibit to this Fourteenth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Fourteenth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.    PRELIMINARY STATEMENT

During the Fourteenth Application Period, the Receiver and her team[2] (i) finalized and filed a motion for approval of procedures to resolve claims and, in accordance with such procedures, reviewed and analyzed each of the claims filed in the receivership to make determinations regarding allowance or disallowance; (ii) continued to formulate a plan of distribution and considered issues relevant to the plan, including the appropriate distribution methodology to implement; (iii)  attended to matters related to an appeal from the dismissal of certain claims asserted in the "Beechwood Action"[3] that were not addressed in the previously approved global settlement; (iv) continued to review and negotiate an agreement to resolve inter-

---

[2]    To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin, a Teneo Company as her financial advisor [Dkt. no. 232] ("Goldin" and, together with Otterbourg, the "Receivership Team").

[3]    The "Beechwood Action" refers to the litigation commenced by the Receiver in the United States District Court for the Southern District of New York, Case No. 18-cv-12018, against various defendants seeking to avoid certain liens that would adversely impact potential distributions to investors and creditors.

6588977.1

estate claims between the Receivership Entities and the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds")[4]; (v) monitored the personal bankruptcy case of Mark Nordlicht and filed a claim and an objection to discharge therein; and (vi) marketed and sold certain remaining assets pursuant to a remnant sale process; and (vii) analyzed the Receiver's legal options with respect to the estate's interest in certain securities and prepared legal papers relating to enforcement of the estate's rights therein.

As previously reported, certain of the settlements that the Receiver reached during the course of the Receivership are confidential.  To preserve the confidentiality of these settlements, the Receiver advised that she would not and will not be disclosing details of *any* settlements, including the identity of the settling parties, the amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and/or the source of any litigation-related funds received in any quarter, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

A. **Analysis and Disposition of Receivership Assets**

During the Fourteenth Application Period, the Platinum Receivership received approximately $235,000.  This amount is in addition to the approximately $86 million received by the Platinum Receivership from the liquidation of various assets from the date of appointment of the Receiver.  Certain parties have asserted a claim to all or part of the proceeds of such liquidated investments, most of which have been resolved pursuant to the settlement in the Beechwood Action.

The review of the non-litigation assets in the Receivership's asset portfolio is substantially complete.  A limited number of remnant assets were marketed during the

---

[4]     PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

6588977.1

Fourteenth Application Period.   There are currently four remaining assets that the Receiver continues to monitor, including assets in which the Receiver retained a residual interest and assets that are jointly held with PPVA that have potential value.   In addition, following the Fourteenth Application Period, Applicants prepared initial pleadings with respect to the Decision Diagnostics investment to enforce the Receiver's rights with respect to this asset to allow the Receivership to potentially realize any value.   The litigation was commenced during the first quarter of 2021.

A description of the investments in which Applicants dedicated significant time during the Fourteenth Application Period and the work done with respect to those investments is set forth in Section IV of this Fourteenth Interim Application.

### B.   Administrative Matters

During the Fourteenth Application Period, the Receiver and the Receivership Team continued to speak with various interested parties and groups, including the joint liquidators for PPVA, the SEC and Platinum investors. The Receiver has updated the Receiver's website with key documents, answers to frequently asked questions, and status reports to investors.   The website also includes links to the Beechwood Action docket.   The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum, such as the personal bankruptcy case of Mark Nordlicht ("Nordlicht").[5]

---

[5]      Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York.   Case No. 20-22782-rdd.   The Receiver is currently monitoring the bankruptcy case.

6588977.1

## II.     CASE BACKGROUND AND STATUS

### A.     Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Nordlicht, David Levy ("Levy"), Daniel Small, Uri Landesman,[6] Joseph Mann, Joseph San Filippo ("San Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems.  This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO.  The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  Following the criminal trial of Nordlicht, David Levy and Joseph SanFilippo, the jury returned a verdict

---

[6]     Uri Landesman passed away in September 2018.

convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht.  The Department of Justice has appealed those decisions, and in the interim, two additional criminal trials have been adjourned pending a ruling on the appeals.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

**B.      Case Status[7]**

In accordance with Section C.2. of the SEC Billing Guidelines, the Receiver and Otterbourg state as follows:

(a)      As of December 31, 2020, the Receivership Entities had approximately $23.2 million in funds.  Certain parties have claimed an interest in certain sold assets and have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Entities).  Other parties have presented documentation which purportedly grant them security interests in all or certain of Platinum's assets.  These secured claims were challenged and have been substantially resolved pursuant to settlements in the Beechwood Action.

It is estimated that, as of December 31, 2020, accrued and unpaid administrative expenses amount to approximately $4.6 million.  This amount includes the fees and expenses incurred by the Receiver, Otterbourg and Goldin during the Fourteenth Application Period, holdbacks for prior applications of the Receiver, Otterbourg and Goldin and holdbacks to the Prior Receiver's

---

[7]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period April 1, 2020 through June 30,, 2020.

counsel (Cooley) with respect to its interim fee application.   In addition to these unpaid administrative expenses, the Receiver paid remaining in-house Platinum staff and other operating expenses during the Fourteenth Application Period.

(b)   Cash disbursements during the Fourteenth Application Period totaled approximately $1.8 million.  This amount consisted primarily of (i) $1,640,648 in professional expenses and (ii) $189,657 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent).

Cash receipts during the Fourteenth Application Period totaled $235,053.  This amount consists of proceeds from the sales of remnant assets, the Cleveland Mining asset, interest and dividends and an installment payment pursuant to a previously reached settlement.

Pursuant to the previously-approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  During the Fourteenth Application Period, the Receivership Team's primary focus was on analyzing claims and preparing a plan of distribution and related documents.  In excess of 300 claims were filed.  Some of these claims may be duplicate claims and some may be asserted against non-Receivership Entities.  Parties holding investor claims, claims for unpaid redemptions and unpaid administrative claims were not required to file proofs of claim.  To facilitate the objection process, during the Fourteenth Application Period, the Receiver filed a motion seeking approval of procedures to reconcile claims and verify the investment and withdrawal amounts with respect to the interests held by investors (the "Claims Procedures Motion").  The Court entered an Order approving the Claims Procedures Motion on December 1, 2020 [Dkt. No. 554].

By the Claims Procedures Motion the Receiver only sought the Court's approval of the Receiver's proposed procedures for finalizing the reconciliation and verification of claims and interests and did not seek approval of the validity, amount, classification, or distribution methodology on account of any claims against, or interests in, any of the Receivership Entities. Rather, the Receiver will be filing a separate motion with the Court to approve a plan for making distributions to claimants and investors, including, but not limited to, the classification of claims and interests, and the distribution methodology she will seek to employ.  The Receiver cannot at this time state what distributions will ultimately be to creditors and investors.

As of December 31, 2020, the primary assets of the estate ("Receivership Property") consisted of the following:

(i)      Cash and cash equivalents of approximately $23.2 million;

(ii)     Remaining stock and royalty interests, litigation financing and other miscellaneous investments; and

(iii)    Potential litigation claims.

(c)      As set forth above, to preserve the confidentiality of certain settlements that the Receiver has reached, the Receiver will not disclose details of any settlements, including the identity of the settling parties, amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and the source of any litigation-related funds received in any interim application period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise. The Receiver and the Receivership Team have analyzed other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis,

10

warrant the commencement of litigation.  The Receiver has concluded that no such additional litigation is warranted.  Where mutual releases are warranted, the Receiver has sought and obtained such releases.  The Receiver, however, continues to evaluate the claims of insiders of the Platinum Entities and is engaging in conversations with certain of the insiders regarding the allowance or disallowance of their claims.

## III.   FEES AND EXPENSES REQUESTED

In connection with the Fourteenth Application Period, the Receiver requests interim approval of her fees in the amount of $46,964.00 and reimbursement of expenses in the amount of $62.87.  Otterbourg requests interim approval of fees in the amount of $764,381.70 and reimbursement of expenses in the amount of $12,756.56.  Thus, the combined total of fees for Applicants of $811,345.70, plus expenses of $12,819.43, is $824,165.13.

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and

complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and Otterbourg.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time.  Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case.  In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment.  (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $82,600.00 to $46,964.00, a reduction in the amount of $35,636.00.  Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $859,860.50 to $764,381.70, a reduction in the amount of $95,478.80.  Therefore, the total reduction for legal fees incurred during the Fourteenth Application Period by the Receiver and Otterbourg professionals is $131,114.80.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.   There was no travel time during the Fourteenth Application Period.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the professionals' time detail to the SEC for its review.

This Fourteenth Interim Application includes certain exhibits:

(a)     The SFAR for the period of October 1, 2020 through December 31, 2020 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Fourteenth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Fourteenth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Fourteenth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Fourteenth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis. In accordance with the SEC Billing Guidelines, and as noted above, Otterbourg submitted its time records for the Fourteenth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour. All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Nine attorneys and one paraprofessional billed time during the Fourteenth Application Period (in addition to the Receiver).[8]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Fourteenth Application Period and their specific roles were as follows:

(a)     Adam C. Silverstein (Partner) (3.8 Hours to P01; 21.8 Hours to P04; 1.6 Hours to P05; 2.3 Hours to P14) – Mr. Silverstein is a senior litigator who has focused his efforts on

---

[8]   The Receiver has voluntarily not billed the time of any professional that billed less than fifteen (15) hours to the case during the Fourteenth Application Period.

Receivership matters requiring applications to the Court, litigation services and the forensics investigation.  During the Fourteenth Application Period, Mr. Silverstein dedicated time to issues relating to potential litigation options in connection with the Decision Diagnostics asset, the appeal of the non-settled claim in the Beechwood Action, as well as issues relating to the claims process that may relate to certain litigation issues.  Mr. Silverstein has also been one of the point persons regarding communications with the SEC.

(b)    <u>William Moran (Partner) (29.1 Hours to P04; 1.8 Hours to P14)</u> – Mr. Moran is a senior litigator who has focused his efforts on Receivership matters relating to the Receiver's litigation activities.   During the Fourteenth Application Period, Mr. Moran assisted with numerous litigation matters, including the proof of claim and the objection to discharge complaint filed in Nordlicht's personal bankruptcy case, the litigation strategy with respect to the Receivership's ownership of certain securities.  Mr. Moran also assisted with the review and analysis of potential additional claims that can be asserted by the Receiver against third parties and insiders.

(c)    <u>Philip Berg (Partner) (17.4 Hours to P02; 5.2 Hours to P04)</u> – Mr. Berg is a partner in the firm's corporate department and specializes in negotiation and documentation of asset sales and other transactions.  During the Fourteenth Application Period, Mr. Berg attended to certain post-closing issues regarding the sale of the assets marketed and sold in a remnant sale.  Mr. Berg reviewed the underlying documents of certain of the assets and prepared the sale documents.

(d)    <u>Erik B. Weinick (Partner) (1.2 Hours to P01; .8 Hours to P02; 188.8 Hours to P04; 98.2 Hours to P05; .9 Hours to P10; 20.9 Hours to P14)</u> – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's

"hub and spoke," coordinating the work of the Receiver's professionals and Platinum's remaining in-house employees on almost every matter confronting the Receivership from asset dispositions, to litigation matters, and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA on matters of mutual interest, including the settlement reached in principal.  Mr. Weinick is also part of the team reviewing claims and helping with issues concerning the formulation of a plan of distribution and has been monitoring Nordlicht's personal bankruptcy case and has been the primary person communicating with Nordlicht's counsel and the Chapter 7 Trustee appointed in Nordlicht's bankruptcy case.

(e)     Jennifer S. Feeney (Of Counsel) (4.0 Hours to P02; 101.6 Hours to P04; 90.4 Hours to P05) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver.  During the Fourteenth Application Period, Ms. Feeney attended to case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions.  Ms. Feeney also dedicated significant time to the Claims Procedures Motion, review of claims and issues relevant to the formulation of a plan of distribution.  Additionally, Ms. Feeney, along with Erik B. Weinick, reviewed applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(f)     Andrew S. Halpern (Associate) (85.3 Hours to P01; 29.3 Hours to P04; .7 Hours to P05; 1.7 Hours to P10; 51.0 Hours to P14) – Mr. Halpern is an experienced litigator who has assisted the Receiver in almost all litigation matters during the course of the Receivership.  During the Fourteenth Application Period, Mr. Halpern helped prepare papers relating to the appeal from the dismissal of certain claims in the Beechwood Action that were not settled while

simultaneously preparing for the mediation to resolve the matter.  Mr. Halpern also lent his litigation expertise to the Decision Diagnostics matter, the PPVA settlement and the complaint objecting to the discharge in Nordlicht's bankruptcy case.

(g)     Gabriela S. Leon (Associate) (7.9 Hours to P01; 55.3 Hours to P04; .3 Hours to P14) – Ms. Leon is a junior associate in the litigation department.  Ms. Leon primarily assisted with the preparation of the notice of appeal and related documents in the Beechwood Action and the mediation brief.  Ms. Leon was also the primary drafter of the proof of claim and complaint objecting to discharge in the Nordlicht proceeding, which was done at a considerably lower billing rate.

(h)     Robert Yan (Associate) (95.0 Hours to P04; .7 Hours to P05) – Mr. Yan is an associate in the bankruptcy department.  Mr. Yan has significant experience with formulations of plans and, accordingly, during the Fourteenth Application Period, assisted with the preparation of a plan of distribution and motion for approval of such plan.  Mr. Yan also reviewed claim issues to the extent that they were relevant to the formulation of the plan of distribution.

(i)     Michael Pantzer (Associate) (31.2 Hours to P04; 198.9 Hours to P05) – Mr. Pantzer is a junior associate in the bankruptcy department.  Mr. Pantzer, at a lower billing rate, assisted with a variety of research issues related to the plan of distribution and claims reconciliation process.  Mr. Pantzer was also primarily responsible for the preparation of the Claims Procedures Motion and the initial review of claims.

(j)     Jessica Hildebrandt (Paralegal) (.4 Hours to P02; 33.1 Hours to P04; _15.3 Hours to P05; 3.1 Hours to P14) – Ms. Hildebrandt is a paralegal and has assisted Otterbourg attorneys for various court filings and helped monitor proceedings outside of the Receivership, including the Nordlicht personal bankruptcy case and the criminal appeal.

6588977.1

## IV.    SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING FOURTEENTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Fourteenth Application Period into five (5) project categories.[9]  Narrative summaries of these activity categories follow:

### A.    Asset Analysis and Recovery (P01) - Total Fees: $75,729.00
### Asset Disposition (P02)[10] - Total Fees:  $23,459.00

During the Fourteenth Application Period, Applicants completed the review of the remaining assets in Platinum's portfolio.  Included in the time billed during the Fourteenth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the issue at hand.  Below is an overview of certain of the investments in which Applicants have dedicated time during the Fourteenth Application Period.  Certain additional assets continue to be monitored for potential future value, including assets that are jointly held with PPVA or for which the Receivership has a potential residual interest. The below summaries include a brief description of the nature of the investment, work performed, and status.

1.    **Decision Diagnostics** – refers to Decision Diagnostics Corp. ("Decision Diagnostics"), a company that describes itself on its website as "a leading manufacturer of low cost home testing devices and test strips for use with legacy meters."  Despite that description, Decision Diagnostics announced in March that it had developed a COVID-19 test, causing its publicly-traded stock to jump in price and the Securities and Exchange Commission to institute a suspension in trading.  On December 17, 2020, the United States Government unsealed an

---

[9]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[10]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

indictment of Decision Diagnostic's CEO, Keith Berman, for securities and other fraud in connection with the company's purported COVID-19 testing capabilities. That same day, the SEC commenced a civil enforcement action against Decision Diagnostics and Berman related to the same conduct.

Alpha Credit Resources LLC ("Alpha Credit"), a wholly-owned subsidiary of PPCO, holds certain common and preferred shares, convertible into common shares, in Decision Diagnostics. According to certain of Decision Diagnostics' financial statements, Decision Diagnostics purported to cancel certain of Alpha Credit's shares in Decision Diagnostics. Decision Diagnostics has also taken active steps to prevent the Receiver from liquidating Alpha Credit's shares, by, among other things, refusing to remove a restrictive legend from Alpha Credit's shares in Decision Diagnostics and to convert Alpha Credit's preferred shares in Decision Diagnostics into common shares. The Receiver believes that Decision Diagnostics' actions in purporting to cancel, refusing to remove the restrictive legend from, and refusing to convert Alpha Credit's shares are unjustified, constitute a contempt of the Receiver Order and violate applicable law.

Decision Diagnostics refused the Receiver's demand to restore, recognize and convert, as applicable, Alpha Credit's shares. Consequently, the Receivership Team analyzed the documents by which Alpha Credit received the shares in Decision Diagnostics, performed legal research regarding the purported cancellation of certain of Alpha Credit's shares by Decision Diagnostics and other actions designed to prevent the Receiver from monetizing the Receivership's shares. During the Fourteenth Application Period, the Receiver prepared pleadings seeking to enforce her rights. Following the Fourteenth Application Period, the Receiver initiated a proceeding in the U.S. District Court for the Eastern District of New York to

enforce her rights with respect to Decision Diagnostics. *See Melanie L. Cyganowski, as Receiver and Agent v. Decision Diagnostics, Inc.,* 2:21-cv-00888-JMA-ST. Otterbourg attorneys who have billed time to this matter primarily included attorneys with litigation experience.

        2.      **Remnant Sale**.  Following a review of the remaining assets in the portfolio, the Receiver and the Receivership Team identified a limited number of assets that they believed may have value, albeit limited, and sought to market the assets through a remnant sale process. Ultimately, eight (8) assets were identified and marketed:  (i) warrants in Bang Holdings Corporation; (ii) stock in Echo Therapeutics, Inc.; (iii) limited partner interests in Grey K Environmental Fund II LP; (iv) participation interest in a loan to Nico Steel Holdings Limited that is collateralized by stock in the company;[11] (v) stock in Nordaq Energy; (vii) an assignment of proceeds of a loan in the Pro Players loan portfolio; (vi) stock in Star Phoenix Group Ltd.; and (vii) rights to a litigation funding loan made to Total Asset Recovery Services, LLC that is dependent upon the outcome of the litigation.

        The marketing materials were provided to nine (9) companies that are known to purchase "remnant" assets and a data room was established.  During the Fourteenth Application Period, the Receiver received offers on all of the assets that were marketed.  There were four (4) different purchasers, with one purchaser acquiring four (4) of the assets.  During the Fourteenth Application Period, Applicants prepared the necessary sale documents.  Otterbourg attorneys who have billed time to this matter include attorneys with transactional experience.

        B.      **Case Administration (P04) - Total Fees:  $476,850.00**

        This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including

---

[11]      An offer was received and accepted for Nico Steel prior to the launch of the remnant sale "teaser," but for the purposes of this report is being considered as part of the remnant sale assets.

preparation of the plan of distribution, communications with investors, preparing status reports, negotiating with the joint liquidators of the PPVA a resolution of purported claims by and against each estate, and monitoring and filing appropriate papers in the Nordlicht personal bankruptcy case.  The tasks recorded under this category include the following:

        1.    **PPVA**.   Since the Receiver's appointment, she and the Receivership Team have kept in frequent communication with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest.  PPVA and PPCO have each analyzed and discussed potential claims against the estate of the other stemming from pre-Receivership transactions.   Upon the Receiver's appointment, the Receiver and the Joint Liquidators agreed to hold the resolution of any such purported claims in abeyance during the cases.  During the second half of 2020, in connection with efforts to wind-down the case, the Receiver engaged in discussions with the Joint Liquidators of PPVA regarding a resolution of such purported claims and any remaining mutual interests, including their joint interest in interest is Agera Energy LLC and Agera Holdings, LLC (collectively,  "Agera")[12] and a tentative resolution was reached, subject to documentation.

        During the Fourteenth Application Period, the Receivership Team continued to review and revise a proposed settlement agreement to resolve all issues between PPVA and the Platinum Entities and communicated with the joint liquidators concerning the status of their review.  The Receiver believes that the resolution of all issues with PPVA is in the best interest of the

---

[12]     Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC. Pursuant to their respective interests in PGS, both PPVA and PPCO agreed that PGS would pursue certain claims and causes of action relating to its ownership of a certain promissory note convertible into 95% of the common equity of Agera's subsidiary, energy reseller Agera Energy.  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, SHIP and CNO.

Receivership as it will avoid additional litigation and enable the Receiver to put forth a plan of distribution.

2.      **Plan of Distribution**.   During the Fourteenth Application Period, Applicants continued to work on preparing a proposed plan of distribution.   Applicants reviewed the implementation of different methodologies, the review of plans in other receivership cases and consideration of issues relevant to Cayman law.   Applicants prepared memoranda for the Receiver and the Receivership Team to outline the issues for consideration and continued to refine such analyses. During the Fourteenth Application Period, Applicants spent considerable time drafting the plan of distribution and preparing additional documents seeking approval of the Receiver's proposed plan of distribution.

3.      **Nordlicht Bankruptcy Case**.   Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York. Case No. 20-22782-rdd.   The Receiver has been monitoring the bankruptcy case, including participating in the continued 341 meetings of creditors and in court hearings, as well as communicating with one of the largest creditors in the Nordlicht case, Richard Stadtmauer, who also has filed a significant claim against the Receivership Entities.   During the Fourteenth Application Period, the Receiver filed a proof of claim on behalf of PPCO in the Nordlicht bankruptcy case, asserting a claim in the amount of not less than $219 million.   The claim is subject to review and objection by the Chapter 7 Trustee.   It is uncertain, even if allowed in whole or in part, what if any recovery may be available from the Nordlicht personal bankruptcy, which currently has extensive claims filed against it and limited assets.   The Receiver continues to periodically engage in discussions with the Chapter 7 Trustee regarding the case and claims

filed by each against the other's estate.  Additionally, the Receiver filed a complaint in the Nordlicht bankruptcy case objecting to the discharge of Nordlicht.

4.      **Website and Investor Communications.**  The receivership retained Epic to create and maintain the Receiver's website (www.PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver revises the website as necessary to update the "Frequently Asked Questions" section and to add "key documents."  The website allows interested parties to sign up to receive daily notices whenever there are new filings on the Receivership docket.  The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to inquiries and requests for information.

5.      **SEC Meetings**.  The Receiver also communicated from time to time with the SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate and to alert them to certain filings by the Receiver.  The Receiver and the Receivership Team also had periodic communications with SEC personnel about pending matters for which SEC input was appropriate.

6.      **Receivership Estate Oversight**.  Professional time during the Fourteenth Application Period was also devoted to the general oversight of the Platinum Entities and the estate.  Conferences with the Receiver and members of the Receivership Team, via conference call or videoconference, occurred on a regular basis to facilitate the exchange of relevant information.  The Receiver maintained direct oversight over all legal and financial-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with

assistance from Platinum's CFO and Goldin, in analyzing budget, cash management and other administrative issues of the Receivership estate.

### C.     Claim Review (P05) – Total Fees:  <u>$288,565.50</u>

During the Fourteenth Application Period, Platinum's CFO and the Receivership Team began an extensive review of each of the filed claims, analyzing the documents provided in support of each claim, comparing the claims to Platinum's books and researching legal issues when necessary.  This extensive analysis was done with the purpose of preparing a "Claims Analysis Report" pursuant to the Claims Procedures Order entered by the Court.  The Claims Analysis Report will identify each filed claim and the Receiver's determination thereof (e.g., allowed, allowed in part, disallowed) and the stated basis for disallowance or partial allowance. Creditors will have an opportunity to contest the Receiver's determinations in accordance with the procedures set forth in the Claims Procedures Order.  The team assembled to review each of the claims spent time analyzing each of the claim, participating in numerous conference calls to review the merits of each, preparing reports for the Receiver and preparing and updating the Claims Analysis Report.

Also during the Fourteenth Application Period, the Receiver and the Receivership Team spent time analyzing issues relevant to the investor claims.  This includes time spent conferring with Platinum's CFO in his review of the investor investments and distributions to be able to provide information for investors to confirm with respect to their individual investments. Applicants also prepared a draft letter to investors that will set forth the information that the Receivership has with respect to their investments.  Applicants also spent time analyzing the differences in various distribution methodologies and the distribution waterfalls.

### D.       Forensic/Investigatory Work (P10) - Total Fees:  $\underline{\textbf{\$2,112.00}}$

The Receiver and the Receivership Team have analyzed other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis, warrant the commencement of litigation.   The Receiver has concluded that no such additional litigation is warranted.  Where mutual releases are warranted, the Receiver has sought and obtained such releases.  During the Fourteenth Application Period, the Receiver entered into another release agreement with a third party professional.   The Receiver, however, continues to evaluate the claims of insiders of the Platinum Entities and is engaging in conversations with certain of the insiders regarding the allowance or disallowance of their claims.   During the Fourteenth Application Period, the Receiver filed a proof of claim in the personal bankruptcy case of Nordlicht, but any recovery on such claim is highly speculative at this time.

### E.       <u>Beechwood Action</u> (P14) – Total Fees: <u>$75,745.00</u>

As previously reported, on July 1, 2020, the Receiver entered into two settlement agreements in connection with the Beechwood Action, both of which were approved by the Court on July 20, 2020 [Dkt. No. 538].   The details of the settlements are set forth in the Receiver's prior status report and in the motion seeking approval of the settlements.

Although the Receiver settled substantially all claims in the Beechwood Action, the Receiver's appeal of Judge Rakoff's pre-settlement decision granting summary judgment in favor of one of the defendants, defendant PBIHL, continues.  During the Fourteenth Application Period, the Receiver began to prepare the necessary papers to perfect the appeal. Simultaneously, the Receiver and PBIHL agreed to participate in mediation and stipulated to

extend the time to perfect the appeal, which was supposed to be on December 22, 2020.  The Receivership Team prepared a mediation brief and participated in a mediation session.  As a result of the mediation, the parties reached an agreement in principle.  Shortly before year end, however, PBIHL commenced a liquidation proceeding in Bermuda and the settlement is subject to the review of the newly appointed liquidators.  The Receivership Team is in communication with the liquidators and their counsel in the United States and has asked the joint liquidators to adopt the terms of the settlement negotiated with prior management or to execute a substantially similar settlement.  Following the Fourteenth Application Period, the settlement was finalized.

## V.      EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $12,819.43. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.  Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Fourteenth Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants normally seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  However, no photocopy or laser printing expenses were incurred by Applicants during the Fourteenth Application Period.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Fourteenth Application

Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did not incur any travel or transportation expenses during the Fourteenth Application Period.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the

extent of the invoiced cost from the vendor Epiq (formerly GCG), which will be billed directly to the Receivership Estate.

(h)    In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.    FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible."  *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented."  *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).  "[R]esults are always relevant."  *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480).  However, a good result may take a form other than

a bare increase in monetary value.  *Id.*  ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them."  *Moody*, 374 F. Supp. at 485.  Moreover, "[t]ime spent cannot be ignored."  *Id.* at 483.  Another "significant factor … is the amount of money involved."  *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted.  Applicants have acted quickly to monetize the assets of the Platinum Entities and is in the process of reconciling claim and formulating a plan of distribution so that the estate can be wound down and distributions made.

## VII.   HOLDBACKS

Earlier in the Receivership, in an effort to preserve assets while the Receiver was actively litigating certain matters, including the removal of the purported blanket liens on the Receivership's assets, Applicants agreed to hold back twenty percent (20%) of the allowed fees requested in this Fourteenth Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Fourteenth Interim Fee Application if the requested fees are approved is $154,086.92 ($8,330.14 for the Receiver and $145,756.78 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     grant interim approval of the Receiver's compensation in the amount of $46,964.00 (the "Allowed Receiver Fees");

(b)     grant interim approval of Otterbourg's compensation in the amount of $764,381.70 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $62.87;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $12,756.56;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     grant such other relief as the Court deems appropriate.

Dated: June 11, 2021

Otterbourg P.C.

By: *Adam C. Silverstein*
        Adam C. Silverstein
        Erik B. Weinick
        Jennifer S. Feeney
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver

6588977.1