UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

              Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**FIFTEENTH JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
JANUARY 1, 2021 THROUGH AND INCLUDING MARCH 31, 2021**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liqu id Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd

and Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Fifteenth Joint Interim Application (the "Fifteenth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from January 1, 2021 through and including March 31, 2021 (the "Fifteenth Application Period").  There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg).  The Receiver requests interim approval of fees in the amount of $56,118.00 and reimbursement of expenses in the amount of $55.05 for the Fifteenth Application Period. Otterbourg requests interim approval of fees in the amount of $767,526.60 and reimbursement of expenses in the amount of $10,335.29 for the Fifteenth Application Period, for a combined total of fees for Applicants in the amount of $823,644.60,[1] and expenses in the amount of $10,390.34 for the Fifteenth Application Period.

This Fifteenth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Fifteenth Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description

---

[1]  As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for those related to certain litigation matters (the Beechwood Action and a previously resolved arbitration proceeding), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges, subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Fifteenth Application Period, the Receiver's recorded time charges before application of these accommodations were $98,700.00 and Otterbourg's recorded time charges were $857,219.50, for a combined gross legal fees total (before the application of any accommodations) of $132,274.90.

of each exhibit to this Fifteenth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Fifteenth Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines.  All such categories correspond with the SEC's SFAR in this case.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.    PRELIMINARY STATEMENT

During the Fifteenth Application Period, the Receiver and her team[2] (i) reviewed and analyzed each of the claims filed in the receivership case (the "Receivership") to make determinations regarding allowance or disallowance of such claims and filed a report with the Court setting forth the Receiver's determinations; (ii) engaged in initial discussions with several creditors regarding their claims; (iii) continued to draft a plan of distribution; (iv)  attended to and resolved remaining matters related to an appeal from the dismissal of certain claims asserted in the "Beechwood Action"[3] that were not addressed in the global settlement; (v) continued to work on a resolution of inter-estate claims between the Receivership Entities and the joint

---

[2]    To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg P.C. ("Otterbourg") as her legal counsel [Dkt. no. 231] and Goldin, a Teneo Company as her financial advisor [Dkt. no. 232] ("Teneo" (f/k/a Goldin) and, together with Otterbourg, the "Receivership Team").

[3]    The "Beechwood Action" refers to the litigation commenced by the Receiver in the United States District Court for the Southern District of New York, Case 1:18-cv-12018, against various defendants seeking to avoid certain liens that would adversely impact potential distributions to investors and creditors.

liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds"); (vi) monitored and exercised rights as a creditor in the personal bankruptcy case of Mark Nordlicht ("Nordlicht"); and (vii) completed the sales of certain assets that were sold through a remnant sale process and continued to monitor the market to sell certain other remaining assets.

As previously reported, certain of the settlements that the Receiver reached during the course of the Receivership are confidential.  To preserve the confidentiality of these settlements, the Receiver advised that she would not and will not be disclosing details of *any* settlements, including the identity of the settling parties, the amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and/or the source of any litigation-related funds received in any quarter, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

### A.  Analysis and Disposition of Receivership Assets

During the Fifteenth Application Period, the Receivership received approximately $68,000.  This amount is in addition to the approximately $86.5 million received by the Receivership from the liquidation of various assets from the date of appointment of the Receiver.  Certain parties have asserted secured claims to all or part of the proceeds of such liquidated investments, most of which have been resolved pursuant to the settlement in the Beechwood Action and with Heartland Bank.

The review of the non-litigation assets in the Receivership's asset portfolio is substantially complete.  The assets that the Receiver believes could be liquidated have been and all of the sales resulting from the marketing of the remnant assets have now closed.  In addition to the litigation seeking the turnover to the Receiver of the Receivership's equity interest in

Decision Diagnostics, there are a few remaining assets that the Receiver continues to actively monitor, including shared assets with PPVA that may have potential material value to the Receivership Estate

A description of the investments in which Applicants dedicated significant time during the Fifteenth Application Period and the work done with respect to those investments is set forth in Section IV of this Fifteenth Interim Application.

### B.      Administrative Matters

During the Fifteenth Application Period, the Receiver and the Receivership Team continued to speak with various interested parties and groups, including the joint liquidators for PPVA,[4] the SEC and Platinum investors and creditors. The Receiver updates the Receiver's website with key documents, answers to frequently asked questions and status reports to investors.  The Receivership Team also filed and responded to other applications made before this Court and in other court proceedings involving Platinum, such as the personal bankruptcy case of Nordlicht.

## II.   CASE BACKGROUND AND STATUS

### A.      Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Nordlicht, David Levy ("Levy"), Daniel Small, Uri Landesman,[5] Joseph Mann, Joseph San Filippo ("San

---

[4]      PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

[5]      Uri Landesman passed away in September 2018.

Filippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively with Nordlicht, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems. This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment Officer of PPVA and PPCO. The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants. Following the criminal trial of Nordlicht, Levy and SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges. SanFilippo was acquitted on all counts with which he was charged. The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht. The Department of Justice has appealed those decisions, and in the interim, two additional criminal trials have been adjourned pending a ruling on the appeals.

*Appointment of Receiver and Receivership Order*

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver"). At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority previously held by the Prior Receiver under the current Receivership Order. [Dkt. No. 216]. On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order"). [Dkt. No. 276]. The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd. [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a

responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

### B.    Case Status[6]

In accordance with Section C.2. of the SEC Billing Guidelines, Applicants state as follows:

(a)      As of March 31, 2021, the Receivership Entities had approximately $22.8 million in funds.  Certain parties have claimed an interest in certain sold assets and have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Entities).  Other parties have presented documentation which purportedly granted them security interests in all or certain of Platinum's assets.   These secured claims were challenged and have been substantially resolved pursuant to settlements in the Beechwood Action.

It is estimated that, as of March 31, 2021, accrued and unpaid administrative expenses amount to approximately $5.55 million.  This amount includes the fees and expenses that are the subject of this application, holdbacks for prior applications of the Receiver, Otterbourg and Teneo and holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application.  In addition to these unpaid administrative expenses, the Receiver paid remaining in-house Platinum staff and other operating expenses during the Fifteenth Application Period.

(b)      Cash disbursements during the Fifteenth Application Period totaled approximately $476,000.  This amount consisted primarily of (i) $275,000 in professional expenses and (ii)

---

[6]  The Receiver and Otterbourg base the information in this section primarily on the receivership's Standardized Fund Accounting Reports covering the period April 1, 2020 through June 30,, 2020.

$199,000 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent). [7]

Cash receipts during the Fifteenth Application Period totaled approximately $68,000. This amount consists of proceeds from the sales of the final two remnant assets, interest and dividends.

Pursuant to the previously-approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  In excess of 300 claims were filed.  Parties holding investor claims, claims for unpaid redemptions and unpaid administrative claims were not required to file proofs of claim.  A fuller description of the claims reconciliation process is described in Section IV.C below.

The Receiver cannot at this time state what distributions will ultimately be to creditors and investors, as it will in large part be dependent upon the outcome of the claims resolution process.

As of March 31, 2021, the primary assets of the estate ("Receivership Property") consisted of the following:

(i)     Cash and cash equivalents of approximately $22.8 million;

(ii)    Remaining stock and royalty interests, litigation financing and other miscellaneous investments; and

(iii)   Potential litigation claims.

(c)     As set forth above, to preserve the confidentiality of certain settlements that the Receiver has reached, the Receiver will not disclose details of any settlements, including the identity of the settling parties, amounts agreed to be paid by such parties, whether such amounts

---

[7]  The Receiver has since entered into a new lease for smaller office space at a reduced rent, which went into effect on July 1, 2021.

are to be paid in structured payouts and over what period of time, and the source of any litigation-related funds received in any interim application period, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise. The Receiver and the Receivership Team have analyzed other pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis, warrant the commencement of litigation.  Where mutual releases are warranted, the Receiver has sought and obtained such releases.  Additionally, during the Fifteenth Application Period, the Receiver continued to evaluate the claims of insiders of the Platinum Entities and is engaging in conversations with certain of the insiders regarding the allowance or disallowance of their claims.  Whether and the extent to which the Receiver may commence additional affirmative actions, will likely be addressed as part of the proposed plan of distribution.

III.     **FEES AND EXPENSES REQUESTED**

In connection with the Fifteenth Application Period, the Receiver requests interim approval of her fees in the amount of $56,118.00 and reimbursement of expenses in the amount of $55.05.  Otterbourg requests interim approval of fees in the amount of $767,526.60 and reimbursement of expenses in the amount of $10,335.29.  Thus, the combined total of fees for Applicants of $823,644.60, plus expenses of $10,390.34, is $834,034.94.

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by Applicants.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time. Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case. In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment. (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $98,700.00 to $56,118.00, a reduction in the amount of $42,582.00. Moreover, the recorded time charges for the Otterbourg professionals have been reduced from $857,219.50 to $767,526.60, a reduction in the amount of

11

$89,692.90.   Therefore, the total reduction for legal fees incurred during the Fifteenth Application Period by the Receiver and Otterbourg professionals is $132,274.90.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.   There was no travel time during the Fifteenth Application Period.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted the professionals' time detail to the SEC for its review.

This Fifteenth Interim Application includes certain exhibits:

(a)   The SFAR for the period of January 1, 2021 through March 31, 2021 is attached as **Exhibit A** hereto.

(b)   A Fee Schedule showing the total fees billed and hours worked during the Fifteenth Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)   In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)   In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Fifteenth Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

(e)     In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)     In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver and Otterbourg for the Fifteenth Application Period, arranged in chronological order, are attached as **Exhibits G** and **H**, respectively, hereto.

(g)     Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Fifteenth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Fifteenth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Seven attorneys and one paraprofessional billed time during the Fifteenth Application Period (in addition to the Receiver).[8]  Because of the diversity of issues confronting the

---

[8]   The Receiver has requested that Otterbourg voluntarily not bill the time of any professional that billed less than fifteen (15) hours to the case during the Fifteenth Application Period.

Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Fifteenth Application Period and their specific roles were as follows:

(h)     Adam C. Silverstein (Partner) (38.5 Hours to P01; 11.1 Hours to P04; 2.1  Hours to P05) – Mr. Silverstein is a senior litigator who has focused his efforts on Receivership matters requiring applications to the Court, litigation services and the forensics investigation.  During the Fifteenth Application Period, Mr. Silverstein dedicated time to the Decision Diagnostics matter, remaining issues related to the Beechwood Action, as well as issues relating to the claims process that may relate to certain litigation issues.  Mr. Silverstein has also been one of the point persons regarding communications with the SEC.

(i)     Erik B. Weinick (Partner) (2.4 Hours to P01; 2.6 Hours to P02; 157.3 Hours to P04; 102.4 Hours to P05; 5.1 Hours to P14) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating the work of the Receiver's professionals and Platinum's remaining in-house employees on almost every matter confronting the Receivership from asset dispositions, to litigation matters, and administrative matters, including responding to investor inquiries, responding to requests from the Defendants and communicating with counsel for the PPVA JOLs on matters of mutual interest, including the resolution of issues between the estates.  Mr. Weinick is also part of the team reviewing claims and helping with issues concerning the

formulation of a plan of distribution and has been spearheading matters relating to the Nordlicht Bankruptcy Case.

(j) <u>Jennifer S. Feeney (Of Counsel) (3.2 Hours to P02; 79.1 Hours to P04; 82.3 Hours to P05)</u> – Ms. Feeney is a senior member of Otterbourg's bankruptcy department and provides specific bankruptcy-related counsel to the Receiver. During the Fifteenth Application Period, Ms. Feeney attended to case administration matters, including preparing the Receiver's quarterly report and updating other reports regarding the status of asset dispositions. Ms. Feeney is also involved in the claims review process and issues relevant to the formulation of a plan of distribution. Additionally, Ms. Feeney, along with Erik B. Weinick, reviewed applications to the Court and worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team and the Receiver's other professionals.

(k) <u>Andrew S. Halpern (Associate) (151.1 Hours to P01; .8 to P02; 32.3 Hours to P04; 23.9 Hours to P14)</u> – Mr. Halpern is an experienced litigator who has assisted the Receiver in almost all litigation matters during the course of the Receivership. During the Fifteenth Application Period, Mr. Halpern helped finalized the resolution of the remaining issues stemming from the Beechwood Action, prepared the complaint and related papers in the Decision Diagnostics matter, reviewed the PPVA settlement and worked on matters related to the discharge complaint filed in the Nordlicht Bankruptcy Case.

(l) <u>Gabriela S. Leon (Associate) (10.2 Hours to P01; 2.8 Hours to P04; 3.4 Hours to P14)</u> – Ms. Leon is a junior associate in the litigation department. Ms. Leon primarily assisted in matters relating to the Decision Diagnostics litigation and the review of certain issues in the Nordlicht Bankruptcy Case, which was done at a considerably lower billing rate.

(m)  <u>Robert Yan (Associate) (122.3 Hours to P04; 14.5 Hours to P05)</u> – Mr. Yan is an associate in the bankruptcy department.  Mr. Yan has significant experience with formulations of plans and, accordingly, during the Fifteenth Application Period, assisted with the preparation of a plan of distribution and motion for approval of such plan.  Mr. Yan also reviewed claim issues to the extent that they were relevant to the formulation of the plan of distribution.

(n)  <u>Michael Pantzer (Associate) (99.6 Hours to P04; 219.3 Hours to P05)</u> – Mr. Pantzer is a junior associate in the bankruptcy department.  Mr. Pantzer, at a lower billing rate, assisted with a variety of research issues related to the plan of distribution and the claims reconciliation process.  Mr. Pantzer was primarily responsible for the review of claims and is active in the claims reconciliation process.

(o)  <u>Jessica Hildebrandt (Paralegal) (7.7 Hours to P01; .6 Hours to P02; 25.7 Hours to P04; 30.3 Hours to P05; 5.6 Hours to P14)</u> – Ms. Hildebrandt is a paralegal and has assisted Otterbourg attorneys for various court filings and helped monitor proceedings outside of the Receivership, including the Nordlicht personal bankruptcy case and the criminal appeal.

## IV.   SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING FIFTEENTH APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Fifteenth Application Period into five (5) project categories.[9]  Narrative summaries of these activity categories follow:

---

[9]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges. The fees for each activity category are stated herein *without* showing the agreed upon reductions.

A.    **Asset Analysis and Recovery (P01) - Total Fees: $171,471.50**
      **Asset Disposition (P02)[10] - Total Fees: $9,952.00**

During the Fifteenth Application Period, Applicants continued to monitor the remaining assets in the portfolio, completed the remnant asset sales and filed a complaint to enforce Platinum's rights with respect to the Decision Diagnostics asset.  Included in the time billed during the Fifteenth Application Period, are regular conferences with working groups of Otterbourg attorneys, memoranda prepared for the Receiver to enable her to analyze the assets at issue and make a decision with respect to those assets.  Below is an overview of certain of the investments in which Applicants have dedicated time during the Fifteenth Application Period. Certain additional assets continue to be monitored for potential future value, including assets that are jointly held with PPVA or for which the Receivership has a potential residual interest, including litigation assets and the China Horizon/Yellow River asset. The below summaries include a brief description of the nature of the investment, work performed, and status.

1.    **Decision Diagnostics** – refers to Decision Diagnostics Corp. ("Decision Diagnostics"), a company that describes itself on its website as "a leading manufacturer of low cost home testing devices and test strips for use with legacy meters."  Despite that description, Decision Diagnostics announced in March 2020 that it had developed a COVID-19 test, causing its publicly-traded stock to jump in price and the SEC to institute a suspension in trading.  On December 17, 2020, the United States Government unsealed an indictment of Decision Diagnostic's CEO, Keith Berman, for securities and other fraud in connection with Decision Diagnostic's purported COVID-19 testing capabilities.  That same day, the SEC commenced a

---

[10]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

civil enforcement action against Decision Diagnostics and Berman related to the same conduct. Decision Diagnostic's stock price is now trading at or near its pre-COVID-19 level.

Alpha Credit Resources LLC ("Alpha Credit"), a wholly-owned subsidiary of PPCO, holds certain common and preferred shares, convertible into common shares, in Decision Diagnostics.   According to certain of Decision Diagnostics' financial statements, Decision Diagnostics purported to cancel certain of Alpha Credit's shares in Decision Diagnostics. Decision Diagnostics also took active steps to prevent the Receiver from liquidating Alpha Credit's shares, by, among other things, refusing to remove a restrictive legend from Alpha Credit's shares in Decision Diagnostics and to convert Alpha Credit's preferred shares in Decision Diagnostics into common shares.   The Receiver believes that Decision Diagnostics' actions in purporting to cancel, refusing to remove the restrictive legend from, and refusing to convert Alpha Credit's shares are unjustified, constitute a contempt of the Receiver Order and violate applicable law.

Consequently, after refusing the Receiver's repeated demands to restore, recognize and convert, as applicable, Alpha Credit's shares, on February 19, 2021, the Receiver initiated a proceeding in the United States District Court for the Eastern District of New York to enforce her rights with respect to the Receivership's holdings in Decision Diagnostics. *See Melanie L. Cyganowski, as Receiver and Agent v. Decision Diagnostics, Inc.,* 2:21-cv-00888-JMA-ST.   In connection with the commencement of the litigation, Applicants also prepared and filed a motion for summary judgment, which it requested permission from the court to file  The litigation is in its early stages and the outcome and the value that the Receiver may recover is still unknown. The Receiver continues to engage in discussions with Decision Diagnostics regarding a possible settlement.   Time during the Fifteenth Application Period was spent in connection with the

preparation of the complaint and the motion for summary judgment, as well as factual and legal research related thereto.  Otterbourg attorneys who have billed time to this matter primarily included attorneys with litigation experience.

2.   **Remnant Sale**.  Following a review of the remaining assets in the portfolio, the Receiver and the Receivership Team identified a limited number of assets that they believed may have value, albeit limited, and marketed the assets through a remnant sale process. Ultimately, eight (8) assets were identified and marketed:  (i) warrants in Bang Holdings Corporation; (ii) stock in Echo Therapeutics, Inc.; (iii) limited partner interests in Grey K Environmental Fund II LP; (iv) participation interest in a loan to Nico Steel Holdings Limited that is collateralized by stock in the company;[11] (v) stock in Nordaq Energy; (vi) an assignment of proceeds of a loan in the Pro Players loan portfolio; (vii) stock in Star Phoenix Group Ltd.; and (viii) rights to a litigation funding loan made to Total Asset Recovery Services, LLC any recovery from which is dependent upon the outcome of the litigation.  The majority of the sales closed during the fourth quarter of 2020.  During the Fifteenth Application Period, sale proceeds from the sale of the Pro Player asset were received and the sale of the Grey K asset closed and proceeds were received. Accordingly, in addition to the $37,000 previously received with respect to the remnant assets, an additional $17,500 was received during the Fifteenth Application Period with respect to the remnant sale assets.  Otterbourg attorneys who have billed time to this matter include attorneys with transactional experience.

B.   **Case Administration (P04) - Total Fees:  $418,707.00**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including

---

[11]   An offer was received and accepted for Nico Steel prior to the launch of the remnant sale "teaser," but for the purposes of this report is being considered as part of the remnant sale assets.

preparation of the plan of distribution, communications with investors, preparing status reports, negotiating with the joint liquidators of the PPVA a resolution of purported claims by and against each estate, and monitoring and filing appropriate papers in the Nordlicht personal bankruptcy case.  The tasks recorded under this category include the following:

3.      **PPVA**.   Since the Receiver's appointment, she and the Receivership Team have kept in frequent communication with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest.  PPVA and PPCO have each analyzed and discussed potential claims against the estate of the other stemming from pre-Receivership transactions.   Upon the Receiver's appointment, the Receiver and the Joint Liquidators agreed to hold the resolution of any such purported claims in abeyance during the cases.  The Receiver has been engaged in a series of discussions with the Joint Liquidators of PPVA regarding a resolution of such purported claims and any remaining mutual interests, including their joint interest in Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera").[12] A resolution between the two estates is understandably complex, and is still being finalized.  During the Fifteenth Application Period, the Receivership Team continued to review and analyze the proposed settlement agreement with PPVA.  Attorneys who billed time to this project include transactional and litigation attorneys.

4.      **Plan of Distribution**.   During the Fifteenth Application Period, Applicants continued to work on a proposed plan of distribution, the filing of which has been delayed as the Receiver and the Receivership Team continue to consider issues that are impacted by, among

---

[12]      Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain entities affiliated and/or associated with Beechwood Re Investments LLC. Pursuant to their respective interests in PGS, both PPVA and PPCO agreed that PGS would pursue certain claims and causes of action relating to its ownership of a certain promissory note convertible into 95% of the common equity of Agera's subsidiary, energy reseller Agera Energy.  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, SHIP and CNO.

other things, the claims reconciliation process and certain claims made by creditors seeking priority status, which outcome will greatly impact any distribution to creditors and investors. The Receiver and the Receivership Team have been working to resolve certain of these issues, some of which may require the intervention of the Court.

During the Fifteenth Application Period, Applicants billed time to the preparation of the draft plan of distribution, the corresponding memorandum of law, declaration in support and proposed order.  Applicants also reviewed and outlined for the Receiver certain plan provisions for her consideration.  Attorneys who spent time on this project primarily include attorneys with experience drafting plans of liquidation and distribution.

5.    **Nordlicht Bankruptcy Case**.  Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York. Case No. 20-22782-rdd (the "Nordlicht Bankruptcy Case").  The Receiver has been monitoring and exercising rights as a creditor in the Nordlicht Bankruptcy Case, including reviewing filings in the case, participating in court hearings, attending the continued Rule 341 meeting of creditors, communicating with one of the largest creditors in the Nordlicht case, Richard Stadtmauer, who also has filed significant claims against the Receivership Entities, and speaking with the Chapter 7 Trustee and his counsel regarding a possible resolution of claims against the respective estates.

The Receiver previously filed a proof of claim on behalf of PPCO in the Nordlicht Bankruptcy Case, asserting a claim in the amount of not less than $219 million.  The claim is subject to review and objection by the Chapter 7 Trustee.  It is uncertain, even if allowed in whole or in part, what recovery, if any, may be available from the Nordlicht Bankruptcy Case, which currently has extensive claims filed against it and has limited disclosed assets with which

to satisfy those claims.  The Receiver continues to periodically engage in discussions with the Chapter 7 Trustee regarding the case and claims held by each against the other's estate. Additionally, to protect and preserve estate assets, the Receiver filed a complaint objecting to the discharge of Nordlicht (the "<u>Discharge Complaint</u>").  If the Receiver is successful in the Discharge Complaint, the Receiver, and other creditors of Nordlicht, will be able to continue to assert claims against Nordlicht, and his assets, post-bankruptcy and will not be limited to a recovery from the assets of his bankruptcy estate.

During the Fifteenth Application Period, Nordlicht filed a Motion to Dismiss the Discharge Complaint.  The Receivership Team reviewed the Motion to Dismiss and prepared papers in opposition to the Motion to Dismiss, which were filed subsequent to the Fifteenth Application Period.  Also subsequent to the Fifteenth Application Period, a hearing was held regarding the Motion to Dismiss.  A decision was read into the record, subject to the entry of a formal order, which was entered on July 6, 2021.  The Bankruptcy Court granted in part and denied in part the Motion to Dismiss, finding the Receiver had general statutory standing to prosecute the Discharge Complaint, but staying the action until this Court permits or approves the prosecution of the Discharge Complaint, finds that no such permission or approval was necessary to commence the Discharge Complaint.  If this Court finds that the Receiver may prosecute the Discharge Complaint, the Receiver will have the opportunity to file a motion for leave to amend the Discharge Complaint.  Attorneys with litigation and bankruptcy experience primarily billed to this matter.

6. **<u>Website and Investor Communications.</u>**  The Receiver retained Epic to create and maintain the Receiver's website (www.PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to

court documents and answers to frequently asked questions.  The Receiver revises the website as necessary to update the "Frequently Asked Questions" section and to add "key documents."  The website allows interested parties to sign up to receive daily notices whenever there are new filings on the Receivership docket.  The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to inquiries and requests for information.

7.     **SEC Meetings**.  The Receiver has frequent communications with SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate, to alert them to certain filings by the Receiver and to keep the SEC apprised of the status of the claims process and wind down of the estate.  During the Fifteenth Application Period, the Receiver and the Receivership Team prepared for and met with SEC personnel via videoconference to review the status of certain matters in the case.  The Receiver and the Receivership Team also had periodic communications with SEC personnel about pending matters before the Court for which SEC input was appropriate.

8.     **Criminal Trial**.  Following the criminal trial of Nordlicht, Levy and SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht.  The Department of Justice has appealed those decisions, and in the interim, two additional criminal trials have been delayed.  The Receivership Team continues to monitor the appellate process.

9.     **Receivership Estate Oversight and General Case Administration**.  Professional time during the Fifteenth Application Period was also devoted to the general

oversight of the Platinum Entities and the estate. Conferences with the Receiver and members of the Receivership Team, via conference call or videoconference, occurred on a regular basis to facilitate the exchange of relevant information, including the status of certain assets being monitored, the claims process, the plan of distribution and other administrative matters. The Receivership Team also responded to subpoenas by third parties, periodically spoke with Cayman counsel and attended to document retention issues with an eye towards reducing expenses. The Receiver maintained direct oversight over all legal and financial-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from Platinum's CFO and Teneo, in analyzing budget, cash management and other administrative issues of the Receivership estate.

### C.     Claims Review (P05) – Total Fees:  <u>**$305,516.00**</u>

During the Fifteenth Application Period, in accordance with the Order approving the procedures to reconcile claims and verify interests, entered on December 1, 2020 (the "<u>Claims Procedures and Verification Order</u>") [Dkt. No. 554], Platinum's CFO and the Receivership Team engaged in an extensive review of each of the filed claims, analyzed the documents provided in support of each claim, compared the claims to Platinum's books and researched legal issues when necessary.

The Receiver completed her review during the Fifteenth Application Period and on March 9, 2021 filed a Notice of Receiver's Claims Analysis Report (the "<u>Claims Report</u>"), which sets forth her determinations with respect to each of the claims. [Dkt. No. 564]   Certain claims were allowed as filed or pursuant to previously reached settlements, others disallowed in total and others partially allowed.  The Claims Report provides the basis for the disallowance or partial disallowance for each of the claims, as applicable.  The reasons for disallowance vary,

including the filing of duplicate claims, claims against non-receivership entities, claims that are investor claims, claims that are not supported by adequate documentation, and claims in which the Receiver does not believe that the Receivership bears any liability (or at least not full liability). Claimants had until April 23, 2021 (unless an extension was mutually agreed upon in writing) to object to the Receiver's determinations in the Claims Report. During the Fifteenth Application Period, the Receivership Team had discussions with several claimants in the hopes of reaching a resolution regarding an allowed claim amount. Several of those discussions are ongoing. For those claims in which the Receiver and the objecting party cannot come to an agreement, including through a mediation process, the dispute will be brought to the Court for resolution through a summary proceeding.

The Claims Report solely relates to general unsecured claims and secured claims. In accordance with the Claims Procedures and Verification Order, investors in PPCO, including unpaid redeemers, received a letter that contains information regarding that investor's equity interest in one or more Receivership Entities (the "Investor Letter"). The letter set forth the amounts invested in one or more Receivership Entities and the amounts previously received as distributions on account of the investor's equity interest, all as reflected in the books and records of the Receivership Entities. Investors had an opportunity to review the information provided and refute the information provided, but solely on the basis that the books and records of the Receivership Entities are inaccurate, which must be supported by documentation from the investor. The Receivership Team is in the process of reviewing and reconciling the responses received from the PPCO investors. The Receiver and the Receivership Team are coordinating with Cayman counsel to facilitate the distribution of similar Investor Letters to investors in the PPLO funds.

Attorneys that billed time to the claims process are primarily attorneys with bankruptcy and litigation experience.

### D.   Beechwood Action (P14) – Total Fees: $43,273.00

As previously reported, on July 1, 2020, the Receiver entered into two settlement agreements in connection with the Beechwood Action, both of which were approved by the Court on July 20, 2020 [Dkt. No. 538].   The details of the settlements are set forth in the Receiver's prior status reports and in the motion seeking approval of the settlements.

Although the Receiver settled substantially all claims in the Beechwood Action, the Receiver's appeal of Judge Rakoff's pre-settlement decision granting summary judgment in favor of one of the defendants, defendant PBIHL, continued post-settlement.   At the end of 2020, the Receiver and PBIHL participated in mediation, which resulted in an agreement in principle. Shortly before year end, however, PBIHL commenced a liquidation proceeding in Bermuda and the settlement became subject to the review of the newly appointed liquidators.   During the Fifteenth Application Period, the Receivership Team continued discussions with the liquidators and their counsel in the United States.   The joint liquidators agreed to enter into a settlement on substantially similar terms as those negotiated with prior management and the settlement agreement was finalized during the Fifteenth Application Period, thus resolving the appeal and all claims between the Receiver and PBIHL.

Attorneys who billed time to this matter are primarily attorneys with litigation experience.

## V.   EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $10,390.34. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement.   Applicants will retain the documentation supporting these expenses for a period

of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Fifteenth Application Period:

(a)      In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 870 internal laser copies and photocopies during the Fifteenth Application Period at the rate of 0.15 cents per page, totaling $130.50 for all in-house copies.

(b)      In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Fifteenth Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)      With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did not incur any travel or transportation expenses during the Fifteenth Application Period.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq, which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel and "may consider all of the factors involved in a particular receivership in determining an appropriate fee."  *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  Many authorities

(even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm 'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005) (receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted.  Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities and is in the process of finalizing a claims analysis and plan of distribution so that the estate can be wound down and distributions made to investors and creditors.

## VII.   HOLDBACKS

Earlier in the Receivership, in an effort to preserve assets while the Receiver was actively litigating certain matters, including the removal of the purported blanket liens on the Receivership's assets, Applicants agreed to hold back twenty percent (20%) of the allowed fees requested in this Fifteenth Interim Application with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to the Beechwood Action, for which Applicants will hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those two project codes (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Fifteenth Interim Fee Application if the requested fees are approved is $160,317.91 ($9,790.80 for the Receiver and $150,527.11 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)     grant interim approval of the Receiver's compensation in the amount of $56,118.00 (the "Allowed Receiver Fees");

(b)     grant interim approval of Otterbourg's compensation in the amount of $762,738.45 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

30

(c)     grant interim approval of Receiver's request for reimbursement of her out-of-pocket expenses in the amount of $55.05;

(d)     grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $10,335.29;

(e)     authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)     grant such other relief as the Court deems appropriate.

Dated: July 13, 2021

Otterbourg P.C.

By: *Adam C. Silverstein*
        Adam C. Silverstein
        Jennifer S. Feeney
        Erik B. Weinick
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
asilverstein@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver