UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    -v-

PLATINUM MANAGEMENT (NY) LLC;
PLATINUM CREDIT MANAGEMENT, L.P.;
MARK NORDLICHT;
DAVID LEVY;
DANIEL SMALL;
URI LANDESMAN;
JOSEPH MANN;
JOSEPH SANFILIPPO; and
JEFFREY SHULSE,

                Defendants.

No. 16-CV-6848 (BMC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SEVENTEENTH JOINT INTERIM APPLICATION OF THE RECEIVER
AND OTTERBOURG P.C. FOR ALLOWANCE OF COMPENSATION
AND REIMBURSEMENT OF EXPENSES INCURRED DURING THE PERIOD
JULY 1, 2021 THROUGH AND INCLUDING SEPTEMBER 30, 2021**

Melanie L. Cyganowski, the receiver (the "Receiver") for Platinum Credit Management,

L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit

Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum

Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY)

LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid

Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd and

Platinum Partners Credit Opportunities Fund International (A) Ltd. (collectively, the

"Receivership Entities," the "Platinum Entities" or "Platinum"), and Otterbourg P.C., as counsel

to the Receiver ("Otterbourg" and, together with the Receiver, "Applicants"), hereby submit this

Seventeenth Joint Interim Application (the "Seventeenth Interim Application") for Allowance of

Compensation and Reimbursement of Expenses Incurred During the Period from July 1, 2021 through and including September 30, 2021 (the "Application Period").  There are two components to this Application: (i) the Receiver's services and (ii) the services of her counsel (Otterbourg). The Receiver requests interim approval of fees in the amount of $33,909.60 and reimbursement of expenses in the amount of $70.20 for the Application Period.  Otterbourg requests interim approval of fees in the amount of $421,891.20 and reimbursement of expenses in the amount of $5,994.21 for the Application Period, for a combined total of fees for Applicants in the amount of $455,800.80,[1] and expenses in the amount of $6,064.41 for the Application Period.

This Seventeenth Interim Application contains the following sections:

**Section I** provides a preliminary statement of the Receiver's activities during the Application Period.

**Section II** summarizes the background of the receivership and also contains case status information required by Section C.2 of the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Billing Guidelines"). Section II also describes the procedures used by Otterbourg in compiling its billing records and provides other information as requested by the SEC Billing Guidelines, including a description of each exhibit to this Seventeenth Interim Application and the reduction in fees agreed to in connection with the appointment of the Receiver.

---

[1]  As agreed to by the Receiver, this total amount reflects several accommodations voluntarily made by Applicants: (1) a public service accommodation of a twenty percent (20%) reduction in the Receiver's recorded time charges; (2) a ten percent (10%) reduction in Otterbourg's recorded time charges for all project code categories except for any related to certain litigation matters (the previously resolved Beechwood Action and a previously resolved arbitration proceeding), for which Applicants have agreed to a twenty-five percent (25%) reduction in Otterbourg's time charges (none were incurred during this Application Period), subject to Applicants requesting  partial repayment of such reduction later in the case; and (3) a reduction in the Receiver's aggregate fees (prior to application of the public service accommodation) to discount for the customary annual increases in her billable rate since her appointment. Therefore, during the Application Period, the Receiver's recorded time charges before application of these accommodations were $59,640.00 and Otterbourg's recorded time charges were $468,768.00, for a combined gross legal fees total (before the application of any accommodations) of $528,408.00.

**Section III** contains a narrative description of the work Otterbourg professionals performed on behalf of the Receiver during the Application Period, under each project category, in accordance with Section D of the SEC Billing Guidelines. All such categories correspond with the SEC's Billing Guidelines.

**Section IV** contains a summary of all expenses for which Applicants seek reimbursement and the procedures and policies adopted by Applicants to ensure compliance with Section E of the SEC Billing Guidelines.

**Section V** briefly summarizes the standards to be applied by the Court in determining fee awards in SEC receivership cases.

## I.    PRELIMINARY STATEMENT

During the Application Period, the Receiver and her team[2] (i) continued to address objections to the Receiver's determinations regarding claims filed in the receivership case (the "Receivership"); (ii) worked with investors to reconcile any differences regarding the Receivership's record of investors' holdings; (iii) monitored and exercised rights as a creditor in the personal bankruptcy case of Mark Nordlicht ("Nordlicht"), including the pursuit of the objection to discharge action filed by the Receiver against Nordlicht; (iv) continued to analyze inter-estate issues between the Receivership Entities and the joint liquidators for Platinum Partners Value Arbitrage Fund L.P. (together with its feeder funds, "PPVA" or "PPVA Funds") regarding common assets and the resolution of inter-estate claims; and (v) prepared for the conclusion of the Receivership by, among other things, preparing a motion, that was filed shortly after the conclusion

---

[2]    To assist her with her duties, the Receiver retained, with the approval of the Court (on July 21, 2017), Otterbourg as her legal counsel [Dkt. no. 231] and Goldin, a Teneo Company as her financial advisor [Dkt. no. 232] ("Teneo" (f/k/a Goldin) and, together with Otterbourg, the "Receivership Team").

of the Application Period, seeking the disposal of certain obsolete electronic and hardcopy documents.

As previously reported, certain of the settlements that the Receiver reached during the course of the Receivership are confidential.  To preserve the confidentiality of these settlements, the Receiver advised that she would not and will not be disclosing details of *any* settlements, including the identity of the settling parties, the amounts agreed to be paid by such parties, whether such amounts are to be paid in structured payouts and over what period of time, and/or the source of any litigation-related funds received in any quarter, unless such details are matters of public record by virtue of a motion for Court approval of such settlement or otherwise.

A.      **Analysis and Disposition of Receivership Assets**

During the Application Period, the Receivership received approximately $27,000.  This amount is in addition to the approximately $87 million received by the Receivership from the date of appointment of the Receiver.  Certain parties have asserted secured claims to all or part of the proceeds of such liquidated investments, most of which have been resolved pursuant to the settlement in the Beechwood Action and with Heartland Bank.

The review of the assets in the Receivership's asset portfolio is substantially complete.  In addition to the litigation seeking the turnover of the Receivership's equity interest in Decision Diagnostics, there are a few remaining assets that the Receiver continues to actively monitor, including shared assets with PPVA that may have potential value to the Receivership Estate.

A description of the investments in which Applicants dedicated significant time during the Application Period and the work done with respect to those investments is set forth in Section IV of this Seventeenth Interim Application.

### B.      Administrative Matters

During the Application Period, the Receiver and the Receivership Team continued to speak with various interested parties and groups, including the joint liquidators for PPVA,[3] the SEC and Platinum investors and creditors. The Receiver updates the Receiver's website with key documents, answers to frequently asked questions and status reports to investors.    The Receivership Team also filed and responded to other applications made before the Court and in other court proceedings involving Platinum.

## II.     CASE BACKGROUND AND STATUS

### A.      Case Background

*SEC Complaint*

On December 19, 2016, the United States Securities and Exchange Commission (the "SEC") filed its Complaint (the "SEC Complaint") against individual defendants Nordlicht, David Levy ("Levy"), Daniel Small, Uri Landesman,[4] Joseph Mann, Joseph SanFilippo ("SanFilippo"), Jeffrey Shulse, and both Platinum Management (NY) LLC and Platinum Credit Management, L.P. (collectively, the "Defendants").

The SEC Complaint alleged, *inter alia*, that the Defendants conducted a fraudulent scheme to inflate asset values and illicitly moved investor money to cover losses and liquidity problems. This was an allegedly multi-pronged fraud perpetrated by Platinum Management (NY) LLC and Platinum Credit Management, L.P., the managers of PPVA and Platinum Credit Opportunities Master Fund L.P. (together with its feeder funds, "PPCO"), respectively, involving multiple individuals led by Nordlicht, the founder of the Platinum Entities and the Co-Chief Investment

---

[3]        PPVA is the subject of insolvency proceedings pending in the Cayman Islands and a Chapter 15 bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of New York.

[4]        Uri Landesman passed away in September 2018.

Officer of PPVA and PPCO.  The SEC further alleged that Nordlicht and the managers of the Platinum Entities overstated the value of an oil company (Black Elk) that was among the funds' largest assets, and that they concealed a growing liquidity crisis by transferring money between the funds, making redemptions to favored investors and using misrepresentations to attract new investors to the struggling funds.

In a parallel action, the U.S. Attorney's Office for the Eastern District of New York brought criminal charges against Nordlicht and the individual Defendants.  Following the criminal trial of Nordlicht, Levy and SanFilippo, the jury returned a verdict convicting Nordlicht and Levy of defrauding bondholders in portfolio company Black Elk Offshore Operations LLC, but acquitting each of them on the remaining charges.  SanFilippo was acquitted on all counts with which he was charged.  The Court thereafter overturned the jury verdict with respect to Levy and ordered a new trial with respect to Nordlicht.  The Department of Justice appealed those decisions and on November 5, 2021, the Court of Appeals for the Second Circuit vacated the Court's order and remanded to the Court for further proceedings consistent with its decision.

## Appointment of Receiver and Receivership Order

To prevent further diversion of funds and dissipation of the assets of the Platinum Entities, the SEC sought, *inter alia,* the appointment of a receiver to take control of the Platinum Entities and their assets.

On December 19, 2016, the District Court entered an Order Appointing Receiver, [Dkt. Nos. 6 and 16], which appointed Bart Schwartz as receiver (the "Prior Receiver").  At the time of his appointment, the Prior Receiver was serving as a monitor for the Platinum Entities.

On June 23, 2017, after six months, the Prior Receiver resigned and, upon the recommendation of the SEC, by Order dated July 6, 2017, Melanie L. Cyganowski was appointed as Receiver, effective immediately (*i.e.*, July 6, 2017), and ordered to assume all authority

previously held by the Prior Receiver under the current Receivership Order.  [Dkt. No. 216].  On October 16, 2017, the Court entered the Second Amended Order Appointing Receiver (the "Receivership Order").  [Dkt. No. 276].  The Court amended the Receivership Order on December 29, 2017 to add the following Cayman Islands entities to the receivership: Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International, Ltd. and Platinum Partners Credit Opportunities Fund International (A), Ltd.  [Dkt. No. 297].

Under the terms of the Receivership Order, the Receiver is, among other things, required to preserve the *status quo*, ascertain the extent of commingling of funds, ascertain the true financial condition of the Platinum Entities, prevent further dissipation of property and assets of those entities, prevent the encumbrance or disposal of property or assets of the Platinum Entities, preserve the books, records, and documents of the Platinum Entities, be available to respond to investors' inquiries, protect investors' assets, conduct an orderly wind down, including a responsible disposition of assets and an orderly and fair distribution of those assets, and determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

**B.    Case Status[5]**

In accordance with Section C.2. of the SEC Billing Guidelines, Applicants state as follows:

(a)    As of September 30, 2021, the Receivership Entities had approximately $20.7 million in funds.  Certain parties have claimed an interest in certain sold assets and have asserted claims to a portion of the sale proceeds of such assets (as opposed to a general claim against the Receivership Entities).  Other parties have presented documentation which purportedly grant them

---

[5] The Receiver and Otterbourg base the information in this section primarily on the Receivership's Standardized Fund Accounting Reports covering the period July 1, 2021 through September 30, 2021.

security interests in all or certain of Platinum's assets.  These secured claims were challenged and have been substantially resolved pursuant to settlements in the Beechwood litigation.

It is estimated that, as of September 30, 2021, accrued and unpaid administrative expenses amount to approximately $5.7 million.  This amount includes the estimate of fees and expenses that have been incurred by the Receiver, Otterbourg and Teneo during the Application Period and that will be requested in future applications, holdbacks for prior applications of the Receiver, Otterbourg and Teneo and holdbacks to the Prior Receiver's counsel (Cooley) with respect to its interim fee application.  In addition to these unpaid administrative expenses, the Receiver paid remaining in-house Platinum staff and other operating expenses during the Application Period.

(b)     Cash disbursements during the Application Period totaled $943,385.  This amount consisted primarily of (i) $783,625 in professional expenses; and (ii) $153,825 in business asset expenses (payroll and related expenses paid to Platinum employees, as well as office rent, which was reduced starting on July 1, 2021).

Cash receipts during the Application Period totaled $27,093, consisting of interest and a return of a security deposit with respect to a prior office lease.

Pursuant to the previously-approved bar date procedures motion [Dkt. No. 453], the bar date to file a proof of claim asserting a claim arising before the Receivership was March 29, 2019 and the bar date for governmental units to file a proof of claim was April 12, 2019.  In excess of 300 claims were filed.  Parties holding investor claims, claims for unpaid redemptions and unpaid administrative claims were not required to file proofs of claim.  A fuller description of the claims reconciliation process is described in Section IV.C below.

The Receiver cannot at this time state what distributions will ultimately be to creditors and investors, as it will in large part be dependent upon the outcome of the claims resolution process.

As of September 30, 2021, the primary assets of the estate ("Receivership Property") consisted of the following:

       (i)      Cash and cash equivalents of approximately $20.7 million;

       (ii)     Remaining stock and royalty interests, litigation financing and other miscellaneous investments; and

       (iii)    Potential litigation claims.

      (c)     The Receiver and the Receivership Team have analyzed pre-Receivership activities, including transfers made by PPCO and PPLO to other entities and individuals, and the professional services provided by, among others, valuation agents, fund administrators, auditors and legal advisors, to determine if any additional causes of action exist that, on a cost-benefit basis, warrant the commencement of litigation.  Where mutual releases are warranted, the Receiver has sought and obtained such releases.  Additionally, during the Application Period, the Receiver continued to engage in conversations with certain of the insiders regarding the allowance or disallowance of their claims.  Whether and the extent to which the Receiver may commence additional affirmative actions will likely be addressed as part of the proposed plan of distribution.

## III.    FEES AND EXPENSES REQUESTED

In connection with the Application Period, the Receiver requests interim approval of her fees in the amount of $33,909.60 and reimbursement of expenses in the amount of $70.20. Otterbourg requests interim approval of fees in the amount of $421,891.20 and reimbursement of expenses in the amount of $5,994.21.  Thus, the combined total of fees for Applicants of $455,800.80, plus expenses of $6,064.41, is $467,929.62.

The Receiver has assembled a team of Otterbourg professionals to prosecute the litigations commenced by the Receiver and to address different investments and different issues that may arise within each investment.  The Otterbourg professionals communicate with each other and the

other retained professionals regularly, so as to keep others informed of each's activities and avoid duplication of efforts.

The fees requested are determined on the basis of the hours worked by Otterbourg attorneys and paraprofessionals, as well as the Receiver, and the hourly rates in effect at the time the services were rendered, as modified by a public service accommodation, described below. The fees requested also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, as applied to Otterbourg as attorneys, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by Applicants.

Pursuant to the public service accommodation applicable to this matter, a 20% accommodation has been applied across the board to the Receiver's recorded time. Furthermore, fees for legal services performed by Otterbourg professionals have been reduced by 10% from the aggregate recorded time charges for all project codes, except for those relating to the Beechwood Action, for which Applicants have applied a 25% discount to the aggregate recorded time charges, subject to the right of Applicants to request a partial repayment of the discount later in the case. In addition, the Receiver has agreed to provide a further discount in an amount that represents the increase in her fees since her appointment. (In accordance, with Otterbourg's regular practice, its hourly rates are reviewed and potentially increased on October 1st of each year.)

Pursuant to the public service and rate increase accommodations described above, the recorded time charges for the Receiver have been reduced from $59,640.00 to $33,909.60, a reduction in the amount of $25,730.40. Moreover, the recorded time charges for the Otterbourg

professionals have been reduced from $468,768.00 to $421,891.20, a reduction in the amount of $46,876.80.  Therefore, the total reduction for fees incurred during the Application Period by the Receiver and Otterbourg professionals is $72,607.20.  This does not include other voluntary reductions in the work recorded with respect to certain matters, which are taken in connection with Applicant's customary review of its recorded time detail.

All non-working travel time is billed at half of the amount of the actual non-working travel time of the professional.   There was no travel time during the Application Period.

In addition, as required by the SEC Billing Guidelines, the Receiver and Otterbourg submitted Applicants' time detail to the SEC for its review.

This Seventeenth Interim Application includes certain exhibits:

(a)     The SFAR for the period of July 1, 2021 through September 30, 2021 is attached as **Exhibit A** hereto.

(b)     A Fee Schedule showing the total fees billed and hours worked during the Application Period by the Receiver and each Otterbourg professional, along with the billing rates of each such professional, is attached as **Exhibit B** hereto.

(c)     In accordance with Section D.3.c of the SEC Billing Guidelines, a summary reflecting the total fees billed and the hours worked by the Receiver and each professional organized by project category, including a chart showing the amounts being requested after application of the accommodations discussed above, is attached as **Exhibit C** hereto.

(d)     In accordance with the Section D.5 of the SEC Billing Guidelines, the time records of the Receiver and the Otterbourg professionals for the Application Period, arranged in chronological order within each activity category, are attached as **Exhibits D** and **E**, respectively, hereto.

11

(e)      In accordance with Section E.1.a. of the SEC Billing Guidelines, a summary of all expenses for which Applicants seek reimbursement organized by expense category is attached as **Exhibit F** hereto.

(f)      In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of the Receiver for the Application Period, arranged in chronological order, is attached as **Exhibit G** hereto.

(g)      In accordance with Section E.1.a. of the SEC Billing Guidelines, the expense records of Otterbourg for the Application Period, arranged in chronological order, is attached as **Exhibit H** hereto.

(h)      Also submitted herewith as **Exhibit I** is the Certification required by Section A.1 of the SEC Billing Guidelines.

This is the Receiver and Otterbourg's Seventeenth request for fees and expenses in this case. Otterbourg received no retainer in this case and the Receivership Order limits the Receiver and Otterbourg to obtaining compensation solely from the Receivership Estate.

The Receivership Order permits the Receiver and her advisors to be paid on a quarterly basis.  In accordance with the SEC Billing Guidelines, and as noted above, the Receiver and Otterbourg submitted its time records for the Seventeenth Interim Application to SEC counsel prior to filing the Application with the Court, and SEC counsel has reviewed such time records and fee and expenses being requested pursuant to this Application.

The Receiver and Otterbourg professionals recorded all services performed in time increments of one tenth (0.1) of an hour.  All services by Otterbourg paralegals and other paraprofessionals were professional in nature and, if not performed by the indicated paraprofessionals, would have been performed by attorneys.

Five attorneys and one paraprofessional billed time during the Application Period (in addition to the Receiver).[6]  Because of the diversity of issues confronting the Receiver, this case necessitated the involvement of attorneys with background and experience in the multitude of litigation and transactional disciplines relevant to this receivership. In addition, while several senior attorneys were utilized, each brought different expertise to the engagement and was the primary responsible party on different tasks.

The particular Otterbourg professionals who billed time during the Application Period and their specific roles were as follows:

(a)     Erik B. Weinick (Partner) (1.2 Hours to P01; 4.7 Hours to P02; 136.3 Hours to P04; 90.4 Hours to P05) – Mr. Weinick is a senior litigator and is also a member of Otterbourg's bankruptcy department.  He has served as the Receiver's "hub and spoke," coordinating the work of the Receiver's professionals and Platinum's Chief Financial Officer on almost every matter confronting the Receivership from asset dispositions, to litigation matters, and administrative matters, including responding to investor inquiries, preparing or reviewing documents filed in this case, and communicating with counsel for the PPVA Joint Liquidators on matters of mutual interest, including the resolution of issues between the estates.  Mr. Weinick is also part of the team reviewing objections to claims and has been spearheading matters relating to the Nordlicht Bankruptcy Case.

(b)     Jennifer S. Feeney (Of Counsel) (1.2 Hours to P02;  33.6 Hours to P04; 57.9 Hours to P05) – Ms. Feeney is a senior member of Otterbourg's bankruptcy department.  During the Application Period, Ms. Feeney attended to case administration matters, including preparing the

---

[6]   The Receiver has requested that Otterbourg voluntarily not bill the time of any professional that billed less than fifteen (15) hours to the case during the Application Period.  Accordingly, other attorneys and paraprofessionals may have worked on the matter, but payment for their time is not being requested and is not reflected in the time detail.

Receiver's quarterly report and updating other reports regarding the status of asset dispositions. Ms. Feeney is also involved in the claims review, objection and settlement process. Additionally, Ms. Feeney, along with Erik B. Weinick, worked to keep the Receiver apprised of all activities being undertaken by the Receivership Team.

(c)     <u>Andrew S. Halpern (Associate) (5.7 Hours to P01; 86.7 Hours to P04)</u> – Mr. Halpern is an experienced litigator who has assisted the Receiver in almost all litigation matters during the course of the Receivership. During the Application Period, Mr. Halpern primarily worked on matters related to the objection to discharge complaint and the amendment to the complaint filed in the Nordlicht Bankruptcy Case. Mr. Halpern also is one of the leads with respect to the Decision Diagnostics matter, although much of that time has not been billed for in this Seventeenth Interim Application.

(d)     <u>Robert Yan (Associate) (20.9 Hours to P04)</u> – Mr. Yan is an associate in the bankruptcy department. Mr. Yan has significant experience with formulations of plans. In anticipation of filing a plan, the Receiver determined to set forth a process for the disposition of obsolete documents. Accordingly, during the Application Period, Mr. Yan was primarily responsible for the drafting of a motion for procedures for the disposition of obsolete documents.

(e)     <u>Michael Pantzer (Associate) (82.0 Hours to P04; 124.8 Hours to P05)</u> – Mr. Pantzer is a junior associate in the bankruptcy department. Mr. Pantzer, at a lower billing rate, was one of the primary team members to review claims, respond to objections to the Receiver's determinations regarding claims, negotiate with creditors, draft settlement agreements and communicate with investors regarding their holdings. Mr. Pantzer also assisted with the drafting of certain motion practice in the Nordlicht Bankruptcy Case regarding the objection to discharge and amendment of the complaint.

(f)     Jessica Hildebrandt (Paralegal) (.5 Hours to P01; 20.8 Hours to P04; 4.7 Hours to P05) – Ms. Hildebrandt is a paralegal and monitors proceedings outside of the Receivership, including the Nordlicht Bankruptcy Case, the criminal appeal and any matters for which the Receivership may have a residual interest.  Ms. Hildebrandt also assists with updates to the Receiver's website and other administrative matters of the Receivership.

## IV.     SERVICES RENDERED BY RECEIVER AND OTTERBOURG DURING APPLICATION PERIOD

In accordance with Section D.3 of the SEC Billing Guidelines, Applicants segregated their time during the Application Period into four (4) project categories.[7]  Narrative summaries of these activity categories follow:

### A.     Asset Analysis and Recovery (P01) - Total Fees: $8,088.00 Asset Disposition (P02)[8] - Total Fees: $5,224.50

Below is an overview of certain of non-litigation assets (although the assets may be subject to litigation) in which the Receiver and the Receivership Team have dedicated time during the Application Period.  Included in the time billed during the Application Period are regular conferences with working groups of Otterbourg attorneys and memoranda prepared for the Receiver to enable her to analyze the assets at issue and to make a decision with respect to those assets.  Certain additional assets continue to be monitored for potential future value, including assets that are jointly held with PPVA or for which the Receivership has a potential residual interest. Applicants also address post-closing issues that periodically arise in connection with prior

---

[7]  As noted above, **Exhibit C** hereto shows each professional working on a particular project category and the total hours he or she billed in that category prior to the agreed-upon reduction to the aggregate recorded time charges.  The fees for each activity category are stated herein *without* showing the agreed upon reductions.

[8]  Because of the symbiotic nature of these two project categories, Applicants are describing the work done with respect to each in a combined narrative to allow the reader to better understand the tasks performed.

sales of assets.  The below summaries include a brief description of the nature of the investment, work performed, and status.

      1.      **<u>Decision Diagnostics</u>** – refers to Decision Diagnostics Corp. ("<u>Decision Diagnostics</u>"), a company that describes itself on its website as "a leading manufacturer of low cost home testing devices and test strips for use with legacy meters."  Despite that description, Decision Diagnostics announced in March 2020 that it had developed a COVID-19 test, causing its publicly-traded stock to jump in price and the SEC to institute a suspension in trading.  On December 17, 2020, the United States Government unsealed an indictment of Decision Diagnostics' CEO, Keith Berman, for securities and other fraud in connection with Decision Diagnostics' purported COVID-19 testing capabilities.  That same day, the SEC commenced a civil enforcement action against Decision Diagnostics and Berman related to the same conduct. Decision Diagnostics' stock price is now trading at or near its pre-COVID-19 level.

      Alpha Credit Resources LLC ("<u>Alpha Credit</u>"), a wholly-owned subsidiary of PPCO, holds certain common and preferred shares, convertible into common shares, in Decision Diagnostics. According to certain of Decision Diagnostics' financial statements, Decision Diagnostics purported to cancel certain of Alpha Credit's shares in Decision Diagnostics.  Decision Diagnostics also took active steps to prevent the Receiver from liquidating Alpha Credit's shares, by, among other things, refusing to remove a restrictive legend from Alpha Credit's shares in Decision Diagnostics and to convert Alpha Credit's preferred shares in Decision Diagnostics into common shares.

      After refusing the Receiver's repeated demands to restore, recognize and convert, as applicable, Alpha Credit's shares, on February 19, 2021, the Receiver initiated a proceeding in the United States District Court for the Eastern District of New York to enforce her rights with respect

to the Receivership's holdings in Decision Diagnostics. *See Melanie L. Cyganowski, as Receiver and Agent v. Decision Diagnostics, Inc.*, 2:21-cv-00888-JMA-ST.   In connection with the commencement of the litigation, the Receiver also prepared a motion for summary judgment, which it requested permission from the court to file.  During the Application Period, the Receiver actively engaged in discussions with Decision Diagnostics regarding a possible settlement.  A settlement in principle was reached; however, the parties continue to dispute certain key provisions of the settlement.  If a resolution is not reached, the litigation will proceed.  Decision Diagnostics answered the Complaint on November 8, 2021.  The Receiver filed an Amended Complaint on November 29, 2021.

The actual time being requested in connection with the Decision Diagnostics matter during the Application Period is significantly less than what was actually recorded.  In addition to certain voluntary reductions for time spent with respect to this matter, Applicants do not bill for attorneys that bill less than 15 hours in any Application Period, which includes time spent by transactional attorneys on discrete issues related to the Decision Diagnostics mater.

2.   **China Horizon/Yellow River** refers to an asset that is jointly held with PPVA through a company called PGS.  PGS owns equity and debt interests in China Horizon and Yellow River—two companies created to build a chain of franchised convenience stores in rural China. The promissory note from China Horizon held by PGS has a face value of approximately $9.0 million and PGS also holds approximately 6.5 million shares of common stock in Yellow River. During the course of the Receivership, the Receiver and the Joint Liquidators of PPVA periodically received inquiries regarding the sale of PGS's and PPVA's collective interests in the China Horizon notes and the Yellow River equity position.  These inquiries never resulted in a firm offer. The Receiver, however, has continued to monitor the assets, particularly the equity interests in

17

Yellow River.  This asset may ultimately add value to the Receivership Estate, although it is still speculative and any amount that may be realized and the timing of such monetization is still in flux and indeterminate.  The Receiver continues to actively monitor and periodically engage in discussions with Yellow River and other parties.  Otterbourg attorneys who have billed time to this matter primarily include attorneys with transactional experience.

**B.**     **Case Administration (P04) - Total Fees:  $302,319.50**

This category includes tasks that may not be directly related to a specific investment or transaction, but impact the overall administration of the Receivership Estate, including preparation of the plan of distribution, communications with investors, preparing status reports, negotiating with the joint liquidators of PPVA a resolution of purported claims by and against each estate, and monitoring and filing appropriate papers in the Nordlicht Bankruptcy Case.  The tasks recorded under this category include the following:

1.     **PPVA**.     Since the Receiver's appointment, she and the Receivership Team have kept in frequent communication with the Joint Liquidators for the PPVA Master Fund and the PPVA Feeder Fund and/or their staff to discuss issues of mutual interest.  PPVA and PPCO have each analyzed and discussed potential claims against the estate of the other stemming from pre-Receivership transactions.   Upon the Receiver's appointment, the Receiver and the Joint Liquidators agreed to hold the resolution of any such purported claims in abeyance during the cases.  The Receiver has been engaged in a series of discussions with the Joint Liquidators of PPVA regarding a resolution of such purported claims and any remaining mutual interests, including their joint interest in Agera Energy LLC and Agera Holdings, LLC (collectively, "Agera").[9] A resolution between the two estates is understandably complex, and the parties are

---

[9]     Agera is a retail energy service company. In June 2016, prior to the receivership, Principal Growth Strategy, LLC ("PGS"), which is owned 55% by PPVA and 45% by PPCO, sold a portion of its interests in Agera to certain

continuing to discuss the details of the settlement.  In the interim, the Receiver is continuing to monitor the status and progress of the Agera Litigation and the China Horizon/Yellow River asset discussed above, both of which are held jointly with PPVA through PGS.

2.    **Plan of Distribution**.  As noted above, the Receiver determined that it was prudent to wait to file the plan until certain material matters, namely resolution of claims for priority distributions as well as potential monetization of an asset, were resolved.  Despite this, the Receiver and her team worked diligently on the plan during this Application Period so that once those matters are resolved, the plan being prepared by Applicants, can be promptly presented and filed. In connection therewith, Applicants also reviewed issues relevant to the plan of distribution, including an analysis of the potential distribution waterfall to creditors and investors of PPCO and PPLO.  Ultimately, through a motion seeking approval of a plan of distribution, the Receiver will seek the Court's approval of, among other things, (i) the distribution methodology to apply in calculating the distribution to be made on account of each claim and equity interest and (ii) the treatment of claims and equity interests under the plan of distribution.  Investors and creditors will have the opportunity to object to the plan of distribution and any of its provisions, including the distribution methodology and treatment of claims and equity interests.  The Receiver cannot at this time state what distributions will ultimately be to creditors and investors.  During the Application Period, while there was not a significant amount of time dedicated towards drafting plan documents, Applicants analyzed various distribution waterfalls and related issues.  Attorneys who

---

entities affiliated and/or associated with Beechwood Re Investments LLC. Pursuant to their respective interests in PGS, both PPVA and PPCO agreed that PGS would pursue certain claims and causes of action relating to its ownership of a certain promissory note convertible into 95% of the common equity of Agera's subsidiary, energy reseller Agera Energy.  In connection with such agreement, a complaint was filed in the Court of Chancery of the State of Delaware on June 7, 2019 against numerous defendants, including AGH Parent LLC, SHIP and CNO (the "Agera Litigation").

spent time on this project primarily include attorneys with experience drafting and reviewing plans of liquidation and distribution.

3.  **Nordlicht Bankruptcy Case**.  Nordlicht filed a Chapter 7 bankruptcy petition on June 29, 2020 in the United States Bankruptcy Court for the Southern District of New York.  Case No. 20-22782-rdd (the "Nordlicht Bankruptcy Case").  The Receiver has been monitoring and exercising rights as a creditor in the Nordlicht Bankruptcy Case.  The Receiver previously filed a proof of claim on behalf of PPCO in the Nordlicht Bankruptcy Case, asserting a claim in the amount of not less than $219 million.  The claim is subject to review and objection by the Chapter 7 Trustee.  It is uncertain, even if allowed in whole or in part, what recovery, if any, may be available from the Nordlicht Bankruptcy Case, which currently has extensive claims filed against it and has limited disclosed assets with which to satisfy those claims.  Nordlicht previously filed a proof of claim against the Receivership Estate. That claim is now the property of Nordlicht's bankruptcy estate and is under the control of the Chapter 7 Trustee to pursue.  The Receiver continues to periodically engage in discussions with the Chapter 7 Trustee with respect to, among other things, resolution of the claims held by each against the other's estate.

Additionally, following Nordlicht's refusal to continue to toll the Receiver's time to do so, to protect and preserve estate assets and causes of action that can be asserted by creditors against Nordlicht, the Receiver filed a complaint objecting to the discharge of Nordlicht (the "Discharge Complaint").  The Discharge Complaint, alleges, among other things, that Nordlicht knowingly and fraudulently made a false oath in the Nordlicht Bankruptcy Case by failing to list significant assets and financial transactions in his bankruptcy schedules, and concealed his property with the intent to hinder, delay, or defraud his creditors.

Prior to the Application Period, the Receiver filed papers in opposition to Nordlicht's Motion to Dismiss the Discharge Complaint and a hearing was held on June 14, 2021.  At the hearing, the Bankruptcy Court granted in part and denied in part the Motion to Dismiss, finding the Receiver had general statutory standing to prosecute the Discharge Complaint and had satisfactorily stated claims for which relief could be granted, but staying the action until the Court in the Receivership Case permitted or approved the prosecution of the Discharge Complaint or made a finding that no such permission or approval was necessary to prosecute the Discharge Complaint.  Following the Bankruptcy Court's oral ruling, the Receivership Team prepared a proposed formal order and exchanged drafts with Nordlicht's counsel, ultimately presenting competing proposed orders to the Bankruptcy Court.  The Bankruptcy Court entered a formal order on July 6, 2021, which was based on the proposed order submitted by the Receiver.

Pursuant to the Bankruptcy Court's oral ruling, the Receiver filed a motion with the Court on June 22, 2021 [Dkt. No. 569] seeking a determination regarding the Receiver's authority pursuant to the Receivership Order to file and prosecute the Discharge Complaint absent leave of the Court.   Subsequent motion practice ensued and in an Order dated July 24, 2021 [Dkt. No. 587], the Court concluded that the Receivership Order authorized the Receiver to file and pursue the Discharge Complaint without seeking leave of Court.  Following the Court's decision, and during the Application Period, the Receiver prepared and filed a Motion for Leave to Amend the Discharge Complaint (the "Motion to Amend") and drafted a proposed Amended Complaint (the "Amended Complaint"). The Motion to Amend was filed with the Bankruptcy Court on August 24, 2021 and Nordlicht filed his Objection to the Motion to Amend on September 30, 2021. The Motion to Amend was heard on October 27, 2021 and the Bankruptcy Court granted the Receiver leave to file her proposed Amended Complaint with a minor modification.

During the Application Period, Applicants spent time reviewing this Court's decision regarding standing and preparing the Receiver's Amended Complaint and Motion to Amend. Counsel also continued to monitor the Nordlicht Bankruptcy Case and engage in discussions with the respective attorneys for Nordlicht and the Chapter 7 Trustee. Attorneys with bankruptcy and litigation experience primarily worked on this matter.

   4. **<u>Obsolete Document Disposal</u>**. During the Application Period, to reduce overhead expenses, the Receivership Team examined its document retention platforms, for which it pays regular fees, to reduce the amount of estate expenses. Following such review, on October 6, 2021, the Receiver filed a Motion for Authority to Discontinue the Preservation of Certain Receivership Estate Electronic and Hardcopy Records [Dkt. No. 590] (the "<u>Obsolete Document Disposal Motion</u>"). As set forth in the Obsolete Document Disposal Motion, since her appointment, the Receiver has maintained the integrity of the Receivership Entities' books and records (in both hard copy and electronic form). At this point in the Receivership, however, the Receiver determined in her business judgment, and in consultation with the Receivership Team, that the cost and risk of maintaining all of these books and records exceeds the benefit.

   As a result, in the Obsolete Document Disposal Motion, the Receiver sought authority to dispose of certain obsolete and/or duplicative material. Specifically, the Receiver sought to destroy approximately 460 boxes of pre-Receivership hardcopy documents and permanently delete and/or destroy certain electronic data and related media (collectively, the "<u>Obsolete Materials</u>"). The Obsolete Material is either no longer necessary for the administration of the Receivership Estate and/or is duplicative of other information that will continue to be maintained on behalf of the Receivership Estate. All other documents, data and related media, including, but not limited

to, the post-Receivership materials, will continue to be maintained in accordance with the Receivership Order, unless otherwise ordered by the Court.

The Court entered an order approving the Obsolete Document Disposal Motion On October 22, 2021. [Dkt. No. 593] Disposal of the Obsolete Materials will reduce the administrative costs associated with the continued preservation and maintenance of the Obsolete Materials, which are presently in the estimated amounts of $32,000 per year and $160,000 over five years.  By comparison, the one-time cost to destroy the Obsolete Materials is about $9,400, which would translate into a potential savings of $22,600 per year and $150,600 over five years.  Prior to filing the Obsolete Document Disposal Motion, any parties with an interest were offered an opportunity to inspect the hardcopy materials, and only one accepted the Receiver's offer.  Otterbourg continues to engage with parties who would like access the hardcopy documents prior to their disposal.

5.     **Website and Investor Communications.**  The Receiver retained Epiq to create and maintain the Receiver's website (www.PlatinumReceivership.com).  This website provides investors and other interested parties with, among other things, periodic status reports, access to court documents and answers to frequently asked questions.  The Receiver revises the website as necessary to update the "Frequently Asked Questions" section and to add "key documents."  The website allows interested parties to sign up to receive daily notices whenever there are new filings on the Receivership docket.  The Receiver and the Receivership Team have attempted to respond to investor inquiries and continue to regularly respond and react to inquiries and requests for information.

6.     **SEC Meetings.**  The Receiver has frequent communications with SEC staff to keep them apprised of ongoing matters as to which SEC input is appropriate, to alert them to certain

filings by the Receiver and to keep the SEC apprised of the status of the claims process and wind down of the estate.  The Receiver and the Receivership Team also had periodic communications with SEC personnel about pending matters before the Court and in the Nordlicht Bankruptcy Case for which SEC input was appropriate.

7.  **Criminal Trial**.  Applicants continue to monitor the criminal trials of the Defendants and the status of the appeal of this Court's decision.  The description of the status of the criminal trials and the appeal is discussed in Section II.A above.

8.  **Receivership Estate Oversight and General Case Administration**.  Professional time during the Application Period was also devoted to the general oversight of the Platinum Entities and the estate.  Conferences with the Receiver and members of the Receivership Team, via conference call or videoconference, occurred on a regular basis to facilitate the exchange of relevant information, including the status of certain assets being monitored, the claims process, the plan of distribution and other administrative matters.  The Receivership Team also attended to document retention issues with an eye towards reducing expenses. The Receiver maintained direct oversight over all legal and financial-related work being done by her Receivership Team. Otterbourg attorneys assisted the Receiver, along with assistance from Platinum's CFO and Teneo, in analyzing budget, cash management and other administrative issues of the Receivership estate.

C.  **Claims Review (P05) – Total Fees:  $212,776.00**

During the Application Period, the Receivership Team's primary focus was on analyzing claims and related documents.  In accordance with the Order approving the procedures to reconcile claims and verify interests, entered on December 1, 2020 (the "Claims Procedures and Verification Order") [Dkt. No. 554], Platinum's CFO and the Receivership Team engaged in an extensive

review of each of the filed claims, analyzed the documents provided in support of each claim, compared the claims to Platinum's books and researched legal issues when necessary.

On March 9, 2021, the Receiver filed a Notice of Receiver's Claims Analysis Report (the "Claims Report"), which set forth her determinations with respect to each of the claims. [Dkt. No. 564].   Certain claims were allowed as filed or pursuant to previously reached settlements, others disallowed in total, and others partially allowed.   Claimants had until April 23, 2021 (unless an extension was mutually agreed upon in writing) to object to the Receiver's determinations in the Claims Report.    Thirteen claimants, asserting multiple claims, objected to the Receiver's determinations in the Claims Report.  The Receivership Team has been in contact with each of the claimants that objected to the claim determinations.    During the Application Period, the Receivership Team's primary focus was on reviewing the objections and seeking to reach resolutions, if possible, regarding the allowed claim amount.  Certain of these discussions resulted in consensual resolutions or possibly the withdrawal of claims.   Other discussions reached an impasse and, pursuant to the procedures set forth in the Claims Procedures and Verification Order, the parties agreed to mediate the issues.  Two such mediations occurred during the Application Period, one of which resulted in a resolution.  With respect to certain claim objections for which no resolution has been reached, in accordance with the procedures set forth in the Claims Procedures and Verification Order, the Receiver has commenced summary proceedings before the Court for adjudication of the disputed claims, which are scheduled to be fully briefed during the current calendar quarter.  There are certain claims issues, such as the assertion of priority, which could significantly impact the distribution, if any, to be made to creditors and investors. Accordingly, the Receiver has determined that it is important for certain claims issues to be resolved prior to presenting a plan of distribution to the court.  On November 12, 2021, Applicants

filed an Omnibus Motion to Confirm Receiver's Determinations with respect to certain claimants that objected to the Receiver's determinations, including parties claiming priority indemnification claims [Dkt. Nos.  597] (the "Claims Motion").   On November 13, 2021, Applicants filed declarations in support of the Claims Motion [Dkt. Nos. 598-599].  An amended memorandum of law in support of the Claims Motion was filed on November 23, 2021.  [Dkt. Nos. 602-603]. Opposition to the Claims Motion is due on December 13, 2021.  Replies in support of the Claims Motion are due December 28, 2021.

The Claims Report solely relates to general unsecured claims and secured claims. In accordance with the Claims Procedures and Verification Order, investors in PPCO, including unpaid redeemers, received a letter that contains information regarding that investor's equity interest in one or more Receivership Entities (the "PPCO Investor Statement").   The PPCO Investor Statement sets forth the amounts invested in one or more Receivership Entities and the amounts previously received as distributions on account of the investor's equity interest, all as reflected in the books and records of the Receivership Entities.  Investors had an opportunity to review the information provided and to refute the information provided, but solely on the basis that the books and records of the Receivership Entities are inaccurate, which must be supported by documentation from the investor.  The Receivership Team is continuing to reconcile the responses received from the PPCO investors.  The limited partners in Platinum Partners Liquid Opportunity Master Fund L.P., and its feeder funds, did not receive a PPCO Investor Statement, but will be sent a separate letter.  The Receivership Team has been coordinating with Cayman counsel regarding the reconciliation of the claims of any PPLO investors.  Attorneys that billed time to the claims process are primarily attorneys with bankruptcy and litigation experience.

## V.     EXPLANATION OF EXPENSES AND RELATED POLICIES

Applicants seek reimbursement of its out-of-pocket costs in the amount of $6,064.41. **Exhibit F** sets forth the various categories of expenses for which Otterbourg seeks reimbursement. Applicants will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Billing Guidelines and will provide the SEC with copies upon request.

Applicants observed the following policies in connection with its expenses during the Application Period:

(a)     In accordance with Section E.2.b. of the SEC Billing Guidelines, Applicants seek reimbursement for photocopying and laser printing expenses performed in-house (listed as Photocopies and Laser Copies in **Exhibit F**) at a rate of $.15 per page.  Otterbourg made 1,128 internal laser copies and photocopies during the Application Period at the rate of 0.15 cents per page, totaling $169.20 for all in-house copies.

(b)     In accordance with Section E.2.g., Applicant would normally seek reimbursement of outgoing facsimile charges at a rate of $1.00 per page for outgoing transmissions.  However, Otterbourg did not make any outgoing facsimile transmissions during the Application Period.  Similarly, Otterbourg has not received any incoming facsimile transmissions, nor would it seek to charge anything for them.

(c)     With respect to all expenses, Applicants seek reimbursement only for the actual cost of its filing and court reporting fees, postage and overnight delivery fees and long distance telephone charges. Applicants have not included in any request for expense reimbursement the amortization of the cost of any investment, equipment or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth in the SEC Billing Guidelines).  Whenever possible, Applicants have used email to transmit documents via

27

portable document format, thereby reducing facsimile, overnight courier and copying costs otherwise chargeable to the Receivership Estate.

(d)     In accordance with Section E.2.h of the SEC Billing Guidelines, Applicants have charged for computerized research only to the extent of the actual discounted invoiced cost of its vendor, Westlaw.

(e)     In accordance with Section E.2.j. of the SEC Billing Guidelines, Applicants have neither sought reimbursement for local travel expenses for late night travel home or travel to court (including mileage, taxis, etc.) nor for meals. Applicants did not incur any travel or transportation expenses during the Application Period.

(f)     In accordance with Section E.2.K of the SEC Applicants have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

(g)     The Receiver has created a website to provide updates to investors and other interested parties and to answer frequently asked questions.  This service is only charged to the extent of the invoiced cost from the vendor Epiq, which will be billed directly to the Receivership Estate.

(h)     In some instances, cost incurred during a particular application period will not be reflected in Applicants' records until a subsequent application period. Applicants will seek reimbursement for such "trailing" expenses in subsequent fee application periods.

## VI.     FACTORS TO BE CONSIDERED BY THE COURT IN AWARDING FEES

The case law on equity receiverships sets forth the standards for approving receiver compensation and the fees and expenses for the receiver's counsel.  This Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his or her counsel

and "may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994). Many authorities (even if dated) provide "convenient guidelines", but in the final analysis, "the unique fact situation of each case renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd sub nom*, 519 F.2d 1087 (5th Cir. 1975).

In allowing counsel fees in Securities Act receiverships, "[t]he court will consider . . . the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained). "[R]esults are always relevant." *Securities & Exchange Comm 'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (quoting *Moody*, 374 F Supp. at 480). However, a good result may take a form other than a bare increase in monetary value. *Id.* ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.").

Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483. Another "significant factor … is the amount of money involved." *Id.* at 486; *see also Gasser v. Infanti Int'l, Inc.*, 358 F. Supp. 2d 176, 182 (E.D.N.Y. 2005)

(receiver's legal fees "must be reasonable in light of the services rendered by counsel and the amount of property held in the receivership").

Under these standards, Applicants have adequately demonstrated that the amount of fees requested is appropriate and warranted.  Applicants have acted quickly to take control of and monetize the assets of the Platinum Entities and is in the process of resolving claims objections so that the Receiver can then file a plan of distribution.

## VII.   HOLDBACKS

Earlier in the Receivership, in an effort to preserve assets while the Receiver was actively litigating certain matters, including the removal of the purported blanket liens on the Receivership's assets, Applicants agreed to hold back twenty percent (20%) of the allowed fees requested with respect to all project codes other than with respect to the fees approved for Otterbourg with respect to certain litigation matters, for which Applicants agreed to hold back five percent (5%) in view of the additional fee accommodation being taken at this time with respect to those project codes[10] (collectively, the "Holdback Amount").  Accordingly, the total Holdback Amount for this Seventeenth Interim Fee Application if the requested fees are approved is $91,160.16 ($6,781.92 for the Receiver and $84,378.24 for Otterbourg).  All payments will be made from the Receivership assets.

WHEREFORE, PREMISES CONSIDERED, the Receiver and Otterbourg respectfully request that the Court:

(a)   grant interim approval of the Receiver's compensation in the amount of $33,909.60 (the "Allowed Receiver Fees");

---

[10]   No time was spent during this Application Period with respect to those project codes in which Applicants agreed to an additional accommodation.

(b)      grant interim approval of Otterbourg's compensation in the amount of $421,891.20 (the "Allowed Otterbourg Fees" and, together with the Allowed Receiver Fees, the "Allowed Fees");

(c)      grant interim approval of the Receiver's request for reimbursement of its out-of-pocket expenses in the amount of $70.20;

(d)      grant interim approval of Otterbourg's request for reimbursement of its out-of-pocket expenses in the amount of $5,994.21;

(e)      authorize the Receiver to immediately pay to Applicants from the Receivership assets (i) the Allowed Fees, less the Holdback Amount, plus (ii) 100% of the allowed out-of-pocket expenses of Applicants; and

(f)      grant such other relief as the Court deems appropriate.

Dated: December 6, 2021

Otterbourg P.C.

By: *Erik B. Weinick*
            Adam C. Silverstein
            Erik B. Weinick
            Jennifer S. Feeney

230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
eweinick@otterbourg.com

On Behalf of Melanie L. Cyganowski, as Receiver, and Otterbourg P.C., as Counsel to the Receiver